```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF GEORGIA
                    AIKEN DIVISION


United States of America,     )
                              )
          Plaintiff,          )
                              )
     vs.                      )    Case No. 1:20CR14
                              )
Michael Peyton Gunn,          )
                              )
          Defendant.          )
_____)



          TESTIMONY OF AMANDA G. GUNN IN JURY TRIAL
            BEFORE THE HONORABLE J. RANDAL HALL
          CHIEF UNITED STATES DISTRICT COURT JUDGE
            TUESDAY, NOVEMBER 16, 2021; 4:09 P.M.



FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Shawn M. Merzlak, Esquire
     Hawk Law Group
     338 Telfair Street
     Augusta, Georgia 30901
     (706)722-3500

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Amanda Gunn, | | | | |
| By Ms. Lyons | 3 | | 68 | |
| By Mr. Merzlak | | 53 | | |

GOVERNMENT'S EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|---|---|---|
| 22 | Photographs of tattoos | 24 |
| 23 | Amanda Lexi Haze VOID website | 30 |
| 24 | Amanda Lexi Haze Flickr website | 31 |
| 25 | Pinterest website screenshots | 53 |
| 60 | Birth Certificate | 4 |

(Amanda Grace Gunn-Direct by Ms. Lyons)                    3

1        (The following begins at 4:09 p.m.)

2            MS. LYONS:  Yes.  Your Honor, the government would

3   call Amanda Gunn.

4        (Amanda G. Gunn is duly sworn.)

5            THE CLERK:  Please state your name for the record.

6            THE WITNESS:  Amanda Grace Gunn.

7            THE CLERK:  Thank you.

8                       **DIRECT EXAMINATION**

9   BY MS. LYONS:

10  Q    Ms. Gunn ---

11           THE COURT:  If you'll sit forward as close as you can

12  so the mic can pick you up.

13  Q    Ms. Gunn, are you the mother of the young girl in this

14  case?

15  A    Yes.

16  Q    And have you pleaded guilty to participating in a

17  conspiracy to sex traffic your daughter?

18  A    Yes.

19  Q    And was your husband, Michael Peyton Gunn, your

20  co-conspirator in the conspiracy to sex traffic your daughter?

21  A    Yes.

22  Q    Do you mind if I call you Amanda?

23  A    That's fine.

24  Q    Amanda, can you tell us about a little bit about your

25  daughter?  First, start with her date of birth for us.

(Amanda Grace Gunn-Direct by Ms. Lyons)                4

1   A    She was born March 5, 2006.

2   Q    And is she the biological daughter of the defendant?

3   A    No.

4   Q    Who was her biological father?

5   A    Jacob Scott Mitchell.

6   Q    And where is he now?

7   A    He passed away a few years ago.

8   Q    I am going to show you what's been marked as Government's

9   Exhibit 60 and ask you if you recognize this document.  When it

10  comes up on the screen, will you let me know?

11  A    Okay.  Yes.

12  Q    What is that?

13  A    That is her birth certificate.

14  Q    Now has her name been removed from that document?

15  A    Yes.

16  Q    But other than that is it still in its accurate original

17  form?

18  A    Yes.

19       MS. LYONS:  Okay.  Your Honor, the government would

20  seek to admit Exhibit 60 at this time.

21       MR. MERZLAK:  No objection.

22       THE COURT:  Admitted.

23  (Government's Exhibit No. 60  is entered into evidence.)

24  Q    Now, Amanda, how did you meet the defendant?

25  A    We met in high school.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    5

1   Q   And did you date when you were in high school?

2   A   No.  We were friends in high school.  He dated a couple of

3   my other friends.

4   Q   Did there come a time later in your life when you circled

5   back around to each other?

6   A   Yes.

7   Q   When was that?

8   A   It was about a year after I divorced.

9   Q   And so you were married to your daughter's father?

10  A   Yes.

11  Q   And did you start dating the defendant?

12  A   Yes.  It was a long distance.

13  Q   When you say "long distance," tell us what that means.

14  A   I was in Georgia.  I had moved back from North Carolina and

15  he was stationed at Fort Drum, New York and then was deployed

16  to Afghanistan.

17  Q   So he was in the military?

18  A   Yes.

19  Q   And did eventually your dating lead to marriage?

20  A   Yes.

21  Q   When did you marry him?

22  A   December 29, 2009.

23  Q   In 2009.  And after you married him did he adopt your

24  daughter?

25  A   Yes, a couple of years after.

(Amanda Grace Gunn-Direct by Ms. Lyons)                6

1  Q   How old was your daughter when the defendant adopted her?

2  A   She was about five or six.

3  Q   Did you eventually move to New York with your daughter and

4  the defendant?

5  A   Yes.

6  Q   About how long did you stay in New York?

7  A   About two years.

8  Q   Now are you still married to the defendant?

9  A   No.

10  Q   When did you divorce?

11  A   February of 2021.

12  Q   Of what year?

13  A   Twenty-one.

14  Q   And so it was after his arrest on these charges?

15  A   Yes.

16  Q   Let's talk a little bit about employment before we go deep

17  into your marriage.  Okay?

18  A   Okay.

19  Q   What types of work have you done in your life?

20  A   I've been a bank teller at a couple of different banks.  I

21  have worked at a factory.  I was a human resources manager,

22  massage therapist, and chiropractic assistant.  I have worked

23  in sales and I also worked at a car dealership when I was in my

24  teens.

25  Q   When you left New York did you return to Georgia with the

(Amanda Grace Gunn-Direct by Ms. Lyons)                7

1  defendant and your children?

2  A    Yes.

3  Q    And by the time you moved back to Georgia did you have a

4  second child?

5  A    I did.

6  Q    Was that a boy?

7  A    Yes.

8  Q    And is that boy the biological child of the defendant?

9  A    Yes.

10 Q    Tell me a little bit about the jobs you've held since you

11 returned to Georgia with the defendant.

12 A    I wasn't really allowed to have a job a lot, but I was -- I

13 worked as the HR manager.  I worked at the factory and then I

14 did the massage therapy.

15 Q    Tell us what you mean when you say that you weren't allowed

16 to have a job.

17 A    He wanted me to stay home with my son.

18 Q    In February of 2020 when the FBI came did you have a job?

19 A    Yes, ma'am.

20 Q    Where were you working?

21 A    I was working as a massage therapist at my office in North

22 Augusta.  It is inside Aiken Augusta Holistic Health and I also

23 was working sales at a store called Peaceful Warrior

24 Apothecary.

25 Q    So you were working two jobs?

1    A    Yes, ma'am.

2    Q    Work backwards in time for me.  So if that was February of

3    2020, were you employed in 2019?

4    A    2019?  A portion of it from about August on.

5    Q    And where were you employed before you had gotten those two

6    jobs in sales and as a massage therapist?

7    A    I was a -- the HR manager for a couple of years.

8    Q    Where?

9    A    At Still Waters Professional Counseling.

10   Q    Was that a counseling services business?

11   A    Yes, ma'am.

12   Q    Now during those last two years that you just covered --

13   2020, 2019, and the period of time you were with the HR

14   company -- where was the defendant employed?

15   A    He was self-employed.  So he worked from home.

16   Q    When you say "self-employed," self-employed in what arena

17   or area?

18   A    He did something with computers -- software design and

19   stuff like that.

20   Q    In 2019 what were your hours of employment?

21   A    2019 -- the first half I was in school for massage therapy.

22   So I would go to school from early in the morning until about

23   3 o'clock.  Sometimes I would have clinicals until 6 and then,

24   occasionally, I would have night classes where I would go from

25   6 to about 11 o'clock.

(Amanda Grace Gunn-Direct by Ms. Lyons)                          9

1   Q   Were you home from 11 p.m. until 6 a.m.?

2   A   Yes.

3   Q   Were you home on weekends?

4   A   Yes.

5   Q   Moving towards the second half of 2019 when you're working

6   as a massage therapist and you have a part time job in sales,

7   what were your hours of employment?

8   A   I was usually -- it was usually between like 9 and 6 for

9   both of them.

10  Q   And were you home between 11 p.m. and 6 a.m.?

11  A   Yes, ma'am.

12  Q   And were you home on weekends?

13  A   Some Saturdays I worked.

14  Q   And when you say "Saturday," what time would that be?

15  A   I would either work until about 3 o'clock in the afternoon

16  or sometimes I would work all day and it would be 'til 6.

17  Q   Now when the defendant was self-employed in 2020 and 2019

18  you said he was working from home?

19  A   Yes, ma'am.

20  Q   Was he at home during the day?

21  A   Yes.

22  Q   Was he at home during the night?

23  A   Yes.

24  Q   Was he home between 11 p.m. and 6 a.m.?

25  A   Yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                10

1   Q   Was he home on the weekends?

2   A   Yes.

3   Q   Who was supporting the household financially?

4   A   I was, but then he also contributed.  I didn't have access

5   to his finances; so I don't know how much he was bringing in or

6   anything.

7   Q   Okay.  So let's separate that.  You said he was also

8   supporting the household.  How?

9   A   I guess through his work that he did, the freelance stuff.

10  Q   Did you ever see a paycheck?

11  A   No, ma'am.

12  Q   Did he have cash on him?

13  A   No, ma'am.

14  Q   Did he pay bills?

15  A   I assumed he was.  There was times where our power would be

16  turned off or the water or like cable and internet would be cut

17  off.

18  Q   I think you said he was in some sort of web design?

19  A   Uh-huh.

20  Q   Did you ever see a client come to the house?

21  A   No, ma'am.

22  Q   Did you ever see him leave to meet a client?

23  A   Occasionally, he would, but it wasn't very often.

24  Q   Tell me about that.

25  A   He would have his briefcase and kind of be dressed nice and

(Amanda Grace Gunn-Direct by Ms. Lyons)                    11

1   say that he was going to a meeting.

2   Q    What time of day?

3   A    It would be like in the middle of the day.

4   Q    Did he have a car?

5   A    We shared a car.

6   Q    Okay.  So you would have to be home in order for him to get

7   in the car to leave?

8   A    Yes, ma'am.

9   Q    Now I want to come back to your marriage and I want to talk

10  a little bit about the places where you've lived during the

11  course of your marriage here in Georgia.  Okay?

12  A    Okay.

13  Q    About how old was your daughter when you moved back to

14  Georgia with the defendant and your son?

15  A    She was about 7.

16  Q    And where did you first move to when the family returned to

17  Georgia?

18  A    Wells Drive in Evans.

19  Q    Was that a house --

20  A    It was a house.

21  Q    -- an apartment?

22  A    A house.

23  Q    A rental or an own?

24  A    A rental.

25  Q    And who paid the rent?

1  A   He did for a little while and then it was my understanding

2  that his dad helped us quite a bit with the rent.

3  Q   How long did you stay on Wells Drive?

4  A   I believe it was right at a year.

5  Q   Did you then move?

6  A   Yes.

7  Q   Where did you move to?

8  A   We moved in with my parents at that time, I believe.

9  Q   What is your parents' last name?

10  A   Howard.

11  Q   And did all four of you -- the two children, the defendant

12  and yourself -- move in with the Howards?

13  A   Yes, ma'am.

14  Q   What was the sleeping arrangement at the Howards?

15  A   My daughter had a room of her own and then they had a back

16  room -- back living room -- that we made like into a bedroom

17  and my son would either sleep in there with him and I or he

18  would sleep with his sister.

19  Q   Did the children ever sleep on pallets on the floor with

20  you and your husband?

21  A   Yes.

22  Q   How long did you stay with your parents, the Howards?

23  A   I don't remember.  It was a little while, I believe.

24  Q   Do you remember where you moved to after the Howards?

25  A   I believe we moved in with his parents for a little bit.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    13

1    Q    That would be the Gunns?

2    A    Yes, the Gunns.

3    Q    And after you stayed with the Gunns where did you move?

4    A    We moved -- we stayed at a hotel for a couple of months.

5    Q    And then where did you go?

6    A    Then we went to Asheville and stayed for a little while.

7    That was kind of within that couple-of-month time period.

8    Q    Did you say you were in Asheville for a couple of months?

9    A    Well, it was in that hotel timeframe, that couple of

10   months.  It was like during the summer.

11   Q    Why did you move to Asheville?

12   A    He said for work.  We were planning on moving there.

13   Q    Okay.  Was it for your work?

14   A    No, ma'am.

15   Q    It was for his work?

16   A    Yes.

17   Q    And about how long did you stay in Asheville?

18   A    A few weeks, maybe a month max, I would think.

19   Q    And then what happened?

20   A    Then we had to move back home.  We moved in with his

21   parents.

22   Q    Okay.  And who moved in with his parents?

23   A    The four of us.

24   Q    Okay.  And the four of you would be the two children --

25   A    Yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    14

1   Q    -- and the defendant?

2   A    Yes.

3   Q    What was the sleeping arrangement when you moved back in

4   with the Gunns the second time?

5   A    We had the two bedrooms upstairs.  My daughter and I would

6   share one room and then he and my son would share a room or the

7   kids would sleep together and he would stay in the room with

8   me.  It would kind of just go back and forth.

9   Q    Where did you move once you left the Gunns' house the

10  second time?

11  A    I believe that's when we moved to Stillwater Drive in

12  Martinez.

13  Q    Did you live anywhere between Stillwater and 220 Nicklaus

14  Court or did you go from Stillwater to 220 Nicklaus Court?

15  A    We stayed with his parents for -- his parents or my parents

16  for a couple of weeks, I believe.

17  Q    And then from 220 Nicklaus Court do you move to 209?

18  A    Yes, ma'am.

19  Q    And I am not trying to trick you or bind you into any of

20  these.  I am just trying to get a general idea of the different

21  places you've lived in Georgia.  Amanda, what is the Order?

22  A    It was an organization that I was made to believe saved me

23  from prostitution, but they were a satanic -- a satanic group

24  that we were supposed to worship and be thankful that they

25  rescued me from that.

1  Q   Who told you about the Order?

2  A   Michael.

3  Q   When did the Order come into play in your household?

4  A   When we lived at Stillwater Drive.

5  Q   Can you tell us a little bit about how you began to be

6  introduced to this?

7  A   I was having to prostitute for a little while and they were

8  -- and I was being made to believe that the MS-13 was after us

9  and going to kill my family and my children and that they were

10 the only ones that would help us and rescue us from them and

11 keep them from hurting us and keep me from prostituting.

12 Q   How did MS-13 first come about?  Where did you hear that

13 from?

14 A   I received an email about 2013 saying that I would -- was

15 going to be a whore and it was signed MSXIII and I didn't know

16 what that was.  At the bottom it said, "Ask your husband.

17 He'll know what this means."  I asked him.  He said that it

18 stood for MS-13.

19 Q   So at that point did you call the police?

20 A   No, ma'am.

21 Q   Why not?

22 A   He said that we shouldn't because they were a very big

23 group and to take them very seriously because they were very

24 dangerous.

25 Q   Did you show him the text message or -- did you say a text

1  message or ---

2  A    Email.

3  Q    Did you show him the email?

4  A    Yes, ma'am.

5  Q    And what did he say?

6  A    He said to do what they asked.

7  Q    And what were they asking you to do?

8  A    Be a whore.

9  Q    Did you ever discuss this issue with the defendant's

10 parents?

11 A    At some point he -- Michael told me that we were supposed

12 to tell my parents and his parents that I was -- had cheated on

13 him and someone was threatening us and that I was being forced

14 into sex trafficking.

15 Q    And so did you do that?

16 A    Yes, ma'am.

17 Q    Did you tell his parents?

18 A    Yes, ma'am.

19 Q    And did you tell your parents?

20 A    Yes, ma'am.

21 Q    What was his parents' response?

22 A    They were kind of shocked but we had made them -- we had

23 made them believe that it had stopped so they wouldn't worry.

24 Q    And did you tell your parents?

25 A    Yes, ma'am.

(Amanda Grace Gunn-Direct by Ms. Lyons)                17

1    Q    And what was their response?

2    A    The same.

3    Q    Do you have any siblings?

4    A    I do.

5    Q    Tell us about your siblings.  How many?

6    A    I have one brother and one sister.

7    Q    What are their names?

8    A    Jason Howard and Ashley Coxwell.

9    Q    Who is your eldest daughter living with right now?

10   A    My sister.

11   Q    And who is your son living with right now?

12   A    His grandparents, my ex-in-laws.

13   Q    When you told your parents this story did you tell your

14   siblings?

15   A    I don't believe I told my brother, but I believe my sister

16   was there or I think she lived in the house at the time; so she

17   knew.

18   Q    What did she think?

19   A    I don't really know.

20   Q    You didn't discuss it with her?

21   A    I don't remember.

22   Q    So you don't go to the police because the defendant tells

23   you not to?

24   A    Yes, ma'am.

25   Q    So what happens next?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    18

1   A    At that point I'm being told that I have to flirt with guys

2   online, learn to dress sexy.  He starts at that point taking

3   pictures of me to post online and to share with people that I

4   meet online.

5   Q    So he starts by flirting with people online?

6   A    Yes, ma'am.

7   Q    What does that mean?

8   A    Like just trying to get their attention, I guess, telling

9   them that I wanted to do things to them, making them think that

10  they wanted to do things to me, and some of it was just like

11  casual conversation just to get used to talking to people.

12  Q    And what did you mean when you said he started to take

13  pictures of you to put online?

14  A    He would make me pose in certain positions, hold up signs

15  with a name that he made up for me to use.  He would make me

16  wear certain clothes or be naked and he would spend hours

17  taking pictures.

18  Q    And you mentioned a name on a sign.  Tell us about that.

19  A    He came up with a name for me to use as like an alias

20  online.  It was Lexi Haze.

21  Q    How are you spelling that?

22  A    L-E-X-I for Lexi and Haze was H-A-Z-E.

23  Q    Where did the defendant get that name?

24  A    It was after his favorite porn star.

25  Q    What was her name?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    19

1   A    Jenna Haze.

2   Q    Did there come a time where that name -- that name changed

3   from Lexi Haze to something different?

4   A    Yes, ma'am.

5   Q    What did it change to?

6   A    It changed to Amanda Lexi Haze.

7   Q    Why did it change?

8   A    As a punishment for not doing what I was supposed to, not

9   being a good enough whore.

10  Q    Not being a what?

11  A    A good enough whore.

12  Q    You used the word "make."  He would "make" you.

13  A    Yes, ma'am.

14  Q    How would he make you do any of these things?

15  A    He would tell me that this is what the MS-13 was wanting me

16  to do so that I would need to follow their directions and he

17  said that they would -- you know, they would hurt the kids.

18  Some occasions he said that they were at the house, that they

19  were outside or they were at my parents' house or my sister's

20  work.

21  Q    Outside the house or your sister's work.  Can you give me

22  an example of a time when he mentioned outside the house?

23  A    There was a point where there were -- he said people were

24  outside the house and I needed to make a decision about whether

25  or not I was going to be part of the Order and there was

1  flashlights shining in my bedroom window and he came in -- he

2  came into my bedroom a little after that and asked me if I saw

3  them and said that people were outside and I needed to make a

4  decision.

5  Q    Where did your sister work?

6  A    She works at Peak Employment.

7  Q    Did he ever say anything to you about any information or

8  having a file related to your sister?

9  A    He did mention that he had a file on her and a lot of other

10  people.

11  Q    Did you say in your testimony a moment ago that you lived

12  with your sister for a period of time?

13  A    She lived at my parents' while we lived there.

14  Q    So while you and the defendant lived at your parents' house

15  Ashley Coxwell also lived there?

16  A    Yes, ma'am.

17  Q    Would there have been any reason for any of your sister's

18  business emails to be on any of your computers?

19  A    No, ma'am.

20  Q    So does the flirting online and pictures being taken and

21  the name -- does that escalate?

22  A    Yes, ma'am.

23  Q    What does it escalate to?

24  A    He -- as a punishment for not flirting like I was supposed

25  to online I was gang raped.

(Amanda Grace Gunn-Direct by Ms. Lyons)                21

1   Q   Tell us what happened.

2   A   He came to me and told me that the MS-13 wasn't happy with

3   my progress and that as a punishment that I was going to have

4   to be raped by several men at the house and he had arranged for

5   my daughter to go to my parents and my son to go to his parents

6   for sleepovers.

7   Q   And what happened?

8   A   He made me go into the guest room and made me start

9   drinking and taking some of his pills and then he blindfolded

10  me and men started showing up.

11  Q   And whose house did this happen inside of?

12  A   This was the Wells Drive house.

13  Q   Was this documented in any way?

14  A   Yes, ma'am.  He took pictures and video of it.

15  Q   Did he post them anywhere?

16  A   He showed me the video where it was posted.  I don't know

17  if any pictures were.

18  Q   Where did he post it?

19  A   He posted it on a PornHub website and then there were some

20  other small websites that I hadn't heard of that he -- kind of

21  like different forums and stuff like that.

22  Q   Did you tell anyone?

23  A   No, ma'am.

24  Q   Why didn't you tell anyone?

25  A   Because I was scared.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    22

1   Q   What were you scared of?

2   A   The MS-13 and my kids being hurt.

3   Q   Amanda, did there come a time where the defendant tattooed

4   you?

5   A   Yes, ma'am.

6   Q   When did that happen?

7   A   It was while we lived at 220 Nicklaus Court.  So sometime

8   between 2017, 2018.

9   Q   Where -- how many tattoos are there?

10  A   Five.

11  Q   Ma'am?

12  A   Five.

13  Q   Can you tell us where on your body the tattoos are located?

14  A   Yes, ma'am.  I have one on my right buttocks, one in the

15  middle of my back, one on each side of my breasts and then one

16  on my left hip groin area.

17  Q   Can you tell us about how that happened?

18  A   Yes, ma'am.  He said that -- this is when the Order was

19  involved and the Order wasn't happy with me.  So as a

20  punishment and a reminder of what I was that I would have to

21  get these put on and if I didn't that they were going to come

22  into the house because there was a car outside with people in

23  it.

24  Q   A reminder of what you were?

25  A   Yes, ma'am.

(Amanda Grace Gunn-Direct by Ms. Lyons)                23

1    Q    What were you?

2    A    A whore.

3    Q    Did he have a tattoo gun?

4    A    Yes, ma'am.

5    Q    Where did he get that from?

6    A    He ordered it off Amazon, I believe.

7    Q    Did you know that he was going to put five tattoos on you?

8    A    No, ma'am.

9    Q    Did you tell him it was okay to put those tattoos there?

10   A    Yes, ma'am.

11   Q    Why?

12   A    Because I didn't want my kids to get hurt.

13   Q    At one point did he consider putting a tattoo anywhere

14   else?

15   A    Yes, ma'am.

16   Q    Where?

17   A    On my face.

18   Q    Was there a difference, Amanda, in the discussions that

19   occurred with the defendant about MS-13 and your

20   responsibilities before you moved to 220 Nicklaus Court and

21   then the Order after you moved to 220 Nicklaus Court?

22   A    When the Order became involved it was -- I was going to

23   stop the prostituting and with the Order involved it was just

24   -- I was just going to have to have sex with him.

25   Q    And did the defendant explain why that was happening -- why

(Amanda Grace Gunn-Direct by Ms. Lyons)                    24

1  the change?

2  A   I don't remember if he did.

3  Q   I'd like to show you on the monitor Government Exhibit 22.

4  Let me know when it comes up in front of you, please.

5  A   It's there.

6  Q   Do you see the beginning of Exhibit 22?

7  A   Yes, ma'am.

8  Q   Is that one of several photos that were taken of your body?

9  A   Yes, ma'am.

10 Q   And were those photos taken with your permission?

11 A   Yes, ma'am.

12 Q   And do they reflect the tattoos that are on your body?

13 A   Yes, ma'am.

14        MS. LYONS:  Your Honor, we would seek to admit

15 Government's Exhibit 22 at this time and publish.

16        MR. MERZLAK:  No objection.

17        THE COURT:  Admitted and you may publish.

18     (Government's Exhibit No. 22  is entered into evidence.)

19 Q   Amanda, let's start with 22-002, and if we can zoom in just

20 a little bit, Ms. Long.

21     Amanda, I want you to tell me what part of your body we are

22 starting with.

23 A   That's my right breast.

24 Q   What was the tattoo that was on this part of your body?

25 A   It said "rape bait."

(Amanda Grace Gunn-Direct by Ms. Lyons)                25

1  Q    So starting from left, the left side of this photo, what

2  letter is that that we can see?

3  A    An "R".

4  Q    And how do you spell rape bait?

5  A    R-A-P-E B-A-I-T.

6  Q    So is that an "E" that we're seeing in the middle of the

7  screen?

8  A    Yes, ma'am.

9  Q    Does the rest of the word go around and end at your nipple?

10 A    Yes, ma'am.

11 Q    Thank you.

12       Ms. Long, 22-05, please.

13       What part of your body is this?

14 A    My left breast.

15 Q    And what word did the defendant tattoo on your left breast?

16 A    Cum slut.

17 Q    What was that?

18 A    Cum slut.

19 Q    Can you spell it, please?

20 A    C-U-M S-L-U-T.

21 Q    Where your fingers are on the left side of the screen,

22 what's that letter?

23 A    "C".

24 Q    The next letter?

25 A    "U".

(Amanda Grace Gunn-Direct by Ms. Lyons)                26

1   Q   And the remnants of a ---

2   A   "M".

3   Q   And so the rest of the word is kind of faded out.  Is that

4   correct?

5   A   Yes, ma'am.

6   Q   Thank you.  22-06, 22-07.  Is that another shot of the same

7   side?

8   A   Yes, ma'am.

9   Q   Okay.  22-008, please. 22-009.  What are we looking at

10  here, Amanda?

11  A   That is a cover-up tattoo that I had done.

12  Q   It's a cover-up tattoo?

13  A   Yes, ma'am.

14  Q   Does that mean there is something underneath there?

15  A   Yes, ma'am.

16  Q   What part of your body, for the record, are we looking at?

17  A   My mid back.

18  Q   And what does that flowered tattoo cover up?

19  A   It says "cum dumpster."

20  Q   Please spell it.

21  A   C-U-M D-U-M-P-S-T-E-R.

22  Q   Now it is hard for us to see the word "cum dumpster," but I

23  am going to ask Ms. Long to focus on the left side of that

24  flower tattoo.  What letter do you see starting out sticking

25  out from that flower?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    27

1   A   That is the "C".

2   Q   That's the "C" of the "cum dumpster"?

3   A   Yes, ma'am.

4   Q   Thank you.

5       Thank you, Ms. Long. 010, 0111, 0112.  Thank you.

6       Where are we now, Amanda, on your body?

7   A   That's my right buttocks.

8   Q   And what word was tattooed here?

9   A   Slut.

10  Q   What word?

11  A   Slut.

12  Q   And how do you spell it?

13  A   S-L-U-T.

14  Q   And this one has also faded?

15  A   Yes, ma'am.

16  Q   Any letters that you can make out here?

17  A   The last letter is the "T" and then it looks like the "L"

18  is the darker lines that you can see.

19  Q   013, Ms. Long, and 14, and 15.

20      Amanda, what are we looking at here?

21  A   That is my left hip groin area.

22  Q   And is this another covered tattoo or cover-up tattoo?

23  A   Yes, ma'am.

24  Q   And what is this tattoo covering up?

25  A   No means yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                28

1   Q   No means yes?

2   A   Yes, ma'am.

3   Q   Ms. Long, can we zoom in?

4       Can you see the letters underneath this tattoo?

5   A   Yes, ma'am.

6   Q   Tell me where you see the "N" of "No" beginning.  I think

7   these screens are touch screen.  They are?  Amanda, try and

8   touch or trace where you see the "N".

9   A   Here is the "O."  The tip of the feather is the "O".  A

10  little in from that you can see the beginning of the "M".

11  Q   From the tip of the feather on the left-hand side of the

12  screen --

13  A   Yes, ma'am.

14  Q   -- a little bit in you can see the "N".

15  A   And then where there is less shading on the feather you can

16  see the "Y" and "E."

17  Q   So almost directly in the middle a little bit to the right

18  you can see the "Y."

19  A   Yes, ma'am.

20  Q   And then an "E."

21  A   Yes.

22          MS. LYONS:  And can you zoom back out, Ms. Long?

23          You can almost see the "Y" and the "E" better from

24  further away?

25          THE WITNESS:  Yes, ma'am.

(Amanda Grace Gunn-Direct by Ms. Lyons)                29

1  Q   Thank you.

2      Ms. Long, you can take that down.

3      When were you able to get those tattoos covered up?

4  A   I got the one on my back covered up in January of 2019 and

5  then I got the one on my hip covered up in May of last year.

6  Q   Did anyone help you do that?

7  A   My sister helped pay for the one on my back.

8  Q   I want to talk a little bit more about the pictures that

9  were posted online.  Okay?

10     I am going to start with Government Exhibit 23 just for the

11 witness.

12     And let me know when you can see it.

13 A   I can see it.

14 Q   Do you recognize that photo?

15 A   Yes, ma'am.

16 Q   Is that you?

17 A   Yes.

18 Q   Have you seen it before?

19 A   Yes.

20 Q   Has it been altered in any way?

21 A   No.

22         MS. LYONS:  Your Honor, we would seek to admit

23 Government Exhibit 23.

24         MR. MERZLAK:  No objection.

25         THE COURT:  Admitted and you may publish.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    30

1        (Government's Exhibit No. 23  is entered into evidence.)

2             MS. LYONS:  Thank you, Your Honor.

3             Amanda, what are we looking at here?

4             THE WITNESS:  That's a picture that was taken of me to

5    use for like profile pictures and stuff like that.

6             MS. LYONS:  Can we zoom in in the middle, Ms. Long?

7             What does the card in the middle say?

8             THE WITNESS:  Amanda Lexi Haze.

9    Q    And, again, where did you get that name?

10   A    That was given to me.

11   Q    Now, Amanda, I apologize for having to ask this question,

12   but I am going to ask it.  Okay?  You don't look very unhappy

13   in that photo, do you?

14   A    No.

15   Q    Did you want to pose for those pictures?

16   A    No.

17   Q    Did you want those pictures put online?

18   A    No.

19   Q    Did you post them online?

20   A    No.

21   Q    Who did?

22   A    Michael.

23            MS. LYONS:  Government Exhibit 24 for the witness,

24   please.

25            Let me know if you see something.

(Amanda Grace Gunn-Direct by Ms. Lyons)                31

1       THE WITNESS:  I see them.

2    Q   Do you recognize Exhibit 24?

3    A   Yes, ma'am.

4    Q   Does that exhibit contain photos of you?

5    A   Yes.

6    Q   Do you recognize it?

7    A   Yes.

8    Q   Has it been altered in any way?

9    A   No.

10       MS. LYONS:  The government would seek to admit and

11   publish Government Exhibit 24 at this time.

12       MR. MERZLAK:  No objection.

13       THE COURT:  Admitted and you may publish.

14   (Government's Exhibit No. 24  is entered into evidence.)

15       MS. LYONS:  Ms. Long, if it's possible, can we go to

16   the top and zoom in?  Thank you.

17       Starting on the left-hand corner, Amanda, can you read

18   the profile name?

19       THE WITNESS:  Amanda Lexi Haze.

20   Q   And was this posted on a website called "Flickr"?  Do you

21   even know?

22   A   I don't -- I don't see the name of the site anywhere.

23   Q   Do you recognize the photographs?

24   A   Yes, ma'am.

25   Q   Do you recall where they were taken?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    32

1   A    Yes.

2   Q    Where were they taken?

3   A    At the lake in Augusta.

4   Q    And who took them?

5   A    Michael.

6   Q    Did you post them online?

7   A    No, ma'am.

8         MS. LYONS:  Ms. Long, can you take that down, please?

9         Amanda, I apologize.  I know it's embarrassing and

10  that's not what I am trying to do.

11        Government Exhibit 25 for the witness as well, please.

12        Do you recognize the exhibit on the screen in front of

13  you?

14        THE WITNESS:  It went away, but I did recognize it.

15  Q    Tell me when you can see it.

16  A    I can see it now.

17  Q    What do you recognize in that exhibit?

18  A    It was a profile on Pinterest that was made.

19  Q    And can you tell me who made that profile?

20  A    Michael.

21  Q    And what name is that profile under?

22  A    Lexi likes it hot.

23  Q    Lexi likes it hot?

24  A    Yes, ma'am.

25  Q    And are you familiar with Pinterest, Amanda?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    33

1   A    Yes, ma'am.

2   Q    What do you do on Pinterest?

3   A    You make different boards of ideas and stuff like that or

4   stuff you want to share.

5   Q    And so did you have to do anything on Pinterest in

6   connection with this profile?

7   A    Yes, ma'am.

8   Q    What did you have to do?

9   A    I had to make boards and add stuff that people would

10  like -- some of it being a video game, some of it being stuff

11  that he thought would be interested -- people would be

12  interested in.

13  Q    And who told you to do that?

14  A    Michael.

15          MS. LYONS:  Thank you, Ms. Long.

16          Now I think you started to talk about a little while

17  ago that there was a change by the time you moved to 220

18  Nicklaus Court and the Order and you may not have to prostitute

19  anymore?

20          THE WITNESS:  Yes, ma'am.

21  Q    Did there come a time where you started having sex with men

22  for money?

23  A    Yes.

24  Q    Okay.  And was that before 220 Nicklaus Court?

25  A    Yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    34

1   Q    And who was making you have sex for money?

2   A    Michael.

3   Q    And what did you do with the money?

4   A    I either gave it to him or I put it into like my bank

5   account.

6   Q    And once you moved to Nicklaus Court did you continue to

7   prostitute?

8   A    No, ma'am.

9   Q    And was the Order talked about when you moved to Nicklaus

10  Court?

11  A    Yes, ma'am.

12  Q    At this time that you're moving to Nicklaus Court about

13  what grade is your daughter in?

14  A    She's in middle school probably like sixth grade, I

15  believe.  She may have been fifth grade at the beginning when

16  we moved there.

17  Q    When you're living in the 220 Nicklaus court house are

18  discussions about the Order happening in front of your

19  daughter?

20  A    Yes, ma'am.

21  Q    What types of discussions?

22  A    There was a lot of talk about the religion aspect of it and

23  then there was also at one point a conversation about how the

24  family needed to make money, how I was being like the sole

25  supporter which I thought was kind of strange because he never

(Amanda Grace Gunn-Direct by Ms. Lyons)                35

1    recognized me for anything.

2    Q    Was there a discussion about roles and responsibilities?

3    A    I don't remember.

4    Q    Was there a discussion about the family needing to

5    contribute and people in the family needing to contribute?

6    A    Yes.  Yes, ma'am.

7    Q    While you're living from home to home to home to home in

8    the state of Georgia was the defendant sleeping on a mattress

9    in the living room most of the time?

10   A    Yes, ma'am.

11   Q    I want to move you to December of 2019.  Which house are

12   you living in?

13   A    209 Nicklaus Court.

14   Q    And why are you in 209 Nicklaus Court?

15   A    Because we had a house fire in October of 2019.

16   Q    Did your daughter receive an iPhone as a holiday gift?

17   A    Yes, ma'am.

18   Q    Did she receive it exactly on Christmas or before

19   Christmas?

20   A    No, ma'am.  I believe it was sometime in November when she

21   received it.

22   Q    And who gave her that iPhone?

23   A    Michael.

24   Q    Do you remember how much that iPhone cost?

25   A    I don't because I didn't purchase it, but I knew that they

(Amanda Grace Gunn-Direct by Ms. Lyons)                    36

1   were very expensive phones.

2   Q    Does it stick out in your mind as something that you were

3   concerned about?

4   A    Yes.

5   Q    Why?

6   A    Because of the price of it.

7   Q    At that time in your financial life could you afford an

8   expensive iPhone?

9   A    No, ma'am.

10  Q    Now prior to the iPhone what kind of phone did your

11  daughter have?

12  A    I believe she may have had like a Motorola or some cheap

13  phone.  It wasn't a very nice one.

14  Q    And do you recall her ever having any other types of phones

15  other than the iPhone that was a holiday gift and a Motorola?

16  A    I believe maybe she had one for a few months at one time.

17  It would have been like a Motorola or a Samsung as well, but I

18  don't think she had it very long.

19  Q    Before I forget, Amanda, did you ever have a reptile tank

20  in your house?

21  A    Yes, ma'am.

22  Q    Why did you have a reptile tank in your house?

23  A    It was one that Michael had had before we got married and

24  at different times the kids caught like a lizard and would put

25  it in the cage.

(Amanda Grace Gunn-Direct by Ms. Lyons)                37

1  Q   In the 220 Nicklaus Court house where was that reptile tank

2  kept?

3  A   It was kept in the storage closet that Michael had access

4  to, but I believe at some point it was also in Grace's room.

5  Q   It was in Grace's room.  Excuse me.  It was in your

6  daughter's room?

7  A   Yes.

8  Q   I apologize.  Did your daughter ever have or did anybody in

9  the family ever have an Xbox?

10 A   Yes, ma'am.

11 Q   How many?

12 A   My sister had bought one for my son for Christmas and then

13 there was another one that Michael brought home.

14 Q   So when you say Christmas, which Christmas are you talking

15 about?  Do you remember?

16 A   I believe it was 2018.

17 Q   Which year?

18 A   2018.

19 Q   2018.

20 A   I believe so.

21 Q   And the second Xbox that shows up, does that show up before

22 or after Christmas 2018?

23 A   After.

24 Q   Remember what color it was?

25 A   It was white.  They were identical.

(Amanda Grace Gunn-Direct by Ms. Lyons)                38

1  Q   And you said the defendant got it?

2  A   Yes.  I don't know.

3  Q   How did you know he got it?

4  A   He's the one that said -- that was there with the Xbox.  I

5  don't know how else it would have got there.

6  Q   Okay.  So now let's move to February 5th of 2020.  Okay?

7  Do you remember being contacted by the FBI?

8  A   Yes, ma'am.

9  Q   Tell us what you remember.

10  A   I was at work and I got a phonecall from the investigator

11  and he said that -- he left a voice mail saying for us to call

12  him.  I was at work by myself.  So I called Michael and gave

13  him the phone number and told him, you know, the FBI guy wanted

14  someone to call him; can you please call and figure out what

15  they want or what they need?  And then he called me back and

16  said that I would need to be home by like 4 o'clock, I believe

17  it was, to meet the investigator.

18  Q   Okay.  So before the FBI ever showed up at your door at 209

19  Nicklaus Court you were already aware that the FBI was at least

20  making a phonecall to contact you?

21  A   Yes.

22  Q   Okay.  And you relayed that to the defendant?

23  A   Yes.

24  Q   The defendant tells you that you need to be home at

25  4 o'clock?

(Amanda Grace Gunn-Direct by Ms. Lyons)                39

1    A    I believe so.

2    Q    Okay.  And so do you go home?

3    A    Yes, ma'am.

4    Q    When you get home who is there?

5    A    Michael and my daughter.

6    Q    Do you remember where the defendant was?

7    A    He was in the living room, I believe.

8    Q    And where was your daughter?

9    A    She was in my bedroom.

10   Q    Okay.  And when you say your bedroom, which room in the

11   house was your bedroom?

12   A    That was the downstairs bedroom.

13   Q    Okay.  And where was she in your bedroom?

14   A    She was laying down on the mattress.  We had blow-up

15   mattresses because the mattresses got damaged in the house

16   fire.

17   Q    Okay.  So she was laying down on the blow-up mattress in

18   your bedroom?

19   A    Yes, ma'am.

20   Q    Is that the master bedroom of that home?

21   A    Yes.

22   Q    So she was laying down in the master bedroom when you got

23   home from work?

24   A    Yes, ma'am.

25   Q    Had the FBI arrived yet?

(Amanda Grace Gunn-Direct by Ms. Lyons)                    40

1  A    No, ma'am.

2  Q    Was it unusual for your daughter to be sleeping in your bed

3  or laying in your bed?

4  A    Yes.

5  Q    Had you told your daughter to get into your bed?

6  A    No.

7  Q    Eventually did the agents arrive?

8  A    Yes.

9  Q    And how many do you recall being there?

10 A    I believe it was just two at that time.

11 Q    And where did you speak with those agents?

12 A    We were like in the door threshold.  They were on the

13 porch.

14 Q    Do you remember who answered the door when the agents

15 knocked?

16 A    I don't.

17 Q    And do you remember one of those agents being Tripp Godbee?

18 A    Yes.

19 Q    Okay.  What do you remember talking to Tripp and the other

20 agent about?

21 A    I remember they showed us some pictures.  They looked like

22 kind of selfies and asked if they were, you know, our daughter.

23 We said yes and they went on to describe how they had found

24 pictures, I guess, in Texas and located her through school and

25 stuff like that.

(Amanda Grace Gunn-Direct by Ms. Lyons)                41

1   Q   And did they talk to you at all about cellular devices?

2   A   He asked if she had a cellphone and I can't remember if I

3   said, yes, she had an iPhone or if Michael did and he asked if

4   he could see the cellphone.

5   Q   And what happened next when the agent asked to see the

6   cellphone?

7   A   Michael said that it was lost.

8   Q   Was that a surprise to you?

9   A   Yes, ma'am.

10  Q   Why?

11  A   Because that morning I had received a text message from her

12  saying that she had missed the bus from school or for school

13  and I told her just to relax and it would be fine.  She can

14  miss the day because she had just had ear surgery as well and I

15  knew the noise and stuff with school was getting to her and --

16  yeah, I think that's it.

17  Q   So you had received a text from your daughter --

18  A   Yes, ma'am.

19  Q   -- from her phone to your phone?

20  A   Yes.

21  Q   So it was a surprise it was gone?

22  A   Yes.

23  Q   Especially because that's kind of an expensive phone?

24  A   Right.

25  Q   Anything else happen on the porch that you recall?

(Amanda Grace Gunn-Direct by Ms. Lyons)                42

1  A    I don't think so.

2  Q    At any point do you remember being alone with Special Agent

3  Godbee?

4  A    Yes.

5  Q    And did Special Agent Godbee ask you if you needed help?

6  A    I believe he may have.

7  Q    Did you tell him that you needed help?

8  A    No, ma'am.

9  Q    Why not?

10 A    I was scared.

11 Q    Eventually did the agents go inside to check on your

12 daughter?

13 A    Yes, ma'am.

14 Q    And where were you when that happened?

15 A    I believe I stayed near the door in the living room.

16 Q    Did you go with the agents upstairs while they took a look

17 in your daughter's room?

18 A    No, ma'am.  I don't believe so.

19 Q    And did you eventually find out that vodka had been found

20 in your daughter's room?

21 A    Yes, ma'am.

22 Q    Now we're still on February 5th and this was the first time

23 you've met any of the agents; is that correct?

24 A    Yes, ma'am.

25 Q    Now eventually Special Agent Escobar and Special Agent

(Amanda Grace Gunn-Direct by Ms. Lyons)                    43

1    Godbee leave?

2    A    Uh-huh.

3    Q    Is that right?

4    A    Yes, ma'am.

5    Q    Now who is left in the house when the two agents leave on

6    February 5th?

7    A    Myself, Michael, and our children.

8    Q    And your children?

9    A    Uh-huh.

10   Q    Was there a discussion about the vodka being found?

11   A    I believe there was.  I don't know exactly what was said.

12   Q    Okay.  Were you upset?

13   A    Yes.

14   Q    Did the defendant start to search for the iPhone?

15   A    No.

16   Q    What was the discussion after the FBI left?

17   A    It was kind of chaotic and he and Grace -- I'm sorry.

18   Q    It's okay.

19   A    They went into the bedroom and were going through some

20   stuff.  He had me clean out some jars that I believe were in

21   the garage at some point.  At one point she came and got me and

22   said that he needed help in the closet with something that she

23   couldn't help him with and I went into the closet and he had

24   what I believe it was like a flash drive that had been broken

25   and he asked me to hold it for him because her fingers were too

(Amanda Grace Gunn-Direct by Ms. Lyons)                    44

1   small to hold it and he drilled a hole into it.

2   Q    At that point did you begin to see him collect anything

3   else in the house?

4   A    He had a bag of -- two trash bags.  I don't know exactly

5   what was in them.  One looked like it had like a laptop in

6   it -- like maybe it had been wrapped around the laptop.  It was

7   like a rectangle -- flat rectangle.

8   Q    Amanda, did you stop at any point and ask him what he was

9   doing?

10  A    No.

11  Q    Why not?

12  A    Because I just didn't ask questions.

13  Q    What, if anything, happens with these trash bags and items?

14  A    He left with them.

15  Q    And how does he leave with them?

16  A    He took the car that we had.  We had one car.  He took

17  that.

18  Q    And does he go alone?

19  A    Yes.

20  Q    Between -- after he leaves in the car does he eventually

21  come back?

22  A    Yes.

23  Q    That night where did you sleep?

24  A    I slept on -- in the living room with my son.

25  Q    And where did your daughter sleep?

1   A    I believe she slept in the master bedroom again.

2   Q    With whom?

3   A    I assume it was by herself.

4   Q    Where was the defendant?

5   A    I thought he was in the living room.

6   Q    The next morning -- the next morning are you making

7   arrangements at some point to have your daughter scheduled for

8   an interview?

9   A    I believe I was -- I went to work and I was -- Peyton

10  called me and told me that she was needed to be at the FBI

11  office at a certain time and I asked him if he could take her

12  since I was at work and had already missed so many hours from

13  the day before and he said, no, that it had to be me to take

14  her.

15  Q    So I want to focus on the time between bedtime and when you

16  leave for work the next morning.  Do you recall the defendant

17  saying anything to you about your daughter's cellphone?

18  A    Yes, ma'am.

19  Q    What did he say?

20  A    He said that he was going to get it from the gazebo and

21  that he was walking to the gas station and going to put it near

22  the railroad tracks or break it and put it -- a piece near the

23  railroad tracks near our house that were -- it was on the way

24  to the gas station.

25  Q    On February 6th did you take your daughter for that

1    interview at the FBI?

2    A    Yes, ma'am.

3    Q    And when you returned back to 209 Nicklaus Court were the

4    agents searching?

5    A    Yes, ma'am.

6    Q    And what were -- did you know what they were searching for,

7    Amanda?

8    A    I didn't know what in particular they were searching for.

9    I just knew they were searching the house at that point.

10   Q    I am showing you Government's Exhibit 13 which has already

11   been admitted and published.  Amanda, do you recognize these

12   shoes?

13   A    Yes, ma'am.

14   Q    Whose shoes are these?

15   A    They're Michael's.

16   Q    What type of shoes are these?

17   A    Pumas.

18   Q    Is this a shoe that he had worn regularly?

19   A    Yes.  He bought the same type of shoes for several years.

20   Q    Is there a point or reference in time as to when he started

21   wearing Pumas?

22   A    It was I believe when we were in New York.

23   Q    Amanda, do you wear your husband's sneakers?

24   A    No, ma'am.

25   Q    And do you see a smudge or a wear mark on these sneakers?

(Amanda Grace Gunn-Direct by Ms. Lyons)          47

1   A   Yes, ma'am.

2   Q   Where on the sneaker is that smudge or worn place located?

3   A   On the inside of the shoe where his bunion is.

4   Q   Where his what is?

5   A   Bunion.

6   Q   The defendant has bunions?

7   A   Yes, ma'am.

8   Q   I am showing you Government's Exhibit 11.  Amanda, have you

9   seen this photograph before?

10  A   Yes, ma'am.

11  Q   Do you see the white sneaker?

12  A   Yes, ma'am.

13  Q   Do you see the smudge?

14  A   Yes.

15  Q   Amanda, did you wear your husband's shoe and take pictures

16  of child pornography of your daughter wearing the shoe?

17  A   No, ma'am.

18          MS. LYONS:  Thank you, Ms. Long.

19          Now, Amanda, you've been interviewed several times

20  during this investigation; is that right?

21          THE WITNESS:  Yes, ma'am.

22  Q   Have you been interviewed more than once?

23  A   Yes.

24  Q   Have you been interviewed more than twice?

25  A   Yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                48

1   Q   Have you been interviewed more than three times?

2   A   Yes.

3   Q   Have you been interviewed more than four times?

4   A   I believe so, yes.

5   Q   Did you tell the truth when you were interviewed?

6   A   No, ma'am.

7   Q   Why didn't you tell the truth when you were interviewed?

8   A   Because I was scared.

9   Q   Was there a point when you finally decided to tell the

10  truth?

11  A   Yes, ma'am.

12  Q   What changed?

13  A   Well, I was -- after I was arrested just memories started

14  coming back of certain things.

15  Q   Did you make a decision to plead guilty?

16  A   Yes, ma'am.

17  Q   And why did you decide to plead guilty?

18  A   Because I knew I had failed to protect my daughter.

19  Q   I'm showing you only what's been -- actually, I think it's

20  already been admitted, Your Honor -- Government Exhibit 21.

21          THE COURT:  No.

22          MS. LYONS:  No?  It has not been admitted?

23          THE COURT:  I don't have it.

24          THE CLERK:  I have it.

25          MS. LYONS:  I think it did.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    49

1          THE COURT:  Oh, I didn't write it down.

2          MS. LYONS:  Thank you.

3          Government's Exhibit 21.  Amanda, what is this?

4          THE WITNESS:  That is my plea agreement.

5    Q   And what did you -- Amanda, what did you plead guilty to?

6    A   Conspiracy for sex trafficking.

7    Q   And who did you conspire with to sex traffic your daughter?

8    A   Michael.

9    Q   What have you promised to do as part of this plea

10   agreement?

11   A   Be truthful.

12   Q   And if you're truthful has the government made you any

13   guarantees?

14   A   No, ma'am.

15   Q   What are you hopeful might happen?

16   A   That I could have a reduced sentence.

17   Q   Who decides if you get a reduction in your sentence?

18   A   The judge.

19   Q   And if you're not truthful, what happens?

20   A   I get in more trouble.

21   Q   We could nullify your plea agreement; is that correct?

22   A   Yes, ma'am.

23   Q   Could you be charged with perjury?

24   A   Yes, ma'am.

25          MS. LYONS:  Thank you, Ms. Long.

(Amanda Grace Gunn-Direct by Ms. Lyons)                    50

1          Now when the FBI came to your house on February 7th

2   of 2020 they had a search warrant, didn't they?

3          THE WITNESS:  Yes.

4   Q   And did they seize some computers?

5   A   Yes, ma'am.

6   Q   Did you have computers on the first floor of your house?

7   A   Yes, ma'am.

8   Q   And did you have laptops?

9   A   Yes, ma'am.

10  Q   And then were there computers on the second floor of the

11  house?

12  A   Yes, ma'am, I believe so.

13  Q   Ma'am?

14  A   I believe so, yes.

15  Q   Okay.  Who was responsible for maintaining and using the

16  computers in your house?

17  A   Michael.

18  Q   There were hard drives.  Were those your hard drives?

19  A   No, ma'am.

20  Q   There were thumb drives.  Were those your thumb drives?

21  A   One thumb drive was mine for school.

22  Q   Okay.  Hard drives, thumb drives, SD cards.  Did you have

23  any SD cards?

24  A   No, ma'am.

25  Q   Let's talk a little bit about email addresses.  What email

(Amanda Grace Gunn-Direct by Ms. Lyons)                    51

1  addresses did you use?

2  A   Agunn421@gmail.com and then also one was amandaggunn@gmail

3  and also amandaggunn@outlook, I believe.

4  Q   And what about the defendant?

5  A   He had gunnpeyton@gmail.com and also at Outlook and then I

6  believe he had more, but I don't remember the names.  I think

7  he had a few.

8  Q   Did the defendant have access to your email accounts?

9  A   Yes, ma'am.

10  Q   Did he have your passwords?

11  A   Yes, ma'am.

12  Q   Did you know your daughter to have any email accounts?

13  A   She had a ggirl something at gmail.com.

14  Q   Did the defendant -- if you know, did the defendant have

15  the passwords to your daughter's accounts?

16  A   Yes, he did.

17  Q   What about your son?  Did he have any email accounts?

18  A   I believe he did.

19  Q   Do you recall any?

20  A   No.  He had a nickname "Das Extreme"; so that was probably

21  it.

22  Q   I'd like to show you Government's Exhibit -- I'd like to

23  show you Government's Exhibit 17-031.  Do you recognize the

24  handwriting on that document?

25  A   Yes.

(Amanda Grace Gunn-Direct by Ms. Lyons)                52

1   Q    Whose is it?

2   A    Michael's.

3   Q    Amanda, did the master bedroom have a master bathroom?

4   A    Yes, ma'am.

5   Q    And did you keep any personal items in that bathroom?

6   A    Yes.

7   Q    And did the defendant keep any personal items in that

8   bathroom?

9   A    Yes.

10  Q    Did you ever own a white vibrator?

11  A    Yes, ma'am.

12  Q    And where was that kept?

13  A    Usually, it was kept in the storage closet that was

14  upstairs.

15  Q    Do you recall seeing a photo where it had been found in the

16  master bathroom --

17  A    Yes, ma'am.

18  Q    -- underneath the sink?

19  A    Uh-huh.

20  Q    Did you put that vibrator there?

21  A    Yes, ma'am.  When we moved into the 209 house he told me to

22  put it under there for some reason instead of keeping it in the

23  closet.

24  Q    Okay.  So you moved into 209 in October or November of

25  2019?

(Amanda Grace Gunn-Cross by Mr. Merzlak)          53

1   A   Correct.

2   Q   Do you recall it being there in 2020?

3   A   Yes.

4   Q   Okay.  And so it was under that sink?

5   A   Uh-huh.

6          MS. LYONS:  I beg the Court's indulgence.

7          Your Honor, just for the record I want to make sure

8   I've admitted Exhibit 25.  I have not.  The government would

9   seek to admit Government Exhibit 25.

10          THE COURT:  Right.  You identified it, but you did not

11   seek admission.

12          MR. MERZLAK:  No objection.

13          THE COURT:  Admitted.

14          MS. LYONS:  Thank you.

15      (Government's Exhibit No. 25  is entered into evidence.)

16          MS. LYONS:  Your Honor, I would pass the witness and,

17   Amanda, I would ask you to answer any questions of Mr. Merzlak.

18                       **CROSS EXAMINATION**

19   BY MR. MERZLAK:

20   Q   Good afternoon.  I am going to try and call you Amanda.

21   A   Okay.

22   Q   You'd probably prefer that.  I will probably refer to you

23   as Ms. Gunn.

24   A   Okay.

25   Q   But I don't mean to not call you by Amanda like you

(Amanda Grace Gunn-Cross by Mr. Merzlak)                54

1   requested.  Okay?

2   A    Okay.

3   Q    Ms. Gunn, we've never met before, have we?

4   A    No, sir.

5   Q    Okay.  But we've talked on the phone once or twice --

6   A    Yes, sir.

7   Q    -- a long time ago?

8   A    Yes, sir.

9   Q    That was a pretty involved traumatic story that you just

10  described for the jury.

11  A    Yes, sir.

12  Q    It had a lot of twists and turns in it.

13  A    Uh-huh.

14  Q    I want to start, really, towards the end.  When you

15  received a call from the Federal Bureau of Investigation you

16  said it was a voice mail?

17  A    Uh-huh.

18  Q    Okay.  You didn't call them back?

19  A    No, sir.

20  Q    You instead called Michael -- and I apologize.  Sometimes I

21  am going to call him Peyton because I know him as Peyton.  You

22  called Michael and had him call them --

23  A    Correct.

24  Q    -- on your behalf even though they had contacted you?

25  A    Correct.

(Amanda Grace Gunn-Cross by Mr. Merzlak)                55

1   Q    And when you were interviewed by these FBI agents at your

2   home you didn't reveal anything about this to him?

3   A    I'm sorry?

4   Q    You didn't reveal anything about this Order and the MS-13

5   gang and all these horrible things you testified to?

6   A    Not at first, no, sir.

7   Q    And Ms. Lyons indicated with you that you were interviewed

8   multiple times in this case?

9   A    Yes, sir.

10  Q    And that was by law enforcement?

11  A    Yes, sir.

12  Q    The FBI agents?

13  A    Yes, sir.

14  Q    Special Agent Godbee?

15  A    Uh-huh.

16  Q    Probably other law enforcement agents as well?

17  A    Yes, sir.

18  Q    And you didn't explain any of that in those first

19  initial ---

20  A    We did discuss the Order, I believe, in the second, maybe

21  third interview.

22  Q    Do you remember when Mr. Gunn was arrested initially?

23  A    Yes, sir.

24  Q    Okay.  And at that point do you recall making several

25  telephone calls or receiving several telephone calls from him

(Amanda Grace Gunn-Cross by Mr. Merzlak)                    56

1  from where he was being housed in jail?

2  A   He had called, yes.

3  Q   And at that point when he was initially arrested the

4  government was actually seeking an order to prevent him from

5  having contact with you; isn't that correct?

6  A   I'm not sure.

7  Q   Do you recall me contacting you and asking you if you

8  desired that type of order to be done and you say, "No, I

9  didn't want that order"?

10  A   Correct.

11  Q   Okay.  So that's what I was referring to.

12  A   Okay.

13  Q   The government prosecutors were seeking an order to have

14  Mr. Gunn not contact you.

15  A   Okay.

16  Q   But at that point when he was arrested and accused of these

17  things you didn't -- you wanted to have contact with him?

18  A   Yes, sir.

19  Q   Okay.  And you received these telephone calls from him

20  while he was in jail?

21  A   Yes, sir.

22  Q   And on those telephones calls it tells you this is a

23  phonecall from a jail and it is recorded; isn't that correct?

24  A   Correct.

25  Q   And do you recall the substance of those telephone calls?

1    A    We talked a lot about my son during those calls.

2    Q    Okay.  And during those telephone calls at no time were you

3    upset with Peyton or expressed anything about being upset?

4    A    I may not have expressed it, no.

5    Q    Okay.  You didn't express any thoughts of anger towards

6    Peyton?

7    A    I don't remember.

8    Q    You don't remember or you didn't?

9    A    I don't remember.

10   Q    Okay.  When did those phonecalls stop occurring?

11   A    I believe the next week.

12   Q    Okay.  Why did they stop occurring?

13   A    I had agreed with the FBI not to contact with him because

14   they gave me more details about what actually was going on.

15   Q    Okay.  But details that you claim you already knew were all

16   going on?

17   A    No, sir.

18   Q    Y'all have lived in a lot of different places?

19   A    Yes, sir.

20   Q    House to house, house to house.  To your knowledge you

21   indicated that at times Peyton was paying the bills?

22   A    Yes, sir, I believe so.

23   Q    You just didn't have access to his finances?

24   A    Right.  Correct.

25   Q    So there was many months that you yourself weren't the one

(Amanda Grace Gunn-Cross by Mr. Merzlak)                    58

1   making the mortgage payment?

2   A   I didn't have access to make those payments.

3   Q   So you never made -- excuse me.  I won't say mortgage --

4   rental payments.  You never made a rental payment?

5   A   I did at times, yes, sir.

6   Q   Okay.  At times.  But most of the time it was Peyton?

7   A   Yes, sir.

8   Q   And most of the time he was the one paying utility bills,

9   cable bills, and things like that?

10  A   Yes, sir.

11  Q   Okay.  And most of the time he was the one, you know,

12  purchasing household supplies, groceries, things like that?

13  A   No, sir.  Most of the time it was either myself or my

14  parents helped with groceries on several occasions and I

15  believe his parents did as well.

16  Q   Okay.  And but -- and they helped you because they were

17  trying to help family members; correct?

18  A   Right.

19  Q   Now you indicated in your testimony that Michael taught you

20  about the Order?

21  A   Yes, sir.

22  Q   I couldn't quite get or could you explain to me what the

23  difference in the Order and MS-13 are?  I didn't -- I thought

24  that those things kind of sounded the same when you were

25  explaining it.

(Amanda Grace Gunn-Cross by Mr. Merzlak)                59

1    A    The MS-13 to my understanding was like a gang where the

2    Order was more of an organized religion, I guess.

3    Q    Okay.  And it's your understanding that somehow y'all were

4    involved in both of these groups?

5    A    Yes.

6    Q    And the government showed you a photograph where you looked

7    pretty happy sitting there with a sign that said "Amanda Lexi

8    Haze."

9    A    Yes, sir.

10   Q    And at that point you're telling the jury that you were

11   absolutely being forced by someone to take that picture?

12   A    Yes, sir.  We took several shots of that particular pose

13   for hours.

14   Q    Isn't it true that those nude photographs as well as the

15   pornographic videos that were put on the internet were done on

16   your own free will and that Peyton didn't have anything to do

17   with it?

18   A    That's not correct.

19   Q    Isn't it true that people in the community, friends were

20   the ones that contacted y'all about these videos saying, "Oh my

21   God.  Amanda is on the internet"?

22   A    No, sir.

23   Q    And that's when this story of the Order you relayed to

24   Peyton saying that you were forced to do this?

25   A    No.

(Amanda Grace Gunn-Cross by Mr. Merzlak)                    60

1   Q    And then you made a comment in response to a question by

2   counsel that you had more than one interview with the FBI.

3   Correct?

4   A    Yes.

5   Q    You have to say yes.  I'm sorry.  She's taking it down.

6   You can't just nod.  You had more than two interviews?

7   A    Yes, sir.

8   Q    You had more than three interviews?

9   A    Yes, sir.

10  Q    More than four, more than five, probably upwards on six and

11  past?

12  A    Yes, sir.

13  Q    All with the FBI?

14  A    Yes, sir.

15  Q    And she asked you when did you decide to start telling the

16  truth; isn't that correct?

17  A    I believe so.

18  Q    And you answered, "When I got arrested."

19  A    Yes, that's what I said.

20  Q    So the entire time that you knew all of this information

21  about the Order and MS-13 that you claimed to be involved in

22  and that you were being sex trafficked and forced to have

23  videos online, you finally thought it was pertinent to the

24  investigation to be honest once you were arrested?

25  A    That's when a lot of my memories of details of what

(Amanda Grace Gunn-Cross by Mr. Merzlak)                    61

1  happened to me started coming back.  Yes, sir.

2  Q    And at that point had you had an attorney to represent you?

3  A    Yes, sir.

4  Q    And who provided that attorney to you?

5  A    The government.

6  Q    Okay.  And at that point had you met with the attorney and

7  talked about your case?

8  A    Yes, sir.

9  Q    And you had talked about the evidence and what was expected

10  to be in evidence of the case?

11  A    No, sir.  I had an attorney several months before I was

12  arrested.

13  Q    No, I know, but you talked about the evidence and the

14  statements and things that you would expect in this case?

15  A    I don't remember.

16  Q    Okay.  And since you were charged and plead guilty to this

17  federal sexual felony you've met with the government several

18  times, haven't you?

19  A    On, I believe, two occasions.

20  Q    On two different occasions?  How long did you meet with the

21  government on two occasions after you plead guilty to this

22  federal felony?

23  A    Couple of hours.

24  Q    Couple of hours each time?

25  A    Yes, sir.

(Amanda Grace Gunn-Cross by Mr. Merzlak)                62

1   Q   And who were you meeting with?

2   A   I was meeting with my attorney, the DA, and an

3   investigator.

4   Q   And when you refer to the DA, are you referring to the

5   Assistant United States District Attorney -- or Attorney who is

6   prosecuting this case, Ms. Lyons?

7   A   Yes, sir.

8   Q   Okay.  And that was at the Jefferson County Jail?

9   A   Yes, sir.

10  Q   And that's where you're currently living?

11  A   Yes.

12  Q   What did y'all need to discuss about this particular case?

13  A   Just detail of what the exhibits were and stuff like that.

14  Q   And what your responses were supposed to be to those

15  exhibits; isn't that correct?

16  A   No, sir.

17          MR. MERZLAK:  Ms. Long, can you pull up Government's

18  21?  I'd like to -- the witness to review page 4 of that

19  document.

20          Can you see that, Ms. Gunn?

21  A   Yes, sir.

22  Q   Okay.  You entered a guilty plea under this plea agreement.

23  Did you not?

24  A   Yes, sir.

25  Q   You signed it.  You came into court.  You told the judge

(Amanda Grace Gunn-Cross by Mr. Merzlak)                63

1   that you were guilty.

2   A    Yes, sir.

3   Q    And this is the contract with you and the government?

4   A    Yes, sir.

5   Q    Could you read 6B -- the paragraph under 6B?

6   A    "Acceptance of Responsibility.  If the Court determines

7   that defendant qualifies for an adjustment under

8   U.S.S.G. § 3E1.1(a) and the offense level prior to operation is

9   16 or greater, the government will move for an additional

10  one-level reduction in offense level pursuant of Section 3E

11  based on defendant's timely notification of his intention to

12  enter a guilty plea."

13  Q    So based on the contract that you have with the United

14  States government you entered a timely plea and they're going

15  to ask the Court for a reduction in your sentence?

16  A    Yes, sir.

17  Q    And if you would continue into "C".

18  A    "The government will recommend the defendant be sentenced

19  to the mandatory minimum of 15 years of imprisonment at

20  sentencing."

21  Q    So the government, in exchange for your plea agreement and

22  testifying in this case, is going to recommend the mandatory

23  minimum sentence of 15 years; is that correct?

24  A    I believe so.

25  Q    And this is an offense that you can receive life in prison

(Amanda Grace Gunn-Cross by Mr. Merzlak)                64

1    for?

2    A    Yes, sir.

3    Q    And if you'll continue to number 7 and read that?

4    A    "At sentencing the government will move to dismiss any

5    other courts [sic] of the superceding indictment that remain

6    pending against defendant."

7    Q    In this particular case you were charged with more than one

8    count, were you not?

9    A    Yes, sir.

10   Q    And in exchange for you coming in here and testifying --

11   A    Yes, sir.

12   Q    -- the government is agreeing to dismiss these counts?

13   A    Yes.  It was one count.

14   Q    And based on you pleading guilty?

15   A    Yes, sir.

16   Q    If we could move on to page 5 as well.  If you would, read

17   section "B" for us.

18   A    "The government, in its sole discretion, will decide

19   whether defendant's cooperation qualifies as substantial

20   assistance pursuant to U.S.S.G. § 5K1 or Fed. R. Crim. P. 35

21   and thereby warrants the filing of a motion for downward

22   departure or reduction of defendant's sentence."

23   Q    That's good enough right there.  And so it's your

24   understanding that the government in its sole discretion may

25   ask the judge for an even more lenient sentencing based on how

(Amanda Grace Gunn-Cross by Mr. Merzlak)                65

1   they feel that you testified in this case?

2   A    They may.  Yes.

3   Q    Okay.  And substantial assistance would be substantial

4   assistance in convicting Mr. Gunn?

5   A    Yes, sir.

6           MR. MERZLAK:  That's all I need from that, Ms. Long.

7   Thank you.

8           Now we saw some images of tattoos that you had -- some

9   that had been covered up, some that we couldn't quite see any

10  longer.  Isn't it true that when you received these tattoos

11  initially you told Peyton that these were some other things

12  that people had forced you to do?

13  A    No, sir.

14  Q    And if it's your testimony that Peyton forced you to get

15  these tattoos your testimony was also that while y'all were

16  still together he just allowed you to cover them up?

17  A    Yes, sir.  He allowed me to cover one up while we were

18  together.

19  Q    I couldn't hear you.

20  A    He allowed me to cover one up while we were together.

21          MR. MERZLAK:  Would you pull up No. 25?

22          Amanda, I'm showing you what they already briefly

23  shown you as Government's Exhibit No. 25.

24          Could you -- to the next page.  Excuse me.  No.  Down

25  -- could you highlight the left-hand side of the page?  That's

(Amanda Grace Gunn-Cross by Mr. Merzlak)                66

1   fine.

2           Now you have a story board on this thing of bondage

3   devices and equipment; isn't that right?

4           THE WITNESS:  Yes, sir.

5   Q   And it's your testimony to this jury today that this

6   Pinterest account was started by Peyton?

7   A   Yes, sir.

8   Q   And that you put these bondage photographs on here at his

9   direction?

10  A   He put some and then I put some as well.

11  Q   Okay.  And it's your understanding that the photographs of

12  the minor in this case involved bondage similar to the pictures

13  that are on your story board?

14  A   I am not sure.  I haven't seen them.

15          MR. MERZLAK:  One moment, please, Judge.

16          THE COURT:  Sure.

17  Q   Ms. Lyons addressed to you this vibrator that was found

18  underneath the sink in your master bedroom -- excuse me, master

19  bathroom?

20  A   Yes, sir.

21  Q   And that was under your portion of the master bathroom?

22  A   Yes, sir.

23  Q   And that was your vibrator?

24  A   Yes, sir.

25  Q   Just going back to this.  I just can't get past this

1   statement that you agreed to tell the truth once you were

2   arrested.  Isn't it true that the only reason you are telling

3   this story today is to get yourself out of trouble?

4   A    No, sir.

5   Q    And that Peyton didn't have any knowledge that this was

6   going on in your house?

7   A    No.  He did.

8   Q    Other than the things that were happening to you that you

9   were claiming was some foreign Order or body or MS-13 forcing

10  you to have sex with these people and post pornography videos?

11          MS. LYONS:  Your Honor, is this a question or a

12  statement?

13          MR. MERZLAK:  That was my question.

14          THE COURT:  It was a question.

15          THE WITNESS:  Can you repeat the question?  I don't

16  understand that.

17  Q    Isn't it true that the only reason you are claiming that

18  these pornography videos were forced on you by Peyton and that

19  these naked videos -- excuse me, naked pictures on the internet

20  were forced upon you by Peyton and that these pictures that

21  show a deviant sexual lifestyle involving bondage were forced

22  by Peyton simply to avoid responsibility for what you did and

23  not anything that Peyton did?

24  A    No, sir.

25          MR. MERZLAK:  One moment, please, Judge.

(Amanda Grace Gunn-Redirect by Ms. Lyons)                    68

1        THE COURT:  Sure.

2        MR. MERZLAK:  Nothing further at this time, Judge.

3        THE COURT:  Okay.  Redirect?

4        MS. LYONS:  Thank you, Your Honor.  Very briefly.

5                    **REDIRECT EXAMINATION**

6   BY MS. LYONS:

7   Q    Amanda, if I can just follow up on a couple of questions by

8   Mr. Merzlak.  I want to clarify the difference between the

9   government or the United States and the court.

10  A    Okay.

11  Q    Okay.  The government or the United States -- is that the

12  same thing as the judge?

13  A    No.  Those are separate.

14  Q    Okay.  So who appointed you a lawyer in this case?

15  A    The government.

16  Q    Okay.  Was it a judge you went before or did I give you a

17  lawyer?

18  A    It was -- I don't remember.  All I know is I got a paper

19  saying that I was getting an attorney.  So I don't remember.

20  Q    So you filled out some papers for the court and the court

21  gave you a lawyer?

22  A    Yes.

23  Q    It wasn't me?

24  A    Correct.

25  Q    Okay.  I can't afford a lawyer.  What did the Judge tell

1   you about the recommendation by the government for the

2   mandatory minimum?  Did the Judge tell you that you were going

3   to get the mandatory minimum of 15 years?

4   A    Yes.

5   Q    The Judge told you you were going to get the mandatory

6   minimum of 15 years when you plead guilty?

7   A    I don't remember.  He said something about -- he did state

8   the mandatory minimum was 15 years.

9   Q    Okay.  And did he also told you that nobody had promised

10  you your sentence?

11  A    Correct.  Correct.

12  Q    And he said that more than once?

13  A    Yes.

14  Q    And, in fact, he said he could give you more than the

15  mandatory minimum?

16  A    Correct, yes.

17  Q    And he said that more than once?

18  A    Yes.

19  Q    And who is the person who ultimately decides your sentence?

20  A    The Judge.

21  Q    Mr. Merzlak asked you a little bit about bondage --

22  A    Yes, ma'am.

23  Q    -- and some of those items on the Pinterest website.  Did

24  the defendant engage in any bondage with you?

25  A    Yes, ma'am.

(Amanda Grace Gunn-Redirect by Ms. Lyons)                70

1  Q    What did that look like?

2  A    For several years he did like bondage torture on me.

3  Q    Can you tell us about that?

4  A    He would tie me up in uncomfortable positions.  He had

5  hooks hooked into our master bedroom closet and would suspend

6  my arms stretched out and I would be on my knees and he would

7  leave me there for hours, sometimes the weekend, and he would

8  bring me a peanut butter and jelly sandwich to eat.  Other

9  times he would put -- blindfold me and put duct tape around my

10 head so that it wouldn't come off and one time he suspended me

11 from the ceiling fan so that my neck was turned at an awkward

12 angle.  He would put clothes pins on me.  He would hit me with

13 a bamboo stick, attach electrical devices to me like a TENS

14 Unit and shock me and he would do this while using the vibrator

15 at the same time.

16     I would be forced to do oral sex on him and it was very

17 rough.  He would have me tied to the bed for long periods of

18 time.  He would blindfold me.  Majority of the time I was

19 blindfolded.  I would wake up.  I would go to sleep with

20 pajamas on and I would wake up with bruises.  I would wake up

21 naked and with bruises between my legs and be really sore the

22 next day.

23 Q    Now Mr. Merzlak asked you whether or not you were aware of

24 any images of bondage --

25 A    Uh-huh.

(Amanda Grace Gunn-Redirect by Ms. Lyons)                71

1    Q    -- in this case and you said no because you hadn't seen

2    any.  You were aware of images of torture in this case?

3    A    Yes, ma'am.

4    Q    And did you engage in torturing your daughter and taking

5    images?

6    A    No.

7    Q    Did you put clamps on your daughter's breasts and vagina?

8    A    No.

9    Q    Did you stick needles in your daughters breasts and vagina

10   and make her bleed?

11   A    No.

12           MS. LYONS:  No further questions, Your Honor.

13           MR. MERZLAK:  Nothing additional, Judge.

14           THE COURT:  None?  All right.  Can Ms. Gunn be

15   excused?

16           MS. LYONS:  Yes, Your Honor.  Thank you.

17           THE COURT:  Ms. Gunn, you are released and excused.

18        (End of Transcript of Record.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2

3

4

5        I, Lisa H. Davenport, Federal Official Reporter, in and

6   for the United States District Court for the Southern District

7   of Georgia, do hereby certify that pursuant to Section 753,

8   Title 28, United States Code that the foregoing is a true and

9   correct transcript of the stenographically-reported proceedings

10  held and that the transcript page format is in conformance with

11  the regulations of the Judicial Conference of the United

12  States.

13

14                         _____

15                         Lisa H Davenport, RPR, FCRR

16                         Federal Official Reporter