```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF GEORGIA
                          AIKEN DIVISION


United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )    Case No. 1:20CR14
                               )
Michael Peyton Gunn,           )
                               )
          Defendant.           )
_____)


              TESTIMONY OF JILL GUNN IN JURY TRIAL
              BEFORE THE HONORABLE J. RANDAL HALL
            CHIEF UNITED STATES DISTRICT COURT JUDGE
              TUESDAY, NOVEMBER 16, 2021; 2:53 P.M.


FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Shawn M. Merzlak, Esquire
     Hawk Law Group
     338 Telfair Street
     Augusta, Georgia 30901
     (706)722-3500

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Jill Gunn, | | | | |
| By Ms. Lyons | 3 | | 25 | |
| By Mr. Merzlak | | 21 | | |

EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|-----|----------------|------|

1    (The following begins at 2:53 p.m.)

2         MS. LYONS:  Your Honor, the government would call Jill

3    Gunn.

4    (Jill Gunn is duly sworn.)

5         THE CLERK:  Please state your name for the record.

6         THE WITNESS:  Jill Gunn.

7         THE CLERK:  Thank you.

8                        **DIRECT EXAMINATION**

9    BY MS. LYONS:

10   Q    Good afternoon, Mrs. Gunn.  Can you tell the Court your

11   relationship to the defendant, Michael Peyton Gunn, please?

12   A    Our son.

13   Q    And does he go by Michael or does he go by Peyton?

14   A    Peyton.

15   Q    Do you know his former wife?

16   A    His what?

17   Q    Former wife.

18   A    Oh, Amanda.

19   Q    Amanda.  Is that her name?  Amanda Gunn?

20   A    Yes.

21   Q    You don't have to say any names, but do they have any

22   children?

23   A    Yes.

24   Q    And can you tell us if they have a boy or a girl or how

25   many?

1  A    A boy and a girl.

2  Q    And who is the oldest?

3  A    The girl.

4  Q    And how old is the girl now if you know?

5  A    Fifteen.

6  Q    When was the last time you spoke with the girl?

7  A    Probably 18 months ago.

8  Q    Before 18 months ago would you have said you had a close

9  relationship to their daughter?

10 A    Yes.

11 Q    Okay.  I'll take you back a little while.  Do you remember

12 when Peyton and Amanda got married?

13 A    Yes.

14 Q    And do you remember how old Amanda's daughter was when they

15 got married?

16 A    Three.

17 Q    Three.  And did Peyton adopt Amanda's daughter?

18 A    Yes.

19 Q    Okay.  And so have you known Amanda's daughter since that

20 time?

21 A    Yes.

22 Q    Did there come a time when the family -- Peyton, Amanda,

23 and their daughter -- moved back to Georgia?

24 A    Yes.

25 Q    Had they had a son by that time?

(Jill Gunn-Direct by Ms. Lyons)

1   A    Yes.

2   Q    Okay.  And about how many years are there between the

3   oldest child and the youngest child?

4   A    Five.

5   Q    Five years.  So you came back -- they came back with two

6   grandchildren for you.  Were you close to the family?

7   A    Yes.

8   Q    Did you spend a lot of time with them?

9   A    Yes.

10  Q    And you're married?

11  A    Yes.

12  Q    What is your husband's name?

13  A    Mike.

14  Q    Mike?

15  A    Michael.

16  Q    Do you have more than one child?

17  A    No.

18  Q    And Peyton is your only son?

19  A    Yes.

20  Q    Is Peyton adopted?

21  A    Yes.

22  Q    So when the family moves back to Georgia you have two

23  grandchildren; you're spending a lot of time with them.  Are

24  you able to develop a close relationship with the eldest

25  daughter?

1   A    Yes.

2   Q    What types of things did you do with her?

3   A    Oh, tea parties and playhouses and dress up.

4   Q    How would you describe her?  How would you have described

5   her growing up?

6   A    Vivacious, fun, inquisitive.

7   Q    When your son moved back with his family do you recall if

8   he had a job?

9   A    No.  He did not.

10  Q    And what type of work did you know your son to do?

11  A    He just said computer work building websites.

12  Q    Before he came back to Georgia were they in New York?

13  A    Yes.

14  Q    And had he been in the military?

15  A    Yes.

16  Q    Okay.  So when he returned to Georgia did you and your

17  husband help them get on their feet?

18  A    Yes.

19  Q    For a number of years did you provide financial support?

20  A    Yes.

21  Q    How would you describe that?  What type of financial

22  support did you provide?

23  A    Oh, making house payments, utility bills, gasoline, things

24  like that.

25  Q    Do you remember -- do you remember how old the eldest

1  daughter was when they moved back to Georgia?

2  A    Oh, gosh.  Probably I guess she was kindergarten.

3  Q    Five or six?

4  A    First grade.

5  Q    Five or six.  So ---

6  A    Yeah, probably a little older.  Maybe six.

7  Q    Is it fair to say that the eldest daughter -- and you

8  correct me if I am wrong -- in February of 2020 she would have

9  been 13?

10 A    Yes.

11 Q    Okay.  And so if she moved back to Georgia when she was

12 even six -- there about seven years between them.  Okay?  I am

13 going to talk about that seven-year period if I can.  When your

14 son was arrested in February of 2020 where was the family

15 living?

16 A    They were in a townhouse.

17 Q    Was that on Nicklaus Court?

18 A    Yes.

19 Q    So I am going to think backwards.  Were you and your

20 husband financially supporting the family in February of 2020?

21 A    Basically.

22 Q    Yes.  And if you think back for the seven years previous to

23 that had you been financially supporting the family on and off

24 for seven years?

25 A    Yes.

1   Q   Okay.  At some points in time did they live with you?

2   A   Yes.

3   Q   Were there at least two occasions where the family moved in

4   with you and your husband?

5   A   Amanda and the children moved in with us briefly and then

6   later they all did.

7   Q   And when you say Amanda and the children moved in with you

8   guys briefly, do you recall where Peyton was?

9   A   That's when he went to Morocco.

10   Q   And what did he go to Morocco for?

11   A   I don't know.

12   Q   Okay.  So when Peyton went to Morocco Amanda and the

13   children lived with you?

14   A   For a few months.

15   Q   For ---

16   A   A month or so.  About a month, I think.

17   Q   About a month.  And then there was another time where he

18   lived with you and the children and Amanda and your husband?

19   A   Yes.

20   Q   Okay.  How many bedrooms are in the house where you were

21   living when Peyton and Amanda and the children were living with

22   you?

23   A   There's a master bedroom downstairs and two upstairs.

24   Q   Master bedroom is down?

25   A   Uh-huh.

(Jill Gunn-Direct by Ms. Lyons)                9

1    Q    And two bedrooms up?

2    A    (Nods head.)

3    Q    If you recall, Mrs. Gunn, when Peyton, Amanda, and the

4    children were staying with you, what was the sleeping

5    arrangement?

6    A    Some kind of computer.

7    Q    Ma'am?

8    A    Some kind of computer work is what he said.

9    Q    Oh, he was doing computer work?

10   A    He said he was doing ---

11   Q    He said.  Let me rephrase my question.  I'm sorry.  Where

12   was everybody sleeping?

13   A    Oh, oh.

14   Q    I'm sorry.

15   A    Our grandson and Peyton were in one room and our

16   granddaughter and Amanda were in the other bedroom.

17   Q    And so Peyton and Amanda were not sleeping in the same bed?

18   A    No.

19   Q    Thank you.  So you had a close relationship with the eldest

20   daughter.  When they moved out from your house the second time

21   did you continue to have a close relationship --

22   A    Yes.

23   Q    -- with the oldest daughter?

24   A    Yes.

25   Q    Were there times when she would sleep over at your house?

1  A    Yes.

2  Q    And did that continue for a little while?

3  A    It did.

4  Q    Did there come a time in 2019 where that stopped or

5  earlier?

6  A    Yes.

7  Q    Is there a reason why you remember that it stopped?

8  A    Peyton told us that she didn't want to do that anymore and

9  that she was embarrassed to tell us -- that it would hurt my

10 feelings.

11 Q    How did that make you feel?

12 A    Sad.

13 Q    Because you felt like you had been close to her?

14 A    Uh-huh.

15 Q    Did Grace ever tell you that she didn't want to -- excuse

16 me.  Did the minor ever tell you that she didn't want to spend

17 the night with you anymore?

18 A    No.

19 Q    Peyton told you that.  You said you haven't spoken to, in

20 essence, your granddaughter -- you haven't spoken to your

21 granddaughter in 18 months.  Do you remember the last time you

22 saw her?

23 A    I think it was Christmas of two years ago.

24 Q    So that would be Christmas 2019?

25 A    Uh-huh.

1  Q    And that would with the last holiday before February of

2  2020?

3  A    Yes.

4  Q    Do you remember anything that sticks out about her

5  behavior?

6  A    Not really.

7  Q    Do you remember thinking that she was tired or she was

8  sleepy?

9  A    I just noticed it seemed like she yawned a lot.

10  Q    That she yawned a lot.  Did you take that for teenager just

11  maybe being bored?

12  A    Yeah, I thought we were boring.

13  Q    Ma'am?

14  A    I thought she thought we were boring.

15  Q    You thought she thought you were boring.  Did you ask her

16  if she was tired?

17  A    No.

18  Q    We talked a little bit about the financial support and I

19  think you mentioned that you paid rent.  Yes?

20  A    Yes.

21  Q    I think you mentioned -- did you say electric bill?

22  A    Off and on.

23  Q    Off and on.  Did Peyton often message you for money?

24  A    Yes.

25  Q    Okay.  Did you have a cellphone in 2019 and 2020?

(Jill Gunn-Direct by Ms. Lyons)                    12

1   A   Yes.

2   Q   Okay.  And when he would message you where were you

3   receiving these messages?

4   A   Actually, he messaged my husband more than me.

5   Q   Okay.

6   A   I mean, I really think it was usually him.

7   Q   Okay.  I'm sorry.  I can't hear you.

8   A   I can't see you.

9   Q   I am going to move up and I am going to ask you to scoot up

10  just as well.  I think you said he messaged your husband more

11  than you and then you said something?

12  A   Yes, that's true.

13  Q   Okay.  But he did message you?

14  A   Yes.

15  Q   Okay.  And how did you receive those messages?

16  A   I guess annoyed.

17  Q   Oh, you were annoyed when you received ---

18  A   You mean how physically?

19  Q   Yes, I meant physically.  Was it on a computer or a phone?

20  But I'll come back to being annoyed.

21  A   Email.

22  Q   It was in an email.  So he would email you to ask for money

23  and you said it would annoy you.  Tell us why it would annoy

24  you.

25  A   Yes.

1   Q   Tell us why.

2   A   Oh, just because it was so frequent.

3   Q   Would it be daily?

4   A   No, no, no.

5   Q   Weekly?

6   A   I don't -- I really can't remember.  Probably not weekly.

7   Q   And if you can recall was he asking for $40 here --

8   A   Yes.

9   Q   -- $50 there?

10  A   Uh-huh.

11  Q   Yes?

12  A   Yes.

13  Q   Did he explain why he needed that money?

14  A   No.

15  Q   And he was also messaging your husband for the same thing?

16  A   Right.

17  Q   Do you recall a time where he went to work in Asheville?

18  A   Yes.

19  Q   What was that for?

20  A   I don't remember the name of the company or what he was

21  doing.

22  Q   But it was work related?

23  A   Yes.

24  Q   And do you recall if the family went with him or not?

25  A   They went -- moved up there briefly -- I mean, just for a

(Jill Gunn-Direct by Ms. Lyons)                              14

1   couple of weeks and then he was commuting.

2   Q   And do you recall where Amanda and the kids were living

3   while he commuted?

4   A   I can't remember if they were -- I don't think they were

5   living with us.  They weren't living with us.  I can't remember

6   where they were.

7   Q   And from your memory have they lived in a number of places

8   since returning to Georgia?

9   A   Yes.

10  Q   Did -- in 2020 when the family is living at 209 Nicklaus

11  Court --

12  A   Right.

13  Q   -- had they recently moved from 220 Nicklaus Court?

14  A   Yes.

15  Q   Do you know why?

16  A   It burned.

17  Q   Ma'am?

18  A   The first townhouse burned.

19  Q   Burned?

20  A   Yes.

21  Q   And so they previously lived right down the street?

22  A   Yes.

23  Q   And is 220 Nicklaus Court a house or townhouse that's owned

24  by your husband?

25  A   Correct.

1  Q    Okay.  Now in 209 Nicklaus Court was Peyton working from

2  home?

3  A    Yes.

4  Q    As far as you knew?

5  A    As far as we knew.

6  Q    Did he have a car?

7  A    Yes.

8  Q    What car was that?

9  A    He had -- I have forgotten what he had.  He had -- they

10 were driving a van that belonged to Amanda's parents for a

11 while and he had a Saab.

12 Q    Did the family have two cars or just one car?

13 A    They had two.

14 Q    And did you lend them your car ever?

15 A    Maybe.

16 Q    You said maybe?

17 A    Maybe.  I don't think -- maybe once or twice.

18 Q    Okay.  Was Amanda working?

19 A    Yes, for a while.

20 Q    Do you know what she was doing?

21 A    For a while she was working at this -- a counseling place

22 that worked with DFCS children, I think.

23 Q    Did she later work at a -- I am going to mess that word

24 up -- apothecary, like a masseuse or needles and that type of

25 thing?

1   A    I am not sure.

2   Q    Now in your messages with Peyton did you ever offer to

3   bring food over?

4   A    Ever offer what?

5   Q    To bring food over?

6   A    Yeah, maybe a few times.

7   Q    And to bring meals -- like deliver meals?

8   A    I don't think so.

9   Q    Buy the kids clothes?

10  A    Yes.

11  Q    Did Peyton and Amanda ever discuss their marital issues

12  with you?

13  A    No.  You mean discuss it?

14  Q    Yes, ma'am.

15  A    No.

16  Q    I beg your indulgence one moment.

17  A    Okay.

18  Q    Mrs. Gunn, can I show you -- would you recognize your son's

19  handwriting if you saw it, Mrs. Gunn?

20  A    Probably.

21  Q    Probably?  I am going to show you what's been marked and

22  admitted as 17-031.  It is going to come up on your screen in

23  front of you.

24  A    Okay.

25  Q    Can you just tell me if you recognize that handwriting?

1          MR. MERZLAK:  Objection, Your Honor.  For legal

2    purposes it is improper foundation for her to testify to that

3    at this point.

4          THE COURT:  Response?

5          MS. LYONS:  Your Honor, this is the defendant's

6    mother.  I think she said she could possibly recognize his

7    handwriting.  I have simply asked if she does.  If she doesn't,

8    the answer is no.

9          THE COURT:  I'll let her answer it.

10          THE WITNESS:  It looks very similar to his.

11   Q    Thank you, ma'am.

12        You can take that down, Ms. Long.

13        Another question maybe as a mother you would know -- have

14   you ever seen your son wearing white Puma sneakers?

15   A    Yes.

16   Q    Is that something he wore often?

17   A    Yes.

18   Q    Mrs. Gunn, I am going to show you Government's Exhibit 13

19   and tell me if you recognize this item.  Does that look

20   familiar to you?

21   A    Yes.  Yes.

22   Q    What does that look like to you?

23   A    It looks like Peyton's shoes.

24   Q    Thank you.

25        Mrs. Widener, I am just going to ask one more question if

1   we can pull that monitor down.

2       Mrs. Gunn, did you ever hear your son talk about anything

3   called "The Order"?

4   A   No.

5   Q   Have you ever heard him talk about MS-13 or gangs?

6   A   Yes.

7   Q   What did he tell you?

8   A   That he -- a gang from Costa Rica had gotten them involved

9   in pornography and things.

10  Q   What else did he tell you, if you can remember?

11  A   That's about it.

12  Q   Do you recall how this conversation came up?

13  A   Oh, it came up, I guess, when things were going on that

14  they -- like they were making -- had Amanda in pornography,

15  that it was a gang and they couldn't get out of it, that they

16  had threatened them.

17  Q   And so your son told you that the gang had threatened them?

18  A   And the children.

19  Q   And the children.  Did he seek help from the police?

20  A   No.  I asked why and he said because he couldn't go to the

21  police because this gang was so violent and that it would hurt

22  them.

23  Q   How did that make you feel?

24  A   I guess helpless.

25  Q   Did that topic ever come up again?

1   A    It came up when Amanda was saying that she had been

2   involved -- actually, I guess that's how it started -- when

3   Amanda said she had been involved in this pornography thing and

4   that that is what it was and then that they -- their house

5   was -- had an attack on their house, I guess, is what you would

6   call it.

7   Q    Okay.  Tell me a little bit about that.  Did Amanda or

8   Peyton or Amanda and Peyton tell you that their house had been

9   attacked?

10  A    Well, it was Amanda was out of town and that someone shot

11  through Grace's window and the bullet stuck in the door frame

12  and Peyton dug it out and then Amanda's dad's truck and her

13  friend's cars were parked in the driveway and the tires were

14  slashed overnight.

15  Q    Okay.  So let me go back because that was a lot.  Amanda

16  was out of town?

17  A    With friends.

18  Q    With friends.  And somebody shot through a window in your

19  eldest granddaughter's room.  Who told you that?

20  A    Peyton.

21  Q    Okay.  Was anybody with you when he told you that?

22  A    Probably Mike.

23  Q    Probably your husband?

24  A    Yes.

25  Q    Okay.  So he told you somebody shot through your eldest

1   granddaughter's window.  Did he call the police?

2   A    No.

3   Q    Okay.  And then he said somebody slashed the tires on a

4   car?

5   A    Yes.

6   Q    The neighbor's car?

7   A    The friend's.

8   Q    Friend's car?

9   A    Friend's car and Mr. Howard's truck.

10  Q    Mr. Howard?

11  A    His truck was parked there.

12  Q    Mr. Howard is Amanda's --

13  A    Yes.

14  Q    -- father?

15  A    Yes.

16  Q    Wow.  What did you think?

17  A    I didn't believe it.

18  Q    You didn't?

19  A    No.

20  Q    Why not?

21  A    Because it was just too wild coincidence that it all

22  happened while she was gone.

23  Q    Did Peyton tell you anything else?

24  A    No.

25            MS. LYONS:  I beg the Court's indulgence.

1            Thank you, Mrs. Gunn.  Just one moment.

2            Mrs. Gunn, thank you.  Why did you come to court

3    today?  Did you volunteer or did I subpoena you?

4            THE WITNESS:  Oh, I was asked.

5    Q    Thank you very much.  I appreciate it.

6    A    Okay.

7            THE COURT:  All right.  Mrs. Gunn, you need to answer

8    Mr. Merzlak's questions.

9                         **CROSS EXAMINATION**

10   BY MR. MERZLAK:

11   Q    Good afternoon, Mrs. Gunn.  I know it's probably difficult

12   for you to be here; so I'll be as brief as possible.

13   A    Okay.

14   Q    You indicated that Peyton and Amanda had explained to you

15   about some pornography that Amanda was involved in; correct?

16   A    Correct.

17   Q    And these were, to your recollection, pornography videos

18   that Amanda was involved in; correct?

19   A    Yes.

20   Q    There was no mention of Peyton being involved in these

21   videos?

22   A    No.

23   Q    And there was no mention at the time that -- from Amanda

24   that Peyton had forced her to be involved in any type of

25   pornography videos, was there?

(Jill Gunn-Cross by Mr. Merzlak)                    22

1   A    No.

2   Q    You indicated that you never talked to Peyton and Amanda

3   about any marital problems.  Do you recall Peyton expressing to

4   you the depressive state that Amanda was in all the time?

5   A    Yes.

6   Q    Okay.  Do you recall him talking about Amanda using drugs

7   or prescription drugs and staying in her room for days on end?

8   A    No.

9   Q    You don't remember that?  Tell me how he described that

10  Amanda was depressed.

11  A    How he described?

12  Q    Uh-huh.

13  A    That she was -- couldn't do anything around the house, that

14  he had to do everything.

15  Q    Because what was she doing?

16  A    Pardon?

17  Q    What was she doing when she couldn't do anything around the

18  house?  What was he describing?

19  A    I don't know.  You mean what he was doing?

20  Q    What I mean -- I'm sorry.  He's describing to you that he

21  has to do everything around the house --

22  A    Right.

23  Q    -- because Amanda won't.  Did he describe to you what

24  Amanda was doing?

25  A    Oh, that she was -- couldn't get out of bed.  She was

1  depressed and sort of non-functioning.

2  Q    And when they explained to you about this issue involving

3  Amanda being on the internet in these videos, what was

4  explained to you was actually what Amanda said was happening;

5  isn't it right?

6  A    Yes.

7  Q    And any information that was being provided to you from

8  Peyton was what Amanda was claiming was happening?

9  A    He told us other things, I think, occasionally.

10 Q    Okay.  And you indicated that they lived with you from time

11 to time?

12 A    Uh-huh.

13 Q    Correct?

14 A    Correct.

15 Q    I'm sorry.  Sometimes when you nod you actually have to

16 say --

17 A    Yes.  That's correct.

18 Q    -- yes because the court reporter is taking it down.  And

19 the first time was when Peyton got out of the military;

20 correct?

21 A    Correct.

22 Q    And they moved down from New York and that was just for a

23 short time -- a week or two before they found their own place?

24 A    Correct.

25 Q    Okay.  And being a good mother and I'm sure your husband --

1  I've met him; he is a good father -- y'all helped them

2  financially?

3  A    Right?

4  Q    As any parents that have the means to do would probably do

5  for their children and daughter; correct?

6  A    Correct.

7  Q    And the other times that they moved in with you was when

8  they were in between houses waiting on a new lease on a new

9  house; correct?

10 A    No.  It was when they -- I think it was right after they

11 came back from the short time in Asheville and they were

12 homeless.

13 Q    Okay.  And then did they find a house?

14 A    They -- now I am trying to think.  Maybe they had moved out

15 of a house, but they had no place to go.

16 Q    Okay.  And eventually they were able to move in -- start

17 renting, essentially, 220 Nicklaus Court --

18 A    Correct.

19 Q    -- from you and your husband?

20 A    Yes.

21 Q    All right.  And the only reason that they were no longer in

22 220 Nicklaus Court is because a fire --

23 A    Correct.

24 Q    -- broke out; correct?

25 A    Yes.

(Jill Gunn-Redirect by Ms. Lyons)                    25

1   Q    And they moved to 209 and started renting that from you and

2   your husband; correct?

3   A    Correct.

4   Q    Although you still help them out financially occasionally?

5   A    Yes.

6   Q    And to your knowledge did -- strike that.  You indicated

7   that when you received any messages from Peyton they were

8   through email; correct?

9   A    Yeah, I actually can't -- I can't remember because he

10  didn't have a phone.  So if he was texting it would be, I

11  guess, with Amanda's phone.

12  Q    Okay.  So he did not have a cellphone to your knowledge?

13  A    No, he didn't.

14           MR. MERZLAK:  No further questions, Judge.  Thank you.

15           THE COURT:  Any redirect?

16           MS. LYONS:  Very briefly, Your Honor.

17                        **REDIRECT EXAMINATION**

18  BY MS. LYONS:

19  Q    Mrs. Gunn, do you remember Amanda attempting to commit

20  suicide?

21  A    What?

22  Q    Do you remember if Amanda -- do you remember learning that

23  Amanda had attempted to commit suicide?

24  A    I can't understand that last word.

25  Q    Suicide.  Did she try to kill herself?

(Jill Gunn-Redirect by Ms. Lyons)                    26

1   A    Yes.

2   Q    And was that before or after the videos that you were

3   talking about?

4   A    I think after.

5   Q    While Peyton and his family were living at 220 Nicklaus,

6   the property owned by your husband, were they paying rent that

7   entire time?

8   A    No.  They paid for a little while but then stopped.

9   Q    And the other places that they were renting since they have

10  been here in Georgia, who was paying for those?

11  A    Off and on, we were.  Sometimes they paid.  Sometimes they

12  didn't.

13  Q    Thank you very much.

14           THE COURT:  All right.

15           MR. MERZLAK:  No additional questions.

16           THE COURT:  No other questions?  May we excuse

17  Mrs. Gunn?

18           MS. LYONS:  Yes.

19           THE COURT:  Mrs. Gunn, you're now excused and released

20  from your subpoena.  Thank you, ma'am.  You may leave.

21           Next witness.

22       (End of Transcript of Record.)

23

24

25

CERTIFICATE OF REPORTER

     I, Lisa H. Davenport, Federal Official Reporter, in and
for the United States District Court for the Southern District
of Georgia, do hereby certify that pursuant to Section 753,
Title 28, United States Code that the foregoing is a true and
correct transcript of the stenographically-reported proceedings
held and that the transcript page format is in conformance with
the regulations of the Judicial Conference of the United
States.


                         _____

                         Lisa H Davenport, RPR, FCRR
                         Federal Official Reporter