```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF GEORGIA
                       AUGUSTA DIVISION


United States of America,    )
                             )
        Plaintiff,           )
                             )
    vs.                      )   Case No. 1:20CR14
                             )
Michael Peyton Gunn,         )
                             )
        Defendant.           )
_____)


           TESTIMONY OF MICHAEL H. GUNN IN JURY TRIAL
              BEFORE THE HONORABLE J. RANDAL HALL
             CHIEF UNITED STATES DISTRICT COURT JUDGE
              TUESDAY, NOVEMBER 16, 2021; 3:25 P.M.


FOR THE PLAINTIFF:

    Tara M. Lyons, Esquire
    U.S. Attorney's Office
    Post Office Box 2017
    Augusta, Georgia 30903
    (706)724-0517

FOR THE DEFENDANT:

    Shawn M. Merzlak, Esquire
    Hawk Law Group
    338 Telfair Street
    Augusta, Georgia 30901
    (706)722-3500

OFFICIAL COURT REPORTER:

    Lisa H. Davenport, RPR, FCRR
    Post Office Box 5485
    Aiken, South Carolina 29804
    (706)823-6468
```

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael H. Gunn, | | | | |
|     By Ms. Lyons | 3 | | 16 | |
|     By Mr. Merzlak | | 13 | | |

EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|---|---|---|

(None)

1      (The following begins at 3:25 p.m.)
2           MS. LYONS:  The government would call Michael H. Gunn.
3      (Michael H. Gunn is duly sworn.)
4           THE CLERK:  Please state your name for the record.
5           THE WITNESS:  Michael Herbert Gunn.
6           THE CLERK:  Thank you.
7                         **DIRECT EXAMINATION**
8   BY MS. LYONS:
9   Q   Good afternoon, Mr. Gunn.  Your wife is Mrs. Jill Gunn who
10  was just in here; is that correct?
11  A   Yes.
12  Q   And is your son Michael Peyton Gunn?
13  A   Yes.
14  Q   You don't have to use any names, but do you have two
15  grandchildren?
16  A   Yes.
17  Q   And do you have a boy?
18  A   Yes.
19  Q   And does the grandson live with you?
20  A   Yes.
21  Q   Do you have also a granddaughter?
22  A   Yes.
23  Q   And she does not live with you?
24  A   Correct.
25  Q   Are those two grandchildren from the marriage of Peyton and

1  Amanda Gunn?
2  A   One is from a previous marriage from Amanda.
3  Q   Thank you.  And the grandson that lives with you is the
4  biological child of Peyton?
5  A   Correct.
6  Q   I just want to ask you a couple of questions.  Do you
7  recall a time when Peyton and his family returned to Georgia
8  from New York?
9  A   Yes.
10 Q   And when they returned to Georgia did Peyton have a job?
11 A   Not to my knowledge.  No.
12 Q   And what type of work did you know your son to do?
13 A   IT work for creating websites and stuff like that.
14 Q   And do you recall about what year or time he returned to
15 Georgia?
16 A   It was after he was discharged from the Army at Fort Drum
17 and I want to say it's around approximately -- 2012,
18 approximately, is the closest I can get to it.
19 Q   So thinking about the time period between 2012 and February
20 of 2020, can you tell us about any jobs that your son has held
21 that you're aware of?
22 A   As I recall he continued to always do the IT stuff.  For a
23 period of time he was employed with an IT company in Asheville,
24 North Carolina.  The company archives weather data for the
25 National Oceanic and Atmospheric Administration.

1  Q  Do you remember how long that job lasted?
2  A  Candidly, no.  It was probably less than a year, but I
3  really can't remember.
4  Q  Less than a year.  Okay.  Any other employers that you
5  remember?
6  A  None I can think of.  No.
7  Q  Do you remember a period of time where your son went to
8  Morocco?
9  A  Yes.
10 Q  And what did he go to Morocco for?
11 A  The same thing he told us -- IT work.
12 Q  IT work.  Do you know if there was an employer?
13 A  I do not.
14 Q  Okay.  How long did he stay in Morocco?
15 A  I'm sorry.  I can't recall.
16 Q  And was that venture, if you know, successful or
17 unsuccessful?
18 A  I would have to consider it unsuccessful.
19 Q  Between 2012 and 2020 who was primarily supporting Peyton's
20 family financially?
21 A  My wife and I.
22 Q  Okay.  And how would you describe that?  If I asked you did
23 you pay their rent, did you pay their rent?
24 A  From time to time.
25 Q  Okay.  Did you provide them housing at 220 Nicklaus Court?

1   A   I did.

2   Q   Who paid the rent?

3   A   For a period of time they paid me some rent and then I
4   didn't receive any rent for quite a long time.

5   Q   And when you say "they," who had a job?

6   A   Amanda, his wife, had a couple of jobs during that period
7   of time.

8   Q   Do you recall any of the jobs that she had during that
9   time?

10  A   One was at a counseling service -- I don't recall the name
11  of it -- for a period of time.  I cannot think -- it seemed
12  like there was another one and I can't think of what it is
13  right now.

14  Q   As far as you know did your son Peyton have a job?

15  A   Not to my knowledge other than the IT work.

16  Q   What other things other than rent did you and your wife pay
17  for for Peyton and his family?

18  A   We purchased groceries and some clothes and stuff like that
19  for the grandkids.  We wanted to ensure that they had a good
20  home life.

21  Q   And what about any monthly bills other than rent?

22  A   Can you rephrase that?  I'm sorry.

23  Q   I'm sorry.  Anything other than rent on a monthly basis?

24  A   Sometimes utilities.

25  Q   Were there times when your son Peyton would contact you for

1  money?
2  A   Yes.
3  Q   And would that be daily?
4  A   No, I wouldn't say that, but it was weekly maybe.
5  Something of that nature.  Sometimes verbally.  Sometimes via
6  emails.
7  Q   Okay.  And would you say that would be in small -- that's
8  not a fair question.  Small or large increments, I guess,
9  depends on how much money you have on you; so I am going to
10 phrase that better.  Would he ask for $50 or $500?
11 A   More of the 50.
12 Q   And that might be once a week?
13 A   I can't say that it would be weekly.  I can't really say
14 that.
15 Q   And you said sometimes that would be verbal?  Does that
16 mean he might call you?
17 A   Right.
18 Q   Okay.  And how would he call you?
19 A   I guess on a cellphone, I assume.  Yeah.
20 Q   And I think you said he would also email you?
21 A   He did.
22 Q   Okay.  I am going to show you Government Exhibit -- I am
23 just going to show you Government Exhibit 39, please.
24     Ms. Long, if you will scroll to page 39-005 for Mr. Gunn to
25 see.

1    Mr. Gunn, if you will take a look at record number one at
2 the top, whose name is in the "from" -- may I approach the
3 witness for a second?  I feel like I am yelling, Your Honor.  I
4 apologize.
5         THE COURT:  No, that's fine.
6 Q   I'm going to turn this.  Okay.  Is that a little bit
7 better?
8 A   Yeah, it is for me.
9 Q   Okay.  Who is that from?
10 A   From me.  It says "from" and has my name.
11 Q   And can you read the line?  Is it your name?
12 A   I'm sorry.  I can't make this out.  I think it says replied
13 and it looks like a bunch of characters.
14 Q   Oh, she is going to -- thank you, Ms. Long.
15     Is that better?
16 A   Yeah.
17 Q   That's much better.  Who is it from?
18 A   That's from me.
19 Q   Say your name, sir.
20 A   Mike Gunn.
21 Q   It says "From Mike Gunn," and at the end it says
22 "Google.com."  Does it?
23 A   Yes, it does.
24 Q   Okay.  Can you read the body of that message?
25 A   "Get your Comcast back.  Do you need paper products?" and

1 from and this is -- I don't know what that is right there.
2 Q   And what's that last word?
3 A   "Chat".
4 Q   Chat.  Does that sound like a message you would have sent
5 to yourself asking about paper products?
6 A   I don't know what chat is, but, you know, when I would be
7 going to Costco sometimes like that I would ask if he needed
8 paper products like paper towels or toilet tissue or something
9 of that nature.
10 Q   I am going to put my glasses on, too, Mr. Gunn.
11     Ms. Long, if you'll go to 39-006.  In the middle of that
12 page if you'll blow up record four, Ms. Long.
13     Mr. Gunn, on your screen do you see record four?
14 A   Yes.
15 Q   And is that from you?
16 A   Yes.
17 Q   And does it say "I need my tripod for some photos"?
18 A   Yes, it does.
19 Q   Thank you.
20     Record five blown up at the bottom, please, Ms. Long.
21 A   Counselor, can I amplify that last one?
22 Q   I'm sorry, Mr. Gunn?
23 A   The -- my wife is a watercolor artist and I take photos of
24 her watercolors is the reason I use it.  I can't hold it steady
25 enough, if that helps you with that.

1  Q   Yes, sir.
2      Record five.  Can we blow that one up?  Record five on that
3  same page -- 006.
4      Mr. Gunn, if I say something wrong or you see it
5  differently from me, would you please correct me?
6  A   Yes.
7  Q   Okay.  Is record five from Peyton Gunn?
8  A   Yes.
9  Q   At realgunnlife@gmail.com?
10 A   Yes.
11 Q   And does the body of it say, "After paying up on our power
12 and other bills that have stacked up that had to be paid by the
13 end of the month we are cutting it real close and low on food.
14 Is it okay if we borrow 80 or 100 for some groceries and
15 things?  Like I said last week, next week when we get paid we
16 will be okay, not behind, caught up from this mess"?
17 A   Yes.
18 Q   Was that the type of message you might receive from your
19 son asking for money?
20 A   Possibly.  Yes.
21 Q   -007, record number six.  Mr. Gunn, is this one from you?
22 A   Yes.
23 Q   And does it say "money in mailbox"?
24 A   Yes, it does.
25 Q   Record number seven.  Is this one from you?

1  A    Yes.

2  Q    "Money under front mat"?

3  A    Yes, it does.

4  Q    Record number eight.  Is this one from you?

5  A    Yes.

6  Q    "Find money?"

7  A    Yes, it does.

8  Q    39-008, record number nine.

9       Mr. Gunn, is this one from you?

10 A    Yes.

11 Q    "I don't have any money on me now.  How about tomorrow?"

12 A    That's what it says.

13 Q    Okay.  And these weren't the only messages like this;

14 correct?  There were more.  Mr. Gunn, I am not doing this in

15 any way to try and embarrass you.

16 A    It's okay.

17 Q    I apologize.  I am just trying to confirm that your son

18 asked you for cash on a regular basis, didn't he?

19 A    Well, quite a bit.  Yes.

20          MS. LYONS:  Thank you, Ms. Long.  I appreciate that.

21          Mr. Gunn, over the last year or so you've continued to

22 speak to Amanda Gunn?

23          THE WITNESS:  Yes.

24 Q    You've had a close relationship with her?

25 A    Yes.

1  Q   I think you even spoke to her on the day she plead guilty?
2  A   Yes, I believe so.  That evening, I believe so.
3  Q   Sir?
4  A   Yes, that evening I believe we did.  She calls about twice
5  a week and talks to her son.
6  Q   She talks to her son?
7  A   Yes.
8  Q   Were you -- I think you've already said you're the owner or
9  were the owner of 220 Nicklaus Court before it burned down?
10 A   Yes.
11 Q   Did that house have wood floors in it?
12 A   I remember the bedrooms upstairs were carpet.  I can't
13 remember what it was downstairs.  I think the kitchen was some
14 type of a ceramic tile and I can't remember about the living
15 area.  I just can't remember in my mind after we rebuilt it
16 what was down there.
17 Q   Thank you, Mr. Gunn.
18         THE COURT:  Any questions for Mr. Gunn?
19         Oh, I ---
20         MS. LYONS:  I beg the Court's indulgence.
21         THE COURT:  Oh, no, I'm sorry.  I thought you were
22 finished.  I'm sorry.
23         MS. LYONS:  Thank you, Your Honor.
24         And thank you, Mr. Gunn, I am going to pass you to
25 Mr. Merzlak.

1           THE COURT:  Answer his questions, please, sir.

2                          **CROSS EXAMINATION**

3    BY MR. MERZLAK:

4    Q    Good afternoon, Mr. Gunn.  How are you doing?

5    A    Good afternoon.

6    Q    I know this is difficult.  We've talked several times in

7    the past; isn't that correct?

8    A    Yes, sir.

9    Q    I just have some brief questions for you, some things that

10   Ms. Lyons covered as well as some things that she didn't cover.

11   Just to follow up, Peyton contacted you and your wife on

12   occasion asking for money?

13   A    Yes.

14   Q    And you and your wife were of the financial means to try

15   and help him and Amanda out the best you could?

16   A    Thankfully, yes.

17   Q    And because you loved him and, you know, you loved your

18   daughter-in-law as well as the grandchildren, that's exactly

19   what you did?

20   A    Precisely.

21   Q    Okay.  Even though you didn't like it necessarily all the

22   time, you know, we did it because that's what we do for family?

23   A    Right.

24   Q    And isn't it true that during this period of time Peyton

25   and Amanda informed you of some videos that were of Amanda that

(Michael H. Gunn-Cross by Mr. Merzlak)                14

1   were on the internet?
2   A    Yes.
3   Q    And when they relayed this information to you they were
4   telling you how Amanda explained that these videos got on the
5   internet?
6   A    Yes.
7   Q    And those were pornographic videos?  That's how they
8   described them?
9   A    So they said, yes.
10  Q    And it was Amanda who claimed that she was somehow being
11  forced to do these; correct?
12  A    Right.
13  Q    And at no time did she ever say that Peyton was forcing her
14  to do anything?
15  A    No, sir.
16  Q    Now at the same time during this was Amanda contacting you
17  for money or because the relationship was just primarily your
18  son Peyton would be the one?
19  A    I don't recall Amanda ever asking for money.
20  Q    Okay.  And all of those text messages or -- excuse me,
21  email messages -- those were email messages that Ms. Lyons
22  showed you; correct?
23  A    Yes, sir.  They appeared to be.
24  Q    And at times Peyton and Amanda were paying their own bills;
25  correct?

1  A    At times, yes.
2  Q    And other times they needed help from you and your wife?
3  A    Correct.
4  Q    And during a significant period of time wasn't there an
5  agreement for them not to pay you rent?
6  A    Possibly so.  I honestly can't remember if we did that or
7  not, but possibly so.  I think we did, as a matter of fact, as
8  I think back that we may have verbally discussed that and if I
9  could elaborate just a little bit.
10 Q    Sure.
11 A    The townhome was purchased by me to give an opportunity for
12 them to be able to ultimately purchase it themselves.  That's
13 what their goal was is to be able to get a loan and purchase it
14 and so we were trying to help them build some equity and build
15 their credit up.  That was the whole purpose of that.
16 Q    And do you recall that you allowed them to not pay rent so
17 that hopefully they would save up a down payment so that they
18 could actually buy the house from you?
19 A    Precisely for a down payment, yeah.
20 Q    And your grandson lives with you and your wife now?
21 A    Yes, sir.
22 Q    Okay.  And you've been unable to have any contact with your
23 granddaughter in some months; isn't that correct?
24 A    Unfortunately, yes.
25 Q    And how many months has that been?

1  A    It's well over a year, I believe.
2  Q    Over a year?
3  A    Somewhere over a year, I think.
4  Q    And who is your granddaughter residing with?
5  A    With Amanda's older sister and her husband.
6  Q    To your knowledge does the couple that she's residing with
7  have any children of their own?
8  A    I don't believe so.  No, sir.
9  Q    Thank you, Mr. Gunn.
10           MS. LYONS:  Just one question, Your Honor.
11                       **REDIRECT EXAMINATION**
12 BY MS. LYONS:
13 Q    Mr. Merzlak asked you if you were unable to have contact
14 with your granddaughter.  That infers that somebody is
15 preventing you from doing that.  Is there a court order in
16 place preventing you from having contact with your
17 granddaughter?
18 A    I can't answer that.  Originally, we were told not to see
19 her and we tried Zooming on cellphones two or three times and
20 it didn't work very effectively and so but our understanding of
21 discussions with in and around the FBI is that we were not to
22 be able to see her because I assume -- I don't know this for a
23 fact -- so that we might not somehow steer her or coerce her or
24 something of that nature reference this case.  So we haven't
25 physically seen her and been able to hug her in a long, long

1  time.
2  Q   Mr. Gunn, who at the FBI told you that you couldn't see
3  your granddaughter?
4  A   I can't -- I honestly can't recall.  There were several
5  people that I dealt with.  So I can't answer that question.
6  Q   Mr. Gunn, do you recall meeting with myself and Special
7  Agent Godbee, your wife, and your attorney in the living room
8  of your home?
9  A   I do.
10 Q   And do you recall your wife expressing disappointment that
11 she couldn't see your granddaughter?
12 A   I do, yes.
13 Q   And, in fact, she said that your granddaughter wasn't ready
14 to see you guys?  Do you recall that?
15 A   I do.
16 Q   Okay.  So it wasn't the FBI that's been preventing you from
17 seeing your granddaughter, has it?
18 A   Well, I can't answer that question.  What you said at that
19 moment right there is true, but we learned about that a little
20 after the fact.
21           MS. LYONS:  No further witnesses, Your Honor.
22           THE COURT:  No questions?
23           MR. MERZLAK:  No, Your Honor.
24           THE COURT:  You may step down, Mr. Gunn.  Thank you.
25 You are released from your subpoena.

(Michael H. Gunn-Redirect by Ms. Lyons) 18

1        All right.  Next witness.
2    (End of Transcript of Record.)

## CERTIFICATE OF REPORTER

I, Lisa H. Davenport, Federal Official Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically-reported proceedings held and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_____

Lisa H Davenport, RPR, FCRR

Federal Official Reporter