UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION


United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )    Case No. 1:20CR14
                               )
Michael Peyton Gunn,           )
                               )
          Defendant.           )
_____)


WITNESS TESTIMONY OF JONATHAN GRANTHAM IN JURY TRIAL
BEFORE THE HONORABLE J. RANDAL HALL
CHIEF UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, NOVEMBER 17, 2021; 9:07 A.M.


FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Shawn M. Merzlak, Esquire
     Hawk Law Group
     338 Telfair Street
     Augusta, Georgia 30901
     (706)722-3500

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jonathan Grantham, | | | | |
| By Ms. Lyons | 3 | | 39 | |
| By Mr. Merzlak | | 36 | | |

GOVERNMENT'S EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|---|---|---|
| 18 | Plea Agreement | 32 |
| 20 | Email chain | 7 |

(Jonathan Grantham-Direct by Ms. Lyons)                    3

1        (The following begins at 9:07 a.m.)

2            MS. LYONS:  Thank you, Your Honor.  The government

3    calls Jonathan Grantham.

4        (Jonathan E. Grantham is duly sworn.)

5            THE CLERK:  Please state your name for the record.

6            THE WITNESS:  My name is Jonathan Eugene Grantham.

7            THE CLERK:  Thank you.

8                         **DIRECT EXAMINATION**

9    BY MS. LYONS:

10   Q    Can you lean forward a little bit into that microphone so

11   we can hear you?

12   A    Yes, ma'am.

13   Q    Thank you.  Good morning, Mr. Grantham.

14   A    Good morning.

15   Q    In August of 2021 did you plead guilty to coercion and

16   enticement related to sexual contact with a minor?

17   A    I did.  Yes, ma'am.

18   Q    And was the victim in your case known to you as Riley?

19   A    Yes, ma'am, she was.

20   Q    And did you pay Riley to have sexual contact with you after

21   communicating over Craigslist?

22   A    I did.  Yes, ma'am.

23   Q    Mr. Grantham, how old are you?

24   A    I am 46.

25   Q    And where are you originally from?

(Jonathan Grantham-Direct by Ms. Lyons)

1   A   Originally, from Augusta, Georgia, but I moved to

2   Graniteville, South Carolina.

3   Q   And are you married?

4   A   I am, yes, ma'am.

5   Q   Do you have children?

6   A   I have three.

7   Q   Where are you living now?  Where are you ---

8   A   Jefferson County.

9   Q   Is that a facility -- a jail facility?

10  A   That's a facility in Jefferson County, yes, ma'am.

11  Q   Why are you in Jefferson County now?

12  A   Because I was arrested for the charges stated.

13  Q   Were you arrested by the FBI?

14  A   I was, yes, ma'am.

15  Q   And have you been there since approximately July of 2021?

16  A   February 5, 2021.

17  Q   February 5th.  I apologize.  Thank you.

18  A   Yes, ma'am.

19  Q   In 2019 what state were you living in?

20  A   I was in Graniteville, South Carolina.

21  Q   Okay.  And were you employed?

22  A   I was.  Yes, ma'am.

23  Q   As what?

24  A   As a teacher.

25  Q   And what grade and subject did you teach?

(Jonathan Grantham-Direct by Ms. Lyons)          5

1   A    I taught multiple sciences ranging from chemistry to

2   environmental science and it ranged from grades 9 through 12.

3   Q    Did you have any other employment?

4   A    I did.  Yes, ma'am.  I taught at a local college where I

5   taught anatomy, physiology, and microbiology.

6   Q    Now in the summer of 2019 did you begin looking at maybe

7   someone would call it personal ads on Craigslist?

8   A    Yes, ma'am.  I did.

9   Q    Why did you start looking at those ads?

10  A    My wife and I were having problems.  I had gone to the

11  hospital, was hospitalized for almost the entire month of

12  December in 2018.  Then I couldn't work until April.  That

13  compounded with the issues I was having with my wife, I guess I

14  was going through a midlife crisis.

15  Q    What were you looking for on Craigslist?

16  A    I was looking for someone to have sexual intercourse with.

17  Q    Is it fair to say you were willing to pay for that?

18  A    Yes, ma'am.

19  Q    And so you were looking for a prostitute?

20  A    Yes, ma'am.  I was looking for a prostitute.

21  Q    Had you ever used Craigslist before to find a prostitute?

22  A    No, ma'am.

23  Q    Had you ever used any other online service or paper to find

24  a prostitute?

25  A    I had used a website called "Skip the Games."

1  Q    Had you actually gone through with it and hired a

2  prostitute?

3  A    Yes, ma'am.  From Skip the Games, yes, ma'am.

4  Q    Was that prostitute an adult?

5  A    Yes, ma'am.  She was.

6  Q    So in the summer of 2019 you're looking through Craigslist.

7  Do you eventually see an ad that catches your attention?

8  A    Yes, ma'am, I did.

9  Q    Did you respond to that ad?

10  A    I did respond to that ad.

11  Q    How do you respond to an ad on Craigslist if you see

12  something you're interested in?

13  A    What you do is there is a little button that you would hit

14  reply to and when you reply to it it requests that you put in

15  an email and then what you'd like to say and then once you've

16  done that you hit submit.

17  Q    Now I am going to show you on your screen only,

18  Mr. Grantham --

19  A    Okay.

20  Q    -- what's previously been marked as 20 -- Government's

21  Exhibit 20.  Is it on your screen, Mr. Grantham?

22  A    Yes, ma'am, it is.

23  Q    Does that exhibit look familiar?

24  A    Yes, ma'am, it does.

25  Q    Is that a copy of the email string with your communications

(Jonathan Grantham-Direct by Ms. Lyons)          7

1   related to this case via Craigslist?

2   A    Yes, ma'am, it is.

3   Q    And does it in any way look as if it's been altered?

4   A    No, ma'am, it does not.

5   Q    And do you see your name in that communication?

6   A    Yes, ma'am, I do.

7            MS. LYONS:  Your Honor the government would move to

8   admit and publish Government Exhibit No. 20 at this time.

9            MR. MERZLAK:  No objection.

10           THE COURT:  Admitted and you may publish.

11   (Government's Exhibit No. 20  is entered into evidence.)

12   Q    Now, Mr. Grantham, this exhibit is around 10 or 11 pages.

13   Can you tell us if we are looking at the end of your

14   conversation or the beginning of your conversation?

15   A    It appears to be the end of the conversation.

16           MS. LYONS:  Okay.  So, Ms. Long, if we can go to the

17   beginning of the conversation, I think it starts around 20.008.

18   Let's try going upwards.  The other direction.  Thank you.

19           Now, Mr. Grantham, at the top of this page do you see

20   the beginning of your conversation?

21           THE WITNESS:  Yes, ma'am, I do.

22   Q    Is this your first reply to the Craigslist ad?

23   A    Yes, ma'am, I believe so.

24           MS. LYONS:  And, Ms. Long, if we can make it a little

25   bit bigger.  Thank you.  That's better.

(Jonathan Grantham-Direct by Ms. Lyons)                    8

1          Mr. Grantham, do you see your name underneath the

2   "from" line?

3   A   Yes, ma'am.

4   Q   And can you tell us the date that your message was sent

5   near the bottom of the screen?

6   A   June 9, 2019.

7   Q   And what did you say in your first message?

8   A   "I saw your ad.  I was wondering if you're 18 and older and

9   female."

10  Q   And what was the reply that you received?

11  A   The reply was "I'm 15 and female."

12  Q   And what date did that come back to you?

13  A   June 23, 2019.

14          MS. LYONS:  If we can scroll up a little bit,

15  Ms. Long.

16          And what was the next message?

17          THE WITNESS:  "It's okay.  Too young for me."

18  Q   And who says that?

19  A   That would be me.

20  Q   And you replied on the same date?

21  A   Yes, ma'am.

22          MS. LYONS:  Okay.  Ms. Long, can we keep scrolling up?

23  Thank you.

24          And do you reply on Sunday, June 23rd at 3:02 or is

25  that the receiver?

(Jonathan Grantham-Direct by Ms. Lyons)                9

1          THE WITNESS:  That would be the recipient.  The

2   recipient -- the one that I sent the email to.

3   Q   And, Mr. Grantham, I know it's probably hard to be here and

4   I know you're a little nervous, but if you'll let me finish any

5   question only because the court reporter is taking everything

6   down.  So it's hard when we talk over each other.

7   A   I apologize.

8   Q   Thank you.  So you said the 3:02 response is from the

9   receiver?

10  A   Yes, ma'am.  That was from the receiver.

11  Q   And how did you respond when the receiver said, "Okay.

12  Well, if you think of anything let me know"?

13  A   I responded with a message saying, "I will."

14  Q   Okay.  And did you respond to that receiver or that person

15  on Craigslist again at some point?

16  A   Yes, ma'am.

17  Q   When?

18  A   On July 1, 2019.

19  Q   And what did you say?

20  A   "Hey.  Didn't know if you knew of anyone that was

21  interested in meeting me.  If we did and we met, I'd give you a

22  finder's fee."

23  Q   Okay.  At this point we're at Monday, July 1, 2019.  Is

24  that correct, Mr. Grantham?

25  A   Yes.

1   Q    And you've had three or four communications over about a

2   week or so.  Do you know if you're speaking to a male or a

3   female via Craigslist?

4   A    At this point I did not know.

5   Q    Do you know if you're speaking to an adult or minor?

6   A    I did not know.

7   Q    Okay.  Let's continue going on up.  And does that person

8   eventually respond to you?

9   A    Yes, ma'am.

10  Q    And what do they say?

11  A    "Well, I can meet with you if you want.  What would we be

12  doing?"

13  Q    And what date is that?

14  A    That was July 20, 2019.

15  Q    Now at this point they've already told you that they're 15

16  years old.  That didn't worry you, Mr. Grantham?

17  A    It did worry me, yes, ma'am.

18  Q    So why did you keep replying?

19  A    Because I had sent a second email from a different account

20  and when I was responded from that email the response was "I'm

21  18."

22  Q    So you believed them when they said "I'm 18"?

23  A    Yes, ma'am.

24  Q    Okay.  Let's go on up.  And what was your next message,

25  Mr. Grantham, on July 20, 2019?

1  A   "When I answered your ad I was looking for a female that I

2  could have adult fun with.  If you're 18 or over we could meet

3  to have adult fun.  I was just looking for someone that might

4  be interested in meeting to enjoy time with.  If you meet those

5  requirements, please feel free to shoot a pic and maybe we can

6  work something out."

7  Q   Now did that person respond with a picture?

8  A   Yes, ma'am, she did.

9  Q   Okay.  Let's scroll on up.  And the person replies on

10 Saturday, July 20, the same day.  What do they say?

11 A   "I can do that.  Okay.  When do you want to meet, day,

12 time, and for how long?"

13 Q   And I see within three minutes you ask again for the

14 picture?

15 A   Yes, ma'am.

16      MS. LYONS:  Okay.  Let's scroll on up.  You can go

17 back out if you need to, Ms. Long.  Thank you.

18      You asked "Did you have a pic?" and what was -- again,

19 I think on July 20th at 8 o'clock you say, "When you send me

20 your pic could you also let me know if you can meet on Monday

21 and what you were wanting when we meet."  And what did you mean

22 by "what you were wanting when we meet"?

23 A   How much money.

24 Q   Okay.  We can scroll on up.  So you still haven't received

25 the picture at this time, though?

(Jonathan Grantham-Direct by Ms. Lyons)                12

1   A   I don't recall getting the picture.  Oh, no, ma'am, because

2   it looks as though I asked again.

3   Q   And we would have seen an image or at least a line

4   indicating an image had been sent?

5   A   Yeah.  On this it would show image.

6   Q   Okay.  Does the person respond after you ask them whether

7   or not they're available on Monday?

8   A   Yes, ma'am.

9   Q   What was the response?

10  A   "I can on" -- it says "money" but the response is "I can on

11  money afternoon like two for 30 minutes car sex.  145."

12  Q   How did you interpret that?

13  A   The individual would be willing to meet me for sexual

14  activity for $145.

15  Q   What time is that email sent on Saturday night?

16  A   10:24 p.m.

17  Q   Okay.  And you respond just after 11 o'clock?

18  A   Yes, ma'am.

19  Q   And you again ask for a picture?

20  A   Yes, ma'am.

21  Q   Now what do we see at 11:08?

22  A   The 11:08 is the email that contained a picture.

23  Q   Do you remember what that picture looked like?

24  A   Yes, ma'am, I do.

25  Q   Can you describe it?

1   A   It was a female sitting down posing.  I can't remember

2   exactly.  I know it -- she was clothed, but I don't remember

3   exactly what she was wearing.

4   Q   Was she Caucasian?

5   A   She was Caucasian, dirty blonde hair, and it looked as

6   though the picture was taken in like a bedroom.

7   Q   How old did she look?

8   A   To me she looked like she was about 18 or 19 years old.

9   Q   What about her made her look 18 or 19 years old?

10  A   The makeup, the way she was posing.

11  Q   So then Saturday night still in the 11 o'clock hour do you

12  respond?

13  A   Yes, ma'am, I do.

14  Q   And what do you say?

15  A   "I'd like to meet you.  Would you be good with me picking

16  you up and going to a hotel room for an hour.  I'll give you

17  150.  If you'd like we can make it a regular thing once or

18  twice a month, maybe more."

19  Q   Okay.  And so I want to go back a second.  Earlier in the

20  string the person who was communicating with you suggested that

21  you meet in a car?

22  A   Yes, ma'am.

23  Q   But you didn't take them up on that?

24  A   Yes, ma'am.

25  Q   You suggested a hotel?

1  A    Yes, ma'am.

2  Q    And why was that?

3  A    I don't like the idea of having sex in a car.

4  Q    And you wanted to set up a regular thing?

5  A    Yes, ma'am.

6  Q    Okay.  We could keep going up.  And how does that person

7  respond at 11:18?

8  A    "Well, I would prefer not to go to a hotel.  I actually do

9  car sex more and for an hour would be $200."

10 Q    So they've raised their price?

11 A    Yes, ma'am.

12 Q    Okay.  And how do you respond?

13 A    "Okay.  I understand, but I don't do sex in a car.  I like

14 having more fun than just that.  The most I would do is 150,

15 but I would be a regular gig if you wanted something like that.

16 If you decided that you're willing to go to hotel for an hour

17 for 150, let me know.  It is open until I find someone else."

18 Q    So at this point you guys are engaging in negotiation?

19 A    Yes, ma'am.

20 Q    It's like, wow, trying to buy a car, trying to negotiate

21 the sale of property?

22 A    Yes, ma'am.

23 Q    You can scroll up.  And was there a response to your

24 counteroffer?

25 A    "I will do 150 for 45 minutes and, yes, I would like this

(Jonathan Grantham-Direct by Ms. Lyons)          15

1  to be a regular thing and what hotel and I have to stay close

2  like in Evans.  You understand, I'm sure."

3  Q    So at this point this person has indicated to you they are

4  likely in Evans?

5  A    Yes.

6  Q    And did you know what Evans was?

7  A    Yes, I did.

8  Q    And you knew the area?

9  A    Yes, ma'am.

10  Q    Okay.  Do you then respond -- again, we're still in the

11  11 o'clock hour; so these messages are just bouncing back and

12  forth pretty quickly?

13  A    Yes, ma'am.

14  Q    Okay.

15  A    You asked me to read, correct?

16  Q    Yes.

17  A    "It would have to be an hour and I was thinking The Ashley.

18  It is a hotel in Clearwater that charges by the hour.  If you

19  need I could come by and pick you up.  If you didn't feel right

20  about it, I would take you back.  I want you to be fine with

21  it.  Let me know."

22  Q    So at this point, Mr. Grantham, you've suggested a very

23  specific location:  The Ashley?

24  A    Yes, ma'am.

25  Q    Can you tell us why or how you know about The Ashley?

(Jonathan Grantham-Direct by Ms. Lyons)                16

1   A   I knew about The Ashley because of a family joke, to be

2   honest.  It was a joke that my oldest nephew was curated there

3   and because of it I knew that they had -- that they went

4   through and sold rooms by the hour or by three-hour sections.

5   Q   Had you taken a prostitute there before?

6   A   I had taken once before.

7   Q   What was their rate if they charge by the hour at that

8   time, if you can recall?

9   A   It was roughly about the same price.  About $120.

10  Q   Did you pay in cash or by credit card?

11  A   By cash.

12  Q   By cash?

13  A   Yes.

14  Q   Okay.  We can keep scrolling up.  Mr. Grantham, what is

15  your response at 1:47 a.m.?

16  A   "Hey, I was thinking about it.  You were willing to work

17  with me some.  If you agree to an hour at the hotel I'll give

18  you 170.  Tell me what you think please.  I figure we would

19  both enjoy the meeting and we would use it to see if we liked

20  it and want to make it a regular thing."

21  Q   And was this person -- as we scroll up, was this person

22  interested at first in going to the hotel?

23  A   No, ma'am.

24  Q   Okay.  And so do you again engage in some negotiation and

25  try and convince them to do that?

(Jonathan Grantham-Direct by Ms. Lyons)                    17

1   A    Yes, ma'am.

2   Q    Okay.  What was does your message say at 1:44 on Sunday?

3   A    "I understand.  A car date is too risky for me.  All I was

4   looking for was privacy so we could enjoy some sex.  If you

5   change your mind let me know by tomorrow.  If I haven't found

6   anyone to spend time with, I will with you.  I really was

7   hoping to make you a regular thing, though.  If not, stay

8   safe."

9   Q    And so do they respond to this message?

10  A    Yes, ma'am.

11          MS. LYONS:  I'm sorry.  Ms. Long, can you go down.

12  Perfect.

13          And they respond that, "Okay, yeah, so was I, but I

14  only do car sex"?

15          THE WITNESS:  Yes.

16  Q    Okay.  And you again respond and say "I'm willing to work

17  with you to a degree"?

18  A    Yes, ma'am.

19  Q    By this time we're on Sunday afternoon and does this person

20  once again respond within three minutes of you saying that you

21  are willing to work with them to a degree?

22  A    Yes, ma'am.

23  Q    What did they say?

24  A    "Well, I could give head in the car for 50 dollars but it

25  would have to be quick."

(Jonathan Grantham-Direct by Ms. Lyons)                18

1  Q   How did you respond to that?

2  A   "Tell me what I would need to make you feel comfortable.

3  Honestly, all I want to do is find a regular that I know is

4  dependable."

5  Q   Going on up.

6  A   The individual response was "Nothing.  LOL.  I don't do

7  hotels."

8  Q   Mr. Grantham, did you notice a change in the tone or

9  cadence or sentence structure from the beginning of this email

10 to right now?

11 A   Yes, ma'am.

12 Q   Can you tell me what you noticed?

13 A   It became more of a negotiation.  It felt as though I was

14 negotiating with an adult.

15 Q   On Sunday at 2:16 p.m. do you apologize and tell the person

16 that it wasn't working out?

17 A   Yes, ma'am.

18        MS. LYONS:  Ms. Long, scroll up.

19        Now at the thought of losing that money does the

20 person then ask you where the hotel is that you were thinking

21 about?

22        THE WITNESS:  Yes, ma'am.

23 Q   And what do you then tell them?

24 A   "If you're interested let me know so I can cancel my date I

25 set up."

1   Q   And then do you provide some information about The Ashley?

2   A   Yes, ma'am, I do.

3   Q   And you even add about $5 to your price --

4   A   Yes, ma'am.

5   Q   --  and you say you'd give them 175?

6   A   Yes, ma'am.

7   Q   Scrolling on up.  And the person tells you that they will

8   let you know their answer.  Is that accurate?

9   A   Yes.

10  Q   Do you begin to negotiate about the time?

11  A   Yes.

12  Q   And does that seem like it's going to occur on the

13  following day which is Monday?

14  A   It does, yes.

15  Q   Was there a reason you said "I was hoping for 10 a.m. or so

16  but I can't after 2 p.m."?

17  A   I do things in the morning time, not in the afternoon.

18  Q   Okay.  And scrolling on up.  And at that point it seems

19  like you were talking about the fact that you hadn't heard and

20  perhaps you had other plans.  Could you read the July 22,

21  8:59 a.m. email?

22  A   "Hey.  I don't mean to bug you but I need to know if we are

23  meeting today.  I was leaving around 9:30 to meet the other

24  girl I had set a date with.  I didn't hear anything from you

25  last night.  So I haven't canceled my date yet.  If I don't

(Jonathan Grantham-Direct by Ms. Lyons)            20

1   hear from you by 9:30 we can meet tomorrow.  If you're serious

2   about meeting could I get your number?  That way I could

3   communicate better."

4   Q    And does the Craigslist user finally respond?

5   A    Yes.

6   Q    And what is their response?

7   A    They give me the phone number and then tell me that they're

8   open to doing something either that night or the following day.

9   Q    And but they tell you tonight would work a whole lot

10  better?

11  A    Yes.

12  Q    Okay.  And then how do you respond to that final message?

13  A    I gave them my phone number and ask them to text me when

14  they have the opportunity.

15  Q    Now, Mr. Grantham, was that your real phone number?

16  A    Yes, ma'am.

17  Q    And eventually do you move from -- thank you, Ms. Long.

18  Eventually, do you move from these Craigslist communications to

19  actually texting back and forth with someone?

20  A    Yes, ma'am.

21  Q    At the point that your Craigslist communications cease,

22  it's approximately July 22nd or 21st; correct?

23  A    Approximately.

24  Q    Okay.  And have you ever verbally spoken to anyone?

25  A    No.

1   Q    Have you, other than the picture, seen this individual in

2   person?

3   A    No, ma'am.

4   Q    Do you have any idea if the Craigslist user is a man or a

5   woman?

6   A    I would have no idea.

7   Q    An adult or a minor?

8   A    No, ma'am.

9   Q    So let's move to the first time that you're starting to

10  plan to meet this person that you're going to pay to have sex

11  with.  Where did you arrange to meet her?

12  A    A neighborhood off of Columbia Industrial Boulevard in

13  Evans, Georgia.

14  Q    And you were coming across the border from South Carolina

15  into Georgia?

16  A    Yes, ma'am.

17  Q    And were you provided a specific address?

18  A    No, ma'am.

19  Q    And why wasn't she just driving to meet you at The Ashley?

20  A    Because I told her I would pick her up.  Other than that, I

21  do not know.

22  Q    Okay.  Did she ever -- did anyone ever indicate to you that

23  she couldn't drive?

24  A    No, ma'am.

25  Q    And why didn't you pick her up from her house?

(Jonathan Grantham-Direct by Ms. Lyons)                    22

1   A    From her house, you said?

2   Q    Yes.

3   A    You said why did I?

4   Q    Why didn't.

5   A    I wasn't given a house address.

6   Q    Now, Mr. Grantham, I am going to show you Government

7   Exhibit 9.002 which has previously been marked and admitted.

8   Do you recognize this girl?

9   A    Yes, ma'am, I do.

10  Q    Who do you know that girl to be?

11  A    By Riley.

12  Q    By Riley?

13  A    Yes, ma'am.

14  Q    Is this the young lady that you picked up from Evans,

15  Georgia?

16  A    Yes, it is.

17  Q    And this is the young lady that you eventually took to The

18  Ashley in South Carolina to have sexual contact with?

19  A    Yes, ma'am.

20         MS. LYONS:  Thank you, Ms. Long.

21         Now the first time you picked this young lady up,

22  where did you take her?

23         THE WITNESS:  The first time?

24  Q    Yes, sir.

25  A    I took her to a Mexican restaurant.

(Jonathan Grantham-Direct by Ms. Lyons)                    23

1    Q    Did you have any sexual contact with her on that first --

2    A    No, ma'am.

3    Q    -- on that first visit?

4    A    No, ma'am.

5    Q    Did you pay her for that first visit?

6    A    No, ma'am.

7    Q    How long did it last?

8    A    Approximately 30 to 45 minutes.

9    Q    And where do you recall picking her up from?

10   A    From the same -- from the place or the road off of Columbia

11   Industrial Boulevard.

12   Q    Off a road off of Columbia Industrial Boulevard?

13   A    Yes, ma'am.  I don't remember the name of the actual road.

14   Q    Okay.  And so how did you know when to be there?

15   A    Through text.

16   Q    And did you just wait for her to arrive?

17   A    She would text me when she was ready for me to pick her up

18   and then I would go and meet where we agreed.

19   Q    I want you to think about the one other time that you hired

20   a prostitute.

21   A    Yes, ma'am.

22   Q    Did you have to meet anybody before you met that

23   prostitute?  Did you have to check in with anybody?

24   A    No, ma'am.

25   Q    So when you picked Riley up the first time, you take her to

(Jonathan Grantham-Direct by Ms. Lyons)        24

1  the Mexican restaurant.  You eat food with her?

2  A   Yes, ma'am.

3  Q   And then what do you do?

4  A   Then take her back.  I dropped her off.

5  Q   Why didn't you have any sexual contact with her the first

6  time?

7  A   Because I was gauging her, I suppose you could say.

8  Q   And did you drop her off?

9  A   I did drop her off.

10 Q   And where did you drop her off?

11 A   The same place I picked her up.

12 Q   Did you go to her house?

13 A   No.

14 Q   The second time you saw Riley how was that arranged?

15 A   The same way through texts.

16 Q   And where did you go on your second?

17 A   To the Ashley Motel.

18 Q   And how was it arranged that you would go to the Ashley

19 Hotel on the second time you saw Riley?

20 A   Through text.

21 Q   And was there a negotiation again for a price?

22 A   It was -- I don't recall.  I recall agreeing to 160.

23 Q   Sir?

24 A   I recall agreeing to 160 or between 140 to 160 and then

25 beyond that I don't recall.

(Jonathan Grantham-Direct by Ms. Lyons)          25

1   Q   You don't remember?

2   A   No, ma'am.  I don't remember none of the negotiations on

3   that visit.

4   Q   How many times in total did you see the young lady?

5   A   Including sex or sexual?

6   Q   Well, let's say including sex how many times in total did

7   you see her?

8   A   Four times.

9   Q   You only saw her four times?

10  A   For sex.  And then I also had seen her -- I took her to a

11  place that sold hamburgers.  I picked her up.  She said during

12  her visits that she needed ---

13  Q   Okay.  Slow down for a minute.  I know you're nervous.

14  A   I apologize.

15  Q   I may have -- I may have worded that in artfully.  So let

16  me try again.  The total number of times that you saw the young

17  lady whether or not you had any sexual contact -- what was the

18  total number of times you saw her?

19  A   Approximately eight times.

20  Q   Okay.  And of the eight times that you saw this young lady

21  how many of those times did you have sexual contact?

22  A   Four times.

23  Q   And the sexual contact on those four occasions -- was it

24  oral, vaginal, anal, what was it?

25  A   Oral sex and one time I tried vaginal.

(Jonathan Grantham-Direct by Ms. Lyons)                    26

1    Q    You tried vaginal sex one time?

2    A    Yes, ma'am.

3    Q    What do you mean you tried vaginal sex?

4    A    As I stated before I was sick previously and after becoming

5    sick I found it almost impossible to keep an erection during

6    vaginal sex.

7    Q    During vaginal sex you couldn't keep an erection?

8    A    Yes, ma'am.

9    Q    So the other times it was oral sex?

10   A    Yes, ma'am.

11   Q    Okay.  So let's talk about the times you didn't have sex

12   with her.

13   A    Yes, ma'am.

14   Q    Where did you take her on the times you did not have sex?

15   A    As I stated I took her once to a Mexican restaurant and had

16   food.  I took her once to a hamburger joint off of or right

17   outside of Aiken, South Carolina.  I took her down to the

18   Augusta Mall to purchase her some clothing at the Forever 21

19   store and then I took her to the Ashley once so she could try

20   on clothing that I purchased for her.

21   Q    Okay.  So you crossed between South Carolina and Georgia a

22   couple of times --

23   A    Yes, ma'am.

24   Q    -- when you spent time with her?

25   A    Yes, sir.

(Jonathan Grantham-Direct by Ms. Lyons)                    27

1  Q   To include the times that you took her to the Ashley to

2  have sexual contact?

3  A   Yes, ma'am.

4  Q   Okay.  So let's talk about when you did take her to the

5  Ashley to have sex.

6  A   Yes, ma'am.

7  Q   Okay.  Did you always pick her up from Columbia County?

8  A   Yes, ma'am.  The same spot.

9  Q   And did you always travel to the Ashley which is over the

10 line in South Carolina?

11 A   Yes, ma'am.

12 Q   How did you get to the Ashley Hotel from Columbia County?

13 A   It depends on the time.  Sometimes I would go down

14 Riverwatch and cross over at Gordon Highway and sometimes I

15 would go to I-20 and then go across I-20.

16 Q   Okay.  And once you got to the Ashley, who paid for the

17 hotel?

18 A   I would.

19 Q   And once you were in the room can you tell us the first

20 time that you had sexual contact with Riley, what was that like

21 when you took her to the room?  What did you do?

22 A   We talked momentarily for five minutes or so.  Then after

23 that I sat in a chair.  She took her top off and then she

24 performed oral sex.

25 Q   Did she have a phone with her?

(Jonathan Grantham-Direct by Ms. Lyons)          28

1  A   She did, yes, ma'am.

2  Q   Did she use her phone at all while she was with you?

3  A   Yes, ma'am.

4  Q   What did you see her doing?

5  A   Texting.

6  Q   She was texting someone?

7  A   Yes, ma'am.

8  Q   Did you ever hear her use the phone?

9  A   As in call someone?

10 Q   Yes.

11 A   No, ma'am.  It was always text.

12 Q   How much did you pay her for oral sex?

13 A   Between 120 to 160.

14 Q   Did you pay her in cash?

15 A   In cash, yes, ma'am.

16 Q   Did she ever tell you why she needed the money?

17 A   She told me that she was trying to purchase a new phone.

18 Q   Mr. Grantham, did you ever meet anyone that you thought

19 were the parents of this young lady?

20 A   No, ma'am.

21 Q   Did you ever speak to anyone other than this young lady --

22 A   No, ma'am.

23 Q   -- about meeting and having sex with her?

24 A   No, ma'am.

25 Q   Did you ever ask to meet her or anybody in her family?

(Jonathan Grantham-Direct by Ms. Lyons)                29

1   A    No, ma'am.

2   Q    Did you ever take any photographs of her?

3   A    No, ma'am.

4   Q    You continued to text and communicate with her into at

5   least the fall of 2019; correct?

6   A    Yes, ma'am.

7   Q    Did you have any reason to doubt the age of the young lady

8   you were having sexual contact with?

9   A    Towards the end of it I started to, yes, ma'am.

10  Q    Tell us why.

11  A    A picture that she sent me, the -- when I was going to the

12  Augusta Mall to take her to purchase some clothing, I was

13  driving down the road.  I was about halfway to the Augusta Mall

14  and I crossed over Columbia Road and when I did that she ducked

15  down and I asked her why did she duck down and she told me that

16  we were approaching her mother's employment or getting close to

17  where her mother worked and so I asked her why was she hiding

18  from her mother and she told me that she wasn't supposed to be

19  out, and then the second time I really doubted it was I had

20  purchased her some clothing from the Goodwill and brought it to

21  the Ashley to try it on and then she was extremely happy about

22  getting the clothing and she was jumping up on the bed,

23  bouncing on the bed like a young girl.

24  Q    Mr. Grantham, let's talk about the text messages you

25  exchanged.

(Jonathan Grantham-Direct by Ms. Lyons)                    30

1   A    Yes, ma'am.

2   Q    Once you had Riley's phone number did the person texting

3   you on the phone use emojis?

4   A    Yes, ma'am.

5   Q    Do you know what that is?

6   A    Yes, ma'am.

7   Q    Did they use emojis?

8   A    Sometimes.

9   Q    Did they use short or long sentences?

10  A    It depended on the time of day, honestly.

11  Q    Did they use -- I am just going to refer to my children.

12  They use all of these acronyms, you know -- LOL, LMAO --

13  different things like that.

14  A    Yes, ma'am.

15  Q    Did she write in complete sentences?

16  A    Sometimes and sometimes it was short.  It was almost like

17  talking to a student.

18  Q    So I am going to ask you to think about some of the text

19  messages that you received and the negotiations that occurred

20  in the Craigslist email.  You said you're a teacher?

21  A    Yes, ma'am.

22  Q    And you worked with students?

23  A    Yes, ma'am.

24  Q    Did you ever grade papers?

25  A    I did.  Yes, ma'am.

(Jonathan Grantham-Direct by Ms. Lyons)                31

1  Q   Have the opportunity to review students when they're

2  writing things?

3  A   Yes, ma'am.

4  Q   Can you compare or notice any difference between the

5  writing in that email versus the text messages?

6  A   Yes, ma'am.

7  Q   What do you notice?

8  A   The text messages were short, sweet, to the point.  They

9  were somewhat joking sometimes where the emails felt like I was

10 speaking to an older individual.  Honestly, it felt like I was

11 talking to two different people.  One was negotiations.  The

12 other one wasn't.

13 Q   Did you enjoy talking to this young lady?

14 A   I -- yes.

15 Q   Now, ultimately, you were arrested --

16 A   Yes, ma'am.

17 Q   -- Mr. Grantham, and did you speak with Special Agent Tripp

18 Godbee?

19 A   Yes, ma'am.

20 Q   And did he ask you about somebody by the name of Riley?

21 A   Yes.

22 Q   And did you immediately admit to paying to have sex with

23 someone named Riley?

24 A   I did.  Yes, ma'am.

25 Q   And were you at that time taken into custody?

(Jonathan Grantham-Direct by Ms. Lyons)                    32

1   A    I was.  Yes, ma'am.

2   Q    Now, Mr. Grantham, I am going to show you what's been

3   marked as Government's Exhibit 18.  Tell me when you can see

4   that on your screen, sir.

5   A    Yes, ma'am.  I can see it.

6   Q    What is that document?

7   A    That's my plea agreement.

8           MS. LYONS:  The government would move to enter

9   Government's Exhibit 18 and publish at this time, Your Honor.

10          MR. MERZLAK:  No objection.

11          THE COURT:  Admitted and you may publish.

12      (Government's Exhibit No. 18  is entered into evidence.)

13  Q    Now, Mr. Grantham -- Ms. Long, can you focus on paragraph

14  two for me?  Thank you so much.

15      Mr. Grantham, does this plea agreement include the charge

16  for which you plead guilty?

17  A    Would you repeat that one more time, please?

18  Q    Does this document include the charge you plead guilty to?

19  A    Yes, ma'am.

20  Q    And, in fact, you plead guilty to enticing or coercing the

21  minor victim to travel and travel for the purpose of engaging

22  in sexual activity; is that right?

23  A    Yes, ma'am.

24          MS. LYONS:  Thank you, Ms. Long.

25          And we already know you plead guilty back in August

1  and at the time you plead guilty did you have an agreement with

2  the government to cooperate?

3           THE WITNESS:  No, ma'am.

4  Q   When was the first time you ever spoke to me or anyone with

5  the government about testifying?

6  A   Approximately a week and a half ago.  It may have been two

7  weeks.  It's been a week and a half to two weeks ago.

8  Q   And after about two weeks ago did I come down and meet with

9  you at the jail?

10 A   You did.  Yes, ma'am.

11 Q   We met two times, maybe three times?

12 A   Two times.

13 Q   And we met for maybe two hours each?

14 A   Yes, ma'am.

15 Q   Did I feed you any answers?

16 A   No, ma'am.

17 Q   Did I tell you to tell the truth?

18 A   You -- multiple times.

19 Q   And at that time did we talk about what would happen if you

20 got on the stand and lied?

21 A   If I lied?  Yes, ma'am.  It would be a perjury and

22 additional ten years to my sentence.

23 Q   And why take the stand, Mr. Grantham?  What is the benefit

24 to you?

25 A   There isn't one.  The opportunity to tell the truth.

1  Q    And why does it matter to you to tell the truth to this

2  Judge?

3  A    So that when I do -- am sentenced he -- I may have -- so

4  that it could be taken into consideration that I was

5  forthcoming.

6  Q    Now, Mr. Grantham, you were charged in an indictment -- I

7  charged you in that indictment?

8  A    Yes, ma'am.

9  Q    And it had four counts.  Yes?

10 A    Yes, ma'am.

11 Q    And you plead guilty to a charge that carries 15 years to

12 life, didn't you?

13 A    Yes, ma'am.

14 Q    And so the Judge can sentence you to 15 years.  Yes?

15 A    Yes, ma'am.

16 Q    Or he can sentence you to life?

17 A    Yes, ma'am.

18 Q    Mr. Grantham, just a few last questions.

19 A    Yes, ma'am.

20 Q    On the times -- on the four times you met with this young

21 lady for sexual contact did you ever have a situation where she

22 was put in bondage?

23 A    Yes, ma'am.

24 Q    What did you do?

25 A    I used painter's tape and took the painter's tape and

1  wrapped it around her wrists and allowed her to perform oral

2  sex.

3  Q    Okay.  And you brought the tape?

4  A    Yes, ma'am.

5  Q    Was she free to move?

6  A    Yes, ma'am.

7  Q    Did you take a picture of that?

8  A    No, ma'am.

9  Q    Mr. Grantham, did you ever give the young lady a gift of an

10  Xbox?

11  A    I did.  Yes, ma'am.

12  Q    What color was it?

13  A    It was white.

14  Q    And did she accept that gift?

15  A    She did.  Yes, ma'am.

16  Q    Now what kind of vehicle were you driving on the occasions

17  that you picked this young lady up?

18  A    A Ford F150.

19  Q    What color?

20  A    Blue.

21  Q    And how many children did you have when you met her?

22  A    Three.

23  Q    And when you met her did you ever wear anything like

24  superhero t-shirts?

25  A    Yes, ma'am.  Superman.

(Jonathan Grantham-Cross by Mr. Merzlak)                36

1   Q    And did you ever drive this young lady by a house and tell

2   her it was your house?

3   A    Yes, ma'am.

4           MS. LYONS:   I beg the Court's indulgence.

5           THE COURT:   Sure.

6   Q    Mr. Grantham, one final question.   You indicated that you

7   never picked her up from her house?

8   A    That's correct.

9   Q    Did you ever step foot in a home you even believed belonged

10  to this little girl?

11  A    No, ma'am.

12          MS. LYONS:   Thank you.   No further questions, Your

13  Honor.

14          Mr. Grantham, please answer any questions of

15  Mr. Merzlak.

16          THE COURT:   Your witness, Mr. Merzlak.

17          MR. MERZLAK:   Thank you, Judge.   I'll be extremely

18  brief.

19                       **CROSS EXAMINATION**

20  BY MR. MERZLAK:

21  Q    Mr. Grantham, you indicated at no time did you ever speak

22  with anybody on the phone when you were setting up this sexual

23  act or sexual meeting; correct?

24  A    Yes, sir.   That's correct.

25  Q    So you've never talked to Michael Gunn to your knowledge?

(Jonathan Grantham-Cross by Mr. Merzlak)                    37

1   A   To my knowledge, no.

2   Q   Okay.  You have never met Mr. Gunn?

3   A   No, sir, I have not.

4   Q   Isn't it true that, in fact, you actually know Amanda Gunn?

5   A   Do I know her?  I have seen her, but I do not know her.

6   Q   And you have never had any conversations with her?

7   A   No, sir.

8   Q   How many times have you seen Amanda Gunn?

9   A   Yesterday was my first time.

10  Q   Yesterday?

11  A   Yes, sir.

12  Q   And during these conversations initially this child told

13  you that she was 15?

14  A   Yes.

15  Q   Okay.  And then eventually sent a picture to you?

16  A   Let me -- may I go back to the question you just asked?

17  Q   Initially when you were text messaging or communicating

18  through Craigslist this child told you that she was 15?

19  A   I was told she was 15.  Yes, sir.

20  Q   And then she sent a text message or somebody sent a photo

21  through Craigslist of a child that appeared to be 15 years old;

22  correct?

23  A   I didn't think she appeared to be 15, but I did receive a

24  text message or email.

25  Q   And the picture that Ms. Lyons just displayed for you as

(Jonathan Grantham-Cross by Mr. Merzlak)                    38

1  well as the jury where she was holding a pink sign --

2  A   No, that wasn't the picture that I received.

3  Q   No, but in that picture does she appear like she is over 18

4  years of age?

5  A   With knowledge of what I know now, no, but she looked older

6  to me.

7  Q   And she never explained anything to you that she was being

8  forced into doing this?

9  A   No.

10 Q   Did she appear to be under the influence of any drugs when

11 you were with her?

12 A   No, sir.

13 Q   She was alert and normal acting?

14 A   Yes, sir.

15 Q   And she voluntarily participated in sexual activities with

16 you -- an adult?

17 A   Yes, sir.

18 Q   So the only thing that based on your plea agreement and you

19 pleading guilty to a federal felony offense that we have proven

20 to this jury through your testimony is that you're a child

21 molester; correct?

22 A   I suppose, yes.

23          MR. MERZLAK:  Nothing additional, Judge.

24          THE COURT:  All right.  Thank you.

25          MS. LYONS:  Your Honor, just one or two questions.

1                        **REDIRECT EXAMINATION**

2    BY MS. LYONS:

3    Q    Can you clarify when you say -- at least Mr. Merzlak says

4    you know Amanda Gunn?

5    A    I don't know Amanda Gunn.  We were downstairs in two

6    different holding cells.

7    Q    So in the holding cell downstairs when you were waiting to

8    testify?

9    A    Yes, sir.

10   Q    And that was yesterday for the first time?

11   A    That was the first time, yes.

12   Q    And then Mr. Merzlak said she told you she was 15 years

13   old.  Mr. Grantham, when you were going back and forth over

14   Craigslist negotiating those prices and location, do you know

15   who you were speaking with?

16   A    I have no idea.  The only time I ever spoke with her about

17   her age was in the vehicle or in my truck and when I spoke with

18   her in the vehicle she told me she was 18 multiple times.

19   Q    You said that she did not act like she was being forced and

20   she voluntarily participated.  Mr. Grantham, minors can't

21   consent to sex with adults.  You know that?

22   A    Yes, ma'am.

23   Q    Okay.  Thank you.

24            THE COURT:  All right.  Are we finished with

25   Mr. Grantham?  Is he excused?

(Jonathan Grantham-Redirect by Ms. Lyons)                    40

1          MS. LYONS:  Yes, Your Honor.

2          THE COURT:  All right.  You can leave.  Thank you.

3       (End of Transcript of Record.)

CERTIFICATE OF REPORTER

I, Lisa H. Davenport, Federal Official Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically-reported proceedings held and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_____

Lisa H Davenport, RPR, FCRR

Federal Official Reporter