UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

United States of America,       )
                                )
          Plaintiff,            )
                                )
     vs.                        )      Case No. 1:20cr14
                                )
Michael Peyton Gunn,            )
                                )
          Defendant.            )
_____)

JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE J. RANDAL HALL
CHIEF UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 15, 2021 THROUGH NOVEMBER 18, 2021

FOR THE PLAINTIFF:

     Tara M. Lyons, Esquire
     U.S. Attorney's Office
     Post Office Box 2017
     Augusta, Georgia 30903
     (706)724-0517

FOR THE DEFENDANT:

     Shawn M. Merzlak, Esquire
     Hawk Law Group
     338 Telfair Street
     Augusta, Georgia 30901
     (706)722-3500

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

**Monday, November 15, 2021**

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Joe Ross Anders, | | | | |
| By Ms. Lyons | 22 | | 88 | |
| By Mr. Merzlak | | 79 | | |
| Jonathan M. Escobar, | | | | |
| By Ms. Lyons | 92 | | 128 | |
| By Mr. Merzlak | | 121 | | |

**Tuesday, November 16, 2021**

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Justin Garrick, | | | | |
| By Ms. Lyons | 135 | | 201 | |
| By Mr. Merzlak | | 187 | | 208 |
| Charles McKee, | | | | |
| By Ms. Lyons | 211 | | 232 | |
| By Mr. Merzlak | | 226 | | |
| Jill Gunn, | | | | |
| By Ms. Lyons | 236 | | 258 | |
| By Mr. Merzlak | | 254 | | |
| Michael H. Gunn, | | | | |
| By Ms. Lyons | 260 | | 273 | |
| By Mr. Merzlak | | 269 | | |
| Amanda G. Gunn, | | | | |
| By Ms. Lyons | 275 | | 340 | |
| By Mr. Merzlak | | 326 | | |

**Wednesday, November 17, 2021**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jonathan Grantham, | | | | |
| By Ms. Lyons | 346 | | 382 | |
| By Mr. Merzlak | | 379 | | |

Grace Gunn

(Transcript filed under seal)

Harold D. Godbee, III,

| | | | | |
|---|---|---|---|---|
| By Ms. Lyons | 392 | | | |

**Thursday, November 18, 2021**

Harold D. Godbee, III,

| | | | | |
|---|---|---|---|---|
| By Ms. Lyons | | | 567 | |
| By Mr. Merzlak | | 521 | | 580 |

GOVERNMENT EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|---|---|---|
| 1 | Photo-Freeman device extraction | 28 |
| 2 | Photos | 76 |
| 3 | Screenshot-Freeman phone extraction | 43 |
| 4 | Screenshots-latitude and longitude | 48 |
| 5 | Screenshots-maps/locations | 52 |
| 6 | Photo-Freeman device data | 62 |
| 7 | Screenshot of texts | 57 |
| 8 | TextNow series | 90 |
| 9 | Images sent via email | 72 |
| 10 | Defendant phone return | 61 |
| 11 | Photo with shoe visible | 105 |
| 12 | Photographs-Consent search | 116 |
| 13 | Photo-White Puma shoes | 219 |
| 14 | Interview of defendant | 144 |
| 15 | Photographs-Search Warrant | 163 |
| 16 | Property List | 180 |

GOVERNMENT EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|-----|----------------|------|
| 17 | Photos of evidence | 182 |
| 18 | Grantham plea agreement | 375 |
| 20 | Grantham email chain | 350 |
| 21 | Amanda Gunn plea agreement | 202 |
| 22 | Photos-tattoos | 297 |
| 23 | VOID website-Lexi Haze | 302 |
| 24 | Screenshots-Flickr website | 303 |
| 25 | Screenshots-Pinterest | 326 |
| 28 | Photo-hard drive | 446 |
| 29 | Summary-subscriber info. | 447 |
| 30 | Photos-Devices analyzed | 453 |
| 31 | Screenshots-AXIOM and Griffeye | 34 |
| 32 | Screenshots-AXIOM | 469 |
| 33 | Image sent | 472 |
| 34 | AXIOM-Amanda Gunn email accounts | |
| 35 | AXIOM-Driver's license | 456 |
| 36 | FetLife emails/screenshots | 458 |
| 37 | Email | 474 |
| 38 | AXIOM-Craigslist | |
| 39 | AXIOM-Defendant chat messages | 463 |
| 40 | Google Play email | 483 |
| 41 | Venmo email | 485 |
| 42 | Model Management screenshots | 481 |
| 43 | AXIOM-Family passwords | 487 |
| 44 | AXIOM- Search term "slut" | 494 |
| 46 | AXIOM-Video | 519 |
| 47 | AXIOM-Video | 519 |
| 48 | AXIOM-Search term "Satan" | 504 |
| 49 | Image with phone number/words | 502 |
| 50 | Image with "whore" written | 501 |
| 52 | Count One images | 509 |
| 53 | Count Two images | 509 |
| 54 | Count Three images | 509 |
| 55 | Count Four images | 509 |
| 56 | Videos | 509 |
| 57 | Videos | 509 |
| 58 | Photo-SanDisk Ultra Plus Mini SD | 509 |
| 59 | Photos-red binder | 509 |
| 60 | Birth Certificate | 277 |

DEFENDANT EXHIBITS

| NO. | DESCRIPTION | EVD |
|-----|-------------|-----|
| 4 | 302 Report | 532 |

1        (The following hearing is held in a separate room from the

2   courtroom on Monday, November 15, 2021 at 8:53 a.m.)

3        THE COURT:  Okay.  Why are we here?  Have a seat.  Why

4   are we here?  Go ahead.

5        MR. MERZLAK:  Your Honor, on behalf of Mr. Gunn I just

6   want to bring up a possible violation of *Brady* on behalf of the

7   United States Government.  I don't think that it's intentional

8   or made in bad faith in any way, but *Brady versus Maryland* as

9   you know requires the government to provide exculpatory

10  material and impeachment evidence as part of the constitutional

11  guarantee to a fair trial for Mr. Gunn.

12        In this particular case in February of 2020 Special

13  Agent Godbee reviewed several videos on a website called

14  PornHub that were of the co-defendant in this case, Amanda

15  Gunn.  Those videos were labeled various things and pardon the

16  use of the language, but one was named, "I am a worthless

17  whore."  Another one was "Getting pounded in the dark.  I am

18  Amanda and a filthy whore.  Riding a hard cock.  I am Amanda

19  and a filthy whore."  About one, two, three, four, five, six,

20  seven videos that he reviewed at that time.

21        It's my understanding that in these videos there was

22  places where she read some sort of a script indicating that she

23  was a filthy whore, things like this.  I anticipate that the

24  government's witnesses including Amanda Gunn would say she was

25  forced to make these videos and she was forced, of course, to

1   make these videos by the defendant, although there is no

2   evidence of that other than her statement alone.

3         These are very material in this case because some of

4   the evidence that will be brought in regards to the minor in

5   this case has where she is reading a script indicates that her

6   father told her to do this and there's handwritten notes from

7   both her as well as what the government will probably proffer

8   as Mr. Gunn of similar scripts.  I think that this evidence

9   that would be provided is crucial for the jury to see.

10        Amanda Gunn -- obviously, what the government's

11  witnesses are going to say that she was forced to do this at

12  the behest of the defendant.  I think it's impeachment evidence

13  and the jury is entitled to see these videos to make a

14  determination on the credibility of the witness whether or not

15  she was actually being forced to do this type of thing or not.

16  I think it's exculpatory as it goes more towards to show that

17  Amanda Gunn was the person -- the individual -- that had this

18  deviant sexual lifestyle and more likely to be the person to

19  have committed these acts against the minor as well as the fact

20  that she's already plead guilty before Your Honor to

21  participating in this.

22        We would request that the Court find that these

23  particular videos were exculpatory in nature and if not

24  exculpatory certainly impeachment evidence as to Amanda Gunn,

25  and if the Court finds that request a continuance based on the

1  *Brady* materials not being provided by the government.  It is my

2  understanding that even as of last week the government was

3  trying to get these videos directly from the PornHub website or

4  the associated media company that houses these videos, but I am

5  not sure why in 2020 when Special Agent Godbee saw these videos

6  he wasn't able to simply capture them through a screen

7  recording or something like that and be able the provide those

8  to us.  That would be the motion on behalf of Mr. Gunn.  I

9  think that these are necessary to ensure his constitutional

10  guarantee to a fair trial.

11          THE COURT:  All right.  Ms. Lyons?

12          MS. LYONS:  Thank you, Your Honor.  May it please the

13  Court.  May I respond?  I wasn't totally prepared to respond to

14  this; so I will go off the top of my head here.  First, I would

15  indicate these videos are not exculpatory.  I would bring up to

16  Your Honor that as far as impeachment goes that Ms. Gunn would

17  admit that these videos exist, that they were on PornHub,

18  although she would say to the Court that Mr. Gunn forced her to

19  make these videos and, in fact, posted them against her will.

20          Your Honor, I would argue that these are not a *Brady*

21  violation because a *Brady* violation only occurs if the videos

22  are in the possession of the government.  These videos have

23  never been in in possession of the government.  We applied for

24  a lawful search warrant.  We obtained one.  We served that, I

25  believe, it's Free Sites Media.  It is the holding company for

1  PornHub.

2          They have on several occasions -- at least twice --

3  sent us links to these videos.  We are unable to download the

4  videos.  I have strings of emails that I'm happy to provide to

5  the Court to show that we have on multiple occasions attempted

6  to ask for an alternative means of obtaining the substance of

7  these videos.  I do have subscriber information that we've

8  provided to the defense.  We have the names, I believe, of

9  those videos in that subscriber information, IP information,

10 when these accounts were signed up for, and when these videos

11 were uploaded, but we do not have the substance of the videos,

12 Your Honor, and I believe that like Mr. Merzlak said this is

13 not an intentional violation and so I do not think the remedy

14 here is any sort of continuance or suppression in any way from

15 referring to these PornHub videos or the suppression of this

16 testimony related to the PornHub videos.

17         I am not sure what the remedy is that Mr. Merzlak is

18 seeking in this particular situation, but I would suggest to

19 the Court that even perhaps a drawn-up stipulation for what

20 facts are at issue related to the PornHub videos might be

21 something that the government would consider at this point.  We

22 do acknowledge that in February of 2020 I believe there is a

23 302 documenting the fact that Special Agent Godbee was able to

24 sign up for an undercover account and view one of the videos

25 with Ms. Gunn in them, but not all of those videos, Your Honor.

1   So we do acknowledge that we've seen them, but we have not been

2   able to obtain them, Your Honor.

3          MR. MERZLAK:  Do you mind if I respond just briefly?

4          THE COURT:  No.  Go right ahead.

5          MR. MERZLAK:  I will just point out that the statement

6   of Special Agent Godbee was that he viewed all of the videos,

7   including a reference that he could not identify any of the

8   male participants in the videos and that none of the referenced

9   videos depicted the minor child in this case, and I understand

10  that the government has been trying to get this information

11  through a search warrant.  I am not familiar with when that

12  search warrant was actually issued to the media site, but my --

13  in reference to it being in possession of the government,

14  Special Agent Godbee found these videos.  He has the means and

15  resources to capture the videos at that time and at this point

16  the videos have been taken down off of PornHub based on the

17  government's investigation and contacting PornHub regarding

18  these.

19          So the defense has no way to review these videos, to

20  see, you know, how closely they resemble the evidence that was

21  in -- that is going to be presented against my client related

22  to the allegations against my client and I think that it is

23  particularly impeachment evidence when the co-defendant in this

24  case is going to get up and say, yes, I plead guilty, but I was

25  forced to do all these things by Mr. Gunn.

1        The government -- excuse me.  The jury should be

2   entitled to see those videos and to judge her credibility based

3   on her actions in those videos as well as her credibility on

4   the stand to make a determination of when she was telling the

5   truth.  Was she a voluntary participant in these videos?  I

6   will submit based on this there is no evidence that Mr. Gunn

7   participated in any of those videos other than Amanda Gunn's

8   statement that he forced her into doing these.

9        MS. LYONS:  Thank you, Your Honor.  First I would say

10   that the government did not request that those videos with

11   Amanda Gunn be taken down from PornHub.

12        THE COURT:  I don't think he is alleging that.  I

13   think they took it down as a result of your contacts.

14        MS. LYONS:  Your Honor, if Your Honor is considering

15   finding that this was a violation of *Brady*, I think a potential

16   remedy would be to limit Ms. Gunn's testimony to not being

17   questioned about the PornHub videos and the government is

18   willing to concede on that issue.  We will not ask Ms. Gunn any

19   questions about whether or not PornHub videos were uploaded

20   against her will, whether or not PornHub videos were made

21   against her will.

22        MR. MERZLAK:  And, Your Honor, I think we would still

23   be entitled to play those as impeachment material and to cast

24   doubt or cast suspicion on the fact that she alone was the

25   person that was involved in this.

1          THE COURT:  So, Mr. Merzlak, what is the remedy if the

2     government cannot obtain these videos or you can't?  Because

3     she's represented to the Court the efforts they've made without

4     success even with a warrant.  So what is the remedy if they're

5     not available?

6          MR. MERZLAK:  I think we have to cross that bridge

7     when we get here.  I think that the government was in at least

8     communication with them as late as last week regarding trying

9     to get those.  I don't think there's been a statement made to

10     the government that, "I'm sorry; there is no other way we can

11     provide those."

12          THE COURT:  What is your last communication?

13          MS. LYONS:  My last communication with a woman named

14     Ms. Safari (phonetic) "Is there any other way other than a

15     secured link which we cannot access to provide these videos,

16     i.e., a thumb drive and CD?"  She said, "I will have to check

17     with the technology department."  I have had no response from

18     her since then, Your Honor, and that was perhaps the second or

19     third link that had been provided to us.  And, Your Honor, if I

20     may add this and I'm trying to think about the timing of

21     things, if these videos were known to the defense and

22     accessible -- certainly, as a government employee I am not

23     allowed to set up an account and download these videos.

24          They've been known to the defense.  This trial date

25     has been scheduled for at least 60 days.  If they were relevant

1    and they've always been relevant, they have known about the

2    interviews with Ms. Gunn.  She stated in her interviews since

3    February of 2020 that Mr. Gunn forced her to make these videos.

4    They were just as accessible and I would argue that even more

5    accessible to Mr. Merzlak and the defendant than to the United

6    States.  He could have set up an account to view those videos

7    and screen-capture them.

8            THE COURT:  Who owned the account that was used to

9    access PornHub when the videos were posted?

10           MS. LYONS:  I think arguably speaking the government

11   would say Mr. Gunn and Mr. Gunn would say Ms. Gunn, but the

12   user names and passwords were all the documents belonging to

13   Mr. Gunn.

14           MR. MERZLAK:  Were you asking who owned it when they

15   found the videos?

16           THE COURT:  No. I was asking whose account was it when

17   they were posted.

18           MR. MERZLAK:  I think Ms. Lyons is correct.  The

19   government would argue that it is Mr. Gunn's account done

20   against Amanda Gunn's will and we would deposit that was done

21   by Amanda Gunn alone.

22           MS. LYONS:  I would argue, Your Honor, though the

23   issue of whether or not it was done against Amanda Gunn's will

24   is in question, whether or not the defendant had knowledge of

25   those videos is not in question because he mentioned those

1   videos to the FBI agents the first time they visited his house.
2   So he's had knowledge of those videos since February 5th of
3   2020 and if he thought those videos were important to his
4   defense he could have asked his attorney to go ahead and
5   screenshot those videos.
6         MR. MERZLAK:  And, Your Honor, just the last thing I
7   would argue that the defendant is not -- doesn't have to put up
8   any evidence in this case, but that doesn't limit the
9   government from complying with the constitutional guarantees of
10  *Brady* and providing exculpatory and impeachment material that
11  they know is available and had the resources to capture at the
12  time Special Agent Godbee reviewed these videos.
13        THE COURT:  Is there any question or dispute about
14  whether or not Mr. Gunn had access to that PornHub account
15  where those videos were played?
16        MR. MERZLAK:  Yes.
17        THE COURT:  There is a dispute?
18        MR. MERZLAK:  Yes.
19        THE COURT:  Do you believe there is a dispute?
20        MS. LYONS:  No, Your Honor.
21        THE COURT:  Why is that?
22        MS. LYONS:  If Your Honor would give me a few minutes
23  to look through documents that contain the family user names
24  and passwords, I may be able to find a document that contains
25  the user name and or password to all of Amanda Gunn's accounts

1  that also include all of the minor's accounts, Mr. Gunn's

2  accounts, and if Your Honor would give me the time to do that

3  I'll find it.

4          THE COURT:  Go see what you can find.  I want to talk

5  to my law clerks just a moment.  We'll take a brief break.

6      (A break is taken.)

7          THE COURT:  Ms. Lyons, we're back now.  Did you tell

8  me earlier that Agent Godbee learned of the existence of the

9  PornHub videos in the first interview?  Did you say that?  Did

10  I ---

11          MS. LYONS:  I think I said that Ms. Gunn -- yes, Your

12  Honor.  So there was a conversation -- there was an odd

13  conversation on February 5th.  He did not know they were

14  PornHub videos.  What Mr. Gunn relayed to the agents on

15  February 5th when they notified the parents that there were

16  images of the minor in Texas, Mr. Gunn made a spontaneous

17  statement about videos of his wife being on the internet having

18  sex with other men and the agents noted to themselves, well,

19  wow, that was weird; why would he say that?  Nothing about

20  PornHub at that time.

21          THE COURT:  Okay.

22          MS. LYONS:  Later when Ms. Gunn is interviewed she

23  starts to divulge some information about being forced to

24  participate in acts of sex with other men and how later those

25  acts are recorded and uploaded online and then at some point I

1    think there is a 302 to document exactly how it happened and

2    what Special Agent Godbee was able to view on the PornHub site

3    and then subsequently I had -- Special Agent Godbee obtained a

4    search warrant to obtain the substance of materials on the

5    PornHub site.

6           THE COURT:  All right.  So the existence of the

7    PornHub site was disclosed by Ms. Gunn, by the defendant or in

8    just additional investigation by the FBI?

9           MS. LYONS:  He doesn't recall if specifically PornHub

10   was mentioned -- that site was mentioned -- on the first day,

11   but he knows that in later interviews with Ms. Gunn that media

12   company or that website comes up.

13          THE COURT:  All right.  Do you remember about when you

14   disclosed the existence of the PornHub sites to the defendant?

15          MS. LYONS:  It clearly came up in the early 302s that

16   were written by Special Agent Godbee in the case.

17          THE COURT:  Would that have been the initial round of

18   discovery by the government?

19          MS. LYONS:  Discovery number one.

20          THE COURT:  Number one?

21          MS. LYONS:  Yes, Your Honor.  And I can -- if you need

22   an exact date, I can look.

23          THE COURT:  No, but you're representing to the Court

24   it was part of discovery number one?

25          MS. LYONS:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MS. LYONS:  I don't think any subpoenas or search

3     warrants had been issued at that time, but, certainly, there

4     was a 302 by Special Agent Godbee written documenting the fact

5     that he viewed videos on PornHub.  Your Honor, I believe

6     Special Agent Merzlak [sic] has the date of that 302 and if I

7     could verify that I could affirm ---

8          THE COURT:  Although I don't think you're a special

9     agent.

10          MR. MERZLAK:  It's news to me.  2/26 was the date of

11     the report.  It indicates that he viewed these of 2/23 of 2020.

12          MS. LYONS:  Then, yes, that would have gone out in the

13     first round of discovery, Your Honor.

14          THE COURT:  Is there anything else you want to offer

15     to me, Ms. Lyons, and then I'll look to Mr. Merzlak?

16          MS. LYONS:  You asked me to attempt to find something

17     connecting Mr. Gunn to the issue and then the second one has

18     gone out of my mind that quickly.  I have attempted to do a

19     quick search through one of the exhibits that we have.  It's

20     about 500 pages, Your Honor, and it is not OCR'ed so I was

21     doing it by hand, but in that document there are several

22     references to Lexi likes it hot -- I'll go back.  It is a

23     combined document.  It contains three documents that say Gunn

24     Famiglia, Gunn Family Passwords.  They are produced in a format

25     that upon first looking at them they have a table of contents

1  so you would think they were almost published books or

2  documents, but, in essence, the table of contents are are using

3  names that have hyperlinks to a page and in those table of

4  contents are Lexi likes it hot, Lexi likes it hot, Amanda Lexi

5  Haze which are all the user names, references for Ms. Gunn on

6  the PornHub site.

7       All of the defendant's user names are in there.  All

8  of his passwords are in there and it's three separate family

9  password documents.  That's how the government knows that

10 Mr. Gunn was aware of all of these things.  That's not the only

11 site.  I only had a couple of minutes to search through those

12 documents, Your Honor, and have even attempted to have somebody

13 print those out for you.

14      The second issue I would simply raise, Your Honor, is

15 if you are going to make a ruling as to whether or not this is

16 a violation, you know, we're here on November 15th of 2021.

17 The issue of PornHub has been in existence since the beginning

18 of this case.  A couple of weeks ago -- maybe one or two weeks

19 ago before the guilty plea -- in fact, the Monday before the

20 guilty plea, I sat down with defense counsel and I voluntarily

21 handed over my exhibit list, went over the entire thing.

22      I have never hidden any of the government's case file,

23 but we waited until the morning while we're picking a jury to

24 allege a *Brady* violation which could impact the government's

25 case and the ability to move forward and just my ability to

1    even respond and defend my position on this, and I would ask

2    the Court to consider all of that.

3              THE COURT:  Mr. Merzlak, you're the last word.

4              MR. MERZLAK:  Yes, Your Honor.  I was in communication

5    with Ms. Lyons throughout since we met with and went over the

6    exhibit list and she reviewed some of the list.  At that point

7    the co-defendant had not entered a guilty plea in the case and

8    Ms. Lyons indicated that she was still trying to provide this

9    information and that they had the videos -- the company or the

10   entity -- and were trying to provide it electronically.  She

11   said that she was in constant communication with them.

12             I anticipated receiving those videos and the more that

13   I thought about the case over the weekend, the more I was of

14   the belief that, you know, these are going to be crucial to

15   Mr. Gunn's defense, especially in the fact that Ms. Gunn is not

16   going to be tried with him because she's already plead guilty.

17   They certainly cast in Mr. Gunn's mind and in my mind guilt and

18   a deviant type of lifestyle that Amanda Gunn was involved in

19   even though the government is going to say and Amanda is going

20   to say she was forced to be involved in this and there's

21   certainly impeachment material that a jury should be able to

22   view.

23             If she's going to make these statements that, yes, I

24   plead guilty to this, but I was forced into doing this and

25   these videos in the past I was forced into doing by Mr. Gunn,

1    then the jury should be able to view these videos and make a

2    determination for themselves whether there is any evidence in

3    those videos to exhibit that she was being forced or whether

4    those videos appear that her credibility should be in question

5    about what she she's testifying to on the stand about being

6    forced.

7            MS. LYONS:  Your Honor ---

8            THE COURT:  Go ahead.

9            MS. LYONS:  I apologize.  I'm sorry.  This just came

10   to my mind.  I recently responded to a motion to dismiss and I

11   don't know that I quite understand the remedy that Mr. Merzlak

12   is seeking because what if we are unable to ever get these

13   videos from PornHub and so I'm imagining the defense is

14   alleging that there is some sort of violation of the

15   defendant's due process rights in that he didn't have these and

16   he was unable to present an adequate defense and all of this

17   goes back to the fact that the Court would have to assess if

18   there was an intentional violation -- an intentional act -- to

19   suppress or diminish the defendant's right to view and use

20   these videos at trial.

21           So the government would argue, one, there was no

22   intentional violation here, and that, two, is there any other

23   way for the defendant to present this evidence by some other

24   means other than physically showing the video?  And I would

25   argue to the Court simply by the fact that Ms. Amanda Gunn can

1   take the stand and they can engage in a cross examination of

2   her would allow that evidence to still be utilized.

3           It is easy to make a comparison in some of those cases

4   to the fact that when a police department loses a piece of

5   evidence have they lost it intentionally and can the defendant

6   still present a defense to the court and question people about

7   that lost evidence, and I would argue that's still a very

8   similar or a similar case that we have here at hand, and I

9   don't think that there's been a violation of the defendant's

10  due process rights and that they are -- according to the

11  subscriber information that I have and have provided to the

12  defense some of those links are still active on PornHub.  They

13  have not all been taken down and I think that subpoenaed

14  information came in around September.  So as of September,

15  unless Mr. Merzlak has searched since then, at least three of

16  those links were active.

17          THE COURT:  All right.  So I have now listened to

18  counsel for the defendant.  I have listened to the government.

19  As to the issue of whether or not this is a *Brady* violation,

20  the facts that I have heard this morning are that the existence

21  of the PornHub videos were disclosed by the government as part

22  of discovery number one in February of this year -- February of

23  this year?

24          MS. LYONS:  February of last year.

25          THE COURT:  2020.

1        MS. LYONS:  Yes, sir.

2        THE COURT:  Okay.  So I'm not faced with an issue of

3   last-minute disclosure.  The government has represented to the

4   Court this morning and has informed the Court of its efforts to

5   gain access to the actual videos from the PornHub site which is

6   a third-party site.  The government has represented to the

7   Court that despite the issuance of a warrant that actual access

8   has not been successful to the government.  The government has

9   also represented to the Court that efforts continue even today

10  with the third-party provider to gain access to the videos.

11       This leads me to what I consider the threshold issue

12  on whether or not this is a *Brady* violation and the threshold

13  issue for me to consider is whether based upon the facts and

14  representations that I have heard this morning the PornHub

15  videos are considered to be in the government's possession,

16  custody or control, and the simple answer to that is no.

17       While the government, again, has represented to the

18  Court and I have no reason to doubt the government's

19  representations the efforts made up until this trial to gain

20  access to the actual videos, the fact is they do not have

21  possession, custody or control of those videos.  In light of

22  this finding, then, I find that there is no *Brady* violation

23  here and the trial will proceed.

24       I will say, however, though, that if the access to the

25  videos is obtained during trial, we will take a short break in

(Joe R. Anders-Direct by Ms. Lyons)                    22

1   this trial to permit the defendant to review those and to

2   prepare for any evidence or impeachment that might need to be

3   accomplished for any of the government's witnesses, but we'll

4   take that up if and when access is granted to the government

5   and obtained.

6           MS. LYONS:  Yes, Your Honor.

7       (The pretrial hearing is concluded and the following

8   proceedings are held in open court.)

9       (Call to Order at 10:02 a.m.)

10      (Jury selection and opening statement by the government is

11  held.)

12          THE COURT:  All right.  First witness.

13          MS. LYONS:  Thank you, Your Honor.  The government

14  would call Special Agent Joe Anders.

15      (Joe R. Anders is duly sworn.)

16          THE CLERK:  Please state your name.

17          THE WITNESS:  My name is Joe Ross Anders.  That's

18  A-N-D-E-R-S.

19          THE CLERK:  And which agency are you with?

20          THE WITNESS:  I work for the FBI.

21          THE CLERK:  Thank you.

22                       **DIRECT EXAMINATION**

23  BY MS. LYONS:

24  Q   Special Agent Anders, I am going to ask you to speak up

25  already because I had a hard time even hearing you say your

1   name.

2   A    No problem.  Is that better?

3   Q    Yes, sir.  Thank you very much.

4   A    Sure.

5   Q    Special Agent Anders, in January of 2020 were you working a

6   distribution of child pornography case for the FBI in Texas?

7   A    Correct.  I was.

8   Q    And while you were working that case did you locate images

9   of child pornography that resolved back to Evans, Georgia?

10  A    I did.

11  Q    And did those images lead to this investigation that we're

12  in court for today?

13  A    That's correct.  It did.

14  Q    Okay.  So before we get into the details of this

15  investigation I'd like you to tell the jury a little bit about

16  yourself.  How long have you been working for the FBI?

17  A    I have been with the FBI approximately six and a half

18  years.

19  Q    And where are you currently assigned?

20  A    Currently I work crimes against children for the Blackfeet

21  Indian Reservation in Northern Montana on the Canadian border.

22  Q    How long have you been assigned to Montana?

23  A    Fourteen months.

24  Q    And before you went to Montana fourteen months ago where

25  were you working?

1   A   I was working for the Dallas Field Office assigned to the

2   Texarkana, Texas RA.  It's on the Texas-Arkansas-Louisiana

3   border.  Right there.

4   Q   In Texas were you also working crimes against children?

5   A   I was.  That was my primary responsibility.

6   Q   How long were you assigned to the Dallas-Texarkana Office

7   in Texas?

8   A   Approximately three years.

9   Q   Any other prior law enforcement experience before the FBI

10  office?

11  A   So before Texarkana I worked crimes against children for

12  the FBI in Dallas and before that I worked crimes against

13  children for the Allen, Texas Police Department.  I started as

14  a Dallas police officer and then I became an Allen police

15  officer where I was detective and I was assigned to the Collin

16  County Child Abuse Task Force.  So all in all I have been

17  working crimes against children cases for approximately eight

18  years.

19  Q   Okay.  Now we've told the jury a little bit about your

20  prior law enforcement experience.  I want to forward from your

21  last assignment.  I guess go back to the last assignment.

22  January 2020 you're working Dallas-Texarkana?

23  A   Correct.

24  Q   And you're in crimes against children?

25  A   Correct.

1  Q   Do you get a call from the Hopkins County Sheriff's Office?

2  A   I did.

3  Q   Okay.  Tell us what that call was about and what you ended

4  up doing.

5  A   An investigator there that I worked with -- actually, the

6  chief deputy that I worked with often -- contacted me about a

7  case that they had that might warrant some federal attention.

8  Q   And what was the violation at that point being

9  investigated?

10 A   At that point receipt of child pornography, possession of

11 child pornography on the state side.

12 Q   And who was the target of that investigation?

13 A   A gentleman by the name of Julian Kesten Freeman.  He went

14 by KJ.

15 Q   Had the Hopkins County Sheriff's Office taken any

16 investigative action at the point when they're contacting you?

17 A   They had.  They had started their investigation.  They had

18 also -- I believe they had already executed a search warrant.

19 Q   So why were they reaching out to you, Special Agent Anders?

20 A   Based on the interview and based on some child pornography

21 that they had seen and cybertips.

22 Q   So what did they want you to do?

23 A   Take a look at the child pornography that he had, also do

24 some forensic examinations on a cellular device and other items

25 that he was in possession of and then give my opinion on

1  whether or not a federal investigation would be warranted.

2  Q    What did they give you?

3  A    Items that were taken from his house --

4  Q    Okay.  Can you give us ---

5  A    -- from the search warrant.

6  Q    I apologize.  Can you give us an example of some of the

7  items that they passed along to you?

8  A    Several computer data items, flash drives, things of that

9  nature and also a cellphone.

10 Q    Specifically, did you end up in possession of a Samsung

11 cellphone?

12 A    A Samsung Galaxy Note 9 to be exact, yes.

13 Q    Before we start to talk about what you found on that

14 Samsung, can you tell us a little bit about what you do with a

15 cellphone if it's given to you for forensic review?

16 A    Right.  So, generally speaking, I use a forensic tool in

17 order to hook it up and extract data from that and then I

18 examine the data to find out what's there.  In an instance like

19 this what I am most interested in is web history, images, and

20 videos extracted from the device, those types of things.

21 Q    What type of software do you usually use if you're looking

22 at a cellphone?

23 A    Cellphone -- the vast majority of the time I use a software

24 called Cellebrite.  Specifically, I used UFED 4PC.  It's a

25 version of that.

1  Q    Now if you're using Cellebrite to look at the cellphone is

2  there a specific software that you use to look at images?

3  A    I do.

4  Q    What is that?

5  A    It's called Griffeye Analyze.  It works really well in hand

6  with Cellebrite extractions in order to take a closer, deeper

7  look at videos and photos.  It is a photo and video analytics

8  tool, essentially.

9  Q    So before we talk a little bit more about the softwares and

10  how you use them in this case, does the FBI provide those

11  softwares to you?

12  A    Yes, both amongst others.

13  Q    I'm sorry?

14  A    Amongst others.

15  Q    And are you trained to use those softwares?

16  A    I am.

17  Q    Tell me a little bit about the certification that you hold

18  in order to properly use those softwares when you're conducting

19  an investigation?

20  A    Right.  So the FBI has something called DExT or Digital

21  Extraction Technician.  I am certified DExT with the FBI and

22  that involves me going to a two-week course.  At the time it

23  was at what was called MCCU or the Major Crimes against

24  Children Unit.  So I had that training as well as training when

25  I was with the state -- multiple conferences and I've used that

(Joe R. Anders-Direct by Ms. Lyons)                    28

1   tool for approximately eight years the entire time I have been

2   working crimes against children.

3   Q    Now I am going to show you what's been marked as Government

4   Exhibit 1.002.  Special Agent Anders, can you see something on

5   your screen?

6   A    I do.

7   Q    Okay.  Can you tell me have you seen that photograph

8   before?

9   A    Yes, I have.

10  Q    And do you recognize the item that's in that photograph?

11  A    I do.

12  Q    How do you recognize that item?

13  A    That item is the item that I put the exam results on and

14  sent to the Augusta Resident Agency.

15  Q    And have you had the opportunity to review the contents of

16  that envelope before testifying today?

17  A    Yes, I have.

18  Q    Were the contents in any way manipulated or altered?

19  A    No.

20       MS. LYONS:  Your Honor, the government would seek to

21  admit and publish Government Exhibit No. 1 at this time.

22       THE COURT:  Any objection?

23       MR. MERZLAK:  No, Your Honor.

24       THE COURT:  Admitted.

25    (Government's Exhibit No. 1 is entered into evidence.)

1          MR. MERZLAK:  Was this Exhibit No. 1 or 2?

2          THE COURT:  It is Exhibit 1.  I think at the bottom of

3   the sheet it says 1-002.

4          MR. MERZLAK:  Okay.

5          THE COURT:  But it is Government's Exhibit 1.

6          MS. LYONS:  Yes, Your Honor.  I have to refer to the

7   -002 just so it shows up on the screen.

8          THE COURT:  But for purposes of evidence it is Exhibit

9   1.

10         MR. MERZLAK:  Thank you.

11  Q    And just as an explanation, Special Agent Anders, this

12  envelope is holding the extraction that you did in this case;

13  correct?

14  A    Correct.  We refer to this as 1A envelope.  We use these in

15  tons of FBI investigations.

16  Q    And I asked somebody to photograph that extraction simply

17  because we're in Covid times and we're not bringing evidence

18  into court.  Is that correct?

19  A    Understood.  Yes.

20         MS. LYONS:  And so, Your Honor, this photo is just

21  representative of the physical evidence in this case.

22         THE COURT:  Okay.

23  Q    So talking about this extraction a little bit, Special

24  Agent Anders, is this the extraction of the Freeman Samsung

25  phone that you did in Texas?

(Joe R. Anders-Direct by Ms. Lyons)                30

1    A    Correct.  This is an extraction of the Samsung Galaxy Note

2    9 that belonged to KJ Freeman.

3    Q    Once you extracted the contents and reviewed it, did you

4    eventually send it to an agent here in Augusta?

5    A    I did.

6    Q    Who was the agent that you sent that to?

7    A    Agent sitting here.  Special Agent Godbee that works at the

8    Augusta RA.

9    Q    Does this evidence document that in any way?

10   A    It does.

11   Q    Thank you.  Okay.

12        We can put that down.  Thank you, Ms. Long.

13        We're going to talk again about your use of software when

14   you're extracting a cellphone.

15   A    Okay.

16   Q    All right.  Can you talk to the jury a little bit about

17   your workflow process, specifically in a child exploitation

18   case like this?

19   A    In general most of the time I'll have a data device, flash

20   drive, camera card, hard drive.  In this case it was a

21   cellphone.  I'll hook that up to a work station and I do an

22   extraction using a number of tools.  In this case it was UFED

23   4PC or Cellebrite and the way that you can think about that is

24   the tool goes in and does a digging and organizes the data that

25   comes out of that in an easy-to-read format for me.

(Joe R. Anders-Direct by Ms. Lyons)                    31

1        After that, because I am most of the time interested in

2   primarily videos and images in these types of cases, I will

3   then extract those into a program called Griffeye Analyze, and

4   like I mentioned before it is a really powerful photo and video

5   analytics tool and it gives me the ability to classify images

6   into different categories and also take a deeper dive into

7   those images and videos.  I do most of my review of what comes

8   out of the device in Griffeye Analyze and that's what happened

9   in this instance.

10  Q    So, Special Agent Anders, I am going to try to break down

11  what you just said into normal people's language.

12  A    Sure.

13  Q    Okay.  I am going to take a minute with that.

14  A    Right.

15  Q    So if you have a cellphone do you plug it into a computer?

16  A    I do.

17  Q    And does that computer have Cellebrite on it?

18  A    It does.

19  Q    And does Cellebrite pull out all types of information from

20  that cellphone?

21  A    It does.

22  Q    And does it put it into a user-friendly format?

23  A    Nice interface, nice format.  Correct.

24  Q    Okay.  Now if that user-friendly format has any images or

25  videos in it, what happens next?

1  A    I take those images -- that media specifically -- and dump

2  that into Griffeye Analyze.

3  Q    And so Griffeye only deals with images and videos?

4  A    Correct.

5  Q    Okay.  So once you have the images and videos in

6  Griffeye -- you talked about categorizing.  What does that

7  mean?

8  A    So in the child exploitation world in the FBI we have one

9  of five categories when we're talking about these types of

10  investigations that you put images and videos in.  We call them

11  reds, yellows or greens and then there's purples and then gray,

12  but one or reds is child pornography material.  Two is what we

13  refer to as child exploitation material.  The threes or the

14  purples is computer-generated child pornography that we'll

15  oftentimes find in investigations and then the greens or the

16  zeroes is non-pertinent.  That's like stock images, things that

17  come out of normal operating systems -- Windows 10, Windows 7,

18  Mac OS -- and then uncategorized or the grays is the other

19  category that I use in that program.

20  Q    So is it fair to say if you're conducting an investigation

21  related to child pornography and you're in Griffeye, if there

22  is child pornography on the screen you're going to see red

23  boxes?

24  A    Correct.

25  Q    If you're not dealing with a cellphone -- let's say you're

1  dealing with a hard drive or a computer -- what software would

2  you be using?

3  A   One of two mainly -- FTK, Forensic Tool Kit.  Outside of

4  that, AXIOM is a big one that I use all the time.  It used to

5  be called IEF, but it's now AXIOM.

6  Q   Is AXIOM also a software that you use to put all of the

7  information from a computer into a really easy, user-friendly

8  format?

9  A   Yes.  That's a way to put it.

10 Q   So I would like to show you what's been previously marked

11 as Government's Exhibit 31.  Is it on your screen, Special

12 Agent Anders?

13 A   Not yet, no.  There it is.  That's it.

14 Q   Do you recognize this exhibit?

15 A   I do.

16 Q   Is this an exhibit that contains screenshots?

17 A   This is.  This is a screenshot of the user interface for

18 AXIOM.

19 Q   Did you have the opportunity to review that exhibit before

20 you came to court?

21 A   I did.

22 Q   Any alterations or deletions?  Does it accurately represent

23 what you reviewed?

24 A   It does.

25          MS. LYONS:  Your Honor, the government would seek to

(Joe R. Anders-Direct by Ms. Lyons)                        34

1    admit Government's Exhibit No. 31 at this time.

2              THE COURT:  Any objection?

3              MR. MERZLAK:  No, Your Honor.

4              THE COURT:  Admitted.

5         (Government's Exhibit No. 31 is entered into evidence.)

6              MS. LYONS:  And I would seek to publish, Your Honor.

7              THE COURT:  You may publish.

8              MS. LYONS:  Ms. Long, thank you.

9              So, Special Agent Anders, what are we looking at on

10   this first page?

11             THE WITNESS:  You're looking at the user interface for

12   Magnet AXIOM.

13   Q   Okay.  So this is the software AXIOM that we just talked

14   about?

15   A   Correct.

16   Q   And we can use this for computers or hard drives?

17   A   You can and a number of other things.

18   Q   Okay.  If I wanted to search through somebody's email

19   account, could I use this software?

20   A   You can.

21   Q   Okay.

22   A   You can point -- they call it point -- this program at a

23   lot of different things on a computer.

24   Q   Can you walk the jury through what we're seeing on this

25   screen?

1  A    I can.

2  Q    Where would you like to start?

3  A    How about on the left-hand side.  We'll go left to right.

4  So what you're seeing here if you look at the top "All

5  Evidence", oftentimes because it is a term that's thrown around

6  in what I do we refer to these as artifacts.  Kind of like an

7  archeology site, diggers go in and dig a lot of things out and

8  they put them on different tarps.  Well, Axiom goes in a hard

9  drive and digs a lot of things out and then puts them over here

10 so that you can view them.  So these are artifacts; right?

11     So at the top if you see "All Evidence" there are 678,614

12 what I would refer to as artifacts or pieces of evidence here.

13 If you go down on the left, okay, so those artifacts are

14 divided into different subcategories.  You see there the one

15 that's highlighted is "Google Searches" and in this particular

16 piece of evidence we were able to pick out 849 different Google

17 searches that were made according to this tool.

18     At the bottom we have other categories.  One that you

19 probably want to focus here is "Media" and media refers to

20 images, videos that the tool was able to pluck out of whatever

21 this evidence item was and there was 120,172 items there.

22 Q    What might we find under "Chat or Email"?

23 A    Under "Chat" or "Email" you could find instant messaging.

24 You could find remnants of any chatting application that was

25 used.  There is any number of them out there.  You would find

(Joe R. Anders-Direct by Ms. Lyons)                          36

1  those types of things.

2  Q   And what might we find under "Documents"?

3  A   Under "Documents," Word documents, .pdfs, Excel.  Those

4  types of items are found under "Documents."

5            MS. LYONS:  Ms. Long, can we go back to the larger

6  screen?

7            THE WITNESS:  Can you hear me okay?

8  Q   Yes, sir.  Thank you.  Special Agent Anders, where do you

9  want to go next?

10 A   Let's go to the middle, please, that middle portion.  So if

11 you remember from the previous, the portion that was

12 highlighted "Google Searches"; so now we're looking at a

13 representation of what AXIOM was telling us those Google

14 searches were.

15 Q   And what is AXIOM telling us the search term was?

16 A   Okay.  The search term if you look at the highlighted one

17 is "How to meet in secret".

18 Q   And is AXIOM telling us the URL that was utilized or

19 accessed?

20 A   Correct.  So the URL or the website is Google.com.

21 Q   And is AXIOM telling us the date and time that that

22 specific URL was accessed?

23 A   It is.  3/15 of 2018, 2:15 a.m.

24 Q   Thank you.

25           Ms. Long?  Shall we move to the right?

(Joe R. Anders-Direct by Ms. Lyons)                37

1   A   Sure.

2   Q   What do we see on the right-hand side in AXIOM?

3   A   So this is more information about that highlighted artifact

4   in the middle and in this case that specific Google search.

5   Q   So any additional details that we might want to know about

6   a search or anything that's highlighted would be on this right

7   side?

8   A   This is just more details about that.  If you look back --

9   you see the artifact information, the term that I was using

10  earlier, it gives you the exact search term "How to meet in

11  secret" at that URL below and then the date and time again.

12  "Evidence Information" down below gives you -- it drills down a

13  little bit more into where this came from on that particular

14  device and even down below that is just more of the same.  Not

15  a lot here that you won't get from that main screen.

16  Q   Thank you.

17      Thank you, Ms. Long.  Can we go to the second page of

18  Exhibit 31?

19      What is this, Special Agent Anders?

20  A   It's a representation of the interface Griffeye analyzed,

21  that photo and video analytics tool.

22  Q   And if you can remind us Griffeye is used to categorize

23  images and videos?  Is that ---

24  A   Yes.

25  Q   Okay.

(Joe R. Anders-Direct by Ms. Lyons)                    38

1   A    To view and categorize not only the images and videos but

2   also information about them.

3   Q    So where do you want to start on this exhibit?

4   A    On this exhibit we can -- we can start on the left-hand

5   side.  So what you're seeing here is just a mini info section

6   about the image that has been selected in the middle of the

7   page.  So when you have this up you click on one of these

8   images more info comes up about it over here on the left-hand

9   side.

10              MS. LYONS:  Going back to the middle, Ms. Long.

11              Can you tell us what we're seeing in the middle of the

12  second page of Exhibit 31?

13              THE WITNESS:  Right.  So in the middle you see a

14  number of images and this is kind of the screen you would look

15  at.  As I'm going through it I'm categorizing different images.

16  It looks like one in the top left-hand corner is red.  That

17  means that it was categorized as child pornography if we're

18  talking about the FBI categorizations and then the yellow would

19  be something that's child exploitation and perhaps more

20  borderline and then the greens are classified as non-pertinent.

21  Q    Before we move on, can you please tell us what you mean by

22  borderline or child exploitation?

23  A    Sure.  So in general when we're talking about child

24  pornography in the federal system I'm looking for lewd and

25  lascivious exhibition of the genitals or I'm looking for a

1   child engaged in a sex act.  That's generally what I'm looking

2   for.  So if I see something and it's a child and it meets one

3   of those two criteria, it is going to be classified as a red.

4        Now let's say that I see something and it might be a child,

5   might be an adult, sort of borderline or it's an image of a

6   child that's definitely a child but it doesn't necessarily meet

7   that definition of lewd and lascivious exhibition of the

8   genitals or a child engaging in a sex act -- maybe it is on its

9   way there -- it would be qualified as a yellow.

10  Q    Anything else you want to point out about the middle of

11  page two on Exhibit 31?

12  A    No.

13  Q    Thank you.  And the right-hand side?

14  A    The right-hand side.  This is really the bread and butter

15  and something I love about this program.  This is the filter

16  section.  So over on the right-hand side there are tons of

17  different ways that you can filter images and videos that you

18  look at in this program.  As you can see here you can look for

19  images that were deleted.  You can search by file extension

20  like .jpeg, so on and so forth.  You can filter how big or the

21  file size if you're looking for great big videos or great big

22  images.  You can view only those or really small ones or you

23  can just look at just images -- image files or just video

24  files.  So this lets you kind of drill down and look at them in

25  a very specific way, if that makes sense.

(Joe R. Anders-Direct by Ms. Lyons)                    40

1    MS. LYONS:  Thank you, Ms. Long, and thank you,
2  Special Agent Anders.
3    THE WITNESS:  Yeah.
4  Q    So moving away from this specific example and back to the
5  Freeman extraction in this investigation --
6  A    Yes.
7  Q    -- were you able to perform an extraction on the Samsung
8  device?
9  A    I was.
10 Q    And were you able to review images that you extracted from
11 that device utilizing Griffeye?
12 A    I did.
13 Q    And were you able to identify images of child pornography?
14 A    Oh, I did.
15 Q    And in those images did you begin to notice the same child?
16 A    I did.
17 Q    Can you please tell us about that?
18 A    I found approximately 730 images that depicted the same
19 female child --
20 Q    And where were those ---
21 A    -- on Freeman's device.
22 Q    And where were those images located?
23 A    They were in a specific folder.  It was called ToxicDove.
24 Riley Cruise ToxicDove I believe is what the folder was called
25 on Freeman's device.

1  Q    Can you spell Toxic Dove for the Court Reporter, please?

2  A    T-O-X-I-C_DOVE or just ToxicDove.

3  Q    Now what did you do once you find this file folder, it has

4  the name Riley ToxicDove, and it appears to be the same child?

5  A    Right.  So one thing I feel I should point out is in these

6  types of investigations it's commonplace once I get done

7  categorizing things to drill down and see where things came

8  from.  So that's how I got to the Riley Cruise ToxicDove

9  folder.  Since I saw so many images of the same child I wanted

10 to know where exactly those images and videos -- I mean, those

11 images were on the device so I went backwards from seeing the

12 videos and I found that they were all under a single file

13 system or single file structure on the phone.

14 Q    I have to ask this question.  If your investigation was

15 related to Mr. Freeman in Texas, why are you even bothering to

16 dig down into this Riley Cruise folder?

17 A    I'd never seen these images before and after doing this for

18 a long time you start to recognize kids.  You know their first

19 names because there's a lot of collectors -- child pornography

20 collectors -- that have a lot of the same images or the same

21 series of kids.  In this particular case I saw a lot of those

22 known series.  I saw a lot of kids that I had seen before that

23 I knew, but I saw an exceptional number of the same child on

24 top of that.  The images appeared to be newer.  Since I hadn't

25 seen them before, I knew there was a chance that this was newer

1   material and I might have to opportunity to get a kid out of a

2   bad situation like I have been fortunate to do a few times.

3   Q    So if you're digging around and you're looking at these

4   images, what do you start to look for in order to find out more

5   information?

6   A    Anything that can tell me where the child is.

7   Q    And how do you figure that out?

8   A    So Griffeye gives you the ability to organize images and

9   view only images that have EXIF data associated with it.  So I

10  can take maybe 5000 images and maybe only 50 have EXIF data.

11  So I would organize by EXIF data and then look through them to

12  try to get some more clues about who the child is and where

13  they might be.

14  Q    Can you tell us what EXIF data is?

15  A    EXIF data is a form of metadata and metadata means data

16  about data.  So EXIF data is data about an image or a video and

17  it gives you more specific information about a specific -- more

18  drilled-down information about a specific image.

19  Q    I would like to show you what's been marked as Government

20  Exhibit 3.

21  A    Okay.

22  Q    Do you recognize Government Exhibit 3?

23  A    I do.

24  Q    And why is it you recognize that exhibit?

25  A    It is a screenshot of the file system from KJ Freeman's

(Joe R. Anders-Direct by Ms. Lyons)

1   phone, the guy from Texas.

2   Q    And did you create that exhibit?

3   A    I did.

4   Q    Does it appear to be in the same condition as when you

5   created it?

6   A    It does.

7         MS. LYONS:  Your Honor, the government would seek to

8   admit Government's Exhibit 3 and publish at this time.

9         THE COURT:  Any objection?

10        MR. MERZLAK:  No, Your Honor.

11        THE COURT:  Admitted and you may publish.

12     (Government's Exhibit No. 3 is entered into evidence.)

13        MS. LYONS:  Thank you.

14        Ms. Long, can we zoom in on the left-hand side maybe

15   the second half?

16        Special Agent Anders, can you tell us what we're

17   looking at?

18        THE WITNESS:  Can we go a little bit higher on that,

19   please?  So what we're seeing here is essentially the file

20   structure in this case on an Android device because Mr. Freeman

21   used an Android device.  So it is a series of folders.  At the

22   top is "Media" and then under that we've dropped down "Phone"

23   and then under that the "Download" section on this phone and

24   then underneath the Download section is the

25   "Rileycruise-toxicdove" file that contained 730 different

1  files.

2  Q    And then what we're seeing under the subsequent file folder

3  just called "toxicdove," what are those individual folders?

4  A    Sub-folders with different numbers of files in them and as

5  you can see some -- a lot of the images are .jpegs or inside

6  the root toxicdove folder as well.

7  Q    And did you have videos inside of this folder as well?

8  A    Yes.  There were some videos in there as well.

9          MS. LYONS:  Thank you, Ms. Long.

10         Special Agent Anders, how many child exploitations

11  have you worked over your career?

12         THE WITNESS:  Hundreds.

13  Q    How many digital devices have you reviewed?

14  A    Thousands.

15  Q    And how many images of child pornography have you had to

16  review during your career?

17  A    Oh, I've seen millions.

18  Q    Can you tell the jury some of the things or factors you're

19  trained to look for when you're viewing or reviewing images of

20  child pornography?

21  A    So I mentioned a little bit before I'm looking for in the

22  federal system lewd and lascivious exhibition of the genitals.

23  I am looking at how new does the image look.  Is it high

24  definition?  Does it look like it was taken on an older camera?

25  And then if something looks newer -- or it is kind of standard

(Joe R. Anders-Direct by Ms. Lyons)                45

1   protocol for me to look at EXIF data in every case to find out
2   -- hopefully, find out when the image was taken, how old it
3   might be, where it was taken if that information is in there
4   because my goal whenever things like this are happening is to
5   try to find kids.  We can look at child pornography all day
6   long, but if we want to -- what we're trying to do is
7   potentially get a child out of a bad situation or rescue them
8   from whatever situation that they're in.  So I try to look for
9   information that could somehow lead me to where the kid is.
10  Q    Now in January of 2020 when you were reviewing the Freeman
11  extraction and you see these 730 images, do any details in
12  these images start to pop out to you?
13  A    Yes.
14  Q    What kind of details?
15  A    A few things offhand is that, well, there is child
16  pornography in there and then there were images in there that
17  were not child pornography of the child.  On top of that, EXIF
18  data was able to pull out of those images was outstanding to me
19  because I had some GPS points and some location of information.
20  Q    And before we move to the GPS points, in the images that
21  weren't child pornography were you able to notice things about
22  location?
23  A    Yes.
24  Q    What types of things do you recall?
25  A    The ones that were ---

1   Q    Were not child pornography or were child pornography.

2   A    Were not child pornography?

3   Q    Yes, sir.

4   A    I noticed pictures that were taken in a neighborhood and

5   there were several that appeared to be taken from the same

6   neighborhood.  There were a few that were taken even in front

7   of the same car.  You're also trained to look for things in an

8   image that might be specific to that kid or to that area.  That

9   way if this is a child that needs to be found, we have some

10  good evidence to go out and actually find them.  Let's say that

11  it was a yellow car with purple racing stripes.  Okay, great.

12  If we can find a neighborhood like this and that's all we had

13  to go with, that stands out, right, and that can perhaps

14  somehow lead us to whoever the kid is.

15  Q    So when you start looking for EXIF data in these 730 images

16  or files are you able to start to see the pattern in the dates?

17  A    Yes.

18  Q    What do you begin to see?

19  A    If I recall correctly they were taken -- in the vast

20  majority of them that I was able to get EXIF data in 2019 and

21  there were some that were taken in the beginning of 2019 and

22  the middle and then some further to the end of 2019.  At the

23  time that I did this extraction it was early 2020.  So I knew

24  seeing that there was EXIF data that showed dates literally

25  below 2019 that there was a good chance that this child had not

(Joe R. Anders-Direct by Ms. Lyons)                    47

1   been identified yet.

2   Q    Did some of those images even go back as far as December of

3   2018?

4   A    Yes.  I remember some back that far.

5   Q    Now you did mention GPS points.  So let's talk a little bit

6   about the EXIF data that you found related to location.

7   A    Okay.

8   Q    Okay?  I am showing you what's been marked as Government's

9   Exhibit 4.  Can you see it?  I'm sorry, Special Agent Anders.

10  I don't know when it's popped up on your screen.  I apologize.

11  A    I keep looking up there, too.

12  Q    I do, too.  Is it on your screen?

13  A    It is.

14  Q    What exhibit are you looking at?

15  A    This is an image with EXIF data to the left of the female

16  child.

17  Q    Okay.  Is this an exhibit you created?

18  A    It is.

19  Q    And did you have the opportunity to review that before you

20  came to court?

21  A    Yes, ma'am.

22  Q    And it has not been altered or manipulated?

23  A    No.

24       MS. LYONS:  The government seeks to admit Government's

25  Exhibit No. 4 at this time and publish.

(Joe R. Anders-Direct by Ms. Lyons)                    48

1          MR. MERZLAK:  No objection.

2          THE COURT:  All right.  It's admitted and you may

3   publish.

4      (Government's Exhibit No. 4 is entered into evidence.)

5          MS. LYONS:  Ms. Long, can we start with 4.002?

6          Was this one of the images -- I'm sorry, Ms. Long.  I

7   shouldn't have -- thank you.

8          Was this one of the images that you found in the

9   toxicdove folder on Mr. Freeman's phone?

10  A   Yes, it is.

11  Q   And, obviously, this is not a picture of child pornography?

12  A   No.

13  Q   Okay.  So what was relevant when you looked for EXIF data

14  from this photograph?

15  A   It had GPS points and it also had a make and model --

16  Q   Okay.

17  A   -- of a camera that was used to take it.

18  Q   Tell us where you'd like to start, Special Agent Anders.

19  A   We don't need to be on the right.  I think everyone can see

20  that pretty well.  Over on the left-hand side if we'll zoom in

21  on a lot of that data.  So if you'll look at the top there, the

22  GPS lat and long.  That 33.55 followed by a string of numbers

23  and then below, the -82 followed by a string of numbers, that's

24  a GPS point that resolves to this geographic region.

25  Q   And if we go further down in the left-hand column?

(Joe R. Anders-Direct by Ms. Lyons)                    49

1    A    Right.  So more EXIF data.  As you can see, this picture

2    had quite a bit with it.  There's a lot of things there, but

3    what we want to focus on is a create date and that shows a

4    creation date for this file of 1/22 of 2019.

5    Q    So that would be January 22 of 2019?

6    A    That's correct.

7    Q    Thank you.  Is there anything else on the left-hand side of

8    4.002 that was relevant?

9    A    Right.  If we could scroll down a little more, please.  The

10   make is a Samsung and a model is an SM-T580.  So I know from my

11   training and experience -- I've seen a lot of these -- that

12   that is a model of a cellphone.

13   Q    And so are you saying that this photo was captured with a

14   Samsung SM-T580?

15   A    I am saying that's what the EXIF data shows.

16   Q    Okay.  Can we move to the second page of this exhibit --

17   Government's Exhibit 4?

18   A    Okay.

19   Q    Same thing.  Another photo found in the toxicdove folder?

20   A    Correct.

21   Q    And can we move to the left-hand side so that you can point

22   out the relevant information in the EXIF data?

23   A    So another GPS point.  You can see the GPS lat and GPS

24   long.  And then the creation date of 1/17 of 2019 or

25   January 17 of 2019 and then down at the bottom the make was a

1   Motorola and Moto G6 Play was the model, and I know from my

2   training and experience that's also a cellular device.

3   Q    Thank you.

4        Ms. Long, 4.004.

5        Another photo from the toxicdove folder; correct?

6   A    Yes.

7   Q    And let's start on the left-hand side.

8   A    Again, at the top, GPS points are relevant here, the lat

9   and long, 33.55 and -82.11, and then down below the create date

10  is 1/9 of 2019.  So I'm knowing at this point as I'm looking

11  through this folder and seeing these images that they were

12  created on different dates, the ones that have EXIF data on

13  them.  I am able to see that they were created on different

14  days and different times and then at the bottom, the make and

15  model of the device, was the same Motorola Moto G6 Play.

16  Q    Thank you, Special Agent Anders.

17  A    Yes, ma'am.

18  Q    I believe there is one last photograph.  Correct?

19  A    Correct.  The same thing here.  A photo of the child and

20  GPS lat and long, 33.55, -82.11, both followed by long streams,

21  and then the create date of 7/10 of 2019.  So at this point

22  we're getting later into 2019.  At this point it is months

23  after I found this data in that folder and then at the bottom

24  the same phone, Motorola G6 Play, the same make and model as

25  before.

(Joe R. Anders-Direct by Ms. Lyons)

1      MS. LYONS:  Thank you, Ms. Long.

2      So, Special Agent Anders, you gave us a sample of four

3  images that you were able to pull EXIF data from?

4      THE WITNESS:  Correct.

5  Q   Were these the only images that you pulled EXIF data from?

6  A   No, there were more.

7  Q   And we noticed in this EXIF data that there was a Samsung

8  phone?

9  A   Uh-huh.

10 Q   And there was -- is that a yes?

11 A   Correct.

12 Q   And we also noticed a Motorola G6?

13 A   Yes.

14 Q   Did you observe any other phones within the EXIF data?

15 A   Yes, ma'am.

16 Q   What other phone did you observe in the EXIF data for the

17 photographs that you found in the Freeman device?

18 A   I remember seeing EXIF data from an Apple iPhone.

19 Q   An Apple iPhone?

20 A   Correct.

21 Q   Thank you.  Now you just pointed out GPS coordinates or

22 latitudes and longitudes.  What did you do with the lat and

23 longitudes that you found from these photos?

24 A   I searched to figure out where they resolved to.

25 Q   And did you provide or create an exhibit to show us how you

(Joe R. Anders-Direct by Ms. Lyons)                    52

1   entered those lat -- latitudes and longitudes and you were able

2   to find the location where those photos were taken?

3   A    I did.

4   Q    I'm showing you what's been marked as Government's

5   Exhibit 5.  Do you recognize ---

6   A    Okay.  I can see it.

7   Q    Do you recognize the exhibit that is on your screen?

8   A    I do.

9   Q    How is it that you recognize that exhibit?

10  A    I created it.

11  Q    And what does it depict?

12  A    GPS points from one of the images that we just looked at.

13  Q    In Government's Exhibit 4?

14  A    Correct.

15  Q    And have you had an opportunity to review that exhibit

16  before testifying in court?

17  A    Yes, ma'am.

18       MS. LYONS:  The government seeks to admit Government

19  Exhibit No. 5 at this time and publish, Your Honor.

20       MR. MERZLAK:  No objection.

21       THE COURT:  All right.  Admitted and you may publish.

22  (Government's Exhibit No. 5 is entered into evidence.)

23       MS. LYONS:  Thank you.

24       Let's start with 5.002, please.

25       Special Agent Anders, can you explain what we're

(Joe R. Anders-Direct by Ms. Lyons)                    53

1   looking at and tell us where you'd like to start?

2          THE WITNESS:  This is from Google Maps.  If you look

3   over at the left-hand side if we can first kind of that box on

4   the top left-hand corner is Google Street View gives kind of a

5   representation of the street where this GPS point came back to.

6   You can even see a shadow, it looks like, the camera on the top

7   of the Google car caught because the sun was angled right and

8   then the GPS point from one of those previous photos and then

9   where Google is telling me that that GPS point -- the address

10  it resolves to is 218 Nicklaus Court, Evans, Georgia.

11  Q    And so did you only put one set of lat and longitudes in?

12  A    No.

13  Q    You did more than one?

14  A    I did.

15  Q    Okay.  Let's go to the next one, please.

16  A    Can we back up to the last one?

17  Q    I'm sorry, Special Agent Anders.  5.002?

18  A    Correct.

19  Q    Did you observe something there?

20  A    In the middle part there I just wanted to point out if you

21  could highlight where the red dot is in the neighborhood we're

22  at.  That red dot, if you don't know, is just a representation

23  on the map of where that GPS point resolves to and in this case

24  just north of Palmer Court somewhere near Nicklaus Court or on

25  Nicklaus Court.

(Joe R. Anders-Direct by Ms. Lyons)                54

1   Q    Thank you.

2   A    No problem.

3   Q    5.003.  Can you tell us here?

4   A    GPS point from the prior exhibit and that one resolves to

5   230 Elgin Drive -- I apologize if I mispronounce that -- here

6   in the greater Augusta area.

7   Q    And that would be Martinez, Georgia?

8   A    Martinez.

9   Q    Thank you.  And any dots on the map in the middle on the

10  Google map?

11  A    The same thing.  Google's representation of where that

12  resolves to in a neighborhood close to Sam's Club.  Just to the

13  west.

14  Q    5.004, please.

15  A    The same thing.  GPS point from prior.  This one resolved

16  to 220 Nicklaus Court in Evans, Georgia.

17  Q    And I believe there was one more sample.  Correct?

18  A    Yes, ma'am.

19       MS. LYONS:  Ms. Long, we'll go to 5.005.

20       THE WITNESS:  Another Google street view showing the

21  same types of houses and 123 Palmer Court, Evans, Georgia.

22  Q    And when we go back to the GPS map with the red dot in the

23  middle --

24  A    Uh-huh.

25  Q    -- if we can zoom in there.  Again, is that location

(Joe R. Anders-Direct by Ms. Lyons)                    55

1   familiar to you, Special Agent Anders?

2   A    It is.  Just north Palmer Court close to Nicklaus Court.

3          MS. LYONS:  Thank you, Ms. Long.

4          Now as you begin to enter these lat and longitudes

5   into Google maps, do you begin to see a pattern?

6          THE WITNESS:  Right.

7   Q    And what did you notice?

8   A    I noticed that a lot of the images resolved into this

9   geographic region and that some of them are recent and based on

10  that I have a child who -- based on what else I had seen in

11  that folder -- who could be being actively abused or even

12  sextorted.

13  Q    So you've talked a little bit about the images.  You talked

14  a lot about what you did with the images from the Freeman

15  extraction.  Other than images in the Freeman extraction, did

16  you find anything else that you believed was relevant to an

17  investigation related to Riley?

18  A    Yes.

19  Q    Were those conversations?

20  A    Yes.  I found -- I mean, videos and also audio recordings

21  in that folder, but I also found images where there were signs

22  being held up by the child.

23  Q    We'll come back to the signs in a minute.  Were you able to

24  find any conversations that Mr. Freeman was having that

25  appeared to relate to Riley?

1    A    Yes, I found messages on his phone.

2    Q    Okay.  You found messages on his phone?

3    A    Correct.

4    Q    Can you tell us a little bit about that?

5    A    So if I recall correctly, it was from the TextNow

6    application that KJ Freeman was in possession of that he had on

7    his Samsung device.  There were some messages in there that

8    appeared to be directed toward people related to Riley.

9    Q    And are you familiar with TextNow, Special Agent Anders?

10   A    Not extremely.  I know the basis of it.  Phone numbers are

11   assigned to it.  You can use it to communicate with other

12   people via text kind of like you do your phone.

13   Q    I am showing you what's been marked as Government

14   Exhibit 7.  Do you recognize that exhibit?

15   A    I do.

16   Q    And is that an exhibit you created?

17   A    It is.

18   Q    Have you had the opportunity to review the contents of that

19   exhibit and make sure it hasn't been altered or manipulated

20   before trial?

21   A    I have.  This one was altered slightly.

22   Q    So tell us why it was altered slightly.

23   A    There is child pornography that's blocked out there.

24   Q    So there is an image of child pornography in this exhibit?

25   A    There is.

(Joe R. Anders-Direct by Ms. Lyons)                    57

1   Q    And was it redacted?

2   A    It was.  It was redacted.

3   Q    Thank you.

4        The government seeks to admit Government Exhibit 7 and

5   publish at this time.

6             MR. MERZLAK:  No objection.

7             THE COURT:  Admitted and you may publish.

8        (Government's Exhibit No. 7 is entered into evidence.)

9             MS. LYONS:  Thank you.

10            Special Agent Anders, can you explain to us starting

11  at the top of 7.002 starting with the participants?

12            THE WITNESS:  Yeah, the participants it shows to Riley

13  dad at the top and then a phone number 17629941872.  It is a

14  phone number associated with Riley Dad and below that is

15  BeastPthc.  I know that that's the user handle used by KJ

16  Freeman.

17  Q    And you know that from the Freeman investigation?

18  A    From the Freeman investigation and interview.

19  Q    Can you tell us what the words based on your experience in

20  child exploitation investigations what the letters P-T-H-C

21  mean?

22  A    They stand for preteen hardcore for guys that are into

23  hardcore sex acts with preteen children.

24  Q    What the phrase or name "beast" means in child exploitation

25  cases?

1  A    Bestiality.

2  Q    What is bestiality?

3  A    It's someone that's interested in watching humans engage in

4  sex with animals.

5  Q    Thank you.

6      Ms. Long, if we can zoom out to the rest of the message.

7      Now we've seen the participants in the upper left-hand

8  corner.  Can you talk to us about the conversation that is

9  happening in the middle?

10  A    Sure can.  So if you zoom in just a little bit on that.  I

11  don't know if everyone can see it, but BeastPthc sends both of

12  these messages and the top message says "Your daughter want you

13  to cum in her cunt and breed her" and that was sent on

14  Christmas 2019 -- 12/25 of 2019.  And then below was an image

15  that was sent with no text to go along with it.  You can see

16  the image file name ending 0520.jpeg and then where that image

17  came from on Mr. Freeman's device.  You can see it comes from

18  the Rileycruise-toxicdove folder that we pointed out earlier in

19  his file system.

20  Q    And I think you mentioned earlier that you -- this image

21  below the black box, was that or was that not child

22  pornography?

23  A    It was.

24  Q    Okay.

25  A    Of the child.

(Joe R. Anders-Direct by Ms. Lyons)                    59

1   Q    Thank you, Special Agent Anders.  Is there another page to

2   this exhibit?

3   A    There is.

4           MS. LYONS:  Ms. Long, we'll move to .003.  Thank you.

5           How many participants engaged in this conversation?

6           THE WITNESS:  It says four here.  Three are listed

7   below in the screenshot, but Riley Dad 678-734-6344.  BeastPthc

8   or KJ Freeman, (678)734-6344 and then Riley Mom, same phone

9   number.

10  Q    And the substance of the conversation contained?

11  A    The message sent by BeastPthc is, "Do you have a daughter?

12  If so how old is she".  That was sent on 11/11 of 2019.

13  Q    Was this the only message?

14  A    No.

15          MS. LYONS:  Can we please go to the next page, 7-004.

16          Who were the participants in this conversation?

17          THE WITNESS:  Two:  Riley, phone number (762)944-7790

18  and then BeastPthc or KJ Freeman.

19  Q    And then the conversation?

20  A    The conversation from Mr. Freeman, "I found this number and

21  I want to know if it belongs to who the person says it does"

22  sent on 11/11/2019.  And then below that a message where it

23  appears that he just sent "0" and then an empty message below

24  that.

25  Q    Thank you, Special Agent Anders.

(Joe R. Anders-Direct by Ms. Lyons)                    60

1          Ms. Long, if you can zoom back out, please, and I would

2    like to go back to 7.003.  7.002.  Thank you.

3          Under the Riley Dad participant, can you give me that phone

4    number again, Special Agent Anders?

5    A    Yes, ma'am.  It is (762)994-1872.

6    Q    Were you able to use a law enforcement database in order to

7    query that phone number during your investigation?

8    A    I did.

9    Q    And what was the result?

10   A    The result is it came back to an individual here in the

11   Augusta, Georgia area in Evans, Georgia.

12   Q    And who was that?

13   A    Michael Gunn.

14   Q    I am showing you now what's been marked as Government's

15   Exhibit 10.  Do you recognize this exhibit?

16   A    I do.

17   Q    Is this a report you ran during this investigation?

18   A    It was.

19   Q    And did you make it part of the case file?

20   A    I did.

21   Q    Has it been altered in any way?

22   A    No, ma'am.

23          MS. LYONS:  The government seeks to admit and publish

24   Government Exhibit No. 10 at this time.

25          MR. MERZLAK:  No objection.

(Joe R. Anders-Direct by Ms. Lyons)                    61

1          THE COURT:  Admitted and you may publish.

2      (Government's Exhibit No. 10 is entered into evidence.)

3          MS. LYONS:  Please publish 10.002.  Ms. Long, if you

4  can zoom in to the second half of that page.

5          Special Agent Anders, is this the report that you ran

6  in conjunction with the phone number from the messages?

7          THE WITNESS:  It was.  This is what we refer to as a

8  realtime phone query.

9  Q   And did this report give you a result when you ran it?

10  A   It did.

11  Q   And who did the phone number come back to?

12  A   Michael Gunn, 220 Nicklaus Court in Evans, Georgia.

13  Q   Was that address familiar to you by this point in the

14  investigation?

15  A   It was because the GPS points also resolved there or close

16  to there.

17  Q   And who was the provider of this service?

18  A   Comcast Phone of Georgia, LLC is an operating name

19  according to this report.

20          MS. LYONS:  We can take that down Ms. Long.  Thank

21  you.

22          One final exhibit, Special Agent Anders.

23          Government Exhibit 6, please.

24          THE WITNESS:  There it is.

25  Q   Do you recognize Government Exhibit 6?

(Joe R. Anders-Direct by Ms. Lyons)                    62

1   A    I do.

2   Q    How is it that you recognize that exhibit?

3   A    I created it.

4   Q    And what does it depict or reflect?

5   A    It depicts the extraction summary from KJ Freeman's phone.

6   Q    And does it appear to be in the same condition as when you

7   created that exhibit?

8   A    Yes, ma'am.

9   Q    Any alterations or manipulations?

10  A    No, ma'am.

11          MS. LYONS:  The government would seek to admit

12  Exhibit 6 and publish at this time, Your Honor.

13          MR. MERZLAK:  No objection.

14          THE COURT:  Admitted and you may publish.

15      (Government's Exhibit No. 6 is entered into evidence.)

16  Q    Special Agent Anders, is this something you create after

17  you extract -- create an extraction?

18  A    The tool creates it for me automatically when an extraction

19  is created.

20  Q    And so this documents the fact that you've done what you

21  say you did?

22  A    Correct.

23  Q    All right.  Can you point us to this document where the

24  date is?

25  A    If you can zoom in on the left two-thirds, kind of down

1   more.  That's perfect.

2       Up at the top you can look at the extraction start and

3   date.  So I did this extraction of KJ Freeman's phone on

4   2/4/2020.  I started it around noon in the afternoon.

5   Q   And does it reflect at the top the type of phone that you

6   were working on?

7   A   It does.  Samsung GSM and then the model number, but it was

8   a Galaxy Note 9 that he was in possession of.

9   Q   Thank you.

10      Thank you very much, Ms. Long.

11      Now, Special Agent Anders, based on your years of

12  experience in crimes against children and child pornography,

13  after you reviewed the EXIF data and you reviewed the images

14  that you found in toxicdove folder, what were you thinking

15  about these images and about this extraction?

16  A   That the girl was being sextorted and that she had not yet

17  been identified.

18  Q   What is sextorted?

19  A   Extorted online sexually.  Sextortion is the term.

20  Q   For those of us who may not be familiar with how that may

21  happen to a minor --

22  A   Got it.

23  Q   -- can you break that down?

24  A   So in general the way I've seen it happen in my career is

25  we have a 10, 11, 12, 14, 15-year-old child and they're

(Joe R. Anders-Direct by Ms. Lyons)                    64

1   communicating with someone online and that person happens to be

2   interested in getting sexually-explicit content from them or

3   he's a predator.  He talks that child or convinces that child

4   to send some sort of image or something and it can be

5   innocent enough at first, but, eventually, let's say, a

6   picture of a child in her underwear or a topless picture of the

7   child.

8       Well, at the same time this individual has been doing

9   research on the child maybe through Facebook or other social

10  media to figure out who the kid's friends are, who the kid's

11  family is.  Once he gets that picture that's topless or maybe

12  it's even child pornography or maybe it's a nude in front of

13  the mirror, whatever, he then uses that -- for example, hey,

14  you're going to send me more; you're going to do exactly what I

15  ask you to do or I am going to send this to your friends; I am

16  going to send this picture of you in your underwear to your

17  family if you don't provide to me the content that I want.

18      So in a way it holds that child hostage online.  Do I tell

19  my parents what's going on or what I did or do I give this guy

20  what he wants or do I risk being humiliated by him?  So the

21  term we Cruise for that is sextortion.  The girl is being

22  extorted for more content on the internet.

23  Q   So the two thoughts you are having at this point on

24  February 4 of 2020 are that this child may be being sextorted

25  and maybe this child has not been located or found yet?

(Joe R. Anders-Direct by Ms. Lyons)                    65

1    A    That's what I was thinking.

2    Q    Okay.  So with those two things in mind and you have the

3    geographical location, what do you do next?

4    A    Pick up the phone and figure out who works child

5    exploitation cases in this region.

6    Q    And who was that?

7    A    Special Agent Godbee.

8    Q    What is his full name if you know it?

9    A    Tripp Harold Godbee.

10   Q    Did you eventually call Special Agent Tripp Godbee?

11   A    I did.  I called him that day.

12   Q    On February 4?

13   A    Correct.

14   Q    And do you recall the conversation?

15   A    Essentially, the conversation was, "Hey, I've got a kid

16   that I've identified.  I think she's in your region.  I've got

17   child pornography images.  Can I provide some information to

18   you to find out if she's been identified and maybe you can

19   follow up with some of your sources out there and make sure

20   she's good, make sure she's safe."

21   Q    And how did Special Agent Godbee respond?

22   A    He said, "Yeah, absolutely.  I'll look into it."

23   Q    Would you say on the night of February 4 of 2020 your goal

24   was to move quickly or slowly?

25   A    Oh, absolutely quickly in cases like this.

(Joe R. Anders-Direct by Ms. Lyons)                    66

1    Q    Why is that?

2    A    Because if a kid is being actively abused we want to get

3    them out of that situation as quickly as possible.  At this

4    point I have evidence that that might be happening whether it

5    is online or otherwise.  We want to get the kid out of that

6    situation.

7    Q    Based on the idea that you're trying to move quickly

8    because a child may still be being abused --

9    A    Correct.

10   Q    -- what do you immediately do?

11   A    Call him and then send him an email --

12   Q    Okay.

13   A    -- with information in it.

14   Q    And what do you send in that email?

15   A    Images and information about GPS points.

16   Q    Do you recall what type of images you sent to him?

17   A    Sanitized.

18   Q    Tell us what sanitized images ---

19   A    Non-child-pornography images.  Images that I pulled out of

20   KJ Freeman's phone that was not child pornography and that had

21   some EXIF data associated with them.

22   Q    After you send the email on February 4, do you follow up

23   with anything after February 4?

24   A    Yes.

25   Q    What do you follow up with?

1   A    I also send him the complete extraction --

2   Q    And that's the ---

3   A    -- that we looked at earlier in that 1A envelope.

4   Q    Okay.  So the extraction that's in Government Exhibit 1?

5   A    Correct.

6   Q    Did you speak with Special Agent Godbee again at any point

7   in the investigation?

8   A    I did.  We spoke a lot.

9   Q    And do you recall if at any point he updated you on what

10  was happening during the investigation?

11  A    He did.

12  Q    What did he tell you?

13  A    Shortly after I was informed that they had located where

14  the child lives, located the child, had performed some

15  interviews and also searched the residence.

16  Q    Based on his update what, if anything, did you do?

17  A    I decided to come out here.

18  Q    So did you come to Augusta?

19  A    I did.

20  Q    And why did you come to Augusta?

21  A    Because I felt sort of responsible for the kid at that

22  point.  I wanted to see it through and I also felt like I

23  needed to see her and make sure she was okay.

24  Q    So in late February, early March did you travel to Augusta,

25  Georgia?

1   A    I did.

2   Q    What types of things did you do while you were here?

3   A    I helped out with some interviews and did some -- helped

4   Agent Godbee with some computer forensics.

5   Q    Let's talk about some of the interviews that you assisted

6   with and we'll come back to the forensics in one moment.  Who

7   did you interview with Special Agent Godbee while you were here

8   in Augusta in late February?

9   A    The wife, Amanda Gunn.

10  Q    Was there anything significant from her interview that you

11  recall?

12  A    I recall a few things, some things that she said to both

13  Special Agent Godbee and I.

14  Q    Did you talk to her at all about her marriage?

15  A    We did.

16  Q    And did you speak with her about her husband, the

17  defendant?

18  A    I did.  We talked about Peyton Gunn.

19  Q    Did you speak with her at all about the Cruise of the

20  internet?

21  A    We did.

22  Q    And her husband's Cruise of the internet?

23  A    We did.  We talked about that some, too.

24  Q    Did you speak with her about her husband's experience with

25  computers?

1   A    I recall speaking about that a little bit, yes.

2   Q    Did you speak with her about being forced to have sex with

3   other men?

4   A    I did.

5   Q    What is a virtual machine, Special Agent Anders?

6   A    Virtual machine or a VM is an operating system -- Windows

7   or even Mac OS or Linux -- a lot of people use Linux if they

8   use VM -- that operates outside of or virtually or separate

9   from the host machine that you're operating it on.  So, in

10  other words, it is a computer that's operating virtually.  So

11  if you're using Windows on a VM instead of data being written

12  to the computer that you're using as a host, the data gets

13  written to the virtual hard drive of the virtual machine.

14  That's essentially how they work.

15  Q    Is a virtual machine something that a beginner or an

16  experienced user would use at home?

17  A    More of an experienced user.

18  Q    Did Amanda Gunn indicate whether or not her husband used

19  virtual machines?

20  A    She talked about VMs.  She did.

21  Q    You also assisted Special Agent Godbee in conducting some

22  forensic examinations in this case?

23  A    I did.

24          MS. LYONS:  I beg the Court's indulgence.

25          Your Honor, at this time I'm about to discuss images

(Joe R. Anders-Direct by Ms. Lyons)                70

1   with Special Agent Anders and I would like to hand out the

2   exhibit book to the jury and the appropriate parties.

3          THE COURT:  So the jury is about to see child

4   pornography or alleged child pornography?

5          MS. LYONS:  Yes, Your Honor.

6          THE COURT:  All right.  You may -- any objections to

7   passing out the books?

8          MR. MERZLAK:  No, Your Honor.

9          THE COURT:  All right.  Ladies and gentlemen of the

10  jury, you're about to be shown certain images that will be

11  admitted into evidence.

12         Are you going to tell them to hold those until you

13  admit them?

14         MS. LYONS:  Yes, Your Honor.

15         THE COURT:  All right.  Please do not open those books

16  until they have been admitted and I instruct you, but these

17  images will be shown or published to you only to assist you in

18  determining whether the government has met its burden to prove

19  Mr. Gunn guilty of all of the elements of the charges against

20  him.  You should not allow any feelings that you may have

21  regarding these images to affect this determination in any

22  manner.  You should view these images in the same unbiased,

23  impartial way as you would of any piece of evidence offered by

24  either side in this case.

25         Please recall that at the beginning of the case each

(Joe R. Anders-Direct by Ms. Lyons)                    71

1   of you took an oath to be fair and impartial to both sides of

2   the case.  Please keep in mind that no matter what you think of

3   these images your duty is to follow the law as I will instruct

4   you.  Please remember Mr. Gunn is presumed innocent of the

5   charges against him and the government bears the burden of

6   proof on each of the elements of the offenses charged, and,

7   again, please do not open the books until we have actually

8   admitted those items into evidence and I will instruct you when

9   to open them.

10          MS. LYONS:  I beg the Court's indulgence.

11          THE COURT:  Sure.

12  Q   Special Agent Anders, I would like to turn your attention

13  back to the email that you sent to Special Agent Godbee on

14  February 4 of 2020.  That email did not contain unsanitized

15  images of child pornography; correct?  So no visible child

16  pornography in that email.

17  A   No.

18  Q   Okay.  So we're going to start with that email and before

19  we move to the actual image of child pornography, I will stop

20  and make an announcement.  Okay?  All right.

21      So let's start with Government Exhibit 9 at this time,

22  Ms. Long.

23      Special Agent Anders, tell me when you see that on your

24  screen.

25  A   I see it.

1  Q   Do you recognize that exhibit?

2  A   I do.

3  Q   Okay.  Is that an exhibit that you've had the opportunity

4  to review before you came to court?

5  A   Yes.

6  Q   Were any of those images altered or manipulated in any way?

7  A   No, ma'am.

8  Q   Okay.  Were those the images that you attached when you

9  first contacted Special Agent Godbee?

10 A   Yes, they were.

11         MS. LYONS:  Your Honor, the government would seek to

12 admit and publish Government's Exhibit 9 at this time.

13         MR. MERZLAK:  No objection.

14         THE COURT:  Admitted and you may publish.

15         MS. LYONS:  Thank you, Your Honor.

16     (Government's Exhibit No. 9 is entered into evidence.)

17 Q   We're going to start with 9.002, Special Agent Anders.  Is

18 this one of the photographs that you emailed to Special Agent

19 Godbee on February 4 of 2020?

20 A   Yes.  I located this on KJ's phone and then sent it to him

21 in an email.

22 Q   I'm sorry.  Your voice -- I'm probably not hearing you.

23 Did you say you located that on Mr. Freeman's phone?

24 A   Correct.  KJ Freeman's phone.

25 Q   Was that located in the Rileycruise-toxicdove folder?

(Joe R. Anders-Direct by Ms. Lyons)                73

1    A    Yes, ma'am.

2    Q    Okay.  So as an experienced investigator in crimes against

3    children I want you to take a look at this photograph and point

4    out to the jury anything of significance in this picture.

5    A    So in my experience she's holding a sign and to me at the

6    time I thought it was a validation sign.  A validation sign is

7    someone is communicating with the kid online and says, okay, I

8    want to make sure that you're real.  I want to make sure, A,

9    that you're not an adult and, b, I want to make sure that

10   you're not a cop.  Send me something with some writing on it

11   and also the date.  This is what I thought that was whenever I

12   looked at it which led me further down the hole of thinking

13   maybe she was being sextorted.

14   Q    Let's move to 9.003.  Was there anything significant about

15   this photograph?

16   A    Right.  One of the reasons I sent this photograph -- for

17   one, it is a good photo of the child but also the neighborhood

18   in the back.  It kind of showed a representation of where she

19   might live and this photograph is very similar to the Google

20   street view -- the homes in the Google street view that I saw.

21   Also, a car is always good because it gives a reference point.

22   There might be a lot of cars like that, but how many cars like

23   that are in that neighborhood and then I also noticed something

24   that looked like a bird feeder or bird bath hanging from that

25   small tree in the right-hand portion.

(Joe R. Anders-Direct by Ms. Lyons)                    74

1        MS. LYONS:  Ms. Long, can you pull that up, please?

2        Where are you referencing a bird house?

3        THE WITNESS:  Hanging from that tree right there.  It

4   looked like a bird house.

5   Q    Thank you very much.

6   A    So my thinking was if we can find this neighborhood if we

7   can't find anything else, what if we see maybe that bird house

8   hanging out there.

9   Q    Let's move to 9.004.  Was there anything significant about

10  this photograph?

11  A    A good close-up picture of the child's face.  It looked

12  like the car again in the background but also a necklace with

13  some writing on it.

14  Q    Did those letters perhaps appear to spell out what could

15  have been a name?

16  A    They did.

17  Q    And finally 9.005.  Tell us about this photograph.

18  A    This is more of what I considered at the time to be

19  validation.  I thought maybe she was reaching out to someone

20  with the screen name or the name of Badoo confirming that she

21  was real perhaps this person had asked her to write and then

22  the date that was on it in June of 2019.

23  Q    Special Agent Anders, you have children, don't you?

24  A    I do.

25        MS. LYONS:  Ms. Long, can you pull that photograph

(Joe R. Anders-Direct by Ms. Lyons)                    75

1   back up, please?  9005.  Can you zoom in on the top right-hand

2   corner of that photograph?  The blue blanket.

3          Does this appear to be a child's blanket?

4          THE WITNESS:  It does.

5   Q   Thank you.

6       Now we're going to move to the images of child pornography

7   at this time, Your Honor.

8       Special Agent Anders, I am going to ask you to look -- and

9   not the jury yet -- but at what's been marked as Government

10  Exhibit 2.  I am going to ask you if you recognize that series

11  of photographs?

12  A   I do.  I recognize these.

13  Q   And why is it you recognize that series of photographs

14  under Government Exhibit 2?

15  A   I found them on Mr. Freeman's phone in that folder.

16  Q   And did you later forward those photographs to Special

17  Agent Godbee here in Augusta, Georgia?

18  A   I did.  They came over with that forensic extraction.

19  Q   And did you categorize those images or that series as child

20  pornography?

21  A   I did.  Most of the series was categorized as child

22  pornography.  At the time I was calling it the wood floor

23  series from his phone.

24  Q   What did you call it?

25  A   The wood floor series.

(Joe R. Anders-Direct by Ms. Lyons)                    76

1   Q    And why is that?

2   A    Because you see the child on a wood floor throughout the

3   images.

4   Q    Have those images been altered or manipulated in any way?

5   A    No, ma'am.

6        MS. LYONS:  The government seeks to admit and publish

7   Government Exhibit No. 2 at this time, Your Honor, holding

8   until we have any objections and Your Honor allows that

9   publication.

10       THE COURT:  Any objections?

11       MR. MERZLAK:  Your Honor, we have no objection to the

12  admittance of this item of evidence.  I just want to let the

13  record reflect that the defendant will not be looking at these

14  items.

15       THE COURT:  Very well.  Hearing no objections, then

16  Government's Exhibit 2 is admitted and you may publish.  I'll

17  let you direct the jury when to open the book.

18       (Government's Exhibit No. 2 is entered into evidence.)

19  Q    Special Agent Anders, if you will start at tab two, the

20  jury can open their book with you.  The first thing we see the

21  Government Exhibit tab or paper that says Government

22  Exhibit 2.  The first page -- can you tell us what we're

23  looking at?

24  A    The first image?

25  Q    The first image.  Thank you.

(Joe R. Anders-Direct by Ms. Lyons)                77

1   A    Yes.  The first image you see the wood floor and it looks

2   like a reflection from a light or a flash and then there is a

3   foot of the child and then on the right-hand side is a shoe

4   that got caught in the image there.

5   Q    And is there anything significant in the detailing on the

6   shoe that's located in the bottom half of this first

7   photograph?

8   A    Right.  So something that stood out to me is that it looked

9   like -- a little bit like it's coming apart near the toe, that

10  the shoe laces are white, that there are what appears to be a

11  dark mark on the other side of the shoe, and then the shoe is

12  distinct in that it had kind of a lot of little air holes in it

13  kind of like if you were to take a needle and poke it a ton of

14  times.  I saw that on it; so it stood out as something that

15  could perhaps be identified later on.

16  Q    And what are we seeing in the top right-hand corner of this

17  first page image?

18  A    Wood floor and a flash.

19           MS. LYONS:  May I approach the witness, Your Honor?

20           THE COURT:  You may.

21  Q    Can you simply -- I apologize.  We're not looking at it at

22  the same direction.  That's why.  Can you please simply

23  describe what you're seeing here?

24  A    Yeah.  Foot, child, and the toes.

25  Q    And this is the first photograph in a series of

(Joe R. Anders-Direct by Ms. Lyons)                    78

1  photographs?

2  A    Correct.  It is.

3  Q    Can you walk us through the rest of the photographs,

4  please?

5  A    Right.  So what I noticed about these is the reason I

6  called it a series is it kind of starts with images that were

7  taken of the child from some of them a little further out or

8  further away as she's in various states of undress and kind of

9  as it goes on you start to see more images of the child's face

10 and of her breast and then toward the end you see images and

11 even more close-up images of the child's breast and then the

12 child's vagina is visible in a few of the images as well --

13 some close up and some far away and also I noticed that the

14 child seemed to -- like she was being posed or was posing in

15 different ways throughout this series from start to finish.

16 Q    Are you able to see her face several times during this

17 series of photos?

18 A    Yes.

19 Q    Does it appear that she is taking these photographs of

20 herself?

21 A    No.

22          MS. LYONS:  I beg the Court's indulgence.

23          Thank you, Special Agent Anders.  I have no further

24 questions for you at this time.  I would pass the witness to

25 Mr. Merzlak for questioning.

(Joe R. Anders-Cross by Mr. Merzlak)                    79

1            THE WITNESS:  Yes, ma'am.

2            MS. LYONS:  Thank you, Your Honor.

3            THE COURT:  Ladies and gentlemen, do you need a

4   restroom break before we go to cross exam or is everyone okay

5   to continue?  Good to go?  No break.  All right.

6            Your witness.

7            MR. MERZLAK:  Thank you, Judge.

8                        **CROSS EXAMINATION**

9   BY MR. MERZLAK:

10  Q    Good afternoon, Agent Anders.

11  A    Good afternoon.

12  Q    Just let me know if any of the questions I ask don't make

13  any sense to you.

14  A    Yes, sir.

15  Q    That's my fault, not yours, obviously.

16  A    No problem.

17  Q    You've got eight years of experience in these child crimes?

18  A    Approximately, yes, sir.

19  Q    And in this particular case it was in Texas that the

20  investigation began?

21  A    That's correct.

22  Q    Okay.  And did your investigation reveal that Mr. Gunn was

23  ever in Texas?

24  A    No.

25  Q    Okay.  And you found these images on a KJ Freeman Samsung

1  Galaxy phone; correct?

2  A    On his Samsung phone, correct.

3  Q    Correct.  You extracted those images off of his phone?

4  A    Correct.

5  Q    And only some of these images had EXIF data on them?

6  A    Some did.

7  Q    Can you explain to the jury why some would have this data

8  and why some would not?

9  A    Sure.  So A lot of times the reason that a phone would have

10 EXIF data or location data is you can turn off that capability

11 on your phone.  If you turn off location services like on your

12 iPhone for your camera, whenever you take that picture EXIF

13 data for GPS lat and long won't be recorded.  You can do that

14 on Samsung devices, too.  Also, is if an image or a video is

15 carved meaning that it came from the unallocated portion of a

16 hard drive or, in other words, it's been deleted before,

17 whenever it is retrieved by a forensic tool from a deleted

18 portion of a hard drive it will not have EXIF data.  The EXIF

19 data doesn't get carved out of the deleted portion of a hard

20 drive with it.  It just -- you get -- a lot of times you get

21 the image itself with no attached EXIF data.

22 Q    Okay.  And if you had locations services turned off would

23 the EXIF data still show the make and model of the phone?

24 A    Sometimes.

25 Q    Okay.  And in your investigation did -- you indicated there

1  was a Motorola G6 cellphone that these photos were taken with?

2  A    One of them, yes, sir.

3  Q    And a Samsung MT something; correct?

4  A    Right, a different model.

5  Q    And then also an Apple iPhone?

6  A    I recall seeing an Apple iPhone as well.

7  Q    And then in your investigation you've never had any

8  information or conclusion that Mr. Gunn possessed any of those

9  phones, did you?

10 A    No, not in my part of the investigation.

11 Q    Okay.  And you showed some text messages that happened

12 between this KJ Freeman in Texas --

13 A    Correct.

14 Q    -- and some unknown persons?

15 A    Correct.

16 Q    And they were indicated Riley Mom, Riley Dad, and Riley

17 herself?

18 A    That's correct.

19 Q    Okay.  And those telephone numbers on some of those were

20 exactly the same for everybody; correct?

21 A    They were.

22 Q    Okay.  How does the TextNow actually work?  Can you just

23 make up a phone number?

24 A    You attach a phone number to like your own personal account

25 on your phone and then you enter phone numbers and you attach a

1   name to those that you want to send it to.

2   Q    So you can put in any phone number you like?

3   A    Essentially, yes.

4   Q    Okay.  And is this an actual text feature on a cellphone?

5   A    You have to download the app -- the TextNow app.  I have

6   only used it a few times.

7   Q    Okay.  And if the cellphone number you found that came back

8   came back to Peyton Gunn was a Comcast landline -- VOIP is what

9   it indicated; correct?

10  A    I don't recall if it indicated VOIP.  I do remember that it

11  came back to Comcast.

12          MR. MERZLAK:  Could you pull back up Plaintiff's

13  Exhibit No. 10, please?

14          I am showing you again what's been marked and admitted

15  as Government's Exhibit No. 10.  Do you see that?

16          THE WITNESS:  I do.

17  Q    So this is a Comcast telephone purportedly of somebody's

18  home?

19  A    According to this it says residential.  Yes, sir.

20  Q    Okay.  There is no indication that this is a cellphone?

21  A    On this report there is no indication that it is a

22  cellphone.

23  Q    Okay.  And it actually indicates that it is VOIP phone,

24  does it not?

25  A    It says active, possible VOIP.

1   Q    Okay.  And can you explain to the jury what that is?

2   A    VOIP is Voice Over Internet Protocol.  Essentially, it is

3   the ability to make a phonecall over the internet.

4   Q    And you were able to confirm that this telephone number

5   belonged to the Gunn residence?

6   A    Correct.

7   Q    Okay.  And, essentially, anybody in the house could use

8   that telephone number?

9   A    That's right.

10  Q    Now you've worked a lot of cases involving allegations of

11  this nature; correct?

12  A    Yes, sir.

13  Q    And you've seen numerous types of scenarios involved in

14  this; correct?

15  A    Oh, yes, sir.

16  Q    And have you seen scenarios where a female has sexually

17  exploited a child?

18  A    Yes.

19  Q    Okay.  And you've seen scenarios where males have sexually

20  exploited children?

21  A    Yes, sir, of course.

22  Q    And have you seen scenarios where other children have

23  sexually exploited children?

24  A    Yes, unfortunately.

25  Q    And have you seen scenarios where children themselves,

1    essentially, exploited themselves?

2    A    Yes.  I've had a few cases like that as well.

3    Q    And in this day and age that is a growing trend, is it not,

4    unfortunately?

5    A    That's fair.  It is.

6    Q    Teenagers sexting with one another, sending naked pictures

7    with their friends, boyfriends, wanna-be boyfriends, whatever?

8    A    Correct.

9    Q    How many of those type of investigations have you been

10   involved in to your knowledge?

11   A    Specifically?

12   Q    Approximately.

13   A    What are you referring to?

14   Q    The investigations that involve children sending pictures

15   of other children, things of that nature?

16   A    Just a handful.  That was more on the state side.

17   Q    And in your investigation of those incidents did you ever

18   actually make contact with the children?

19   A    I have.

20   Q    Okay.  Were those children embarrassed about what had

21   occurred?

22   A    Sometimes, sometimes not.

23   Q    Some of them just didn't care?

24   A    (Shakes head.)

25   Q    In your investigation involving Mr. Freeman, Mr. Freeman

1   didn't provide you with any evidence that he had ever spoken to

2   Peyton Gunn, did he?

3   A   No and even during his interview with me he confirmed that

4   he had not spoken with anyone associated with that household.

5   Q   Okay.  And, obviously, you saw that there was a child that

6   was possibly in danger?

7   A   Yes, sir.

8   Q   And that's why you got in touch with Special Agent

9   Godbee --

10  A   Yes, sir.

11  Q   -- who is local?

12  A   Yes, sir, right here.

13  Q   At the point in your investigation when you came to Augusta

14  and interviewed Amanda Gunn, who brought up the fact that there

15  was sexual videos of her on the internet?  Was that law

16  enforcement, the Federal bureau of Investigation or did Amanda

17  Gunn just bring that out herself?

18  A   I don't recall, sir.  She spoke a lot about being recorded

19  or making videos and about their sex life a little bit, but I

20  don't recall who brought that up.

21  Q   Okay.  But based on your knowledge of the investigation,

22  there were videos out on the internet of Amanda Gunn?

23  A   Correct.  I know that.

24  Q   And those were videos of her engaging in sexual acts?

25  A   I know that -- I know that they're out there.  I haven't --

(Joe R. Anders-Cross by Mr. Merzlak)                86

1  I don't think I've seen those videos of Amanda Gunn.

2  Q   Okay.  But she described them to you as that she was being

3  forced to have sex with somebody?

4  A   Correct.  Yeah, I do recall her saying that she was having

5  sex at the direction of Mr. Gunn.

6  Q   Now in terms of the forensics that you contributed to once

7  you got here in Augusta --

8  A   Yes, sir.

9  Q   -- can you tell me what portion of the evidence that you

10  actually participated in?

11  A   There were four different items that I assisted with.

12  Q   And what items were those; do you recall?

13  A   I don't recall, sir.  I remember a laptop and I remember a

14  hard drive from a desktop.  I don't recall really the other

15  two.

16  Q   Did those particular items contain child pornography?

17  A   I don't know.  The in-depth analysis review of that was

18  done after my departure.  I helped with more of a cursory

19  review and the extraction of the device while I was here.

20  Q   Okay.  And ---

21  A   I couldn't tell you if child pornography came from a device

22  that I did because I don't remember or what device that would

23  be.

24  Q   Sure, but in your cursory review of those devices that you

25  worked on and during the extraction process you didn't locate

(Joe R. Anders-Cross by Mr. Merzlak)                87

1   any child pornography on those devices?

2   A    I don't remember, sir.

3   Q    Okay.

4        One quick moment, please, Judge.

5             THE COURT:  Sure.

6   Q    Just a few more questions.  Back to the TextNow --

7   A    Yes, sir.

8   Q    -- text communications.  Those communications that were on

9   that extraction what we saw and what the jury saw -- those were

10  only communications that KJ Freeman made to a purported number;

11  correct?

12  A    Number that he got online.

13  Q    Correct.

14  A    Correct.

15  Q    There was no response?

16  A    It was one-sided.

17  Q    Okay.

18  A    He sent.  He did not receive messages back.

19  Q    And the child pornography that was sanitized from that text

20  message, was that a picture that was involved in this case or

21  was it some other picture of child pornography?

22  A    It was a picture of a child involved in this case.

23  Q    So he already had these pictures?

24  A    He did.

25  Q    And was texting purportedly somebody at the Gunn residence?

88

1   A    Correct.

2            MR. MERZLAK:  Nothing further at this time, Judge.

3            THE COURT:  Any follow-up, Ms. Lyons?

4            MS. LYONS:  I beg the Court's indulgence.

5                     **REDIRECT EXAMINATION**

6   BY MS. LYONS:

7   Q    Special Agent Anders, do you still have your red book in

8   front of you?

9   A    Yes, ma'am.

10  Q    Just a few questions.  Thank you.

11  A    No problem.

12  Q    Mr. Merzlak asked you a little bit about the Comcast

13  residential service and he had you explain what VOIP was.

14  A    Yes, ma'am.

15  Q    Can you tell us what VOIP is again?

16  A    Voice Over Internet Protocol is what it stands for and,

17  essentially, you're able to make a phonecall from one IP

18  address to another using the internet.  That's essentially what

19  that means.

20  Q    So if I have a desktop computer and microphone and speakers

21  can I make a phonecall?

22  A    You can.

23  Q    Even more so, if I claim to not own a cellphone having VOIP

24  would be very convenient?

25  A    You can -- correct.  You can still make phonecalls using a

1    computer.  Different websites or applications would allow you

2    to do that.

3    Q   He also spoke to you about KJ Freeman and you mentioned

4    that Mr. Freeman indicated that he never spoke with anybody in

5    the Gunn household; correct?

6    A   He did.  He told me that.

7    Q   What did KJ Freeman tell investigators about where he found

8    these images of child pornography of Riley Cruise?

9    A   So he recalled either getting them off of Instagram or off

10   of FetLife, I believe, is what he told me -- fetlife.com.

11   Q   And so Mr. Merzlak asked you about the defendant never

12   being in Texas.  Didn't he ask you that?

13   A   He did.

14   Q   In your experience as an investigator in child exploitation

15   crimes, do you have to live in the same state with the

16   pedophile to share images?

17   A   No.  You do not.

18   Q   Because you just post them on the internet?

19   A   Or trade them directly with someone using a variety of

20   different mediums.

21   Q   Mr. Merzlak asked you about the image of child pornography

22   that was in the TextNow conversations.

23   A   He did.

24        MS. LYONS:  Your Honor, I am going to show an image of

25   child pornography.  I would ask the -- first ask the witness,

1    Special Agent Anders, please turn to tab eight.  Do you

2    recognize that image?

3             THE WITNESS:  Yes, I've seen this image before.

4    Q   Is that the same child we've been speaking about?

5    A   That's the child.

6    Q   Is that the image that was redacted from Government's

7    Exhibit 7, the TextNow conversations?

8    A   I don't recall, but I don't think so, ma'am.

9             MS. LYONS:  Your Honor, at this point the government

10   would ask you admit and publish Government's Exhibit 8.

11            THE COURT:  Any objection?

12            MR. MERZLAK:  Your Honor, I have no objection to the

13   government admitting any of the child pornography that's

14   contained in this.

15            THE COURT:  All right.  It's admitted.  Eight is

16   admitted and you may publish.

17      (Government's Exhibit No. 8 is entered into evidence.)

18            MS. LYONS:  Ladies and gentlemen of the jury, I would

19   ask you to turn to tab eight in your red book.

20            After looking at the exhibit tag, there is one page

21   and, Special Agent Anders, is this the image of child

22   pornography that KJ Freeman was sending out the via the TextNow

23   application?

24            THE WITNESS:  Yes, ma'am.  That's it.

25   Q   And was that image also in the folder found in his Samsung

(Joe R. Anders-Redirect by Ms. Lyons)          91

1   device?

2   A    Yes, ma'am.  That's where I got it from.

3   Q    Thank you very much, Special Agent Anders.

4   A    Yes, ma'am.

5          MS. LYONS:  Thank you, Your Honor.

6          THE COURT:  Anymore questions for Special Agent

7   Anders?

8          MR. MERZLAK:  Not on behalf of Mr. Gunn.

9          THE COURT:  May he be excused?

10         MS. LYONS:  Yes, Your Honor.  He is no longer under

11  sequestration, Your Honor.  Thank you.

12         THE COURT:  He is released.

13         You're released from your subpoena and the order.

14         THE WITNESS:  Thank you.

15         THE COURT:  Next witness.

16         Does anyone need a break?  No?  Good?

17         All right.  Let's hear another witness.

18         MS. LYONS:  Thank you, Your Honor.  The government

19  would call Special Agent Jonathan Escobar.

20     (Jonathan Escobar is duly sworn.)

21         THE CLERK:  Please state your name.

22         THE WITNESS:  Jonathan Escobar.

23         THE CLERK:  And which agency are you with?

24         THE WITNESS:  With the FBI.

25         THE CLERK:  Thank you.

(Jonathan Escobar-Direct by Ms. Lyons)                     92

**DIRECT EXAMINATION**

BY MS. LYONS:

Q    Good afternoon, Special Agent Escobar.  How are you?

A    Good.  How are you?

Q    Good.  Special Agent Escobar, on February 5, 2020, did you
visit the home of Michael Peyton Gunn with Special Agent Tripp
Godbee?

A    Yes.

Q    And were you present with Special Agent Godbee when he
notified the Gunn parents that nude images of their child had
been found in Texas?

A    Yes.

Q    And did you return to the Gunn home on February 6 of 2020
to search for a pair of white sneakers?

A    Yes.

Q    Before we talk about February 5 and 6, I'd like you to go
back and ask a few preliminary questions.  Is that okay?

A    Yes.

Q    Special Agent Escobar, how long have you been working for
the FBI?

A    Approximately three and a half years.

Q    And what office are you currently assigned to?

A    The Augusta Resident Agency.

Q    Would you consider the Augusta Office to be a small,
medium, or a large office?

(Jonathan Escobar-Direct by Ms. Lyons)                    93

1  A    A small office.

2  Q    Approximately how many agents do you have?

3  A    Approximately ten.

4  Q    Is it a normal thing with only ten agents to be asked by a

5  colleague to assist in their investigation?

6  A    Yes.  That would be normal.

7  Q    What types of cases do you investigate, Special Agent

8  Escobar?

9  A    I investigate all types of federal criminal activity.

10 However, I am currently assigned to the cyber division.

11 Q    Before the last three and a half years with the FBI here in

12 Augusta were you working for another law enforcement agency?

13 A    Yes.  I was a police officer in Florida for approximately

14 ten years.  I worked for the Titusville Police Department and

15 the Rockledge Police Department.

16 Q    Do you currently work with Special Agent Godbee here in

17 Augusta?

18 A    Yes.

19 Q    Did you know him prior to that?

20 A    No.

21 Q    Is it unusual for him to ask you to help him out with one

22 of his cases?

23 A    No.

24 Q    Are you familiar with the types of violations that he

25 usually works or investigates?

(Jonathan Escobar-Direct by Ms. Lyons)                    94

1   A    Yes.

2   Q    What types of violations would that be?

3   A    Violent crimes against children.

4   Q    Now in comparison to other agents in your office would you

5   say that Special Agent Godbee carries a lower or a higher

6   caseload?

7   A    Higher caseload.

8   Q    And why is that?

9   A    Because of the prevalence of violent crimes against

10  children.

11  Q    Is it normal for him to work nights?

12  A    Yes.

13  Q    Is it normal for him to work weekends?

14  A    Yes.

15  Q    And are you often required to assist him if he needs to go

16  do a knock and talk?

17  A    Yes.

18  Q    Or if he needs to execute a search warrant?

19  A    Yes.

20  Q    So I want to take you to February of 2020 and discuss what

21  happened when Special Agent Godbee asked you for some

22  assistance.  Okay?

23  A    Okay.

24  Q    On February 5th specifically do you recall Special Agent

25  Godbee asking you to meet him out in Columbia County?

(Jonathan Escobar-Direct by Ms. Lyons)          95

1    A    Yes.

2    Q    Do you remember why he asked you to meet him out there?

3    A    Yes.

4    Q    Why did he ask you to meet him there?

5    A    He notified me that he needed to make notification to a

6    family in reference to having sexually explicit images

7    discovered of their little girl.

8    Q    And was this on February 5th of 2020?

9    A    Yes.

10   Q    And where in Columbia County did Special Agent Godbee ask

11   you to meet him?

12   A    At 209 Nicklaus Court.

13   Q    Do you recall what time of day it was?

14   A    It was towards the end of the workday.

15   Q    Why does that stick out in your mind?

16   A    Because I remember him asking me if I could stop out with

17   him on my way home from work.

18   Q    So you two were not in the same vehicle?

19   A    We were not.

20   Q    Okay.  Did you agree to provide that assistance to Special

21   Agent Godbee?

22   A    Yes.

23   Q    So did you drive out to Columbia County?

24   A    Yes.

25   Q    Did you meet him at 209 Nicklaus Court?

(Jonathan Escobar-Direct by Ms. Lyons)                96

1   A    Yes.

2   Q    What happened when you arrived at 209 Nicklaus Court?

3   A    We made contact at the residence.

4   Q    Why didn't Special Agent Godbee just go make this

5   notification by himself?

6   A    It's quite common for us to go out together for safety

7   reasons.  We don't really know what we could be walking into.

8   Q    When you go to the door of 209 Nicklaus Court do you recall

9   knocking on the door?

10  A    Yes.

11  Q    Who answered?

12  A    Michael Gunn.

13  Q    Was he alone?

14  A    When he first answered the door, yes.

15  Q    Was he later joined by someone?

16  A    Yes.

17  Q    Who was he joined by?

18  A    By his wife.

19  Q    Do you recall what is said or what the discussion is at the

20  front door?

21  A    Yes.

22  Q    Can you tell us?

23  A    Special Agent Godbee made the notification that their

24  little girl had been found in sexually-explicit images.

25  Q    Do you recall how Amanda Gunn reacted?

1  A    She acknowledged what we were telling her; however, to me

2  didn't appear to be shocked or surprised.

3  Q    Do you recall how Michael Peyton Gunn reacted?

4  A    He also acknowledged what Agent Godbee had told him, but he

5  didn't appear shocked or surprised.

6  Q    Do you remember what you were thinking in that moment?

7  A    That I know that I have kids and I know that my reaction

8  would have been very different.

9  Q    Now at the time of the notification at the front door have

10  you seen the little girl yet?

11  A    We have not.

12  Q    While at the front door what did you and Special Agent

13  Godbee discuss with the parents?

14  A    We discussed several things:  Cellphones, the safety of the

15  little girl, as well as the images.

16  Q    Okay.  So we've already discussed the fact that you've told

17  them that their child was found in nude images in another

18  state.

19  A    Yes.

20  Q    Check.  That's done.  Tell me about the cellphone

21  discussion.

22  A    We asked them if she had a cellphone and Mr. Gunn advised

23  that she had a cellphone but that it had just recently been

24  lost.

25  Q    Now why is it important for you to ask about the cellphones

1  at this point?

2  A    Cellphones are often used in crimes of this nature and in

3  this case I think Agent Godbee already had the information that

4  some of the images were produced with a cellphone.

5  Q    So Mr. Gunn told you what about his daughter's cellphone?

6  A    That she had just recently lost it.

7  Q    Did Amanda Gunn, the defendant's wife, attempt to correct

8  or alter his statements at all?

9  A    No.

10  Q    Did you ask about any other cellular telephones?

11  A    Yes.

12  Q    What did he indicate at that time?

13  A    We asked him if he had -- if she had any other cellphones.

14  He said that she had destroyed a couple over time but that he

15  would go try to find other ones that they might have at the

16  residence.

17  Q    Did he attempt to do that?

18  A    Yes.

19  Q    Did he provide Special Agent Godbee with anything?

20  A    Yes.

21  Q    Now you mentioned the notification.  You mentioned the

22  cellphone, and the last thing you mentioned was the safety of

23  the little girl.

24  A    Correct.

25  Q    So what was the discussion in relation to the safety of the

1    little girl?

2    A    Special Agent Godbee wanted to check on the safety of the

3    little girl.

4    Q    So what did he ask?

5    A    That we could come in and see the little girl.

6    Q    And how did the parents respond?

7    A    They allowed us in.

8    Q    Now before you leave the front porch to go check on the

9    little girl, do you recall any other conversations that stick

10   out in your mind that you had with Mr. and Ms. Gunn?

11   A    Yes.

12   Q    Please tell the jury.

13   A    Mr. Gunn advised me that there was a sex video of his wife

14   on the internet having sex with multiple men.

15   Q    Now you used the words "having sex with multiple men".

16   A    Correct.

17   Q    How did Mr. Gunn phrase it?

18   A    He said "gang bang."

19   Q    Why does that conversation stick out in your head, Special

20   Agent Escobar?

21   A    Because that information wasn't elicited from him.  We were

22   there to make a notification about sexual images of his little

23   girl; so it was strange to me that he was just disclosing that

24   information to us.

25   Q    So after you have this conversation with Mr. Gunn about his

1  wife and a potential sex video, do you move inside the house in

2  order to see their little girl?

3  A    Yes.

4  Q    Can you tell us where you went and what you saw?

5  A    Yeah.  We walked into the house and then walked into the

6  back bedroom to Mr. Gunn's bedroom.

7  Q    So you walked into the house on the first floor?

8  A    Correct.

9  Q    And went to the bedroom of whom?

10  A    Mr. Gunn.

11  Q    Did you understand that to be the master bedroom of the

12  house?

13  A    Yes.

14  Q    And where was the little girl?

15  A    She was laying in the room.

16  Q    Did anyone provide to you an explanation at that point why

17  the little girl was in the bedroom?

18  A    Yes.  They advised that she had some type of issue with her

19  ear and was on medication.

20  Q    Who told you that?

21  A    Mr. Gunn.

22  Q    After he tells you that she had some sort of ear issue and

23  she's on medication, does Special Agent Godbee have the

24  opportunity to either see or speak to the little girl?

25  A    Yes.

1    Q    After that interaction what happens next?

2    A    I asked -- requested Mr. Gunn if we can go look at her

3    room.

4    Q    What is Mr. Gunn's response?

5    A    He says that we can.

6    Q    So what do you do?

7    A    He walks us up the stairs and takes us to the bedroom which

8    he says is the little girl's.

9    Q    So the child's bedroom is on the second floor?

10   A    Correct.

11   Q    And do you and Special Agent Godbee go upstairs to the

12   second floor?

13   A    Yes.

14   Q    If you're describing the house is the second floor a

15   closed-in plan or an open floor plan?

16   A    The bedrooms are closed in, but when you walk up the stairs

17   it is kind of like an open loft.

18   Q    Did you make your way to the little girl's room?

19   A    Yes.

20   Q    And can you tell us or describe what her room looked like?

21   A    Yeah.  There was a dresser as you come in.  There was some

22   stuffed animals that were lined up against the wall underneath

23   the window.  There was a collage of pictures with the little

24   girl in it and other little girls, as well as girls clothes.

25   Q    Now does anything happen when you're reviewing the little

(Jonathan Escobar-Direct by Ms. Lyons)                102

1   girl's room?

2   A    Yes.

3   Q    What happens?

4   A    I see behind one of the dressers there is a bottle of vodka

5   on the floor.

6   Q    Who was with you when you noticed the bottle of vodka on

7   the floor in the child's room?

8   A    I was in the room but Mr. Gunn was just outside of the

9   room.

10  Q    What do you say or do at the moment that you find the

11  bottle of vodka?

12  A    I tell him that there is a bottle of vodka in the room.

13  Q    How does he respond?

14  A    He said that he didn't know that it was in there and that

15  he was surprised.

16  Q    Now, Special Agent Escobar, do you take the bottle of

17  vodka?

18  A    I did not.

19  Q    Did you photograph the bottle of vodka?

20  A    I did not.

21  Q    Did Special Agent Godbee take the bottle of vodka?

22  A    No.

23  Q    Did he photograph the bottle of vodka?

24  A    No.

25  Q    Why not?

1   A   At that time I didn't think it was relevant to the

2   investigation.

3   Q   Why were you there on February 5th?

4   A   To make the notification to the parents that there was

5   sexually explicit images of their little girl.

6   Q   A year and a half later in hindsight would you have

7   photographed the bottle?

8   A   Yes.

9   Q   Does anything else of significance that sticks out in your

10  mind happen on February 5, 2020, while you're in the

11  defendant's home?

12  A   Not that I can think of.

13  Q   Now after you leave the house on February 5th with Special

14  Agent Godbee do you recall thinking anything, having an

15  impression?

16  A   Yes.

17  Q   What was your impression?

18  A   The same impression when I went to the door when the

19  notification was made was just kind of the reaction of them

20  being told that there was sexually explicit images of their

21  little girl and they kind of didn't seem shocked.

22  Q   You mentioned that Special Agent Godbee had called you for

23  assistance because you were on your way home that evening?

24  A   Yes.

25  Q   So if that's February 5th do you return to the office for

(Jonathan Escobar-Direct by Ms. Lyons)                104

1  work on February 6th?

2  A    Yes.

3  Q    Are you once again asked for assistance by Special Agent

4  Godbee on February 6th of 2020?

5  A    Yes.

6  Q    Had something happened in the case?

7  A    Yes.

8  Q    What, if anything, does Special Agent Godbee relay to you

9  has changed in the investigation?

10 A    That in one of the images in the series that there is a

11 photograph of a shoe in the image.

12 Q    And so in one of the series of child pornography --

13 A    Correct.

14 Q    -- he observed a shoe?

15 A    Yes.

16 Q    So what did he ask you to do on February 6th?

17 A    To go back out to the residence to speak with Mr. Gunn as

18 well as attempt to conduct a search of the residence.

19          MS. LYONS:  And, Your Honor, I am going to ask the

20 witness to look at Government Exhibit 11.  Government Exhibit

21 11 is simply the first page of Government Exhibit 2.  It is

22 just the image of the series of child pornography with the

23 feet -- the sneaker and the bare foot.  We would offer that

24 into evidence at this time.

25          THE COURT:  Any objection?

1          MR. MERZLAK:  No, Your Honor.

2          THE COURT:  Admitted and you may publish.

3          MS. LYONS:  Thank you, Your Honor.

4      (Government's Exhibit No. 11 is entered into evidence.)

5          MS. LYONS:  Ms. Long, we'll look at Government Exhibit

6   11.  Thank you.

7          Now on February 6th, Special Agent Escobar, does

8   Special Agent Godbee show you this image?

9          THE WITNESS:  Yes.

10  Q   And, in fact, do you have a copy of it?

11  A   Yes.

12  Q   And, again, I'm sorry.  What does Special Agent Godbee ask

13  you to do on February 6th?

14  A   To go back and speak with Mr. Gunn as well as to attempt to

15  conduct a consent search of the residence.

16  Q   Why is Special Agent Godbee asking you to obtain a consent

17  search for the house?

18  A   So that we could search for the shoe.

19  Q   What time of day do you remember going out to speak to

20  Mr. Gunn?

21  A   It was the afternoon.

22  Q   Were you alone?

23  A   No.

24  Q   Who was with you?

25  A   Special Agent Justin Garrick.

1  Q    And who is he?

2  A    He is a special agent that also works at the Augusta

3  Resident Agency.

4  Q    When you traveled out to 209 Nicklaus Court to speak with

5  the defendant and look for the sneaker, did you bring anything

6  with you?

7  A    Yes.  We brought -- I brought this copy of that image with

8  me.

9  Q    When you arrived at 209 Nicklaus Court, who was home?

10 A    Mr. Gunn.

11 Q    So what did you and Special Agent Garrick do when you

12 arrived?

13 A    We asked him if we could come in and speak with him.

14 Q    Did he allow you?

15 A    Yes.

16 Q    Later on in that same day while you're still at the

17 defendant's home do other agents arrive?

18 A    Yes.

19 Q    Who do you recall arriving?

20 A    Special Agent Godbee, Special Agent Chuck McKee, Special

21 Agent An Luang, Special Agent Chuck Boling.

22 Q    Can you tell the jury the difference between a consent

23 search and a search warrant?

24 A    A consent search is done with the person's permission.  A

25 search warrant you would need a judge to sign off and would be

1   done with or without their permission.

2   Q   So on February 6th when you're out on 209 Nicklaus Court

3   are you going in to look for these sneakers based on consent or

4   with a search warrant signed by a judge?

5   A   Consent.

6   Q   So who needs to give that consent to look for those

7   sneakers?

8   A   The owner of the residence.

9   Q   Did Mr. Gunn, the defendant, give you consent to search?

10  A   Yes.

11  Q   And did he give it to you verbally or written?

12  A   Both verbal and written.

13  Q   Did, in fact, did you record that?

14  A   Yes.

15  Q   So you're in the house.  You're with Special Agent Garrick;

16  is that correct?

17  A   Yes.

18  Q   Do you begin recording?

19  A   Yes.

20  Q   Did you have a certain role or responsibility that

21  afternoon?  A formal one.  Was one of you going to search or

22  one of you going to interview?  How did you decide that?

23  A   At the time we went out we had just both went out to do the

24  interview and then we were going to decide on scene how we

25  conducted the search.

1   Q    At some point while you're out there at the house does

2   there become a need to split duties?

3   A    Yes.

4   Q    Tell us why.

5   A    Special Agent Godbee had called and notified me that the

6   interview with the little girl was concluding and that they

7   were going to start heading home and I wanted to try to begin

8   the search, especially her room, before they got home.

9   Q    Okay.  So you've said something they haven't heard before;

10  so let's stop and talk about that.

11  A    Okay.

12  Q    One, is it normal for an agent to call you while you're out

13  at the scene to talk to you about development?

14  A    Yes.

15  Q    And so you said Special Agent Godbee had called you about

16  the little girl's interview.  What did you understand was

17  happening while you were out at the house doing the consent

18  search?

19  A    There was a forensic interview going on with her in

20  reference to her being victimized.

21  Q    Okay.  So how did the little girl coming home to the house

22  impact what you were going to do at 209 Nicklaus Court?

23  A    I wanted to make sure that we got -- especially, like I

24  said, with her room -- into the room before she was there

25  before she got home.

1  Q    Did Special Agent Godbee also at some point during that day

2  mention there was something else that you needed to begin to

3  search for?

4  A    Yes.

5  Q    What was that?

6  A    A tripod.

7  Q    And how did that come up, if you know?

8  A    Yeah, when he called me it got disclosed in that forensic

9  interview that a photograph was taken and she had mentioned a

10 tripod.

11 Q    Now I am going to take you back to 209 Nicklaus Court.

12 You're with Special Agent Garrick.  Where in the house are you

13 located with the defendant?

14 A    We're in the living room on the couch.

15 Q    And are you on the first floor or second floor?

16 A    First floor.

17 Q    When you walk through the front door of 209 Nicklaus Court

18 what room do you walk into?

19 A    The living room area.

20 Q    Okay.  So you're not in a back room.  You haven't gone up

21 the stairs?

22 A    No.

23 Q    All three of you were in the same room?

24 A    Yes.

25 Q    And is Special Agent Justin Garrick recording?

1   A    Yes.

2   Q    Did you have an opportunity to review the recording of that

3   interview before you testified today?

4   A    Yes.

5   Q    Now, Special Agent Escobar, were you present for the entire

6   interview?

7   A    No.

8   Q    And why is that?

9   A    Like we were discussing earlier, I left.  After he

10  consented to the search and signed the form, I left the

11  interview area and went upstairs to search.

12  Q    So are there times during that interview where you leave

13  the room and then you come back into the room?

14  A    Yes.

15  Q    And do you come back into the room sometimes to ask a

16  question?

17  A    Yes.

18  Q    I want to speak to you specifically about the parts in

19  which you are a participant.  Okay?

20  A    Okay.

21  Q    All right.  Special Agent Escobar, did you ever show the

22  defendant the image of the shoe from the larger series of child

23  pornography where the bare foot and the white sneaker are

24  present?

25  A    Yes.

1   Q    Did you tell the defendant that you were looking for that

2   white shoe?

3   A    Yes.

4   Q    And did you ask him if he recognized that shoe?

5   A    Yes.

6   Q    What was his response?

7   A    He said he did not recognize that shoe.

8   Q    After Mr. Gunn tells you that he did not recognize the shoe

9   in that image, do you continue searching or begin searching the

10  house for that shoe?

11  A    I asked that question before I began searching, but after

12  that I do begin searching.

13  Q    While you're searching the house for that shoe, did the

14  defendant ever stop you and say, wait, I do recognize that

15  shoe?

16  A    No.

17  Q    Did he ever stop and say, oh, the shoe is right here; let

18  me give it to you?

19  A    No.

20  Q    In what room was Mr. Gunn, the defendant, sitting in while

21  you were searching?

22  A    The living room.

23  Q    Did Mr. Gunn ever point out to you while you were searching

24  for the shoe that there was a shoe rack in the living room?

25  A    No.

(Jonathan Escobar-Direct by Ms. Lyons)                112

1  Q   Approximately how long did you search for the shoe in the

2  defendant's house that day?

3  A   Approximately an hour and a half.

4  Q   Now at another point during the interview with the

5  defendant do you return and ask him another question?

6  A   Yes.

7  Q   And what was the next question that you asked the

8  defendant?

9  A   It was in reference to a cellphone charger that was in the

10 little girl's room.

11 Q   Why did you come back to ask the defendant about a

12 cellphone charger?

13 A   On February 5th he had advised that she had lost her

14 cellphone and when I looked in the room I didn't see a

15 cellphone charger.  However, on the 6th during that search

16 there was a cellphone charger plugged into the wall and it was

17 pulled out with the cord going across the top part of the

18 bedding in the room.

19 Q   All right.  That was a little bit confusing.

20 A   Okay.

21 Q   So I want to unpack that.  On February 5th you visited

22 209 Nicklaus Court?

23 A   Yes.

24 Q   And did you speak to Mr. Gunn?

25 A   Yes.

1   Q   And you had a conversation about cellphones?

2   A   Yes.

3   Q   One of the cellphones in question was lost?

4   A   Correct.

5   Q   And did he ever talk to you about what kind of cellphone

6   that was?

7   A   It was an iPhone.

8   Q   It was an iPhone.  Okay.  And do you recall reviewing the

9   daughter's -- or going upstairs and looking in the child's

10  room?

11  A   Yes.

12  Q   Did you see a charger when you were in the girl's room on

13  February 5th?

14  A   No.

15  Q   Okay.  Now you're back on February 6th.  Is that right?

16  A   Correct.

17  Q   And you're looking for the shoes and maybe you're looking

18  for a tripod?

19  A   Yes.

20  Q   Do you go back to the girl's room?

21  A   Yes.

22  Q   And what is it you notice?

23  A   A cellphone charger plugged into the wall.

24  Q   And where is the charger stretching across?

25  A   The top of the bedding in her room.

(Jonathan Escobar-Direct by Ms. Lyons)                    114

1   Q    Top of the bed?

2   A    Yep.

3   Q    In the child's room?

4   A    Yes.  It is bedding because there is not an actual bed, but

5   yes.

6   Q    There is no bed in the room?

7   A    Correct.

8   Q    What was in the room?

9   A    It was like bedding like blankets that were on the floor.

10  Q    So during the course of the interview with Mr. Gunn, the

11  defendant, you come back and you ask him about that charger?

12  A    Yes.

13  Q    What does he say to you?

14  A    He acts like he didn't know.  He said, "Oh, she did have a

15  charger in the room," but acts like he doesn't know why it

16  would have been pulled across the bed like it was.  He also

17  says he thinks maybe she hid the phone.

18  Q    So after you speak to the defendant about the charger being

19  present in the child's room after you're told the phone had

20  been lost, what did you do?

21  A    Continued to search.

22  Q    And other than searching for the shoes and the tripod do

23  you take on any other role that day?

24  A    I did take some photographs while searching.

25  Q    Now I'm going to show you what's been marked as Government

1  Exhibit 10 -- excuse me -- 12.  Twelve.  Please tell me when it

2  comes up on your screen, Special Agent Escobar.

3  A    It's here.

4  Q    Do you recognize this exhibit?

5  A    Yes.  This is the little girl's room.

6  Q    And does that exhibit contain more than one photo?

7  A    No.  Yes, I took more than one photo that day.

8  Q    Okay.

9       Can you scroll through them just so he feels comfortable

10  that all the photos are present?

11      Are all the photos present that you reviewed and prepared

12  for this exhibit?

13  A    Yes.

14  Q    And do they accurately represent what you saw on

15  February 6th of 2020?

16  A    Yes.

17  Q    Have you had an opportunity to review this exhibit before

18  today?

19  A    Yes.

20  Q    And were those photos altered in any way?

21  A    No.

22          MS. LYONS:  The government seeks to admit and publish

23  Exhibit 12 at this time.

24          THE COURT:  Any objection?

25          MR. MERZLAK:  No, Your Honor.

1          THE COURT:  Admitted and you may publish.

2          MS. LYONS:  Thank you, Your Honor.

3       (Government's Exhibit No. 12 is entered into evidence.)

4          MS. LYONS:  Special Agent Escobar, can we briefly go

5   through these three photographs?

6   A    Yes.

7   Q    Thank you.  Let's start with 12.002.  Can you -- can you

8   see the photograph?

9   A    Yes.

10  Q    Can you tell us what we're looking at?

11  A    This is the little girl's room.

12  Q    And can you describe where in this room you found the vodka

13  bottle on February 5th of 2020?

14  A    On the right side of this picture there is a dresser and

15  the vodka bottle was behind that dresser.

16  Q    Almost where we see the outline of what appears to be

17  either a cable jack or an outlet?

18  A    So the bottle was on the other side.

19  Q    The other side of the dresser.  Thank you.

20     Moving to -- backing out of this photo to the bigger

21  version, Ms. Long.

22     And where was the outlet where you saw the charger on the

23  6th?

24  A    It is on the wall underneath the window.

25  Q    So this photograph is taken on the 6th.  Is that correct?

1    A    Yes.

2    Q    And are you referring to that dark shadow we see?

3    A    Yes.

4    Q    Thank you.

5         We can back out of this photo and we will go to 12.003.

6         Is this another photograph you took?

7    A    Yes.

8    Q    And why did you take a picture of this, Special Agent

9    Escobar?

10   A    It was found in a box in a room and I just thought the

11   whole image was strange.  It says, "I love you Grace. From

12   Dad."  I thought it was kind of written in like a kid way.  I

13   thought it was strange.

14   Q    Thank you.  12.004.  Now first tell us where we're looking

15   in the room and tell us what we're looking at, if you recall.

16   A    Yeah, this was the closet within the little girl's room and

17   there was a -- I don't know if you call it a stand-up shelf

18   cabinet and this was inside that cabinet.

19   Q    Why did you take this photograph?

20   A    Well, it's a Vella box wine which is in her room and I

21   thought that was strange that it was in the room after we just

22   notified him the night before of the vodka we found and he also

23   said that he had searched her room.

24   Q    Okay.  So I am going to take that one at a time.

25   A    Okay.

(Jonathan Escobar-Direct by Ms. Lyons)

1   Q   You found it odd because you notified him about the vodka?

2   A   Correct.

3   Q   Tell us about that first.

4   A   We had notified him about the vodka the night before; so I

5   thought it was strange that there was still alcohol in the room

6   the next day.

7   Q   Now the second part of that is you said he'd searched her

8   room?

9   A   Correct.

10  Q   What are you talking about?

11  A   He indicated that he had searched her room for the

12  cellphone and he had searched her room.

13  Q   So Mr. Gunn, the defendant, told you that he had looked

14  through his little girl's room for the phone?

15  A   Yes.

16  Q   So you thought it odd that he wouldn't have removed the

17  wine?

18  A   Yes.

19          MS. LYONS:  Thank you, Ms. Long.

20          Now, Special Agent Escobar, did you have to leave 209

21  Nicklaus Court before the whole search concluded that day?

22          THE WITNESS:  Yes.

23  Q   And if you can recall did you leave before or after the

24  child and her mother returned to the home?

25  A   It was after.

1  Q   And did you leave before or after Special Agent Godbee made

2  it to 209 Nicklaus Court?

3  A   I believe it was shortly after Special Agent Godbee

4  arrived.

5  Q   Okay.  So absent -- excuse me.  After these photos are

6  taken do you have any significant investigative task that you

7  need to relay before you leave this house?

8  A   Not before I leave the house.

9  Q   Okay.  Now, Special Agent Escobar, later on in this

10 investigation did Special Agent Godbee again ask you for your

11 assistance?

12 A   Yes.

13 Q   With what task?

14 A   With searching the woods for a USB.

15 Q   And where was that wood or woods or wooded area -- where

16 was that?

17 A   It was a wooded area near 209 Nicklaus Court.

18 Q   And why were you searching a wooded area near 209 Nicklaus

19 Court?

20 A   The little girl had disclosed that she was told to destroy

21 a USB and that she had thrown it into the woods.

22 Q   When did that search occur?

23 A   It was December 10th of 2020.

24 Q   And who participated in that search?

25 A   Myself as well as other agents and staff from the FBI,

(Jonathan Escobar-Direct by Ms. Lyons)                    120

1   Augusta.

2   Q    Were you able to find a USB drive in those woods in

3   December of 2020?

4   A    We were not.

5   Q    Was that a surprise?

6   A    No.

7   Q    Tell us why that wasn't a surprise.

8   A    Well, it was almost ten months had passed since the first

9   time we had made contact with them.  It was in the woods.

10  There was mud, debris everywhere, and, obviously, weather over

11  that time.  It wasn't that surprising.

12  Q    So, Special Agent Escobar, why did you guys go out and even

13  search that area?

14  A    Once that information was disclosed to us, obviously, we

15  wanted to find it and that's our job to try to find the

16  evidence.

17  Q    After searching the wooded area in December of 2020 did you

18  assist Special Agent Godbee with any other investigative steps

19  in this case that stand out in your mind?

20  A    Nothing that stands out.

21         MS. LYONS:  I beg the Court's indulgence, Your Honor.

22         Nothing further, and, Special Agent Escobar, I would

23  ask you to answer any questions of Mr. Merzlak.

24         THE WITNESS:  Yes.

25         THE COURT:  Thank you.

1          Mr. Merzlak, your witness.

2          MR. MERZLAK:  Thank You, Judge.

3                       **CROSS EXAMINATION**

4    BY MR. MERZLAK:

5    Q   Agent Escobar, you would agree that you've come in contact

6    with lot of people as a law enforcement officer; correct?

7    A   Yes.

8    Q   And you've come across them in a lot of different

9    scenarios?

10   A   Yes.

11   Q   You've interacted with people that were victims of crime?

12   A   Correct.

13   Q   People that were witnesses of crime?

14   A   Yes.

15   Q   People that were suspected of crimes?

16   A   Yes.

17   Q   People that were guilty of crimes?

18   A   Yes.

19   Q   You've probably relayed some bad messages to parties?

20   A   Yes.

21   Q   And you would agree that people act differently to certain

22   news, do they not?

23   A   Yes.

24   Q   Some people may act one way when they're angry.  Other

25   people may act another way?

1  A    Yes.

2  Q    Some people when they're told that a loved one has passed

3  away, they may act differently from one person to the next;

4  correct?

5  A    That is correct.

6  Q    In this particular case you went to Mr. Gunn's house on

7  February 5th; correct?

8  A    Yes.

9  Q    And told him about or you and Mr. Godbee told him about

10 these images of his daughter?

11 A    Yes.

12 Q    And on that particular day he fully cooperated with you in

13 every way, did he not?

14 A    Yes.  I mean --

15 Q    Talked to you --

16 A    Talked.

17 Q    Let you in the house, let you see his daughter?

18 A    Yes.

19 Q    And isn't it true that when you arrived there the daughter

20 was actually in her bedroom upstairs and then when you guys

21 asked to search that room that's when Mr. Gunn asked his

22 daughter who had the ear infection to go into the master

23 bedroom?

24 A    That was never related to us.

25 Q    Okay.  When you walked in the house did you initially see

1   the daughter was in the master bedroom?

2   A   Yeah, we walked directly to the master bedroom.

3   Q   But that was after Mr. Gunn had already went up and

4   searched for her phone and told the minor that her room was

5   going to be searched; correct?

6   A   I don't know what he told the minor, sir, but we did go in

7   after he went inside.  So that answer is yes.

8   Q   Would you want to search a minor child's room while she was

9   in the room?

10  A   No.

11  Q   Okay.  And he gave you full permission to search?

12  A   Yes.

13  Q   And then you came back a day later and Mr. Gunn was

14  completely cooperative?

15  A   He did speak with us, yes.

16  Q   Answered any questions that you had?

17  A   Yes.

18  Q   Answered any questions that Special Agent Garrick had of

19  him?

20  A   Yes.

21  Q   Allowed you to search his house?

22  A   Yes.

23  Q   Without a search warrant?

24  A   Correct.

25  Q   And Ms. Lyons brought up the difference between a consent

1    search and search warrant.  An individual doesn't have to let

2    you search his house, does he?

3    A    That's correct.

4    Q    If you don't have a court order indicating that the court

5    authorizes a search warrant based on probable cause he could

6    have just shut the door in your face, could he not?

7    A    Yes, he could have.

8    Q    But he didn't do that.  He let you in.

9    A    He did.

10   Q    And on the 5th or -- excuse me.  On the 6th was the vodka

11   bottle still present there?

12   A    No.

13   Q    Okay.  And if someone had told an adult that their child

14   had a vodka bottle in their room, wouldn't it be prudent for

15   that adult to remove it?

16   A    Yes.

17   Q    Okay.  So you weren't surprised that that had been removed?

18   A    No.

19   Q    You were just surprised that this wine box had been

20   found --

21   A    Yes.

22   Q    -- when you were taking pictures?  And did you open that

23   particular cabinet when you searched Grace's room the day

24   before?

25   A    I don't recall.

1   Q    Okay.  So it's quite possible that that wine box was in

2   that cabinet?

3   A    It is possible.

4   Q    That you opened that cabinet and you didn't even notice

5   that it was a wine box?

6   A    If I had seen it, I would have said something.

7   Q    Correct.  So that's a yes?

8   A    Sir?

9   Q    So that's a yes to my question?

10  A    Can you ask your question again because I guess I don't ---

11  Q    Yes, sir.  It is completely possible that you yourself the

12  day before had opened that cabinet?

13  A    It is not possible that I opened the cabinet.  It is

14  possible that I went in the room and did not open the cabinet.

15  If I opened the cabinet, I would have seen that wine box.

16  Q    Okay.  So you didn't open that cabinet?

17  A    I don't recall if I opened that cabinet; so probably not.

18  Q    And you were searching for a cellphone?

19  A    Correct.

20  Q    Okay.  And then you wanted to bring up in questioning from

21  Ms. Lyons that it was odd that Mr. Gunn in searching for a

22  cellphone had missed it?

23  A    Sorry?

24  Q    It was odd that Mr. Gunn had missed that wine box --

25  A    Yes.

1   Q    -- when he said that he searched his daughter's room?

2   A    Yes.

3   Q    But you're a law enforcement officer in the business of

4   searching?

5   A    Yep.

6   Q    And Mr. Gunn allowed you to search his home without a

7   search warrant -- sat there and allowed you to go through his

8   entire house with no problem whatsoever?

9   A    Yes.

10  Q    On the 5th of February you and Agent Godbee left the minor

11  child at that residence, didn't you?

12  A    Yes.

13  Q    And at that point you didn't have any indication that the

14  minor child was in any type of danger from Mr. Gunn?

15  A    Correct.

16  Q    Okay.  And isn't it true that any statement Mr. Gunn might

17  have made about his wife Amanda Gunn being in any videos was

18  more in relation to I can't believe I am going through this

19  again ---

20          MS. LYONS:  Objection, Your Honor.  This witness is

21  not in Mr. Gunn's head; therefore, he can't say why Mr. Gunn

22  made that statement to the law enforcement agents.

23          MR. MERZLAK:  I'll rephrase, Your Honor.

24          THE COURT:  Please rephrase.  I'll sustain the

25  objection.

1  Q   You found it odd that Mr. Gunn had brought up that

2  statement?

3  A   Yes.

4  Q   Isn't there -- just like there is different ways that

5  people deal with grief, being upset, being angry, isn't there

6  different ways that people relay information?

7  A   Yes.

8  Q   Okay.  And -- one moment, please, Judge.

9          THE COURT:  Sure.

10          MR. MERZLAK:  One quick second.

11          The date that Mr. Gunn told you about the videos of

12  his wife --

13          THE WITNESS:  Yes.

14  Q   -- was that on February 5th or February 6th?

15  A   On the 5th.

16  Q   And on February 5th were either yourself or Special Agent

17  Godbee -- were y'all recording that conversation?

18  A   No, we were not.

19  Q   Okay.  But then when you came back on February 6th you

20  recorded that conversation?

21  A   Correct.

22          MR. MERZLAK:  No further questions at this time,

23  Judge.

24          THE COURT:  Redirect?

25          MS. LYONS:  Very briefly, Your Honor.  Thank you.

1                           **REDIRECT EXAMINATION**

2     BY MS. LYONS:

3     Q    I think Mr. Merzlak was asking you some questions about

4     whether or not the defendant was fully cooperative.

5     A    Yes.

6     Q    Was that the word he used -- fully cooperative?

7     A    Yes.

8     Q    And I think you testified that the defendant was sitting in

9     the living room --

10    A    Yes.

11    Q    -- while you were searching for the sneakers?

12    A    Yes.

13    Q    You work with Special Agent Godbee?

14    A    Yes.

15    Q    You've been assisting in this investigation?

16    A    Yes.

17    Q    Did you later find out that the shoes were also found in

18    the living room?

19    A    Yes.

20    Q    Did the defendant ever tell you that the shoes you were

21    looking for were right there in the living room?

22    A    He did not.

23    Q    Would you call that fully cooperative?

24    A    No.

25    Q    Mr. Merzlak also pointed out the fact that you're a law

(Jonathan Escobar-Redirect by Ms. Lyons)                    129

1  enforcement officer; you know how to conduct a search?

2  A    Yes.

3  Q    And pointed out that you were searching for a cellphone and

4  you didn't find the wine --

5  A    Correct.

6  Q    -- right, so how could the defendant find it?  I think

7  that's what he said.

8  A    Yes.

9  Q    You'd notified the defendant that there was vodka in his

10  daughter's room?

11  A    Yes.

12  Q    She was underage?

13  A    Yes.

14  Q    Did you expect that he might search her room for alcohol?

15  A    Yes.

16  Q    And the cellphone?

17  A    Correct.

18         MS. LYONS:  Thank you, Your Honor.

19         THE COURT:  Any more questions for this witness?

20         MR. MERZLAK:  No, Your Honor.

21         THE COURT:  May he be excused from his subpoena?

22         MS. LYONS:  Yes, Your Honor, and the sequestration

23  order.

24         THE COURT:  And the sequestration, yes.

25         MS. LYONS:  Thank you.

1          THE COURT:  All right.  You are excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  Do you have a short next witness or no?

4          MS. LYONS:  No, Your Honor.  I have a long next

5     witness and I would like to discuss some scheduling issues if

6     you have time.

7          THE COURT:  Do you want to do it as a sidebar or after

8     I excuse them?

9          MS. LYONS:  After.

10         THE COURT:  All right.

11         MS. LYONS:  Thank you.

12         THE COURT:  Ladies and gentlemen, you have just heard

13    Ms. Lyons say that the next witness will be long.  It is now

14    5:25.  Long witness generally means an hour or two.

15         MS. LYONS:  An hour and a half.

16         THE COURT:  An hour and a half.  So rather than

17    keeping you here too late in the evening, we're going to go

18    ahead and take our break this evening, our recess.  We will be

19    in recess until 9 o'clock tomorrow morning.  As I release you

20    please remember my instructions.  Do not discuss the case with

21    each other, with anyone else.  Do not post anything on social

22    media or internet about your participation in this trial.  Do

23    not conduct any research.  Do not listen to any press reports.

24    Do not discuss it with anyone who should approach you, and if

25    they do, let us know in the morning.

1          With that, I am going to excuse you tonight and with

2   my wishes that you will have a pleasant evening at home and

3   then we will see you back here in the morning at 9 a.m. sharp.

4   Please come to the jury room when you return to the courthouse

5   at nine.  Thank you very much.

6          Oh, please leave the red binders in your seats.  The

7   government will pick those up or the CSOs.  Do not take the

8   binders with you, and you can leave your baskets right in front

9   of you if you would that we have given you with all of your

10  items and your notebook.  Please leave all of that here.  Just

11  take yourself with you.

12      (The jury exits the courtroom at 5:27 p.m.)

13          THE COURT:  All right.  Have a seat if you would.

14  What do we need to talk about while the jury is clearing the

15  courthouse?

16          MS. LYONS:  Your Honor, just very briefly, I wanted to

17  update you on the status of witnesses.

18          THE COURT:  Yes.

19          MS. LYONS:  One thing I didn't get to mention post the

20  guilty plea of Amanda Gunn which that removed probably three

21  witnesses off of our witness list; so our witness list got

22  shorter.

23          THE COURT:  Okay.

24          MS. LYONS:  By starting this afternoon and being able

25  to get these two witnesses on the stand what I would anticipate

1   is being able to call a witness in the morning that would take

2   about an hour and a half, probably two witnesses that would

3   probably wouldn't take more than 30 minutes each -- of course,

4   depending on cross.  I am not including cross in this.

5               THE COURT:  Right.

6               MS. LYONS:  And then being ready to put up Amanda Gunn

7   on Tuesday.

8               THE COURT:  Tomorrow afternoon.

9               MS. LYONS:  Yes, just depending on how long those

10  three witnesses take.  So I would ask the Court to consider

11  depending on how long those three witnesses take if you would

12  consider taking an earlier lunch maybe at 11:30 or 11:45 and

13  then putting her up in the afternoon.  The next witness would

14  be Jonathan Grantham who is also in custody.  So we could

15  potentially bring them both over.  He would maybe be an hour to

16  an hour and a half, if that, again, depending on cross

17  examination and then the next witness would be the minor

18  victim.

19              So what I would anticipate the is the minor victim

20  taking the stand either Wednesday morning or mid-morning

21  Wednesday and then Tripp Godbee.  Special Agent Godbee would be

22  the next witness.  I do -- just based on my notes, you know,

23  the end of the day Wednesday we might be able to finish the

24  case.

25              THE COURT:  All right.  So tomorrow you plan on having

1   three witnesses in the morning.

2          MS. LYONS:  Maybe a short fourth one, but definitely

3   three.  Yes.

4          THE COURT:  Right.  Okay.  And then early lunch break

5   and then Amanda Gunn and Jonathan Grantham in the afternoon.

6          MS. LYONS:  Correct.

7          THE COURT:  All right.  And potentially finishing with

8   Jonathan Wednesday morning or do you think you'll be finished

9   with Jonathan tomorrow?

10          MS. LYONS:  I think that depends on how long ---

11          THE COURT:  I understand.

12          MS. LYONS:  Yes.

13          THE COURT:  All right.  But we could be here until

14   6 o'clock or so if we needed to be here late.

15          MS. LYONS:  Okay.  And then if we did that I would

16   start with the minor victim on Wednesday morning.

17          THE COURT:  All right.  That's fine.  Make sure that

18   those witnesses are here tomorrow then.

19          MS. LYONS:  Yes, Your Honor.

20          THE COURT:  Any issues with that?

21          MR. MERZLAK:  No, Your Honor.

22          THE COURT:  Good.  Excellent.  Are they clear?

23          COURT SECURITY OFFICER:  Yes, sir.

24          THE COURT:  All right.  Ladies and gentlemen, we are

25   in recess until 9 a.m. tomorrow morning.  Have a good evening.

 1          (The hearing is concluded and begins again on Tuesday,

 2    December 16, 2021, at 9:04 a.m. as follows.)

 3          THE COURT:  Are there any issues to discuss before the

 4    jury is recalled?

 5          MS. LYONS:  No, Your Honor, not from the government.

 6          THE COURT:  None?

 7          MR. MERZLAK:  No, Your Honor.

 8          THE COURT:  Very well.  If we will all rise, we'll

 9    recall the jury, please.

10        (The jury enters the courtroom at 9:05 a.m.)

11          THE COURT:  Members of the jury, good morning.  I hope

12    you had a pleasant evening.  I certainly thank you for your

13    attention and diligence yesterday, and we're ready to begin

14    work this morning.

15          So the government can call its next witness.

16          MS. LYONS:  Thank you, Your Honor.  The government

17    would call Special Agent Justin Garrick to the stand.

18        (Justin C. Garrick is duly sworn.)

19          THE CLERK:  Please state your name.

20          THE WITNESS:  Justin C. Garrick.

21          THE CLERK:  And which agency are you with?

22          THE WITNESS:  The Federal Bureau of Investigation.

23          MS. LYONS:  Mrs. Widener, can we move the monitor just

24    for the beginning portion?

25          THE CLERK:  Yes.

1          MS. LYONS:  Thank you.

2                      **DIRECT EXAMINATION**

3    BY MS. LYONS:

4    Q    Good morning, Special Agent Garrick.  How are you?

5    A    Well.  How are you?

6    Q    In February of 2020 did you participate in a consent search

7    at 209 Nicklaus Court?

8    A    Yes, I did.

9    Q    And while searching that residence did your team find a

10   pair of white sneakers?

11   A    Yes, we did.

12   Q    Did you also have the opportunity to interview the

13   defendant on that same date?

14   A    We did.

15   Q    And, Special Agent Garrick, in February of 2020 did you

16   also participate in the search warrant that was executed at 209

17   Nicklaus Court?

18   A    I did, yes.

19   Q    Okay.  Before we talk about February 5th -- or, excuse

20   me -- February 6th and 7th, I want to tell the jury a little

21   bit about your background.  Okay?  Where are you currently

22   assigned to the work for the FBI?

23   A    I am currently assigned to the Augusta Resident Agency of

24   the Atlanta Field Office.

25   Q    How long have you been assigned to that office?

1   A   I have been assigned to that office for about eight and a

2   half years.

3   Q   Were you assigned to another FBI office before coming to

4   Augusta?

5   A   Yes.  I was assigned to the Philadelphia Field Office and

6   Headquarters in Washington DC.

7   Q   And how many total years do you have with the FBI?

8   A   January will mark 17.

9   Q   What types of cases are you usually assigned to

10  investigate?

11  A   My primary area is counterintelligence.

12  Q   Can you tell the jury a little bit about what

13  counterintelligence means?

14  A   Sure.  It's basically identifying and investigating issues

15  of attempts by foreign governments to infiltrate the U.S.

16  Government, stealing of classified information, foreign

17  intelligence service trying to recruit spies here in the United

18  States, economic espionage, things like that.

19  Q   If I were simplifying it, I think you mentioned the word

20  "spies"?

21  A   Yes, ma'am.

22  Q   Okay.  And so other than investigating counterintelligence

23  and spies, do you have another assignment or ancillary duty

24  that you work on with the FBI?

25  A   Yes, ma'am.  I am on the Evidence Response Team.

1   Q    Can you tell the jury a little bit about what the Evidence

2   Response Team is?

3   A    Sure.   It's -- like she said, it's an ancillary duty of FBI

4   employees.   We are trained in evidence response, handling

5   evidence, recovery of it, and we're on teams associated with

6   the field offices and we can deploy local or nationally on a

7   variety of violations.

8   Q    Now is this a team that you have to apply and be selected

9   for?

10  A    Yes, ma'am.

11  Q    And do they only take a certain number of applicants,

12  perhaps, annually?

13  A    Yes, they do.

14  Q    Now as a part of this evidence recovery team do you get

15  deployed to what we would consider maybe national emergencies?

16  A    Yes.

17  Q    And high profile cases?

18  A    Yes, we do.

19  Q    Have you been deployed to any high profile cases in the

20  past?

21  A    Yes, two of them.

22  Q    Can you give us an example of a high profile case in which

23  you've assisted with evidence recovery?

24  A    In 2016 ---

25          MR. MERZLAK:   Objection, Your Honor, bolstering and

1  irrelevant.

2          MS. LYONS:  May I respond, Your Honor?

3          THE COURT:  Sure.

4          MS. LYONS:  Your Honor, this particular witness was

5  designated and handled the search warrant on February 7th and

6  evidence recovered on February 6th.  I think it's appropriate

7  to give the jury an idea of what his background is in evidence

8  collection in order to substantiate the fact that he followed

9  procedures; he did what he was supposed to do so they can find

10 him credible.

11         THE COURT:  I'll overrule the objection.  I'll let you

12 ask the question.

13         MS. LYONS:  Thank you, Your Honor.

14         I'll rephrase the question, Special Agent Garrick, and

15 I'll ask you again.  Have you been deployed in any high profile

16 cases to assist with evidence recovery?

17         THE WITNESS:  Yes, ma'am.

18 Q   Can you tell us about one?

19 A   One was in 2016.  I responded to the Pulse nightclub

20 shooting in Orlando, Florida and worked in morgue operations

21 there processing the victims of that case.

22 Q   Thank you very much, Special Agent Garrick.  Working in the

23 Augusta Branch Office which we've heard is a smaller office is

24 it unusual for you to be asked to assist other agents in search

25 warrants or collecting evidence?

1    A    No, not at all.

2    Q    Especially since you're on the ERT or the Evidence Recovery

3    Team?

4    A    Correct.

5    Q    In February of 2020 do you remember being asked by Special

6    Agent Tripp Godbee to assist in a search?

7    A    Yes, I was.

8    Q    And were you asked specifically with -- to assist with a

9    consent search --

10   A    Yes.

11   Q    -- at 209 Nicklaus Court?

12   A    Yes, ma'am.

13   Q    Do you recall Special Agent Godbee asking for your

14   assistance?

15   A    Yes, I do.

16   Q    And do you recall what type of case it was?

17   A    As he told me, it was a child exploitation case.

18   Q    Can you tell the jury what you remember or what information

19   Special Agent Godbee provided to you on that particular day?

20   A    Yes.  That morning Special Agent Godbee provided me a

21   photograph that had been -- it was a lead from another division

22   that included an image of a child and then at the bottom of the

23   image was a shoe.

24   Q    And at that time what was Special Godbee [sic] asking you

25   to do?

1  A    Special Agent Godbee initially asked me to sit in on --

2  that morning sit in on a separate interview and then after

3  maybe an hour or so requested that I go to the 209 Nicklaus

4  Court residence to interview Mr. Gunn.

5  Q    I'm showing you what's previously been marked and admitted

6  as Government Exhibit No. 11.  Do you recognize that

7  photograph?

8  A    Yes, I do.

9  Q    Is that the photograph that Special Agent Godbee asked or

10 showed you on the day that he was asking for assistance?

11 A    It was.

12         MS. LYONS:  Thank you, Ms. Long.

13         So where were you going to go on February 6th in

14 order to assist Special Agent Godbee?

15         THE WITNESS:  I went to 209 Nicklaus Court.

16 Q    And did you go with anybody?

17 A    Yes, Special Agent Jonathan Escobar.

18 Q    Were you looking for anything specific?

19 A    Specifically, we were -- through the consent search we were

20 going to be looking for, among a couple of other things, the

21 white shoes.

22 Q    And when you arrived at 209 Nicklaus Court who was home?

23 A    That was Michael Peyton Gunn.

24 Q    Was there anybody else with Mr. Gunn?

25 A    No.

1  Q   What did you do when you arrived, Special Agent Garrick?

2  A   We introduced ourselves, asked that we could speak with

3  him, and we started our interview.

4  Q   Did any other agents arrive that day?

5  A   Yes.  Through the course of the interview we had Special

6  Agent Godbee, Special Agent McKee, Special Agent Charles

7  Boling, Special Agent An Luang and Special Agent Rob Stewart.

8  Q   Now on that particular day when you were going to look for

9  the sneakers did you have a search warrant?

10  A   No, we did not.

11  Q   And so what type of search was happening?  How were you

12  going to find the sneakers?

13  A   It was via a consent search.

14  Q   And so what does a consent search depend upon?

15  A   Consent search depends upon the consent of the individual

16  who was in charge -- who has authorization over the property.

17  So a resident who lived there has to give us their verbal

18  and/or written consent.

19  Q   So upon arrival and speaking with Mr. Gunn, the defendant,

20  did you obtain his verbal or written consent to search for the

21  sneakers?

22  A   We did both.

23  Q   On the way to 209 Nicklaus Court did you or Special Agent

24  Escobar decide who would interview the defendant or who would

25  search?

1  A    It was kind of in the air a little bit.  Special Agent

2  Escobar had more experience, knowledge of the case.  So through

3  the course of the interview Special Agent Escobar performed the

4  consent search while I continued with the interview.

5  Q    Now, Special Agent Garrick, you mentioned earlier that your

6  main investigative caseload involves counterintelligence;

7  correct?

8  A    Yes, ma'am.

9  Q    Do you have experience in interviewing?

10  A    Yes.

11  Q    Okay.  So who ended up interviewing or speaking with

12  Mr. Gunn on February 6th?

13  A    Primarily, I did.

14  Q    And where did you conduct that interview?

15  A    It was in the living room, the main living area of the

16  house just as you walk through the front door.

17  Q    And did you record that interview?

18  A    Yes, I did.

19  Q    And can you tell us how you normally record an interview?

20  A    We have recorders that we're assigned and I just had the

21  recorder out and recording.

22  Q    Can you tell the jury what an overt recording is versus a

23  covert recording?

24  A    Yes, ma'am.  An overt recording is one in which the

25  individual is fully aware that we're recording it typically by

1   just having the recorder out and the light on.  A covert

2   recording would be one in which the individual isn't aware that

3   we're recording and that would be through the use of a body

4   recorder that we might have somewhere on our person.

5   Q   And in this particular case were you recording overtly or

6   covertly?

7   A   Overtly.

8   Q   Now once you made this recording on February 6th what did

9   you do with the recording at the end of the day?

10  A   At the end of the day I downloaded the recording onto a

11  disc and I wrote what we call a 302 which is an investigative

12  report regarding the interview.  I then placed the recording --

13  attached the recording to that document.

14  Q   And was it made a part of the investigative file in this

15  case?

16  A   Yes, ma'am, it was.

17  Q   Is that your standard procedure?

18  A   It is.

19  Q   I am showing you what's previously been marked as

20  Government Exhibit 14.  If you'll tell me when you see

21  something on your screen, Special Agent Garrick.

22  A   Okay.  I see something. I see Media Player.

23  Q   Okay.  And is that Media Player associated with Exhibit 14,

24  the recording that you made on February 6th?

25  A   Yes, ma'am.

1  Q   And did you have an opportunity to review that recording

2  before testifying today?

3  A   Yes.

4  Q   And that's a copy of the recording you made with the

5  defendant on February 6th?

6  A   Correct.

7  Q   And has that recording been manipulated or altered in any

8  way?

9  A   No.

10        MS. LYONS:  The government would seek to admit

11  Government Exhibit No. 14, Your Honor.  We are not publishing

12  at this time.

13        THE COURT:  Any objections?

14        MR. MERZLAK:  No, Your Honor.

15        THE COURT:  It is admitted.

16        MS. LYONS:  Thank you, Your Honor.

17     (Government's Exhibit No. 14 is entered into evidence.)

18  Q   Special Agent Garrick, how long did your discussion with

19  the defendant last on February 6th?

20  A   Approximately an hour, 47 minutes.

21  Q   Let's talk about some of the things that you discussed with

22  the defendant that day.  Okay?

23  A   Okay.

24  Q   All right.  Did the defendant say anything about the

25  cellular devices that his daughter had possession of or owned?

1   A    Yes.  When we asked him he said that she had used three

2   phones previously.  He identified a Motorola G6 Play, a

3   Samsung, and then an iPhone.

4   Q    And I apologize.  I am going to take one step back, Special

5   Agent Garrick.  Special Agent Escobar went out to 209 Nicklaus

6   Court with you on February 6th?

7   A    Yes, he did.

8   Q    Was he present during the interview of the defendant?

9   A    He was present during the beginning of the interview.

10  Q    And where was he for the rest of the interview?

11  A    For the rest of the interview he was conducting the consent

12  search.

13  Q    Did he ever step in and out to ask questions?

14  A    He did.

15  Q    Thank you.  I apologize for interrupting.  After you

16  discussed the cellular phones and the defendant talked about an

17  iPhone and a Motorola Play and perhaps a Samsung, do you recall

18  whether or not Special Agent Escobar ever returned to the room

19  to talk about sneakers?

20  A    Yes, he did.

21  Q    Do you recall what that discussion was?

22  A    Yes.  We showed Mr. Gunn the photograph of the sneaker that

23  we had -- that we had received from the other division and we

24  asked him if he recognized the shoe in the photograph.

25  Q    And what did the defendant say?

1  A   He stated -- after he looked at it he stated that he didn't

2  recognize it but that he had had a pair of white shoes in the

3  past.

4  Q   He did or did not recognize it?

5  A   That he did not recognize it.

6  Q   And when he was asked about the shoes where in the house

7  were you guys located?

8  A   We were in the living room in the main living area of the

9  house.

10  Q   Special Agent Garrick, did you speak to the defendant about

11  whether or not any individuals who were not members of the

12  family had access to the family's home?

13  A   Yes, we did ask.

14  Q   What, if anything, did the defendant tell you about

15  individuals outside of the family accessing the home?

16  A   He stated that no individuals outside of the family had any

17  access to the house or spent any time at the residence.

18  Q   Did you talk to the defendant about whether or not his

19  child spent time alone in their home?

20  A   As I recall he said that she didn't spend any significant

21  amount of time alone.

22  Q   What did the defendant tell you about his knowledge --

23  well, I withdraw this question.  Let me step back a moment.  At

24  some point during the interview did you gain more information

25  about other items that you needed to search for?

1   A   Yes, we did.

2   Q   Okay.  And how did you find out that there were other items

3   that you may need to look for?

4   A   I believe that Special Agent Escobar received a telephone

5   call.

6   Q   Did an issue come up related to a vibrator?

7   A   Yes, ma'am.

8   Q   Okay.  Do you recall what that information was or what you

9   were thinking at the time?

10  A   We were told -- instructed to look for a white vibrator and

11  we questioned -- I questioned Mr. Gunn if he was aware of one

12  in the residence.

13  Q   Do you know why or recall why you were looking for a white

14  vibrator?

15  A   As I recall it was depicted in an image, but I can't be

16  certain.

17  Q   So you did ask the defendant about his knowledge related to

18  a white vibrator?

19  A   Yes, I did.

20  Q   Was there another term or word used for vibrator if you

21  remember?

22  A   I don't remember.

23  Q   What, if any, response did the defendant give you about a

24  white vibrator?

25  A   He said that he wasn't aware of a white vibrator in the

1   house.  He said that his wife had a vibrator but it was of a

2   different color.  I showed Mr. Gunn a photograph of what -- an

3   examplar of the white vibrator that we were looking for and he

4   said that he didn't recognize it and that he didn't know of one

5   in the house.

6   Q    Special Agent Garrick, did the defendant tell you anything

7   about any travel or trips he had ever taken in the past?

8   A    He stated that he had for work had traveled to Asheville,

9   North Carolina and that he had also traveled to Morocco in

10  North Africa looking for something related to work.

11  Q    And when he began to talk about work did he tell you what

12  type of work he did?

13  A    Yes, ma'am.  He said that he worked on computers from home.

14  He did administration security, software checks, things like

15  that.

16  Q    Did he appear to be familiar with computers?

17  A    Yes, ma'am.

18  Q    Did he tell you whether or not he worked inside the home or

19  outside of the home?

20  A    He said that he worked inside the home.

21  Q    Did he discuss his work hours with you?

22  A    Yes.  He said that he would often stay up very late

23  working.  Other times he would be up very early and it just

24  depended on what he was working on at the time.

25  Q    Did the defendant talk to you about whether or not he had

1   ever served in the military?

2   A   Yes, he did.

3   Q   What did he tell you?

4   A   He stated that he had served in the U.S. Army and also

5   noted that he was in the same fort operating base as Special

6   Agent Godbee in Afghanistan.  He stated that he had been

7   diagnosed with PTSD regarding his time in the military and had

8   been close to a mortar blast and had been medically discharged.

9   Q   Special Agent Garrick, while you were talking to the

10  defendant on February 6th did any other agents ultimately

11  arrive?

12  A   Yes.

13  Q   Who arrived and came into the room while you were speaking

14  to the defendant?

15  A   At first it was Special Agent Godbee.

16  Q   And was the recorder still running?

17  A   Yes, ma'am.

18  Q   What, if anything, did Special Agent Godbee ask Mr. Gunn

19  about when he stepped into the room?

20  A   Could you be more specific?

21  Q   Sure.  Did Special Agent Godbee ask anything -- did Special

22  Agent Godbee ask the defendant anything related to his shoes or

23  shoe size?

24  A   Oh, yes.  He asked Mr. Gunn what his shoe size was.

25  Q   And did the defendant respond?

1   A    Yes.  He initially stated that he couldn't remember what

2   his shoe size was and then after a few seconds said 11 and a

3   half.

4   Q    Special Agent Garrick, during your time with the FBI -- and

5   I apologize; did you say that was 16 or 17 years?

6   A    Going on 17.

7   Q    You've conducted interviews before?

8   A    Yes, ma'am.

9   Q    About how many interviews have you conducted over the

10  course of your career with the FBI?

11  A    A couple of hundred.  It's a lot.

12  Q    And you have worked in counterintelligence for a number of

13  those years?

14  A    Yes, ma'am.

15  Q    And so you are interviewing people who don't necessarily

16  want to tell you the truth?

17  A    Correct.

18  Q    Have you been trained to watch body language?

19  A    Yes, ma'am.

20  Q    And to look for signs of truthfulness or somebody who is

21  not telling you the truth?

22  A    Correct.

23  Q    Do you recall a discussion with Special Agent Godbee and

24  the defendant that took place outside on the porch?

25  A    Yes, I do.

1  Q   And was there a discussion in which you were talking about

2  Special Agent Godbee being a good agent?

3  A   Yes, I was.

4  Q   Can you tell the jury a little bit about that discussion?

5  A   Sure.  At the time Mr. Gunn was -- he was agitated,

6  emotional, and I told him that if it was my family going

7  through what they were going through at the time that the only

8  one I would want working on it was Special Agent Godbee and

9  that his primary concern would be -- was for the child and that

10  he wouldn't stop until he found out who it was that had done

11  this.

12  Q   Special Agent Garrick, what was the defendant's response

13  when you said that Special Agent Godbee wouldn't stop?

14  A   He shied away and looked away and almost became sheepish.

15  Q   Now you mentioned that the recording lasts for about an

16  hour and 45 minutes?

17  A   An hour and 47 minutes, yes.

18  Q   An hour and 47 minutes.  And so during that hour and 47

19  minutes had you viewed every image of child pornography that

20  had been found in this investigation?

21  A   No, ma'am, I had not.

22  Q   Were you privy to every report or fact that was known to

23  Special Agent Godbee while you were sitting with the defendant?

24  A   No, I was not.

25  Q   Had you drawn any conclusions about the case while you were

1   sitting with Mr. Gunn?

2   A    At that time the only conclusion that I had was that the

3   image was not -- had been taken by someone other than the

4   child.

5   Q    So during the course of your conversation with the

6   defendant did you engage in something called RPM?

7   A    Yes, ma'am, I did.

8   Q    Can you tell the jury what that is?

9   A    Sure.  RPM'ing stands for rationalization, projection, and

10  minimization.  It is an interview tactic that's trained at the

11  FBI Academy and it's one that we employ in certain interviews.

12  When an individual that we interview is becoming very agitated

13  and emotional we use these to help bring the individual down

14  more towards a baseline emotional state.  In this case I used

15  minimization and projection during this time to keep Mr. Gunn

16  calmer and to keep him speaking.

17  Q    While you're using this RPM technique, Special Agent

18  Garrick, are you making comments to the defendant about the

19  seriousness or the lack of seriousness of this case?

20  A    Yes, ma'am, I am.

21  Q    Tell us the types of things that you were saying to the

22  defendant if you recall?

23  A    Sure.  In one instance I was using what we call

24  minimization where we downplay the severity of the issue and I

25  made a comment something to the effect of, "This isn't that

1   bad; I've seen a lot worse" and this is an effort to calm the

2   individual and just to keep them speaking in the hopes that we

3   gain more information.

4   Q    And, Special Agent Garrick, at that point in time did you

5   know how bad it was?

6   A    No, I did not.

7   Q    Did your technique seem to be working in order to calm the

8   defendant down?

9   A    Yes, it did.

10  Q    Now around the conclusion of -- the timing of the

11  conclusion of this interview with the defendant, what is

12  starting to happen?

13  A    Around the time of concluding the interview the consent

14  search was starting to wind down as well.

15  Q    And who makes the decision that the consent search will end

16  or terminate?

17  A    Ultimately, that's up to the case agent.

18  Q    And in this case who was that?

19  A    That was Special Agent Godbee.

20  Q    So does Special Agent Godbee make a decision that the

21  consent search should terminate?

22  A    Yes, he did.

23  Q    And so what happens when he makes that decision?

24  Practically speaking, what are people doing?

25  A    Okay.  So at that point as we wrap things up you conclude

1   your recording.  You gather, you know, your folders and your

2   recorder and make sure that you haven't left anything there and

3   you proceed to exit the residence.

4   Q    Now as you start to move out of the house with your team

5   does something happen?

6   A    Yes.

7   Q    What happens?

8   A    So at that time Special Agents Escobar, McKee, Boling,

9   Long, and Stewart were already outside of the residence.  They

10  had already left.  Special Agents Godbee -- excuse me.  Special

11  Agent McKee was still inside.  At that point Special Agent

12  Godbee, Special Agent McKee, and myself start to exit the

13  residence.  Special Agent McKee as we get to the front door he

14  moves the front door a little bit.  It had been open during the

15  majority of that afternoon and looks down in the corner and

16  says, "Oh, are these the shoes you're looking for?"  Something

17  to that effect.

18  Q    What happens when Special Agent McKee makes that comment --

19  "Are these the shoes?"

20  A    Special Agent Godbee looks at the shoes, reacts with a fair

21  amount of surprise.  We pick up the shoes and examine them and

22  immediately recognize them as the shoes in the photograph.

23  Q    And how are you able to compare or recognize that the shoes

24  that were on -- are in the living room are the same shoes in

25  the photograph?

1  A   There is a distinctive mark on the left -- the front of the

2  left shoe.

3  Q   And I want to go back just a moment.  You made a comment

4  about the door being open the majority of the day.  Where were

5  you with the defendant most of the day?

6  A   I was in the main living area sitting on the couch.

7  Q   And the door that you were exiting through to leave the

8  house, is that in the same room as the living room?

9  A   Yes, ma'am.

10 Q   And was the shoe in that room the entire time your team was

11 searching?

12 A   Yes, it was.

13 Q   So once Agent McKee has located that sneaker behind the

14 door in the living room, what do you do?

15 A   At that point Special Agent Godbee and I go upstairs to

16 interview the daughter in the case.

17 Q   And you go up to the second floor?

18 A   Yes, ma'am.

19 Q   And it's you and Special Agent Godbee.  Any other agents?

20 A   No.

21 Q   And who is with the child?

22 A   The child's mother, Amanda Gunn.

23 Q   Do you recall what room of the house you're in?

24 A   Yes.  It was in the upstairs bedroom.  So as you go up the

25 stairs up -- there is a landing and then at the back left of

1    the house.

2    Q    Is there a discussion about who the sneaker belongs to?

3    A    Yes, ma'am.

4    Q    And what is the answer when the minor is asked who the

5    sneaker belongs to?

6    A    Special Agent Godbee asks if those were her father's shoes.

7    She nods her head.  Special Agent Godbee then asks, "Are you

8    sure?"  And the child says, "I'm sure."

9    Q    Does Special Agent Godbee then ask who was it who took the

10   picture?

11   A    Yes.

12   Q    And does the minor respond?

13   A    Yes.  She identifies her father as the one who took the

14   picture.

15   Q    What is the mother, Amanda Gunn, doing while this happens?

16   A    She's standing in the room watching.

17   Q    And after her child indicates that the defendant, her

18   adoptive father, had taken that picture, what does the mother

19   do?

20   A    She sits on a box in the room.

21   Q    Did she hug her daughter?

22   A    No.

23   Q    Did she say anything to her daughter?

24   A    No.

25   Q    Did you say anything, Special Agent Garrick?

1    A    Yes.  I spoke with Mrs. Gunn and tried to say some

2    reassuring words.

3    Q    And during this four or five minutes did you have your

4    recorder running?

5    A    Yes.  We recorded the questioning of the child.

6    Q    Now what do you and Special Agent Godbee do after you

7    finish speaking to the minor about the white sneakers?

8    A    Yes, we go downstairs.  We photograph the shoes.  We do

9    what we would normally do when seizing an item of evidence.

10   Q    And do you make one final trip back upstairs to speak to

11   the child?

12   A    Yes, we do.

13   Q    And is there any comforting going on for that child when

14   you go upstairs again?

15   A    No, not that I see.

16   Q    Now everything we just discussed occurred on February 6th

17   of 2020; is that correct?

18   A    Yes, ma'am.

19   Q    Was that the last day that you provided any assistance in

20   this case?

21   A    No, ma'am.

22   Q    Did something happen the next day, February 7th?

23   A    Yes, ma'am.  We executed a search warrant on the 209

24   Nicklaus Court residence.

25   Q    And who was the affiant on that search warrant?

1    A    That was Special Agent Godbee.

2    Q    Can you tell us what an affiant is?

3    A    Sure.  An affiant is a law enforcement official that swears

4    to the accuracy of the probable cause in the application of the

5    warrant -- who swears to the facts of the case.

6    Q    And who authorizes or signs a search warrant?

7    A    A magistrate judge.

8    Q    And so on February 7th after Special Agent Godbee saw a

9    magistrate judge and a magistrate judge signed a search

10   warrant, did you and other agents go execute that search

11   warrant at 209 Nicklaus Court?

12   A    Yes, we did.

13   Q    Were there any procedures or steps that you took before

14   executing the search warrant on February 7th?

15   A    Yes.

16   Q    Can you tell us about that?

17   A    Sure.  Prior to a search warrant we do a standard briefing.

18   So we bring the team together, anyone who is going to be

19   assisting in the search, and we brief the individuals on the

20   nature of the case.  We allow them to read the warrant and go

21   over the list of items to be seized and assign various work

22   roles to the individuals for the team.

23   Q    And why is it important that you do or take those steps

24   before you execute the search warrant?

25   A    It's so that the search runs more smoothly, that we

1    identify and locate and seize the correct items, and that

2    everything runs safely.

3    Q    In this particular case you actually executed the search

4    warrant on the same day that it was obtained; correct?

5    A    Correct.

6    Q    All right.  So once you arrive at 209 Nicklaus Court, what

7    happens?

8    A    When we arrive at 209 Nicklaus Court the first thing we

9    do -- the residence is secured and we begin photographing.

10   Q    And tell us why you photograph and what other

11   administrative steps you take before you begin searching.

12   A    Sure.  The reason we photograph is to show the condition of

13   the residence at the time that we arrive.  We go through.  We

14   photograph the exterior of the residence and then we photograph

15   our entry into it.  We photograph each individual room.  We

16   label them with alpha designations.  So room A, room B, room C,

17   room D and so forth, and after we photograph the entire

18   residence and we assign a sketcher to sketch out the layout of

19   the house.  Then we assign searchers to search the residence.

20   Q    And what happens if a searcher who is assigned to a part of

21   the house does actually find an item of relevance or evidence?

22   What do they do with it?

23   A    So when a searcher finds something that might be

24   significant, they call out.  The photographer will come over,

25   will photograph it in place, and depending on if it's obvious

1   we'll go ahead and seize the item.  If it is in question we'll

2   call the case agent and point it out and say, "Is this

3   significant?"  At that point we'll either seize it or not seize

4   it or just photograph it.  It depends on the item.

5   Q    So you've mentioned the fact that you take photos when you

6   go in.  That's entry.  And you'll take photos of the evidence.

7   Do you also take photos when you leave?

8   A    Yes, ma'am.

9   Q    And why do you do that?

10  A    We take exit photos so that we can show the condition of

11  the residence when we leave it to show that we left it in the

12  same condition as how we found it -- that we didn't tear it up.

13  Q    And after the search warrant is completed, where do the

14  items of evidence go?

15  A    So the items of evidence once they're seized they're given

16  over to the case agent.  The case agent then enters them

17  into -- for here our evidence control room which is at the

18  Savannah Resident Agency.  So they're then entered into

19  evidence into the office in Savannah.

20  Q    And what happens to the actual photos that are taken at the

21  scene of the search warrant?

22  A    The photos of the search warrant are downloaded onto a disc

23  and they are included with the investigative report of the

24  search.  They're included in an attachment with all of the

25  other documentation that's created during the search.

1   Q    And so in this particular case did that happen?

2   A    Yes.

3   Q    And were search warrants -- search warrant photos taken and

4   added to the investigative file?

5   A    Yes, they were.

6   Q    And were reports subsequently written to document those

7   photos?

8   A    Yes.

9   Q    And every step you just described, did you employ those

10   same procedures when executing the search warrant on

11   February 7, 2020, at 209 Nicklaus Court?

12   A    Yes, ma'am.

13   Q    Now what was your role or responsibility at the search

14   warrant on February 7th?

15   A    On February 7th I was designated as the photographer.

16   Q    And who was the supervisory agent on that day?

17   A    That would be Marcus Kirkland.

18   Q    And what did Supervisory Agent Marcus Kirkland -- what were

19   his responsibilities that day?

20   A    The on scene -- commander on scene supervisor just monitors

21   the overall situation and provides assistance calling for

22   additional resources if we need it or dealing with any incoming

23   calls be it from, you know, higher echelon authorities or what

24   have you -- basically, whatever comes up.

25   Q    So focusing our attention on the search warrant that you

1   took photographs of on February 7th who was home during the

2   search?

3   A    No one was.

4   Q    Special Agent Garrick, you would have photographed or at

5   least put into the investigative file all relevant photographs

6   and items seized by all of the agents who were on scene that

7   day; correct?

8   A    Correct.

9   Q    Okay.  And did -- have you reviewed those photos before

10  coming to court today?

11  A    Yes.

12  Q    And did you make sure that that exhibit was accurate?

13  A    Yes.

14  Q    And that it had not been manipulated or altered in any way?

15  A    Correct.

16  Q    And that's Government's Exhibit 15 and I am going to ask

17  for it to be pulled up on your screen at this time.  Tell me

18  when you can see it, Special Agent Garrick?

19  A    So this is the entry photo of the front door of the

20  residence.

21  Q    And is that the first of the entire package of photos for

22  Government Exhibit 15?

23  A    The first photo is of the -- is a document that just shows

24  who the photographer was, what the location and the case

25  number.

1   Q   Okay.  And there are approximately 140 photos in that

2   exhibit; is that correct?

3   A   Yes, I believe so.

4            MS. LYONS:  Your Honor, the government would seek to

5   admit and publish Government's Exhibit No. 15 at this time.

6            THE COURT:  Any objection?

7            MR. MERZLAK:  No, Your Honor.

8            THE COURT:  Admitted and you may publish.

9        (Government's Exhibit No. 15 is entered into evidence.)

10  Q   Special Agent Garrick, I know there are over 140 photos and

11  I don't want to go through all of those photos with you.  I

12  just want to go through a handful.  Okay?

13  A   Yes, ma'am.

14           MS. LYONS:  Ms. Long, if we can start with 15.002.

15           Special Agent Garrick, if you could walk us through

16  some of these photos and tell us what we're looking at.  Let's

17  start with this one, 15.002.

18           THE WITNESS:  Yes, ma'am.  This is the entry photo of

19  the residence.  This is the front door.

20           MS. LYONS:  15.003.  And I apologize, Ms. Long.  Can

21  we start with 15 -- is it 016?  016.

22           What room in the house are we looking at right now,

23  Special Agent Garrick?

24           THE WITNESS:  So this is the main living room of the

25  house.  This is at the back of that main living area -- the

1  living room, dining room combination where if you see the light

2  source on the left-hand side, that's the front door.

3  Q    Okay.  15.014.

4  A    So this is the living room.  As you come in this would be

5  as you come into the front door and you go to and you look to

6  the left, this would be that left front corner of the

7  residence.

8  Q    Okay.  So in that first photograph we saw the front door

9  with 209 on it.  I have just walked through the front door and

10 I am turning to my left.  This is the image that I see?

11 A    Correct.

12 Q    15.015.

13 A    This is the living room as you walk in to the front door.

14 Q    15.125.

15 A    This is the living room, dining room.  This is the main

16 living area as you walk in through the front door.

17 Q    So the other shot where we were standing in the back of the

18 living room, basically, this is the reverse shot of that?

19 A    Correct.

20 Q    Okay.  And can you tell me what you're seeing in the center

21 of this shot?

22 A    That is an inflatable bed.

23 Q    And that was on the floor in the living room?

24 A    Yes.

25 Q    Do you see anything in the center of the mattress?  Do you

1  see a stuffed animal?

2  A   Yes, I do.

3  Q   15.003.  What are we seeing here?

4  A   This is a laptop computer that was in that left corner

5  between the desk and the couch.

6  Q   And was that item seized on February 7th?

7  A   Yes, it was.

8  Q   In the lower right-hand corner do you see another item?

9  A   Yes.  That is a satchel that contained multiple media cards

10 and thumb drives.

11 Q   Is there another photograph of that?

12 A   Yes, there is.

13 Q   Okay.  15.078.

14 A   This is a laptop that was also in the main living area of

15 the house.

16 Q   And was that item seized?

17 A   Yes, ma'am, it was.

18 Q   15.67.  Is this a closeup shot of the little satchel that

19 you mentioned that was sitting on the table?

20 A   Yes, it is.

21 Q   And can you tell us to the best of your ability what was

22 inside of that black little satchel?

23 A   There were memory cards, computer memory cards, thumb

24 drive.

25 Q   15.65 -- 065.  I'm sorry.  Is this just another shot of

1  that same computer that you found on the floor?

2  A    Yes.

3  Q    Thank you.  15.070.  What are we looking at right here,

4  Special Agent Garrick?

5  A    This is a tower computer that was located under the desk in

6  the living room.

7  Q    The living room that's on the first floor?

8  A    Yes, ma'am.

9  Q    15.072.  What is this?

10 A    This is another tower computer that is on the right side of

11 the desk.  So on the opposite side of the desk from the

12 previous one.

13 Q    So there were two computer towers under this same desk?

14 A    Yes, ma'am.

15 Q    15.081.  What is the white object in this picture?

16 A    This was a letter that was in the main living area of the

17 house.

18 Q    And what is sitting underneath it?

19 A    A white Xbox.

20 Q    15.087.  What are we looking at here, Special Agent

21 Garrick?

22 A    This is wood flooring -- like an engineered wood flooring

23 that was stacked up in the garage.

24 Q    Was this item seized?

25 A    Yes.

1   Q    Why?

2   A    The flooring that we found in the garage bore a very

3   similar resemblance to the flooring that you can see in the

4   image of the shoe series of the photograph of the child

5   pornography.

6   Q    When you're referring to the shoe series, that's the series

7   of child pornography?

8   A    Yes, ma'am.

9   Q    And the child is rolling around on that wood floor?

10  A    Correct.

11  Q    Let's take a look at 15.088.  Can you tell us what this is?

12  A    This is a printed-out document showing the log-in

13  information and phone numbers for one of the members of the

14  family.

15  Q    And I want you to take a look at the user ID on that,

16  Special Agent Garrick.

17  A    It says agunn421@gmail.com.

18  Q    And what is the defendant's name in this case?

19  A    Michael Peyton Gunn.

20  Q    What is his wife's name?

21  A    Amanda Gunn.

22  Q    Under the "Password" is a password listed?

23  A    Yes.

24  Q    And was this document in any way secured or behind a locked

25  safe or was it out in the open?

1  A    No.  It was out in the open.

2  Q    15.133.  Now if we need to zoom in on any of these, Special

3  Agent Garrick, please let us know if you want to see a tighter

4  view, but can you walk us through these documents?

5  A    Sure.  These were documents that were found in the main

6  living room of the house.  We have several of the printed

7  documents contained the user names and passwords of online

8  accounts for every member of the family and we also recovered a

9  handwritten note and a handwritten spiral notebook.

10       MS. LYONS:  Your Honor, may I approach the witness for

11  just one moment?

12       THE COURT:  Sure.

13  Q    Special Agent Garrick, I am going to point at the screen

14  and ask you to tell or at least mimmick what I am doing.  If

15  you point at your screen or tell Ms. Long where to zoom in and

16  then identify the item that she's zooming in on.

17  A    Okay.

18  Q    Is that okay?

19  A    Sure.

20  Q    Okay.  Let's start kind of at the left-hand corner and work

21  your way around.  What are we looking at?

22  A    This was a handwritten spiral notebook.  On the left-hand

23  side it says, "Find guy for money for the family" and then

24  "Clean up messages."  On the right side is handwritten it says

25  "prices" and then underneath "video chat, pictures, and

1   meet-ups".

2   Q   And were there other documents that you later photographed

3   contained within that same spiral notebook?

4   A   Yes.

5           MS. LYONS:  Ms. Long, can we back out?

6           All right.  Where do you want to go now?  Which part

7   of the photograph?

8           THE WITNESS:  We can go to the bottom left-hand.

9   Q   What is this document?

10  A   These are log-in information.  It is data user name,

11  password, account information for various online accounts.

12  Q   I apologize, Special Agent Garrick.

13      15.133.

14      If you can see it, Special Agent Garrick, can you read

15  what's highlighted in pink?

16  A   This would be Reddit, user ID ggirl4U and then a password.

17          MS. LYONS:  And, Ms. Long, if we can then scroll down.

18          What is highlighted in pink, Special Agent Garrick?

19          THE WITNESS:  It says "Second Life, user ID

20  toxicdove," and then a password.

21  Q   And what is the email address listed?

22  A   Ggirl06@outlook.com.

23  Q   And the display name?

24  A   Toxicdove.

25          MS. LYONS:  And if you will scroll all the way back up

1   to the top of that document, Ms. Long.

2          Now, Special Agent Garrick, along the top line of that

3   document, what is the document called?

4          THE WITNESS:  It is "Toxicdove accounts.txt."

5   Q   Thank you.  All right.  Going back to 15.133, how about the

6   kind of mildewed documents in the middle?

7   A   So this was a large, printed-out document that had the user

8   names and account information and passwords for every member of

9   the family at the residence.

10  Q   Okay.  Ms. Long, thank you.

11  A   So this is a handwritten note from the child -- from the

12  daughter to Mr. Gunn.

13         MS. LYONS:  We can back out of this one.

14         Is this also a note from the child?

15         THE WITNESS:  Correct.

16         MS. LYONS:  We can back out of this one.

17         THE WITNESS:  This is a handwritten document,

18  "Important Sites and Numbers".  A website down at the bottom is

19  Google Voice, business telephone number, and a telephone

20  number.

21  Q   Thank you.

22      And the two documents at the bottom, Ms. Long.

23  A   This is a printed-out document with user names, account

24  information, password.

25         MS. LYONS:  And, if I may, Ms. Long, can you please

(Justin C. Garrick-Direct by Ms. Lyons)

1    focus in on the page on the left-hand side, the middle half.  A

2    little bit further.  Right there.  Thank you.

3            Can you start at the top and tell me what account the

4    first user ID is?

5            THE WITNESS:  It's Microsoft account, user ID

6    gunnpeyton@outlook.com.

7    Q    And is there a password?

8    A    Yes.

9    Q    And if you scroll down a little bit further, is there an

10   Outlook account for Amanda Gunn?

11   A    Yes.

12   Q    And is there a password?

13   A    Yes.

14   Q    And is there a Microsoft account for ggirl?

15   A    Ggirl06, yes.

16   Q    And is there a password?

17   A    Correct.  Yes.

18   Q    Thank you.

19        Thank you, Ms. Long.  15.090.

20        Anything significant in this photograph?

21   A    These were several handwritten letters from various members

22   of the family to each other.

23   Q    And if we can just focus in on the documents -- not the

24   printed document, Ms. Long.  Thank you.

25        You don't have to read these, Special Agent Garrick, but

1   did you notice a difference in handwriting as you started to

2   review any of these documents?

3   A    Yes.

4   Q    I am not asking you to identify anybody's handwriting.  I

5   am simply asking you did you notice a difference in

6   handwriting?

7   A    I did.

8   Q    Okay.  And did the handwriting in the bottom left corner

9   appear to be different than the handwriting at the top of this

10  document?

11  A    It did.

12  Q    Thank you.  15.092.  What are we looking at here, Special

13  Agent Garrick?

14  A    We're looking at a jar that was in the daughter's room.

15  Q    15.131.  Is this the same jar?

16  A    Yes, it is.

17  Q    And is there something in the jar?

18  A    Yes.  It was a printed letter.

19  Q    15.130.  Was that the letter that was in the jar?

20  A    Yes, it was.

21  Q    Thank you.

22       Remove that, please.

23       Now I want to take you back for a second because I kind of

24  moved from the first floor to the second floor pretty quickly.

25  15.046.  Special Agent Garrick, is this how you move from the

1   first floor of the defendant's house to the second floor?

2   A    Yes.

3   Q    15.47 -- 047.  Is there a second set of stairs or a longer

4   stairway to get upstairs?

5   A    Correct.

6   Q    And then when you do get upstairs -- 15.048 -- is there an

7   open landing?

8   A    Yes, there is.

9   Q    Can you see from the landing upstairs down into the living

10  room downstairs?

11  A    Yes, you can.

12  Q    15.049.  Where are we seeing in this picture right now?

13  A    What we're seeing is you're at the top of the second set of

14  stairs.  You're looking towards the back of the house.  On the

15  left is a continuation of that landing and you have a work

16  station there, a computer desk, and then what would -- it was

17  used for storage, a bedroom there in the back.

18          MS. LYONS:  I beg the Court's indulgence.

19          Special Agent Garrick, I just want to make sure I have

20  been clear about something.  There's a wall right here running

21  through this picture; is that correct?

22          THE WITNESS:  Correct.

23  Q    15.049.  Yes?

24  A    Yes.

25  Q    Okay.  If I were standing or sitting behind that wall in

1  that loft and I were yelling, could my voice carry to the

2  living room?

3  A    Yes.

4  Q    Okay.  So are we on the second floor now?

5  A    We are.

6  Q    15.059.

7  A    This is on the second floor.  This is the daughter's room.

8  Q    You took these photographs on February 7th?

9  A    Yes, I did.

10 Q    Do you see any bedding -- a bed or a mattress in this room,

11 Special Agent Garrick?

12 A    No, I don't.

13 Q    Are the curtains opened or closed?

14 A    It appears as though the blinds are somewhat closed.

15 Q    And are there stuffed animals near the window?

16 A    Yes.

17 Q    Are there stuffed animals sitting up or have they fallen to

18 their sides?

19 A    They are on their sides.

20 Q    Can you see a charger plugged into the outlet near the

21 window?

22 A    I do not see a charger.

23 Q    Thank you.  15.61.  What are we looking at here, Special

24 Agent Garrick?

25 A    This is the daughter's room from the opposite angle.  So

1  this is towards the front -- towards that window looking back

2  to the door and you can see the bathroom on the right.

3  Q   15.093, please.  Is this another letter that was found in

4  the house?

5  A   Yes, it was.

6  Q   15.094.  Is this another letter that was found in the

7  house?

8  A   It was.

9  Q   15.096.  What are we looking at, Special Agent Garrick?

10  A   This is a disassembled laptop that was found in the

11  residence.

12  Q   Do you recall what floor this was located on?

13  A   On the second floor.

14  Q   15.134.  What are we looking at in this photo?

15  A   This is another disassembled laptop.

16  Q   Can you read what is written on what appears to be maybe

17  like a ziplock bag?

18  A   Sure.  It is "Grace's laptop, broken pin connectors."

19  Q   I have no idea what pin connectors are.  I don't know if

20  you do, Special Agent Garrick.  Do you know what those are?

21  A   Vaguely familiar.

22          MS. LYONS:  We can back out of this one.  15.097.

23  Okay.

24          Can you tell us where -- what's of relevance in this

25  particular photograph?

1          THE WITNESS:  Sure.  This is on the second floor at

2    the landing.  This is where the -- where that desk is and there

3    are two computer -- two computers, desktop computers --

4    underneath the desk.

5    Q    Were those seized?

6    A    Yes, they were.

7    Q    Okay.  So you already seized two computers from the first

8    floor?

9    A    Two towers and two laptops.  So four computers.

10   Q    I should have been clear.  Thank you.  Two towers, two

11   laptops and now you have another two here?

12   A    Yes, ma'am.

13   Q    Okay.  Can I ask you another question?  I'm sorry.  You

14   took the entry search warrant photos.  Yes?

15   A    Yes, ma'am.

16   Q    When we were looking at the photos from the front door --

17   perspective photos of the first floor -- those were as soon as

18   you entered the house?

19   A    Correct.

20   Q    So the house looked like that when you came in?

21   A    It did.

22   Q    Okay.  15.103.  What is this, Special Agent Garrick?

23   A    This is a SanDisk thumb drive.

24   Q    Was that item seized?

25   A    Yes, it was.

1  Q    15.106.  Anything of significance in this photograph?

2  A    This was the box of documents there and the black notebook

3  on top.

4  Q    And so some of the documents we've already seen came from

5  this box?

6  A    Correct.

7  Q    And do you remember what floor of the house that was on?

8  A    First floor, main living area.

9  Q    15.127.  What do we have in this particular photograph?

10 A    This is an external hard drive that was found there at the

11 desk on the first floor in the living room and we also have a

12 handwritten document on the side.

13 Q    So when we saw the earlier photos of the two towers under a

14 desk, is this the same desk?

15 A    Yes, ma'am.  It is.

16 Q    Okay.

17      And, Ms. Long, if you will zoom in on that document in the

18 left-hand half of this photograph.

19      And to the extent that you can, Special Agent Garrick, can

20 you read any words into the record?

21 A    Yes, I can.  "So they can do whatever they want."  Then

22 "have guys, like clean, anal."  Then the next line "at what."

23 Then two lines down "at school."  Down at the bottom you can

24 see "Instagram."  You can see the letters "H-O-O-L" and then

25 "at night."

(Justin C. Garrick-Direct by Ms. Lyons)          178

1  Q   Again, is this a handwriting that seemed to appear again

2  and again throughout the house?

3  A   Yes, it did.

4          MS. LYONS:  Thank you, Ms. Long.  15.128.

5          All right.  Special Agent Garrick, tell us what we're

6  looking at.

7          THE WITNESS:  These were documents that were found in

8  the residence.

9  Q   Again, did you notice a distinct handwriting here?

10  A   Yes.

11  Q   15.139.  Where are we in the house, Special Agent Garrick?

12  A   We are on the first floor.  This is the bathroom -- the

13  master bathroom.  So it is off the master bedroom.  So if

14  you're walking through the front door of the residence, it's at

15  the back of the residence.  The kitchen is on the left.  The

16  master bedroom and the master bathroom are on the right.

17  Q   And is there an item of significance in this photograph?

18  A   Yes, ma'am.  There is.

19          MS. LYONS:  Can we zoom to 15.138?

20          What are we looking at that's significant in this

21  photograph?

22          THE WITNESS:  We're looking at a white vibrator.

23  Q   And why was this significant?

24  A   This was significant because the item appeared in an image

25  of the child pornography.

1   Q    Is this the white vibrator that you were asking the

2   defendant about on February 5th?

3   A    Yes.  On February 6th.

4   Q    Thank you for correcting me.  On February 6th during the

5   consent search?

6   A    Yes.

7   Q    Thank you very much.  15.140.  What are we looking at?

8   A    We're looking at handwritten document that was in a spiral

9   notebook located in the residence.

10  Q    Can you read what the note says, please?

11  A    Yes.  "Tips."  Then the next line, "Websites,

12  lovepanky.com, sensual tease, YouTube.com, PornHub.com.

13  Google.com."  Then continuing on the right column, "Today.com.

14  Health, 18 ways to first, *watch playlist with those few

15  special videos.  Bad Girl's Bible, Cosmopolitan."  On the left

16  are three names:  "Adriana Checkik, Jenna Haze and Riley Reid."

17  Q    15.141.  Is this another letter?

18  A    Yes.

19  Q    Thank you.

20       Please take that down, Ms. Long.

21       Now after the search warrant did you create a report in

22  order to memorialize the items that had been seized?

23  A    Yes, I did.

24  Q    And, Special Agent Garrick, I am showing you what's been

25  previously marked as Government's Exhibit 16.  Tell me when you

1  can see it on your screen.

2  A   I can see it.

3  Q   What is this document?

4  A   This is what we call an FD-302.  It is our investigative

5  document.  It memorializes what we did on a certain day.  It is

6  a testimonial document.

7  Q   Does this become a part of the investigative file?

8  A   Yes, it does.

9  Q   Has it been altered or manipulated in any way?

10  A   No, it has not.

11  Q   And who drafted this report?

12  A   I did.

13       MS. LYONS:  Your Honor, the government would move to

14  enter Government Exhibit 16 at this time.

15       MR. MERZLAK:  No objection.

16       THE COURT:  No objection?  Admitted.

17       MS. LYONS:  Thank you.

18     (Government's Exhibit No. 16 is entered into evidence.)

19       MS. LYONS:  Ms. Long, can we go to page two of this

20  particular document?

21       So what are we seeing here on page two, Special Agent

22  Garrick?

23       THE WITNESS:  This is a table that is listing the item

24  numbers and the descriptions of the evidence seized.

25  Q   Thank you.

1       We can take that down.

2       Now did that exhibit include the listing of any digital

3    devices seized or documents taken?

4    A    Yes.

5    Q    Thank you.  Now as far as particular documents and letters

6    that you were able to seize on February 7th of 2020, Special

7    Agent Garrick, have you had an opportunity to review some of

8    those documents?

9    A    Yes, I have.

10   Q    And did some of them stand out to you?

11   A    Yes.

12   Q    I'm going to ask you did you gather some of those exhibits

13   -- some of those documents and put them together as an exhibit

14   at my request?

15   A    Yes, I did.

16   Q    And I am showing you what's been marked as Government's

17   Exhibit 17.  You tell me when it's up on your screen.

18   A    Yes.  These are photos of documents -- of a document that

19   was located in the master bedroom --

20   Q    Okay.

21   A    -- on the first floor.

22   Q    Does that exhibit contain multiple photos?

23   A    Yes, it does.

24   Q    Okay.  And does it basically consist of documentary

25   evidence that was seized from the home?

1   A    Yes.

2   Q    Thank you and the government would seek to admit and

3   publish Government Exhibit No. 17 at this time.

4         MR. MERZLAK:  No objection.

5   Q    I'm just going to ask you to walk us through ---

6         THE COURT:  It's admitted.

7         MS. LYONS:  I apologize, Your Honor.

8         THE COURT:  That's okay.  That's fine.

9    (Government's Exhibit No. 17 is entered into evidence.)

10  Q    Can you walk us through just a few of these photos and I'm

11  going to tell you which ones, okay?

12  A    Yes, ma'am.

13  Q    Let's go to 005.  Can you go ahead and read this letter to

14  us, please?

15  A    Yes, I can.  "Love Dove, please don't forget to go to River

16  Ridge LEM Elementary and register Dastan.  Call Stallings

17  Island Middle and make sure they have Grace registered.  Call

18  Augusta ENT and cancel surgery for next week.  Tuesday.  Love

19  you."

20        MS. LYONS:  007, please.

21        THE WITNESS:  "My Love Dove, you kept waking up when I

22  was trying to do the dishes.  I will finish when I get home.

23  Relax and I will take care of everything.  Love you, Amanda."

24        MS. LYONS:  008, please.

25        THE WITNESS:  "My Love Dove, I will do dishes in the

1  morning.  I did not want to wake you.  Love, me."

2  Q    Did you notice a pattern in this handwriting?

3  A    Yes.

4  Q    17.4.  We already reviewed this document; so I am not going

5  to go through it again.

6  A    Okay.

7  Q    17.018.  What is this Special Agent Garrick?

8  A    This is a clipboard that was found in a piece of furniture

9  in the main living area towards a dining room, what would be

10 considered the dining area of the main living room in a piece

11 of furniture.

12 Q    Okay.  So was this furniture locked?

13 A    No.

14 Q    Was it secured in any way?

15 A    No.

16 Q    17.019.  Is this the handwritten document that was located

17 on the clipboard?

18 A    Yes.

19 Q    17.020.  Is this a close-up of that document?

20 A    Yes, it is.

21 Q    I would like you to read that into the record, please.

22 A    "Introduction and confession.  I can't help who I am.

23 Therapy.  In a lot of trouble.  No reason.  This is also

24 embarrassing.  I've always had very intense and extreme

25 fantasies.  Love everything.  Specify in all in generic terms.

1  Get really wet fast and by end of day my panties are soaked and

2  it is running down my thighs.  Just being near boys makes me so

3  wet.  I hate school bc I'm squirming in my desk sometimes.  By

4  the end of the day I just want every boy in the school to fuck

5  my ass so hard and my pussy is so wet and I need it so bad.  My

6  best day would be for them to all line up and fuck my face and

7  cum on me.  I don't know why almost any boy gets me so wet.  We

8  can be hanging out like anywhere, just talking, or even when I

9  am near boys.  I just can't control it.  It sucks so much at

10 school bc I just want to not think about it but I can't stop.

11 I wish boys would accidentally brush up against" -- I can't

12 read that -- "touch me or do whatever they want with me more at

13 school.  I almost came one day at school when boy's hand sort

14 of touched my ass.  Umm, so, yeah, if you want, feel free to

15 touch, just as long as I don't get in trouble and if we are

16 somewhere else, I'll do anything you want.  Trust me.

17 Anything.  A whore, but I love it and it's my choice."

18 Q    Now, Special Agent Garrick, you reviewed the letters and

19 notes that had the child's name written on them?

20 A    Yes.

21 Q    Did you look at the handwriting in those notes written from

22 the child --

23 A    Yes.

24 Q    -- to the defendant, her father?

25 A    Yes.

1   Q    Did the handwriting in those notes match the handwriting in

2   that document?

3   A    No.

4        MS. LYONS:  17.22.  Ms. Long, let's start in the

5   left-hand top corner, please.

6        Were these some of the notes that you found in the

7   house?

8        THE WITNESS:  Yes.

9   Q    And was there a note folded up that said "Lists for

10  Dad"?

11  A    Yes.

12  Q    Can you read these into the record?

13  A    This one says, "Things I should be doing that I'm not.

14  Making myself feel good every two hours.  Meditating.

15  Punishing myself.  Walking.  Diet.  Working out.  What to do to

16  punish me.  Every day I don't do my responsibilities get

17  whipped ten times for everything I miss.  Whipped twice for

18  every mistake.  Get tied up and left on the floor and whipped

19  90 times.  Get fucked three times a week."

20  Q    Top right corner, please.

21  A    "My fantasies or what I want to happen.  To get fucked for

22  one hour straight.  Have to cum six times a day.  Get vibrated.

23  To dress up in lingerie and model for pictures.  To be with

24  another girl."

25  Q    Special Agent Garrick, thank you for answering my

(Justin C. Garrick-Direct by Ms. Lyons)                    186

1    questions.  I am going to turn you over to Mr. Merzlak at this

2    point.

3              MR. MERZLAK:  Your Honor, can we take a restroom

4    break?

5              THE COURT:  Yeah.  Let's take a 15-minute break and

6    we'll be back.

7              Ladies and gentlemen, please remember while you're in

8    the jury room please do not discuss the case with each other.

9    Enjoy your break.  We'll be back in 15 minutes.

10        (The jury exits the courtroom at 10:27 a.m.)

11        (A break is taken.)

12             THE COURT:  Anything to discuss before the jury is

13   recalled?

14             MR. MERZLAK:  Judge, I just want to let you know we're

15   about to play the hour and 47 minutes audio just for

16   time-keeping purposes for you.

17             THE COURT:  All right.  Thank you.  Let's recall the

18   jury.

19        (The jury enters the courtroom at 10:49 a.m.)

20             THE COURT:  All right.  Mr. Merzlak, he is your

21   witness.  You may cross.

22             MR. MERZLAK:  Yes, Your Honor.  Is there a way to move

23   that screen?

24             THE COURT:  Yes.

25             MR. MERZLAK:  Thank you.

1          **CROSS EXAMINATION**

2    BY MR. MERZLAK:

3    Q    Good morning, Special Agent Garrick.

4    A    Good morning.

5    Q    You were involved in this investigation primarily that you

6    testified on two days; correct?

7    A    Correct.

8    Q    And that would have been the 6th of February of 2020 and

9    then the 7th of February of 2020?

10   A    Yes, that's right.

11   Q    Okay.  And on the first day that would be the day that

12   Mr. Gunn was actually home when you and Agent Escobar arrived?

13   A    Correct.

14   Q    Okay.  And on that day you did not have a search warrant?

15   A    Correct.

16   Q    You did not have an arrest warrant for Mr. Mr. Gunn?

17   A    Correct.

18   Q    And he allowed you to come in and allowed himself to be

19   interviewed by you?

20   A    Yes.

21   Q    He didn't have to make any statements to you?

22   A    No.

23   Q    He could have told y'all to leave and you would have had to

24   have left?

25   A    Correct.

1    MR. MERZLAK:  Your Honor, at this time we would seek

2  to publish what's already been tendered as State's [sic]

3  Exhibit 14.

4    THE COURT:  Any objection?  I assume -- any objection,

5  Ms. Lyons?

6    MS. LYONS:  No objection, Your Honor.

7    THE COURT:  Okay.  All right.  You may publish.

8    (Video played.)

9    MS. LYONS:  Your Honor, can we just scroll back about

10  30 seconds?  We lost the sound.

11    THE COURT:  Yes, please do.

12    (Video played.)

13 Q   Thank you for sitting there and listening to that

14  interview, Agent Garrick.  Just a couple of things to highlight

15  throughout that interview.  In your prior testimony you

16  indicated that you were in the living room the entire time when

17  this interview took place.  Based on that interview and

18  listening to it isn't it true that you and Mr. Gunn moved from

19  the living room to outside to back into the living room and

20  outside a few times?

21 A   Yeah, so he could smoke a cigarette.

22 Q   Okay.  So he wasn't keeping anybody from searching any part

23  of the living room in that house?

24 A   No.

25 Q   And you heard him say repeatedly, especially towards the

1  end of the interview, that y'all can search anything you want;

2  you can take anything you want from the house.  Even the

3  computers he offered to provide to you?

4  A    Yes.

5  Q    How many agents were actually at the house at that time?

6  A    Approximately six or seven.

7  Q    Six or seven agents are at the house and you're the one

8  primarily interviewing Mr. Gunn?

9  A    Yes.

10 Q    And there are six other agents presumably searching the

11 entire house at the consent of Mr. Gunn?

12 A    They were focusing their search on the second floor.

13 Q    Okay.  And none of these items were found that particular

14 day, other than the shoes that y'all indicate were found on the

15 way out?

16 A    The shoes were found that day, yes.

17 Q    Okay.  In this particular interview Ms. Lyons highlighted

18 with you that towards the end you said that Mr. Gunn -- said he

19 looked sheepishly and shied away when you made a statement that

20 Tripp Godbee would find who took these pictures?

21 A    Yes.

22 Q    But she didn't highlight -- excuse me.  But we couldn't

23 tell that from the actual audio interview?

24 A    Correct.

25 Q    That's just your personal observation or claim?

(Justin C. Garrick-Cross by Mr. Merzlak)                    190

1   A   Correct.

2   Q   Okay.  But she didn't highlight how emotional he got when

3   he was asked if he was the actual one that took the pictures?

4   A   He did express some emotional statement, yes.

5   Q   And he was actually crying?

6   A   At one point he was near tears.

7   Q   And throughout that interview at least four times he was

8   voicing concern for his daughter?

9   A   He on a number of occasions made statements requesting the

10  timeline of counseling.

11  Q   And we could assume that counseling is because he wants to

12  get his daughter some help?

13  A   I don't know what the underlying motive behind the question

14  is, but he was asking for the counseling.

15  Q   Let's just unpack that just one second.  You indicated that

16  you have children as well?

17  A   Yes.

18  Q   And if your child had absolutely nothing wrong with it,

19  would you send your child to a counselor?

20  A   I don't understand.

21  Q   If your child had absolutely nothing wrong with it, had not

22  gone through any type of traumatic event, had no problems at

23  all, wasn't depressed, no issues, perfect child, would you send

24  your daughter to a counselor?

25  A   No.

(Justin C. Garrick-Cross by Mr. Merzlak)                191

1   Q    Okay.  So we can assume and the jury can assume that if he

2   is seeking a counselor for his daughter he wanted to get help

3   for his daughter, can we not?

4   A    Depending on what the motive of the question is, it could

5   be yes or it could be no.

6   Q    In that interview he also gave you the profile that his

7   daughter had been using ggirl06; correct?

8   A    Yes.

9   Q    And he actually offered you to pull up any of the accounts

10  that he knew about right there?

11  A    I believe he did, yes.

12  Q    But you didn't want to see those at that point?

13  A    No.

14  Q    Now the events that occurred at 209 Nicklaus Court that the

15  FBI was involved in, I think we've all understood happened on

16  February 5th, 6th, and 7th; correct?

17  A    Correct.

18  Q    But and you were only present on the 6th and 7th?

19  A    Correct.

20  Q    And there was talk during the interview when Agent Escobar

21  came in about a cellphone charger being in the child's room

22  that he didn't recall seeing on the first day -- the 5th --

23  when Agent Escobar was there; correct?

24  A    Correct.

25  Q    And do most people that have a cellphone have a cellphone

(Justin C. Garrick-Cross by Mr. Merzlak)

1  charger?

2      MS. LYONS:  Objection, Your Honor.  I think the

3  phrasing of the question -- this witness won't be able to speak

4  about what most people have.  I think that may be out of the

5  scope of his knowledge.  I think it probably needs to be

6  rephrased.

7      MR. MERZLAK:  Your Honor, I don't think it takes an

8  expert to answer that question.

9      THE COURT:  I think he can answer the question.

10     THE WITNESS:  Yes.  Most people have a cellphone

11 charger.

12 Q   Okay.  So if Agent Escobar didn't see a cellphone charger

13 in the child's room on the 5th but then saw one on the 6th it

14 is possible that he just didn't see it on the 5th?

15 A   You would have to speak to Special Agent Escobar about

16 that.

17 Q   But it is possible?

18 A   Possible, sure.

19 Q   Are you familiar with a wine box that was found in the

20 child's room?

21 A   I know that one was there.  I don't know any of the details

22 about it.

23 Q   Okay.  Does it surprise you that that wasn't found on the

24 5th by Agent Escobar when he searched that room?

25     MS. LYONS:  Objection.  I think the witness just said

(Justin C. Garrick-Cross by Mr. Merzlak)                193

1   he wasn't familiar with the details of it.

2          MR. MERZLAK:  I don't know which details he's

3   referring to.

4          THE COURT:  I'll let him answer the question.  Go

5   ahead.

6          THE WITNESS:  As far as being surprised or not, I

7   don't have an opinion on it.  It is what it is.

8          MR. MERZLAK:  Would you mind pulling up 17-005 for me?

9          And, Agent Garrick, anything that I am showing you has

10  already been tendered and admitted into evidence by the

11  government.  This letter has the phrase "Love Dove," does it

12  not?

13         THE WITNESS:  Yes.

14  Q   Do you have any allegation that Mr. Gunn wrote this letter?

15  A   Could you --

16         THE CLERK:  I'm sorry.

17         THE WITNESS:  Can I see the -- that Mr. Gunn wrote

18  this letter?

19  Q   Correct.

20  A   No, I do not believe that he did.

21         MR. MERZLAK:  Okay.  Can we see 17-006?  And this

22  letter actually purports to be from Amanda Gunn, does it not,

23  or Amanda?

24         THE WITNESS:  Correct.

25  Q   And it uses the term "Dove" as well?

(Justin C. Garrick-Cross by Mr. Merzlak)                     194

1   A    It uses the term "Love Dove."

2   Q    Correct.  17.007, please.  This one also purports to be

3   from Amanda and it also uses the term "Love Dove," does it not?

4   A    Correct.

5   Q    And 17.021, please.  Do you recall where this actual desk

6   was that this hard drive device and this letter was found?

7   A    In the main living room.

8   Q    In the main living room and this would have been on the day

9   that you executed a search warrant on the 7th; correct?

10  A    Correct.

11  Q    And in the main living room where you and Mr. Gunn had an

12  hour and 47 minutes interview?

13  A    Yes.  We were on the couch.

14  Q    Okay.  And 15.138, please.  Now you would agree that people

15  use different terms for different things; correct?

16  A    Correct.

17  Q    So if one person referenced a vibrator it might mean

18  something different to another person?

19  A    It's possible.

20  Q    And if one person mentioned a massager it might mean

21  something different to another person?

22  A    Yes.

23  Q    And if someone referenced a dildo it might mean something

24  different to everybody?

25  A    It is possible, yes.

1  Q   And not everybody would assume that a massager, a dildo,

2  and a vibrator are all the same thing; correct?

3  A   Correct.

4  Q   Now which room of the house was this found in?

5  A   This was found in the -- under the sink of the master

6  bathroom attached to the back bedroom on the first floor.

7  Q   Okay.  And this item was found on the 7th of February;

8  correct?

9  A   Yes, correct.

10 Q   When you executed a search warrant?

11 A   Correct.

12 Q   And it was not found when six agents searched the house on

13 February 6th when Mr. Gunn gave you complete consent to search

14 the entire house?

15 A   It was not recover -- it recovered on the 7th, not the 6th.

16 Q   And to your knowledge was Mr. Gunn taken into custody on

17 February 6th?

18 A   Yes, he was.

19 Q   And on February 6th after this interview you indicated

20 that there was a brief conversation with the child in this case

21 in front of Amanda Gunn?

22 A   Yes.

23 Q   And is it the policy of the Federal Bureau of Investigation

24 to interview children along with their parent?

25 A   It varies.  I'm not 100 percent expert on the policies, but

1  sometimes a parent is present.  Other times another

2  representative is.

3  Q    Okay.  And you've been an FBI agent for 17-some years?

4  A    Yes, sir.

5  Q    And you don't know the policy in relation to interviewing

6  juveniles?

7  A    Sometimes we do use parents.  Sometimes we have someone

8  else.

9  Q    Okay.  Would it be the policy of the Federal Bureau of

10  Investigation to interview a child who is suspected of being

11  sexually exploited or sexually abused in the presence of the

12  actual abuser?

13  A    We would not be interviewing in front of an abuser.

14  Q    But that's actually what took place in this case, is it

15  not?

16  A    No.  It is not.

17  Q    Are you familiar that Amanda Gunn was charged and indicted

18  in this case?

19  A    Yes.

20  Q    And she was charged and indicted and plead guilty to sexual

21  exploitation of this particular child?

22  A    Yes, she did.

23  Q    So isn't it true that you conducted an interview of a child

24  who was suspected of sexual exploitation, sexual abuse in the

25  presence of a sexual abuser of that child?

1  A    I see your point.  Yes.

2  Q    Based on your knowledge, training, and experience isn't the

3  reason that that wouldn't be the best practices is because the

4  child would be afraid to speak in front of that abuser?

5  A    Yes.

6  Q    When Mr. Gunn was taken into custody on February 6th was

7  the house secure from the time he was taken into custody until

8  y'all arrived and executed the search warrant?

9  A    I'm -- when we left I'm not sure what -- if anyone stayed

10 in the residence that evening.

11 Q    When -- let me just rewind and I'm sorry because sometimes

12 I use terminology that the jury might not be familiar with but

13 that you might be familiar with.  When I am referring to

14 secured, I mean did a Federal Bureau of Investigation employee

15 or any other law enforcement employee stay there at the scene

16 and maintain security of that scene?

17 A    No.

18 Q    So, Mr. Gunn was arrested and the only other people that

19 had access to that would have been Grace Gunn -- excuse me --

20 the minor child, Amanda Gunn, and anybody that they would have

21 let in the house?

22 A    Correct.

23 Q    Okay.  There was also testimony in that audio interview --

24 I believe it was Mr. Godbee -- explaining some text messages

25 that were sent back and forth or was that you, Agent Garrick?

(Justin C. Garrick-Cross by Mr. Merzlak)                198

1   A    No.  That was Special Agent Godbee.

2   Q    Okay.  But you were present at that point?

3   A    Yes.

4   Q    And you heard Agent Godbee say to Mr. Gunn that the 678

5   number comes back to his address?

6   A    I believe he said it came back to an address within his

7   address history I think was specifically.

8   Q    And he actually indicated that there was a text message

9   thread that indicated it was Riley's Dad?

10  A    Yes.

11  Q    Okay.  But isn't it true that there were absolutely no text

12  messages from this number purporting to be Riley's Dad?

13  A    I have no information on that either way.  I am not privy

14  to that.

15  Q    You didn't actually see that?

16  A    No, I didn't.

17          MR. MERZLAK:  One moment, please, Judge.

18          THE COURT:  Sure.

19  Q    Now we talked briefly about the cellphone charger that was

20  found in the child's room and it seems there was an implication

21  that there might have been an iPhone that wasn't lost between

22  the day that Agent Escobar was there on the 5th and the 6th

23  when you guys arrived.  Isn't that true?

24  A    There was an issue about the location of the cellphone as I

25  recall.

1  Q    Okay.  And the Federal Bureau of Investigation has the

2  resources to locate cellphones, do they not?

3  A    In -- on occasions, yes.  It's an involved process.

4  Q    Okay.  But you have that capability?

5  A    With the proper authority, yes.

6  Q    Who would you have to get authority from in order to find

7  evidence to assist in the sexual exploitation of a child?

8  A    Typically, to get location data you would need a court

9  order.

10 Q    Okay.  A court order just like a search warrant that was

11 obtained in this case?

12 A    Similar.

13 Q    And can you explain to the jury if you were able to obtain

14 that court order what that court order -- what kind of

15 information could the cellphone provider provide you with?

16 A    So in those instances the information would be usually a

17 general location, what cell towers they're pinging off of.

18 Q    Okay.  So if the phone is turned on you would get that

19 historical information of where the phone was?

20 A    Depending on how the warrant was written, yes.

21        MR. MERZLAK:  Okay.  One moment, please, Judge.

22        THE COURT:  Sure.

23 Q    Just a few more questions, Agent Garrick.  Do you recall a

24 point in the interview where Mr. Gunn indicated that he was

25 sorry that he came across upset and that he was upset when he

1    was talking to Agent Godbee?

2    A    Yes, towards the end of the interview.

3    Q    And what -- do you recall what Mr. Gunn was referring to?

4    A    I don't specifically recall, no.

5    Q    Okay.  At any point during that interview did you turn off

6    the recording device?

7    A    For one minute.

8    Q    Other than the time that you indicated on the recording

9    device that you were turning it off, did you turn off the

10   recording device?

11   A    No.

12   Q    Okay.  During that particular time period or any time

13   period do you recall Agent Godbee asking Mr. Gunn what he was

14   on as if he was on any drugs?

15   A    Yes, he did.

16   Q    Okay.  Did we hear that on the audio that was played for

17   the jury?

18   A    Yes.

19   Q    Okay.  I didn't hear it.

20   A    Yes.

21   Q    And what was -- was that what Mr. Gunn was referring to

22   when he said, "I'm sorry I came across upset"?

23   A    I am not sure.  I would have to listen to it again.

24         MR. MERZLAK:  No further questions at this time,

25   Judge.

(Justin C. Garrick-Redirect by Ms. Lyons)                201

1              THE COURT:  Any redirect?

2              MS. LYONS:  Yes, Your Honor.

3              THE COURT:  Is it long?  I'm just looking at the

4    clock.

5              MS. LYONS:  Your Honor, I can do whichever you prefer.

6    I probably say I have five to ten questions.

7              THE COURT:  Lets's go ahead and knock it out.

8              MS. LYONS:  I'll move as expeditiously as possible,

9    Your Honor.

10             THE COURT:  Thank you.

11                    **REDIRECT EXAMINATION**

12   BY MS. LYONS:

13   Q   Special Agent Garrick, you've been an FBI agent for 16

14   years.  Have you always been absolutely right in every choice

15   you've made?

16   A   No.

17   Q   Have you always known when you were interviewing somebody

18   that they were a witness, a target, or ultimately a defendant?

19   A   No.

20   Q   When you were interviewing Amanda Gunn on the night of

21   February 6th did you realize that she was involved in abusing

22   her daughter?

23   A   No.

24   Q   If you had known would you have kept her in the room?

25   A   Absolutely not.

1              MS. LYONS:  Ms. Long, will you pull up Exhibit 21,

2    please?

3              Mr. Merzlak -- I apologize.

4              Only to Special Agent Garrick.

5              Special Agent Garrick, will you look at the first page

6    of that document?  Do you recognize what it is?

7              THE WITNESS:  This is a plea agreement between Amanda

8    Gunn and the United States.

9              MS. LYONS:  Your Honor, the government would offer

10   Government Exhibit 21 into evidence at this time to publish to

11   the jury.

12             THE COURT:  Any objection?

13             MR. MERZLAK:  No, Your Honor.

14             THE COURT:  Admitted and you may publish.

15        (Government's Exhibit No. 21 is entered into evidence.)

16   Q    Now Mr. Merzlak talked about the fact that you kept a sex

17   abuser in the room with you and that she plead guilty to

18   abusing her child; correct?

19   A    Correct.

20   Q    Did she plead guilty to abusing her child alone or did she

21   plead guilty to a conspiracy to abuse her child?

22   A    She plead guilty to a conspiracy.

23   Q    In fact, can you please read the second paragraph on that

24   first page?

25   A    The elements -- number two?

1   Q    Yes.

2   A    "Elements and Factual Basis.  The elements necessary to

3   prove the offense charged in count one are, one, that two or

4   more people in some way agreed to try to accomplish a shared

5   and unlawful plan; two, that the defendant knew the unlawful

6   purpose of the plan and willfully joined in it; three, that the

7   object of the unlawful plan was to recruit, entice, harbor,

8   transport, provide, obtain, maintain or solicit by any means a

9   person the defendant had" ---

10  Q    You can stop there, Special Agent Garrick.  Thank you.

11  Going back to the second line, how many people are required for

12  a conspiracy?

13  A    Two or more.

14  Q    Thank you.

15       We can take that down.

16       Now not to disparage the FBI, Special Agent Garrick, but I

17  want you to think back to 2020 and when you're doing this

18  interview.  Were there any women in that house other than

19  Amanda Gunn?

20  A    The child.

21  Q    Did you have any female agents?

22  A    No.

23  Q    Were there any other females present who could have been in

24  the room with a female minor child who was 13 years old?

25  A    No.

(Justin C. Garrick-Redirect by Ms. Lyons)                    204

1   Q    Is it comfortable for male agents to interview a female

2   minor child who's been sexually abused?

3   A    No.

4   Q    Special Agent Garrick, thank you for sitting through that

5   recording and I just want to ask a couple of questions about

6   it.  Did you ever hear the defendant ask who Riley was?

7   A    No.

8   Q    Did the defendant confirm his email address to be

9   gunnpeyton@outlook.com?

10  A    Yes.

11  Q    Mr. Merzlak spent a lot of time pointing out what the

12  agents searched and didn't search; correct?

13  A    Correct.

14  Q    Was it about 24 hours between the first contact with the

15  defendant on February 5th until the FBI came back on

16  February 6th?

17  A    I believe so, yes.

18  Q    So there were 24 hours where the defendant was alone in the

19  house?

20  A    Yes.

21  Q    Now Mr. Merzlak asked you if most people have phone

22  chargers; correct?

23  A    Correct.

24  Q    And you talked about the number of devices you seized from

25  the house on February 7th.  Yes?

1   A    Yes.

2   Q    Now most people if they want to hide things they throw them

3   out.  Don't most people do that?

4   A    Correct.

5   Q    And most people who have stuff on their phone that they

6   don't want anybody else to see, most people would delete it,

7   wouldn't they?

8   A    Yes.

9   Q    So the defendant had at least 24 hours to delete the stuff

10  on his computers?

11  A    Correct.

12  Q    Mr. Merzlak also wanted you to assume why the defendant was

13  so interested in when the counseling was going to start?

14  A    Yes.

15  Q    He even mentioned the fact that you have a child and

16  whether or not you would send your child to counseling, didn't

17  he?

18  A    Yes.

19  Q    Special Agent Garrick, if you hypothetically had been

20  sexually abusing your daughter, wouldn't you be concerned when

21  she was starting counseling?

22  A    Absolutely.

23  Q    Why?

24  A    Because I would be concerned that the abuse would be

25  revealed to the counselor.

(Justin C. Garrick-Redirect by Ms. Lyons)                    206

1  Q   During the recording that we heard did Special Agent Godbee

2  ask the defendant about whether or not he was utilizing the

3  voiceover in the house?

4  A   Yes.

5  Q   Did he ask him once?

6  A   More than once.

7       MS. LYONS:  Ms. Long, can you pull up 17.004, please?

8       There was a point in the interview where the defendant

9  was talking to you about the fact that he writes scripts, he

10 does extractions, he is moving to the IBM cloud.  Do you

11 remember that discussion?

12      THE WITNESS:  Yes, ma'am.

13 Q   And then he even provided some sort of address like

14 ex.ad.xent.  It was hard for me to keep up.

15 A   Yes.

16 Q   Do you remember that?

17 A   Yes, ma'am.

18      MS. LYONS:  Ms. Long, will you focus in on the

19 mildewed document and it has "X enter" -- that big one in the

20 middle.  Nope.  Up.  Yes, please.

21      Do you see that?

22      THE WITNESS:  Yes, ma'am.

23 Q   Is that ex.ad.xent?

24 A   Yes.

25      MS. LYONS:  Can we back out, please?

1      And right below that in that same document do you see

2  it mentioned again?

3      THE WITNESS:  Yes.

4  Q    And again at the bottom?

5  A    Yes.

6  Q    And again at the top?

7  A    Yes.

8  Q    Sounds very familiar.  Okay.  Thank you.  And in the

9  letters where the name Love Dove is written and Mr. Merzlak

10  said it seemed like those letters had been written from Amanda,

11  who was she writing to?

12  A    She was writing to Peyton Gunn -- Michael Peyton Gunn.

13  Q    So based on your experience you would assume that Love Dove

14  is Peyton Gunn?

15  A    Correct.

16  Q    And do you recall that Toxic Dove was the name of a lot of

17  accounts in those passwords?

18  A    Yes.

19  Q    One more question and then I'll sit down, Special Agent

20  Garrick.  Thank you very much.  You talked a little bit about

21  obtaining a court order if the FBI wants to find a phone.

22  Right?

23  A    Yes.

24  Q    And I think you even used the word "ping".  Yes?

25  A    Yes.

1   Q    Is that something like a trap and trace?

2   A    It is similar.  Yes.

3   Q    Okay.  So and I think Mr. Merzlak even said if the phone is

4   on then you can find it?

5   A    We can get a general location, sometimes more specific

6   depending on where it is.

7   Q    So the phone has to actually be on, doesn't it?

8   A    It does.

9   Q    And if the phone is not on, then you can't find it?

10  A    No.

11  Q    Okay.  And even if the phone is on do you get an exact

12  location or do you get a radius?

13  A    Radius depending on how many towers it is hitting off of.

14  Q    Thank you very much.

15          THE COURT:  All right.

16          MR. MERZLAK:  Just two questions.

17          THE COURT:  Go ahead.  Go ahead.

18                        **RECROSS EXAMINATION**

19  BY MR. MERZLAK:

20  Q    Just in reference to that phone, you don't know whether or

21  not that phone was lost, off or on, do you?

22  A    I don't know the status of the phone, no.

23  Q    But getting that extra step of investigation to a court

24  order would have provided you information on either the

25  location or that the phone was off or any other type of useful

(Justin C. Garrick-Recross by Mr. Merzlak)

1   information -- the last time that the phone was on, where the

2   location was, things like that?

3   A   Depending on how it's written.

4   Q   Thank you.

5              THE COURT:  All right.  May he be excused?

6              MS. LYONS:  Yes, Your Honor.

7              MR. MERZLAK:  Yes, sir.

8              THE COURT:  You are released from your subpoena and

9   the order of sequestration.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  All right.  Ladies and gentlemen, we are

12  going to take our lunch break.  It is late, but, nevertheless,

13  we are ready to go.  So we're going to be on lunch break until

14  2:15.  So everyone please return no later than 2:15 and we will

15  resume the trial of the case.  Please remember my instructions

16  on not discussing the case or performing any research or

17  listening to any news report while you're at lunch and I hope

18  you enjoy your lunch break.

19       (The jury exits the courtroom at 1:13 p.m.)

20       (A lunch break is taken.)

21             THE COURT:  Is there anything to discuss before we

22  begin?

23             MS. LYONS:  Your Honor, the only thing we need to

24  bring up is we intend on calling Amanda Gunn this afternoon and

25  I think at the pretrial we may have talked about the fact that

1   Adam Nelson had a conflict this afternoon, but that's no longer

2   an issue.  So we do have Special Agent Chuck McKee who we

3   anticipate being a short witness.  We have Mr. and Mrs. Gunn,

4   the parents of the defendant, pretty short witnesses, and then

5   we would call Amanda Gunn who we would think would be a lengthy

6   witness.  So, Your Honor, we may want to take a just a short

7   bathroom break until we put Amanda Gunn up --

8                THE COURT:  That will be fine.

9                MS. LYONS:  -- and then we can go as long as Your

10  Honor feels comfortable with.

11               THE COURT:  Okay.  That's what we'll do.

12               MS. LYONS:  Thank you.

13      (The jury enters the courtroom at 2:18 p.m.)

14               THE COURT:  Welcome back, ladies and gentlemen of the

15  jury.  I see that you've all returned.  I thank you for doing

16  so.  We're ready for our next witness.

17               MS. LYONS:  Thank you, Your Honor.  The government

18  would call Special Agent Charles McKee of the FBI.

19      (Charles E. McKee, III is duly sworn.)

20               THE CLERK:  Please state your name.

21               THE WITNESS:  My name is Charles E. McKee, III.

22               THE CLERK:  And which agency are you with?

23               THE WITNESS:  I'm with the Federal Bureau of

24  Investigations.

25               THE CLERK:  Thank you.

1                          **DIRECT EXAMINATION**

2    BY MS. LYONS:

3    Q    Good afternoon, Special Agent McKee.

4    A    Good afternoon.

5    Q    Thank you for joining us.  Special Agent McKee, in February

6    of 2020 did you participate in a consent search at 209 Nicklaus

7    Court?

8    A    Yes.

9    Q    And while searching did you find a pair of white Puma

10   sneakers?

11   A    Yes.

12   Q    Okay.  Before we talk about the sneakers you are able to

13   locate, let's talk a little bit about how you ended up at that

14   consent search.  Okay?

15   A    Okay.

16   Q    How long have you been with the FBI, Special Agent McKee?

17   A    Over 17 years.

18   Q    And are you currently located or assigned to the Augusta

19   Office -- Augusta branch office?

20   A    Yes.

21   Q    What types of cases do you investigate here in Augusta?

22   A    I currently am assigned public corruption, civil rights,

23   and white collar investigations.

24   Q    And since child exploitation cases are not your normal

25   assigned cases, do you often assist other agents if they need

1    help?

2    A    Yes.

3    Q    Was it unusual for you to assist Special Agent Godbee in

4    February of 2020 in conducting a consent search?

5    A    No.

6    Q    Do you recall when Special Agent Godbee asked you to assist

7    with this consent search out at 209 Nicklaus Court?

8    A    Yes.

9    Q    Can you tell us a little bit about what you remember that

10   day?

11   A    Yes.  I remember that it was an investigation that Special

12   Agent Godbee was investigating; so it involved child

13   pornography.

14   Q    Did he show you anything on February 6th in reference to

15   the case when he was asking you to assist?

16   A    Yes.

17   Q    What did he show you?

18   A    Portions of images of child pornography.

19   Q    And were those images blurred or what we call sanitized?

20   A    Yes.

21   Q    And in those photos was there something significant that

22   had caught his attention and he was pointing that out to you?

23   A    Yes.  It was a white shoe that was in the frame of the

24   photo.

25   Q    Do you recall about what time of day Special Agent Godbee

1    was speaking to you and then sending you out to conduct this

2    search?

3    A    It was in the afternoon timeframe.

4    Q    And did anybody travel with you to go out to 209 Nicklaus

5    Court?

6    A    No.  I traveled alone.

7    Q    And when you arrived there were there any agents already at

8    the residence?

9    A    Yes.

10   Q    Who do you -- if you remember encountering anybody as you

11   went into the house?

12   A    Yes.  Special Agent Justin Garrick and Special Agent

13   Jonathan Escobar were already at the residence.

14   Q    What did you do when you arrived at 209 Nicklaus Court?

15   A    After being notified that we had consent to search the

16   residence, I began to search the residence upstairs.

17   Q    Was there a reason -- if you recall, was there a reason you

18   were focusing your search upstairs?

19   A    Yes, because there was an interview being conducted

20   downstairs and I wanted to be away from disrupting that

21   interview.

22   Q    And were you involved at all in the interview of the

23   defendant that day?

24   A    No.

25   Q    Now when you were searching upstairs or downstairs did you

1  find anything that stuck out in your mind?

2  A    Yes.

3  Q    What was that?

4  A    I found a letter.

5  Q    And can you remember that letter just in your mind right

6  now?

7  A    Yes.

8  Q    Where did you find that letter?

9  A    I found the letter downstairs in the living room.

10  Q    What did you ultimately do with that letter?

11  A    After reading it, I did provide it to Mr. Gunn to read.

12  Q    And why did you do that?

13  A    Because I believed that he was not fully forthright with

14  his answers and I allowed him to read the letter and hoped that

15  he would become fully forthright in his answers.

16  Q    I'd like to show you what has already been marked and

17  admitted as Government's 17-011.  Is this the letter that

18  you're referring to?

19  A    Yes.

20  Q    And if you can, please read that out in the record.

21  A    "Dear Dad, I'm sorry you're having to go through this.  I

22  don't even like seeing you sad and stressed out, but that

23  doesn't mean I want you to hide it.  I need you to talk to me.

24  What other people say and do doesn't matter.  You are awesome.

25  I love you more than anything.  I love you.  Mom loves you.

1    Das loves you.  Tamina loves you and deep inside Lily's anger

2    she loves you, too.  You work so hard, more than you should,

3    but you do it for us.  You shouldn't have to do -- you

4    shouldn't have to, though" -- excuse me -- "but I think" --

5    which is crossed out -- "know there is no other Dad better than

6    you.  I love you.  Grace."

7    Q    Now in the blue font which appears to be pen on the

8    right-hand side of this letter, is there anything drawn?

9    A    A heart.

10   Q    And are there four hearts?

11   A    Yes.  There is one blue.  One appears to be black, one that

12   appears to be red, and one appears to be pink.

13           MS. LYONS:  Thank you, Ms. Long.

14           What, if any, reaction did you see the defendant have

15   when you handed him that letter?

16   A    No reaction.

17   Q    What did you ultimately do with that letter?

18   A    Ultimately, it was collected on the following day when a

19   search warrant was conducted at the residence.

20   Q    But on February 6th did you take the letter into custody?

21   A    No.

22   Q    You simply left it with the defendant?

23   A    Yes.

24   Q    Now we're still on February 6th.  We're still in the

25   middle of this consent search for these sneakers; is that

1    right?

2    A    Yes.

3    Q    At some point during the search for these sneakers does

4    team leader or case agent Special Agent Godbee arrive?

5    A    Yes.

6    Q    And when he arrives -- when he arrives, does he ultimately

7    make a decision to end the search?

8    A    Yes.

9    Q    Tell us what happens when Special Agent Godbee decides to

10   end the search.

11   A    After he decided to end the search, it's time for the team

12   to leave.  So the majority of the team members exit the front

13   door and I am next to last and exiting the front door with

14   Special Agent Godbee being the last one in line to exit the

15   front door.

16   Q    And when you are exiting the front door with Special Agent

17   Godbee, what happens?

18   A    I looked to the left which was the way that the door was

19   swung against the wall and behind where the door would normally

20   swing was a shoe rack and on the shoe rack was a pair of white

21   tennis shoes.

22   Q    When you saw those tennis sneakers, Special Agent McKee,

23   what did you say or do?

24   A    I turned to Special Agent Godbee and asked him if those

25   shoes were in play.

1  Q    What did you mean by that -- are those shoes in play?

2  A    Meaning are they in the category of the items that we're

3  looking for.

4  Q    And what was Special Agent Godbee's response?

5  A    Yes.

6  Q    And what did Special Agent Godbee or you do at that point?

7  A    At that point I took the shoes out of the living room area

8  where they were found to the kitchen area which was, you know,

9  in another room out of where the -- Mr. Gunn was.

10 Q    So when you located the sneakers -- the white Pumas -- in

11 the living room behind the door, was the defendant still

12 sitting in the living room?

13 A    Yes.

14 Q    And you said you took them to the kitchen?

15 A    Yes.

16 Q    Why did you take them to the kitchen?

17 A    To be out of view of Mr. Gunn while I took photographs of

18 those tennis shoes.

19 Q    Why did you want to take photographs of those white Pumas,

20 Special Agent McKee?

21 A    First off, to document them and also to send them to the

22 prosecutor of this investigation.

23 Q    Were you able to make a comparison of the shoes that you

24 picked up from behind the door in the living room to the actual

25 image from the series of child pornography?

1    A    Yes.

2    Q    And did you do that on scene at the residence?

3    A    Yes.

4    Q    Did somebody have a picture?

5    A    Yes.

6    Q    Okay.  I'm showing you what's previously been marked as

7    Government Exhibit 13.  I am just going to show that to you,

8    Special Agent McKee, please.  Let me know when it comes up on

9    your screen, okay?

10   A    It's up.

11   Q    Do you recognize that exhibit?

12   A    Yes.

13   Q    Is that the item or the sneakers that you seized from 209

14   Nicklaus Court on February 6th of 2020?

15   A    Yes.

16   Q    And does that exhibit include the photographs that you took

17   of those sneakers at the residence?

18   A    Yes.  This shows one photograph.

19   Q    And you took pictures of those sneakers from multiple

20   angles; correct?

21   A    Yes.

22   Q    Now are those sneakers currently in evidence with the FBI?

23   A    Yes.

24   Q    And this exhibit -- have you had the opportunity to review

25   it before coming to court?

(Charles E. McKee III-Direct by Ms. Lyons)          219

1    A    Yes.

2    Q    And did that exhibit accurately reflect what those sneakers

3    looked like?

4    A    Yes.

5          MS. LYONS:   The government seeks to admit and publish

6    Government's Exhibit 13 at this time.

7          THE COURT:   Any objection?

8          MR. MERZLAK:   No, Your Honor.

9          THE COURT:   You may admit.   They are admitted and you

10   may publish.

11       (Government's Exhibit No. 13 is entered into evidence.)

12         MS. LYONS:   And, Your Honor, just as a reminder, due

13   to Covid we are not bringing any physical exhibits into the

14   courtroom.   So these photos are the representation of those

15   sneakers.

16         THE COURT:   Okay.

17   Q    Special Agent McKee, can you tell us what we're seeing in

18   this first photograph, please?

19   A    It is the two Puma sneakers that were found behind the

20   front door.

21   Q    Now is there anything of note on these sneakers that you

22   recall in making the comparison to the image that was provided

23   by Special Agent Godbee from the series of child pornography?

24   A    Yes, a couple of things.   The -- first off, I thought it

25   was unusual to see the holes -- the holes in the toe of the

1    tennis shoes.  There are not a lot of shoes that I come in

2    contact with that have those type of holes like that -- at

3    least that many -- and also there seems to be a unique wear

4    pattern on the inside left around where the big toe joint would

5    be where it meets the foot.  It seems to be a gray area or a

6    wear pattern there on the interior of the shoe.

7    Q    Now was that wear pattern or scuff mark something that you

8    were able to use as a reference point in the image from the

9    series of child pornography?

10   A    Yes.

11   Q    Okay.  So going to the second page or 13-003, why did you

12   take this picture?

13   A    To further illustrate and show the wear pattern previously

14   described.

15   Q    And, finally, 13-004, please.  Now tell us about this

16   photograph.

17   A    Yes.  I took this photograph because we had the photograph

18   of child pornography with us and I was trying to put the shoe

19   in the same kind of reference as the shoe that had appeared in

20   the image of child pornography -- just to kind of put the shoe

21   -- put the shoe that we had in evidence, basically, in the same

22   frame kind of mirroring the way the shoe looked in the child

23   pornography.

24   Q    So what we're seeing right now in 13-004 is you've, in

25   essence, only taken a picture of half of that shoe?

(Charles E. McKee III-Direct by Ms. Lyons)                221

1   A    That's correct.

2   Q    And we're seeing the scuff mark; correct?

3   A    Correct.

4         MS. LYONS:  All right.  Ms. Long, will you bring up

5   what's previously been admitted as Government's Exhibit 11?

6   Thank you.

7         So, Special Agent Godbee [sic], when you were talking

8   about attempting to mirror or get the same perspective as the

9   image from the series of child pornography, is this the

10  photograph you were attempting to mirror?

11  A    Yes.

12  Q    And by positioning the shoe that way were you trying to

13  mirror the white sneaker at the bottom of this image?

14  A    Yes.

15  Q    Thank you very much.

16        Thank you, Ms. Long.

17        Now after you found the sneakers and you photographed them,

18  did anything else significant happen on February 6th of 2020?

19  A    They were taken by Special Agent Godbee into evidence and

20  we departed the scene.

21  Q    So on February 7th of 2020 did you then assist Special

22  Agent Godbee again at 209 Nicklaus Court?

23  A    Yes.

24  Q    And did you assist in the execution of a search warrant

25  there?

1   A    Yes.

2   Q    And the letter that you had provided to the defendant and

3   you've read into the record, was that letter then collected on

4   February 7th?

5   A    Yes.

6   Q    Moving forward in the case was February 7th the last time

7   that you assisted Special Agent Godbee with any investigative

8   tasks in this case?

9   A    No.

10  Q    Do you recall assisting Special Agent Godbee later in this

11  case with blood samples?

12  A    Yes.

13  Q    Can you tell us a little bit about that?  Who did you go

14  with?

15  A    I went with Special Agent Godbee and Mr. Gunn.  We all went

16  to University Hospital.

17  Q    What was your understanding of what was going to happen at

18  University Hospital?

19  A    We were going -- we went to have bodily fluids from

20  Mr. Gunn and samples from Mr. Gunn taken by medical personnel

21  from the hospital.

22  Q    And was that done pursuant to a court order?

23  A    Yes.

24  Q    And did you have a basis or knowledge -- and if you don't

25  recall, it's okay, but did you have a basis or knowledge for

1   why a court order had been issued to take blood samples or

2   samples of bodily fluids from Mr. Gunn taken?

3   A    Yes.

4   Q    What was that?

5   A    It was because a sexually transmitted disease had been

6   identified in the minor.

7   Q    And therefore?

8   A    And, therefore, the search warrant was to see if Mr. Gunn

9   had the same sexual transmitted disease.

10  Q    And were those samples taken?

11  A    Yes.

12  Q    Thank you.  What was the next thing you recall assisting

13  Special Agent Godbee with?

14  A    With going to a local motel in North Augusta, South

15  Carolina on or about May 22, 2020.

16  Q    And do you recall why you were going to North Augusta to a

17  local hotel/motel?

18  A    Yes, because the minor had described going to a motel for

19  the purposes of sexual activity with a male and that hotel that

20  she had described after hearing of that description it

21  triggered a memory in my mind of a hotel that I had been to for

22  work-related purposes in the past and so I passed that

23  information on to Special Agent Godbee and so I took him to

24  that hotel to show him why I thought this might be the hotel

25  the minor had described.

1   Q   And you mentioned the fact that the minor had referenced

2   this hotel for sexual encounters with males and were those

3   sexual encounters with males -- males were under the age of 18

4   or over the age of 18?

5   A   Over the age of 18.

6   Q   And, Special Agent McKee, you've referenced that you were

7   familiar with that hotel for work purposes and were you

8   ultimately able to locate the hotel that you were thinking of?

9   A   Yes.

10  Q   What was the name of that hotel?

11  A   Ashley Motel.

12  Q   Who went with you to the Ashley hotel?

13  A   Special Agent Godbee.

14  Q   And I believe you said that this was in May of 2020?

15  A   Correct.

16  Q   When you went to that hotel, what did you do?

17  A   We interviewed the owner of the hotel, Mr. Aaron Green, who

18  I had already had a previous knowledge of from a previous

19  investigation.

20  Q   Was there any investigative task that you were able to

21  accomplish while you were at that hotel other than just

22  speaking to the owner?

23  A   Yes.  The owner also allowed us to enter into one of the

24  rooms and at that point Special Agent Godbee took photographs

25  of the interior of the motel room.

1   Q   Why did he do that?

2   A   Because the interior of the motel room had been described

3   by the minor and these photographs would depict the way it

4   currently looked.

5   Q   And, again, if you recall, did those photographs ultimately

6   match the minor's description and did the minor identify that

7   hotel?

8   A   Yes.

9   Q   Moving forward again in the investigation, did you provide

10  further investigative support to Special Agent Godbee again?

11  A   Yes.

12  Q   And do you recall what the next event was?

13  A   The next event was a search of a wooded area near the 209

14  Nicklaus Court residence.

15  Q   And why were you searching that area, Special Agent McKee?

16  A   Because the minor had described that as being an area where

17  a thumb drive had been discarded.

18  Q   And were you -- other agents with you?

19  A   Yes.

20  Q   Did that occur in December of 2020?

21  A   Yes, it did.

22  Q   And were you able to find anything?

23  A   No, we were not.

24  Q   And did that surprise you?

25  A   No, it did not.

1    Q    And why didn't that surprise you?

2    A    Because it had been a significant period of time and there

3    had been, you know, rainfall.  The area was on an incline; so

4    anything potentially on that incline could have been washed

5    downhill into the stream or kind of a swampy area.  So we were

6    not -- we're not caught offguard by us not finding anything,

7    the thumb drive that we were looking for.

8    Q    Thank you, Special Agent McKee.  At this time I would ask

9    you to -- I apologize.

10        I beg the Court's indulgence.

11        Thank you very much, Special Agent McKee.  If you'll answer

12   the questions of Mr. Merzlak.

13             THE COURT:  Your witness, sir.

14             MR. MERZLAK:  Thank you, Your Honor.

15                           **CROSS EXAMINATION**

16   BY MR. MERZLAK:

17   Q    Good afternoon, Agent McKee.

18   A    Good afternoon.

19   Q    Now are you doing?

20   A    Doing great, sir.

21   Q    Just a couple of quick questions.  Initially, you went to

22   Mr. Gunn's residence on the 6th of February 2020?

23   A    Correct.

24   Q    And that was to do a consent search of his residence?

25   A    Correct.

1   Q    And he fully allowed y'all to do that?

2   A    Correct.

3   Q    Okay.  And the government showed you a letter that you

4   found that you provided to Mr. Gunn.  Did you say anything to

5   Mr. Gunn at that time?

6   A    Yes.

7   Q    What did you say to him?

8   A    To the best of my recollection I told him, "You might want

9   to read this.  This might be the last nice letter you ever hear

10  from your daughter."

11  Q    Okay.  And you don't have any context of what that letter

12  was actually about, do you?

13  A    No, I have no context.

14  Q    And then this piece of evidence that the government has

15  introduced and been admitted into court you didn't collect that

16  day, you left it with Mr. Gunn?

17  A    Correct.

18  Q    And it was collected the following day?

19  A    Correct.

20  Q    So on the 6th of February 2020 it was not relevant evidence

21  that needed to be collected but on the 7th of February of 2020

22  when you had a search warrant it was relevant evidence?

23  A    It was collected on the 7th.  Correct.

24  Q    Why is evidence usually collected?

25  A    To preserve it to be used in court so it cannot be

1    destroyed.

2    Q    And that is evidence that is usually has some type of

3    evidentiary value to an investigation; correct?

4    A    Correct.

5    Q    Okay.  Were there any other items that you recall being of

6    evidentiary value on February 6, 2020, that you noted, took

7    note of, wrote down, that would have been -- had evidentiary

8    value to this investigation that you just left behind with

9    Mr. Gunn?

10   A    I don't recall anything else that I took note of that we

11   should have taken that one day and waited and didn't take until

12   the 7th.  No.

13   Q    Okay.  And Mr. Gunn was actually taken into custody that

14   day; so technically nothing was really left with him that day,

15   was it?

16   A    It was left at the residence.  Correct.

17   Q    But Mr. Gunn was taken into custody?

18   A    That's correct.

19   Q    And when the FBI departed the residence no law enforcement

20   official was left behind to secure the residence at all?

21   A    Correct.

22   Q    So there was no safekeeping of this alleged scene or crime

23   scene for -- until the following day when the FBI agents got

24   back there; correct?

25   A    Correct.

1   Q    And the only person to our knowledge that had access to

2   that would have been Amanda Gunn and the minor children?

3   A    I'm not sure who had access to the residence once we left.

4   I did not have any knowledge of that.

5   Q    But Mr. Gunn certainly didn't have access to it?

6   A    Correct.

7   Q    Because he was in y'alls custody?

8   A    Correct.

9   Q    Now in terms of the search of the wooded area behind 209

10  Nicklaus Court, when -- you indicated that you weren't

11  surprised that something wasn't found there?

12  A    Correct.

13  Q    And how big of an area would you say that y'all searched?

14  Can you describe it to the jury?

15  A    Sure.  It's an area about as big as the open floor area

16  here if we remove the desk where the lawyers and marshals are

17  and the defendant.  If we -- if all that area was cleared out,

18  it was about that big of an area.

19  Q    Okay.  And does the FBI have access to metal detection

20  equipment?

21  A    Yes.

22  Q    And was metal detection equipment utilized during that

23  search?

24  A    No.

25  Q    And do thumb drives to your knowledge contain metallic

1   materials?

2   A    Yes.

3   Q    If a metal detector would have been used are you familiar

4   with how a grid search is done of a particular area?

5   A    Yes.

6   Q    And the area the size of this open courtroom is not a very

7   large area?

8   A    Correct.

9   Q    Okay.  Can you explain to the jury how a grid area search

10  would have been done with a metal detector?

11  A    Yes.  The area such as this area here would have been

12  gridded off meaning it would have been divided into quadrants

13  or sections and each section would have been searched and then

14  the next section would have been searched on until the whole

15  section would have been searched.

16  Q    And if it had been done that way and nothing was found

17  wouldn't it have corroborated the possibility that there was no

18  evidence that was thrown there?

19  A    Not necessarily because the evidence could have been thrown

20  there and then later removed.

21  Q    Correct.  Or it could have never been there in the first

22  place; correct?

23  A    Correct.

24  Q    And you would agree that it's just as important in an

25  investigation in trying to affirm a witness' testimony as well

1  as affirm what the actual truth is?

2  A    Yes.

3  Q    And the use of that particular search with a metal detector

4  would have been more helpful in this case?

5  A    Yes.

6  Q    Now back to the 6th of February in the -- when y'all were

7  doing a consent search of Mr. Gunn's residence, how many agents

8  were there in total?

9  A    I'm not sure of the exact number.

10  Q    Just approximate.  Are we talking a dozen?

11  A    I would say less.  There were 11 FBI employees or task

12  force officers on the 7th and I believe there was less than

13  that number on the 6th.  So I would say less than 11.

14  Q    Okay.  And during your search of the residence tell me the

15  items that you were looking for.

16  A    The main item that I was looking for were the white shoes.

17  Q    Okay.  That's the only thing that you were looking for to

18  your recollection?

19  A    Yes.

20  Q    And Mr. Gunn fully consented to y'all searching his

21  property to your understanding; correct?

22  A    He did give consent.  Written consent.

23  Q    Did he ever tell you or any other agent to your knowledge

24  to stop searching his property?

25  A    No.

1  Q    So he never withdrew his consent?

2  A    Not that I'm aware of.

3  Q    And he never prevented you or any other FBI agent from

4  searching any area of the home at all, did he?

5  A    No.

6         MR. MERZLAK:  One moment, please, Judge.

7         Thank you, Agent McKee.  Good to see you.

8         THE WITNESS:  Thank you.  Good to see you as well.

9         THE COURT:  Redirect?

10        MS. LYONS:  Very briefly, Your Honor.

11        THE COURT:  All right.

12                     **REDIRECT EXAMINATION**

13  BY MS. LYONS:

14  Q    Special Agent McKee, other than your regular duties as a

15  case agent in civil rights or white collar and public

16  corruption, are you also on the ERT team?

17  A    Yes.

18  Q    And that stands for Evidence Recovery Team?

19  A    Evidence response.

20  Q    Evidence response.  I'm sorry.  Is that the same thing that

21  Special Agent Garrick is on?

22  A    Yes.

23  Q    Okay.  So sometimes you're deployed to assist in certain

24  situations?

25  A    Yes.

(Charles E. McKee III-Redirect by Ms. Lyons)                    233

1   Q    And have you ever assisted in landfill searches?

2   A    Landfill searches, yes.

3   Q    So a moment ago you were talking a little bit about grid

4   searches.

5   A    Yes.

6   Q    And you were telling Mr. Merzlak that metal detectors are

7   available?

8   A    Yes.

9   Q    And they can be helpful?

10  A    Yes.

11  Q    But that you didn't use any that day.

12  A    Yes.

13  Q    I want you to think back to December of 2020 where you were

14  searching.  That area had trash, didn't it?

15  A    Yes.

16  Q    What would a metal detector have done every time you went

17  over a piece of metal trash?

18  A    It would have alerted.

19  Q    Would that have assisted or slowed down your search?

20  A    It would have taken longer, for sure.

21  Q    And is there a difference between fully consenting during a

22  search and fully cooperating during a search?

23  A    Yes.

24  Q    Mr. Merzlak also asked you a question about you leaving the

25  letter on February 6th -- the letter from the child to her

1  father.  What were you there to search for on the 6th?

2  A    The white shoes.

3  Q    And were you there for a search warrant or for a consent

4  search?

5  A    Consent search.

6  Q    What is the difference between a consent search and a

7  search warrant?

8  A    A consent search is a search that is provided by the person

9  that is responsible for a location -- in this case a residence.

10 So the consent was provided by in this case Mr. Gunn versus a

11 search warrant is an order signed by a judge to search a

12 location after probable cause has been determined by the judge

13 exists.

14 Q    Have you obtained search warrants before for houses?

15 A    Yes.

16 Q    And is there something called an attachment or a list of

17 items to be seized?

18 A    Yes.

19 Q    Who determines what the list of items to be seized will be?

20 A    The case agent.

21 Q    And who authorizes that?

22 A    The judge.

23 Q    Does the person who owns the house have any say in that?

24 A    No.

25 Q    Okay.  If you're doing a consent search and you're coming

1  to search my house, who has say in what you can take or search?

2  A    The person giving consent.

3  Q    So at the moment that you're deciding whether or not

4  something is relevant to the investigation who has to give you

5  permission to search or take that item?

6  A    The person providing consent.

7  Q    And in that case on February 6th who was it?

8  A    Mr. Gunn.

9  Q    And if you wanted to take any of those letters who would

10 you have had to ask?

11 A    Mr. Gunn.

12 Q    And at that point when you had the letter had Mr. Gunn

13 already given consent to search for the sneakers?

14 A    Yes.

15 Q    Thank you.

16          THE COURT:  Are we finished with this witness?

17          MS. LYONS:  Yes.  May he be excused, Your Honor?

18          THE COURT:  Any objection?

19          MR. MERZLAK:  No, Your Honor.

20          THE COURT:  You are excused.  You are released from

21 your subpoena.  Thank you.

22          THE WITNESS:  Thank you.

23          THE COURT:  Next witness.

24          MS. LYONS:  Your Honor, the government would call Jill

25 Gunn.

(Jill Gunn-Direct by Ms. Lyons)                    236

1        (Jill Gunn is duly sworn.)

2              THE CLERK:  Please state your name for the record.

3              THE WITNESS:  Jill Gunn.

4              THE CLERK:  Thank you.

5                        **DIRECT EXAMINATION**

6   BY MS. LYONS:

7   Q    Good afternoon, Mrs. Gunn.  Can you tell the Court your

8   relationship to the defendant, Michael Peyton Gunn, please?

9   A    Our son.

10  Q    And does he go by Michael or does he go by Peyton?

11  A    Peyton.

12  Q    Do you know his former wife?

13  A    His what?

14  Q    Former wife.

15  A    Oh, Amanda.

16  Q    Amanda.  Is that her name?  Amanda Gunn?

17  A    Yes.

18  Q    You don't have to say any names, but do they have any

19  children?

20  A    Yes.

21  Q    And can you tell us if they have a boy or a girl or how

22  many?

23  A    A boy and a girl.

24  Q    And who is the oldest?

25  A    The girl.

1   Q   And how old is the girl now if you know?

2   A   Fifteen.

3   Q   When was the last time you spoke with the girl?

4   A   Probably 18 months ago.

5   Q   Before 18 months ago would you have said you had a close

6   relationship to their daughter?

7   A   Yes.

8   Q   Okay.  I'll take you back a little while.  Do you remember

9   when Peyton and Amanda got married?

10  A   Yes.

11  Q   And do you remember how old Amanda's daughter was when they

12  got married?

13  A   Three.

14  Q   Three.  And did Peyton adopt Amanda's daughter?

15  A   Yes.

16  Q   Okay.  And so have you known Amanda's daughter since that

17  time?

18  A   Yes.

19  Q   Did there come a time when the family -- Peyton, Amanda,

20  and their daughter -- moved back to Georgia?

21  A   Yes.

22  Q   Had they had a son by that time?

23  A   Yes.

24  Q   Okay.  And about how many years are there between the

25  oldest child and the youngest child?

(Jill Gunn-Direct by Ms. Lyons)                              238

1    A    Five.

2    Q    Five years.  So you came back -- they came back with two

3    grandchildren for you.  Were you close to the family?

4    A    Yes.

5    Q    Did you spend a lot of time with them?

6    A    Yes.

7    Q    And you're married?

8    A    Yes.

9    Q    What is your husband's name?

10   A    Mike.

11   Q    Mike?

12   A    Michael.

13   Q    Do you have more than one child?

14   A    No.

15   Q    And Peyton is your only son?

16   A    Yes.

17   Q    Is Peyton adopted?

18   A    Yes.

19   Q    So when the family moves back to Georgia you have two

20   grandchildren; you're spending a lot of time with them.  Are

21   you able to develop a close relationship with the eldest

22   daughter?

23   A    Yes.

24   Q    What types of things did you do with her?

25   A    Oh, tea parties and playhouses and dress up.

1  Q   How would you describe her?  How would you have described
2  her growing up?
3  A   Vivacious, fun, inquisitive.
4  Q   When your son moved back with his family do you recall if
5  he had a job?
6  A   No.  He did not.
7  Q   And what type of work did you know your son to do?
8  A   He just said computer work building websites.
9  Q   Before he came back to Georgia were they in New York?
10  A   Yes.
11  Q   And had he been in the military?
12  A   Yes.
13  Q   Okay.  So when he returned to Georgia did you and your
14  husband help them get on their feet?
15  A   Yes.
16  Q   For a number of years did you provide financial support?
17  A   Yes.
18  Q   How would you describe that?  What type of financial
19  support did you provide?
20  A   Oh, making house payments, utility bills, gasoline, things
21  like that.
22  Q   Do you remember -- do you remember how old the eldest
23  daughter was when they moved back to Georgia?
24  A   Oh, gosh.  Probably I guess she was kindergarten.
25  Q   Five or six?

1    A    First grade.

2    Q    Five or six.  So ---

3    A    Yeah, probably a little older.  Maybe six.

4    Q    Is it fair to say that the eldest daughter -- and you

5    correct me if I am wrong -- in February of 2020 she would have

6    been 13?

7    A    Yes.

8    Q    Okay.  And so if she moved back to Georgia when she was

9    even six -- there about seven years between them.  Okay?  I am

10   going to talk about that seven-year period if I can.  When your

11   son was arrested in February of 2020 where was the family

12   living?

13   A    They were in a townhouse.

14   Q    Was that on Nicklaus Court?

15   A    Yes.

16   Q    So I am going to think backwards.  Were you and your

17   husband financially supporting the family in February of 2020?

18   A    Basically.

19   Q    Yes.  And if you think back for the seven years previous to

20   that had you been financially supporting the family on and off

21   for seven years?

22   A    Yes.

23   Q    Okay.  At some points in time did they live with you?

24   A    Yes.

25   Q    Were there at least two occasions where the family moved in

1  with you and your husband?

2  A   Amanda and the children moved in with us briefly and then

3  later they all did.

4  Q   And when you say Amanda and the children moved in with you

5  guys briefly, do you recall where Peyton was?

6  A   That's when he went to Morocco.

7  Q   And what did he go to Morocco for?

8  A   I don't know.

9  Q   Okay.  So when Peyton went to Morocco Amanda and the

10  children lived with you?

11  A   For a few months.

12  Q   For ---

13  A   A month or so.  About a month, I think.

14  Q   About a month.  And then there was another time where he

15  lived with you and the children and Amanda and your husband?

16  A   Yes.

17  Q   Okay.  How many bedrooms are in the house where you were

18  living when Peyton and Amanda and the children were living with

19  you?

20  A   There's a master bedroom downstairs and two upstairs.

21  Q   Master bedroom is down?

22  A   Uh-huh.

23  Q   And two bedrooms up?

24  A   (Nods head.)

25  Q   If you recall, Mrs. Gunn, when Peyton, Amanda, and the

1   children were staying with you, what was the sleeping

2   arrangement?

3   A   Some kind of computer.

4   Q   Ma'am?

5   A   Some kind of computer work is what he said.

6   Q   Oh, he was doing computer work?

7   A   He said he was doing ---

8   Q   He said.  Let me rephrase my question.  I'm sorry.  Where

9   was everybody sleeping?

10  A   Oh, oh.

11  Q   I'm sorry.

12  A   Our grandson and Peyton were in one room and our

13  granddaughter and Amanda were in the other bedroom.

14  Q   And so Peyton and Amanda were not sleeping in the same bed?

15  A   No.

16  Q   Thank you.  So you had a close relationship with the eldest

17  daughter.  When they moved out from your house the second time

18  did you continue to have a close relationship --

19  A   Yes.

20  Q   -- with the oldest daughter?

21  A   Yes.

22  Q   Were there times when she would sleep over at your house?

23  A   Yes.

24  Q   And did that continue for a little while?

25  A   It did.

1   Q    Did there come a time in 2019 where that stopped or

2   earlier?

3   A    Yes.

4   Q    Is there a reason why you remember that it stopped?

5   A    Peyton told us that she didn't want to do that anymore and

6   that she was embarrassed to tell us -- that it would hurt my

7   feelings.

8   Q    How did that make you feel?

9   A    Sad.

10  Q    Because you felt like you had been close to her?

11  A    Uh-huh.

12  Q    Did Grace ever tell you that she didn't want to -- excuse

13  me.  Did the minor ever tell you that she didn't want to spend

14  the night with you anymore?

15  A    No.

16  Q    Peyton told you that.  You said you haven't spoken to, in

17  essence, your granddaughter -- you haven't spoken to your

18  granddaughter in 18 months.  Do you remember the last time you

19  saw her?

20  A    I think it was Christmas of two years ago.

21  Q    So that would be Christmas 2019?

22  A    Uh-huh.

23  Q    And that would with the last holiday before February of

24  2020?

25  A    Yes.

1  Q    Do you remember anything that sticks out about her

2  behavior?

3  A    Not really.

4  Q    Do you remember thinking that she was tired or she was

5  sleepy?

6  A    I just noticed it seemed like she yawned a lot.

7  Q    That she yawned a lot.  Did you take that for teenager just

8  maybe being bored?

9  A    Yeah, I thought we were boring.

10  Q    Ma'am?

11  A    I thought she thought we were boring.

12  Q    You thought she thought you were boring.  Did you ask her

13  if she was tired?

14  A    No.

15  Q    We talked a little bit about the financial support and I

16  think you mentioned that you paid rent.  Yes?

17  A    Yes.

18  Q    I think you mentioned -- did you say electric bill?

19  A    Off and on.

20  Q    Off and on.  Did Peyton often message you for money?

21  A    Yes.

22  Q    Okay.  Did you have a cellphone in 2019 and 2020?

23  A    Yes.

24  Q    Okay.  And when he would message you where were you

25  receiving these messages?

1   A   Actually, he messaged my husband more than me.

2   Q   Okay.

3   A   I mean, I really think it was usually him.

4   Q   Okay.  I'm sorry.  I can't hear you.

5   A   I can't see you.

6   Q   I am going to move up and I am going to ask you to scoot up

7   just as well.  I think you said he messaged your husband more

8   than you and then you said something?

9   A   Yes, that's true.

10  Q   Okay.  But he did message you?

11  A   Yes.

12  Q   Okay.  And how did you receive those messages?

13  A   I guess annoyed.

14  Q   Oh, you were annoyed when you received ---

15  A   You mean how physically?

16  Q   Yes, I meant physically.  Was it on a computer or a phone?

17  But I'll come back to being annoyed.

18  A   Email.

19  Q   It was in an email.  So he would email you to ask for money

20  and you said it would annoy you.  Tell us why it would annoy

21  you.

22  A   Yes.

23  Q   Tell us why.

24  A   Oh, just because it was so frequent.

25  Q   Would it be daily?

1    A    No, no, no.

2    Q    Weekly?

3    A    I don't -- I really can't remember.  Probably not weekly.

4    Q    And if you can recall was he asking for $40 here --

5    A    Yes.

6    Q    -- $50 there?

7    A    Uh-huh.

8    Q    Yes?

9    A    Yes.

10   Q    Did he explain why he needed that money?

11   A    No.

12   Q    And he was also messaging your husband for the same thing?

13   A    Right.

14   Q    Do you recall a time where he went to work in Asheville?

15   A    Yes.

16   Q    What was that for?

17   A    I don't remember the name of the company or what he was

18   doing.

19   Q    But it was work related?

20   A    Yes.

21   Q    And do you recall if the family went with him or not?

22   A    They went -- moved up there briefly -- I mean, just for a

23   couple of weeks and then he was commuting.

24   Q    And do you recall where Amanda and the kids were living

25   while he commuted?

1   A    I can't remember if they were -- I don't think they were

2   living with us.  They weren't living with us.  I can't remember

3   where they were.

4   Q    And from your memory have they lived in a number of places

5   since returning to Georgia?

6   A    Yes.

7   Q    Did -- in 2020 when the family is living at 209 Nicklaus

8   Court --

9   A    Right.

10  Q    -- had they recently moved from 220 Nicklaus Court?

11  A    Yes.

12  Q    Do you know why?

13  A    It burned.

14  Q    Ma'am?

15  A    The first townhouse burned.

16  Q    Burned?

17  A    Yes.

18  Q    And so they previously lived right down the street?

19  A    Yes.

20  Q    And is 220 Nicklaus Court a house or townhouse that's owned

21  by your husband?

22  A    Correct.

23  Q    Okay.  Now in 209 Nicklaus Court was Peyton working from

24  home?

25  A    Yes.

1   Q    As far as you knew?

2   A    As far as we knew.

3   Q    Did he have a car?

4   A    Yes.

5   Q    What car was that?

6   A    He had -- I have forgotten what he had.  He had -- they

7   were driving a van that belonged to Amanda's parents for a

8   while and he had a Saab.

9   Q    Did the family have two cars or just one car?

10  A    They had two.

11  Q    And did you lend them your car ever?

12  A    Maybe.

13  Q    You said maybe?

14  A    Maybe.  I don't think -- maybe once or twice.

15  Q    Okay.  Was Amanda working?

16  A    Yes, for a while.

17  Q    Do you know what she was doing?

18  A    For a while she was working at this -- a counseling place

19  that worked with DFCS children, I think.

20  Q    Did she later work at a -- I am going to mess that word

21  up -- apothecary, like a masseuse or needles and that type of

22  thing?

23  A    I am not sure.

24  Q    Now in your messages with Peyton did you ever offer to

25  bring food over?

(Jill Gunn-Direct by Ms. Lyons)

1   A    Ever offer what?

2   Q    To bring food over?

3   A    Yeah, maybe a few times.

4   Q    And to bring meals -- like deliver meals?

5   A    I don't think so.

6   Q    Buy the kids clothes?

7   A    Yes.

8   Q    Did Peyton and Amanda ever discuss their marital issues

9   with you?

10  A    No.  You mean discuss it?

11  Q    Yes, ma'am.

12  A    No.

13  Q    I beg your indulgence one moment.

14  A    Okay.

15  Q    Mrs. Gunn, can I show you -- would you recognize your son's

16  handwriting if you saw it, Mrs. Gunn?

17  A    Probably.

18  Q    Probably?  I am going to show you what's been marked and

19  admitted as 17-031.  It is going to come up on your screen in

20  front of you.

21  A    Okay.

22  Q    Can you just tell me if you recognize that handwriting?

23       MR. MERZLAK:  Objection, Your Honor.  For legal

24  purposes it is improper foundation for her to testify to that

25  at this point.

1          THE COURT:  Response?

2          MS. LYONS:  Your Honor, this is the defendant's

3    mother.  I think she said she could possibly recognize his

4    handwriting.  I have simply asked if she does.  If she doesn't,

5    the answer is no.

6          THE COURT:  I'll let her answer it.

7          THE WITNESS:  It looks very similar to his.

8    Q    Thank you, ma'am.

9          You can take that down, Ms. Long.

10         Another question maybe as a mother you would know -- have

11   you ever seen your son wearing white Puma sneakers?

12   A    Yes.

13   Q    Is that something he wore often?

14   A    Yes.

15   Q    Mrs. Gunn, I am going to show you Government's Exhibit 13

16   and tell me if you recognize this item.  Does that look

17   familiar to you?

18   A    Yes.  Yes.

19   Q    What does that look like to you?

20   A    It looks like Peyton's shoes.

21   Q    Thank you.

22         Mrs. Widener, I am just going to ask one more question if

23   we can pull that monitor down.

24         Mrs. Gunn, did you ever hear your son talk about anything

25   called "The Order"?

1    A    No.

2    Q    Have you ever heard him talk about MS-13 or gangs?

3    A    Yes.

4    Q    What did he tell you?

5    A    That he -- a gang from Costa Rica had gotten them involved

6    in pornography and things.

7    Q    What else did he tell you, if you can remember?

8    A    That's about it.

9    Q    Do you recall how this conversation came up?

10   A    Oh, it came up, I guess, when things were going on that

11   they -- like they were making -- had Amanda in pornography,

12   that it was a gang and they couldn't get out of it, that they

13   had threatened them.

14   Q    And so your son told you that the gang had threatened them?

15   A    And the children.

16   Q    And the children.  Did he seek help from the police?

17   A    No.  I asked why and he said because he couldn't go to the

18   police because this gang was so violent and that it would hurt

19   them.

20   Q    How did that make you feel?

21   A    I guess helpless.

22   Q    Did that topic ever come up again?

23   A    It came up when Amanda was saying that she had been

24   involved -- actually, I guess that's how it started -- when

25   Amanda said she had been involved in this pornography thing and

1    that that is what it was and then that they -- their house

2    was -- had an attack on their house, I guess, is what you would

3    call it.

4    Q    Okay.  Tell me a little bit about that.  Did Amanda or

5    Peyton or Amanda and Peyton tell you that their house had been

6    attacked?

7    A    Well, it was Amanda was out of town and that someone shot

8    through Grace's window and the bullet stuck in the door frame

9    and Peyton dug it out and then Amanda's dad's truck and her

10   friend's cars were parked in the driveway and the tires were

11   slashed overnight.

12   Q    Okay.  So let me go back because that was a lot.  Amanda

13   was out of town?

14   A    With friends.

15   Q    With friends.  And somebody shot through a window in your

16   eldest granddaughter's room.  Who told you that?

17   A    Peyton.

18   Q    Okay.  Was anybody with you when he told you that?

19   A    Probably Mike.

20   Q    Probably your husband?

21   A    Yes.

22   Q    Okay.  So he told you somebody shot through your eldest

23   granddaughter's window.  Did he call the police?

24   A    No.

25   Q    Okay.  And then he said somebody slashed the tires on a

(Jill Gunn-Direct by Ms. Lyons)                    253

1    car?

2    A    Yes.

3    Q    The neighbor's car?

4    A    The friend's.

5    Q    Friend's car?

6    A    Friend's car and Mr. Howard's truck.

7    Q    Mr. Howard?

8    A    His truck was parked there.

9    Q    Mr. Howard is Amanda's --

10   A    Yes.

11   Q    -- father?

12   A    Yes.

13   Q    Wow.  What did you think?

14   A    I didn't believe it.

15   Q    You didn't?

16   A    No.

17   Q    Why not?

18   A    Because it was just too wild coincidence that it all

19   happened while she was gone.

20   Q    Did Peyton tell you anything else?

21   A    No.

22             MS. LYONS:  I beg the Court's indulgence.

23             Thank you, Mrs. Gunn.  Just one moment.

24             Mrs. Gunn, thank you.  Why did you come to court

25   today?  Did you volunteer or did I subpoena you?

(Jill Gunn-Cross by Mr. Merzlak)                          254

1           THE WITNESS:  Oh, I was asked.

2    Q    Thank you very much.  I appreciate it.

3    A    Okay.

4           THE COURT:  All right.  Mrs. Gunn, you need to answer

5    Mr. Merzlak's questions.

6                          **CROSS EXAMINATION**

7    BY MR. MERZLAK:

8    Q    Good afternoon, Mrs. Gunn.  I know it's probably difficult

9    for you to be here; so I'll be as brief as possible.

10   A    Okay.

11   Q    You indicated that Peyton and Amanda had explained to you

12   about some pornography that Amanda was involved in; correct?

13   A    Correct.

14   Q    And these were, to your recollection, pornography videos

15   that Amanda was involved in; correct?

16   A    Yes.

17   Q    There was no mention of Peyton being involved in these

18   videos?

19   A    No.

20   Q    And there was no mention at the time that -- from Amanda

21   that Peyton had forced her to be involved in any type of

22   pornography videos, was there?

23   A    No.

24   Q    You indicated that you never talked to Peyton and Amanda

25   about any marital problems.  Do you recall Peyton expressing to

(Jill Gunn-Cross by Mr. Merzlak)                      255

1   you the depressive state that Amanda was in all the time?

2   A    Yes.

3   Q    Okay.  Do you recall him talking about Amanda using drugs

4   or prescription drugs and staying in her room for days on end?

5   A    No.

6   Q    You don't remember that?  Tell me how he described that

7   Amanda was depressed.

8   A    How he described?

9   Q    Uh-huh.

10  A    That she was -- couldn't do anything around the house, that

11  he had to do everything.

12  Q    Because what was she doing?

13  A    Pardon?

14  Q    What was she doing when she couldn't do anything around the

15  house?  What was he describing?

16  A    I don't know.  You mean what he was doing?

17  Q    What I mean -- I'm sorry.  He's describing to you that he

18  has to do everything around the house --

19  A    Right.

20  Q    -- because Amanda won't.  Did he describe to you what

21  Amanda was doing?

22  A    Oh, that she was -- couldn't get out of bed.  She was

23  depressed and sort of non-functioning.

24  Q    And when they explained to you about this issue involving

25  Amanda being on the internet in these videos, what was

1   explained to you was actually what Amanda said was happening;

2   isn't it right?

3   A    Yes.

4   Q    And any information that was being provided to you from

5   Peyton was what Amanda was claiming was happening?

6   A    He told us other things, I think, occasionally.

7   Q    Okay.  And you indicated that they lived with you from time

8   to time?

9   A    Uh-huh.

10  Q    Correct?

11  A    Correct.

12  Q    I'm sorry.  Sometimes when you nod you actually have to

13  say --

14  A    Yes.  That's correct.

15  Q    -- yes because the court reporter is taking it down.  And

16  the first time was when Peyton got out of the military;

17  correct?

18  A    Correct.

19  Q    And they moved down from New York and that was just for a

20  short time -- a week or two before they found their own place?

21  A    Correct.

22  Q    Okay.  And being a good mother and I'm sure your husband --

23  I've met him; he is a good father -- y'all helped them

24  financially?

25  A    Right?

1   Q   As any parents that have the means to do would probably do

2   for their children and daughter; correct?

3   A   Correct.

4   Q   And the other times that they moved in with you was when

5   they were in between houses waiting on a new lease on a new

6   house; correct?

7   A   No.  It was when they -- I think it was right after they

8   came back from the short time in Asheville and they were

9   homeless.

10  Q   Okay.  And then did they find a house?

11  A   They -- now I am trying to think.  Maybe they had moved out

12  of a house, but they had no place to go.

13  Q   Okay.  And eventually they were able to move in -- start

14  renting, essentially, 220 Nicklaus Court --

15  A   Correct.

16  Q   -- from you and your husband?

17  A   Yes.

18  Q   All right.  And the only reason that they were no longer in

19  220 Nicklaus Court is because a fire --

20  A   Correct.

21  Q   -- broke out; correct?

22  A   Yes.

23  Q   And they moved to 209 and started renting that from you and

24  your husband; correct?

25  A   Correct.

(Jill Gunn-Redirect by Ms. Lyons)                    258

1   Q    Although you still help them out financially occasionally?

2   A    Yes.

3   Q    And to your knowledge did -- strike that.  You indicated

4   that when you received any messages from Peyton they were

5   through email; correct?

6   A    Yeah, I actually can't -- I can't remember because he

7   didn't have a phone.  So if he was texting it would be, I

8   guess, with Amanda's phone.

9   Q    Okay.  So he did not have a cellphone to your knowledge?

10  A    No, he didn't.

11           MR. MERZLAK:  No further questions, Judge.  Thank

12  you.

13           THE COURT:  Any redirect?

14           MS. LYONS:  Very briefly, Your Honor.

15                        **REDIRECT EXAMINATION**

16  BY MS. LYONS:

17  Q    Mrs. Gunn, do you remember Amanda attempting to commit

18  suicide?

19  A    What?

20  Q    Do you remember if Amanda -- do you remember learning that

21  Amanda had attempted to commit suicide?

22  A    I can't understand that last word.

23  Q    Suicide.  Did she try to kill herself?

24  A    Yes.

25  Q    And was that before or after the videos that you were

1  talking about?

2  A    I think after.

3  Q    While Peyton and his family were living at 220 Nicklaus,

4  the property owned by your husband, were they paying rent that

5  entire time?

6  A    No.  They paid for a little while but then stopped.

7  Q    And the other places that they were renting since they have

8  been here in Georgia, who was paying for those?

9  A    Off and on, we were.  Sometimes they paid.  Sometimes they

10 didn't.

11 Q    Thank you very much.

12          THE COURT:  All right.

13          MR. MERZLAK:  No additional questions.

14          THE COURT:  No other questions?  May we excuse

15 Mrs. Gunn?

16          MS. LYONS:  Yes.

17          THE COURT:  Mrs. Gunn, you're now excused and released

18 from your subpoena.  Thank you, ma'am.  You may leave.

19          Next witness.

20          MS. LYONS:  The government would call Michael H.

21 Gunn.

22     (Michael H. Gunn is duly sworn.)

23          THE CLERK:  Please state your name for the record.

24          THE WITNESS:  Michael Herbert Gunn.

25          THE CLERK:  Thank you.

1         **DIRECT EXAMINATION**

2    BY MS. LYONS:

3    Q    Good afternoon, Mr. Gunn.  Your wife is Mrs. Jill Gunn who

4    was just in here; is that correct?

5    A    Yes.

6    Q    And is your son Michael Peyton Gunn?

7    A    Yes.

8    Q    You don't have to use any names, but do you have two

9    grandchildren?

10   A    Yes.

11   Q    And do you have a boy?

12   A    Yes.

13   Q    And does the grandson live with you?

14   A    Yes.

15   Q    Do you have also a granddaughter?

16   A    Yes.

17   Q    And she does not live with you?

18   A    Correct.

19   Q    Are those two grandchildren from the marriage of Peyton and

20   Amanda Gunn?

21   A    One is from a previous marriage from Amanda.

22   Q    Thank you.  And the grandson that lives with you is the

23   biological child of Peyton?

24   A    Correct.

25   Q    I just want to ask you a couple of questions.  Do you

1    recall a time when Peyton and his family returned to Georgia

2    from New York?

3    A    Yes.

4    Q    And when they returned to Georgia did Peyton have a job?

5    A    Not to my knowledge.  No.

6    Q    And what type of work did you know your son to do?

7    A    IT work for creating websites and stuff like that.

8    Q    And do you recall about what year or time he returned to

9    Georgia?

10   A    It was after he was discharged from the Army at Fort Drum

11   and I want to say it's around approximately -- 2012,

12   approximately, is the closest I can get to it.

13   Q    So thinking about the time period between 2012 and February

14   of 2020, can you tell us about any jobs that your son has held

15   that you're aware of?

16   A    As I recall he continued to always do the IT stuff.  For a

17   period of time he was employed with an IT company in Asheville,

18   North Carolina.  The company archives weather data for the

19   National Oceanic and Atmospheric Administration.

20   Q    Do you remember how long that job lasted?

21   A    Candidly, no.  It was probably less than a year, but I

22   really can't remember.

23   Q    Less than a year.  Okay.  Any other employers that you

24   remember?

25   A    None I can think of.  No.

1   Q    Do you remember a period of time where your son went to

2   Morocco?

3   A    Yes.

4   Q    And what did he go to Morocco for?

5   A    The same thing he told us -- IT work.

6   Q    IT work.  Do you know if there was an employer?

7   A    I do not.

8   Q    Okay.  How long did he stay in Morocco?

9   A    I'm sorry.  I can't recall.

10  Q    And was that venture, if you know, successful or

11  unsuccessful?

12  A    I would have to consider it unsuccessful.

13  Q    Between 2012 and 2020 who was primarily supporting Peyton's

14  family financially?

15  A    My wife and I.

16  Q    Okay.  And how would you describe that?  If I asked you did

17  you pay their rent, did you pay their rent?

18  A    From time to time.

19  Q    Okay.  Did you provide them housing at 220 Nicklaus Court?

20  A    I did.

21  Q    Who paid the rent?

22  A    For a period of time they paid me some rent and then I

23  didn't receive any rent for quite a long time.

24  Q    And when you say "they," who had a job?

25  A    Amanda, his wife, had a couple of jobs during that period

1   of time.

2   Q   Do you recall any of the jobs that she had during that

3   time?

4   A   One was at a counseling service -- I don't recall the name

5   of it -- for a period of time.  I cannot think -- it seemed

6   like there was another one and I can't think of what it is

7   right now.

8   Q   As far as you know did your son Peyton have a job?

9   A   Not to my knowledge other than the IT work.

10  Q   What other things other than rent did you and your wife pay

11  for for Peyton and his family?

12  A   We purchased groceries and some clothes and stuff like that

13  for the grandkids.  We wanted to ensure that they had a good

14  home life.

15  Q   And what about any monthly bills other than rent?

16  A   Can you rephrase that?  I'm sorry.

17  Q   I'm sorry.  Anything other than rent on a monthly basis?

18  A   Sometimes utilities.

19  Q   Were there times when your son Peyton would contact you for

20  money?

21  A   Yes.

22  Q   And would that be daily?

23  A   No, I wouldn't say that, but it was weekly maybe.

24  Something of that nature.  Sometimes verbally.  Sometimes via

25  emails.

1   Q    Okay.  And would you say that would be in small -- that's

2   not a fair question.  Small or large increments, I guess,

3   depends on how much money you have on you; so I am going to

4   phrase that better.  Would he ask for $50 or $500?

5   A    More of the 50.

6   Q    And that might be once a week?

7   A    I can't say that it would be weekly.  I can't really say

8   that.

9   Q    And you said sometimes that would be verbal?  Does that

10  mean he might call you?

11  A    Right.

12  Q    Okay.  And how would he call you?

13  A    I guess on a cellphone, I assume.  Yeah.

14  Q    And I think you said he would also email you?

15  A    He did.

16  Q    Okay.  I am going to show you Government Exhibit -- I am

17  just going to show you Government Exhibit 39, please.

18       Ms. Long, if you will scroll to page 39-005 for Mr. Gunn to

19  see.

20       Mr. Gunn, if you will take a look at record number one at

21  the top, whose name is in the "from" -- may I approach the

22  witness for a second?  I feel like I am yelling, Your Honor.  I

23  apologize.

24           THE COURT:  No, that's fine.

25  Q    I'm going to turn this.  Okay.  Is that a little bit

1  better?

2  A    Yeah, it is for me.

3  Q    Okay.  Who is that from?

4  A    From me.  It says "from" and has my name.

5  Q    And can you read the line?  Is it your name?

6  A    I'm sorry.  I can't make this out.  I think it says replied

7  and it looks like a bunch of characters.

8  Q    Oh, she is going to -- thank you, Ms. Long.

9       Is that better?

10 A    Yeah.

11 Q    That's much better.  Who is it from?

12 A    That's from me.

13 Q    Say your name, sir.

14 A    Mike Gunn.

15 Q    It says "From Mike Gunn," and at the end it says

16 "Google.com."  Does it?

17 A    Yes, it does.

18 Q    Okay.  Can you read the body of that message?

19 A    "Get your Comcast back.  Do you need paper products?" and

20 from and this is -- I don't know what that is right there.

21 Q    And what's that last word?

22 A    "Chat".

23 Q    Chat.  Does that sound like a message you would have sent

24 to yourself asking about paper products?

25 A    I don't know what chat is, but, you know, when I would be

1  going to Costco sometimes like that I would ask if he needed

2  paper products like paper towels or toilet tissue or something

3  of that nature.

4  Q   I am going to put my glasses on, too, Mr. Gunn.

5      Ms. Long, if you'll go to 39-006.  In the middle of that

6  page if you'll blow up record four, Ms. Long.

7      Mr. Gunn, on your screen do you see record four?

8  A   Yes.

9  Q   And is that from you?

10 A   Yes.

11 Q   And does it say "I need my tripod for some photos"?

12 A   Yes, it does.

13 Q   Thank you.

14     Record five blown up at the bottom, please, Ms. Long.

15 A   Counselor, can I amplify that last one?

16 Q   I'm sorry, Mr. Gunn?

17 A   The -- my wife is a watercolor artist and I take photos of

18 her watercolors is the reason I use it.  I can't hold it steady

19 enough, if that helps you with that.

20 Q   Yes, sir.

21     Record five.  Can we blow that one up?  Record five on that

22 same page -- 006.

23     Mr. Gunn, if I say something wrong or you see it

24 differently from me, would you please correct me?

25 A   Yes.

1   Q    Okay.  Is record five from Peyton Gunn?

2   A    Yes.

3   Q    At realgunnlife@gmail.com?

4   A    Yes.

5   Q    And does the body of it say, "After paying up on our power

6   and other bills that have stacked up that had to be paid by the

7   end of the month we are cutting it real close and low on food.

8   Is it okay if we borrow 80 or 100 for some groceries and

9   things?  Like I said last week, next week when we get paid we

10  will be okay, not behind, caught up from this mess"?

11  A    Yes.

12  Q    Was that the type of message you might receive from your

13  son asking for money?

14  A    Possibly.  Yes.

15  Q    -007, record number six.  Mr. Gunn, is this one from you?

16  A    Yes.

17  Q    And does it say "money in mailbox"?

18  A    Yes, it does.

19  Q    Record number seven.  Is this one from you?

20  A    Yes.

21  Q    "Money under front mat"?

22  A    Yes, it does.

23  Q    Record number eight.  Is this one from you?

24  A    Yes.

25  Q    "Find money?"

1   A    Yes, it does.

2   Q    39-008, record number nine.

3        Mr. Gunn, is this one from you?

4   A    Yes.

5   Q    "I don't have any money on me now.  How about tomorrow?"

6   A    That's what it says.

7   Q    Okay.  And these weren't the only messages like this;

8   correct?  There were more.  Mr. Gunn, I am not doing this in

9   any way to try and embarrass you.

10  A    It's okay.

11  Q    I apologize.  I am just trying to confirm that your son

12  asked you for cash on a regular basis, didn't he?

13  A    Well, quite a bit.  Yes.

14           MS. LYONS:  Thank you, Ms. Long.  I appreciate that.

15           Mr. Gunn, over the last year or so you've continued to

16  speak to Amanda Gunn?

17           THE WITNESS:  Yes.

18  Q    You've had a close relationship with her?

19  A    Yes.

20  Q    I think you even spoke to her on the day she plead guilty?

21  A    Yes, I believe so.  That evening, I believe so.

22  Q    Sir?

23  A    Yes, that evening I believe we did.  She calls about twice

24  a week and talks to her son.

25  Q    She talks to her son?

(Michael H. Gunn-Cross by Mr. Merzlak)                 269

1   A    Yes.

2   Q    Were you -- I think you've already said you're the owner or

3   were the owner of 220 Nicklaus Court before it burned down?

4   A    Yes.

5   Q    Did that house have wood floors in it?

6   A    I remember the bedrooms upstairs were carpet.  I can't

7   remember what it was downstairs.  I think the kitchen was some

8   type of a ceramic tile and I can't remember about the living

9   area.  I just can't remember in my mind after we rebuilt it

10  what was down there.

11  Q    Thank you, Mr. Gunn.

12              THE COURT:  Any questions for Mr. Gunn?

13              Oh, I ---

14              MS. LYONS:  I beg the Court's indulgence.

15              THE COURT:  Oh, no, I'm sorry.  I thought you were

16  finished.  I'm sorry.

17              MS. LYONS:  Thank you, Your Honor.

18              And thank you, Mr. Gunn, I am going to pass you to

19  Mr. Merzlak.

20              THE COURT:  Answer his questions, please, sir.

21                         **CROSS EXAMINATION**

22  BY MR. MERZLAK:

23  Q    Good afternoon, Mr. Gunn.  How are you doing?

24  A    Good afternoon.

25  Q    I know this is difficult.  We've talked several times in

1    the past; isn't that correct?

2    A    Yes, sir.

3    Q    I just have some brief questions for you, some things that

4    Ms. Lyons covered as well as some things that she didn't cover.

5    Just to follow up, Peyton contacted you and your wife on

6    occasion asking for money?

7    A    Yes.

8    Q    And you and your wife were of the financial means to try

9    and help him and Amanda out the best you could?

10   A    Thankfully, yes.

11   Q    And because you loved him and, you know, you loved your

12   daughter-in-law as well as the grandchildren, that's exactly

13   what you did?

14   A    Precisely.

15   Q    Okay.  Even though you didn't like it necessarily all the

16   time, you know, we did it because that's what we do for family?

17   A    Right.

18   Q    And isn't it true that during this period of time Peyton

19   and Amanda informed you of some videos that were of Amanda that

20   were on the internet?

21   A    Yes.

22   Q    And when they relayed this information to you they were

23   telling you how Amanda explained that these videos got on the

24   internet?

25   A    Yes.

1  Q   And those were pornographic videos?  That's how they

2  described them?

3  A   So they said, yes.

4  Q   And it was Amanda who claimed that she was somehow being

5  forced to do these; correct?

6  A   Right.

7  Q   And at no time did she ever say that Peyton was forcing her

8  to do anything?

9  A   No, sir.

10 Q   Now at the same time during this was Amanda contacting you

11 for money or because the relationship was just primarily your

12 son Peyton would be the one?

13 A   I don't recall Amanda ever asking for money.

14 Q   Okay.  And all of those text messages or -- excuse me,

15 email messages -- those were email messages that Ms. Lyons

16 showed you; correct?

17 A   Yes, sir.  They appeared to be.

18 Q   And at times Peyton and Amanda were paying their own bills;

19 correct?

20 A   At times, yes.

21 Q   And other times they needed help from you and your wife?

22 A   Correct.

23 Q   And during a significant period of time wasn't there an

24 agreement for them not to pay you rent?

25 A   Possibly so.  I honestly can't remember if we did that or

1   not, but possibly so.  I think we did, as a matter of fact, as

2   I think back that we may have verbally discussed that and if I

3   could elaborate just a little bit.

4   Q   Sure.

5   A   The townhome was purchased by me to give an opportunity for

6   them to be able to ultimately purchase it themselves.  That's

7   what their goal was is to be able to get a loan and purchase it

8   and so we were trying to help them build some equity and build

9   their credit up.  That was the whole purpose of that.

10  Q   And do you recall that you allowed them to not pay rent so

11  that hopefully they would save up a down payment so that they

12  could actually buy the house from you?

13  A   Precisely for a down payment, yeah.

14  Q   And your grandson lives with you and your wife now?

15  A   Yes, sir.

16  Q   Okay.  And you've been unable to have any contact with your

17  granddaughter in some months; isn't that correct?

18  A   Unfortunately, yes.

19  Q   And how many months has that been?

20  A   It's well over a year, I believe.

21  Q   Over a year?

22  A   Somewhere over a year, I think.

23  Q   And who is your granddaughter residing with?

24  A   With Amanda's older sister and her husband.

25  Q   To your knowledge does the couple that she's residing with

1  have any children of their own?

2  A   I don't believe so.  No, sir.

3  Q   Thank you, Mr. Gunn.

4          MS. LYONS:  Just one question, Your Honor.

5                    **REDIRECT EXAMINATION**

6  BY MS. LYONS:

7  Q   Mr. Merzlak asked you if you were unable to have contact

8  with your granddaughter.  That infers that somebody is

9  preventing you from doing that.  Is there a court order in

10  place preventing you from having contact with your

11  granddaughter?

12  A   I can't answer that.  Originally, we were told not to see

13  her and we tried Zooming on cellphones two or three times and

14  it didn't work very effectively and so but our understanding of

15  discussions with in and around the FBI is that we were not to

16  be able to see her because I assume -- I don't know this for a

17  fact -- so that we might not somehow steer her or coerce her or

18  something of that nature reference this case.  So we haven't

19  physically seen her and been able to hug her in a long, long

20  time.

21  Q   Mr. Gunn, who at the FBI told you that you couldn't see

22  your granddaughter?

23  A   I can't -- I honestly can't recall.  There were several

24  people that I dealt with.  So I can't answer that question.

25  Q   Mr. Gunn, do you recall meeting with myself and Special

 1   Agent Godbee, your wife, and your attorney in the living room
 2   of your home?
 3   A    I do.
 4   Q    And do you recall your wife expressing disappointment that
 5   she couldn't see your granddaughter?
 6   A    I do, yes.
 7   Q    And, in fact, she said that your granddaughter wasn't ready
 8   to see you guys?  Do you recall that?
 9   A    I do.
10   Q    Okay.  So it wasn't the FBI that's been preventing you from
11   seeing your granddaughter, has it?
12   A    Well, I can't answer that question.  What you said at that
13   moment right there is true, but we learned about that a little
14   after the fact.
15            MS. LYONS:  No further witnesses, Your Honor.
16            THE COURT:  No questions?
17            MR. MERZLAK:  No, Your Honor.
18            THE COURT:  You may step down, Mr. Gunn.  Thank you.
19   You are released from your subpoena.
20            All right.  Next witness.
21            MS. LYONS:  Your Honor, I think probably a restroom
22   break might be appropriate as in our next witness may be
23   significantly long.
24            THE COURT:  All right.  Ladies and gentlemen, we
25   expect to have a long witness next; so we're going to give you

1   a short break.  Fifteen minute break.  Please remember my

2   instructions about not discussing the case amongst yourselves

3   while you're on this break.  So we'll be back in 15 minutes.

4        (The jury exits the courtroom at 3:48 p.m.)

5             THE COURT:  Any issues at all before we start?

6             MS. LYONS:  No, Your Honor, none from the government.

7             THE COURT:  Let's recall the jury.

8        (The jury enters the courtroom at 4:08 p.m.)

9             THE COURT:  Ready?

10            MS. LYONS:  Yes.  Thank you, Your Honor.

11            THE COURT:  I'm sorry.  Are you going to go ahead and

12  call and then we'll swear her in?

13            MS. LYONS:  Yes.  Your Honor, the government would

14  call Amanda Gunn.

15       (Amanda G. Gunn is duly sworn.)

16            THE CLERK:  Please state your name for the record.

17            THE WITNESS:  Amanda Grace Gunn.

18            THE CLERK:  Thank you.

19                         **DIRECT EXAMINATION**

20  BY MS. LYONS:

21  Q   Ms. Gunn ---

22            THE COURT:  If you'll sit forward as close as you can

23  so the mic can pick you up.

24  Q   Ms. Gunn, are you the mother of the young girl in this

25  case?

1   A    Yes.

2   Q    And have you pleaded guilty to participating in a

3   conspiracy to sex traffic your daughter?

4   A    Yes.

5   Q    And was your husband, Michael Peyton Gunn, your

6   co-conspirator in the conspiracy to sex traffic your daughter?

7   A    Yes.

8   Q    Do you mind if I call you Amanda?

9   A    That's fine.

10  Q    Amanda, can you tell us about a little bit about your

11  daughter?  First, start with her date of birth for us.

12  A    She was born March 5, 2006.

13  Q    And is she the biological daughter of the defendant?

14  A    No.

15  Q    Who was her biological father?

16  A    Jacob Scott Mitchell.

17  Q    And where is he now?

18  A    He passed away a few years ago.

19  Q    I am going to show you what's been marked as Government's

20  Exhibit 60 and ask you if you recognize this document.  When it

21  comes up on the screen, will you let me know?

22  A    Okay.  Yes.

23  Q    What is that?

24  A    That is her birth certificate.

25  Q    Now has her name been removed from that document?

1    A    Yes.

2    Q    But other than that is it still in its accurate original

3    form?

4    A    Yes.

5            MS. LYONS:  Okay.  Your Honor, the government would

6    seek to admit Exhibit 60 at this time.

7            MR. MERZLAK:  No objection.

8            THE COURT:  Admitted.

9        (Government's Exhibit No. 60 is entered into evidence.)

10   Q    Now, Amanda, how did you meet the defendant?

11   A    We met in high school.

12   Q    And did you date when you were in high school?

13   A    No.  We were friends in high school.  He dated a couple of

14   my other friends.

15   Q    Did there come a time later in your life when you circled

16   back around to each other?

17   A    Yes.

18   Q    When was that?

19   A    It was about a year after I divorced.

20   Q    And so you were married to your daughter's father?

21   A    Yes.

22   Q    And did you start dating the defendant?

23   A    Yes.  It was a long distance.

24   Q    When you say "long distance," tell us what that means.

25   A    I was in Georgia.  I had moved back from North Carolina and

1   he was stationed at Fort Drum, New York and then was deployed

2   to Afghanistan.

3   Q   So he was in the military?

4   A   Yes.

5   Q   And did eventually your dating lead to marriage?

6   A   Yes.

7   Q   When did you marry him?

8   A   December 29, 2009.

9   Q   In 2009.  And after you married him did he adopt your

10  daughter?

11  A   Yes, a couple of years after.

12  Q   How old was your daughter when the defendant adopted her?

13  A   She was about five or six.

14  Q   Did you eventually move to New York with your daughter and

15  the defendant?

16  A   Yes.

17  Q   About how long did you stay in New York?

18  A   About two years.

19  Q   Now are you still married to the defendant?

20  A   No.

21  Q   When did you divorce?

22  A   February of 2021.

23  Q   Of what year?

24  A   Twenty-one.

25  Q   And so it was after his arrest on these charges?

1    A    Yes.

2    Q    Let's talk a little bit about employment before we go deep

3    into your marriage.  Okay?

4    A    Okay.

5    Q    What types of work have you done in your life?

6    A    I've been a bank teller at a couple of different banks.  I

7    have worked at a factory.  I was a human resources manager,

8    massage therapist, and chiropractic assistant.  I have worked

9    in sales and I also worked at a car dealership when I was in my

10   teens.

11   Q    When you left New York did you return to Georgia with the

12   defendant and your children?

13   A    Yes.

14   Q    And by the time you moved back to Georgia did you have a

15   second child?

16   A    I did.

17   Q    Was that a boy?

18   A    Yes.

19   Q    And is that boy the biological child of the defendant?

20   A    Yes.

21   Q    Tell me a little bit about the jobs you've held since you

22   returned to Georgia with the defendant.

23   A    I wasn't really allowed to have a job a lot, but I was -- I

24   worked as the HR manager.  I worked at the factory and then I

25   did the massage therapy.

1   Q   Tell us what you mean when you say that you weren't allowed

2   to have a job.

3   A   He wanted me to stay home with my son.

4   Q   In February of 2020 when the FBI came did you have a job?

5   A   Yes, ma'am.

6   Q   Where were you working?

7   A   I was working as a massage therapist at my office in North

8   Augusta.  It is inside Aiken Augusta Holistic Health and I also

9   was working sales at a store called Peaceful Warrior

10  Apothecary.

11  Q   So you were working two jobs?

12  A   Yes, ma'am.

13  Q   Work backwards in time for me.  So if that was February of

14  2020, were you employed in 2019?

15  A   2019?  A portion of it from about August on.

16  Q   And where were you employed before you had gotten those two

17  jobs in sales and as a massage therapist?

18  A   I was a -- the HR manager for a couple of years.

19  Q   Where?

20  A   At Still Waters Professional Counseling.

21  Q   Was that a counseling services business?

22  A   Yes, ma'am.

23  Q   Now during those last two years that you just covered --

24  2020, 2019, and the period of time you were with the HR

25  company -- where was the defendant employed?

1   A   He was self-employed.  So he worked from home.

2   Q   When you say "self-employed," self-employed in what arena

3   or area?

4   A   He did something with computers -- software design and

5   stuff like that.

6   Q   In 2019 what were your hours of employment?

7   A   2019 -- the first half I was in school for massage therapy.

8   So I would go to school from early in the morning until about

9   3 o'clock.  Sometimes I would have clinicals until 6 and then,

10  occasionally, I would have night classes where I would go from

11  6 to about 11 o'clock.

12  Q   Were you home from 11 p.m. until 6 a.m.?

13  A   Yes.

14  Q   Were you home on weekends?

15  A   Yes.

16  Q   Moving towards the second half of 2019 when you're working

17  as a massage therapist and you have a part time job in sales,

18  what were your hours of employment?

19  A   I was usually -- it was usually between like 9 and 6 for

20  both of them.

21  Q   And were you home between 11 p.m. and 6 a.m.?

22  A   Yes, ma'am.

23  Q   And were you home on weekends?

24  A   Some Saturdays I worked.

25  Q   And when you say "Saturday," what time would that be?

1   A    I would either work until about 3 o'clock in the afternoon

2   or sometimes I would work all day and it would be 'til 6.

3   Q    Now when the defendant was self-employed in 2020 and 2019

4   you said he was working from home?

5   A    Yes, ma'am.

6   Q    Was he at home during the day?

7   A    Yes.

8   Q    Was he at home during the night?

9   A    Yes.

10  Q    Was he home between 11 p.m. and 6 a.m.?

11  A    Yes.

12  Q    Was he home on the weekends?

13  A    Yes.

14  Q    Who was supporting the household financially?

15  A    I was, but then he also contributed.  I didn't have access

16  to his finances; so I don't know how much he was bringing in or

17  anything.

18  Q    Okay.  So let's separate that.  You said he was also

19  supporting the household.  How?

20  A    I guess through his work that he did, the freelance stuff.

21  Q    Did you ever see a paycheck?

22  A    No, ma'am.

23  Q    Did he have cash on him?

24  A    No, ma'am.

25  Q    Did he pay bills?

1    A    I assumed he was.  There was times where our power would be

2    turned off or the water or like cable and internet would be cut

3    off.

4    Q    I think you said he was in some sort of web design?

5    A    Uh-huh.

6    Q    Did you ever see a client come to the house?

7    A    No, ma'am.

8    Q    Did you ever see him leave to meet a client?

9    A    Occasionally, he would, but it wasn't very often.

10   Q    Tell me about that.

11   A    He would have his briefcase and kind of be dressed nice and

12   say that he was going to a meeting.

13   Q    What time of day?

14   A    It would be like in the middle of the day.

15   Q    Did he have a car?

16   A    We shared a car.

17   Q    Okay.  So you would have to be home in order for him to get

18   in the car to leave?

19   A    Yes, ma'am.

20   Q    Now I want to come back to your marriage and I want to talk

21   a little bit about the places where you've lived during the

22   course of your marriage here in Georgia.  Okay?

23   A    Okay.

24   Q    About how old was your daughter when you moved back to

25   Georgia with the defendant and your son?

1    A    She was about 7.

2    Q    And where did you first move to when the family returned to

3    Georgia?

4    A    Wells Drive in Evans.

5    Q    Was that a house --

6    A    It was a house.

7    Q    -- an apartment?

8    A    A house.

9    Q    A rental or an own?

10   A    A rental.

11   Q    And who paid the rent?

12   A    He did for a little while and then it was my understanding

13   that his dad helped us quite a bit with the rent.

14   Q    How long did you stay on Wells Drive?

15   A    I believe it was right at a year.

16   Q    Did you then move?

17   A    Yes.

18   Q    Where did you move to?

19   A    We moved in with my parents at that time, I believe.

20   Q    What is your parents' last name?

21   A    Howard.

22   Q    And did all four of you -- the two children, the defendant

23   and yourself -- move in with the Howards?

24   A    Yes, ma'am.

25   Q    What was the sleeping arrangement at the Howards?

1   A    My daughter had a room of her own and then they had a back

2   room -- back living room -- that we made like into a bedroom

3   and my son would either sleep in there with him and I or he

4   would sleep with his sister.

5   Q    Did the children ever sleep on pallets on the floor with

6   you and your husband?

7   A    Yes.

8   Q    How long did you stay with your parents, the Howards?

9   A    I don't remember.  It was a little while, I believe.

10  Q    Do you remember where you moved to after the Howards?

11  A    I believe we moved in with his parents for a little bit.

12  Q    That would be the Gunns?

13  A    Yes, the Gunns.

14  Q    And after you stayed with the Gunns where did you move?

15  A    We moved -- we stayed at a hotel for a couple of months.

16  Q    And then where did you go?

17  A    Then we went to Asheville and stayed for a little while.

18  That was kind of within that couple-of-month time period.

19  Q    Did you say you were in Asheville for a couple of months?

20  A    Well, it was in that hotel timeframe, that couple of

21  months.  It was like during the summer.

22  Q    Why did you move to Asheville?

23  A    He said for work.  We were planning on moving there.

24  Q    Okay.  Was it for your work?

25  A    No, ma'am.

1   Q    It was for his work?

2   A    Yes.

3   Q    And about how long did you stay in Asheville?

4   A    A few weeks, maybe a month max, I would think.

5   Q    And then what happened?

6   A    Then we had to move back home.  We moved in with his

7   parents.

8   Q    Okay.  And who moved in with his parents?

9   A    The four of us.

10  Q    Okay.  And the four of you would be the two children --

11  A    Yes.

12  Q    -- and the defendant?

13  A    Yes.

14  Q    What was the sleeping arrangement when you moved back in

15  with the Gunns the second time?

16  A    We had the two bedrooms upstairs.  My daughter and I would

17  share one room and then he and my son would share a room or the

18  kids would sleep together and he would stay in the room with

19  me.  It would kind of just go back and forth.

20  Q    Where did you move once you left the Gunns' house the

21  second time?

22  A    I believe that's when we moved to Stillwater Drive in

23  Martinez.

24  Q    Did you live anywhere between Stillwater and 220 Nicklaus

25  Court or did you go from Stillwater to 220 Nicklaus Court?

1    A   We stayed with his parents for -- his parents or my parents

2    for a couple of weeks, I believe.

3    Q   And then from 220 Nicklaus Court do you move to 209?

4    A   Yes, ma'am.

5    Q   And I am not trying to trick you or bind you into any of

6    these.  I am just trying to get a general idea of the different

7    places you've lived in Georgia.  Amanda, what is the Order?

8    A   It was an organization that I was made to believe saved me

9    from prostitution, but they were a satanic -- a satanic group

10   that we were supposed to worship and be thankful that they

11   rescued me from that.

12   Q   Who told you about the Order?

13   A   Michael.

14   Q   When did the Order come into play in your household?

15   A   When we lived at Stillwater Drive.

16   Q   Can you tell us a little bit about how you began to be

17   introduced to this?

18   A   I was having to prostitute for a little while and they were

19   -- and I was being made to believe that the MS-13 was after us

20   and going to kill my family and my children and that they were

21   the only ones that would help us and rescue us from them and

22   keep them from hurting us and keep me from prostituting.

23   Q   How did MS-13 first come about?  Where did you hear that

24   from?

25   A   I received an email about 2013 saying that I would -- was

1   going to be a whore and it was signed MSXIII and I didn't know

2   what that was.  At the bottom it said, "Ask your husband.

3   He'll know what this means."  I asked him.  He said that it

4   stood for MS-13.

5   Q    So at that point did you call the police?

6   A    No, ma'am.

7   Q    Why not?

8   A    He said that we shouldn't because they were a very big

9   group and to take them very seriously because they were very

10  dangerous.

11  Q    Did you show him the text message or -- did you say a text

12  message or ---

13  A    Email.

14  Q    Did you show him the email?

15  A    Yes, ma'am.

16  Q    And what did he say?

17  A    He said to do what they asked.

18  Q    And what were they asking you to do?

19  A    Be a whore.

20  Q    Did you ever discuss this issue with the defendant's

21  parents?

22  A    At some point he -- Michael told me that we were supposed

23  to tell my parents and his parents that I was -- had cheated on

24  him and someone was threatening us and that I was being forced

25  into sex trafficking.

1  Q   And so did you do that?

2  A   Yes, ma'am.

3  Q   Did you tell his parents?

4  A   Yes, ma'am.

5  Q   And did you tell your parents?

6  A   Yes, ma'am.

7  Q   What was his parents' response?

8  A   They were kind of shocked but we had made them -- we had

9  made them believe that it had stopped so they wouldn't worry.

10 Q   And did you tell your parents?

11 A   Yes, ma'am.

12 Q   And what was their response?

13 A   The same.

14 Q   Do you have any siblings?

15 A   I do.

16 Q   Tell us about your siblings.  How many?

17 A   I have one brother and one sister.

18 Q   What are their names?

19 A   Jason Howard and Ashley Coxwell.

20 Q   Who is your eldest daughter living with right now?

21 A   My sister.

22 Q   And who is your son living with right now?

23 A   His grandparents, my ex-in-laws.

24 Q   When you told your parents this story did you tell your

25 siblings?

1    A    I don't believe I told my brother, but I believe my sister

2    was there or I think she lived in the house at the time; so she

3    knew.

4    Q    What did she think?

5    A    I don't really know.

6    Q    You didn't discuss it with her?

7    A    I don't remember.

8    Q    So you don't go to the police because the defendant tells

9    you not to?

10   A    Yes, ma'am.

11   Q    So what happens next?

12   A    At that point I'm being told that I have to flirt with guys

13   online, learn to dress sexy.  He starts at that point taking

14   pictures of me to post online and to share with people that I

15   meet online.

16   Q    So he starts by flirting with people online?

17   A    Yes, ma'am.

18   Q    What does that mean?

19   A    Like just trying to get their attention, I guess, telling

20   them that I wanted to do things to them, making them think that

21   they wanted to do things to me, and some of it was just like

22   casual conversation just to get used to talking to people.

23   Q    And what did you mean when you said he started to take

24   pictures of you to put online?

25   A    He would make me pose in certain positions, hold up signs

1   with a name that he made up for me to use.  He would make me

2   wear certain clothes or be naked and he would spend hours

3   taking pictures.

4   Q   And you mentioned a name on a sign.  Tell us about that.

5   A   He came up with a name for me to use as like an alias

6   online.  It was Lexi Haze.

7   Q   How are you spelling that?

8   A   L-E-X-I for Lexi and Haze was H-A-Z-E.

9   Q   Where did the defendant get that name?

10  A   It was after his favorite porn star.

11  Q   What was her name?

12  A   Jenna Haze.

13  Q   Did there come a time where that name -- that name changed

14  from Lexi Haze to something different?

15  A   Yes, ma'am.

16  Q   What did it change to?

17  A   It changed to Amanda Lexi Haze.

18  Q   Why did it change?

19  A   As a punishment for not doing what I was supposed to, not

20  being a good enough whore.

21  Q   Not being a what?

22  A   A good enough whore.

23  Q   You used the word "make."  He would "make" you.

24  A   Yes, ma'am.

25  Q   How would he make you do any of these things?

1  A   He would tell me that this is what the MS-13 was wanting me

2  to do so that I would need to follow their directions and he

3  said that they would -- you know, they would hurt the kids.

4  Some occasions he said that they were at the house, that they

5  were outside or they were at my parents' house or my sister's

6  work.

7  Q   Outside the house or your sister's work.  Can you give me

8  an example of a time when he mentioned outside the house?

9  A   There was a point where there were -- he said people were

10  outside the house and I needed to make a decision about whether

11  or not I was going to be part of the Order and there was

12  flashlights shining in my bedroom window and he came in -- he

13  came into my bedroom a little after that and asked me if I saw

14  them and said that people were outside and I needed to make a

15  decision.

16  Q   Where did your sister work?

17  A   She works at Peak Employment.

18  Q   Did he ever say anything to you about any information or

19  having a file related to your sister?

20  A   He did mention that he had a file on her and a lot of other

21  people.

22  Q   Did you say in your testimony a moment ago that you lived

23  with your sister for a period of time?

24  A   She lived at my parents' while we lived there.

25  Q   So while you and the defendant lived at your parents' house

1   Ashley Coxwell also lived there?

2   A    Yes, ma'am.

3   Q    Would there have been any reason for any of your sister's

4   business emails to be on any of your computers?

5   A    No, ma'am.

6   Q    So does the flirting online and pictures being taken and

7   the name -- does that escalate?

8   A    Yes, ma'am.

9   Q    What does it escalate to?

10  A    He -- as a punishment for not flirting like I was supposed

11  to online I was gang raped.

12  Q    Tell us what happened.

13  A    He came to me and told me that the MS-13 wasn't happy with

14  my progress and that as a punishment that I was going to have

15  to be raped by several men at the house and he had arranged for

16  my daughter to go to my parents and my son to go to his parents

17  for sleepovers.

18  Q    And what happened?

19  A    He made me go into the guest room and made me start

20  drinking and taking some of his pills and then he blindfolded

21  me and men started showing up.

22  Q    And whose house did this happen inside of?

23  A    This was the Wells Drive house.

24  Q    Was this documented in any way?

25  A    Yes, ma'am.  He took pictures and video of it.

1    Q    Did he post them anywhere?

2    A    He showed me the video where it was posted.  I don't know

3    if any pictures were.

4    Q    Where did he post it?

5    A    He posted it on a PornHub website and then there were some

6    other small websites that I hadn't heard of that he -- kind of

7    like different forums and stuff like that.

8    Q    Did you tell anyone?

9    A    No, ma'am.

10   Q    Why didn't you tell anyone?

11   A    Because I was scared.

12   Q    What were you scared of?

13   A    The MS-13 and my kids being hurt.

14   Q    Amanda, did there come a time where the defendant tattooed

15   you?

16   A    Yes, ma'am.

17   Q    When did that happen?

18   A    It was while we lived at 220 Nicklaus Court.  So sometime

19   between 2017, 2018.

20   Q    Where -- how many tattoos are there?

21   A    Five.

22   Q    Ma'am?

23   A    Five.

24   Q    Can you tell us where on your body the tattoos are located?

25   A    Yes, ma'am.  I have one on my right buttocks, one in the

1  middle of my back, one on each side of my breasts and then one

2  on my left hip groin area.

3  Q   Can you tell us about how that happened?

4  A   Yes, ma'am.  He said that -- this is when the Order was

5  involved and the Order wasn't happy with me.  So as a

6  punishment and a reminder of what I was that I would have to

7  get these put on and if I didn't that they were going to come

8  into the house because there was a car outside with people in

9  it.

10 Q   A reminder of what you were?

11 A   Yes, ma'am.

12 Q   What were you?

13 A   A whore.

14 Q   Did he have a tattoo gun?

15 A   Yes, ma'am.

16 Q   Where did he get that from?

17 A   He ordered it off Amazon, I believe.

18 Q   Did you know that he was going to put five tattoos on you?

19 A   No, ma'am.

20 Q   Did you tell him it was okay to put those tattoos there?

21 A   Yes, ma'am.

22 Q   Why?

23 A   Because I didn't want my kids to get hurt.

24 Q   At one point did he consider putting a tattoo anywhere

25 else?

1    A    Yes, ma'am.

2    Q    Where?

3    A    On my face.

4    Q    Was there a difference, Amanda, in the discussions that

5    occurred with the defendant about MS-13 and your

6    responsibilities before you moved to 220 Nicklaus Court and

7    then the Order after you moved to 220 Nicklaus Court?

8    A    When the Order became involved it was -- I was going to

9    stop the prostituting and with the Order involved it was just

10   -- I was just going to have to have sex with him.

11   Q    And did the defendant explain why that was happening -- why

12   the change?

13   A    I don't remember if he did.

14   Q    I'd like to show you on the monitor Government Exhibit 22.

15   Let me know when it comes up in front of you, please.

16   A    It's there.

17   Q    Do you see the beginning of Exhibit 22?

18   A    Yes, ma'am.

19   Q    Is that one of several photos that were taken of your body?

20   A    Yes, ma'am.

21   Q    And were those photos taken with your permission?

22   A    Yes, ma'am.

23   Q    And do they reflect the tattoos that are on your body?

24   A    Yes, ma'am.

25          MS. LYONS:  Your Honor, we would seek to admit

(Amanda G. Gunn-Direct by Ms. Lyons)                    297

1    Government's Exhibit 22 at this time and publish.

2                MR. MERZLAK:  No objection.

3                THE COURT:  Admitted and you may publish.

4        (Government's Exhibit No. 22 is entered into evidence.)

5    Q   Amanda, let's start with 22-002, and if we can zoom in just

6    a little bit, Ms. Long.

7        Amanda, I want you to tell me what part of your body we are

8    starting with.

9    A   That's my right breast.

10   Q   What was the tattoo that was on this part of your body?

11   A   It said "rape bait."

12   Q   So starting from left, the left side of this photo, what

13   letter is that that we can see?

14   A   An "R".

15   Q   And how do you spell rape bait?

16   A   R-A-P-E B-A-I-T.

17   Q   So is that an "E" that we're seeing in the middle of the

18   screen?

19   A   Yes, ma'am.

20   Q   Does the rest of the word go around and end at your nipple?

21   A   Yes, ma'am.

22   Q   Thank you.

23       Ms. Long, 22-05, please.

24       What part of your body is this?

25   A   My left breast.

1   Q    And what word did the defendant tattoo on your left breast?

2   A    Cum slut.

3   Q    What was that?

4   A    Cum slut.

5   Q    Can you spell it, please?

6   A    C-U-M S-L-U-T.

7   Q    Where your fingers are on the left side of the screen,

8   what's that letter?

9   A    "C".

10  Q    The next letter?

11  A    "U".

12  Q    And the remnants of a ---

13  A    "M".

14  Q    And so the rest of the word is kind of faded out.  Is that

15  correct?

16  A    Yes, ma'am.

17  Q    Thank you.  22-06, 22-07.  Is that another shot of the same

18  side?

19  A    Yes, ma'am.

20  Q    Okay.  22-008, please. 22-009.  What are we looking at

21  here, Amanda?

22  A    That is a cover-up tattoo that I had done.

23  Q    It's a cover-up tattoo?

24  A    Yes, ma'am.

25  Q    Does that mean there is something underneath there?

(Amanda G. Gunn-Direct by Ms. Lyons)                    299

1    A    Yes, ma'am.

2    Q    What part of your body, for the record, are we looking at?

3    A    My mid back.

4    Q    And what does that flowered tattoo cover up?

5    A    It says "cum dumpster."

6    Q    Please spell it.

7    A    C-U-M D-U-M-P-S-T-E-R.

8    Q    Now it is hard for us to see the word "cum dumpster," but I

9    am going to ask Ms. Long to focus on the left side of that

10   flower tattoo.  What letter do you see starting out sticking

11   out from that flower?

12   A    That is the "C".

13   Q    That's the "C" of the "cum dumpster"?

14   A    Yes, ma'am.

15   Q    Thank you.

16        Thank you, Ms. Long. 010, 0111, 0112.  Thank you.

17        Where are we now, Amanda, on your body?

18   A    That's my right buttocks.

19   Q    And what word was tattooed here?

20   A    Slut.

21   Q    What word?

22   A    Slut.

23   Q    And how do you spell it?

24   A    S-L-U-T.

25   Q    And this one has also faded?

1   A    Yes, ma'am.

2   Q    Any letters that you can make out here?

3   A    The last letter is the "T" and then it looks like the "L"

4   is the darker lines that you can see.

5   Q    O13, Ms. Long, and 14, and 15.

6        Amanda, what are we looking at here?

7   A    That is my left hip groin area.

8   Q    And is this another covered tattoo or cover-up tattoo?

9   A    Yes, ma'am.

10  Q    And what is this tattoo covering up?

11  A    No means yes.

12  Q    No means yes?

13  A    Yes, ma'am.

14  Q    Ms. Long, can we zoom in?

15       Can you see the letters underneath this tattoo?

16  A    Yes, ma'am.

17  Q    Tell me where you see the "N" of "No" beginning.  I think

18  these screens are touch screen.  They are?  Amanda, try and

19  touch or trace where you see the "N".

20  A    Here is the "O."  The tip of the feather is the "O".  A

21  little in from that you can see the beginning of the "M".

22  Q    From the tip of the feather on the left-hand side of the

23  screen --

24  A    Yes, ma'am.

25  Q    -- a little bit in you can see the "N".

(Amanda G. Gunn-Direct by Ms. Lyons)          301

1  A   And then where there is less shading on the feather you can

2  see the "Y" and "E."

3  Q   So almost directly in the middle a little bit to the right

4  you can see the "Y."

5  A   Yes, ma'am.

6  Q   And then an "E."

7  A   Yes.

8       MS. LYONS:  And can you zoom back out, Ms. Long?

9       You can almost see the "Y" and the "E" better from

10  further away?

11       THE WITNESS:  Yes, ma'am.

12  Q   Thank you.

13      Ms. Long, you can take that down.

14      When were you able to get those tattoos covered up?

15  A   I got the one on my back covered up in January of 2019 and

16  then I got the one on my hip covered up in May of last year.

17  Q   Did anyone help you do that?

18  A   My sister helped pay for the one on my back.

19  Q   I want to talk a little bit more about the pictures that

20  were posted online.  Okay?

21      I am going to start with Government Exhibit 23 just for the

22  witness.

23      And let me know when you can see it.

24  A   I can see it.

25  Q   Do you recognize that photo?

(Amanda G. Gunn-Direct by Ms. Lyons)                    302

1   A    Yes, ma'am.

2   Q    Is that you?

3   A    Yes.

4   Q    Have you seen it before?

5   A    Yes.

6   Q    Has it been altered in any way?

7   A    No.

8           MS. LYONS:  Your Honor, we would seek to admit

9   Government Exhibit 23.

10          MR. MERZLAK:  No objection.

11          THE COURT:  Admitted and you may publish.

12      (Government's Exhibit No. 23 is entered into evidence.)

13          MS. LYONS:  Thank you, Your Honor.

14          Amanda, what are we looking at here?

15          THE WITNESS:  That's a picture that was taken of me to

16  use for like profile pictures and stuff like that.

17          MS. LYONS:  Can we zoom in in the middle, Ms. Long?

18          What does the card in the middle say?

19          THE WITNESS:  Amanda Lexi Haze.

20  Q    And, again, where did you get that name?

21  A    That was given to me.

22  Q    Now, Amanda, I apologize for having to ask this question,

23  but I am going to ask it.  Okay?  You don't look very unhappy

24  in that photo, do you?

25  A    No.

(Amanda G. Gunn-Direct by Ms. Lyons)

1   Q   Did you want to pose for those pictures?

2   A   No.

3   Q   Did you want those pictures put online?

4   A   No.

5   Q   Did you post them online?

6   A   No.

7   Q   Who did?

8   A   Michael.

9        MS. LYONS:  Government Exhibit 24 for the witness,

10  please.

11       Let me know if you see something.

12       THE WITNESS:  I see them.

13  Q   Do you recognize Exhibit 24?

14  A   Yes, ma'am.

15  Q   Does that exhibit contain photos of you?

16  A   Yes.

17  Q   Do you recognize it?

18  A   Yes.

19  Q   Has it been altered in any way?

20  A   No.

21       MS. LYONS:  The government would seek to admit and

22  publish Government Exhibit 24 at this time.

23       MR. MERZLAK:  No objection.

24       THE COURT:  Admitted and you may publish.

25       (Government's Exhibit No. 24 is entered into evidence.)

1          MS. LYONS:  Ms. Long, if it's possible, can we go to

2     the top and zoom in?  Thank you.

3          Starting on the left-hand corner, Amanda, can you read

4     the profile name?

5          THE WITNESS:  Amanda Lexi Haze.

6  Q   And was this posted on a website called "Flickr"?  Do you

7     even know?

8  A   I don't -- I don't see the name of the site anywhere.

9  Q   Do you recognize the photographs?

10 A   Yes, ma'am.

11 Q   Do you recall where they were taken?

12 A   Yes.

13 Q   Where were they taken?

14 A   At the lake in Augusta.

15 Q   And who took them?

16 A   Michael.

17 Q   Did you post them online?

18 A   No, ma'am.

19         MS. LYONS:  Ms. Long, can you take that down, please?

20         Amanda, I apologize.  I know it's embarrassing and

21    that's not what I am trying to do.

22         Government Exhibit 25 for the witness as well, please.

23         Do you recognize the exhibit on the screen in front of

24    you?

25         THE WITNESS:  It went away, but I did recognize it.

1   Q   Tell me when you can see it.

2   A   I can see it now.

3   Q   What do you recognize in that exhibit?

4   A   It was a profile on Pinterest that was made.

5   Q   And can you tell me who made that profile?

6   A   Michael.

7   Q   And what name is that profile under?

8   A   Lexi likes it hot.

9   Q   Lexi likes it hot?

10  A   Yes, ma'am.

11  Q   And are you familiar with Pinterest, Amanda?

12  A   Yes, ma'am.

13  Q   What do you do on Pinterest?

14  A   You make different boards of ideas and stuff like that or

15  stuff you want to share.

16  Q   And so did you have to do anything on Pinterest in

17  connection with this profile?

18  A   Yes, ma'am.

19  Q   What did you have to do?

20  A   I had to make boards and add stuff that people would

21  like -- some of it being a video game, some of it being stuff

22  that he thought would be interested -- people would be

23  interested in.

24  Q   And who told you to do that?

25  A   Michael.

(Amanda G. Gunn-Direct by Ms. Lyons)                    306

1          MS. LYONS:  Thank you, Ms. Long.

2          Now I think you started to talk about a little while

3    ago that there was a change by the time you moved to 220

4    Nicklaus Court and the Order and you may not have to prostitute

5    anymore?

6          THE WITNESS:  Yes, ma'am.

7    Q    Did there come a time where you started having sex with men

8    for money?

9    A    Yes.

10   Q    Okay.  And was that before 220 Nicklaus Court?

11   A    Yes.

12   Q    And who was making you have sex for money?

13   A    Michael.

14   Q    And what did you do with the money?

15   A    I either gave it to him or I put it into like my bank

16   account.

17   Q    And once you moved to Nicklaus Court did you continue to

18   prostitute?

19   A    No, ma'am.

20   Q    And was the Order talked about when you moved to Nicklaus

21   Court?

22   A    Yes, ma'am.

23   Q    At this time that you're moving to Nicklaus Court about

24   what grade is your daughter in?

25   A    She's in middle school probably like sixth grade, I

1    believe.  She may have been fifth grade at the beginning when

2    we moved there.

3    Q    When you're living in the 220 Nicklaus court house are

4    discussions about the Order happening in front of your

5    daughter?

6    A    Yes, ma'am.

7    Q    What types of discussions?

8    A    There was a lot of talk about the religion aspect of it and

9    then there was also at one point a conversation about how the

10   family needed to make money, how I was being like the sole

11   supporter which I thought was kind of strange because he never

12   recognized me for anything.

13   Q    Was there a discussion about roles and responsibilities?

14   A    I don't remember.

15   Q    Was there a discussion about the family needing to

16   contribute and people in the family needing to contribute?

17   A    Yes.  Yes, ma'am.

18   Q    While you're living from home to home to home to home in

19   the state of Georgia was the defendant sleeping on a mattress

20   in the living room most of the time?

21   A    Yes, ma'am.

22   Q    I want to move you to December of 2019.  Which house are

23   you living in?

24   A    209 Nicklaus Court.

25   Q    And why are you in 209 Nicklaus Court?

1  A    Because we had a house fire in October of 2019.

2  Q    Did your daughter receive an iPhone as a holiday gift?

3  A    Yes, ma'am.

4  Q    Did she receive it exactly on Christmas or before

5  Christmas?

6  A    No, ma'am.  I believe it was sometime in November when she

7  received it.

8  Q    And who gave her that iPhone?

9  A    Michael.

10  Q    Do you remember how much that iPhone cost?

11  A    I don't because I didn't purchase it, but I knew that they

12  were very expensive phones.

13  Q    Does it stick out in your mind as something that you were

14  concerned about?

15  A    Yes.

16  Q    Why?

17  A    Because of the price of it.

18  Q    At that time in your financial life could you afford an

19  expensive iPhone?

20  A    No, ma'am.

21  Q    Now prior to the iPhone what kind of phone did your

22  daughter have?

23  A    I believe she may have had like a Motorola or some cheap

24  phone.  It wasn't a very nice one.

25  Q    And do you recall her ever having any other types of phones

1   other than the iPhone that was a holiday gift and a Motorola?

2   A   I believe maybe she had one for a few months at one time.

3   It would have been like a Motorola or a Samsung as well, but I

4   don't think she had it very long.

5   Q   Before I forget, Amanda, did you ever have a reptile tank

6   in your house?

7   A   Yes, ma'am.

8   Q   Why did you have a reptile tank in your house?

9   A   It was one that Michael had had before we got married and

10  at different times the kids caught like a lizard and would put

11  it in the cage.

12  Q   In the 220 Nicklaus Court house where was that reptile tank

13  kept?

14  A   It was kept in the storage closet that Michael had access

15  to, but I believe at some point it was also in Grace's room.

16  Q   It was in Grace's room.  Excuse me.  It was in your

17  daughter's room?

18  A   Yes.

19  Q   I apologize.  Did your daughter ever have or did anybody in

20  the family ever have an Xbox?

21  A   Yes, ma'am.

22  Q   How many?

23  A   My sister had bought one for my son for Christmas and then

24  there was another one that Michael brought home.

25  Q   So when you say Christmas, which Christmas are you talking

1  about?  Do you remember?

2  A    I believe it was 2018.

3  Q    Which year?

4  A    2018.

5  Q    2018.

6  A    I believe so.

7  Q    And the second Xbox that shows up, does that show up before

8  or after Christmas 2018?

9  A    After.

10  Q    Remember what color it was?

11  A    It was white.  They were identical.

12  Q    And you said the defendant got it?

13  A    Yes.  I don't know.

14  Q    How did you know he got it?

15  A    He's the one that said -- that was there with the Xbox.  I

16  don't know how else it would have got there.

17  Q    Okay.  So now let's move to February 5th of 2020.  Okay?

18  Do you remember being contacted by the FBI?

19  A    Yes, ma'am.

20  Q    Tell us what you remember.

21  A    I was at work and I got a phonecall from the investigator

22  and he said that -- he left a voice mail saying for us to call

23  him.  I was at work by myself.  So I called Michael and gave

24  him the phone number and told him, you know, the FBI guy wanted

25  someone to call him; can you please call and figure out what

1   they want or what they need?  And then he called me back and

2   said that I would need to be home by like 4 o'clock, I believe

3   it was, to meet the investigator.

4   Q    Okay.  So before the FBI ever showed up at your door at 209

5   Nicklaus Court you were already aware that the FBI was at least

6   making a phonecall to contact you?

7   A    Yes.

8   Q    Okay.  And you relayed that to the defendant?

9   A    Yes.

10  Q    The defendant tells you that you need to be home at

11  4 o'clock?

12  A    I believe so.

13  Q    Okay.  And so do you go home?

14  A    Yes, ma'am.

15  Q    When you get home who is there?

16  A    Michael and my daughter.

17  Q    Do you remember where the defendant was?

18  A    He was in the living room, I believe.

19  Q    And where was your daughter?

20  A    She was in my bedroom.

21  Q    Okay.  And when you say your bedroom, which room in the

22  house was your bedroom?

23  A    That was the downstairs bedroom.

24  Q    Okay.  And where was she in your bedroom?

25  A    She was laying down on the mattress.  We had blow-up

1  mattresses because the mattresses got damaged in the house
2  fire.
3  Q   Okay.  So she was laying down on the blow-up mattress in
4  your bedroom?
5  A   Yes, ma'am.
6  Q   Is that the master bedroom of that home?
7  A   Yes.
8  Q   So she was laying down in the master bedroom when you got
9  home from work?
10  A   Yes, ma'am.
11  Q   Had the FBI arrived yet?
12  A   No, ma'am.
13  Q   Was it unusual for your daughter to be sleeping in your bed
14  or laying in your bed?
15  A   Yes.
16  Q   Had you told your daughter to get into your bed?
17  A   No.
18  Q   Eventually did the agents arrive?
19  A   Yes.
20  Q   And how many do you recall being there?
21  A   I believe it was just two at that time.
22  Q   And where did you speak with those agents?
23  A   We were like in the door threshold.  They were on the
24  porch.
25  Q   Do you remember who answered the door when the agents

1  knocked?

2  A    I don't.

3  Q    And do you remember one of those agents being Tripp Godbee?

4  A    Yes.

5  Q    Okay.  What do you remember talking to Tripp and the other

6  agent about?

7  A    I remember they showed us some pictures.  They looked like

8  kind of selfies and asked if they were, you know, our daughter.

9  We said yes and they went on to describe how they had found

10 pictures, I guess, in Texas and located her through school and

11 stuff like that.

12 Q    And did they talk to you at all about cellular devices?

13 A    He asked if she had a cellphone and I can't remember if I

14 said, yes, she had an iPhone or if Michael did and he asked if

15 he could see the cellphone.

16 Q    And what happened next when the agent asked to see the

17 cellphone?

18 A    Michael said that it was lost.

19 Q    Was that a surprise to you?

20 A    Yes, ma'am.

21 Q    Why?

22 A    Because that morning I had received a text message from her

23 saying that she had missed the bus from school or for school

24 and I told her just to relax and it would be fine.  She can

25 miss the day because she had just had ear surgery as well and I

1   knew the noise and stuff with school was getting to her and --

2   yeah, I think that's it.

3   Q   So you had received a text from your daughter --

4   A   Yes, ma'am.

5   Q   -- from her phone to your phone?

6   A   Yes.

7   Q   So it was a surprise it was gone?

8   A   Yes.

9   Q   Especially because that's kind of an expensive phone?

10  A   Right.

11  Q   Anything else happen on the porch that you recall?

12  A   I don't think so.

13  Q   At any point do you remember being alone with Special Agent

14  Godbee?

15  A   Yes.

16  Q   And did Special Agent Godbee ask you if you needed help?

17  A   I believe he may have.

18  Q   Did you tell him that you needed help?

19  A   No, ma'am.

20  Q   Why not?

21  A   I was scared.

22  Q   Eventually did the agents go inside to check on your

23  daughter?

24  A   Yes, ma'am.

25  Q   And where were you when that happened?

1   A    I believe I stayed near the door in the living room.

2   Q    Did you go with the agents upstairs while they took a look

3   in your daughter's room?

4   A    No, ma'am.  I don't believe so.

5   Q    And did you eventually find out that vodka had been found

6   in your daughter's room?

7   A    Yes, ma'am.

8   Q    Now we're still on February 5th and this was the first time

9   you've met any of the agents; is that correct?

10  A    Yes, ma'am.

11  Q    Now eventually Special Agent Escobar and Special Agent

12  Godbee leave?

13  A    Uh-huh.

14  Q    Is that right?

15  A    Yes, ma'am.

16  Q    Now who is left in the house when the two agents leave on

17  February 5th?

18  A    Myself, Michael, and our children.

19  Q    And your children?

20  A    Uh-huh.

21  Q    Was there a discussion about the vodka being found?

22  A    I believe there was.  I don't know exactly what was said.

23  Q    Okay.  Were you upset?

24  A    Yes.

25  Q    Did the defendant start to search for the iPhone?

1    A    No.

2    Q    What was the discussion after the FBI left?

3    A    It was kind of chaotic and he and Grace -- I'm sorry.

4    Q    It's okay.

5    A    They went into the bedroom and were going through some

6    stuff.  He had me clean out some jars that I believe were in

7    the garage at some point.  At one point she came and got me and

8    said that he needed help in the closet with something that she

9    couldn't help him with and I went into the closet and he had

10   what I believe it was like a flash drive that had been broken

11   and he asked me to hold it for him because her fingers were too

12   small to hold it and he drilled a hole into it.

13   Q    At that point did you begin to see him collect anything

14   else in the house?

15   A    He had a bag of -- two trash bags.  I don't know exactly

16   what was in them.  One looked like it had like a laptop in

17   it -- like maybe it had been wrapped around the laptop.  It was

18   like a rectangle -- flat rectangle.

19   Q    Amanda, did you stop at any point and ask him what he was

20   doing?

21   A    No.

22   Q    Why not?

23   A    Because I just didn't ask questions.

24   Q    What, if anything, happens with these trash bags and items?

25   A    He left with them.

1  Q   And how does he leave with them?

2  A   He took the car that we had.  We had one car.  He took

3  that.

4  Q   And does he go alone?

5  A   Yes.

6  Q   Between -- after he leaves in the car does he eventually

7  come back?

8  A   Yes.

9  Q   That night where did you sleep?

10 A   I slept on -- in the living room with my son.

11 Q   And where did your daughter sleep?

12 A   I believe she slept in the master bedroom again.

13 Q   With whom?

14 A   I assume it was by herself.

15 Q   Where was the defendant?

16 A   I thought he was in the living room.

17 Q   The next morning -- the next morning are you making

18 arrangements at some point to have your daughter scheduled for

19 an interview?

20 A   I believe I was -- I went to work and I was -- Peyton

21 called me and told me that she was needed to be at the FBI

22 office at a certain time and I asked him if he could take her

23 since I was at work and had already missed so many hours from

24 the day before and he said, no, that it had to be me to take

25 her.

1  Q    So I want to focus on the time between bedtime and when you

2  leave for work the next morning.  Do you recall the defendant

3  saying anything to you about your daughter's cellphone?

4  A    Yes, ma'am.

5  Q    What did he say?

6  A    He said that he was going to get it from the gazebo and

7  that he was walking to the gas station and going to put it near

8  the railroad tracks or break it and put it -- a piece near the

9  railroad tracks near our house that were -- it was on the way

10  to the gas station.

11  Q    On February 6th did you take your daughter for that

12  interview at the FBI?

13  A    Yes, ma'am.

14  Q    And when you returned back to 209 Nicklaus Court were the

15  agents searching?

16  A    Yes, ma'am.

17  Q    And what were -- did you know what they were searching for,

18  Amanda?

19  A    I didn't know what in particular they were searching for.

20  I just knew they were searching the house at that point.

21  Q    I am showing you Government's Exhibit 13 which has already

22  been admitted and published.  Amanda, do you recognize these

23  shoes?

24  A    Yes, ma'am.

25  Q    Whose shoes are these?

1   A    They're Michael's.

2   Q    What type of shoes are these?

3   A    Pumas.

4   Q    Is this a shoe that he had worn regularly?

5   A    Yes.  He bought the same type of shoes for several years.

6   Q    Is there a point or reference in time as to when he started

7   wearing Pumas?

8   A    It was I believe when we were in New York.

9   Q    Amanda, do you wear your husband's sneakers?

10  A    No, ma'am.

11  Q    And do you see a smudge or a wear mark on these sneakers?

12  A    Yes, ma'am.

13  Q    Where on the sneaker is that smudge or worn place located?

14  A    On the inside of the shoe where his bunion is.

15  Q    Where his what is?

16  A    Bunion.

17  Q    The defendant has bunions?

18  A    Yes, ma'am.

19  Q    I am showing you Government's Exhibit 11.  Amanda, have you

20  seen this photograph before?

21  A    Yes, ma'am.

22  Q    Do you see the white sneaker?

23  A    Yes, ma'am.

24  Q    Do you see the smudge?

25  A    Yes.

(Amanda G. Gunn-Direct by Ms. Lyons)

1  Q   Amanda, did you wear your husband's shoe and take pictures

2  of child pornography of your daughter wearing the shoe?

3  A   No, ma'am.

4       MS. LYONS:  Thank you, Ms. Long.

5       Now, Amanda, you've been interviewed several times

6  during this investigation; is that right?

7       THE WITNESS:  Yes, ma'am.

8  Q   Have you been interviewed more than once?

9  A   Yes.

10 Q   Have you been interviewed more than twice?

11 A   Yes.

12 Q   Have you been interviewed more than three times?

13 A   Yes.

14 Q   Have you been interviewed more than four times?

15 A   I believe so, yes.

16 Q   Did you tell the truth when you were interviewed?

17 A   No, ma'am.

18 Q   Why didn't you tell the truth when you were interviewed?

19 A   Because I was scared.

20 Q   Was there a point when you finally decided to tell the

21 truth?

22 A   Yes, ma'am.

23 Q   What changed?

24 A   Well, I was -- after I was arrested just memories started

25 coming back of certain things.

(Amanda G. Gunn-Direct by Ms. Lyons)                    321

1   Q   Did you make a decision to plead guilty?

2   A   Yes, ma'am.

3   Q   And why did you decide to plead guilty?

4   A   Because I knew I had failed to protect my daughter.

5   Q   I'm showing you only what's been -- actually, I think it's

6   already been admitted, Your Honor -- Government Exhibit 21.

7              THE COURT:  No.

8              MS. LYONS:  No?  It has not been admitted?

9              THE COURT:  I don't have it.

10             THE CLERK:  I have it.

11             MS. LYONS:  I think it did.

12             THE COURT:  Oh, I didn't write it down.

13             MS. LYONS:  Thank you.

14             Government's Exhibit 21.  Amanda, what is this?

15             THE WITNESS:  That is my plea agreement.

16  Q   And what did you -- Amanda, what did you plead guilty to?

17  A   Conspiracy for sex trafficking.

18  Q   And who did you conspire with to sex traffic your daughter?

19  A   Michael.

20  Q   What have you promised to do as part of this plea

21  agreement?

22  A   Be truthful.

23  Q   And if you're truthful has the government made you any

24  guarantees?

25  A   No, ma'am.

(Amanda G. Gunn-Direct by Ms. Lyons)          322

1    Q    What are you hopeful might happen?

2    A    That I could have a reduced sentence.

3    Q    Who decides if you get a reduction in your sentence?

4    A    The judge.

5    Q    And if you're not truthful, what happens?

6    A    I get in more trouble.

7    Q    We could nullify your plea agreement; is that correct?

8    A    Yes, ma'am.

9    Q    Could you be charged with perjury?

10   A    Yes, ma'am.

11         MS. LYONS:  Thank you, Ms. Long.

12         Now when the FBI came to your house on February 7th

13   of 2020 they had a search warrant, didn't they?

14         THE WITNESS:  Yes.

15   Q    And did they seize some computers?

16   A    Yes, ma'am.

17   Q    Did you have computers on the first floor of your house?

18   A    Yes, ma'am.

19   Q    And did you have laptops?

20   A    Yes, ma'am.

21   Q    And then were there computers on the second floor of the

22   house?

23   A    Yes, ma'am, I believe so.

24   Q    Ma'am?

25   A    I believe so, yes.

1  Q    Okay.  Who was responsible for maintaining and using the

2  computers in your house?

3  A    Michael.

4  Q    There were hard drives.  Were those your hard drives?

5  A    No, ma'am.

6  Q    There were thumb drives.  Were those your thumb drives?

7  A    One thumb drive was mine for school.

8  Q    Okay.  Hard drives, thumb drives, SD cards.  Did you have

9  any SD cards?

10 A    No, ma'am.

11 Q    Let's talk a little bit about email addresses.  What email

12 addresses did you use?

13 A    Agunn421@gmail.com and then also one was amandaggunn@gmail

14 and also amandaggunn@outlook.com, I believe.

15 Q    And what about the defendant?

16 A    He had gunnpeyton@gmail.com and also at Outlook and then I

17 believe he had more, but I don't remember the names.  I think

18 he had a few.

19 Q    Did the defendant have access to your email accounts?

20 A    Yes, ma'am.

21 Q    Did he have your passwords?

22 A    Yes, ma'am.

23 Q    Did you know your daughter to have any email accounts?

24 A    She had a ggirl something at gmail.com.

25 Q    Did the defendant -- if you know, did the defendant have

1    the passwords to your daughter's accounts?

2    A    Yes, he did.

3    Q    What about your son?  Did he have any email accounts?

4    A    I believe he did.

5    Q    Do you recall any?

6    A    No.  He had a nickname "Das Extreme"; so that was probably

7    it.

8    Q    I'd like to show you Government's Exhibit -- I'd like to

9    show you Government's Exhibit 17-031.  Do you recognize the

10   handwriting on that document?

11   A    Yes.

12   Q    Whose is it?

13   A    Michael's.

14   Q    Amanda, did the master bedroom have a master bathroom?

15   A    Yes, ma'am.

16   Q    And did you keep any personal items in that bathroom?

17   A    Yes.

18   Q    And did the defendant keep any personal items in that

19   bathroom?

20   A    Yes.

21   Q    Did you ever own a white vibrator?

22   A    Yes, ma'am.

23   Q    And where was that kept?

24   A    Usually, it was kept in the storage closet that was

25   upstairs.

1    Q    Do you recall seeing a photo where it had been found in the

2    master bathroom --

3    A    Yes, ma'am.

4    Q    -- underneath the sink?

5    A    Uh-huh.

6    Q    Did you put that vibrator there?

7    A    Yes, ma'am.  When we moved into the 209 house he told me to

8    put it under there for some reason instead of keeping it in the

9    closet.

10   Q    Okay.  So you moved into 209 in October or November of

11   2019?

12   A    Correct.

13   Q    Do you recall it being there in 2020?

14   A    Yes.

15   Q    Okay.  And so it was under that sink?

16   A    Uh-huh.

17            MS. LYONS:  I beg the Court's indulgence.

18            Your Honor, just for the record I want to make sure

19   I've admitted Exhibit 25.  I have not.  The government would

20   seek to admit Government Exhibit 25.

21            THE COURT:  Right.  You identified it, but you did not

22   seek admission.

23            MR. MERZLAK:  No objection.

24            THE COURT:  Admitted.

25            MS. LYONS:  Thank you.

(Amanda G. Gunn-Cross by Mr. Merzlak)                    326

1        (Government's Exhibit No. 25 is entered into evidence.)

2             MS. LYONS:  Your Honor, I would pass the witness and,

3    Amanda, I would ask you to answer any questions of Mr. Merzlak.

4                         **CROSS EXAMINATION**

5    BY MR. MERZLAK:

6    Q    Good afternoon.  I am going to try and call you Amanda.

7    A    Okay.

8    Q    You'd probably prefer that.  I will probably refer to you

9    as Ms. Gunn.

10   A    Okay.

11   Q    But I don't mean to not call you by Amanda like you

12   requested.  Okay?

13   A    Okay.

14   Q    Ms. Gunn, we've never met before, have we?

15   A    No, sir.

16   Q    Okay.  But we've talked on the phone once or twice --

17   A    Yes, sir.

18   Q    -- a long time ago?

19   A    Yes, sir.

20   Q    That was a pretty involved traumatic story that you just

21   described for the jury.

22   A    Yes, sir.

23   Q    It had a lot of twists and turns in it.

24   A    Uh-huh.

25   Q    I want to start, really, towards the end.  When you

(Amanda G. Gunn-Cross by Mr. Merzlak)                    327

1   received a call from the Federal Bureau of Investigation you

2   said it was a voice mail?

3   A    Uh-huh.

4   Q    Okay.  You didn't call them back?

5   A    No, sir.

6   Q    You instead called Michael -- and I apologize.  Sometimes I

7   am going to call him Peyton because I know him as Peyton.  You

8   called Michael and had him call them --

9   A    Correct.

10  Q    -- on your behalf even though they had contacted you?

11  A    Correct.

12  Q    And when you were interviewed by these FBI agents at your

13  home you didn't reveal anything about this to him?

14  A    I'm sorry?

15  Q    You didn't reveal anything about this Order and the MS-13

16  gang and all these horrible things you testified to?

17  A    Not at first, no, sir.

18  Q    And Ms. Lyons indicated with you that you were interviewed

19  multiple times in this case?

20  A    Yes, sir.

21  Q    And that was by law enforcement?

22  A    Yes, sir.

23  Q    The FBI agents?

24  A    Yes, sir.

25  Q    Special Agent Godbee?

1   A    Uh-huh.

2   Q    Probably other law enforcement agents as well?

3   A    Yes, sir.

4   Q    And you didn't explain any of that in those first

5   initial ---

6   A    We did discuss the Order, I believe, in the second, maybe

7   third interview.

8   Q    Do you remember when Mr. Gunn was arrested initially?

9   A    Yes, sir.

10  Q    Okay.  And at that point do you recall making several

11  telephone calls or receiving several telephone calls from him

12  from where he was being housed in jail?

13  A    He had called, yes.

14  Q    And at that point when he was initially arrested the

15  government was actually seeking an order to prevent him from

16  having contact with you; isn't that correct?

17  A    I'm not sure.

18  Q    Do you recall me contacting you and asking you if you

19  desired that type of order to be done and you say, "No, I

20  didn't want that order"?

21  A    Correct.

22  Q    Okay.  So that's what I was referring to.

23  A    Okay.

24  Q    The government prosecutors were seeking an order to have

25  Mr. Gunn not contact you.

1   A    Okay.

2   Q    But at that point when he was arrested and accused of these

3   things you didn't -- you wanted to have contact with him?

4   A    Yes, sir.

5   Q    Okay.  And you received these telephone calls from him

6   while he was in jail?

7   A    Yes, sir.

8   Q    And on those telephones calls it tells you this is a

9   phonecall from a jail and it is recorded; isn't that correct?

10  A    Correct.

11  Q    And do you recall the substance of those telephone calls?

12  A    We talked a lot about my son during those calls.

13  Q    Okay.  And during those telephone calls at no time were you

14  upset with Peyton or expressed anything about being upset?

15  A    I may not have expressed it, no.

16  Q    Okay.  You didn't express any thoughts of anger towards

17  Peyton?

18  A    I don't remember.

19  Q    You don't remember or you didn't?

20  A    I don't remember.

21  Q    Okay.  When did those phonecalls stop occurring?

22  A    I believe the next week.

23  Q    Okay.  Why did they stop occurring?

24  A    I had agreed with the FBI not to contact with him because

25  they gave me more details about what actually was going on.

(Amanda G. Gunn-Cross by Mr. Merzlak)    330

1  Q   Okay.  But details that you claim you already knew were all

2  going on?

3  A   No, sir.

4  Q   Y'all have lived in a lot of different places?

5  A   Yes, sir.

6  Q   House to house, house to house.  To your knowledge you

7  indicated that at times Peyton was paying the bills?

8  A   Yes, sir, I believe so.

9  Q   You just didn't have access to his finances?

10 A   Right.  Correct.

11 Q   So there was many months that you yourself weren't the one

12 making the mortgage payment?

13 A   I didn't have access to make those payments.

14 Q   So you never made -- excuse me.  I won't say mortgage --

15 rental payments.  You never made a rental payment?

16 A   I did at times, yes, sir.

17 Q   Okay.  At times.  But most of the time it was Peyton?

18 A   Yes, sir.

19 Q   And most of the time he was the one paying utility bills,

20 cable bills, and things like that?

21 A   Yes, sir.

22 Q   Okay.  And most of the time he was the one, you know,

23 purchasing household supplies, groceries, things like that?

24 A   No, sir.  Most of the time it was either myself or my

25 parents helped with groceries on several occasions and I

(Amanda G. Gunn-Cross by Mr. Merzlak)                    331

1  believe his parents did as well.

2  Q   Okay.  And but -- and they helped you because they were

3  trying to help family members; correct?

4  A   Right.

5  Q   Now you indicated in your testimony that Michael taught you

6  about the Order?

7  A   Yes, sir.

8  Q   I couldn't quite get or could you explain to me what the

9  difference in the Order and MS-13 are?  I didn't -- I thought

10 that those things kind of sounded the same when you were

11 explaining it.

12 A   The MS-13 to my understanding was like a gang where the

13 Order was more of an organized religion, I guess.

14 Q   Okay.  And it's your understanding that somehow y'all were

15 involved in both of these groups?

16 A   Yes.

17 Q   And the government showed you a photograph where you looked

18 pretty happy sitting there with a sign that said "Amanda Lexi

19 Haze."

20 A   Yes, sir.

21 Q   And at that point you're telling the jury that you were

22 absolutely being forced by someone to take that picture?

23 A   Yes, sir.  We took several shots of that particular pose

24 for hours.

25 Q   Isn't it true that those nude photographs as well as the

1  pornographic videos that were put on the internet were done on

2  your own free will and that Peyton didn't have anything to do

3  with it?

4  A   That's not correct.

5  Q   Isn't it true that people in the community, friends were

6  the ones that contacted y'all about these videos saying, "Oh my

7  God.  Amanda is on the internet"?

8  A   No, sir.

9  Q   And that's when this story of the Order you relayed to

10 Peyton saying that you were forced to do this?

11 A   No.

12 Q   And then you made a comment in response to a question by

13 counsel that you had more than one interview with the FBI.

14 Correct?

15 A   Yes.

16 Q   You have to say yes.  I'm sorry.  She's taking it down.

17 You can't just nod.  You had more than two interviews?

18 A   Yes, sir.

19 Q   You had more than three interviews?

20 A   Yes, sir.

21 Q   More than four, more than five, probably upwards on six and

22 past?

23 A   Yes, sir.

24 Q   All with the FBI?

25 A   Yes, sir.

1   Q    And she asked you when did you decide to start telling the

2   truth; isn't that correct?

3   A    I believe so.

4   Q    And you answered, "When I got arrested."

5   A    Yes, that's what I said.

6   Q    So the entire time that you knew all of this information

7   about the Order and MS-13 that you claimed to be involved in

8   and that you were being sex trafficked and forced to have

9   videos online, you finally thought it was pertinent to the

10  investigation to be honest once you were arrested?

11  A    That's when a lot of my memories of details of what

12  happened to me started coming back.  Yes, sir.

13  Q    And at that point had you had an attorney to represent you?

14  A    Yes, sir.

15  Q    And who provided that attorney to you?

16  A    The government.

17  Q    Okay.  And at that point had you met with the attorney and

18  talked about your case?

19  A    Yes, sir.

20  Q    And you had talked about the evidence and what was expected

21  to be in evidence of the case?

22  A    No, sir.  I had an attorney several months before I was

23  arrested.

24  Q    No, I know, but you talked about the evidence and the

25  statements and things that you would expect in this case?

(Amanda G. Gunn-Cross by Mr. Merzlak)                    334

1    A    I don't remember.

2    Q    Okay.  And since you were charged and plead guilty to this

3    federal sexual felony you've met with the government several

4    times, haven't you?

5    A    On, I believe, two occasions.

6    Q    On two different occasions?  How long did you meet with the

7    government on two occasions after you plead guilty to this

8    federal felony?

9    A    Couple of hours.

10   Q    Couple of hours each time?

11   A    Yes, sir.

12   Q    And who were you meeting with?

13   A    I was meeting with my attorney, the DA, and an

14   investigator.

15   Q    And when you refer to the DA, are you referring to the

16   Assistant United States District Attorney -- or Attorney who is

17   prosecuting this case, Ms. Lyons?

18   A    Yes, sir.

19   Q    Okay.  And that was at the Jefferson County Jail?

20   A    Yes, sir.

21   Q    And that's where you're currently living?

22   A    Yes.

23   Q    What did y'all need to discuss about this particular case?

24   A    Just detail of what the exhibits were and stuff like that.

25   Q    And what your responses were supposed to be to those

1  exhibits; isn't that correct?

2  A   No, sir.

3          MR. MERZLAK:  Ms. Long, can you pull up Government's

4  21?  I'd like to -- the witness to review page 4 of that

5  document.

6          Can you see that, Ms. Gunn?

7  A   Yes, sir.

8  Q   Okay.  You entered a guilty plea under this plea agreement.

9  Did you not?

10  A   Yes, sir.

11  Q   You signed it.  You came into court.  You told the judge

12  that you were guilty.

13  A   Yes, sir.

14  Q   And this is the contract with you and the government?

15  A   Yes, sir.

16  Q   Could you read 6B -- the paragraph under 6B?

17  A   "Acceptance of Responsibility.  If the Court determines

18  that defendant qualifies for an adjustment under

19  U.S.S.G. § 3E1.1(a) and the offense level prior to operation is

20  16 or greater, the government will move for an additional

21  one-level reduction in offense level pursuant of Section 3E

22  based on defendant's timely notification of his intention to

23  enter a guilty plea."

24  Q   So based on the contract that you have with the United

25  States government you entered a timely plea and they're going

(Amanda G. Gunn-Cross by Mr. Merzlak)                336

1  to ask the Court for a reduction in your sentence?

2  A    Yes, sir.

3  Q    And if you would continue into "C".

4  A    "The government will recommend the defendant be sentenced

5  to the mandatory minimum of 15 years of imprisonment at

6  sentencing."

7  Q    So the government, in exchange for your plea agreement and

8  testifying in this case, is going to recommend the mandatory

9  minimum sentence of 15 years; is that correct?

10 A    I believe so.

11 Q    And this is an offense that you can receive life in prison

12 for?

13 A    Yes, sir.

14 Q    And if you'll continue to number 7 and read that?

15 A    "At sentencing the government will move to dismiss any

16 other courts [sic] of the superceding indictment that remain

17 pending against defendant."

18 Q    In this particular case you were charged with more than one

19 count, were you not?

20 A    Yes, sir.

21 Q    And in exchange for you coming in here and testifying --

22 A    Yes, sir.

23 Q    -- the government is agreeing to dismiss these counts?

24 A    Yes.  It was one count.

25 Q    And based on you pleading guilty?

1    A    Yes, sir.

2    Q    If we could move on to page 5 as well.  If you would, read

3    section "B" for us.

4    A    "The government, in its sole discretion, will decide

5    whether defendant's cooperation qualifies as substantial

6    assistance pursuant to U.S.S.G. § 5K1 or Fed. R. Crim. P. 35

7    and thereby warrants the filing of a motion for downward

8    departure or reduction of defendant's sentence."

9    Q    That's good enough right there.  And so it's your

10   understanding that the government in its sole discretion may

11   ask the judge for an even more lenient sentencing based on how

12   they feel that you testified in this case?

13   A    They may.  Yes.

14   Q    Okay.  And substantial assistance would be substantial

15   assistance in convicting Mr. Gunn?

16   A    Yes, sir.

17        MR. MERZLAK:  That's all I need from that, Ms. Long.

18   Thank you.

19        Now we saw some images of tattoos that you had -- some

20   that had been covered up, some that we couldn't quite see any

21   longer.  Isn't it true that when you received these tattoos

22   initially you told Peyton that these were some other things

23   that people had forced you to do?

24   A    No, sir.

25   Q    And if it's your testimony that Peyton forced you to get

(Amanda G. Gunn-Cross by Mr. Merzlak)

1   these tattoos your testimony was also that while y'all were

2   still together he just allowed you to cover them up?

3   A   Yes, sir.  He allowed me to cover one up while we were

4   together.

5   Q   I couldn't hear you.

6   A   He allowed me to cover one up while we were together.

7          MR. MERZLAK:  Would you pull up No. 25?

8          Amanda, I'm showing you what they already briefly

9   shown you as Government's Exhibit No. 25.

10          Could you -- to the next page.  Excuse me.  No.  Down

11  -- could you highlight the left-hand side of the page?  That's

12  fine.

13          Now you have a story board on this thing of bondage

14  devices and equipment; isn't that right?

15          THE WITNESS:  Yes, sir.

16  Q   And it's your testimony to this jury today that this

17  Pinterest account was started by Peyton?

18  A   Yes, sir.

19  Q   And that you put these bondage photographs on here at his

20  direction?

21  A   He put some and then I put some as well.

22  Q   Okay.  And it's your understanding that the photographs of

23  the minor in this case involved bondage similar to the pictures

24  that are on your story board?

25  A   I am not sure.  I haven't seen them.

(Amanda G. Gunn-Cross by Mr. Merzlak)                    339

1          MR. MERZLAK:  One moment, please, Judge.

2          THE COURT:  Sure.

3   Q   Ms. Lyons addressed to you this vibrator that was found

4   underneath the sink in your master bedroom -- excuse me, master

5   bathroom?

6   A   Yes, sir.

7   Q   And that was under your portion of the master bathroom?

8   A   Yes, sir.

9   Q   And that was your vibrator?

10  A   Yes, sir.

11  Q   Just going back to this.  I just can't get past this

12  statement that you agreed to tell the truth once you were

13  arrested.  Isn't it true that the only reason you are telling

14  this story today is to get yourself out of trouble?

15  A   No, sir.

16  Q   And that Peyton didn't have any knowledge that this was

17  going on in your house?

18  A   No.  He did.

19  Q   Other than the things that were happening to you that you

20  were claiming was some foreign Order or body or MS-13 forcing

21  you to have sex with these people and post pornography videos?

22          MS. LYONS:  Your Honor, is this a question or a

23  statement?

24          MR. MERZLAK:  That was my question.

25          THE COURT:  It was a question.

(Amanda G. Gunn-Redirect by Ms. Lyons)                340

1          THE WITNESS:  Can you repeat the question?  I don't

2   understand that.

3   Q   Isn't it true that the only reason you are claiming that

4   these pornography videos were forced on you by Peyton and that

5   these naked videos -- excuse me, naked pictures on the internet

6   were forced upon you by Peyton and that these pictures that

7   show a deviant sexual lifestyle involving bondage were forced

8   by Peyton simply to avoid responsibility for what you did and

9   not anything that Peyton did?

10  A   No, sir.

11         MR. MERZLAK:  One moment, please, Judge.

12         THE COURT:  Sure.

13         MR. MERZLAK:  Nothing further at this time, Judge.

14         THE COURT:  Okay.  Redirect?

15         MS. LYONS:  Thank you, Your Honor.  Very briefly.

16                    **REDIRECT EXAMINATION**

17  BY MS. LYONS:

18  Q   Amanda, if I can just follow up on a couple of questions by

19  Mr. Merzlak.  I want to clarify the difference between the

20  government or the United States and the court.

21  A   Okay.

22  Q   Okay.  The government or the United States -- is that the

23  same thing as the judge?

24  A   No.  Those are separate.

25  Q   Okay.  So who appointed you a lawyer in this case?

(Amanda G. Gunn-Redirect by Ms. Lyons)                341

1   A   The government.

2   Q   Okay.  Was it a judge you went before or did I give you a

3   lawyer?

4   A   It was -- I don't remember.  All I know is I got a paper

5   saying that I was getting an attorney.  So I don't remember.

6   Q   So you filled out some papers for the court and the court

7   gave you a lawyer?

8   A   Yes.

9   Q   It wasn't me?

10  A   Correct.

11  Q   Okay.  I can't afford a lawyer.  What did the Judge tell

12  you about the recommendation by the government for the

13  mandatory minimum?  Did the Judge tell you that you were going

14  to get the mandatory minimum of 15 years?

15  A   Yes.

16  Q   The Judge told you you were going to get the mandatory

17  minimum of 15 years when you plead guilty?

18  A   I don't remember.  He said something about -- he did state

19  the mandatory minimum was 15 years.

20  Q   Okay.  And did he also told you that nobody had promised

21  you your sentence?

22  A   Correct.  Correct.

23  Q   And he said that more than once?

24  A   Yes.

25  Q   And, in fact, he said he could give you more than the

(Amanda G. Gunn-Redirect by Ms. Lyons)                342

1   mandatory minimum?

2   A   Correct, yes.

3   Q   And he said that more than once?

4   A   Yes.

5   Q   And who is the person who ultimately decides your sentence?

6   A   The Judge.

7   Q   Mr. Merzlak asked you a little bit about bondage --

8   A   Yes, ma'am.

9   Q   -- and some of those items on the Pinterest website.  Did

10  the defendant engage in any bondage with you?

11  A   Yes, ma'am.

12  Q   What did that look like?

13  A   For several years he did like bondage torture on me.

14  Q   Can you tell us about that?

15  A   He would tie me up in uncomfortable positions.  He had

16  hooks hooked into our master bedroom closet and would suspend

17  my arms stretched out and I would be on my knees and he would

18  leave me there for hours, sometimes the weekend, and he would

19  bring me a peanut butter and jelly sandwich to eat.  Other

20  times he would put -- blindfold me and put duct tape around my

21  head so that it wouldn't come off and one time he suspended me

22  from the ceiling fan so that my neck was turned at an awkward

23  angle.  He would put clothes pins on me.  He would hit me with

24  a bamboo stick, attach electrical devices to me like a TENS

25  Unit and shock me and he would do this while using the vibrator

(Amanda G. Gunn-Redirect by Ms. Lyons)                   343

1   at the same time.

2       I would be forced to do oral sex on him and it was very

3   rough.  He would have me tied to the bed for long periods of

4   time.  He would blindfold me.  Majority of the time I was

5   blindfolded.  I would wake up.  I would go to sleep with

6   pajamas on and I would wake up with bruises.  I would wake up

7   naked and with bruises between my legs and be really sore the

8   next day.

9   Q    Now Mr. Merzlak asked you whether or not you were aware of

10  any images of bondage --

11  A    Uh-huh.

12  Q    -- in this case and you said no because you hadn't seen

13  any.  You were aware of images of torture in this case?

14  A    Yes, ma'am.

15  Q    And did you engage in torturing your daughter and taking

16  images?

17  A    No.

18  Q    Did you put clamps on your daughter's breasts and vagina?

19  A    No.

20  Q    Did you stick needles in your daughters breasts and vagina

21  and make her bleed?

22  A    No.

23           MS. LYONS:  No further questions, Your Honor.

24           MR. MERZLAK:  Nothing additional, Judge.

25           THE COURT:  None?  All right.  Can Ms. Gunn be

344

1   excused?

2          MS. LYONS:  Yes, Your Honor.  Thank you.

3          THE COURT:  Ms. Gunn, you are released and excused.

4          I know you were planning for one more witness today.

5   Is that a lengthy witness?

6          MS. LYONS:  He could be an hour and a half, so.

7          THE COURT:  We'll break.

8          MS. LYONS:  Thank you.

9          THE COURT:  We'll break.

10         Ladies and gentlemen, you've now heard all the

11  evidence you're going to hear today.  Obviously, the trial will

12  continue, but that is going to bring an end to today's session.

13  So we'll break until 9 a.m. tomorrow morning.  I wish all of

14  you a very pleasant evening and safe drive home.  Please

15  remember my instructions on not talking to anyone or performing

16  any research or listening to any accounts.  Just go home and

17  enjoy your evening and we'll see you back here at 9 o'clock

18  tomorrow morning.  Thank you.

19      (The jury exits the courtroom at 5:44 p.m.)

20         THE COURT:  Have a seat until they clear.

21         COURT SECURITY OFFICER:  They are clear, Your Honor.

22         THE COURT:  All right.  Anything to discuss?

23         MS. LYONS:  Your Honor, our plan tomorrow would be to

24  put Mr. Grantham up, perhaps a very short medical witness --

25  very short -- the minor victim.  So perhaps mid-morning put the

1  minor victim up and then Special Agent Godbee to end the day.

2  I am not sure about any defense witnesses.  I would expect

3  Special Agent Godbee to be up a while.  I would ask the Court

4  to consider, depending on the time that Special Agent Godbee

5  were to finish, whether or not we would be doing closing and

6  charging tomorrow night.

7           THE COURT:  No.

8           MS. LYONS:  Thank you.

9           THE COURT:  We'll do that on Thursday.

10          MS. LYONS:  Thank you, Your Honor.

11          THE COURT:  All right.  Is that all?

12          MR. MERZLAK:  Yes, sir.  No, I am good.

13          THE COURT:  You're good?  I understand.

14          MR. MERZLAK:  I have been sitting for a while.

15          THE COURT:  We all have.  Let's go home.

16      (The hearing is adjourned and resumes on Wednesday,

17  November 17, 2022 at 9:06 a.m. as follows.)

18          THE COURT:  Anything that we need to talk about before

19  we bring in the next witness?

20          MS. LYONS:  Nothing from the government, Your Honor.

21          MR. MERZLAK:  No, Your Honor.

22          THE COURT:  Very well.  Let's recall the jury.

23      (The jury enters the courtroom at 9:06 a.m.)

24          THE COURT:  The record will reflect that all of our

25  jurors have returned from the overnight break; so we're ready

1    to proceed.

2              Good morning, ladies and gentlemen.  Welcome back.

3    We're ready to go.  Call your next witness.

4              MS. LYONS:  Thank you, Your Honor.  The government

5    calls Jonathan Grantham.

6         (Jonathan E. Grantham is duly sworn.)

7              THE CLERK:  Please state your name for the record.

8              THE WITNESS:  My name is Jonathan Eugene Grantham.

9              THE CLERK:  Thank you.

10                        **DIRECT EXAMINATION**

11   BY MS. LYONS:

12   Q    Can you lean forward a little bit into that microphone so

13   we can hear you?

14   A    Yes, ma'am.

15   Q    Thank you.  Good morning, Mr. Grantham.

16   A    Good morning.

17   Q    In August of 2021 did you plead guilty to coercion and

18   enticement related to sexual contact with a minor?

19   A    I did.  Yes, ma'am.

20   Q    And was the victim in your case known to you as Riley?

21   A    Yes, ma'am, she was.

22   Q    And did you pay Riley to have sexual contact with you after

23   communicating over Craigslist?

24   A    I did.  Yes, ma'am.

25   Q    Mr. Grantham, how old are you?

1    A    I am 46.

2    Q    And where are you originally from?

3    A    Originally, from Augusta, Georgia, but I moved to

4    Graniteville, South Carolina.

5    Q    And are you married?

6    A    I am, yes, ma'am.

7    Q    Do you have children?

8    A    I have three.

9    Q    Where are you living now?  Where are you ---

10   A    Jefferson County.

11   Q    Is that a facility -- a jail facility?

12   A    That's a facility in Jefferson County, yes, ma'am.

13   Q    Why are you in Jefferson County now?

14   A    Because I was arrested for the charges stated.

15   Q    Were you arrested by the FBI?

16   A    I was, yes, ma'am.

17   Q    And have you been there since approximately July of 2021?

18   A    February 5, 2021.

19   Q    February 5**th**.  I apologize.  Thank you.

20   A    Yes, ma'am.

21   Q    In 2019 what state were you living in?

22   A    I was in Graniteville, South Carolina.

23   Q    Okay.  And were you employed?

24   A    I was.  Yes, ma'am.

25   Q    As what?

1   A   As a teacher.

2   Q   And what grade and subject did you teach?

3   A   I taught multiple sciences ranging from chemistry to

4   environmental science and it ranged from grades 9 through 12.

5   Q   Did you have any other employment?

6   A   I did.  Yes, ma'am.  I taught at a local college where I

7   taught anatomy, physiology, and microbiology.

8   Q   Now in the summer of 2019 did you begin looking at maybe

9   someone would call it personal ads on Craigslist?

10  A   Yes, ma'am.  I did.

11  Q   Why did you start looking at those ads?

12  A   My wife and I were having problems.  I had gone to the

13  hospital, was hospitalized for almost the entire month of

14  December in 2018.  Then I couldn't work until April.  That

15  compounded with the issues I was having with my wife, I guess I

16  was going through a midlife crisis.

17  Q   What were you looking for on Craigslist?

18  A   I was looking for someone to have sexual intercourse with.

19  Q   Is it fair to say you were willing to pay for that?

20  A   Yes, ma'am.

21  Q   And so you were looking for a prostitute?

22  A   Yes, ma'am.  I was looking for a prostitute.

23  Q   Had you ever used Craigslist before to find a prostitute?

24  A   No, ma'am.

25  Q   Had you ever used any other online service or paper to find

1    a prostitute?

2    A    I had used a website called "Skip the Games."

3    Q    Had you actually gone through with it and hired a

4    prostitute?

5    A    Yes, ma'am.  From Skip the Games, yes, ma'am.

6    Q    Was that prostitute an adult?

7    A    Yes, ma'am.  She was.

8    Q    So in the summer of 2019 you're looking through Craigslist.

9    Do you eventually see an ad that catches your attention?

10   A    Yes, ma'am, I did.

11   Q    Did you respond to that ad?

12   A    I did respond to that ad.

13   Q    How do you respond to an ad on Craigslist if you see

14   something you're interested in?

15   A    What you do is there is a little button that you would hit

16   reply to and when you reply to it it requests that you put in

17   an email and then what you'd like to say and then once you've

18   done that you hit submit.

19   Q    Now I am going to show you on your screen only,

20   Mr. Grantham --

21   A    Okay.

22   Q    -- what's previously been marked as 20 -- Government's

23   Exhibit 20.  Is it on your screen, Mr. Grantham?

24   A    Yes, ma'am, it is.

25   Q    Does that exhibit look familiar?

1    A    Yes, ma'am, it does.

2    Q    Is that a copy of the email string with your communications

3    related to this case via Craigslist?

4    A    Yes, ma'am, it is.

5    Q    And does it in any way look as if it's been altered?

6    A    No, ma'am, it does not.

7    Q    And do you see your name in that communication?

8    A    Yes, ma'am, I do.

9              MS. LYONS:  Your Honor the government would move to

10   admit and publish Government Exhibit No. 20 at this time.

11             MR. MERZLAK:  No objection.

12             THE COURT:  Admitted and you may publish.

13   (Government's Exhibit No. 20 is entered into evidence.)

14   Q    Now, Mr. Grantham, this exhibit is around 10 or 11 pages.

15   Can you tell us if we are looking at the end of your

16   conversation or the beginning of your conversation?

17   A    It appears to be the end of the conversation.

18             MS. LYONS:  Okay.  So, Ms. Long, if we can go to the

19   beginning of the conversation, I think it starts around 20.008.

20   Let's try going upwards.  The other direction.  Thank you.

21             Now, Mr. Grantham, at the top of this page do you see

22   the beginning of your conversation?

23             THE WITNESS:  Yes, ma'am, I do.

24   Q    Is this your first reply to the Craigslist ad?

25   A    Yes, ma'am, I believe so.

1        MS. LYONS:  And, Ms. Long, if we can make it a little

2   bit bigger.  Thank you.  That's better.

3        Mr. Grantham, do you see your name underneath the

4   "from" line?

5   A   Yes, ma'am.

6   Q   And can you tell us the date that your message was sent

7   near the bottom of the screen?

8   A   June 9, 2019.

9   Q   And what did you say in your first message?

10  A   "I saw your ad.  I was wondering if you're 18 and older and

11  female."

12  Q   And what was the reply that you received?

13  A   The reply was "I'm 15 and female."

14  Q   And what date did that come back to you?

15  A   June 23, 2019.

16       MS. LYONS:  If we can scroll up a little bit,

17  Ms. Long.

18       And what was the next message?

19       THE WITNESS:  "It's okay.  Too young for me."

20  Q   And who says that?

21  A   That would be me.

22  Q   And you replied on the same date?

23  A   Yes, ma'am.

24       MS. LYONS:  Okay.  Ms. Long, can we keep scrolling up?

25  Thank you.

(Jonathan E. Grantham-Direct by Ms. Lyons)    352

1          And do you reply on Sunday, June 23**rd** at 3:02 or is

2   that the receiver?

3          THE WITNESS:   That would be the recipient.   The

4   recipient -- the one that I sent the email to.

5   Q    And, Mr. Grantham, I know it's probably hard to be here and

6   I know you're a little nervous, but if you'll let me finish any

7   question only because the court reporter is taking everything

8   down.   So it's hard when we talk over each other.

9   A    I apologize.

10  Q    Thank you.   So you said the 3:02 response is from the

11  receiver?

12  A    Yes, ma'am.   That was from the receiver.

13  Q    And how did you respond when the receiver said, "Okay.

14  Well, if you think of anything let me know"?

15  A    I responded with a message saying, "I will."

16  Q    Okay.   And did you respond to that receiver or that person

17  on Craigslist again at some point?

18  A    Yes, ma'am.

19  Q    When?

20  A    On July 1, 2019.

21  Q    And what did you say?

22  A    "Hey.   Didn't know if you knew of anyone that was

23  interested in meeting me.   If we did and we met, I'd give you a

24  finder's fee."

25  Q    Okay.   At this point we're at Monday, July 1, 2019.   Is

1  that correct, Mr. Grantham?

2  A   Yes.

3  Q   And you've had three or four communications over about a

4  week or so.  Do you know if you're speaking to a male or a

5  female via Craigslist?

6  A   At this point I did not know.

7  Q   Do you know if you're speaking to an adult or minor?

8  A   I did not know.

9  Q   Okay.  Let's continue going on up.  And does that person

10 eventually respond to you?

11 A   Yes, ma'am.

12 Q   And what do they say?

13 A   "Well, I can meet with you if you want.  What would we be

14 doing?"

15 Q   And what date is that?

16 A   That was July 20, 2019.

17 Q   Now at this point they've already told you that they're 15

18 years old.  That didn't worry you, Mr. Grantham?

19 A   It did worry me, yes, ma'am.

20 Q   So why did you keep replying?

21 A   Because I had sent a second email from a different account

22 and when I was responded from that email the response was "I'm

23 18."

24 Q   So you believed them when they said "I'm 18"?

25 A   Yes, ma'am.

1  Q    Okay.  Let's go on up.  And what was your next message,

2  Mr. Grantham, on July 20, 2019?

3  A    "When I answered your ad I was looking for a female that I

4  could have adult fun with.  If you're 18 or over we could meet

5  to have adult fun.  I was just looking for someone that might

6  be interested in meeting to enjoy time with.  If you meet those

7  requirements, please feel free to shoot a pic and maybe we can

8  work something out."

9  Q    Now did that person respond with a picture?

10  A    Yes, ma'am, she did.

11  Q    Okay.  Let's scroll on up.  And the person replies on

12  Saturday, July 20, the same day.  What do they say?

13  A    "I can do that.  Okay.  When do you want to meet, day,

14  time, and for how long?"

15  Q    And I see within three minutes you ask again for the

16  picture?

17  A    Yes, ma'am.

18         MS. LYONS:  Okay.  Let's scroll on up.  You can go

19  back out if you need to, Ms. Long.  Thank you.

20         You asked "Did you have a pic?" and what was -- again,

21  I think on July 20**th** at 8 o'clock you say, "When you send me

22  your pic could you also let me know if you can meet on Monday

23  and what you were wanting when we meet."  And what did you mean

24  by "what you were wanting when we meet"?

25  A    How much money.

1   Q    Okay.  We can scroll on up.  So you still haven't received

2   the picture at this time, though?

3   A    I don't recall getting the picture.  Oh, no, ma'am, because

4   it looks as though I asked again.

5   Q    And we would have seen an image or at least a line

6   indicating an image had been sent?

7   A    Yeah.  On this it would show image.

8   Q    Okay.  Does the person respond after you ask them whether

9   or not they're available on Monday?

10  A    Yes, ma'am.

11  Q    What was the response?

12  A    "I can on" -- it says "money" but the response is "I can on

13  money afternoon like two for 30 minutes car sex.  145."

14  Q    How did you interpret that?

15  A    The individual would be willing to meet me for sexual

16  activity for $145.

17  Q    What time is that email sent on Saturday night?

18  A    10:24 p.m.

19  Q    Okay.  And you respond just after 11 o'clock?

20  A    Yes, ma'am.

21  Q    And you again ask for a picture?

22  A    Yes, ma'am.

23  Q    Now what do we see at 11:08?

24  A    The 11:08 is the email that contained a picture.

25  Q    Do you remember what that picture looked like?

1    A    Yes, ma'am, I do.

2    Q    Can you describe it?

3    A    It was a female sitting down posing.  I can't remember

4    exactly.  I know it -- she was clothed, but I don't remember

5    exactly what she was wearing.

6    Q    Was she Caucasian?

7    A    She was Caucasian, dirty blonde hair, and it looked as

8    though the picture was taken in like a bedroom.

9    Q    How old did she look?

10   A    To me she looked like she was about 18 or 19 years old.

11   Q    What about her made her look 18 or 19 years old?

12   A    The makeup, the way she was posing.

13   Q    So then Saturday night still in the 11 o'clock hour do you

14   respond?

15   A    Yes, ma'am, I do.

16   Q    And what do you say?

17   A    "I'd like to meet you.  Would you be good with me picking

18   you up and going to a hotel room for an hour.  I'll give you

19   150.  If you'd like we can make it a regular thing once or

20   twice a month, maybe more."

21   Q    Okay.  And so I want to go back a second.  Earlier in the

22   string the person who was communicating with you suggested that

23   you meet in a car?

24   A    Yes, ma'am.

25   Q    But you didn't take them up on that?

1   A   Yes, ma'am.

2   Q   You suggested a hotel?

3   A   Yes, ma'am.

4   Q   And why was that?

5   A   I don't like the idea of having sex in a car.

6   Q   And you wanted to set up a regular thing?

7   A   Yes, ma'am.

8   Q   Okay.  We could keep going up.  And how does that person

9   respond at 11:18?

10   A   "Well, I would prefer not to go to a hotel.  I actually do

11   car sex more and for an hour would be $200."

12   Q   So they've raised their price?

13   A   Yes, ma'am.

14   Q   Okay.  And how do you respond?

15   A   "Okay.  I understand, but I don't do sex in a car.  I like

16   having more fun than just that.  The most I would do is 150,

17   but I would be a regular gig if you wanted something like that.

18   If you decided that you're willing to go to hotel for an hour

19   for 150, let me know.  It is open until I find someone else."

20   Q   So at this point you guys are engaging in negotiation?

21   A   Yes, ma'am.

22   Q   It's like, wow, trying to buy a car, trying to negotiate

23   the sale of property?

24   A   Yes, ma'am.

25   Q   You can scroll up.  And was there a response to your

(Jonathan E. Grantham-Direct by Ms. Lyons)                358

1   counteroffer?

2   A   "I will do 150 for 45 minutes and, yes, I would like this

3   to be a regular thing and what hotel and I have to stay close

4   like in Evans.  You understand, I'm sure."

5   Q   So at this point this person has indicated to you they are

6   likely in Evans?

7   A   Yes.

8   Q   And did you know what Evans was?

9   A   Yes, I did.

10  Q   And you knew the area?

11  A   Yes, ma'am.

12  Q   Okay.  Do you then respond -- again, we're still in the

13  11 o'clock hour; so these messages are just bouncing back and

14  forth pretty quickly?

15  A   Yes, ma'am.

16  Q   Okay.

17  A   You asked me to read, correct?

18  Q   Yes.

19  A   "It would have to be an hour and I was thinking The Ashley.

20  It is a hotel in Clearwater that charges by the hour.  If you

21  need I could come by and pick you up.  If you didn't feel right

22  about it, I would take you back.  I want you to be fine with

23  it.  Let me know."

24  Q   So at this point, Mr. Grantham, you've suggested a very

25  specific location:  The Ashley?

1   A    Yes, ma'am.

2   Q    Can you tell us why or how you know about The Ashley?

3   A    I knew about The Ashley because of a family joke, to be

4   honest.  It was a joke that my oldest nephew was curated there

5   and because of it I knew that they had -- that they went

6   through and sold rooms by the hour or by three-hour sections.

7   Q    Had you taken a prostitute there before?

8   A    I had taken once before.

9   Q    What was their rate if they charge by the hour at that

10  time, if you can recall?

11  A    It was roughly about the same price.  About $120.

12  Q    Did you pay in cash or by credit card?

13  A    By cash.

14  Q    By cash?

15  A    Yes.

16  Q    Okay.  We can keep scrolling up.  Mr. Grantham, what is

17  your response at 1:47 a.m.?

18  A    "Hey, I was thinking about it.  You were willing to work

19  with me some.  If you agree to an hour at the hotel I'll give

20  you 170.  Tell me what you think please.  I figure we would

21  both enjoy the meeting and we would use it to see if we liked

22  it and want to make it a regular thing."

23  Q    And was this person -- as we scroll up, was this person

24  interested at first in going to the hotel?

25  A    No, ma'am.

1   Q   Okay.  And so do you again engage in some negotiation and

2   try and convince them to do that?

3   A   Yes, ma'am.

4   Q   Okay.  What was does your message say at 1:44 on Sunday?

5   A   "I understand.  A car date is too risky for me.  All I was

6   looking for was privacy so we could enjoy some sex.  If you

7   change your mind let me know by tomorrow.  If I haven't found

8   anyone to spend time with, I will with you.  I really was

9   hoping to make you a regular thing, though.  If not, stay

10  safe."

11  Q   And so do they respond to this message?

12  A   Yes, ma'am.

13          MS. LYONS:  I'm sorry.  Ms. Long, can you go down.

14  Perfect.

15          And they respond that, "Okay, yeah, so was I, but I

16  only do car sex"?

17          THE WITNESS:  Yes.

18  Q   Okay.  And you again respond and say "I'm willing to work

19  with you to a degree"?

20  A   Yes, ma'am.

21  Q   By this time we're on Sunday afternoon and does this person

22  once again respond within three minutes of you saying that you

23  are willing to work with them to a degree?

24  A   Yes, ma'am.

25  Q   What did they say?

1   A   "Well, I could give head in the car for 50 dollars but it

2   would have to be quick."

3   Q   How did you respond to that?

4   A   "Tell me what I would need to make you feel comfortable.

5   Honestly, all I want to do is find a regular that I know is

6   dependable."

7   Q   Going on up.

8   A   The individual response was "Nothing.  LOL.  I don't do

9   hotels."

10  Q   Mr. Grantham, did you notice a change in the tone or

11  cadence or sentence structure from the beginning of this email

12  to right now?

13  A   Yes, ma'am.

14  Q   Can you tell me what you noticed?

15  A   It became more of a negotiation.  It felt as though I was

16  negotiating with an adult.

17  Q   On Sunday at 2:16 p.m. do you apologize and tell the person

18  that it wasn't working out?

19  A   Yes, ma'am.

20          MS. LYONS:  Ms. Long, scroll up.

21          Now at the thought of losing that money does the

22  person then ask you where the hotel is that you were thinking

23  about?

24          THE WITNESS:  Yes, ma'am.

25  Q   And what do you then tell them?

1   A   "If you're interested let me know so I can cancel my date I

2   set up."

3   Q   And then do you provide some information about The Ashley?

4   A   Yes, ma'am, I do.

5   Q   And you even add about $5 to your price --

6   A   Yes, ma'am.

7   Q   --  and you say you'd give them 175?

8   A   Yes, ma'am.

9   Q   Scrolling on up.  And the person tells you that they will

10  let you know their answer.  Is that accurate?

11  A   Yes.

12  Q   Do you begin to negotiate about the time?

13  A   Yes.

14  Q   And does that seem like it's going to occur on the

15  following day which is Monday?

16  A   It does, yes.

17  Q   Was there a reason you said "I was hoping for 10 a.m. or so

18  but I can't after 2 p.m."?

19  A   I do things in the morning time, not in the afternoon.

20  Q   Okay.  And scrolling on up.  And at that point it seems

21  like you were talking about the fact that you hadn't heard and

22  perhaps you had other plans.  Could you read the July 22,

23  8:59 a.m. email?

24  A   "Hey.  I don't mean to bug you but I need to know if we are

25  meeting today.  I was leaving around 9:30 to meet the other

1   girl I had set a date with.  I didn't hear anything from you

2   last night.  So I haven't canceled my date yet.  If I don't

3   hear from you by 9:30 we can meet tomorrow.  If you're serious

4   about meeting could I get your number?  That way I could

5   communicate better."

6   Q    And does the Craigslist user finally respond?

7   A    Yes.

8   Q    And what is their response?

9   A    They give me the phone number and then tell me that they're

10  open to doing something either that night or the following day.

11  Q    And but they tell you tonight would work a whole lot

12  better?

13  A    Yes.

14  Q    Okay.  And then how do you respond to that final message?

15  A    I gave them my phone number and ask them to text me when

16  they have the opportunity.

17  Q    Now, Mr. Grantham, was that your real phone number?

18  A    Yes, ma'am.

19  Q    And eventually do you move from -- thank you, Ms. Long.

20  Eventually, do you move from these Craigslist communications to

21  actually texting back and forth with someone?

22  A    Yes, ma'am.

23  Q    At the point that your Craigslist communications cease,

24  it's approximately July 22**nd** or 21**st**; correct?

25  A    Approximately.

1   Q    Okay.  And have you ever verbally spoken to anyone?

2   A    No.

3   Q    Have you, other than the picture, seen this individual in

4   person?

5   A    No, ma'am.

6   Q    Do you have any idea if the Craigslist user is a man or a

7   woman?

8   A    I would have no idea.

9   Q    An adult or a minor?

10  A    No, ma'am.

11  Q    So let's move to the first time that you're starting to

12  plan to meet this person that you're going to pay to have sex

13  with.  Where did you arrange to meet her?

14  A    A neighborhood off of Columbia Industrial Boulevard in

15  Evans, Georgia.

16  Q    And you were coming across the border from South Carolina

17  into Georgia?

18  A    Yes, ma'am.

19  Q    And were you provided a specific address?

20  A    No, ma'am.

21  Q    And why wasn't she just driving to meet you at The Ashley?

22  A    Because I told her I would pick her up.  Other than that, I

23  do not know.

24  Q    Okay.  Did she ever -- did anyone ever indicate to you that

25  she couldn't drive?

1   A    No, ma'am.

2   Q    And why didn't you pick her up from her house?

3   A    From her house, you said?

4   Q    Yes.

5   A    You said why did I?

6   Q    Why didn't.

7   A    I wasn't given a house address.

8   Q    Now, Mr. Grantham, I am going to show you Government

9   Exhibit 9.002 which has previously been marked and admitted.

10  Do you recognize this girl?

11  A    Yes, ma'am, I do.

12  Q    Who do you know that girl to be?

13  A    By Riley.

14  Q    By Riley?

15  A    Yes, ma'am.

16  Q    Is this the young lady that you picked up from Evans,

17  Georgia?

18  A    Yes, it is.

19  Q    And this is the young lady that you eventually took to The

20  Ashley in South Carolina to have sexual contact with?

21  A    Yes, ma'am.

22          MS. LYONS:  Thank you, Ms. Long.

23          Now the first time you picked this young lady up,

24  where did you take her?

25          THE WITNESS:  The first time?

1   Q   Yes, sir.

2   A   I took her to a Mexican restaurant.

3   Q   Did you have any sexual contact with her on that first --

4   A   No, ma'am.

5   Q   -- on that first visit?

6   A   No, ma'am.

7   Q   Did you pay her for that first visit?

8   A   No, ma'am.

9   Q   How long did it last?

10  A   Approximately 30 to 45 minutes.

11  Q   And where do you recall picking her up from?

12  A   From the same -- from the place or the road off of Columbia

13  Industrial Boulevard.

14  Q   Off a road off of Columbia Industrial Boulevard?

15  A   Yes, ma'am.  I don't remember the name of the actual road.

16  Q   Okay.  And so how did you know when to be there?

17  A   Through text.

18  Q   And did you just wait for her to arrive?

19  A   She would text me when she was ready for me to pick her up

20  and then I would go and meet where we agreed.

21  Q   I want you to think about the one other time that you hired

22  a prostitute.

23  A   Yes, ma'am.

24  Q   Did you have to meet anybody before you met that

25  prostitute?  Did you have to check in with anybody?

1   A    No, ma'am.

2   Q    So when you picked Riley up the first time, you take her to

3   the Mexican restaurant.  You eat food with her?

4   A    Yes, ma'am.

5   Q    And then what do you do?

6   A    Then take her back.  I dropped her off.

7   Q    Why didn't you have any sexual contact with her the first

8   time?

9   A    Because I was gauging her, I suppose you could say.

10  Q    And did you drop her off?

11  A    I did drop her off.

12  Q    And where did you drop her off?

13  A    The same place I picked her up.

14  Q    Did you go to her house?

15  A    No.

16  Q    The second time you saw Riley how was that arranged?

17  A    The same way through texts.

18  Q    And where did you go on your second?

19  A    To the Ashley Motel.

20  Q    And how was it arranged that you would go to the Ashley

21  Hotel on the second time you saw Riley?

22  A    Through text.

23  Q    And was there a negotiation again for a price?

24  A    It was -- I don't recall.  I recall agreeing to 160.

25  Q    Sir?

1  A   I recall agreeing to 160 or between 140 to 160 and then

2  beyond that I don't recall.

3  Q   You don't remember?

4  A   No, ma'am.  I don't remember none of the negotiations on

5  that visit.

6  Q   How many times in total did you see the young lady?

7  A   Including sex or sexual?

8  Q   Well, let's say including sex how many times in total did

9  you see her?

10  A   Four times.

11  Q   You only saw her four times?

12  A   For sex.  And then I also had seen her -- I took her to a

13  place that sold hamburgers.  I picked her up.  She said during

14  her visits that she needed ---

15  Q   Okay.  Slow down for a minute.  I know you're nervous.

16  A   I apologize.

17  Q   I may have -- I may have worded that in artfully.  So let

18  me try again.  The total number of times that you saw the young

19  lady whether or not you had any sexual contact -- what was the

20  total number of times you saw her?

21  A   Approximately eight times.

22  Q   Okay.  And of the eight times that you saw this young lady

23  how many of those times did you have sexual contact?

24  A   Four times.

25  Q   And the sexual contact on those four occasions -- was it

(Jonathan E. Grantham-Direct by Ms. Lyons)      369

1   oral, vaginal, anal, what was it?

2   A    Oral sex and one time I tried vaginal.

3   Q    You tried vaginal sex one time?

4   A    Yes, ma'am.

5   Q    What do you mean you tried vaginal sex?

6   A    As I stated before I was sick previously and after becoming

7   sick I found it almost impossible to keep an erection during

8   vaginal sex.

9   Q    During vaginal sex you couldn't keep an erection?

10  A    Yes, ma'am.

11  Q    So the other times it was oral sex?

12  A    Yes, ma'am.

13  Q    Okay.  So let's talk about the times you didn't have sex

14  with her.

15  A    Yes, ma'am.

16  Q    Where did you take her on the times you did not have sex?

17  A    As I stated I took her once to a Mexican restaurant and had

18  food.  I took her once to a hamburger joint off of or right

19  outside of Aiken, South Carolina.  I took her down to the

20  Augusta Mall to purchase her some clothing at the Forever 21

21  store and then I took her to the Ashley once so she could try

22  on clothing that I purchased for her.

23  Q    Okay.  So you crossed between South Carolina and Georgia a

24  couple of times --

25  A    Yes, ma'am.

1  Q    -- when you spent time with her?

2  A    Yes, sir.

3  Q    To include the times that you took her to the Ashley to

4  have sexual contact?

5  A    Yes, ma'am.

6  Q    Okay.  So let's talk about when you did take her to the

7  Ashley to have sex.

8  A    Yes, ma'am.

9  Q    Okay.  Did you always pick her up from Columbia County?

10 A    Yes, ma'am.  The same spot.

11 Q    And did you always travel to the Ashley which is over the

12 line in South Carolina?

13 A    Yes, ma'am.

14 Q    How did you get to the Ashley Hotel from Columbia County?

15 A    It depends on the time.  Sometimes I would go down

16 Riverwatch and cross over at Gordon Highway and sometimes I

17 would go to I-20 and then go across I-20.

18 Q    Okay.  And once you got to the Ashley, who paid for the

19 hotel?

20 A    I would.

21 Q    And once you were in the room can you tell us the first

22 time that you had sexual contact with Riley, what was that like

23 when you took her to the room?  What did you do?

24 A    We talked momentarily for five minutes or so.  Then after

25 that I sat in a chair.  She took her top off and then she

(Jonathan E. Grantham-Direct by Ms. Lyons)          371

1  performed oral sex.

2  Q    Did she have a phone with her?

3  A    She did, yes, ma'am.

4  Q    Did she use her phone at all while she was with you?

5  A    Yes, ma'am.

6  Q    What did you see her doing?

7  A    Texting.

8  Q    She was texting someone?

9  A    Yes, ma'am.

10 Q    Did you ever hear her use the phone?

11 A    As in call someone?

12 Q    Yes.

13 A    No, ma'am.  It was always text.

14 Q    How much did you pay her for oral sex?

15 A    Between 120 to 160.

16 Q    Did you pay her in cash?

17 A    In cash, yes, ma'am.

18 Q    Did she ever tell you why she needed the money?

19 A    She told me that she was trying to purchase a new phone.

20 Q    Mr. Grantham, did you ever meet anyone that you thought

21 were the parents of this young lady?

22 A    No, ma'am.

23 Q    Did you ever speak to anyone other than this young lady --

24 A    No, ma'am.

25 Q    -- about meeting and having sex with her?

1   A   No, ma'am.

2   Q   Did you ever ask to meet her or anybody in her family?

3   A   No, ma'am.

4   Q   Did you ever take any photographs of her?

5   A   No, ma'am.

6   Q   You continued to text and communicate with her into at

7   least the fall of 2019; correct?

8   A   Yes, ma'am.

9   Q   Did you have any reason to doubt the age of the young lady

10  you were having sexual contact with?

11  A   Towards the end of it I started to, yes, ma'am.

12  Q   Tell us why.

13  A   A picture that she sent me, the -- when I was going to the

14  Augusta Mall to take her to purchase some clothing, I was

15  driving down the road.  I was about halfway to the Augusta Mall

16  and I crossed over Columbia Road and when I did that she ducked

17  down and I asked her why did she duck down and she told me that

18  we were approaching her mother's employment or getting close to

19  where her mother worked and so I asked her why was she hiding

20  from her mother and she told me that she wasn't supposed to be

21  out, and then the second time I really doubted it was I had

22  purchased her some clothing from the Goodwill and brought it to

23  the Ashley to try it on and then she was extremely happy about

24  getting the clothing and she was jumping up on the bed,

25  bouncing on the bed like a young girl.

1  Q    Mr. Grantham, let's talk about the text messages you

2  exchanged.

3  A    Yes, ma'am.

4  Q    Once you had Riley's phone number did the person texting

5  you on the phone use emojis?

6  A    Yes, ma'am.

7  Q    Do you know what that is?

8  A    Yes, ma'am.

9  Q    Did they use emojis?

10  A    Sometimes.

11  Q    Did they use short or long sentences?

12  A    It depended on the time of day, honestly.

13  Q    Did they use -- I am just going to refer to my children.

14  They use all of these acronyms, you know -- LOL, LMAO --

15  different things like that.

16  A    Yes, ma'am.

17  Q    Did she write in complete sentences?

18  A    Sometimes and sometimes it was short.  It was almost like

19  talking to a student.

20  Q    So I am going to ask you to think about some of the text

21  messages that you received and the negotiations that occurred

22  in the Craigslist email.  You said you're a teacher?

23  A    Yes, ma'am.

24  Q    And you worked with students?

25  A    Yes, ma'am.

1   Q    Did you ever grade papers?

2   A    I did.  Yes, ma'am.

3   Q    Have the opportunity to review students when they're

4   writing things?

5   A    Yes, ma'am.

6   Q    Can you compare or notice any difference between the

7   writing in that email versus the text messages?

8   A    Yes, ma'am.

9   Q    What do you notice?

10  A    The text messages were short, sweet, to the point.  They

11  were somewhat joking sometimes where the emails felt like I was

12  speaking to an older individual.  Honestly, it felt like I was

13  talking to two different people.  One was negotiations.  The

14  other one wasn't.

15  Q    Did you enjoy talking to this young lady?

16  A    I -- yes.

17  Q    Now, ultimately, you were arrested --

18  A    Yes, ma'am.

19  Q    -- Mr. Grantham, and did you speak with Special Agent Tripp

20  Godbee?

21  A    Yes, ma'am.

22  Q    And did he ask you about somebody by the name of Riley?

23  A    Yes.

24  Q    And did you immediately admit to paying to have sex with

25  someone named Riley?

(Jonathan E. Grantham-Direct by Ms. Lyons)

1  A   I did.  Yes, ma'am.

2  Q   And were you at that time taken into custody?

3  A   I was.  Yes, ma'am.

4  Q   Now, Mr. Grantham, I am going to show you what's been

5  marked as Government's Exhibit 18.  Tell me when you can see

6  that on your screen, sir.

7  A   Yes, ma'am.  I can see it.

8  Q   What is that document?

9  A   That's my plea agreement.

10       MS. LYONS:  The government would move to enter

11  Government's Exhibit 18 and publish at this time, Your Honor.

12       MR. MERZLAK:  No objection.

13       THE COURT:  Admitted and you may publish.

14   (Government's Exhibit No. 18 is entered into evidence.)

15  Q   Now, Mr. Grantham -- Ms. Long, can you focus on paragraph

16  two for me?  Thank you so much.

17       Mr. Grantham, does this plea agreement include the charge

18  for which you plead guilty?

19  A   Would you repeat that one more time, please?

20  Q   Does this document include the charge you plead guilty to?

21  A   Yes, ma'am.

22  Q   And, in fact, you plead guilty to enticing or coercing the

23  minor victim to travel and travel for the purpose of engaging

24  in sexual activity; is that right?

25  A   Yes, ma'am.

1          MS. LYONS:  Thank you, Ms. Long.

2          And we already know you plead guilty back in August

3     and at the time you plead guilty did you have an agreement with

4     the government to cooperate?

5          THE WITNESS:  No, ma'am.

6     Q   When was the first time you ever spoke to me or anyone with

7     the government about testifying?

8     A   Approximately a week and a half ago.  It may have been two

9     weeks.  It's been a week and a half to two weeks ago.

10    Q   And after about two weeks ago did I come down and meet with

11    you at the jail?

12    A   You did.  Yes, ma'am.

13    Q   We met two times, maybe three times?

14    A   Two times.

15    Q   And we met for maybe two hours each?

16    A   Yes, ma'am.

17    Q   Did I feed you any answers?

18    A   No, ma'am.

19    Q   Did I tell you to tell the truth?

20    A   You -- multiple times.

21    Q   And at that time did we talk about what would happen if you

22    got on the stand and lied?

23    A   If I lied?  Yes, ma'am.  It would be a perjury and

24    additional ten years to my sentence.

25    Q   And why take the stand, Mr. Grantham?  What is the benefit

1  to you?

2  A    There isn't one.  The opportunity to tell the truth.

3  Q    And why does it matter to you to tell the truth to this

4  Judge?

5  A    So that when I do -- am sentenced he -- I may have -- so

6  that it could be taken into consideration that I was

7  forthcoming.

8  Q    Now, Mr. Grantham, you were charged in an indictment -- I

9  charged you in that indictment?

10  A    Yes, ma'am.

11  Q    And it had four counts.  Yes?

12  A    Yes, ma'am.

13  Q    And you plead guilty to a charge that carries 15 years to

14  life, didn't you?

15  A    Yes, ma'am.

16  Q    And so the Judge can sentence you to 15 years.  Yes?

17  A    Yes, ma'am.

18  Q    Or he can sentence you to life?

19  A    Yes, ma'am.

20  Q    Mr. Grantham, just a few last questions.

21  A    Yes, ma'am.

22  Q    On the times -- on the four times you met with this young

23  lady for sexual contact did you ever have a situation where she

24  was put in bondage?

25  A    Yes, ma'am.

1   Q   What did you do?

2   A   I used painter's tape and took the painter's tape and

3   wrapped it around her wrists and allowed her to perform oral

4   sex.

5   Q   Okay.  And you brought the tape?

6   A   Yes, ma'am.

7   Q   Was she free to move?

8   A   Yes, ma'am.

9   Q   Did you take a picture of that?

10  A   No, ma'am.

11  Q   Mr. Grantham, did you ever give the young lady a gift of an

12  Xbox?

13  A   I did.  Yes, ma'am.

14  Q   What color was it?

15  A   It was white.

16  Q   And did she accept that gift?

17  A   She did.  Yes, ma'am.

18  Q   Now what kind of vehicle were you driving on the occasions

19  that you picked this young lady up?

20  A   A Ford F150.

21  Q   What color?

22  A   Blue.

23  Q   And how many children did you have when you met her?

24  A   Three.

25  Q   And when you met her did you ever wear anything like

1    superhero t-shirts?

2    A    Yes, ma'am.  Superman.

3    Q    And did you ever drive this young lady by a house and tell

4    her it was your house?

5    A    Yes, ma'am.

6          MS. LYONS:  I beg the Court's indulgence.

7          THE COURT:  Sure.

8    Q    Mr. Grantham, one final question.  You indicated that you

9    never picked her up from her house?

10   A    That's correct.

11   Q    Did you ever step foot in a home you even believed belonged

12   to this little girl?

13   A    No, ma'am.

14         MS. LYONS:  Thank you.  No further questions, Your

15   Honor.

16         Mr. Grantham, please answer any questions of

17   Mr. Merzlak.

18         THE COURT:  Your witness, Mr. Merzlak.

19         MR. MERZLAK:  Thank you, Judge.  I'll be extremely

20   brief.

21                      **CROSS EXAMINATION**

22   BY MR. MERZLAK:

23   Q    Mr. Grantham, you indicated at no time did you ever speak

24   with anybody on the phone when you were setting up this sexual

25   act or sexual meeting; correct?

1    A    Yes, sir.  That's correct.

2    Q    So you've never talked to Michael Gunn to your knowledge?

3    A    To my knowledge, no.

4    Q    Okay.  You have never met Mr. Gunn?

5    A    No, sir, I have not.

6    Q    Isn't it true that, in fact, you actually know Amanda Gunn?

7    A    Do I know her?  I have seen her, but I do not know her.

8    Q    And you have never had any conversations with her?

9    A    No, sir.

10   Q    How many times have you seen Amanda Gunn?

11   A    Yesterday was my first time.

12   Q    Yesterday?

13   A    Yes, sir.

14   Q    And during these conversations initially this child told

15   you that she was 15?

16   A    Yes.

17   Q    Okay.  And then eventually sent a picture to you?

18   A    Let me -- may I go back to the question you just asked?

19   Q    Initially when you were text messaging or communicating

20   through Craigslist this child told you that she was 15?

21   A    I was told she was 15.  Yes, sir.

22   Q    And then she sent a text message or somebody sent a photo

23   through Craigslist of a child that appeared to be 15 years old;

24   correct?

25   A    I didn't think she appeared to be 15, but I did receive a

(Jonathan E. Grantham-Cross by Mr. Merzlak)          381

1   text message or email.

2   Q    And the picture that Ms. Lyons just displayed for you as

3   well as the jury where she was holding a pink sign --

4   A    No, that wasn't the picture that I received.

5   Q    No, but in that picture does she appear like she is over 18

6   years of age?

7   A    With knowledge of what I know now, no, but she looked older

8   to me.

9   Q    And she never explained anything to you that she was being

10  forced into doing this?

11  A    No.

12  Q    Did she appear to be under the influence of any drugs when

13  you were with her?

14  A    No, sir.

15  Q    She was alert and normal acting?

16  A    Yes, sir.

17  Q    And she voluntarily participated in sexual activities with

18  you -- an adult?

19  A    Yes, sir.

20  Q    So the only thing that based on your plea agreement and you

21  pleading guilty to a federal felony offense that we have proven

22  to this jury through your testimony is that you're a child

23  molester; correct?

24  A    I suppose, yes.

25       MR. MERZLAK:  Nothing additional, Judge.

1        THE COURT:  All right.  Thank you.

2        MS. LYONS:  Your Honor, just one or two questions.

3                        **REDIRECT EXAMINATION**

4   BY MS. LYONS:

5   Q    Can you clarify when you say -- at least Mr. Merzlak says

6   you know Amanda Gunn?

7   A    I don't know Amanda Gunn.  We were downstairs in two

8   different holding cells.

9   Q    So in the holding cell downstairs when you were waiting to

10  testify?

11  A    Yes, sir.

12  Q    And that was yesterday for the first time?

13  A    That was the first time, yes.

14  Q    And then Mr. Merzlak said she told you she was 15 years

15  old.  Mr. Grantham, when you were going back and forth over

16  Craigslist negotiating those prices and location, do you know

17  who you were speaking with?

18  A    I have no idea.  The only time I ever spoke with her about

19  her age was in the vehicle or in my truck and when I spoke with

20  her in the vehicle she told me she was 18 multiple times.

21  Q    You said that she did not act like she was being forced and

22  she voluntarily participated.  Mr. Grantham, minors can't

23  consent to sex with adults.  You know that?

24  A    Yes, ma'am.

25  Q    Okay.  Thank you.

 1              THE COURT:  All right.  Are we finished with

 2    Mr. Grantham?  Is he excused?

 3              MS. LYONS:  Yes, Your Honor.

 4              THE COURT:  All right.  You can leave.  Thank you.

 5              MS. LYONS:  Your Honor, the government would call

 6    Dr. Donald Loebl, Jr.

 7              MR. MERZLAK:  Judge, if we could take up a brief

 8    matter outside of the presence of of the jury about this

 9    witness?

10              THE COURT:  Yes.  Do I need to send them to the room

11    or do it as a sidebar?

12              MR. MERZLAK:  Probably to the room.

13              THE COURT:  All right.  Let's just take 15 minutes and

14    give them an opportunity to have a short break and then we'll

15    take up this matter.

16         (The jury exits the courtroom at 9:53 a.m.)

17              THE COURT:  All right.

18              MR. MERZLAK:  Thank You, Judge.  I apologize, but I

19    think we would have had to do it in the middle of the

20    testimony.

21              THE COURT:  No, that's fine.  Let's do it this way.

22              MR. MERZLAK:  We believe through this witness the

23    government to going to seek to introduce a medical record from

24    University Hospital pertaining to Mr. Gunn.  This particular

25    medical record was generated and occurred as a result of a

1   court order.  The government sought issuance of a court order

2   to extract bodily fluids of Mr. Gunn for the purposes of

3   testing for sexually-transmitted diseases.  He was taken from

4   the Lincoln County Jail by Special Agent Godbee to the hospital

5   at University Hospital where they did, in fact, execute that

6   order and withdraw bodily fluids from him and purportedly

7   tested those materials.

8          This particular report, based on that, is absolutely

9   generated for the purposes of this investigation, this

10  prosecution, and is, therefore, testimonial in nature.

11  Ms. Lyons through discovery provided this report as well as

12  provided a certified business record affidavit constituting

13  that it was a business record which in some cases it may be,

14  but in this particular case to introduce this particular item

15  without the actual individual who conducted these tests that

16  can testify to conducting these tests and what these test

17  results were, this document itself is testimonial in nature.

18  It violates the confrontation clause and my client's

19  constitutional rights to confront his witness that's going to

20  testify against him.

21         Simply having a doctor testify that I am a doctor and

22  this is a business record and this is the result of this

23  business record does not take it out of the realm of a

24  violation of his confrontation clause rights under *Crawford*

25  simply by labeling it as a business record when it was

1    specifically generated by the government through a court order

2    that the government sought for the purposes of using in this

3    litigation.

4              THE COURT:  Okay.  Thank you.

5              Ms. Lyons?

6              MS. LYONS:  Your Honor, once again, I feel somewhat

7    frustrated that this case has been set for trial two months,

8    maybe even three months -- that on at least two occasions I

9    provided my exhibit list to the defense, sat down with the

10   defense attorney to discuss any objectionable issues so that

11   they could be raised in motions in limine before the Court so

12   that both parties could have an opportunity to properly brief

13   and argue the issue.  As late as yesterday I discussed this

14   issue with Mr. Merzlak.  He gave me no opportunity to respond

15   accordingly.  He waits until I am about to call the witness to

16   the stand.

17             I feel unprepared to provide Your Honor with any case

18   law to the issue of whether or not this is testimonial in

19   nature due to whether or not -- I don't think it is

20   testimonial, Your Honor.  I know it comes in under the business

21   records exception.  I do not think that I need the person who

22   drew the blood if I have a doctor who is willing to say that in

23   his training and work experience he has drawn blood; he has

24   asked for urine samples; he has routinely had those blood

25   samples and urine samples tested for sexually-transmitted

1    diseases.

2           He will further testify that when those samples come

3    back he reviews and analyzes the results and then he can read

4    those reports and provide a simplified answer to this jury on

5    what that report says and that's all he is going to say, and,

6    in fact, he'll further testify that he's never met either the

7    minor or the defendant in this case.  He's had no other contact

8    in this investigation.  He was simply called to review these

9    records and translate them for the jury.

10          THE COURT:  All right.  So he had no role in the

11   tests; correct?

12          MS. LYONS:  Your Honor, I apologize.

13          THE COURT:  He had no role in conducting the test?

14          MS. LYONS:  Correct.  He is a doctor at University

15   Hospital where the sample was drawn and that current employee

16   is no longer at that hospital -- Stephen Courier.  He is in a

17   hospital or job in South Carolina.  He is the head in the

18   critical care unit at the hospital.

19          THE COURT:  So is Dr. Loebl in that department that

20   conducts those tests?  Is this the same department -- is he

21   part of the same department that conducted the test at all?

22          MS. LYONS:  Your Honor, the defendant was not sent to

23   a department.  He was just sent straight to a lab where samples

24   were drawn and the tests were submitted.

25          THE COURT:  Okay.  Dr. Loebl does not work for the

1    lab?  He is not over the lab in a supervisory role --

2          MS. LYONS:  No, sir.

3          THE COURT:  -- at all?

4          MS. LYONS:  He would send his tests to that lab for

5    screening.

6          MR. MERZLAK:  Judge, may I just respond briefly?

7          THE COURT:  Sure.

8          MR. MERZLAK:  The only thing I just wanted to clear up

9    because I take, you know, serious issues anytime that it's

10   referred to that I am doing something that is distractive or

11   obstructive because I am not that type of attorney.

12          Yes, Ms. Lyons, I have known about this particular

13   thing for a long time.  We've talked about this particular

14   thing for a long time, and I've told her that I would have to

15   object to it.  I don't think that it's necessary for me to do a

16   motion in limine in advance of trial for everything that I feel

17   is going to be objectionable.  I don't know whether or not just

18   because it's provided in discovery whether it's even going to

19   come in at trial.  When Ms. Lyons talked to me about this

20   record either yesterday or the day before Special Agent Godbee

21   was standing right there in the hallway and, again, I told her

22   that I would have to object to that because I didn't think it

23   was admissible in the way that she was bringing it.

24          I actually told her that it was very similar to if you

25   just brought in some guy to testify to a crime lab report for a

1   DUI.  That was the exact conversation I had with her.  I think

2   it's a simple issue that doesn't require a lengthy brief from

3   either side.  It is an objection that can be made during trial

4   and I just wanted to make sure that the Court was aware that I

5   wasn't trying to surprise anybody.  I am not trying to be an

6   obstructionist in either way.  It is a legitimate issue that

7   affects my client's constitutional rights, and if it is going

8   to be brought in, I have to raise the issue.

9        MS. LYONS:  Your Honor, may we take a break so that I

10  can properly prepare?

11       THE COURT:  We're going to take a break because my law

12  clerks and I are going to go back here and answer the question.

13       MS. LYONS:  Thank you very much.

14     (A break is taken.)

15       THE COURT:  Anything from anyone else before I tell

16  you my findings on this issue?

17       MS. LYONS:  Nothing except that I apologize to

18  Mr. Merzlak.  I didn't mean to infer ---

19       THE COURT:  I understand.  I am a little puzzled why I

20  am dealing with this now and not at pretrial, but,

21  nevertheless, we've looked at the issue and there are two cases

22  that are driving this:  *Melendez-Diaz versus Massachusetts*

23  which is 557 U.S. 305 (2009) case followed by another Supreme

24  Court case, *Bullcoming versus New Mexico*, 564 U.S. 647 (2011).

25  Both of those were then recognized in *U.S. versus Ignasiak*, an

1  Eleventh Circuit case, 667 F.3d 1217 (2012).

2         Basically, what the law is coming out of those cases

3  is that without any evidence that Dr. Courier I guess is the

4  doctor that signed off on these -- unless he is clearly

5  established to be unavailable for trial and unless we establish

6  that Mr. Gunn had an opportunity to cross examine him prior to

7  trial, those cases will not allow surrogate testimony under the

8  confrontation clause.  They don't come in.  I think it is a

9  violation of the confrontation clause for -- even though it's

10 submitted as a business record with the necessary affidavit, I

11 still think the fact that the analyst that signed off on it is

12 not present in court to testify as to the results, I think it

13 would be a violation of the confrontation clause and I am not

14 going to allow it in.

15         MS. LYONS:  Your Honor, may I clarify something for

16 the record?

17         THE COURT:  Yes.

18         MS. LYONS:  Maybe several things in this respect.  If

19 this doctor worked with Mr. Courier and testifies that he is no

20 longer in this jurisdiction; he is employed somewhere else,

21 establishes that he's unavailable, would that meet the

22 standard?  Perhaps not.

23         THE COURT:  No.

24         MS. LYONS:  But, furthermore, if Dr. Courier is the

25 one who ordered the exam and we do not know who the lab analyst

1    is -- we have no idea who the lab analyst is -- how does that

2    impact Your Honor's ruling?

3           THE COURT:  The fact is that the only doctor on here

4    that ordered it and signed off on this report is Dr. Courier

5    and it's ---

6           MS. LYONS:  Then, Your Honor, we would probably just

7    seek permission at least to perhaps take some witnesses out of

8    order.  We do have the minor victim here ready to testify if

9    you'll just give us two minutes maybe to make a phonecall and

10   we're ready to put the minor victim up.

11          THE COURT:  All right.  Get her in here then.

12          MS. LYONS:  Thank you, Your Honor.

13          Your Honor, we're ready.

14          THE COURT:  You're ready?

15          MS. LYONS:  Yes, sir.

16          THE COURT:  All right.  Let's recall the jury.

17          MS. LYONS:  Your Honor, we need to seal the room.

18          THE COURT:  Okay.  Do you want to allow any family at

19   all or none?

20          MS. LYONS:  The minor does not want her family

21   present, Your Honor.

22          THE COURT:  Okay.  Do we have availability for the

23   public, though, to watch the testimony by video?

24          Mr. Merzlak, are you going to make any objection if

25   these folks that have asked to leave the courtroom -- I mean,

1   is there a member of the press in any of that group?

2          MR. MERZLAK:  We have no objection to the courtroom

3   being sealed.

4          THE COURT:  Being sealed for this testimony?

5          MR. MERZLAK:  No objection.

6          THE COURT:  Very well.  Recall the jury.

7      (The jury enters the courtroom at 10:41 a.m.)

8          THE COURT:  All right.  You may call your witness.

9          MS. LYONS:  Thank you, Your Honor.  The government

10  would call Grace Gunn.

11     (The testimony of Grace Gunn is filed in a separate, sealed

12  transcript.)

13         THE COURT:  Well, it's 12 o'clock.  I think this is

14  probably the best time to take our lunch break.

15         MS. LYONS:  We would ask, Your Honor.  The next

16  witness should be a long one.

17         THE COURT:  Okay.  Let's do that.

18         Ladies and gentlemen, we're going to take a lunch

19  break.  I would ask you to be back here at 1 o'clock here if

20  you would, please.  Please remember while you're in lunch my

21  instructions:  Do not discuss the case with each other, anyone

22  else, conduct any research, post anything on social media.

23  Just go and enjoy your lunch and we'll be back here at

24  1 o'clock and resume trial.

25     (The jury exits the courtroom at 12:01 p.m.)

1      (A lunch break is taken.)

2           THE COURT:  All right.  Anything to discuss before we

3   start?

4           MS. LYONS:  No, Your Honor.

5           THE COURT:  All right.  Let's recall the jury, please.

6      (The jury enters the courtroom at 1:04 p.m.)

7           THE COURT:  Okay.  It appears our jurors have all

8   returned from the lunch break.  Thank you very much, ladies and

9   gentlemen, for being prompt in your return.  We're ready to

10   resume trial.

11          Call your next witness.

12          MS. LYONS:  Thank you, Your Honor.  The government

13   would call the Special Agent Harold Tripp Godbee, III of the

14   FBI.

15      (Harold D. Godbee, III is duly sworn.)

16          THE CLERK:  Please state your name.

17          THE WITNESS:  My name is Harold Dennis Godbee, III.  I

18   go by Tripp Godbee.

19          THE CLERK:  And which agency are you with?

20          THE WITNESS:  The FBI.

21          THE CLERK:  Thank you.

22                         **DIRECT EXAMINATION**

23   BY MS. LYONS:

24   Q   Good afternoon, Special Agent Godbee.

25   A   Hey.  How are you?

(Harold D. Godbee III-Direct by Ms. Lyons)                393

1   Q    I'm good.  How are you?

2   A    Good.

3   Q    Are you currently located or assigned to the Augusta branch

4   office?

5   A    Yes, ma'am.

6   Q    And how long have you been working there?

7   A    Since 2016.

8   Q    And are you currently the agent on call or assigned to all

9   of the child exploitation cases for the Atlanta-Augusta RA?

10  A    Yes, ma'am.

11  Q    What are your responsibilities as the person who handles

12  all of the child exploitation cases?

13  A    I'm responsible for crimes -- any crimes against children

14  or human trafficking that are generally in our -- we cover

15  about a 12-county area, but also help out with other offices

16  depending on what's going on.

17  Q    And I was about to ask -- what does a typical day look like

18  for you?

19  A    There isn't one.  There's not a typical day.

20  Q    Can you give us an example of a call that you may receive

21  or a location that you may go out to on any day of the week?

22  A    Sure.  There could be a call of a missing child or a child

23  that is possibly being exploited in some way.  There could be a

24  call that we have what we call "travelers" coming in to meet

25  with children.

1  Q   What if I am a parent and I find nude images of my child on

2  the internet -- can I call the FBI?

3  A   Sure.

4  Q   And who is going to come visit me?

5  A   Me.

6  Q   And what if my student -- or what if my child goes to

7  school in Columbia County and my child decides to make some

8  sort of bomb threat at the school and the principal needs to

9  call somebody about the child.  Who are they most likely going

10 to call?

11 A   Most likely me or it is going to get routed to me.

12 Q   Okay.  And the National Center for Missing and Exploited

13 Children -- they have something called the "cybertip"?

14 A   Yes, ma'am.

15 Q   I think Special Agent Anders talked about it earlier and

16 those resolve back to geographic areas.  So for the surrounding

17 six or seven counties who gets all of the cybertips?

18 A   I do.

19 Q   About how many cybertips are pending right now?

20 A   I haven't checked this week because of this, but I believe

21 there is roughly 115 right now.

22 Q   And while you're in court who is handling any missing kids?

23 A   Any missing kids?

24 Q   Yes.  Any calls for assistance with missing children?

25 A   Right now we have sent a different agent for a child that

1   is missing.  I'm here.

2   Q   Did your phone ring last night?

3   A   Yes.

4   Q   And when it's time to go to court for a search warrant or

5   to testify on all of those cases that you're involved in, are

6   you the affiant?  Are you the person testifying?

7   A   Can you say that again?

8   Q   I'm sorry.  That was an inartfully-worded question.  I'm

9   sorry.  On any case that you may have are you the person who

10  has to go swear out the warrant?

11  A   Most of the time.  90 percent of the time.  Lately I've had

12  someone that's helped me a lot.

13  Q   And do you have to go testify in front of, perhaps, a grand

14  jury?

15  A   Yes, ma'am.

16  Q   And do you have to go testify if there is a court hearing?

17  A   Yes, ma'am.

18  Q   And that's in addition to all the other duties that you

19  have?

20  A   Yes, ma'am.

21  Q   Are you also on any specialized teams for the FBI?

22  A   Yes, ma'am.

23  Q   What do you assist with?

24  A   I'm on the SWAT Team, the Atlanta Field Office SWAT Team.

25  I'm an online undercover agent.  I'm a fitness adviser; so I

1  give fitness tests to other agents.  I'm a firearms instructor.

2  Q    You're a firearms instructor?

3  A    Yes, ma'am.

4  Q    What other positions do you hold as an instructor?

5  A    I am a -- the fitness instructor or adviser.  I also teach

6  close quarter battle or CQB, clearing houses, going into

7  houses, arresting people.  I am a defensive tactics instructor.

8  Q    Pretty busy?

9  A    Yes, ma'am.

10 Q    Okay.  So some of the other agents who have testified said

11 considering your subject matter you handle one of the highest

12 case loads in the office; is that accurate?

13 A    Yes, ma'am.

14 Q    Is it accurate to say that you work nights and weekends?

15 A    Yes, ma'am.

16 Q    Now prior to joining the child exploitation area, were you

17 in another division within the FBI?

18 A    Yes, ma'am.

19 Q    And did you work a different violation?

20 A    I did.

21 Q    What violation did you work?

22 A    Excuse me.  Drugs and gangs.

23 Q    I don't know if you recall, Special Agent Godbee, but

24 before I worked child exploitation I, too, worked drugs and

25 gangs.  Do you remember that we used to prosecute cases

1   together?

2   A    Yes, ma'am.  I remember one case.

3   Q    And do you recall that we had a conversation one time about

4   our satisfaction with the cases we were working?  Do you

5   remember that?

6   A    I remember having a conversation about my satisfaction with

7   working drugs and gangs.

8   Q    Did you ultimately leave drugs and gangs?

9   A    Yes, ma'am.

10  Q    Why?

11  A    I felt like I could do more working crimes against

12  children.

13  Q    More satisfaction?

14  A    Yes, ma'am.

15  Q    Let's talk about your prior experience before the FBI.

16  What did you do before you came to the FBI?

17  A    I was in the Army.

18  Q    For how long?

19  A    From 2010 to 2016.

20  Q    I'm not very familiar with the military; so I am going to

21  ask the best way I can.  What did you do in the Army?

22  A    I was Special Forces Green Beret.

23  Q    Did you ever deploy?

24  A    Yes, ma'am.

25  Q    And did you have combat deployments?

1    A    Yes, ma'am.

2    Q    And if I ask you any other questions about your unit or any

3    specific missions, how are you supposed to answer my question?

4    A    I have signed nondisclosure agreements and I don't think I

5    would be able to.

6    Q    And who is that nondisclosure agreement with?

7    A    I believe there's three total:  One with the U.S. Army,

8    one with SOCOM or Special Operations Command and one with JSOC

9    or Joint Special Operations Command.

10   Q    Now between the Army and the FBI what kinds of special

11   trainings have you received over the course of your career?

12   What areas?

13   A    Tactics that I previously discussed, interviewing.

14   Q    Anything related to surveillance or negotiation?

15   A    Surveillance for sure, both Army and FBI.  Not much

16   negotiation.  I think that we did cover that at Quantico but

17   nothing that sticks out.  I am not an FBI negotiator.

18   Q    Now as it specifically relates to child exploitation cases,

19   have you received any special training?

20   A    Yes, ma'am.

21   Q    What kind of special training have you received in relation

22   to these types of cases?

23   A    I have -- I'm DExT certified.

24   Q    Can you explain what that is?

25   A    It's the same thing that Special Agent Anders testified to.

1  It is Digital Extraction Technician and then I have been to

2  conferences and training on investigating crimes against

3  children, interviewing children, things of that nature.

4  Q    And so in our district in the Southern District of Georgia

5  basically between Brunswick, Savannah, Augusta, maybe all the

6  way to Athens, how many other FBI agents are DExT certified?

7  A    I only know of one or two in Atlanta.

8  Q    And so if somebody needs a cellphone dumped or a computer

9  reviewed and they need information extracted from a device, who

10 are they going to call?

11 A    The fastest way would be for someone that's DExT certified

12 to do it or they could call CART at Quantico or a CART agent

13 that each field office has that would do it.

14 Q    What is CART?

15 A    It is the computer experts.  So as a DExT I am not an

16 expert.  CART qualified agents or staff are experts.

17 Q    We've talked a little bit about cybertips.  Let's talk a

18 little bit about the types of crime specifically.  What types

19 of federal crimes are you running into most of the time in your

20 investigations?

21 A    With children it's usually production of child pornography

22 or explicit child photographs.  There are sort of different

23 terms for it, but I usually call it child pornography.

24 Distribution, manufacture of it or possession of it is what I

25 see a lot.  Then also the travelers are traveling for the

1   purpose of having sex with a minor.

2   Q    And how do you define trafficking -- sex trafficking?

3   A    Trafficking?  I define it as a person or a child that is

4   traded for sex for something of value whether that's money or

5   goods or safe passage.

6   Q    Now I want to specifically move you towards this

7   investigation.  Okay?

8   A    Okay.

9   Q    You have some water?

10  A    Yes, ma'am.

11  Q    All right.  In late January an investigation began in

12  Texas.  In early February were you contacted by Special Agent

13  Joe Anders from Texas?

14  A    Yes, ma'am.

15  Q    And based on what Special Agent Joe Anders told you and

16  shared with you what did you do?

17  A    He -- what he told me was that the pictures online had been

18  discovered.  So I asked him to send me some pictures via the

19  internet -- so email that were sanitized or non-pornographic so

20  that we could start trying to figure out who the child was.

21  Q    Is that normal?  Is that something that happens, sadly

22  enough, on a regular basis?

23  A    Yes.

24  Q    Okay.  So and funny enough, Special Agent Godbee, do you

25  remember where you were when Special Agent Anders called you?

1   A    I was on the way to give a speech to a school.

2   Q    About what?

3   A    The extortion of children.

4   Q    So it sticks out in your mind?

5   A    Yeah, it does because I actually used it as an example that

6   I was likely -- I had just gotten a call from an agent and

7   there's a chance that a child was either self-exploiting or

8   being exploited.

9   Q    So after you took that call from Special Agent Anders and

10  its sounds like it was sometime in the afternoon or evening did

11  you await an email from him?

12  A    Did I what?

13  Q    Await an email from him?

14  A    Oh, yes, ma'am.

15  Q    And did you receive that email?

16  A    Yes, ma'am.

17  Q    Once you received his email with the photographs, what did

18  you begin to do?

19  A    So I looked at the photographs.  We had a general idea of

20  where they were taken because of the EXIF data Special Agent

21  Anders testified to.  So I went out to that neighborhood with

22  the pictures and started canvassing the neighborhood trying to

23  figure out exactly which house or where the pictures were

24  taken.

25  Q    What did you do -- when you go out and canvas a

(Harold D. Godbee III-Direct by Ms. Lyons)                402

1   neighborhood and you said you're trying to figure out which

2   house it is in the photos, what did you do in order to figure

3   that out?

4   A    So those photographs that he sent me -- I believe it was

5   four of them -- had some pretty not distinct but they had some

6   things in them that helped us.  So they had -- one of them had

7   a birdhouse in it.  One of them you could see the structure of

8   the way the top of the building was behind the little girl.

9   The area that we believe that the pictures were in were sort of

10  row -- there's row houses.  So it was townhouses almost.  So I

11  was able to drive up and down and figure out by looking exactly

12  where the little girl was standing when some of the pictures

13  were taken.

14  Q    Once you figured out where she was standing in the frames

15  of those photos, what did you do?

16  A    Once I figured out where she was generally standing, I

17  believe that it was at that point that I realized that the

18  house that she was likely standing in front of there was

19  construction going on and that there was people there fixing

20  it.

21  Q    Did you speak to them?

22  A    I did go up to one of them and I asked what was going on.

23  He said that they had had a fire at this house.  I said, "Where

24  is the family?  Are they still living in the house?"  And the

25  person, I don't think, knew.  He didn't know.

1   Q    So what was your next step?

2   A    At that point I canvassed the neighborhood and tried to

3   knock on doors or see people in yards to see maybe do they know

4   who lived in that house that had burned down.  At the same time

5   I was trying to figure out based on the picture of the little

6   girl what school she might go to.  So I believe that she was

7   likely in middle school and so I figured out that that area the

8   children in that area went to Stallings Island.

9   Q    And so did you make a decision to go visit Stallings

10  Island?

11  A    I did.  And before I left I believe it was as I'm leaving I

12  look over and I see the birdhouse that was in one of the

13  pictures hanging at another house right down the road which was

14  209.

15  Q    What did that lead you to believe?

16  A    Well, it made me think that the people that were in the

17  house that burned down might be in this other house.

18  Q    So you kind of had two separate pieces of information at

19  that point?

20  A    Yeah, so things were starting to come together a little bit

21  at that point.

22  Q    So do you make it to Stallings Island?

23  A    I did.

24  Q    And what do you find out while you're at Stallings Island?

25  A    I talked to the principal and the guidance counselor and

1   asked if I could show them a picture of a student that might go

2   there.  I did, and they immediately said the little girl's

3   name, and when they said that name I thought we were pretty

4   much on track that it was probably the right person because the

5   name that they said matched what I could make out -- what we

6   had been able to make out on a necklace the little girl was

7   wearing in a picture.

8   Q   And so in one of those pictures that Special Agent Anders

9   had sent you there was a necklace?

10  A   Yes, ma'am.

11  Q   And some of the letters had been turned so you weren't sure

12  of the name.  Is that fair?

13  A   Right.  I couldn't see the entire name.  I don't think

14  anyone that looked at the picture -- we couldn't tell exactly

15  what it was, but there was enough letters that once it was said

16  to me I thought to myself that makes sense.

17  Q   Okay.  So you're at the school and you have some

18  information now.  Do you have parents' names and an address?

19  A   Yes, ma'am.  They provided me a printout of the child's

20  picture, parents, phone numbers, possible addresses, things

21  like that.

22  Q   So do you then move your way towards that address to talk

23  to the parents or what do you decide to do?

24  A   I believe at that point I either went back to the office or

25  I had people at the office start searching those names to see

1  where those parents might work and I believe at some point I

2  called one of the parents.

3  Q    Okay.  And that's Amanda Gunn who said she received a call

4  from somebody at the FBI?

5  A    Right.

6  Q    Okay.  And do you schedule a time to visit the parents?

7  And we're still on February 5th.

8  A    Yes, ma'am.

9  Q    Okay.  And do you ask for somebody to join you at the house

10  on Nicklaus Court?

11  A    Yes, ma'am.

12  Q    Do you remember who that was?

13  A    Jonathan Escobar.

14  Q    Okay.  So does Jonathan Escobar come out and join you?

15  A    Yes, ma'am.

16  Q    And once you make it to 209 Nicklaus Court with Jonathan

17  Escobar, what is your plan?  Why are you going to see the

18  parents?

19  A    We were going because we had information based on what I

20  had heard from Special Agent Anders that this little girl's

21  images had been found on a subject's phone in Texas.

22  Q    Is there an obligation by you and other members of the FBI,

23  via it a victim witness coordinator or an agent, to notify

24  parents when images of a minor are found and those images are

25  sexually explicit?

1    A    Yes, ma'am.

2    Q    Okay.  So you have an obligation to tell the parents?

3    A    Yes, ma'am.  I'm not sure of our legal obligation, but I

4    feel like I have an obligation to tell a parent if I know that

5    or I think that they're child is possibly being posted online.

6    Q    So did you go to 209 Nicklaus Court that day to make a

7    parent notification?

8    A    Yes, ma'am.

9    Q    And do you recall going to the door to make that parent

10   notification with Special Agent Escobar?

11   A    Yes, ma'am.

12   Q    What, if anything, do you remember about speaking to

13   Mr. and Mrs. Gunn that day?

14   A    I remember we were on the front porch.  Both Mr. and

15   Mrs. Gunn were out there at times.  One would go in the house.

16   One might be out there.  We told them that there were pictures

17   found of their little girl on a subject's phone in Texas; did

18   they know anything about it; and then I just asked questions

19   that I routinely ask parents about their children when these

20   things happen.  Do they know ---

21   Q    I was about to say what kinds of questions are those,

22   Special Agent Godbee?

23   A    Is their child -- do they know their child is doing this?

24   Have they already addressed this?  Do they know -- that sort of

25   leads me down a different path depending on what they say.  If

1   they say, yeah, we've had this issue before, that's one thing.

2   If they say, no, we don't know anything about this, they're a

3   straight A student, they've never done this, that leads me down

4   another path.

5   Q    Did Mr. and Mrs. Gunn tell you that they knew anything

6   about their daughter having posted any images of herself or

7   taken any images of herself in a sexually explicit manner?

8   A    Not that I remember.

9   Q    Okay.  And at some point did you have a discussion with

10  them about cellular devices belonging to their daughter?

11  A    Yes, ma'am.

12  Q    Why would you bring that up?

13  A    We had data -- EXIF data -- that showed some of the

14  pictures were taken with certain devices and so I was asking

15  about those devices if they knew about them, if they had them,

16  if I could look at them, things like that.

17  Q    And what, if any, response did you receive when you asked

18  about devices?

19  A    Well, I distinctly remember asking about the iPhone and I

20  was told it was lost or wasn't there.

21  Q    What did you think when you received the answer that the

22  iPhone was lost?

23  A    I was -- I was a little shocked because of the price of

24  them and that it seemed like one of the parents knew it was

25  lost and one of them didn't and so that was a little odd to me.

1  Q   Which parent knew that the device was lost and which parent

2  didn't appear to know that the device was lost?

3  A   Amanda Gunn -- I don't -- she seemed like she didn't know

4  it was lost.  Peyton Gunn seemed to know or was told that it

5  was lost.

6  Q   While you're out on the porch -- front porch -- Special

7  Agent Godbee, who was doing most of the talking?

8  A   I was.

9  Q   And out of the parents who was doing most of the talking?

10  A   Peyton Gunn.

11  Q   Did you make any observations about how the parents were

12  standing in perspective to you?

13  A   Peyton Gunn was standing facing me like a normal

14  conversation.  It seemed that Amanda was more turned towards

15  Peyton and I.  So as I look at them Peyton was on my left and

16  Amanda was on my right and Amanda was shaded more towards

17  Peyton and I.

18  Q   Did that stick out in your mind?

19  A   A little bit, but, again, I was -- I had just told them

20  that their child had been found; so I didn't have a real strong

21  opinion on much more than that.

22  Q   Now I think you said a moment ago that off and on maybe the

23  parents were going in and out of the house?

24  A   Yes, ma'am.

25  Q   Okay.  Tell me about that.  Were you alone with a parent at

1   any given time?

2   A    Yes, ma'am.

3   Q    Okay.  Tell me why and what any conversations might have

4   been if you were alone with one?

5   A    My understanding was that there were dogs in the house and

6   other children and at times for whatever reason one would go

7   in.  For instance, I know Peyton went inside to I guess look

8   for the phone and either that same time he went inside or a

9   different time he went inside to get other phones that he said

10  the little girl had.

11  Q    Do you remember any conversations that you had with Amanda

12  Gunn when you were alone with her?

13  A    I did.  I asked -- I asked her, basically, if she needed

14  help if there was something going on because I think by that

15  point Peyton had mentioned to me that there was some sort of

16  infidelity in the marriage.  I believe when he said that, I

17  believe that Amanda was inside and he told us that there was

18  some infidelity on Amanda's part while he was in Morocco.

19  Q    Did you think that was -- what was your feeling or instinct

20  when Mr. Gunn told you his wife had been unfaithful or

21  infidelity in the marriage while she had gone inside?

22  A    That was a little weird to me.  I don't know why that had

23  come up when we're talking about their little girl.

24  Q    Okay.  And so now you're alone with Amanda.  What makes you

25  ask her if she needs help?

1   A    The fact that she just seemed more -- she just seemed like

2   she wasn't talking as much, almost like she needed to say

3   something and just didn't say it, and so I just asked her.  I

4   said, "Hey, if you need help, if there is something you need to

5   tell me or make a sign to me or something and we'll help you."

6   Q    And did she?

7   A    No.

8   Q    So at some point -- you've talked about cellular devices.

9   You've given them a parent notification about their daughter.

10  Was there anything else you were concerned about doing while

11  you were at the house?

12  A    As the conversation went on I wanted to see the little girl

13  with my own eyes to make sure that she was there or okay or

14  alive.  So I asked if I could see her.

15  Q    And did they grant that request?

16  A    Yes, ma'am.

17  Q    What happened next, Special Agent Godbee?

18  A    We went inside the house, walked to the back bedroom, and I

19  think we -- I think they opened the door and she sort of leaned

20  her head up out of the bed and I just kind of smiled and was

21  like, "Hey, I'm Tripp," and she was like, "Hey."  Not much more

22  than that.

23  Q    Do you recall being told anything about why the little girl

24  was asleep or in the bed?

25  A    They had said that she had had an ear surgery or an

1   infection or something going on previous.

2   Q    And when you went in that room did the child appear to be

3   asleep or awake?

4   A    She appeared to be groggy like she had just woken up or

5   sort of out of it.

6   Q    Now after checking on the child, where else did you go in

7   the house?

8   A    We went to the little girl's room.

9   Q    And why were you going up there?

10  A    I just wanted to see what the little girl's room looked

11  like.  I wanted to see pictures on the wall of friends,

12  anything that might help us figure out what was going on.

13  Q    And did the parents allow you to do that?

14  A    Yes, ma'am.

15  Q    And so did you and Special Agent Escobar go up to the room?

16  A    Yes, ma'am.

17  Q    And did you notice anything while you guys were in the

18  room?

19  A    We found a bottle of vodka.

20  Q    Okay.

21  A    Special Agent Escobar did.

22  Q    And do you recall how Mr. Gunn responded?

23  A    I remember him sort of being shocked about it and I

24  remember him almost like putting his hands in his head like

25  shaking and maybe even like going down on the wall like just so

1   shocked that he couldn't stand up, like ---

2   Q   And after that happens, anything else significant happen in

3   the house?

4   A   That day?

5   Q   That day on the 5th.

6   A   No, ma'am.  We -- I believe we left and that was it, I

7   believe.

8   Q   Did you have any sort of instinct or feeling when you were

9   leaving the house on the 5th?

10  A   Something just didn't feel right.  I didn't know what was

11  going on, but it just -- something was off.

12  Q   So did you make a decision when you left on the 5th that

13  you wanted to have the child interviewed?

14  A   Yes, ma'am.

15  Q   So what did you do?

16  A   I discussed with the parents what we would like to do which

17  was have the child interviewed by someone that specializes in

18  interviewing children.

19  Q   And what do you call that person -- the acronym?

20  A   The acronym is a CAFI.  It's a Child and Adolescent

21  Forensic Interviewer, but we refer to them as a CAFI.

22  Q   And so did you speak with the parents and then subsequently

23  set up a CAFI interview for the child?

24  A   We did.  It was a process to set that up.  It's not just

25  something that, bam, it's set up.  We have to ---

1    Q    After you leave on the 5th do you go to work on the 6th?

2    A    I believe I went back to the office -- yes, ma'am, I went

3    to work on the 6th.

4    Q    And on the morning of the 6th did you receive another email

5    from Special Agent Joe Anders in Texas?

6    A    I did.

7    Q    And was there another file attached?

8    A    There were pictures -- yes, ma'am.

9    Q    Okay.  What was in that package or in that file?

10   A    What I distinctly remember was a picture of a foot with a

11   shoe in it and then there were other photographs that were

12   sanitized meaning they weren't -- you couldn't see any breasts

13   or vagina of the child.

14   Q    Okay.  And they would have been considered child

15   pornography if they had not been blurred out; is that fair?

16   A    Yes, ma'am, and then -- and going back, those images -- I

17   had asked Special Agent Anders when he initially called me to

18   go ahead and send me the actual images via Fed Ex which is how

19   the FBI routinely sends child pornography.

20   Q    So in addition to the fact that Special Agent Anders was

21   sending you emails, you were expecting a Fed Ex package to come

22   most likely overnight of child pornography?

23   A    Yes, ma'am.

24   Q    Okay.  So you go to work on the 6th.  You get this email

25   and all of a sudden you have a picture that has a sneaker and a

1   foot in it?

2   A   Yes, ma'am.

3   Q   Does that change things?

4   A   Drastically, yes, ma'am.

5   Q   Tell us why.

6   A   Well, at that point I believed that there was more to the

7   story.  I didn't quite know what it was, but I thought that

8   there was someone in the room at least when the little girl was

9   either taking these pictures or having these pictures taken.

10         MS. LYONS:  Ms. Long, can I pull up, please,

11   Government Exhibit 11?

12         Special Agent Godbee, I just want to make sure we're

13   talking about the same picture.  Is this the picture that you

14   received on the morning of the 6th?

15   A   Yes, ma'am.

16   Q   And you said it changed things for you?

17   A   Yes, ma'am.

18   Q   Okay.  So now remind us was this the only picture or was

19   this in a series of pictures?

20   A   So this is a series of pictures.

21   Q   Can you kind of tell us what you're thinking then?  If this

22   is in a series of pictures, take us into where you were on that

23   morning -- why this is so significant.

24   A   So when I refer to a series of pictures I'm talking about

25   pictures that are taken maybe in the same instance.  In this

1   instance there are pictures of the little girl taken in

2   different poses and it seemed to me that it was taken at the

3   same time or general time.  She's wearing the same thing.

4   She's moving maybe an arm here in one picture and then here in

5   another picture.  So it's a series and from what I can tell in

6   the series she's not taking them.  I can see her hands.  So

7   at --

8   Q   Go ahead.

9   A   -- that point there is something going on.

10  Q   And so you're, basically, seeing photos in a sequence and

11  you're almost seeing the girl moving across the floor.  Is that

12  fair?

13  A   Yes, ma'am.  Can I move this back?

14  Q   Oh, sure.

15  A   I'm sorry.

16          MS. LYONS:  Thank you, Ms. Long.

17          So when you're looking at that foot -- when you're

18  looking at that foot at that particular moment, does the foot

19  look like -- I apologize.  Does the sneaker look like it's just

20  thrown on the floor and sitting there or are you actually

21  looking at the sneaker to see is there form?  Is there weight?

22  Does it appear to have somebody standing in it?  Are you making

23  that sort of judgment in the moment?

24          THE WITNESS:  Yes, ma'am.  It's on the screen, but if

25  you look at it to me it looks like it is almost there on

1  accident like it wasn't supposed to be there.  It's not in any

2  other picture in that series and that series there are pictures

3  taken all around that little girl and there is no shoe.  So

4  it's almost like, well, why is that shoe in that one picture?

5  And I'm not a shoe expert but it looked to me that there was

6  weight in the shoe like towards the toe area.

7  Q    Thank you, Special Agent Godbee.  If you want to push it

8  out of your way a little bit, we'll be fine for a little while.

9  So on the morning of the 6th you now have a picture that has a

10  foot in a shoe and you're trying to schedule a CAFI interview.

11  So you have two different things that are on your plate.  What

12  do you decide to do?

13  A    So I need -- I had to go to the CAFI interview to --

14  because that's how they work.  I'm there.  The CAFI is there to

15  interview the child.  I briefed the CAFI on the facts of the

16  case.  I provide the images to the CAFI that we want shown to

17  the minor -- the little girl in this case -- and then I watch

18  it and I listen to it and the CAFI and I sort of team up to ask

19  questions that might be -- that might be needed to be asked or

20  that are relevant.

21  Q    Now before I ask you about the CAFI and the CAFI interview,

22  have you asked for assistance from people in your office to go

23  look for the sneaker at the house?

24  A    At some point I did.

25  Q    Okay.  I'm sorry?

1   A    I'm not sure at what point, but it was probably as soon as

2   I found it, I'm pretty certain that I told people in the

3   office, "Hey, just be ready.  Something is going on.  I don't

4   know what it is yet."

5   Q    And so the CAFI and the CAFI interview -- when the CAFI is

6   with the child are you in the room?

7   A    No, ma'am.

8   Q    Okay.  You're in a separate room?

9   A    Yes, ma'am.

10  Q    And you're viewing through a closed-circuit television?

11  A    Yes, ma'am.

12  Q    Okay.  Are you able to send in questions if you need to?

13  A    Not in real time.  I mean, I could go and knock on the door

14  and stop it, but that generally does not happen.

15  Q    Now during that first CAFI do you recall a summary of what

16  the minor basically says when she's asked about the photograph

17  and what's going on?

18  A    I don't remember what she said verbatim, but it was,

19  basically, that she didn't know whose shoe that was and that

20  when asked, "Well, then how did you take them?" she said, "A

21  tripod."

22  Q    Okay.  What does that do to your investigation at that

23  point?  You should just stop; right?  Should you stop?  She

24  told you that she took those photos herself.

25  A    No.  No.  No, I don't stop.

1   Q    Okay.  Why not?

2   A    I have done this long enough to know that children

3   sometimes don't tell the truth right out of the gate, right,

4   the first time they're interviewed, and I believed watching the

5   interview that she knew whose shoe that was.

6   Q    Go ahead.  I did not mean to interrupt.

7   A    And so I wanted to find out whose shoe that was and I

8   wanted to find out about the tripod.

9   Q    So you needed to find out about the sneaker and you needed

10  to find out about the tripod.  So what did you do?

11  A    So I asked agents to go to the residence and do a --

12  interview the parent there and do a consent search if allowed.

13  Q    Okay.  And which parent was at the home?

14  A    Peyton Gunn.

15  Q    Okay.  And you mentioned to do a consent search.  Why

16  didn't you just get a search warrant and go in there and tear

17  the house up?

18  A    So it's better in my opinion to do a consent search versus

19  a search warrant.  I don't think I had enough at that point to

20  get a search warrant.  I needed more probable cause for a

21  search warrant and in my experience it's better to have

22  someone's consent to search something.

23  Q    Okay.  So that's two different issues.  So you needed

24  probable cause to get a search warrant because who has to

25  authorize the search warrant?

(Harold D. Godbee III-Direct by Ms. Lyons)                419

1   A   A magistrate judge.

2   Q   Okay.  You don't get to just sign your search warrant and

3   take it on out there; right?

4   A   Right.

5   Q   And, in fact, who do you have to go through first to get

6   the search warrant?

7   A   You.

8   Q   Okay.  So tell us why you also think that consent searches

9   are sometimes better than search warrants?

10  A   Well, consent searches in these cases -- if we can get --

11  if the parent is really wanting to find out about what's going

12  on, they'll -- they want to help.  They'll usually consent to

13  the searches.  When -- that's also a lot quicker for us and

14  we're at this point trying to move fast.  A search warrant -- a

15  federal search warrant is not a two-page document that you see

16  on TV.  It's a very time consuming and tedious document.

17  Q   How many pages are your search warrants -- how many pages

18  long are usually your search warrants?

19  A   I've had them from 20 to 50.

20  Q   And how long is usually the turnaround on a search warrant

21  for you?

22  A   I've had them done in a day, but that's rushing.

23  Q   And so on February 6**th** did you make a call because you

24  wanted to move quickly that you needed to send these agents out

25  to try to do a consent search?

(Harold D. Godbee III-Direct by Ms. Lyons)          420

1   A    Yes, ma'am.

2   Q    And so did you have some agents who agreed to assist you

3   with that?

4   A    Yes, ma'am.

5   Q    All right.  So you weren't there during the first part of

6   the consent search; correct?

7   A    Right.

8   Q    Did you show up at 209 Nicklaus Court at some point on

9   February 6th?

10  A    Yes, ma'am.

11  Q    And do you recall what was going on when you arrived?

12  A    Yes, ma'am.  The agents that were there were searching and

13  I believe it was Justin Garrick was talking to Peyton Gunn.

14  Q    Okay.  And at that point in time based on what had happened

15  in the CAFI, what were the agents searching for?

16  A    Certainly, the white shoe --

17  Q    Okay.

18  A    -- was very important, tripods, and there was also a

19  vibrator that was in a picture of -- the little girl was using

20  on herself in a picture.

21  Q    Okay.  I was about to ask you about the vibrator, how that

22  came up.  So the vibrator was a tool that had been utilized in

23  an image of child pornography?

24  A    Yes, ma'am.

25  Q    And so you wanted to find that tool?

1   A   Yes, ma'am.

2   Q   Okay.  So the agents are searching based on consent when

3   you arrived.  Are you all right?

4   A   Yes, ma'am.  I just hit this.  Sorry.

5   Q   What did you decide to do when you arrived?

6   A   I believe I -- when I arrived I spoke to Peyton Gunn and

7   just told him, "Hey, have you kind of been told what's going

8   on?"  And then I was looking around for different things,

9   talking to different agents, trying to find out what had been

10  found, what impressions they were getting, just trying to

11  figure out what was going on.

12  Q   In your discussions with the defendant once you arrived at

13  the house, were you guys getting along or not getting along?

14  A   I think we were getting along for a little while and then I

15  think that he started probably getting annoyed that I wasn't

16  believing what he was saying.

17  Q   So does your team ultimately find the vibrator?

18  A   Not on the 6th.  No, ma'am.

19  Q   Why not?

20  A   I'm not sure.  We -- you're doing a consent search.  So at

21  any point the person can say, "Hey, stop.  Get out of my

22  house."  So we're not flipping open every single cabinet and

23  turning over bookshelves and looking everywhere.  I'm not sure

24  why it wasn't found.  I'm not sure if someone looked underneath

25  the sink where it was found.

1  Q   And what do you mean you're not flipping couches over or

2  looking in everywhere?  What is the fear?  What do you mean

3  "get out of my house"?

4  A   The fear is that the person will say, "Hey, stop; get out."

5  If I start taking every single hard drive out of computers in

6  the house and grabbing a computer and every single laptop and

7  carrying them out in boxes, they're probably going to say,

8  "Hey, stop," and then at that point we're dead in the water for

9  a little while.

10 Q   What do you mean you're dead in the water for a little

11 while?

12 A   Well, at that point we either -- we got to get out of the

13 house because we're only there on consent and we have to go get

14 a search warrant if we want to search any more.  We can't take

15 those items.

16 Q   And if you didn't have PC before you might not have PC when

17 you get kicked out?

18 A   Right.

19 Q   So you didn't find the vibrator at that point.  Had you

20 found any tripods?

21 A   No, ma'am.

22 Q   Okay.  And so you hadn't found the sneakers either?

23 A   No, ma'am.

24 Q   What did you decide to do?

25 A   At some point I decided to end the consent search.

1    Q    And that was your call?

2    A    Yes, ma'am.

3    Q    And your team begins to leave?

4    A    Yes, ma'am.

5    Q    And what happens?

6    A    As we're leaving Special Agent McKee looks to the left of

7    the front door and there's a pair of white shoes on like a shoe

8    rack or some sort of a rack.  He asked me, "Hey, are these in

9    play?"  And I looked at them.  I believe I picked them up and

10   said "Yeah."

11   Q    Special Agent Godbee, what was your reaction when you saw

12   those sneakers and picked them up?

13   A    I believe I looked at Peyton Gunn and said, "What -- what

14   are these?  What the fuck are these?"

15   Q    Now I want to step back a moment right before you find the

16   sneakers.  You were stepping in and out of Peyton Gunn's

17   recorded interview with Justin Garrick.  Maybe once or twice we

18   hear your voice.  Do you remember stepping in and out of that

19   interview?

20   A    I remember -- I remember it vaguely and when I heard -- I

21   have listened to the interview repeatedly now.  I remember it

22   more.

23   Q    And do you remember a discussion about the Freeman

24   extraction and the conversations in chats that happened?

25   A    I remember that night having -- trying to reconcile what

1   was going on with these chats and Riley's dad and Riley's mom

2   and the fact that some of the numbers had come back on open

3   source reporting to the Gunns.

4   Q   So had you had those chats that we saw when Special Agent

5   Anders was on the stand, how long had you had those chats in

6   your possession?

7   A   I believe they were sent to me via email on probably the

8   4th or the 5th.  I am not sure, though.

9   Q   If your first email was on the 5th from Special Agent

10  Anders could you have had them longer than 24 hours?

11  A   No, ma'am.

12  Q   Okay.  And so had you had time to figure out what they

13  really meant?

14  A   No, ma'am.

15  Q   So when you're talking to the defendant on that recording

16  do you even understand the chats?

17  A   No, ma'am.

18  Q   So why are you asking him those questions?

19  A   Just seeing if he'll give me something to go on to explain

20  something because I didn't understand what was going on.

21  Q   During the time you're discussing those chats with him does

22  Mr. Gunn ever ask you who Riley is?

23  A   Not that I remember.

24  Q   Special Agent Godbee, why in the world did it take walking

25  out of the house to find the white sneakers?

1  A   We were interviewing the defendant in the room that the

2  shoes were found in and the way that the room was set up,

3  ironically, he's looking right at them when he's sitting on the

4  couch.  The door would open and shut and the way the door

5  opened covered the shoe rack or at least concealed it partly

6  and when you're doing a consent search it's not a great idea to

7  sit there and flip up a room and search a room while the person

8  is giving you consent and we just didn't see them.  We didn't

9  search the room that he was in that we were interviewing him in

10 as well as we should've.

11 Q   Now once you have these sneakers, do you go speak to the

12 minor again?

13 A   Yes, ma'am.

14 Q   And what does she tell you?

15 A   She tells me that those are her dad's shoes and that he

16 took that picture.

17 Q   Special Agent Godbee, once again, not trying to disparage

18 the FBI or perhaps I am just trying to make a dig -- did you

19 have any female agents in the Augusta Office of the FBI when

20 this case happened?

21 A   No, ma'am.

22 Q   Did you have any females at all on site on February 6,

23 2020, at 209 Nicklaus Court?

24 A   Not that I recall, no.

25 Q   So when you had to make a decision to talk to the minor,

1  what are you thinking?

2  A   I was thinking that we had a minor in the house where

3  pictures were taken and there was a shoe in one of those

4  pictures and that the shoe belonged to the adult male that

5  lived in the house and I needed to find out if that was true or

6  likely true or made sense.  So I made a very quick decision to

7  interview her and the way that I did it was with another male

8  agent and her mom in the room.  I asked the mom's permission

9  and the mom gave me permission.

10 Q   Is that in policy for interviewing a minor or out of policy

11 for interviewing a minor?

12 A   Ultimately, the policy is that I can make the decision as

13 the agent, especially when there is an exigent or extraordinary

14 situation.  It is always better for us to have a CAFI do it,

15 but I was not going to put this little girl in a room with two

16 FBI agents by ourselves.  I didn't know if the mom was involved

17 at that point.  I wasn't sure, but I was fairly certain that

18 whoever was wearing that shoe was involved.  If the mom was

19 involved I could figure that out later, but I needed to find

20 out whose shoe that was and try to get that little girl away

21 from whoever was wearing that shoe in that picture, and so I

22 made the split-second decision to interview the little girl in

23 what I now know was in the presence of someone that was charged

24 with the crime of conspiracy against her.

25 Q   Hindsight is 20/20.

1    A    Yes, ma'am.

2    Q    Had you known then what you found out 12 months later, 16

3    months later, would you have interviewed the minor with her

4    mother present?

5    A    If I knew everything, no, I wouldn't have.  I would've done

6    it with another -- just one other agent.

7    Q    You even hesitated then and why were you hesitating?

8    A    Because, ultimately, I did the right thing.  Ultimately, I

9    did get that little girl out of that house from the person that

10   was wearing that shoe and then I dealt with the mom later and

11   she is currently being dealt with appropriately.

12   Q    Now after you find the white sneakers, what happens?  This

13   is February 6, 2020.  The young girl has confirmed that her

14   father is wearing the sneakers and her father is the one who

15   took the pictures.  What do you do next?

16   A    I arrest Peyton Gunn.

17   Q    Once he's in custody and he's been arrested, what happens

18   next in the case?

19   A    He is transported to the jail.  The next day we come back

20   with our -- he's transported to the jail by other agents, I

21   believe.  I go and start writing the search warrant.  I believe

22   I sent it to you throughout the night and then we execute the

23   search warrant the following day at the house.

24   Q    Were you concerned on the evening of the 6th that evidence

25   might be destroyed?

1   A   I was not.  That was not a huge concern.  I was not -- I

2   didn't think that the mom was the one with the computer

3   knowledge to destroy the evidence or that was not a major

4   concern of mine on the 6th, but I didn't want to come back in

5   two weeks with a search warrant.  I wanted to go ahead and get

6   the search warrant.

7   Q   What was the major concern on the night of the 6th?

8   A   The little girl was my major concern.

9   Q   On February 7th you come back with a lawful search

10  warrant and do you execute it and your team begins to search

11  the house?

12  A   Yes, ma'am.

13  Q   Were you ever able to find the iPhone?

14  A   No, ma'am.

15  Q   As it's been suggested, Special Agent Godbee, why didn't

16  you just try to ping the iPhone and find it?

17  A   So that is a difficult task, to say the least.  To ping an

18  iPhone under what would have had to have been exigent

19  circumstances pretty quickly -- what's exigent to me is not

20  necessarily exigent to a judge.  That takes a massive amount of

21  time and paperwork and writing on a lot of people's parts to

22  get the right order to ping a phone.  It also takes tremendous

23  effort to get the team in place to ping it to a location so

24  close that we can actually find it.

25  Q   What's that mean?  What is the team that's actually pinging

1  it?

2  A    So there is a couple of ways to do it.  One of them -- the

3  most accurate is with -- it's, basically, a truck that drives

4  around and gives you I believe it's like a 2-meter radius and

5  we don't have one of those in Augusta.  We would have to get

6  one out of Atlanta or Columbia.  It's not something that --

7  it's not like you see on TV.  It doesn't happen in a day or

8  two, especially when I would have to go before the judge and

9  say, "Well, we have arrested this person and we're just looking

10 for this iPhone."  It's not like a kidnapping scenario where

11 the iPhone is with the kidnapper and we're watching them go

12 down the road.  It's not the same.

13 Q    Now during the course of this early investigation in the

14 first few days, did you become aware of a second minor child

15 living in the house?

16 A    Can you repeat that?  I think we were both drinking water.

17 Q    Did you become aware of a second minor child who was living

18 in the household?

19 A    Yes, ma'am.

20 Q    And have you been able to find any information that

21 indicates that the minor son has been victimized or sexually

22 abused?

23 A    No, ma'am.

24 Q    So after the arrest of the defendant and the search warrant

25 did you try to review some of the items that were seized during

(Harold D. Godbee III-Direct by Ms. Lyons)                430

1   the search warrant?

2   A    Yes, ma'am.

3   Q    And did you find that some of the written documents seized

4   from the defendant's home were eventually very relevant to the

5   investigation?

6   A    Yes, ma'am.

7   Q    On first glance when you were looking at these documents

8   after they're photographed, after they're seized immediately,

9   did they make sense to you?

10  A    Can you repeat that?

11  Q    Did some of these documents seem confusing when you first

12  saw them?

13  A    Yes, ma'am.

14  Q    Okay.  Did they eventually start to make sense?

15  A    Over time, over several weeks.

16  Q    And why did they start to make sense over several weeks?

17  A    Well, one, there was so much data that was seized and so

18  many documents and so many little notes that we just couldn't

19  make sense of it.  We didn't quite understand what was going

20  on.

21  Q    And I should ask you this -- this is February of 2020.

22  Special Agent Godbee, what happens nationally at the end of

23  February of 2020?  Do you remember?

24  A    Yeah, Covid.

25  Q    Okay.  Covid hit.  Did that in any way impact your ability

1  to work on your cases?

2  A   Yes.  Yeah, it was hard to do our job.

3  Q   Okay.  Tell me why.

4  A   Because our country shut down and we still had a job to do

5  and it actually made our job more difficult because of children

6  being at home with cellphones and computers.

7  Q   Did you see a rise in the number of cybertips during Covid?

8  A   A tremendous rise.

9  Q   And what I mean by that, again, with cybertips, that means

10  an internet service provider is telling you somebody is viewing

11  child pornography somewhere on the internet; is that correct?

12  A   It's telling me that, yeah, an electronic service provider

13  has picked up child pornography on their systems or there is a

14  chat going on on their systems where a child or what they

15  believe is a child is chatting or talking to an adult and maybe

16  planning to meet up imminently.

17  Q   And so the number of those reports went through the roof

18  when everybody was home?

19  A   Yes, ma'am.

20  Q   And so, one, you had an increase in your cybertips, but is

21  most of your -- excuse me.  Strike that.  A lot of your job is

22  done on computers; is that correct?

23  A   Yes, ma'am.

24  Q   Are you allowed to take your computers home?

25  A   No, ma'am.

1   Q    Why?

2   A    Well, because I am dealing with child pornography.  So I

3   can't -- I can't take child pornography out of my office and

4   also we have systems in the FBI.  I use two different systems

5   in the FBI.  One is what we say is the red side or the

6   classified side and it's on a whole separate network that I

7   can't get access to at my house.

8   Q    And so there were certain days where you were not even

9   allowed into the office?

10  A    Most days I wasn't allowed in the office.

11  Q    And so, basically, 2020 -- it becomes very hard to work

12  these types of violations; isn't that correct?

13  A    Yes, ma'am.

14  Q    Okay.  So you start talking about the fact that you're

15  trying to review these documents and the information that

16  you're receiving from this investigation, but things are

17  getting slowed down?

18  A    Yes, ma'am.

19  Q    All right.  I would like to in this moment review a couple

20  of the documents that you thought were relevant in this

21  investigation that we've not seen yet.  Okay?

22  A    Okay.

23       MS. LYONS:  All right.  Can I have 17030, but these

24  have been admitted into evidence.  Thank you, Your Honor.

25       Thank you, Ms. Long.

(Harold D. Godbee III-Direct by Ms. Lyons)                    433

1          What are we looking at here Special Agent Godbee?

2          THE WITNESS:   A list.

3   Q    And where was this list located?

4   A    In, I believe, the bounded notebook.

5   Q    And at first glance maybe the first time you saw this list

6   did it make sense to you?

7   A    No, ma'am.

8   Q    Did it later in your investigation start to become a little

9   clearer?

10  A    Yes, ma'am.

11  Q    Okay.  So go down -- starting at the top what did you start

12  to interpret this list as being relevant to?

13  A    Are you asking initially or in time?

14  Q    After time.

15  A    In time I realized that these were tools or devices or

16  equipment used on the little girl.

17  Q    And used on the little girl by whom?

18  A    Peyton Gunn.

19  Q    And whose handwriting is this in?

20  A    Peyton Gunn's.

21  Q    Specifically, Special Agent Godbee, is there an image or

22  video of child pornography in which the minor is utilizing a

23  Magic Wand?

24  A    Yes, ma'am.  That's the vibrator.

25  Q    Okay.  And, specifically, is there an image of child

1  pornography where the child is in some form of bondage?

2  A   Yes, ma'am.

3  Q   And, finally, is there a series of photographs in which

4  needles are inserted in the body parts of this child?

5  A   Yes, ma'am.

6          MS. LYONS:  17031, please.

7          Did this list make sense to you the first time you saw

8  it?

9          THE WITNESS:  I knew that it was ingredients for

10  likely methamphetamine, but it didn't make much sense other

11  than that.

12  Q   And tell me how you knew this was a recipe or the

13  ingredients for methamphetamine.

14  A   I worked drugs and gangs.  I bought methamphetamine in

15  undercover -- I didn't, but I ran operations where

16  methamphetamine was bought.  I interviewed people that made

17  methamphetamine and used methamphetamine.

18          MS. LYONS:  Ms. Long, just -- can you please show him

19  17032?

20          Is that just the rest of that recipe?

21          THE WITNESS:  Yes, ma'am.

22  Q   And whose handwriting is that?

23  A   Peyton Gunn's.

24  Q   Now, Special Agent Godbee, I am going to show you 17-024.

25  Do you recall this letter being found in a jar in the child's

1   room?

2   A    Yes, ma'am.

3   Q    Did the child authenticate and say that this was a letter

4   she kept in her room?

5   A    Yes, ma'am.

6   Q    I am going to read it.  Okay?

7   A    Okay.

8   Q    "Grace, it's time you consider what is best for yourself

9   and those around you.  Why do you continue when you know your

10  rightful place is on the floor surrounded by men?  Why do you

11  wish to reject drugs, alcohol when other girls rely on them to

12  help them be what they must?  The more that you resist, the

13  worse that it will be.  You already feel this.  You know that

14  your destiny is to be a slut and that the more you attempt to

15  be good, the more that you are bad.  The more you avoid

16  something sexual, the more sexual and intense the next

17  situation is as well.  Men cannot resist your flesh.  They

18  crave it, need it, and will always take what you do not give.

19  You are a weak whore that has already been ruined by cock so

20  that no man will ever want you.  Even your father was unsure of

21  whether or not he wanted to fuck you after all the of the other

22  men had used you.  This brings us to the point of this letter.

23  Your choices do not only affect you."

24      "You must accept and embrace your whore nature, not only

25  for your sake, but for all of those around you.  Look inside

1   yourself in your mind and see if you can tell yourself that you

2   are not hopeless, that you are not a lost cause.  You have

3   betrayed your father over and over again and have watched as he

4   has defended you.  It is a wonderful thing, but how long will

5   it last?  Certainly, it will last as long as he is able to

6   defend you and he will defend you for as long as he is alive.

7   So the question is how long will he live at this rate?  He

8   tells you little of what he does for you.  He will not believe

9   that you are a whore and that there is no hope for you because

10  he loves you.  No one in this world would be able to convince

11  him otherwise except for you.  If you truly love your father,

12  you must show him what a worthless whore you really are.  You

13  must show him the worst parts of you and degrade and humiliate

14  yourself willingly in front of him.  He has given everything to

15  help you.  What now will you do to help him?  You have brought

16  him to the edge of ruin.  Your actions have further affected

17  his health, happiness, and much more."

18      "We know this is not what you want to do, but doing this

19  for his good and for yours is the right thing to do.  You know

20  this inside.  He blames much of your actions on the blackouts

21  that you have and does not wish to admit what you are.  He may

22  have said that you were before, but he would fight for

23  something so worthless and pathetic as you?  You are holes for

24  men to use.  You are nothing, a fuck toy, not even a person,

25  not a girl.  You know all of this to be true.  He must see your

1   true self if he is to survive.  Otherwise, he will die and this

2   will happen very soon.  He has given everything to save you.

3   The question is whether you will do the same for him.  You much

4   [sic] keep yourself aroused, playing with yourself, and trying

5   as hard as you can to enjoy it.  You must strip your clothes

6   and act like the nympho that are.  You must tie yourself

7   and punish yourself.  You must get to know men around you by

8   having conversations because it is important to know people in

9   your neighborhood or ask for donations for something you put

10   together in order to dress sexy and have an excuse to step into

11   their home.  You do not wish to use alcohol or drugs and your

12   father kept them from you for as long as he could.  Did you

13   know that you were the reason he began to use some?  He began

14   to use some in order to stay up later to work more hours of the

15   day to fight for you.  No one has hurt him more than you have

16   or hurt his efforts to save you more than you have.  You know

17   that the alcohol and drugs go hand in hand with what you are

18   and you know that you need them.  So give into them.  If you

19   care for him for as long as it takes you know what you must do

20   and how hard you must do each thing.  How much and how hard you

21   do each will show how much love you have for him.  Otherwise,

22   you will have completely destroyed the only one that actually

23   cares for you.  Time will show whether you will do the best you

24   can for him or not.  Did you know that he was threatened with a

25   list of things for you to do or he would be executed?  The

1   threat is real and from the MS-13.  He chose not to tell you,

2   to protect you as he has done with so many other things as

3   well.  You may ask him about the list and say that this paper

4   was about that if you choose, but do not mention any other part

5   or he will be condemned."

6        Your Honor, may we take a break, please?

7              THE COURT:  Yes.

8              MS. LYONS:  Thank you.

9              THE COURT:  We'll take a 15-minute break.

10       (The jury exits the courtroom at 2:23 p.m.)

11             MS. LYONS:  I will instruct the witness not to speak

12   to anybody.

13             THE COURT:  Don't talk to anybody --

14             THE WITNESS:  Yes, sir.

15             THE COURT:  -- other than the CSOs to direct you to

16   the bathroom.  Come right back here.

17             THE WITNESS:  Yes, sir.

18       (A break is taken.)

19             THE COURT:  Are we ready to resume?

20             MS. LYONS:  Yes, Your Honor.

21             THE COURT:  Call the jury, please.

22       (The jury enters the courtroom at 2:44 p.m.)

23             THE COURT:  You may resume your questioning.

24             MS. LYONS:  Thank you, Your Honor.

25             Special Agent Godbee, I'd like to move to the next

1   exhibit.

2            Ms. Long, 17033, please.

3            Special Agent Godbee, do you recognize this document?

4            THE WITNESS:  Yes, ma'am.

5   Q   Is it the first of two or three pages?

6   A   Yes, ma'am.

7   Q   Again, whose handwriting is this?

8   A   Peyton Gunn's.

9   Q   Is there something in the middle of this page that you

10  eventually found relevant to your investigation?

11  A   Yes, ma'am.

12  Q   What was that?

13  A   It says -- you want me to read it?

14  Q   Yes, sir.

15  A   "You say we are like roommates and you will say I only made

16  love to you one time like six months ago when I brought it up,

17  but I'm just asking when did you ever try?"

18  Q   And on the next page, 17-034, towards the bottom of this

19  page about six lines up, is there a mention of "her" --

20  something about "her."

21  A   Yes, ma'am.

22  Q   Can you start reading at the word "and" after the period in

23  "worse"?

24  A   "And, of course, I bring it up.  They are real huge issues.

25  Other than that, though, you say I treat her more like a wife.

1    No.  We are close.  She has beared the" ---

2    Q    Next page, 17-035.  Continue to read, please.

3    A    -- "responsibilities of someone way past her age and has

4    had to bear many things you've run from."

5    Q    Thank you.  Why did you feel like that was relevant to your

6    investigation, Special Agent Godbee?

7    A    Because it was -- it seemed to me that it was written by

8    Peyton to his wife and he was talking about the little girl,

9    basically, taking his wife's place in some ways.

10   Q    So now we've talked about -- thank you, Ms. Long.

11        We've gone through February 6, 7, and some of the relevant

12   documents you reviewed from February 7th.  What other

13   investigative steps do you begin to take after the defendant is

14   arrested and after you're reviewing documents?  What other

15   things are simultaneously going on in order to investigate this

16   case?

17   A    We reviewed the -- we started to review the electronic

18   devices that were taken.  We issued subpoenas to companies,

19   search warrants, and then we continued to interview the little

20   girl in the hopes that she would continue to disclose or tell

21   us what was going on.

22   Q    So of all of those investigative tasks, let's start with

23   the interviews first, okay?

24   A    Sure.

25   Q    Is that all right?

(Harold D. Godbee III-Direct by Ms. Lyons)          441

1   A    Sure.

2   Q    And you mentioned the little girl.  Can you recall about

3   how many interviews were conducted with the child?

4   A    There's about four CAFIs which are the Child Analysis and

5   Forensic Interviews with Shannon Martucci and it came to a

6   point where we decided that I would begin interviewing the

7   little girl and so then interviews continued and there are

8   multiple.

9   Q    And why was that or how was that decision made that you

10  didn't need the CAFI anymore?

11  A    The little girl was getting more comfortable with me and

12  the whole process and it got to the point where we have one

13  CAFI in the Atlanta Division and every time the little girl

14  needed to make a disclosure or needed to talk about something

15  it wasn't practical to get the CAFI to come down and do the

16  interviews.

17  Q    And so you began having interviews with the child?  And to

18  be clear, did you ever interview this child alone?

19  A    No, ma'am.

20  Q    So towards the summer of 2020 did she begin to provide you

21  with any new investigative information?

22  A    Yes, ma'am.

23  Q    And did the focus or -- yes, did the focus of the

24  investigation begin to shift away from just production of child

25  pornography?

1   A    Yes, ma'am.

2   Q    What kinds of violations or allegations started to come up

3   on the basis of what the child was saying?

4   A    It turned into a much more in depth case in that there was

5   trafficking -- human trafficking -- of the little girl

6   involved.

7   Q    So did she start to disclose at that point that her father

8   had been selling her to other men?

9   A    Yes, ma'am.

10  Q    Did she start to give you details about where sexual acts

11  had occurred?

12  A    Yes, ma'am.

13  Q    Did she tell you of sexual acts ever occurring in the home?

14  A    Yes, ma'am.

15  Q    Was there one incidence in particular that you recall that

16  she mentioned happening in the house?

17  A    The one that sticks out to me the most is there's an

18  incident where she heard Peyton and Amanda arguing about Amanda

19  having to sleep with guys -- be with guys -- and Amanda said

20  something of the effect I am not going to do it anymore and

21  Peyton said, well, then the little girl is going to have to do

22  it, and over a two-day period approximately ten guys came to

23  the house and had sex with the little girl.

24  Q    You mentioned that subpoenas and search warrants were one

25  of the ways that you attempted to investigate this case.  So as

1  we're dealing with the fact that the minor is giving you more

2  information, are you getting information back from these

3  subpoenas and search warrants, also?

4  A   Yes, ma'am.

5  Q   And to be clear for the jury, can you tell the jury what

6  type of information you get back when you send out a subpoena?

7  A   Sure.  So a subpoena will usually give you subscriber

8  information or a limited amount of information on an account

9  such as a user name or an IP address that it was used -- that

10 was used to log in or create the account versus a search

11 warrant which is much more intrusive on an account.  It will

12 give you all that a subpoena will usually give you plus the

13 actual content of what's inside of the account.  For instance,

14 if it's an email account it will give you the actual email, the

15 actual pictures inside your email account in the inbox and the

16 deleted usually and the sent.

17 Q   And so when you apply for a search warrant in any case you

18 have to put certain qualifications or boundaries on your search

19 warrant; is that correct?  You can't just get my emails from my

20 entire life, can you?

21 A   No, ma'am.

22 Q   Okay.  And so in this particular case you applied for

23 search warrants for several of the family's accounts?

24 A   Yes, ma'am.

25 Q   And you put them within a certain date range that seemed to

(Harold D. Godbee III-Direct by Ms. Lyons)                444

1   apply for your -- apply to your investigation, did you not?

2   A   Yes, ma'am.

3   Q   And were you able to successfully get back returns or

4   information from providers?

5   A   In some cases.

6   Q   In some cases.  And did you also receive returns from

7   subpoenas in this case?

8   A   Yes, ma'am.

9   Q   Can you tell us some of the people that you sent subpoenas

10  to?

11  A   We sent subpoenas to Victoria's Secret, Snapchat, Gmail,

12  Yahoo, Twitter, a bunch.

13  Q   Is there a reason why you're struggling to remember,

14  Special Agent Godbee?

15  A   Because we sent so many.

16  Q   Okay.  Did you send more than 20?

17  A   Yes, ma'am.

18  Q   Did you send more than 30?

19  A   Yes, ma'am.

20  Q   Did you send more than 40?

21  A   Probably.

22  Q   And every time you found a new user name or a new alias did

23  you attempt to resend that subpoena to see if you could get a

24  return?

25  A   Yes, ma'am.

1   Q    And so you had a lot of failures?

2   A    Sure.

3   Q    And some successes?

4   A    Yes, ma'am.

5   Q    Okay.  I am showing you what's been marked as Government

6   Exhibit 28 and I do believe there is a photocopy of that

7   exhibit in the book, but what is this right here?

8   A    That's an external hard drive.

9   Q    And are these your initials?

10  A    Yes, ma'am.

11  Q    And is it dated?

12  A    Ma'am?

13  Q    Is it dated?

14  A    Yes, ma'am.

15  Q    Okay.  And what is contained on this hard drive?

16  A    Those are returns.

17  Q    And are they the returns that you received, for instance,

18  from GoDaddy, Comcast, Craigslist, FetLife, anybody who sent

19  you a subpoena return that had information in it?

20  A    Yes, ma'am.

21  Q    And, additionally, were you able to include search warrant

22  returns for fckmeup@outlook.com -- F-C-K-M-E-U-P --

23  ggirl06@outlook.com, toxicdove@outlook.com,

24  realgunnlife@gmail.com, amandagunn@outlook.com, and

25  agunn421@gmail.com?

(Harold D. Godbee III-Direct by Ms. Lyons)                446

1   A    Yes, ma'am.

2   Q    Did you include all of those returns on this device?

3   A    Yes, ma'am.

4         MS. LYONS:  Your Honor, the government would seek to

5   admit this as evidence in this case at this time.

6         MR. MERZLAK:  No objection.

7         THE COURT:  Admitted.

8      (Government's Exhibit No. 28 is entered into evidence.)

9         MS. LYONS:  Thank you, Your Honor.

10         Now, Special Agent Godbee, as you just mentioned you

11   had a number of subpoena returns and search warrant returns in

12   this case?

13         THE WITNESS:  Yes, ma'am.

14   Q    And in anticipation of trial and perhaps being called to

15   remember any of that information, if necessary, did you gain

16   the assistance of an analyst in creating a spreadsheet with all

17   of the subscriber information for all of those accounts?

18   A    Yes, ma'am.

19         MS. LYONS:  Can I show the witness Government's

20   Exhibit 29, please?

21         Special Agent Godbee, please let me know when that

22   comes up on your screen.

23         THE WITNESS:  It's up.

24   Q    Okay.  Tell us what you're looking at.

25   A    It is a spreadsheet titled "Gunn Accounts."  It shows

1  across the top the "platform"; the next row, "Name of account

2  and personal identifiers"; next row, "user name"; the next

3  column, "Email and phone number, type of phone, dates activated

4  and closed," and "IP addresses and the account."

5  Q    And is this document several pages long?

6  A    Yes, ma'am.

7  Q    And does it contain all of the returns, be it search

8  warrant or subpoena subscriber information, that you were able

9  to gather in this case?

10  A    Yes, ma'am.

11          MS. LYONS:  Your Honor, the government would seek to

12  admit Government's Exhibit 29 at this time.

13          MR. MERZLAK:  No objection.

14          THE COURT:  Admitted.

15      (Government's Exhibit No. 29 is entered into evidence.)

16          MS. LYONS:  Thank you.  May we publish?

17          THE COURT:  Yes.

18  Q    Now, Special Agent Godbee, I am not going to make you go

19  through this spreadsheet, but I am -- can we zoom in just a

20  smidge, Tracey?  Thank you.

21      I am not going to make you go through all of these

22  categories, but just as you pointed out before across the top

23  you have different information that was available; is that

24  correct?

25  A    Yes, ma'am.

1   Q    And that ranges from the name and personal identifiers to

2   the user name, the email, the phone number, whether or not it

3   was activated or closed, any IP addresses; correct?

4   A    Yes, ma'am.

5   Q    All right.  And it goes down.

6        We can go to the next page.

7        And it's alphabetical by platform; is that correct?

8   A    Yes, ma'am.

9   Q    Okay.  And it is a total of two, three -- is it five pages?

10  A    Yes, ma'am.  That's what I believe it is.

11  Q    Thank you very much, Special Agent Godbee.

12       Thank you, Ms. Long.

13       Okay.  So we've talked about the subpoenas.  We've talked

14  about the search warrants, and when you got the email returns

15  did you start to find anything of interest that connected back

16  to the fact that the child had told you she was being sex

17  trafficked?

18  A    Yes, ma'am.

19  Q    What did you start to find?

20  A    People's ads or reply to ads discussing prostitution or sex

21  trafficking.

22  Q    Was there a certain social media platform that was being

23  used that you began to observe?

24  A    Craigslist was the one that sticks out.

25  Q    Okay.  And is that the platform that Jonathan Grantham was

(Harold D. Godbee III-Direct by Ms. Lyons)                    449

1   using?

2   A   Yes, ma'am.

3   Q   Okay.  So let's turn to that for one moment.  During your

4   interviews with the child in this case once you started seeing

5   these Craigslist ads and solicitations via email, did you

6   become interested in trying to find some of the men who had

7   paid to have sex with her?

8   A   Yes, ma'am.

9   Q   And was the child able to give you any identifying

10  information about some of these men?

11  A   Yes, ma'am.

12  Q   What did the child tell you about somebody named Jon?

13  A   She told me that one of the guys she met with was named Jon

14  or something like that.  When I asked, "What did he look like

15  or where did y'all go?" she described his general hair color,

16  that he was a white guy, his general age.  When I asked what he

17  wore, what kind of things that he wore, she said that he wore

18  like super -- like Superman-type shirts or like Marvel type of

19  stuff.  She told me that he drove a truck -- a blue truck --

20  and then she told me where she went with him to have sex or for

21  prostitution.

22  Q   Did she begin to tell you where he would pick her up from

23  and the sexual acts that they engaged in?

24  A   Yes, ma'am.

25  Q   Where did she tell you that he would take her to in order

(Harold D. Godbee III-Direct by Ms. Lyons)                450

1   to engage in these sexual acts?

2   A    To a motel across the river in South Carolina.

3   Q    And was she able to give you the name of the motel?

4   A    She didn't give me the name of it, but we were able to find

5   it.

6   Q    And how were you able to find it?

7   A    We -- she described it to us and then I believe it just --

8   we were looking at maps talking about how -- what bridges she

9   would have to cross, the timelines, and I think at some point

10  we're in the office and I mentioned to another -- Agent

11  McKee -- or either he saw what I was doing and we were just

12  talking about it and he thought that he knew which hotel she

13  might be talking about and so we went to that hotel.

14  Q    And did it turn out to be the right hotel?

15  A    Yes, ma'am.

16  Q    Now she gives you this information about this guy.  It's

17  pretty vague:  Jon, Superhero shirts, blue truck.  Did she talk

18  about kids and a house?

19  A    She mentioned that he took her by his house and that he had

20  kids.  When I asked her, "Why would he tell you that?" she

21  said, "He wanted me to trust him," or something like that.

22  Q    Special Agent Godbee, did you really think you would ever

23  find Jon?

24  A    No.

25  Q    So as you started reviewing the Craigslist email, what do

1   you end up finding?

2   A    The name Jonathan Grantham.

3   Q    And then is his phone number in the actual email?

4   A    Yes, ma'am.

5   Q    So what do you do once you have that phone number?

6   A    We serve legal process to find out who that phone number

7   belongs to.

8   Q    And it came back to whom?

9   A    Jonathan Grantham.

10  Q    So at some point do you go out and talk to Mr. Grantham and

11  subsequently arrest him?

12  A    Yes, ma'am.

13  Q    In your discussions with him does he corroborate everything

14  that the little girl told you about his truck?

15  A    Yes, ma'am.

16  Q    His superhero t-shirts?

17  A    Yes, ma'am.

18  Q    Having kids?

19  A    Yes, ma'am.

20  Q    And the hotel?

21  A    Yes, ma'am.

22  Q    And at some point in your discussions with the little girl

23  does she happen to mention an Xbox?

24  A    She did.

25  Q    And did she tell you that he had given her a white one?

(Harold D. Godbee III-Direct by Ms. Lyons)          452

1  A    She told me that that he had given her an Xbox.

2  Q    And then in a subsequent conversation separately with

3  Mr. Grantham did you confirm that information?

4  A    Yes, ma'am.

5  Q    Had the child to that point proven to be reliable?

6  A    Absolutely.

7  Q    So, again, simultaneously you're still reviewing

8  information from lots of different places and you still have

9  other email addresses; is that right?

10 A    Yes, ma'am.

11 Q    Okay.  So I would like to show you what's been marked as

12 Government's Exhibit 30.  Let me know when you can see it,

13 Special Agent Godbee.

14 A    I see it.

15 Q    What is that?

16 A    That's a Gateway computer tower that we took out of the

17 Gunn residence.

18 Q    Okay.  Is that one photo of a larger set of photographs in

19 that particular exhibit?

20 A    Yes, ma'am.

21 Q    And does this exhibit contain photos of the devices that

22 you or Special Agent Anders assisted you with in analyzing in

23 this case?

24 A    Yes, ma'am.

25 Q    Okay.  And were you asked to take those photographs in

1  preparation for trial?

2  A   Yes, ma'am.

3         MS. LYONS:  Your Honor, the government would seek to

4  admit Exhibit 30 and publish at this time.

5         MR. MERZLAK:  No objection.

6         THE COURT:  Okay.  It is admitted.

7         MS. LYONS:  Thank you, Your Honor.

8      (Government's Exhibit No. 30 is entered into evidence.)

9  Q   So starting with the first photograph can you just briefly

10  describe some of the devices that you seized and then

11  ultimately analyzed for us starting with this first one?

12  A   That's a Gateway computer tower.

13  Q   Now I believe you served -- seized two of them?

14  A   Two Gateway.  Yes, ma'am, two Gateways.

15         MS. LYONS:  Okay.  The next photo, Ms. Long.

16         Is that the other Gateway?

17         THE WITNESS:  Yes, ma'am.

18  Q   And just for context, are these photos taken in the FBI

19  office?

20  A   Yes, ma'am.

21         MS. LYONS:  Okay.  Next one, Ms. Long.

22         What are we looking at here, Special Agent Godbee?

23         THE WITNESS:  That's another computer.  That's a HP

24  computer tower that was taken out of the Gunn house.

25         MS. LYONS:  And next one, please.

1          What is this?

2          THE WITNESS:  That's an HP -- another separate HP

3    computer tower.

4          MS. LYONS:  06, please.  What is this?

5          THE WITNESS:  It is an Acer laptop.

6    Q    And if you remember is this the Acer that was in the living

7    room that Special Agent Justin Garrick talked about in his

8    testimony?

9    A    Yes, ma'am.

10   Q    Thank you.  007.  What is this?

11   A    It's an HP laptop.

12   Q    And was this the purple laptop that was open in the living

13   room when Special Agent Justin Garrick testified?

14   A    Yes, ma'am.

15   Q    Okay.  Thank you.  008.  What are these?

16   A    Those are two SanDisk thumb drives.

17   Q    Do you recall where the different thumb drives in the house

18   were located?

19   A    I don't recall where every single one was located.  The

20   majority of them were on the desk -- on top of a desk, I

21   believe.

22   Q    009.  What are we looking at here?

23   A    These are mini discs or -- they're memory devices and

24   memory device readers to the right there that were seized from

25   the Gunn household.

1  Q   And some of these items actually hold storage or images or

2  pictures or whatever you put on them, but not all of them can

3  hold memory; correct?

4  A   Correct.  Yes, ma'am.

5          MS. LYONS:  Any further photos in this one, Ms. Long?

6  Thank you.

7          Thank you, Special Agent Godbee.  So in addition to

8  the email accounts that you have to review and in addition to

9  the subpoena information that you have to review, are you also

10 utilizing software to attempt to go through all of these

11 devices?

12         THE WITNESS:  Yes, ma'am.

13 Q   And that software -- is it AXIOM and Griffeye?

14 A   Yes, ma'am.

15 Q   And that's the software that Special Agent Anders told us

16 about?

17 A   Yes, ma'am.

18         MS. LYONS:  So I would like to start with Government

19 Exhibit 35, please, showing to Special Agent Godbee.

20         THE WITNESS:  I see it.

21         MS. LYONS:  And, Ms. Long, I am going to stand behind

22 you for a second just to make sure I am seeing.

23         Special Agent Godbee, what are we looking at in this

24 particular exhibit?

25         THE WITNESS:  It's a fake Georgia driver's license.

(Harold D. Godbee III-Direct by Ms. Lyons)          456

1  Q   And did you find that in one of the devices in this case?

2  A   Yes, ma'am.

3  Q   And did you create a screenshot or exhibit to bring to

4  court?

5  A   Yes, ma'am.

6  Q   And is that accurate?  Does that reflect the exhibit that

7  you made?

8  A   Yes, ma'am.

9        MS. LYONS:  Your Honor, the government would seek to

10  admit 35 -- Government Exhibit 35 -- at this time.

11        MR. MERZLAK:  No objection.

12        THE COURT:  Admitted.

13     (Government's Exhibit No. 35 is entered into evidence.)

14        MS. LYONS:  May I publish, Your Honor?

15        THE COURT:  Yes.

16  Q   Now whose driver's license is this supposed to be, Special

17  Agent Godbee?

18  A   It's supposed to be the little girl -- the victim or the

19  little girl's.

20        MS. LYONS:  And is there a second page to this?  If

21  you'll zoom out.  Is there any way to -- thank you, Ms. Long.

22  Thank you.  That's much better.

23        So what program did you use in order to look at this?

24        THE WITNESS:  Magnet AXIOM.

25  Q   Okay.  And if we're looking on the right do we see the

1   driver's license?

2   A    Yes, ma'am.

3   Q    And on the bottom can you see if there is a creation or

4   modified date?

5   A    There is a creation date and a modified date.

6   Q    Okay.  And if you look over to the left do you see that

7   this driver's license was actually attached to an email?

8   A    Yes, ma'am.

9   Q    And in the middle does it tell you what that email -- or

10  the subject of that email was?

11  A    Yes, ma'am.

12  Q    What was the subject?

13  A    "Re:" like regarding and then "A message from the FetLife

14  caretakers."

15  Q    Now, Special Agent Godbee, what is FetLife?

16  A    FetLife is an adult website that contains pornography and

17  it markets itself towards the fetish community.

18  Q    It's totally legal, though?

19  A    It is.

20  Q    It is illegal, however, if you're attempting to upload

21  child pornography to the FetLife website?

22  A    Yes, ma'am.

23          MS. LYONS:  Okay. Ms. Long, can we take that down and

24  pull up Government's Exhibit 36?

25          Special Agent Godbee, if you will tell me when you see

1  that exhibit.

2          THE WITNESS:  I see it.

3  Q    What is Government Exhibit 36?

4  A    It's a screen grab of an email.

5  Q    And who was the email from?

6  A    It's from the account fckmeup@outlook.com.

7  Fuck-me-up@outlook.com.

8  Q    Who was it going to?

9  A    To the caretakers@fetlife.com.

10 Q    Is this an email that you found that related to that

11 driver's license?

12 A    Yes, ma'am.

13         MR. SYMS:  Okay.  Your Honor, the government would

14 seek to publish Government's Exhibit 36.

15         MR. MERZLAK:  No objection to admission.

16         THE COURT:  Admitted.

17         MS. LYONS:  And publish, Your Honor.  Thank you.

18         THE COURT:  And publish.

19     (Government's Exhibit No. 36 is entered into evidence.)

20 Q    Now, if you will, Special Agent Godbee, can you walk us

21 through this email starting at the top?

22 A    Sure.  So on August 25, 2019, about 2 o'clock in the

23 morning an email is written to the caretakers@fetlife that

24 says, "K.  It's no problem.  I am going over to my brother's

25 house tomorrow and he has a scanner so I can send it tomorrow

1  afternoon.  I've had to work almost all day the past few days

2  and don't have one here at the house.  Riley."

3  Q    What time was this email sent?

4  A    2 a.m. in the morning.

5  Q    And it was in reply to an email from the

6  caretakers@fetlife; is that correct?

7  A    Yes, ma'am.

8  Q    And if you read the third paragraph in the email from

9  caretakers, why are they emailing the fckmeup@outlook.com?

10  A    Are you asking me to read that paragraph?

11  Q    Yes, sir.

12  A    "I know your profile says you're at least 18, but,

13  unfortunately, some doubt came up.  I mean, we could hardly

14  wait until we reached legal age for an adult site so we

15  understand that sometimes people jump the gun.  On the other

16  hand, we also know that sometimes people just look really young

17  (although no one thinks Grandpa Pairadox looks like TNG

18  material)  So that really leaves us only one choice and that's

19  to ask for an ID."

20  Q    And then the next paragraph does it ask for the person to

21  provide a copy of a photo ID indicating or proving that they

22  are at least 18 years old?

23  A    Yes, ma'am.

24  Q    Thank you.

25      Ms. Long, is there another page to this?

1        Now this is an email from FetLife; is it not?

2        Can you zoom in a little bit?

3        Can you tell us what we're seeing in this email back and

4    forth from FetLife?

5    A   So the picture is a part of a picture of the little girl.

6    The top email is from the fckmeup@outlook.com and it's to a

7    fetlife.com address for an upload of a picture.

8    Q   And so is this the same picture, Special Agent Godbee, that

9    we saw earlier in the Freeman chat where the child is leaning

10   back and her legs are spread open?

11   A   It is -- if it's not the exact same picture, it is a very,

12   very close picture.

13   Q   And was that picture being uploaded to FetLife?

14   A   According to this, yes, ma'am.

15   Q   And if you start at the bottom of the email, what is

16   Wallace trying to tell the user who is uploading?

17   A   You want me to read it?

18   Q   You can read it.

19   A   "Hi there.  My name is Wallace and I am a caretaker with

20   FetLife.  I am sorry to have to tell you this but we've

21   received a couple of emails from other members concerning that

22   the pictures you've uploaded are not of you.  We're sure this

23   is not the case, but we really want to put people's doubts to

24   rest.  Do you mind taking a picture of yourself holding up a

25   handwritten piece of paper with your FetLife nickname and date

1   on it and send it to us?  We also need a real photo of your

2   license, not a photocopy but a color photo.  Feel free to cover

3   up your real name.  We'll give you three days to send these two

4   photos to us or we'll have no choice but to delete your

5   profile.  If the images are posted without written permission

6   and they are not of you, we ask that you please remove them

7   proactively and post images of you taken by you or that you

8   have written permission to post them.  Thank you for your

9   understanding and cooperation.  I look forward to hearing from

10  you.  Kindly, Wallace."

11  Q    Now at the top we have a response right under the yellow

12  bar.  We have a response from the fckmeup@outlook.com.  Can you

13  read that response?

14  A    "Okay.  I understand but I've already been through this.

15  Sorry. I just emailed from my other email, riley@toxicdove.com,

16  but I already had to verify!!  Like, people just don't believe

17  me when I say what I am into, but why should I have to keep

18  doing this?  I have to wait until I get home tonight to take

19  the pics and like now I don't have my account all day.  Can you

20  pls explain why I have to do this?  I made a video a few days

21  ago talking about everything and uploaded it an hour ago to

22  your site, too.  Why should I have to do this process again?"

23  Q    So what's your interpretation?  This is the second email of

24  a question coming back from FetLife.  What did you see in these

25  emails?

(Harold D. Godbee III-Direct by Ms. Lyons)                    462

1   A    That FetLife is not wanting to post images or videos of

2   this little girl and they're giving pushback to the little girl

3   -- to the account that supposedly this little girl is posting

4   to.

5   Q    And then somebody responds with a fake driver's license?

6   A    Right.

7          MS. LYONS:  Thank you, Ms. Long.

8          Now, Special Agent Godbee, we saw another email

9   address pop up in there -- riley@toxicdove.  There were a lot

10  of email addresses in this case, weren't there?

11         THE WITNESS:  Yes, ma'am.

12  Q    A lot of them seem to be circular and maybe unsure of how

13  to tie them together, but I want to try and do that with you.

14  Okay?

15  A    Okay.

16  Q    Let's start with one -- realgunnlife@gmail.com.

17  R-E-A-L-G-U-N-N life.  Who did that email address belong to?

18  A    Peyton Gunn.

19  Q    And how did you know?

20  A    There is email correspondence between Peyton and his

21  father.

22  Q    Is that correspondence something that I actually went

23  through with Michael -- I'll call him senior -- Mr. Gunn while

24  he was on the stand?

25  A    Yes, ma'am.

1          MS. LYONS:  Ms. Long, can we pull up Exhibit 39 for

2  Special Agent Godbee?

3          Tell me when you see it, Special Agent Godbee.

4          THE WITNESS:  I see it.

5  Q    Can you tell us what that is?

6  A    It's a forensic examination report from Magnet AXIOM.

7  Q    And AXIOM is the software we've been talking about?

8  A    Yes, ma'am.

9  Q    Were you able to isolate some records in order to confirm

10 that the defendant was having conversations with anybody

11 through realgunnlife?

12 A    Yes, ma'am.

13 Q    And did you put those conversations or records into a

14 report or exhibit for trial?

15 A    We did.

16 Q    And is this that exhibit?

17 A    Yes, ma'am.

18         MS. LYONS:  Your Honor, the government would offer

19 Government's Exhibit 39 at this time for admission and

20 publication.

21         MR. MERZLAK:  No objection.

22         THE COURT:  Admitted and you may publish.

23         MS. LYONS:  Thank you, Your Honor.

24 (Government's Exhibit No. 39 is entered into evidence.)

25 Q    So, Special Agent Godbee, this first page -- is this just

1   the cover page?

2   A   Yes, ma'am.

3   Q   And it just gives you some bio -- I didn't mean

4   biographical; I'm sorry -- case name, case agent.

5       Can we go to the next page, Ms. Long?  And 004, please,

6   005, and that's perfect.  005 is perfect.  Thank you.  So if we

7   can just zoom in, for instance, on record number one on the top

8   so Special Agent Godbee can explain what we're seeing.

9       Special Agent Godbee, can you tell us what we're seeing

10  here?

11  A   Yes, ma'am.  This is correspondence between Mike Gunn and

12  Peyton Gunn.

13  Q   And was this one of the messages that I read to Mr. Gunn,

14  "Get your Comcast back?  Do you need paper products?"

15  A   Yes, ma'am.

16  Q   And he confirmed that he was the Mike Gunn in the "from"

17  box; correct?

18  A   Yes, ma'am.

19          MS. LYONS:  I think I then went to the next page,

20  Ms. Long, 006, and if we could focus on record four.

21          Did the senior Mike Gunn read this one?  We talked

22  about this one.  "I need my tripod for some photos."  Did we

23  talk about that?

24  A   Yes, ma'am.

25  Q   And he confirmed that he had that conversation?

1   A    Yes, ma'am.

2   Q    Now going to record five on the same page, who is in the

3   "from" line there?

4   A    Peyton Gunn using realgunnlife@gmail.com.

5   Q    And is this the message where he indicates that he needs to

6   borrow money?

7   A    Yes, ma'am.

8   Q    And scrolling on down do we then see a series of messages

9   from the senior Mr. Gunn where he is indicating that he is

10  leaving money in the mailbox, money under the mat, asking if

11  his son has found the money?

12  A    Yes, ma'am.

13  Q    And then he says, "I don't have any money on me now.  How

14  about tomorrow?"

15  A    Yes, ma'am.

16  Q    And this continues to go on.

17  A    Yes, ma'am.

18          MS. LYONS:  One more page, Ms. Long.  Thank you.  Keep

19  going.

20          Can you read that message into the record, Special

21  Agent Godbee?

22          THE WITNESS:  Yes, ma'am.  "I am at a church meeting a

23  HVAC guy from Atlanta so contact mom for the money.  She may

24  have some cash.  I have none.  Later from."

25  Q    And then the tag.

1     Can we scroll down, Ms. Long?

2     Another message from Mr. Gunn, Sr., and what does he say?

3   A   "At bank and bringing it to you.  Mom wants to know if Das

4   wants to spend the night."

5   Q   And while we see that message, I think we had a number of

6   people to testify that the minor son in this case is the

7   biological child of the defendant; correct?

8   A   Yes, ma'am.

9   Q   And it's your understanding that that minor child is now

10  living with the grandparents?

11  A   He is.

12  Q   He is?

13  A   He is living with the grandparents.  Yes, ma'am.

14  Q   And during the course of your interviews with either Amanda

15  Gunn or the minor female child in this case was it your

16  understanding that the minor son would often go sleep at his

17  grandparents' house while they were living in the Nicklaus

18  Court address?

19  A   Yes, ma'am.

20        MS. LYONS:  Scrolling down two more records.  We're

21  going to go to record number three.  We'll stop right here.

22        Special Agent Godbee, will you read record three for

23  me, please?

24        THE WITNESS:  Yes, ma'am.  "I need to talk to both of

25  you.  We cannot continue down this path.  We need to lay the

(Harold D. Godbee III-Direct by Ms. Lyons)                467

1  cards on the table so that everyone recognizes the seriousness

2  of what is happening."

3          MS. LYONS:  Ms. Long, if you'll go to the next page

4  down to record six.

5          Can you read this one Special Agent Godbee?

6          THE WITNESS:  "I cannot help you with any more cash.

7  I learned that I have to replace my upstairs air handler and it

8  will be expensive.  You need to possibly sell the Saab for some

9  quick cash."

10 Q   Now I know Mr. and Mrs. Gunn came in and talked about how

11 they financially supported their son and there were some

12 questions asked about families love family and when they can

13 help family they help family, but did you read these chats,

14 Special Agent Godbee?  Have you read these chats?

15 A   Yes, ma'am.

16 Q   What was the tone of these chats as it related to

17 Mr. Peyton Gunn borrowing money from his parents?

18 A   That he repeatedly borrowed money and that at a point Mike

19 Gunn told him that he couldn't help him anymore with money.

20         MS. LYONS:  Ms. Long, can we go to 39-016?

21         And so now, Special Agent Godbee, the only reason I am

22 asking you about this is was there a particular reason you

23 wanted to put that photograph in this exhibit for realgunnlife?

24         THE WITNESS:  Well, that shows a character from the

25 movie Elf compared side by side with Peyton Gunn's father Mike

(Harold D. Godbee III-Direct by Ms. Lyons)                468

1  Gunn.

2  Q   Was that simply an attempt to connect Peyton Gunn to this

3  email address?

4  A   Yes, ma'am, to show that he does use this email address.

5           MS. LYONS:  And going backwards one page, Ms. Long, to

6  39-015.

7           Who is that?

8           THE WITNESS:  That's Peyton Gunn.

9  Q   And where did you find that photo?

10 A   In that email address.

11 Q   Thank you.  So now that we've established that Peyton Gunn

12 is the one using realgunnlife, I'd like to ask you to take a

13 look at Government's Exhibit 32.

14 A   It's up.

15 Q   Special Agent Godbee, what do you see on your screen?

16 A   It's a screen grab of a Magnet AXIOM examine.

17 Q   And are there two pages or two screen grabs in this

18 exhibit?

19 A   Yes, ma'am.

20 Q   Again, did you prepare this in anticipation for trial?

21 A   Yes, ma'am.

22 Q   And what two email accounts are captured in this screen

23 grab?

24 A   Toxicdove@outlook.com and realgunnlife@gmail.com.

25 Q   Have there been any alterations made to this email

(Harold D. Godbee III-Direct by Ms. Lyons)                469

1   specifically on page two?

2   A    Yes, ma'am.

3   Q    What has been altered?

4   A    There is an image of the little girl that has been

5   sanitized.

6   Q    And so have we put a black box over that --

7   A    Yes, ma'am.

8   Q    -- for the purpose of this exhibit?

9   A    Yes, ma'am.

10  Q    Other than that, is this exhibit accurate?

11  A    Yes, ma'am.

12  Q    Thank you.

13       Your Honor, the government would seek to admit Exhibit 32

14  at this time and publish.

15            MR. MERZLAK:  No objection.

16            THE COURT:  Admitted and you may publish.

17       (Government's Exhibit No. 32 is entered into evidence.)

18            MS. LYONS:  So can we go to the first page of that

19  exhibit which would be 32-002?  Thank you, Ms. Long.

20            So, Special Agent Godbee, starting on the left-hand

21  side of the screen the inbox emails are highlighted; is that

22  correct?

23            THE WITNESS:  Yes, ma'am.

24  Q    And so across the middle what does it tell us about this

25  particular email?

1  A    So the word toxicdove was searched and these are the

2  results -- the matching results -- of that.  So there were four

3  of them out of 1488.  There's four emails between

4  toxicdove@outlook.com and realgunnlife@gmail.com.

5  Q    Now they all have the same time; so it could be duplicates;

6  correct?

7  A    Yes, ma'am.

8  Q    All right.  And what are we seeing on the right?

9  A    On the right on the top is just a preview of the email and

10 then on the bottom right would be the attachments on the email.

11 Q    Okay.  And in that preview box who does it say this message

12 is from?

13 A    Peyton Gunn using realgunnlife@gmail.com.

14 Q    And when does it tell you it was sent?

15 A    9/8/2019 at 08:16.

16 Q    And who was it sent to?

17 A    Toxicdove@outlook.com.

18 Q    And what were the attachments?

19 A    There were five attachments and they are .jpeg attachments

20 which are generally images.

21 Q    .jpeg means a picture?

22 A    Yes, ma'am.

23        MS. LYONS:  So, Ms. Long, can we go to the second page

24 in this exhibit, 003?  Thank you.

25        Are we seeing a similar screen here?

1        THE WITNESS:  Yes, ma'am.

2   Q   What is the difference?  What has been highlighted in this

3   second screen?

4   A   We've just highlighted the third email attachment and then

5   it shows the preview of that attachment and we've sanitized the

6   picture.

7        MS. LYONS:  Your Honor, at this time the government

8   would be asking to hand out the exhibit books with child

9   pornography.

10        THE COURT:  All right.  You may go ahead.

11        Ladies and gentlemen of the jury, you remember the

12   instructions I gave you about viewing child pornography.

13        MR. MERZLAK:  Your Honor, again, may the record

14   reflect that Mr. Gunn will not be viewing any items in the red

15   binder?

16        THE COURT:  The record will reflect that.

17   Q   Special Agent Godbee, I gave you a copy?

18   A   Yes, ma'am.

19   Q   Okay.  So on the screen was the -- Ms. Long, if we could

20   put the second page of 32 back up.

21        Thank you, Mrs. Widener.

22        So, Special Agent Godbee -- third page.  So I think what

23   you just testified to was that the redacted box covers and

24   image of child pornography; correct?

25   A   Yes, ma'am.

(Harold D. Godbee III-Direct by Ms. Lyons)          472

1       MS. LYONS:  And, Your Honor, at this time the

2  government would seek to admit Exhibit 33 which is the image

3  that is 20190713_030218.jpeg?

4       MR. MERZLAK:  No objection.

5       THE COURT:  This is Exhibit 33?

6       MS. LYONS:  Thirty-three, Your Honor.

7       THE COURT:  Okay.  Admitted.

8    (Government's Exhibit No. 33 is entered into evidence.)

9       MS. LYONS:  Ladies and gentlemen of the jury and

10 Special Agent Godbee, I would ask you to open to tab 33.

11      Special Agent Godbee, I would ask you to describe this

12 image for the record.

13 A   This is ---

14      MS. LYONS:  And, ladies and gentlemen, you don't have

15 to keep the books open if you don't choose to.

16      Go ahead, Special Agent Godbee.

17 A   It's an image ---

18 Q   Special Agent Godbee, if you'll just confirm for me, is

19 this an image of the minor?  Her hands are over her head.  They

20 are in some sort of black cuff holding them together.  She has

21 a collar around her neck.  There is a chain coming from the

22 collar.  She is on some sort of blue bedding with stripes.  Her

23 breasts are exposed.  She has some sort of strip of black

24 clothing around her stomach.  Her legs are spread and being

25 held open by some sort of straps on either side.  Her vagina is

1  visible.  There is semen spread on her vagina and there is a

2  black anal plug.  Is that accurate?

3  A    Yes, ma'am.

4  Q    That is the image that you found in the email belonging to

5  Peyton Gunn; is that correct?

6  A    Yes, ma'am.

7  Q    Now, Special Agent Godbee, we heard the young lady -- the

8  little girl -- testified that her father, Michael Peyton Gunn,

9  had access to her email and her passwords?

10  A    Yes, ma'am.

11        MS. LYONS:  I would ask Ms. Long to pull up

12  Government's Exhibit 37.

13        Special Agent Godbee, please tell me when you see that

14  exhibit on your screen?

15        THE WITNESS:  I see it.

16  Q    Can you tell me what this exhibit is in reference to?

17        Ms. Long, you may need to scroll through it in order for

18  you to get your bearing because it's multiple pages.

19  A    I'm familiar with it.

20  Q    What's in this exhibit, Special Agent Godbee?

21  A    These are email correspondence to and from

22  ggirl06@outlook.com where two people -- I believe two people

23  are having a conversation.

24  Q    But it's within the same email address?

25  A    Correct.

(Harold D. Godbee III-Direct by Ms. Lyons)                    474

1  Q   Okay.  And did you prepare this exhibit for trial?

2  A   We did.

3  Q   And did this come from the search warrant return for the

4  ggirl06@outlook.com?

5  A   Yes, ma'am.

6        MS. LYONS:  Your Honor, the government seeks to admit

7  Exhibit 37 at this time and publish.

8        MR. MERZLAK:  No objection.

9        THE COURT:  Admitted.  You may publish.

10     (Government's Exhibit No. 37 is entered into evidence.)

11        MS. LYONS:  Is there any way to zoom in the left-hand

12  side just a little bit?

13        Just starting at the bottom, Special Agent Godbee, who

14  is on the "from" line and the "to" line?

15        THE WITNESS:  The "from" line is ggirl06@outlook.com

16  and the "to" line is the same email address.

17  Q   I'm sorry?

18  A   Ggirl06@outlook.com.

19  Q   And what is the subject?

20  A   "Hey.  Read this ASAP."

21  Q   What is the message?

22  A   "If nana asks, you do not want to do the birthday dinner

23  this weekend.  Love dad."

24  Q   Date that it was sent?  Date and time, please?

25  A   January 24, 2020 at 2:16 and ten seconds p.m.

1   Q    And as you scroll up or move up, what is the next message?

2   A    From the same ggirl06@outlook.com to ggirl06@outlook.com,

3   same subject, and it says "Okay.  Love you."

4   Q    Now the first message said "Dad"?

5   A    Right.

6   Q    The second response is, "Okay.  Love you."

7   A    Yes, ma'am.

8   Q    What does the third response above it say?

9   A    "Love you more."

10  Q    So two people are telling one another that they love each

11  other?

12  A    That's the way that I read this.

13  Q    Fourth message up?

14  A    "LOL see you in a bit."

15  Q    And what's above that?

16  A    "See you more."

17  Q    All within the same email account?

18  A    Yes, ma'am.

19  Q    Thank you.

20       Ms. Long, if we can scroll down to the next page in this

21  exhibit.

22       Were you able to find another email that was relevant in

23  this case, Special Agent Godbee?

24  A    Yes, ma'am.

25  Q    And what's the date on this email?

(Harold D. Godbee III-Direct by Ms. Lyons)                476

1   A   Friday, December 6, 2019, 08:18:53.

2           MS. LYONS:  Ms. Long, can you back out just a smidge?

3           Special Agent Godbee, why was this email relevant to

4   you?

5           THE WITNESS:  It was relevant to me because it listed

6   user IDs and passwords for accounts that we were beginning to

7   find that were becoming more and more relevant in the

8   investigation.

9           MS. LYONS:  And scrolling down just a smidge,

10  Ms. Long, let's start with the B's.

11          What is Badoo?

12          THE WITNESS:  Badoo is a website.  It's a European

13  website, I believe, that is like a social meet-up site from

14  what I understand.  I am not completely familiar with it.

15  Q   Had you seen the word Badoo referenced in any images?

16  A   I did.

17  Q   Do you remember the image?

18  A   I remember that it was on -- written on something that a

19  little girl was holding up.

20  Q   Like a sign?

21  A   A piece of paper, yes, ma'am.

22  Q   And going to the C's.

23  A   Craigslist.

24  Q   Was that relevant to your investigation?

25  A   I know that the little girl was trafficked using

1  Craigslist.

2  Q   And is there a user ID there for the Craigslist account?

3  A   Yes, ma'am.

4  Q   And is there a password for the user account?

5  A   There is.

6  Q   That's a long password, isn't it?

7  A   Yes, ma'am.

8  Q   How about eBay?

9  A   Yes -- I'm sorry.  Are you asking ---

10 Q   Yes.  How about eBay?  Does that user ID at all look

11 familiar to you?

12 A   It does.

13 Q   Tell me why.

14 A   That user ID, I believe, is similar to other accounts we

15 found of businesses that Peyton Gunn started or was involved

16 with or had listed in other documents.

17 Q   And what are we seeing in the F's?

18 A   I'm sorry?

19 Q   F?

20 A   Facebook.

21 Q   And is Facebook one of the media sites that you've heard

22 about from the child in the case?

23 A   Yes, ma'am.

24 Q   Thank you.

25     Ms. Long.

(Harold D. Godbee III-Direct by Ms. Lyons)     478

1        Flickr.  Did Flickr begin to be relevant in this case?

2    A   It did.

3    Q   And where else did you see Flickr?

4    A   The mom, I believe, was posted on Flickr at some point.

5    Q   Now under the Facebook right above Flickr, what is the

6    password?

7    A   Can you repeat that?  I just want to make sure I heard what

8    you said.

9    Q   What is the password for the Facebook account right above

10   Flickr?

11   A   Slut -- S-L-U-T -- 19$$.

12   Q   Thank you.

13       Can we keep scrolling down, Ms. Long?

14       Another Flickr account.  Yes?

15   A   Yes, ma'am.

16           MS. LYONS:  Can we stop right here?

17           Instagram.  Are you familiar with Instagram?

18           THE WITNESS:  Yes, ma'am.

19   Q   Here do we see more than one Instagram account?

20   A   Yes, ma'am.

21   Q   And had the child told you anything about Instagram?

22   A   She had.

23   Q   What did she tell you about Instagram?

24   A   That there are accounts that she was on that were used.

25   Q   Do you recall the defendant mentioning an incident on his

(Harold D. Godbee III-Direct by Ms. Lyons)                479

1   -- in his recording of his interview on February 6th where he

2   relayed that he and his wife had to handle an issue where his

3   daughter had sent out images of herself via Snapchat or

4   Instagram -- he couldn't remember?

5   A    I remember hearing it in the recording.

6   Q    And do you remember if the child in this case relayed a

7   different version of that story?

8   A    I do.

9   Q    What was that?

10  A    That he sent it out.  She didn't send it out.

11  Q    And that her friends saw it?

12  A    Yes, ma'am.  People in her friend group.

13          MS. LYONS:  Please scroll down.

14          What is MeetMe?

15          THE WITNESS:  MeetMe is another social media platform

16  to meet people is what I understand.

17  Q    Did that seem consistent with the fact that part of the

18  child's roles and responsibilities was to meet a certain number

19  of men a week and schedule appointments and flirt?

20  A    That is -- that made sense to me.

21          MS. LYONS:  Scrolling down.  Let's stop here for one

22  second, Ms. Long.  Thank you.

23          We see a Microsoft Office account, the first one,

24  Special Agent Godbee.  What is the user ID there?

25          THE WITNESS:  Sysadmin@txdv.cloud.

1  Q   And then the second one?

2  A   You're asking for the second ---

3  Q   User ID, please?

4  A   Riley@toxicdove.com.

5  Q   And then moving down, what is the email address listed for

6  Microsoft, that third one right there?

7  A   Ad@txdv.cloud.

8  Q   And the description under this Microsoft Office Group?

9  A   Toxic Dove Administration Division.

10 Q   As if it is a business?

11 A   Right.  Yes, ma'am.

12        MS. LYONS:  We'll scroll on down.  Thank you.

13        Again, does this document go on and on with more user

14 names and user passwords?

15        THE WITNESS:  Yes, ma'am.

16        MS. LYONS:  And, Ms. Long, if you'll stop a little bit

17 further down right under "Model Management."

18        Special agent Godbee, is Model Management familiar to

19 you?

20        THE WITNESS:  Yes, ma'am.

21 Q   Tell us why.

22 A   The little girl was posted on modelmanagement.com.

23 Q   And were you able to find screenshots?

24 A   Yes, ma'am.

25 Q   Did you, in fact, serve a subpoena for which was not

1   responsive?

2   A    Yes, ma'am.

3   Q    Model Management is not in the United States, is it?

4   A    Not from what I understand.

5   Q    Nothing we can do to compel them?

6   A    No, ma'am.

7   Q    Why don't we close this exhibit and move to Government's

8   Exhibit 42 for you to review and approve?  Tell me when it's on

9   your screen, please.

10  A    It's up.

11  Q    What exhibit is this, Special Agent Godbee?

12  A    It is a picture of the little girl.  It's on the

13  modelmanagement.com website.  It's a screen grab of her face.

14  Q    And did you prepare this exhibit in anticipation of trial?

15  A    We did.

16  Q    Any alterations or modifications to it?

17  A    No, ma'am.

18          MS. LYONS:  The government would seek to admit 42 and

19  publish at this time.

20          MR. MERZLAK:  No objection.

21          THE COURT:  Admitted.  You may publish.

22      (Government's Exhibit No. 42 is entered into evidence.)

23  Q    What is the name of the name of the website in the top

24  left-hand corner?

25  A    Modelmanagement.com.

1    Q    Who is that in the center?

2    A    The little girl.

3              MS. LYONS:  Can we go to the next page, Ms. Long?

4              Who is that?

5              THE WITNESS:  The little girl.

6              MS. LYONS:  The third page.

7              Who is that?

8              THE WITNESS:  The little girl.

9    Q    Do those screenshots corroborate the information that you

10   found in this emails?

11   A    Yes, ma'am.

12   Q    I would like to take you to the toxicdove account.  Since

13   you were able to connect realgunnlife to toxicdove, let's take

14   a look at things from ToxicDove.  Okay?

15   A    Sure.

16             MS. LYONS:  Ms. Long, can we pull up 40?

17             And, Special Agent Godbee, let me know when that's on

18   your screen.

19             THE WITNESS:  It's on my screen.

20   Q    What are we looking at here?

21   A    We're looking at your Google Play order receipt, a screen

22   grab of it.

23   Q    And is it from the toxicdove@outlook.com?

24   A    Can you repeat that question?

25   Q    Is it associated with toxicdove?

1  A    It is, yes, ma'am.

2  Q    And did you prepare that in anticipation of trial?

3  A    We did.

4  Q    How -- I'm sorry, not how.  Has it been altered or modified

5  in any way?

6  A    No, ma'am.

7         MS. LYONS:  Your Honor, the government would seek to

8  admit and publish 40 at this time.

9         MR. MERZLAK:  No objection.

10        THE COURT:  Admitted and you may publish.

11  (Government's Exhibit No. 40 is entered into evidence.)

12  Q    Starting at the top, Special Agent Godbee, can you give us

13  the date and the email address?

14  A    Yes, ma'am.  It's from googleplay-noreply@google.com to

15  toxicdove@outlook.com.  The date is 9/17/2019 at 5:50 p.m.

16  Q    What is this a receipt for?

17  A    It is a subscription to a Virtual Private Network or VPN.

18  Q    Okay.  So two things I want to ask.  When you say

19  subscription, what does that mean?

20  A    For one month they're paying 11.99 for the use of this VPN

21  is how I interpret that.

22  Q    And in the middle of the page does it say that it auto

23  renews?

24  A    Yes, ma'am.

25  Q    So every month they have the opportunity to renew this

1   subscription?

2   A    Right.  For 11.99 a month it will automatically renew.

3   Q    Do you see some sort of payment method listed there?

4   A    Yes, ma'am.

5   Q    A Visa?

6   A    Yes, ma'am.

7   Q    Okay.  That was to the toxicdove@outlook.com account?

8   A    Yes, ma'am.

9   Q    What do you use a VPN for?

10  A    A VPN is used to conceal the actual IP address that you're

11  using.  So it will use another IP address that is not the one

12  you're using.

13  Q    So if law enforcement is trying to track somebody down by

14  something that's traveling over their IP address but they're

15  using a VPN, will law enforcement see the correct IP address or

16  the wrong IP address?

17  A    Initially they'll see the wrong.  It takes effort -- a lot

18  of effort -- to determine the correct IP address if you can

19  even do it on occasion.

20        MS. LYONS:  Ms. Long, can we pull up Government's

21  Exhibit 41?

22        THE WITNESS:  I see it.

23  Q    Do you see it?

24  A    Yes, ma'am.

25  Q    What is this one, Special Agent Godbee?

(Harold D. Godbee III-Direct by Ms. Lyons)          485

1  A   This is an email for Venmo or in relation to Venmo from
2  venmo@venmo.com to toxicdove@outlook.com.
3  Q   And did you prepare this exhibit in preparation for trial?
4  A   We did.  Yes, ma'am.
5  Q   Has it been altered or modified in any way?
6  A   No, ma'am.
7        MS. LYONS:  Your Honor, the government would seek to
8  admit No. 41 at this time.
9        MR. MERZLAK:  Without objection.
10        THE COURT:  Okay.  Admitted.  You may publish.
11        MS. LYONS:  Thank you, Your Honor.
12     (Government's Exhibit No. 41 is entered into evidence.)
13  Q   Starting at the top with the date and the emails, can you
14  read into the record what we're seeing, Special Agent Godbee?
15  A   Yes, ma'am.  The subject is "Your April through June 2020
16  transaction history" from venmo@venmo.com. The date is
17  7/25/2020 at 4:46 a.m. to toxicdove@outlook.com.
18  Q   And in the substance of this email who is Venmo saying "Hi"
19  to?
20  A   Riley.
21  Q   And what is the user name for this Venmo account?
22  A   @ToxicDove.
23  Q   And how long does it say that @ToxicDove has been a user?
24  A   Since 6/30/19.
25  Q   And the email address for ToxicDove?

1   A   Toxicdove@outlook.com.

2   Q   Thank you.  Do you know what Venmo is, Special Agent

3   Godbee?

4   A   I know that it's a way to pay people.  If I wanted to send

5   you a Venmo I would just send you money via Venmo.

6   Q   Thank you.  I apologize, Special Agent Godbee.  I think I

7   missed one which was when we were talking about Craigslist we

8   were speaking about Jonathan Grantham and how you were able to

9   locate him through the use of the Craigslist messages; is that

10  right?

11  A   Yes, ma'am.

12  Q   Was he the only person who was messaging -- was he the only

13  person who was messaging ggirl06@outlook.com?

14  A   No, ma'am.

15  Q   In fact, there were a lot of people messaging her?

16  A   Yes, ma'am.  I think I have a list of at least 20 people.

17  Q   And are they still targets?

18  A   They sure are.

19  Q   I would like to move to Government's Exhibit 43, Special

20  Agent Godbee.  Please tell me when it's on your screen.

21  A   It's on my screen.

22  Q   Is this an exhibit that you prepared for trial?

23  A   We did, yes, ma'am.

24  Q   Did this relate to the family's passwords?

25  A   It does.

(Harold D. Godbee III-Direct by Ms. Lyons)

1  Q   And did you make any alterations or modifications to these
2  documents?
3  A   No, ma'am.
4       MS. LYONS:  Your Honor, at this time the government
5  seeks to admit No. 43 and publish.
6       MR. MERZLAK:  No objection.
7       THE COURT:  Admitted.  You may publish.
8     (Government's Exhibit No. 43 is entered into evidence.)
9  Q   Special Agent Godbee, this exhibit is over 500 pages, isn't
10 it?
11 A   I believe so.  I can't see on here, but I know it's
12 significant.
13 Q   I just want to highlight a couple of things and we'll leave
14 this exhibit, okay?  When you reviewed these exhibits did it
15 appear to have all of the user names and passwords for every
16 member of the family?
17 A   Yes, ma'am.  It had a lot.
18       MS. LYONS:  Ms. Long, if you will go to the bottom of
19 0004, please, and blow it up.
20       What accounts do we see on the four lines kind of
21 right in the middle that end in the number 182, 184, 185, and
22 186?
23       THE WITNESS:  Amandagunn@outlook.com,
24 anonlexi@outlook.com, lexihaze69@outlook.com,
25 lexilikesithot@outlook.com.

1          MS. LYONS:  And, Ms. Long, can you scroll up in this

2    and stop right there?

3          What other emails do we see?

4          THE WITNESS:  Amandaggunn@outlook.com,

5    agunn421@gmail.com, anonlexi69@gmail.com, lexihaze69@gmail.com.

6    Q    Now we've heard Amanda Gunn's name several times.  Can you

7    remind us who Lexi Haze is?

8    A    That is a name that Amanda was associated with online.

9    Q    And who gave her that name?

10   A    Peyton Gunn.

11         MS. LYONS:  Bottom of 43005, please.

12         What is the account that you see starting at the

13   bottom moving upwards?

14         THE WITNESS:  GGirl06.

15   Q    And do you see variations of ggirl06 with different

16   numbers?

17   A    Yes, ma'am.

18         MS. LYONS:  Turning to the next page, Ms. Long, 006,

19   if you'll highlight maybe just a whole left side, please.

20   Let's start at the top.  Can you highlight the top portion and

21   we'll scroll our way through?

22         Special Agent Godbee, I don't need you to read all of

23   them for me, but starting at the top line do you recognize the

24   ggirl06 account?

25         THE WITNESS:  I recognize -- yes, ma'am, I recognize

(Harold D. Godbee III-Direct by Ms. Lyons)          489

1  that variations of it throughout this.

2  Q    And you see Elder Scrolls Online, Extreme Restraints?

3  A    Yes, ma'am.

4  Q    Fredericks of Hollywood?

5  A    Yes, ma'am.

6         MS. LYONS:  Scrolling down, Ms. Long.

7         And in the middle, a student.ccboe.net.  Special Agent

8  Godbee, are you familiar with Columbia County Board of

9  Education?

10        THE WITNESS:  Yes, ma'am.

11 Q    That's a student email address in the middle of all of

12 those email addresses; correct?

13 A    Right.  That is an email address given to a student when

14 they're enrolled in that school or Columbia County schools.

15        MS. LYONS:  Scroll on down, please.

16        And do you see Instagram listed?

17        THE WITNESS:  Yes, ma'am.

18 Q    And I see Kik.

19 A    Yes, ma'am.

20 Q    Are you familiar with Kik?

21 A    Yes, ma'am.

22 Q    How many times a week do you hear about Kik, Special Agent

23 Godbee?  Let me rephrase that.  How many times a day do you

24 hear about Kik?

25 A    Multiple.

(Harold D. Godbee III-Direct by Ms. Lyons)                490

1   Q    Why?

2   A    It's a popular site right now that children are using to

3   exchange and message each other on.

4   Q    And what other group of people like to exchange pictures on

5   Kik?

6   A    Pedophiles.

7          MS. LYONS:  007.  Thank you, Ms. Long.

8          Do we see more accounts for ggirl06?

9          THE WITNESS:  Yes, ma'am.

10  Q    Do we see Pinterest?

11  A    Yes, ma'am.

12  Q    What does Pinterest remind us of, Special Agent Godbee?

13  A    Pinterest is a site that Amanda Gunn discussed and that she

14  was posted on.

15  Q    And do we see PornHub?

16  A    Yes, ma'am.

17  Q    And what does that remind us of?

18  A    PornHub was a site that Amanda Gunn was posted on.

19  Q    And turning to page 009, this is called Gunn Famiglia;

20  correct?

21  A    Yes, ma'am.

22  Q    And if you turn to 43-011 and we make that big and we look

23  at Gunn Famiglia, who is the account holder's name?

24  A    The account holder's name is Michael Gunn.

25  Q    Does this document go on for hundreds of pages with lots of

1  different passwords for Amanda and for the child in this case?

2  A    Yes, ma'am.

3  Q    And were these documents all found within the Word document

4  section of these devices -- of the devices you analyzed?  I'm

5  sorry.  Devices you analyzed.

6  A    Yes, ma'am.

7  Q    And, in fact, were found on 1B23_1.  Can you explain what

8  1B23_1 stands for generally, Special Agent Godbee?

9  A    So 1B23 would be -- it's a naming convention that the FBI

10 uses.  1B23_1 would be -- usually, it's the -- it would be the

11 hard drive of what's in 1B23.  In this case it is a bit

12 different.  We just named -- because there are so many devices,

13 we named similar devices, 1B23_1, 1B23_2 and so on.

14 Q    And there were so many devices in this case are you able to

15 remember them off the top of your head?

16 A    No, ma'am.

17 Q    If I asked you what 1B23_1 is, can you answer me?

18 A    I would feel more comfortable looking at something -- a

19 document that I wrote.

20 Q    To refresh your recollection?

21 A    Yes, ma'am.

22 Q    Did you create a little bit of a summary chart with some of

23 the devices?

24 A    I did.

25 Q    If I hand that to you, would it refresh your recollection?

1    A    Sure.

2    Q    And I'm looking -- I'll repeat what I'm looking for.

3         May I, Your Honor?

4              THE COURT:  Yes.

5              MS. LYONS:  Thank you.

6              I'm looking to find out what 1B23_1 was.

7              THE WITNESS:  That was a 32 gigabyte SanDisk Ultra

8    Plus Mini SD card.

9    Q    So you found all of these family passwords in documents on

10   that 32 gigabyte SanDisk you said thumb drive or ---

11   A    It's a Mini SD card.

12   Q    A Mini SD card.  Thank you.  Now during the course of your

13   preparation for trial and your investigation, did you also try

14   to search some key words that became relevant in the case?

15   A    Yes, ma'am.

16   Q    Was one of those words "slut"?

17   A    Yes, ma'am.

18   Q    Why did you search the word "slut"?

19   A    For a lot of reasons.  One, the little girl had "whore"

20   written across her butt and slut and whore were to me related

21   names.  There's also some indication that the little girl was

22   called a slut.

23   Q    And so you wanted to search to see if you could find any

24   documentation with that word in it?

25   A    Yes, ma'am.

1          MS. LYONS:  Ms. Long, can you pull up Exhibit 44 for

2   Special Agent Godbee?

3          THE WITNESS:  I see it.

4   Q    And what is that?

5   A    It's a forensic examination report.

6   Q    And does it indicate that you were able to find the term

7   "slut" on some of the devices in this case?

8   A    Can you go to the next page of it?  I just see the first

9   page.

10  Q    Are you ready, Special Agent Godbee?

11  A    I don't see the keyword search that I used on this.

12  Q    Do you see the documents that came up as a result of your

13  keyword search?

14  A    I see a table of contents.

15         MS. LYONS:  Ms. Long, can you go to 44024?

16         Special Agent Godbee, do you see a document in front

17  of you called "Daily Tasks"?

18         THE WITNESS:  Yes, ma'am.

19  Q    Was that one of the documents that came up when you

20  searched the word "slut"?

21  A    Yes, ma'am.

22  Q    Okay.

23         And then, Ms. Long, can you go to 44030?

24         Is that another document that came up when you searched the

25  word "slut"?

1   A    Yes, ma'am.

2   Q    And so, Special Agent Godbee, there were a number of

3   documents that came up when you searched that term; correct?

4   A    Yes, ma'am.

5   Q    Did you compile them together in one exhibit?

6   A    Yes, ma'am.

7   Q    In preparation for court?

8   A    I did.

9   Q    Did you make any alterations to that document?

10  A    No, ma'am.

11       MS. LYONS:  Your Honor, at this time we would seek to

12  admit Government's Exhibit 44, an AXIOM report from 1B23_6 for

13  the search term "slut" and publish at this time.

14       MR. MERZLAK:  No objection.

15       THE COURT:  No objection?  It's admitted.  You may

16  publish.

17       MS. LYONS:  Thank you, Your Honor.

18    (Government's Exhibit No. 44 is entered into evidence.)

19       MS. LYONS:  So, Ms. Long, let's start on 44024.

20       Special Agent Godbee, in Axiom I think we saw it when

21  we did the search for ToxicDove, but in AXIOM if you search a

22  term and you have an email return or you're looking at a hard

23  drive will you get a whole bunch of choices and you can choose

24  to look at whatever document has the word "slut" in it?

25       THE WITNESS:  Yes, ma'am.

(Harold D. Godbee III-Direct by Ms. Lyons)                    495

1          MS. LYONS:  Okay.  And so if we can make this bigger.
2          When you typed in the word "slut" is this one of the
3   documents that came up?
4          THE WITNESS:  Yes, ma'am.
5   Q   And this is a prayer?
6   A   It is.
7   Q   So the word "slut" is in the second line.  Is that correct?
8   A   Yes, ma'am.
9   Q   "Pray the Slut's Modern Prayer five times throughout the
10  day.  You must do this in at least two separate sessions."  Is
11  that what it says?
12  A   Yes, ma'am.
13  Q   "Pray the Slut's Mantra twice throughout the day," and it
14  gives a list of things like a checklist?
15  A   Yes, ma'am.
16  Q   Like the lists for dad?
17  A   Yes, ma'am.
18         MS. LYONS:  How about 44032, please.
19         Special Agent Godbee, was this another document that
20  the word "slut" came up in?
21         THE WITNESS:  Yes, ma'am.
22  Q   Starting at the top just maybe three lines, please?
23  A   Read it?
24  Q   Yes, please.
25  A   "It is important that you concentrate only on what is being

1   said in this recording.  You will be silent.  The only noise

2   should be your moans when you feel pleasure.  Your only words

3   will be repeating what you hear, repeating things about

4   yourself or repeating what you love.  Things about yourself

5   would include saying that you are a whore or a cum slut, that

6   you are worthless, that you're only pretty when you're covered

7   in cum and anything else that is about you."

8   Q    Can you read the next line, please?

9   A    "Things that you love would include saying that you love it

10  when men hold you down.  You love it when they look at your

11  body.  You love it when they fuck you and anything else that

12  you love."

13  Q    Thank you.  Do you recall that one of Amanda Gunn's tattoos

14  said "No means Yes"?

15  A    Yes, ma'am.

16        MS. LYONS:  44085, please.  Thank you.

17        What does this page say?

18        THE WITNESS:  "Who you are."

19        MS. LYONS:  And if we go to the next page, Ms. Long,

20  and highlight the left-hand column.

21        And tell me if I am reading this incorrectly, Special

22  Agent Godbee.  "Sluts are mentally more similar to animals

23  having a simple purpose and simple needs.  Because of your

24  simplicity you are unable to fully understand how different you

25  really are.  However, a slut only has to think back at all the

1   mistakes of her life and all of the times that she believed she

2   knew better than others to see that there is a difference

3   though.  Do not make the mistake of believing that you are

4   special or more than the truth that you know in your heart."

5          Do you recall the child and Amanda Gunn talking to you

6   about having to be reminded of who they were?

7   A   Yes, ma'am.

8   Q   And do you remember what the word was?  Who were they?

9   A   Sluts and whores.

10         MS. LYONS:  Page 44104, please.  Highlight the word on

11  the right top corner.  Thank you.

12         Was this one of the words that was tattooed on Amanda

13  Gunn?

14         THE WITNESS:  Yes, ma'am.

15         MS. LYONS:  44150.

16         Can you read this one to us, Special Agent Godbee?

17         THE WITNESS:  Yes, ma'am.  It's titled, "Desiring of

18  Pain.  Desiring of pain is used to cast off your selfish

19  nature.  Say this prayer when you have become distracted from

20  your purpose or when you wish to reaffirm your most base

21  desires in meditation or worship to Lord Satan.  I am a

22  collection of holes, empty when not filled with cock.  Take

23  this body to the depths of hell that I may be eternally raped

24  in every hole."

25         MS. LYONS:  44153.

1          This is called the "Slut's Modern Prayer to Satan."

2          THE WITNESS:  Yes, ma'am.

3   Q    Again, is Satan something that the child had told you

4   about?

5   A    Yes, ma'am.

6   Q    Do you specifically remember what the defendant had told

7   the child about who she was in relation to Satan?

8   A    I believe he told her that she was Satan's daughter.

9   Q    Please correct me if I am wrong in my reading.  "I call to

10  you, Satan.  You are my love.  I have become a dark temple.  I

11  am bound to your will.  Enter into my body.  Fill it with your

12  perfect love.  Consume my mind.  Take away my selfish thoughts.

13  My mind has only one thought now.  I wish to please and be

14  used, broken for you.  I will obey.  I forsake my own pleasure

15  even though in my own sick mind I find pleasure in their abuse.

16  I am nothing.  I am not special.  I am worthless, a sick fuck

17  whore for men.  I am dirty, a twisted cock whore.  I am nasty,

18  a cock-sucking addicted bitch.  I am disgusting desperate for

19  their spit and cum.  I am filthy cherishing their piss on me.

20  I am sadistic desiring more punishment."

21       Special Agent Godbee, do you remember how long the child

22  said she was taught about Satan and the Order?

23  A    Two to three years.

24  Q    There is more than this in here, isn't there, Special Agent

25  Godbee?

1   A   Significantly more.

2   Q   I am not sure, Special Agent Godbee, if you'll be able to

3   recollect this off the top of your head and if I need to find

4   the document for you, I will, but what device is 1B23_6 or

5   1B23_2?

6   A   1B23_6 is a 32 gigabyte SanDisk Ultra.  What was the second

7   one you asked?

8   Q   1B23_6.

9   A   Yeah, 1B23_6 is a 32 gigabyte SanDisk Ultra.

10  Q   And was there also a PNY Performance 8 gigabyte SD card?

11  A   That sounds right.  If you want me to look at my 302 I can

12  tell you exactly what the title of it is.

13  Q   It was found on at least one of those devices, if not both;

14  correct?

15  A   Can you ask that again?

16  Q   1B236 and 1B232 -- those documents were found on those two

17  devices.  We just need to confirm which devices those are; is

18  that correct?

19  A   Yes, ma'am.

20  Q   Okay.  Give me one second.  Special Agent Godbee, do you

21  recall where the torture images were found in this case?

22  A   They were found on one of the devices in the clear

23  packaging.

24  Q   Okay.

25  A   I don't remember the number that I have it labeled as.

1   Q    I'll find that document for you.  I apologize.  It's just

2   not at my fingertips right now.  We'll keep going.

3            MR. MERZLAK:  Your Honor, we have no objection to him

4   referring to his notes or investigative file if he needs to.

5            THE COURT:  Okay.  Thank you.

6            MS. LYONS:  Thank you.  Well, we'll keep referring to

7   the 1B numbers.

8            The 1B numbers refer to the devices; correct?

9            THE WITNESS:  Yes, ma'am.

10           MS. LYONS:  Okay.  I think at this time, Your Honor, I

11  think we have one more email and then we would be moving to the

12  child pornography.

13           THE COURT:  Okay.

14  Q    Special Agent Godbee, one thing we've been talking a little

15  bit about are the similarities between Amanda Peyton Gunn's

16  punishment by the defendant and the child's punishments and

17  treatment by the defendant.  Did you notice anything with words

18  or markings between Amanda and the child?

19  A    I noticed that they were marked in similar places on their

20  body and that sexually -- sexual type of derogatory terms were

21  used.

22  Q    And we saw tattoos earlier in this case of Amanda.  Were

23  you able to find images of the child in this case where words

24  had been written on her?

25  A    Yes, ma'am.

1   Q   Can we take a look at two of those images?

2   A   Sure.

3   Q   Let's start with Government Exhibit 50.

4   A   You want me to open this?

5   Q   No.  Fifty is going to show up on your screen first and

6   then we'll move to 49.

7   A   I see it.  Sorry.

8   Q   Do you recognize that image?

9   A   Yes, ma'am.

10  Q   What is that?

11  A   That is the little girl with the word "whore" written on

12  her upper butt cheek.

13          MS. LYONS:  Your Honor, the government would seek to

14  admit and publish Government's Exhibit 50 at this time.

15          MR. MERZLAK:  No objection.

16          THE COURT:  Admitted.  You may publish.

17      (Government's Exhibit No. 50 is entered into evidence.)

18  Q   Is this an image you identified in this case, Special Agent

19  Godbee?

20  A   Yes, ma'am.

21  Q   And was it one that the child referred to on the stand that

22  had been written by the defendant?

23  A   Yes, ma'am.

24  Q   Let's move to 51.  Excuse me.  Forty-nine.  Backwards.

25          And, ladies and gentlemen, this one is in your red books.

1    MR. MERZLAK:  Your Honor, again, just let the record

2  reflect that Mr. Gunn will not be looking in the red binder of

3  these exhibits.

4    THE COURT:  All right.

5    MS. LYONS:  Your Honor, the government seeks to admit

6  and publish 49 at this time.

7    THE COURT:  Any objection?

8    MR. MERZLAK:  No, Your Honor.

9    THE COURT:  All right.  You may admit and publish.

10   (Government's Exhibit No. 49 is entered into evidence.)

11 Q   Special Agent Godbee, can you tell us what we're looking at

12 in Government's Exhibit 49?

13 A   Yes, ma'am.

14 Q   Can you start from the top and describe the image?

15 A   It's the little girl with her head turned to her left.

16 Around her left nipple is written "dirty girl".  Around her

17 right nipple is written "nympho".  Under her breast is the date

18 12/6/2019.  Under her other breast is written "rape me pls"

19 with five lines and three exclamation points after me and three

20 explanations points after please or P-L-S.  The word "whore" is

21 written across her midsection with an arrow pointing towards

22 her head.  A phone number is written underneath that

23 706-513-680 and that last digit is not visible.  "Don't ask

24 permission" is written under that and then LOL is written under

25 that.  To the left is "love cum" with three exclamation points.

(Harold D. Godbee III-Direct by Ms. Lyons)       503

1   Q    Do you recall that -- I think we've already mentioned this
2   -- "Don't ask permission."  Is that similar to no means yes?
3   A    Yes, ma'am.
4   Q    And "rape me, please."  No means yes?
5   A    That's the same concept to me.
6   Q    And in her testimony did the child tell us who had written
7   these words on her?
8   A    Yes, ma'am.
9   Q    Who?
10  A    Her dad, Peyton Gunn.
11  Q    And who took the picture?
12  A    Peyton Gunn.
13  Q    Special Agent Godbee, did you also do a search for the term
14  "Satan"?
15  A    Yes, ma'am.
16  Q    Were you able to find documents related to the word
17  "Satan"?
18  A    Yes, ma'am.
19  Q    I am going to show you the beginning of Government Exhibit
20  48.
21  A    I see it.
22  Q    Is this an exhibit that you prepared for court?
23  A    We did.  Yes, ma'am.
24  Q    And, again, you used AXIOM by searching the term "Satan"?
25  A    Yes, ma'am.

1  Q    And your search results came from, again, 1B23_6 and also

2  1B23_2; is that correct?

3  A    Yes, ma'am.

4  Q    And Special Agent Godbee, 1B23_6 is the PNY Performance 8

5  gigabyte storage device with the 111 images of torture; is that

6  correct?

7  A    Can you say that again?

8  Q    Is 1B23_6 the PNY Performance 8 gigabyte SDHC, black in

9  color, with 111 images including the torture images?

10 A    I would need to look at my 302 to be sure.

11 Q    Okay.  So in this document that we're looking at, did you

12 prepare this for court?

13 A    I did.

14 Q    And did you make any modifications?

15 A    No, ma'am.

16      MS. LYONS:  Your Honor, the government would seek to

17 admit 48.

18      THE COURT:  Any objection?

19      MR. MERZLAK:  No, Your Honor.

20      THE COURT:  Admitted.  You may publish.

21      (Government's Exhibit No. 48 is entered into evidence.)

22 Q    And what's this first screen telling us, Special Agent

23 Godbee?

24 A    It is a Magnet AXIOM screen grab where "Satan" is the

25 search term used or a filter used.

1   Q   Does it tell you how many documents were returned?

2   A   42 of 35,878.

3   Q   Let's take a look at just a couple of these pages, okay,

4   Special Agent Godbee?

5   A   Sure.

6   Q   48-017.  What is this?

7   A   It is a document that's titled "The 13 Laws of the

8   Brotherhood of Satan Explained."

9   Q   And this document according to page 48-023 was saved in

10   Word; is that correct?

11   A   Yes, ma'am.

12   Q   And going to 48024.  What is this document?

13   A   It is a document titled "Being a Satanic Friend" with an

14   email address under it.

15   Q   And going to page 48031.  What is this book?

16   A   It's titled "Hell's Army.  Spiritual Warfare Training

17   Manual."

18   Q   And finally 48-052.  What is this?

19   A   A document titled "We all believe in Satan."

20   Q   Now going back to the initial first page where you have the

21   screen grab for this exhibit, what is the highlighted document?

22   What is the name of that document in the middle?

23   A   The Satanic Bible.

24          MS. LYONS:  Thank you, Ms. Long.

25          Special Agent Godbee, are you okay?

1              THE WITNESS:  Yes, ma'am.

2    Q    Can you explain the idea of what interstate commerce is

3    when it relates to child pornography?

4    A    Yes.  Yes, ma'am.  So, traditionally, thinking about

5    something crossing state lines or a tool that's used like a

6    cellphone or a computer or internet that crosses state lines.

7    Q    So in this particular case some of the counts in the

8    indictment refer to whether or not interstate commerce -- did

9    the sex trafficking -- was it impacted by interstate commerce.

10   Did we have movement from the state of Georgia into the state

11   of South Carolina?

12   A    Yes, ma'am.  Jonathan Grantham took the little girl from

13   Georgia to South Carolina and back.

14   Q    And as it relates to the production and the possession of

15   child pornography in this particular case you had an Apple

16   iPhone; is that right?

17   A    Ma'am?

18   Q    Did the minor have an Apple iPhone?

19   A    Yes, ma'am.

20   Q    Are parts of that Apple iPhone made in China?

21   A    Yes, ma'am.

22   Q    Does that mean that parts of that phone have traveled or

23   been shipped in interstate and affecting commerce?

24   A    Yes, ma'am.

25   Q    The same thing with the Samsung or Motorola; is that

1  correct?

2  A    Yes, ma'am.

3  Q    Thank you.  You were also able to make a forensic copy of

4  the Acer laptop in this case; is that correct?

5  A    Yes, ma'am.

6  Q    And when you did the forensic image of the Acer laptop, did

7  you find an image of the minor in bondage?

8  A    I believe so, but I would need to look at my 302 to ---

9  Q    Now before we look at the final images of child

10 pornography, Special Agent Godbee, I want to ask you a little

11 bit about NCMEC -- The National Center for Missing and

12 Exploited Children.  When you find and locate these images of

13 child pornography, what do you do with them?

14 A    I send them to NCMEC.

15 Q    Why?

16 A    For a few reasons.  To find out if the child is a known

17 victim that the images have already been found on another

18 person's devices or to find out if it's an unknown person or

19 child and then to also have it in the NCMEC database where if

20 that is found on another person's device they know who the

21 child is.

22 Q    So let's talk about the NCMEC database for a second.  What

23 is the NCMEC database?  What's in there?

24 A    It's very, very large database of known and unknown child

25 porn images.

1  Q    And so what if I bring you a phone and it has images on it

2  and you send those child pornography images to NCMEC, what will

3  NCMEC tell you?

4  A    They'll generally tell me if it's a known image that

5  they've already seen this image before; they know who that

6  child is or if it's a completely new image and they don't know

7  who that child is -- it's never seen before.

8  Q    Now on the basis of the dates and Special Agent Anders'

9  work in bringing this case to you will this child's photographs

10 now be in the NCMEC database?

11 A    Yes, ma'am.

12 Q    And if her picture were to show up on somebody else's phone

13 in the future and an FBI agent or law enforcement agent were to

14 find it, they could notify NCMEC and ask who this girl is?

15 A    Yes, ma'am.

16 Q    Is that correct?

17 A    Yes, ma'am.

18          MS. LYONS:  I beg the Court's indulgence.

19          All right.  Special Agent Godbee, if you have your red

20 book in front of you, I would like to finish with the child

21 pornography.  Okay?

22          THE WITNESS:  Okay.

23          MS. LYONS:  Mrs. Widener, can we take the monitor

24 down, please?  Thank you.

25          Your Honor the government seeks to introduce and

1   publish Government's Exhibits 52, 53, 54, 55, 56, 57, 58, and

2   59 at this time.

3          THE COURT:  Any objection?

4          MR. MERZLAK:  No, Your Honor.

5          THE COURT:  Admitted.  And you may publish.

6      (Government's Exhibit Nos. 52-59 are entered into

7   evidence.)

8   Q   Special Agent Godbee, let's all start together with Exhibit

9   52, if you'll turn to that tab.  This is count one -- excuse

10  me; not count one.  I apologize.  It's count four of the

11  indictment, Special Agent Godbee -- count four of the

12  Superceding Indictment.  Can you describe that image for the

13  jury?

14  A   Yes, ma'am.  This is a picture of the little girl with her

15  vagina exposed and her shirt is pulled up exposing her nipple.

16  She's laying on her back on a wooden floor.

17  Q   Government Exhibit 53 is count five of the indictment and

18  what are we seeing?

19  A   This is a picture of the little girl.  Her vagina is

20  exposed.  Her hand is touching her vagina.  She has a bra on.

21  Q   This was originally a video; correct?

22  A   Yes, ma'am.

23  Q   This is just a screenshot from that video?

24  A   That's correct.

25  Q   Government Exhibit 54, please.  Can you describe that?

(Harold D. Godbee III-Direct by Ms. Lyons)                510

1   A    That is a picture of the minor -- the little girl -- with

2   her vagina exposed and she's holding the vibrator that we found

3   in the house to her vagina and her breasts are exposed.

4   Q    Is she wearing some sort of jean -- blue jean?

5   A    Yes, ma'am.

6   Q    Fifty-five.

7             THE COURT:  Wait a minute.  Ms. Lyons, I just want to

8   make sure because the exhibit list seems to be a little bit

9   different in terms of the counts.

10             MS. LYONS:  Yes, Your Honor.

11             THE COURT:  52 is count four.  53 is count five.  You

12   did not say 54.  What is that?

13             MS. LYONS:  Count six.

14             THE COURT:  Six.  Okay.  Thank you.  I'm sorry.

15             MS. LYONS:  I apologize.

16             THE COURT:  No, that's okay.  Thank you.

17             MS. LYONS:  And 55 would be count seven.

18             Take a look at 55, please, Special Agent, Godbee.  Can

19   you describe this one, please?

20             THE WITNESS:  That's a picture of the little girl with

21   a chain.

22   Q    With a chain around her neck and some sort of bralet -- a

23   cream-colored bralet across her stomach?

24   A    Yes, ma'am.

25   Q    And there is a pin with a yellow head that appears to be

(Harold D. Godbee III-Direct by Ms. Lyons)            511

1    protruding from somewhere in her pubic region.  She has red

2    marks around her breasts.  There appears to be a yellow needle

3    somewhere around her left armpit.  Her hair is partially

4    covering her face.  That is count seven, Exhibit 55.

5        Can we turn to 56?  Now these are screenshots of two videos

6    that were found on the Seagate desktop; is that correct,

7    Special Agent Godbee?

8    A    Yes, ma'am.

9    Q    And because they were videos we wanted to just prepare

10   screenshots instead; correct?

11   A    Yes, ma'am.

12   Q    So what are we seeing here in this Exhibit 56?

13   A    These are screenshots of different points of the video with

14   the little girl's breast exposed.  She's wearing a gray sweater

15   and she's touching herself.

16   Q    Now if we turn the page under the same exhibit do we see a

17   second video that was also found on the Seagate desktop?

18   A    Yes, ma'am.

19   Q    And what does this movie depict?

20   A    The little girl.

21   Q    And does the minor appear to have her hand on her vagina?

22   A    Yes, ma'am.

23   Q    And is she wearing a blue shirt?

24   A    Yes, ma'am.  Yes, ma'am, gray shirt, blue shirt.

25   Q    Exhibit 57.  These two videos came from the Western Digital

1   one terabyte that was green.  Did you find the same two videos

2   on another hard drive?

3   A    Yes, ma'am.

4   Q    And are these the same two screenshots of those videos that

5   you found?

6   A    Yes, ma'am.

7   Q    Let's turn to 58, please.  Now before -- I'm sorry.

8   Fifty-eight is from the SanDisk Ultra Plus Mini SD card.  What

9   are we looking at in 58?

10  A    It's the minor -- the little girl -- with her breast

11  exposed and her hand touching her breast.

12  Q    Now before we move to Exhibit 59, is 59 the series of

13  photos of torture?

14  A    Yes, ma'am.

15  Q    And I am going to describe those for the record.

16  Fifty-nine are images that were found on the PNY Performance

17  8 gigabyte SD card.  There were a total of 111 images.  Is that

18  correct, Special Agent Godbee?

19  A    Yes, ma'am.

20  Q    And it included in those images 111 images of child

21  pornography.  Were there images of torture?

22  A    Yes, ma'am.

23        MS. LYONS:  Let's start with the first page, ladies

24  and gentlemen.

25        Special Agent Godbee, do you see a blurry image of the

1   minor from behind?

2          THE WITNESS:  Yes, ma'am.

3   Q   In the second page do you see a clearer picture of the

4   minor from behind with a pink pillow or blanket and her nails

5   are blue?

6   A   I see the first picture is the clear one.  The second one

7   is blurry.

8   Q   I apologize.  My notebook may be slightly different.  And

9   as the pictures move on do we then move to an image of the

10  minor with needles in her?

11  A   Yes, ma'am.

12  Q   Is there an image of needles in her vagina?

13  A   Yes, ma'am.

14  Q   And in the image of the needles in her vagina, is there a

15  butt plug in her anal cavity?

16  A   Yes, ma'am.

17  Q   Is there more than one needle?

18  A   Yes, ma'am.

19  Q   Is there an image of her face?

20  A   Yes, ma'am.

21  Q   Can you see a chain hanging down from her face?

22  A   Yes, ma'am.

23  Q   Is there a close-up of her vagina where the needles are

24  going into her vagina?

25  A   Yes, ma'am.

1  Q   Is there an image of her vagina with at least 20 needles

2  and a clothes pin clamp on her vagina?

3  A   Yes, ma'am.

4  Q   Are there several images that are going closer of that

5  shot?

6  A   Yes, ma'am.

7  Q   With more needles?

8  A   Yes, ma'am.

9  Q   Is there an image of her nipple with a clothes pin and a

10 needle shoved through her nipple?

11 A   Yes, ma'am.

12 Q   Is there a second image of that?

13 A   Yes, ma'am.

14 Q   Is there a close-up shot of the minor in pain?

15 A   Yes, ma'am.

16 Q   Is there another shot of the minor in pain with clothes

17 pins on her ears?

18 A   Yes, ma'am.

19 Q   Is there a third shot of the minor --

20 A   Yes, ma'am.

21 Q   -- in pain with clothes pins on her ear?

22 A   Yes, ma'am.

23 Q   Is there a picture of the clothes pins on her nipple with a

24 needle stuck through her nipple and blood coming out?

25 A   Yes, ma'am.

1  Q    Is there a blurry image of the same thing?

2  A    Yes, ma'am.

3  Q    Is there an image of the side of the minor's face with

4  blood smeared on her neck and face?

5  A    Yes, ma'am.

6  Q    Is there another image of that?

7  A    Yes, ma'am.

8  Q    Is there a third image of that?

9  A    Yes, ma'am.

10  Q    Is there an image of the minor with blood smeared on what

11  appears to be her breast and neck?

12  A    Yes, ma'am.

13  Q    Is there a second picture of blood around her breast and

14  neck?

15  A    Yes, ma'am.

16  Q    Is there a picture of her vagina with blood smeared all

17  over her thighs and vagina?

18  A    Yes, ma'am.

19  Q    Are there several pictures like that?

20  A    (Nods head.)

21  Q    Is there another picture of her face with blood and the

22  camera is close up under her nose and mouth?

23  A    Yes, ma'am.

24          MS. LYONS:  Your Honor, can we take a break?  That's

25  my last question.

1          THE COURT:  For him?

2          MS. LYONS:  Yes.

3          THE COURT:  Okay.  Let's take about a 15-minute break.

4          MS. LYONS:  Fifteen minutes, Your Honor?

5          THE COURT:  Fifteen.  Is that --

6          MS. LYONS:  Oh, no, I couldn't hear you.  I'm sorry.

7          THE COURT:  Fifteen.  So we'll be ready for cross?

8          MS. LYONS:  Yes, sir.

9      (The jury exits the courtroom at 4:58 p.m.)

10          THE COURT:  Ms. Lyons and Mr. Merzlak, may I see you?

11      (A bench conference is held as follows.)

12          THE COURT:  Just gauging time.  How long do you think
13  your cross is going to be?

14          MR. MERZLAK:  I would imagine probably two hours.

15          THE COURT:  Really?

16          MR. MERZLAK:  I do have some news at this moment.
17  Mr. Gunn has informed me as of now that he's not going to
18  testify.  So I think -- I think we could really just wrap this
19  up without doing the cross today and do it in the morning,
20  charge, and be done with it.

21          MS. LYONS:  I would prefer to do cross tonight.

22          THE COURT:  Okay.  Two hours.  You want to keep them
23  here until 7 o'clock?  I am just asking.

24          MR. MERZLAK:  I am not going to come up with any more
25  questions.  I mean, I've already got what I need.

1          MS. LYONS:  I'll leave it to your discretion, Your

2   Honor.

3          MR. MERZLAK:  It's not a mad -- but I wanted to let

4   you know that so now we know we'll be doing closings.

5          THE COURT:  Do you think it will be two hours?

6   Probably?

7          MR. MERZLAK:  Yes, sir.  I promise you I am not going

8   to be ---

9          THE COURT:  Let me think about it while we're on

10  break.

11         MS. LYONS:  Thank you, Your Honor.

12      (Bench Conference Ends.)

13         THE COURT:  Let's recall the jury, please.

14      (The jury enters the courtroom at 5:18 p.m.)

15         THE COURT:  Ladies and gentlemen of the jury, I want

16  to remind each of you again that any feelings that you may have

17  had about images that you just saw must not affect your

18  determination of the issues in this case and your duty to be

19  fair and impartial to both sides.  As I have previously

20  instructed you Mr. Gunn is presumed innocent of the charges

21  against him and at all times the government bears the burden of

22  proving his guilt of each of the elements of the charges

23  against him beyond a reasonable doubt.  Please remember that no

24  matter what you think or feel about the images that you've just

25  seen this afternoon, your duty is to follow the law as I will

1    instruct you at the end of the case.

2           Now let me tell you where we are in this trial.  After

3    talking to the lawyers -- Mr. Merzlak will need to

4    cross-examine.  Certainly, he will have the right on behalf of

5    the defendant, Mr. Gunn, to cross-examine Agent Godbee.  We're

6    going to finish that in the morning.  After talking to the

7    lawyers what I can tell you tonight is that you will get this

8    case tomorrow.  The evidence will end tomorrow and I will

9    instruct you on the law tomorrow.  You'll hear the closing

10   arguments and you'll get the case to deliberate and decide on a

11   verdict.  So you will finish tomorrow.  We will be finished

12   tomorrow; so I wanted you to know that.

13          It appears that it may take a couple of hours to

14   cross-examine Agent Godbee.  I think that what we'll do is

15   break tonight and then we will take up cross examination in the

16   morning and then we will move right on in to finishing the

17   trial tomorrow.

18          So I am going to excuse all of you until 9 o'clock

19   tomorrow morning and allow you to go home and have dinner, do

20   whatever else you need to do.  Please remember as you leave

21   here my constant instructions:  Do not talk to each other.  Do

22   not talk to anyone.  No research.  Don't listen to any press

23   accounts.  Don't read anything about it.  Please do not post

24   anything on social media about this trial.  Simply go home and

25   enjoy your evening and we'll be back tomorrow morning at nine

1   and we'll finish up.  I hope you have a pleasant evening.

2          Please rise for the jury.

3      (The jury exits the courtroom at 5:21 p.m.)

4          THE COURT:  All right.  Please have a seat until the

5   jury clears.  Thank you.

6          MS. LYONS:  I forgot to admit two exhibits.  I just

7   wanted to formally make sure they are admitted, Your Honor.

8          MR. MERZLAK:  We have no objection.

9          THE COURT:  What are they?

10          MS. LYONS:  46 and 47.  They are duplicate images of

11   child pornography but they were found on a different device.

12   So I just want to make sure that they get admitted into the

13   record.

14          THE COURT:  46 and 47.

15          You said no objection, Mr. Merzlak?

16          MR. MERZLAK:  No, Your Honor.  No objection.

17          THE COURT:  All right.  Without objection, they're

18   admitted.

19      (Government's Exhibit Nos. 46 & 47 are entered into

20   evidence.)

21          THE COURT:  Was that an accurate statement to the jury

22   that we'll finish tomorrow?  Is that your feeling?

23          MR. MERZLAK:  That's my understanding at this point,

24   Judge.

25          THE COURT:  Good.  Thank you.  I am always reluctant

1   to do that, but it seemed like that was the correct course

2   tonight.

3            THE COURT SECURITY OFFICER:  We're clear.

4            THE COURT:  They're clear.  In recess until 9 a.m.

5   tomorrow.  Thank you.

6        (The hearing is concluded and resumes on Thursday, November

7   18, 2021, at 9:00 a.m. as follows.)

8            THE COURT:  Good morning.  Anything we need to go over

9   before the jury comes back?

10           MS. LYONS:  No, Your Honor.

11           MR. MERZLAK:  No, Judge.

12           THE COURT:  Is the news announced in the sidebar

13  yesterday, is that still -- the information you provided in the

14  sidebar yesterday --

15           MR. MERZLAK:  Yes, Your Honor.

16           THE COURT:  -- is that still correct?

17           MR. MERZLAK:  Yes, Your honor.

18           THE COURT:  No change.

19           MR. MERZLAK:  No change.

20           THE COURT:  Very well.  All right.  Let's recall the

21  jury.

22       (The jury enters the courtroom at 9:00 a.m.)

23           THE COURT:  Good morning, ladies and gentlemen.  It

24  appears to the Court for the record that all of our jurors have

25  returned from their overnight recess or break; so we will now

1  resume the trial of the case.

2          I believe, Mr. Merzlak, you were beginning cross

3  examination of the witness; correct?

4          MR. MERZLAK:  Yes, Your Honor.  Thank you.

5          THE COURT:  Very well.  You may proceed.

6          MR. MERZLAK:  Permission to move around, Judge?

7          THE COURT:  Yes.  Granted.

8          MR. MERZLAK:  I'm not much behind the podium most of

9  the time.

10                      **CROSS EXAMINATION**

11  BY MR. MERZLAK:

12  Q    Good morning, Agent Godbee.

13  A    Good morning.

14  Q    I just want to start out with some of your training that

15  you highlighted.  You had a vast amount of military experience;

16  correct?

17  A    Yes, sir.

18  Q    And then what year did you go to the FBI Academy?

19  A    2016.

20  Q    And in the FBI Academy you're exposed to train on a vast

21  array of law enforcement stuff; correct?

22  A    Yes, sir.

23  Q    Investigations?

24  A    Yes, sir.

25  Q    Interviews?

(Harold D. Godbee, III-Cross by Mr. Merzlak)          522

1    A    Yes, sir.

2    Q    Crime scene processing?

3    A    Yes, sir.

4    Q    Fingerprints?

5    A    Yes, sir.

6    Q    Okay.  Different investigative tools to use in your

7    investigations?

8    A    Correct.

9    Q    And you're familiarized with the various departments within

10   the Federal Bureau of Investigation?

11   A    Departments?

12   Q    Divisions, specialty divisions?

13   A    Oh, yes, sir.

14   Q    Okay.  And you're familiarized with different individuals

15   at the locations that you serve in like the Augusta Agency on

16   what their specialty and training is as well?

17   A    Yes, sir.

18   Q    And some of those have advanced training just like

19   yourself?

20   A    Yes, sir.

21   Q    And you have advanced training and it was DExT Digital

22   Extraction?

23   A    Yes, sir.

24   Q    And other people have advanced training in evidence

25   recovery?

1   A    Yes, sir, we have ---

2   Q    Go ahead.  I'm sorry.

3   A    We have several people in the office that are on the

4   Evidence Response Team so that they are trained in evidence

5   collection and things and we have a person that's a negotiate

6   -- a trained negotiator, things like that.

7   Q    And then you're also trained in SWAT?

8   A    Yes, sir.

9   Q    Or tactical type of aspect?

10  A    Yes, sir.

11  Q    And you're provided training on DNA; correct?  Generally,

12  what DNA is and how it can be useful in an investigation?

13  A    I know what DNA is.  I have never been trained on anything

14  more than collecting like a swab of someone's mouth and then

15  sending it to the lab or something like that.

16  Q    Okay.  But you overall based on your knowledge, training,

17  and experience are familiar with the fact that you can collect

18  DNA?

19  A    Yes, sir.

20  Q    And you can send it to a lab?

21  A    Right.

22  Q    The FBI lab, actually?

23  A    Yes, sir.

24  Q    And that lab can compare it to another DNA sample?

25  A    Yes, sir.

1   Q    Or they can enter it into a database that may match with

2   some DNA sample that's in a database already; correct?

3   A    Yes, sir.

4   Q    And in basic training were you familiarized with how to

5   lift fingerprints?

6   A    Yes, sir.

7   Q    And the FBI has numerous ways to do that; correct?

8   A    Yes, sir.

9   Q    Old school -- you can use a black powder, essentially, and

10  then you lift it with some type of adhesive device; correct?

11  A    Yes, sir.

12  Q    And then items that are sent to a lab can actually be done

13  in a method that preserves them a lot longer than that black

14  powder; correct?

15  A    Yes, sir.

16  Q    They use -- I don't even know how to pronounce the word

17  like, but it's, basically, an aerosol Super Glue that attaches

18  to the fingerprint; correct?

19  A    Yes, sir.

20  Q    And then it can be photographed, compared, and displayed?

21  A    Yes, sir.

22  Q    In this particular case you collected a whole lot of items

23  from the residence of Mr. Gunn and his wife on February 7th

24  pursuant to a search warrant; correct?

25  A    Yes, sir.

1   Q    Those were hard drives out of computers?

2   A    Yes, sir.

3   Q    Flash drives that contained or, basically, data devices

4   that can store data on them?

5   A    Yes, sir.

6   Q    SD cards which are also data devices that can store data?

7   A    Yes, sir.

8   Q    And computers themselves?

9   A    Yes, sir.

10  Q    The vibrator that was pertinent to this investigation?

11  A    Yes, sir.

12  Q    And other items?

13  A    I'm sorry?

14  Q    And other items?

15  A    Yes, sir.

16  Q    And out of those items that you collected, how many of the

17  items that were digital actually contained child pornography?

18  A    I would have to look at my 302 to say exactly how many had

19  child pornography on it.

20  Q    Was it all of these devices?

21  A    No, sir.

22  Q    Was it just a couple of the devices?

23  A    It was -- when you say "a couple," I think of two, but I

24  think it was more than two.

25  Q    Two, three, four, maybe?  Somewhere in that area?

(Harold D. Godbee, III-Cross by Mr. Merzlak)          526

1  A   More than two.

2  Q   Okay.  That's fair.  Of all of those items that were

3  collected did you pull any DNA swabs off of it?

4  A   No, sir.

5  Q   Did you fingerprint any of those items?

6  A   No, sir.

7  Q   Did you send those items to the FBI laboratory with the

8  request for any DNA to be pulled from those items?

9  A   No, sir.

10 Q   Did you send any of those items to the Federal Bureau of

11 Investigation lab requesting that they be examined for latent

12 fingerprints?

13 A   No, sir.

14 Q   In a case of this nature knowledge on behalf of an

15 individual is part of it; correct?

16 A   Sir?

17 Q   That a person knowingly possessed something.

18 A   You're asking ---

19 Q   I'm asking you.

20 A   Is part -- can you repeat the question?  I'm sorry.

21 Q   Yes, sir.  In this particular case possession of child

22 pornography, a person has to knowingly possess that item;

23 correct?

24 A   Right.  Yes, sir.

25 Q   So if I was to go to your home, let's say in a different

1   manner and plant a kilo of cocaine in your house and I called

2   the government and said, "Hey, Agent Godbee has a kilo of

3   cocaine in his house," and they went and you gave them consent

4   to search and they found it, the government still has to prove

5   that you knew it was there; correct?

6   A    Exactly.

7   Q    Okay.  So the simple fact that an item that is illegal or

8   that is contraband is in someone's house doesn't necessarily

9   mean that they know that it is in there?

10  A    That's very true.

11  Q    And on these particular items that child pornography was

12  found on, if Mr. Gunn's DNA would have been found on those

13  items that would have been more evidence that he might have

14  known or touched those items and used those items; correct?

15  A    It would have been more evidence that he touched those

16  items, yes, sir.

17  Q    And if his fingerprints were found on those devices it

18  would have been additional evidence that he had at least

19  touched those items at some point?

20  A    Yes, sir.

21  Q    Just like if the cocaine hypothetical that was found in

22  your house, if you claim that you didn't have knowledge but

23  then they fingerprinted that item and your fingerprints were on

24  it, that would tend to show that you probably did have

25  knowledge that that cocaine was in your house or that you had

1  touched it?

2  A    Right.  I would have a hard time explaining that.

3  Q    And there's nothing that prevented you from submitting

4  these items for additional examination?

5  A    No, sir.

6  Q    The basics of this case occurred over a three-day time

7  period that you were involved in the investigation at the

8  house; correct?

9  A    The meat of the initial part of it, yes, sir.

10  Q    And we're talking about February 5, 2020, 6th and 7th;

11  correct?

12  A    Yes, sir.

13  Q    And the first day the main, I guess, mission is to identify

14  this child and get her out of harm's way?

15  A    Not necessarily get her out of harm's way, but we wanted to

16  identify the girl in the pictures and find out what was going

17  on.

18  Q    At least make sure that she wasn't in harm's way?

19  A    Right.  On the 5th we didn't have any evidence that she was

20  in harm's way more than she possibly could have been taking

21  selfies.

22  Q    And on that particular day when you met with Mr. Gunn and

23  Amanda, Mr. Gunn freely talked to you?

24  A    Yes, sir.

25  Q    And I believe it was your testimony that he stood face to

1   face and answered any questions that you had?

2   A    He did.

3   Q    Okay.  And it was Amanda that was standing off to the side?

4   A    Yes, sir.  I would say they were equidistant.  She was

5   maybe facing more towards Peyton and Peyton was pretty much

6   straight on with me.

7   Q    And she was talking less?

8   A    Yes, sir.

9   Q    Let's -- you indicated that you had some advanced training

10  in the investigation of child sexual exploitation; correct?

11  A    Yes, sir.

12  Q    And that is through classes that you've attended through

13  the FBI?

14  A    Yes, sir.

15  Q    As well as conferences and seminars that you've gone to?

16  A    Yes, sir.

17  Q    And I would imagine that the Federal Bureau of

18  Investigation puts out research bulletins that highlight

19  different areas of this?

20  A    Yes, sir.

21  Q    And you -- based on your specialty you read up on those to

22  stay abreast of what's going on?

23  A    I do.

24  Q    In your, essentially, sex crimes training, knowledge, and

25  experience, are you familiar with masochism?

1    A    Yes, sir.

2    Q    And are you familiar with sadism?

3    A    I know what Satanism is.

4    Q    No.  Sadism.

5    A    Oh, yes, sir.

6    Q    Can you explain what a masochist is or what masochism is?

7    A    So it's a way or lifestyle that sometimes people engage in

8    that there's punishment or bondage, things like that, that

9    elicit sometimes a positive response for one or both of the

10   parties.

11   Q    So in masochism isn't it true that it's generally some type

12   of sexual pleasure derived from the actual person themselves

13   receiving punishment or abuse or bondage?

14   A    I'm not sure who gets the pleasure.

15   Q    The sadist is the opposite?

16   A    I am not sure, but usually when I'm talking about

17   sadomasochism it's a combined term and so I am not sure who

18   gets the pleasure out of one and who gets the pleasure out of

19   the other or if both do.

20   Q    But when it's the combined term of sadomasochism, that's a

21   term for someone that engages in both?

22   A    I believe.

23   Q    It's a sadist and a masochist blended together?

24   A    That's the way that I understand it.  Yes, sir.

25   Q    Someone that somehow derives pleasure from being punished,

1    tortured, bounded, whatever, and someone that derived some type

2    of sexual pleasure from punishing someone, torturing them, etc,

3    abusing them?

4    A    That's the way that I understand those two terms.

5    Q    In this particular case, let me ask you just a couple of

6    more questions about that.  In your knowledge, training, and

7    experience you've learned that men can be sadomasochists?

8    A    Yes, sir.

9    Q    And that women as well can be sadomasochists?

10   A    Yes, sir.

11   Q    At some point during this investigation early on there was

12   an allegation by Mr. Gunn or a revelation to you or one of your

13   agents that there was some infidelity on behalf of Amanda in

14   the past; correct?

15   A    Yes, sir.

16   Q    And he acknowledged or revealed to y'all that she had been

17   on the internet performing sexual acts before; correct?

18   A    Yes, sir.

19   Q    And back in February of 2020 you actually located these

20   particular videos on the internet, did you not?

21   A    I am not sure of the exact date, but that sounds the right

22   timeframe.

23         MR. MERZLAK:  Okay.  May I approach the witness,

24   Judge?

25         THE COURT:  You may.

(Harold D. Godbee, III-Cross by Mr. Merzlak)          532

1  Q    I am hand handing you what's been previously marked for

2  identification Defendant's Exhibit No. 4.  Do you recognize

3  that particular item?

4  A    Yes, sir.

5  Q    And what just in general is that particular item?

6  A    A 302.  What we call an FD-302.

7  Q    What is a 302?  Can you explain to the jury?

8  A    It is an investigative report.  In simple terms, it is a

9  police report that the FBI calls it a 302.  That's how we

10 memorialize interviews or law enforcement actions.

11 Q    And is that a fair and accurate copy of the 302 that you

12 generated in this particular case on that particular day?

13 A    Yes, sir.

14      MR. MERZLAK:  Your Honor, at this time we'd tender

15 Defendant's Exhibit No. 4 into evidence.

16      MS. LYONS:  No objection, Your Honor.

17      THE COURT:  Admitted.

18      (Defendant's Exhibit No. 4 is entered into evidence.)

19 Q    Agent Godbee, can you tell me what date you completed that

20 report?

21 A    I believe I finished it on February 23rd and it was entered

22 into the system on February 26th.

23 Q    Okay.  And it relates to activities that you did on

24 February 23rd?

25 A    Yes, sir.

(Harold D. Godbee, III-Cross by Mr. Merzlak)

1   Q   And can you tell the jury what videos you found and where

2   you found them that were of Amanda Gunn?

3   A   Yes, sir.  Can I read this --

4   Q   Yes, absolutely.

5   A   -- first?

6   Q   And can you state the serial number of that report?

7   A   Sure.  It is serial number -- give me one second.  I am

8   trying to find it.  I don't believe that the serial number is

9   on this unless I am just missing it.

10  Q   That's okay.  I was trying to get that for counsel's

11  purposes.  If it's not on there, it's not on there.

12  A   I believe because it is printed out as the official record

13  the serial number is not on it when we print them out as the

14  official.

15  Q   Can you explain to the jury where you found videos of

16  Amanda Gunn and what the titles of those videos were?

17  A   Sure.  I found these -- the titles of these videos on

18  PornHub.com.

19  Q   What were -- how many videos were there that you reviewed

20  that day?

21  A   Seven.

22  Q   Could you read the titles of those videos to the jury?

23  A   Yes, sir.  "I am a worthless whore."  The second is

24  "Getting pounded in the dark. I am Amanda and I am a filthy

25  whore."  The third is "Riding a hard cock.  I'm Amanda and I'm

1   a filthy whore."  The fourth one is "I am a worthless whore.  I

2   am Amanda.  I'm a filthy whore."  The next one, "Double

3   penetrated II.  I'm Amanda and I'm a filthy whore."  The next

4   is "Double penetrated I.  I'm Amanda and I'm a filthy whore."

5   The next is "Fucked hard by two black cocks.  I'm Amanda and

6   I'm a filthy whore."

7   Q    And you reviewed these videos?

8   A    Yes, sir.

9   Q    And Peyton Gunn is not in any of those videos; correct?

10  A    There is a video -- one of them that had multiple people.

11  I thought I saw him, but I could not be sure.

12  Q    And these particular videos you don't have in your

13  possession, do you?

14  A    I don't.

15  Q    And on February 23, 2020, when you viewed these videos you

16  had the capability to save these videos for use in this

17  investigation?

18  A    I have the ability to screen record or take screenshots of

19  these videos.  At the time this was very early on and PornHub

20  is not an illegal site and the fact that pictures of this woman

21  were on or videos were on this site I felt that it was more

22  prudent to go the official route and get a search warrant for

23  this site for these accounts which we did.

24  Q    Okay.  And when was that search warrant --

25  A    When ---

(Harold D. Godbee, III-Cross by Mr. Merzlak)

1   Q   -- obtained?

2   A   I would have to look at my reports to figure out exactly

3   when we sent the search warrant.

4   Q   Okay.  But the answer to my original question, essentially,

5   is, yes, you could have screen-recorded them right then?

6   A   I could've.

7   Q   Based on what you saw on those videos, multiple people

8   having sex with Amanda, is that -- absent her later testimony

9   that she was forced to do this by Mr. Gunn, would that behavior

10  be consistent with masochism?

11  A   Can you say that again?

12  Q   If we take Amanda Gunn's claim from out from our mind that

13  she was forced to do this and she did this willingly or if we

14  assume she did this willingly, would that behavior be

15  consistent with masochism allowing herself to be used in that

16  way?

17  A   You're asking if I knew nothing else, that Amanda had never

18  told me anything, and I just looked at these videos?

19  Q   Yes, sir.

20  A   This would be consistent with a person engaging in what I

21  would say is some sort of deviant sexual behavior, masochism,

22  sadomasochism, however you want to say it, where they're being

23  used.

24  Q   Thank you.  That's all I needed from that particular

25  exhibit.  Now on February 5th when you and I believe it was

1   Agent Escobar went to the Gunn residence --

2   A    Yes, sir.

3   Q    -- correct?  You were eventually let in the home to check

4   on the minor?

5   A    Yes, sir.

6   Q    Okay.  And this was after you had already been informed

7   that the minor's phone was gone or missing?

8   A    Yes, sir.

9   Q    And you actually laid eyes on the minor?

10  A    I did.

11  Q    And said, "Hey, I'm Tripp," you know, introduced yourself?

12  A    Yes, sir.

13  Q    But you never asked her about her phone at that period of

14  time?

15  A    I don't think I did.  No, sir.

16  Q    And at that point you left?

17  A    We went upstairs after that.

18  Q    Excuse me.  You went upstairs and searched -- you did a

19  cursory search of her room for that phone?

20  A    Yes, sir.

21  Q    And you didn't locate it?

22  A    Sir?

23  Q    And you did not locate it?

24  A    No, sir.

25  Q    And you and Agent Escobar left at that point?

1  A    Yes.

2  Q    But you felt like something was wrong?

3  A    Yes, sir.

4  Q    And then there was this photograph contained in the images

5  that had a shoe in it?

6  A    That -- I believe it was maybe late, late that night or the

7  next morning or in the early morning hours I got the photograph

8  with the shoe.

9  Q    So sometime that evening or the next morning is when you

10  had an indication that maybe somebody was present taking that

11  picture?

12  A    Right.  Yes, sir.

13  Q    And that's based on an assumption that there was an actual

14  foot in that shoe laying there?

15  A    Yes, sir.

16  Q    And we don't really -- you don't know whether there was a

17  foot in the shoe or not?

18  A    I do know there was a foot in the shoe because the little

19  girl told me there was a foot in the shoe.

20  Q    Absent the child's statement just looking at that picture

21  you cannot tell this jury today that you know that there was an

22  actual foot in that shoe, can you?

23  A    Not beyond the fact that the little girl told me that when

24  the picture was taken who took the picture, who was wearing the

25  shoe when the picture was taken, and the fact that the shoe is

1    not on its side like it is just laying there and it -- and

2    based on looking at the other pictures in that series that

3    there's -- it's not there.  So the fact that the shoe is there

4    in one picture and not in these other pictures that were taken

5    in a very short timeframe that shoe moved which would lead me

6    to think that there is a foot in that shoe that moved that

7    shoe.

8    Q    That could be an assumption you could make?

9    A    Sure.

10   Q    So the answer to my question is, no, you cannot tell the

11   jury one way or the other whether there was a shoe -- or,

12   actually, a foot in that shoe absent all of these other

13   parameters?

14   A    Yes, sir.

15   Q    And you then have Grace -- excuse me, the minor --

16   interviewed on the following day, the 6th?

17   A    Yes, sir.

18   Q    And at the same time have additional agents go to the Gunn

19   residence to see if they can search the residence to get more

20   evidence, to look for that shoe?

21   A    Yes, sir.  So on the 5th we leave.  I talked to our Victim

22   Specialist, Nancy Uvegas, who helps me coordinate getting the

23   CAFI set up and we have it set up for the 6th which is when

24   Grace -- when the little girl is interviewed.

25   Q    And to your knowledge of the investigation and when your

1   agents arrive at the Gunn residence Mr. Gunn was present?

2   A    That's what I understand, yes, sir.

3   Q    And he gave them full authority to search his house?

4   A    He did.

5   Q    And you actually were there later on during the search of

6   the house?

7   A    Yes, sir.

8   Q    And you have reviewed the interview that was conducted by

9   Justin Garrick -- Agent Garrick?

10  A    Yes, sir.

11  Q    And you heard in that interview and while you were present

12  at times in that interview Mr. Gunn repeatedly tell you you

13  could search anything and that you could take anything from the

14  home?

15  A    Yes, sir.

16  Q    And on that particular day you guys didn't take any digital

17  devices, other than the two phones that were turned over?

18  A    Right.

19  Q    You didn't take any computers?

20  A    No, sir.

21  Q    You didn't take any thumb drives?

22  A    Not on that day, no, sir.

23  Q    Or any SD cards that were laying about?

24  A    No, sir.

25  Q    Or any records, documents?

(Harold D. Godbee, III-Cross by Mr. Merzlak)                540

1   A    No, sir, not that day.

2   Q    And at some point towards the end of that interaction at

3   the Gunn residence there is an interview that is conducted with

4   the child?

5   A    Yes, sir.

6   Q    And that's a brief interview once these shoes have been

7   found?

8   A    Yes, sir.

9   Q    And that interview was conducted with Amanda Gunn present?

10  A    Yes, sir.

11  Q    And Amanda Gunn, as we know in this case, has plead guilty

12  to sexually exploiting the child; correct?

13  A    To conspiracy to sex trafficking of the child.

14  Q    And that interview was conducted in front of Amanda?

15  A    Yes, sir.

16  Q    And you indicate that that's when the child said "That shoe

17  belongs to my dad and he took these pictures"?

18  A    Yes, sir.

19  Q    And then Mr. Gunn is arrested?

20  A    Yes, sir.

21  Q    And a search warrant is obtained and executed the following

22  day?

23  A    Yes, sir.  It's executed the following day.

24  Q    And the child and Amanda and possibly the younger child of

25  the Gunns, they are the individuals that are left in the home

1  when y'all leave on the 6th?

2  A   Yes, sir.

3  Q   Those are the individuals that have access to the home?

4  A   Right.  Yes, sir.

5  Q   And there was a lot of testimony about what occurred on the

6  night of the 5th after your initial meeting with the Gunn

7  family and that Mr. Gunn took items of evidence out of the

8  house, somehow got rid of those; correct?

9  A   Yes, sir.  Either that night or in the early morning hours

10 of the next day.

11 Q   And this was after you had already talked to him?

12 A   You're talking about on the 5th?

13 Q   Correct.

14 A   Yes, sir.  I had spoken to him and then the items were

15 taken out of the house.

16 Q   And after he was fully aware that this was a child

17 pornography investigation?

18 A   Yes, sir.

19 Q   And then once Mr. Gunn is removed from that situation via

20 arrest and the search warrant is conducted the following day

21 there's multiple items that were found -- more than two -- that

22 contain child pornography?

23 A   Yes, sir.

24 Q   Now during these first couple of days when it's been

25 brought to the attention of Amanda Gunn that her child has been

1  exhibited in this fashion at no time did Amanda Gunn relay to

2  you that she had these pornographic videos on the internet, did

3  she?

4  A   She, I believe, did -- I believe she did tell us there was

5  videos of her on the internet.

6  Q   Was that before or after Mr. Gunn informed you of that?

7  A   I believe that was -- that was on the 5th when we were on

8  the porch.  I believe that Mr. Gunn -- I believe Amanda was

9  inside and Mr. Gunn said there's some infidelity; she did some

10 stuff and it was recorded; and then I believe she comes back

11 out and they discuss that they were posted somewhere on the

12 internet.

13 Q   All right.  And at no time at that point does she reveal to

14 you that she was forced to do these videos by Mr. Gunn?

15 A   No, sir.

16 Q   And, in fact, it's much later on that she comes -- reveals

17 this claim to you?

18 A   When you say "much", what do you mean?

19 Q   She didn't call you the next day and say, oh, by the way,

20 Peyton is the one that did this?

21 A   No, sir.  It wasn't the next day, no, sir.

22 Q   Several weeks, actually?

23 A   I would need to look at my 302s to know exactly when it was

24 that she started disclosing that there was much more to this

25 story.

1  Q   And you conducted another interview with her and her sister

2  was actually present during that interview.  Do you recall

3  that?

4  A   Yes, sir.

5  Q   Okay.  And in that interview you repeatedly asked her why

6  you didn't think this was relevant on the day that we came to

7  your house?

8  A   Yes, sir.

9  Q   Because it was surprising to you that someone would

10 withhold that information?

11 A   It was surprising and frustrating, yes, sir.

12 Q   And in that interview she told you about these tattoos that

13 were on her body?

14 A   I believe that was the interview.  Yes, sir.

15 Q   And in that particular interview at no time did she claim

16 that Mr. Gunn had put those tattoos on her, did she?

17 A   No.  In fact, during that interview she had told me that

18 she didn't remember how those interviews -- how those tattoos

19 got on her.

20 Q   Just that she woke up with these tattoos?

21 A   Yes, sir.

22 Q   And that she never had any kind of discussion with Peyton

23 about how these could have gotten there?

24 A   I believe she said that she -- I believe her exact story

25 was -- and this could be memorialized in my 302, but I am not

1  sure -- that she was forced by Peyton to go to Atlanta and have

2  sex with hundreds of men and during that time she woke up and

3  there were these tattoos on her and Peyton told her that,

4  "Yeah, they put tattoos on you," or something of that effect.

5  Q    And she revealed this trip to Atlanta and she actually said

6  that she was in a movie theater where hundreds of men had sex

7  with her; isn't that right?

8  A    There was something mentioned about a movie theater, yes,

9  sir.

10  Q    And you found that quite surprising, didn't you?

11  A    Yes, sir.

12  Q    You found that pretty unbelievable, didn't you?

13  A    I found -- yes, sir.  That many people and waking up with

14  tattoos and not remembering where they came from I found

15  surprising.

16  Q    If an individual had traveled to Atlanta and voluntarily

17  engaged in that type of behavior would you say that that is

18  consistent with masochism?

19  A    Similar to the previous question, I would say that that was

20  some concerning deviant sexual behavior whether it's called

21  sadomasochism or masochism.

22  Q    And you also asked Amanda, you know, why would you not

23  think this was relevant in the past?

24  A    Yes, sir.

25  Q    And we heard Amanda here testify that it became relevant

1  when she was leading up to her arrest; correct?

2  A    To her I believe that that ---

3  Q    When she was in trouble?

4  A    Right.  I believe that's what she said.  I can't remember

5  her testimony exactly.

6  Q    Now you've had a lot of training in this, you know, type of

7  child exploitation and a large part of this is about

8  manipulation of the child, is it not?

9  A    A large part of this particular ---

10  Q    In a lot of sexual exploitation cases?

11  A    Yes, sir.

12  Q    Okay.  Sometimes children are groomed --

13  A    Yes, sir.

14  Q    -- into being involved into these experiences?

15  A    Sure.

16  Q    They're manipulated?

17  A    Yes, sir.

18  Q    And over the course of years that can have a tremendous

19  mental impact on a child, can it not?

20  A    Absolutely.

21  Q    And are you familiar with the term Stockholm Syndrome?

22  A    I am familiar with it just ---

23  Q    Sure.  Let me ask a couple of questions about it and maybe

24  you can determine whether or not it rings a bell or is familiar

25  with you or maybe you know it by another term in your

(Harold D. Godbee, III-Cross by Mr. Merzlak)

1    knowledge, training, and experience.  Is there situations where

2    individuals are manipulated to such an extent over a long

3    period of time that they do not act normal the way we would

4    think somebody would be if they were being abused?

5    A    That is my understanding of -- I believe it's called

6    Stockholm Syndrome, but I am absolutely no expert in that --

7    Q    Sure.

8    A    -- at all.

9    Q    But you've heard about it?

10   A    I've heard about it.

11   Q    You've heard about it in law enforcement investigations?

12   A    I have.  I have.

13   Q    And in cases of this nature based on your knowledge,

14   training, and experience, sometimes over a period of time

15   children willingly participate in this type of activity after

16   being abused for so long; correct?

17   A    Sure.  Children will oftentimes protect their abuser,

18   especially if it is a parent.  They'll lie for them or not

19   automatic right out of the gate disclose that.

20   Q    And Amanda Gunn is the child's parent; correct?

21   A    She is.

22   Q    People that are exhibiting this type of behavior can

23   cooperate with their abusers; correct?

24   A    Are you talking about the Stockholm?

25   Q    Yes, sir.

1  A    Can you ask that again?  I'm sorry.

2  Q    Yeah.  People that are suffering from this mental condition

3  can cooperate with their abusers?

4  A    I think so.  I just don't know enough about it.

5  Q    They can -- you know, obviously, they can love their abuser

6  still?

7  A    Again, I think that's the way -- that's the way I think

8  I've read or heard about it, but I just don't know --

9  Q    Enough about it.

10 A    -- enough about it.

11 Q    I understand.  And in this particular case the allegation

12 is that Grace -- excuse me, the child has been abused for a

13 significant period of time --

14 A    Yes, sir.

15 Q    -- manipulated for a significant period of time?

16 A    Yes, sir.

17 Q    And a child that goes through that type of abuse and

18 manipulation, it can take years for that child to overcome it,

19 can it not?

20 A    She may never overcome it.

21 Q    She may never overcome it.  Do you recall or approximately

22 recall how many days the child was left in the custody of

23 Amanda Gunn after Peyton's arrest?

24 A    I don't recall the number of days.  We worked as quickly

25 and as legally as we could to get her away from Amanda into

(Harold D. Godbee, III-Cross by Mr. Merzlak)          548

1  another environment, but I don't remember the exact amount of

2  days that she was with Amanda after Peyton's arrest.

3  Q    But more than one or two days?

4  A    I know it was more than one -- one night.

5  Q    And after Mr. Gunn was arrested he is transported to where

6  and housed where?

7  A    He was transported to Lincoln County Jail and housed in

8  Lincoln County Jail.

9  Q    And in your investigation you obtained phonecalls from the

10  Lincoln County Jail, did you not?

11  A    Yes, sir.

12  Q    Recordings of phonecalls?

13  A    Yes, sir.

14  Q    And that's because when you're in a detention facility like

15  that all of the calls that inmates make are recorded?

16  A    Yes, sir.

17  Q    And those telephone calls when an inmate calls someone

18  informs the person they're calling that it is from a jail?

19  A    Yes, sir.

20  Q    That the phonecall is being recorded?

21  A    Yes, sir.

22  Q    And most of the time the person actually has to pay to talk

23  to them?

24  A    I believe someone has to pay, yes, sir.

25  Q    And in this case there were multiple phonecalls immediately

1  after Mr. Gunn's arrest to Amanda; correct?

2  A   I'm not sure.  I don't -- I am not sure how many were made

3  between he and Amanda and he and his dad or ---

4  Q   Do you recall listening to phonecalls that were made

5  between Mr. Gunn and Amanda?

6  A   I don't recall those.

7  Q   Okay.  That was not part of your investigation?

8  A   We -- it was part of our investigation in that we got the

9  jail calls, but I just don't recall what was said on those

10  particular calls or I don't remember listening to them.

11  Q   But you or someone at your office would have listened to

12  them at some point to see if they had any evidentiary value;

13  correct?

14  A   Yes, sir.

15  Q   And at no point do you recall listening to them and hearing

16  Amanda accuse Mr. Gunn of anything; correct?

17  A   No, sir.  I don't remember.

18  Q   And no one from your office notified you of anything of

19  evidentiary value related to Amanda accusing Mr. Gunn of doing

20  anything on those calls?

21  A   Not that sticks out in my head or not -- at the time we

22  were moving very quickly trying to understand what was going on

23  and if there was other people involved or what we needed to do.

24  The only jail call that I remember hearing was one between

25  Peyton and his dad, I believe, telling his dad to go get

1    banker's boxes or something out of the house.  That is the only

2    one that sticks out in my head.

3    Q    Sure.  And those were notes that Mr. Gunn thought could

4    help with his innocence; correct?

5    A    That's the way that I took it.

6    Q    Okay.  In fact, he actually said, "Get those items and give

7    them to my attorney," did he not?

8    A    I believe he did.

9    Q    In your investigation you had an opportunity to talk to

10   Mr. Gunn -- Peyton's father; correct?

11   A    Yes, sir.

12   Q    Was there any indication that he had ever gone to the house

13   and actually completed that mission on behalf of his son?

14   A    I can't remember -- I seem to remember that he did go to

15   the house to pick up stuff or help the move or something like

16   that.

17   Q    Okay.  But no recollection that he actually picked up

18   banker's boxes full of items?

19   A    I believe I asked him about that and he said he didn't know

20   what he was talking about or he looked for them and didn't know

21   what he was talking about or something like that.

22   Q    And another thing about the phonecalls between Mr. Gunn and

23   Amanda, it surprised you that she was still talking to him, did

24   it not?

25   A    It was frustrating to me.  I don't think I knew that they

1   were talking maybe as much as they were and it was frustrating

2   to me that there was communications between the two of them

3   while we're trying to conduct an investigation and at that time

4   she was still a potential target of ours.  I believed that she

5   probably knew what was going on in the house because I think

6   she probably had to have heard the screams of the little girl

7   when needles were inserted in her, things like that, and so I

8   just -- I was surprised, frustrated.  I was a lot of things.

9   Q   Because the normal behavior, I would say, of a mother who

10  is told this about her child and that her husband is the

11  alleged person to do it, you would find it odd that she would

12  just be talking casually with him on the phone the next day?

13  A   Yes, sir.

14  Q   And at this point during the investigation the child as

15  well as the other minor child are still left in the custody of

16  Amanda?

17  A   Again, I don't remember exactly what day we were able to

18  come to an agreement where the children would be taken out of

19  the house.  It took some time because I couldn't just --

20  legally I couldn't go just grab these children and take them

21  out of the house.  I had -- there's -- I had to either get

22  consent or -- from the mom to allow the children to be removed

23  and so I just don't remember how long that took to do that.  I

24  don't remember if it was a day or two or three days.  I just

25  don't remember.

(Harold D. Godbee, III-Cross by Mr. Merzlak)                552

1   Q    Okay.  But you never asked Amanda Gunn at that point for

2   consent to remove the children from the home, did you?

3   A    I believe we did.  I believe we did ask her to not have any

4   contact with the children in an effort to not taint this

5   investigation.

6   Q    So the continued contact with the minor child could hinder

7   the investigation?

8   A    Can you say that again?

9   Q    I'll ask it a little more clear.  I'm sorry.  It's always

10  my fault.

11  A    No, no, I am trying to think, too.

12  Q    If -- obviously, if we didn't know this at the time, but

13  leaving a minor child in the care, custody, and control of who

14  we now know was an abuser can hamper the investigation --

15  hinder it?

16  A    Sure.  Knowing now -- knowing now I would have arrested

17  both of them at the same time, but I just didn't have those --

18  I didn't have enough at that point.

19  Q    And it can allow for the child to be continuously

20  manipulated during this entire time that she's still in

21  Amanda's custody?

22  A    Had the little girl been in the custody for a significant

23  amount of time I do believe that she could have been

24  manipulated and I do believe that the mom actually asked her to

25  change her story and the little girl said, "No, that wouldn't

1   make sense.  I am not going to do that."

2   Q    And the other minor child who is not a victim in this

3   case -- he was interviewed; correct?

4   A    By a CAFI, yes, sir.

5   Q    By a CAFI, a person that specializes in child interview?

6   A    Yes, sir.

7   Q    And there was no disclosure from him that he was ever

8   abused in any form or fashion?

9   A    No, sir.

10  Q    And no disclosure from him that he had ever witnessed the

11  other minor being abused in any form or fashion?

12  A    No, sir.

13  Q    On the day of the search warrant you located a white

14  vibrator that was consistent with one that was in the child

15  pornography pictures; correct?

16  A    Yes, sir.

17  Q    And that white vibrator was located under what appeared to

18  be the sink that belonged to Amanda Gunn; correct?

19  A    Amanda and Peyton Gunn is what I understand.

20  Q    Okay.  And she actually came in here and testified that

21  that was the sink that was her sink -- it was under her sink,

22  did she not?

23  A    I don't remember her exact testimony, but it was in the

24  master -- what I considered the master bathroom.

25  Q    And there was a women's hair coloring product right next to

1  it, was it not?

2  A    I would have to look at the search pictures to remember

3  that.

4  Q    And all these exhibits and pictures are things that will be

5  available to the jury during their deliberations; correct?

6  A    Yes, sir.

7  Q    Now in a criminal prosecution the person being accused has

8  the right to what's called discovery; correct?

9  A    Yes, sir.

10 Q    And that's where they get to view all the items of evidence

11 that the government intends to introduce against them; correct?

12 A    Yes, sir.

13 Q    They can't limit anything from them?

14 A    Not besides attorney work stuff.

15 Q    Attorney work product, but the evidence that they intend to

16 use?

17 A    The evidence, yes, sir.

18 Q    And they have to provide exculpatory evidence -- evidence

19 that may be helpful to the accused; correct?

20 A    Yes, sir.

21 Q    And in this particular case all that evidence is provided

22 to the client's attorney to go over with him; correct?

23 A    Yes, sir.

24 Q    But the United States Attorney's Office nor you can

25 disclose child pornography images to me.

(Harold D. Godbee, III-Cross by Mr. Merzlak)

1   A    Correct.

2   Q    You can't disclose them to Mr. Gunn.

3   A    We can't give them to you, no, sir.

4   Q    Correct.  But he has the right to see those?

5   A    I'm not sure how that part works.

6   Q    Okay.

7   A    I think so.

8   Q    Do you recall a discovery review that was set up between me

9   and you?

10  A    I do.

11  Q    Okay.  And Mr. Gunn had the ability to be there, did he

12  not?

13  A    I believe so.

14  Q    In fact, you would have gone to the Lincoln County Jail and

15  transported him down to the FBI office so he could review any

16  of these discoverable materials?

17  A    I would have conferred with the U.S. Attorney and if we had

18  gotten a writ and she said it was okay I would have absolutely

19  have done that.

20  Q    And in this particular case Mr. Gunn did not do that, did

21  he?

22  A    No, sir.

23  Q    And you've been in court this entire time and at no time

24  has Mr. Gunn ever looked at any of these child pornography

25  photos that this jury and the rest of this court has had to

1   see, has he?

2   A    That's what I understand when you said that he's not

3   looking at them.

4   Q    And did you ever see him open that red book?

5   A    I can't really see his table, but I believe you when you

6   say that.

7   Q    Now there was some satanic stuff that was found in the

8   extraction of some of these computers; correct?

9   A    Yes, sir.

10  Q    And did you or any of your other agents ever come across

11  handwritten materials of Amanda?

12  A    Yes, sir.

13  Q    And did any of those relate to Satanism, Paganism, Wiccan?

14  A    I don't remember.

15  Q    And we had a screenshot from one of the extraction reports

16  that actually had a column that said "author" on it; is that

17  correct?

18  A    Are you referring to ---

19  Q    Satanism one.

20  A    The spreadsheet that was made to keep the things in order?

21  Q    This was an actual screenshot where you had typed in the

22  word "Satan" as a search term and it brought up Satanic Bible

23  and ---

24  A    In Magnet AXIOM?

25  Q    Yes.

1  A    Yes, sir.

2  Q    And it purports to show who the author of something is from

3  that computer that it is extracted from; correct?

4  A    Could we look at it?

5  Q    Yes.  Hold on one second.

6  A    I'm sorry.

7         MR. MERZLAK:  Could you pull up Exhibit 44, possibly?

8  Excuse me.  44-153 might be it.

9         I'll withdraw that question for the moment.  The

10  exhibits are voluminous as the jury is aware.

11         Just in general since the jury will have this exhibit

12  available to them for their review, can you tell me about a

13  computer in general and how it would assign an author to

14  something that was saved or modified, et cetera?

15  A    Can you kind of guide me?  I don't know ---

16  Q    Sure.  If I was to buy a computer today, take it home, and

17  plug it in, register it as Shawn Merzlak's computer, and I

18  pulled up a Word document, Microsoft Word was registered

19  showing Merzlak, and I typed out a sentence or a paragraph and

20  saved it, when you did your forensic extraction report,

21  wouldn't it say that Shawn Merzlak was the author?

22  A    Of the Microsoft Word document?

23  Q    Yes.

24  A    I'm not sure.  I'm not sure how you registering your

25  computer then transfers to Microsoft Word.  I will -- Magnet

1    AXIOM is just a program that I think what you're referring to

2    produced.  So I am not sure how Microsoft Word or a Word

3    document gets assigned a name.

4    Q   Okay.  So in this particular case us not knowing that

5    information, any of those Magnet AXIOM reports that lists the

6    author as Michael Gunn, we can't rely on that to actually say

7    that Michael Gunn was the author of that, can we?

8    A   I just don't know -- I can't explain forensically how a

9    name is assigned from a computer to a Word document or a

10   document in AXIOM.

11   Q   So you would agree that if you don't know then we can't

12   rely on that to say that Michael Gunn actually authored that

13   document?

14   A   I don't know.  It didn't say Amanda's name.  It said

15   Michael's name.  That's what I go on when I'm looking at these

16   reports.

17   Q   Okay.  If Ms. Long were to log in to her email right now

18   and walk out of the room during a break of these sessions and I

19   came over here and sat down and sent an email and then you did

20   your extraction report on her computer it would say that

21   Ms. Long had sent an email; correct?

22   A   Right.

23   Q   And if I pulled up Microsoft Word or some type of a text

24   document and she was logged in on her computer and I sat down

25   and typed out a thing and saved it, it would show Ms. Long as

1  the author?

2  A    Right.

3  Q    Now several times during your direct examination you were

4  asked questions and you responded with, "Peyton did it; Peyton

5  wrote that on her," et cetera.  Those are all based on

6  statements that were made by the minor child or by Amanda;

7  correct?

8  A    Are you -- you're talking about like the "whore" written

9  across her?  Is that what you're ---

10  Q    Correct.

11  A    Yes, sir.  Yes, sir.

12  Q    You don't have any personal knowledge.  You weren't there.

13  You don't know actually who wrote that on her except for the

14  fact that these statements were made?

15  A    Right.  The little girl told me that and I believe that

16  because everything else she has said has lined up almost

17  perfectly.

18  Q    Now are you familiar with password saving programs on

19  computers?

20  A    No, sir.

21  Q    Not generally at all or ---

22  A    I know that you can buy programs to save your user names

23  and passwords, but that's it.

24  Q    And don't many programs that most modern computers have

25  already contain those type of programs?

1    A    I don't know.

2    Q    Like when you go on -- let's say you pulled up your Google

3    or your Safari, a lot of times it self-populates the user name

4    and password if you allow it to?

5    A    Right.  You can, I think, click on something to say save

6    this password.

7    Q    And if everybody on a particular device is using that and

8    allowing that, somewhere on that computer it is going to save

9    all of these passwords?

10   A    Yes, sir.

11   Q    Okay.  So that, basically, it is for convenience so when

12   you go to common websites it automatically logs in for you?

13   A    Right.

14   Q    And so you can -- you don't have to remember all of these

15   passwords that we're all now faced with in life for every

16   different thing?

17   A    Yes, sir.

18   Q    And we saw these password lists that were extracted in your

19   computer forensic analysis and some of the passwords were

20   relatively simple; correct?

21   A    Yes, sir.

22   Q    And then some of the passwords were extremely complex?

23   A    Yes, sir.

24   Q    A password that certainly I could never remember.

25   A    Right.  Yes, sir.

(Harold D. Godbee, III-Cross by Mr. Merzlak)          561

1  Q    And that you could probably never remember.

2  A    Certainly not.

3  Q    Are you familiar with password-generating devices?

4  A    I'm familiar with just in my own personal life where an

5  account will say do you want the password created for you or do

6  you want to create your own password.

7  Q    And these passwords that are created for you are normally

8  those crazy long weird ones that we could never remember?

9  A    Yes, sir.

10 Q    Because those are the strongest passwords according to

11 computer experts?

12 A    Yes, sir.

13      Is there any way we could take a restroom break?

14           MR. MERZLAK:  I have no problem with that, Judge.

15           THE COURT:  No problem.  Let's just take about a

16 15-minute break.

17      (The jury exits the courtroom at 10:09 a.m.)

18      (A break is taken.)

19           THE COURT:  All right.  Let's recall the jury.

20      (The jury enters the courtroom at 10:29 a.m.)

21           THE COURT:  Thank you.  Mr. Merzlak, you may resume.

22           MR. MERZLAK:  Thank you, Your Honor.  Just a couple of

23 more topics to touch on, Your Honor.

24      Now there was an allegation that the child had to use

25 alcohol, drugs and things; correct?

(Harold D. Godbee, III-Cross by Mr. Merzlak)          562

1          THE WITNESS:  Yes, sir.

2    Q    All right.  And that included cocaine, methamphetamine?

3          MS. LYONS:  Mr. Merzlak, I can't hear you.

4          MR. MERZLAK:  Okay.  I have never been told that

5    someone can't hear me.

6          And that included cocaine, methamphetamine?

7          THE WITNESS:  Yes, sir.

8    Q    Marijuana?

9    A    Yes, sir.

10   Q    At any point in your investigation was there any drug

11   testing done of the child to determine if -- to corroborate

12   those statements?

13   A    I believe that there was some tests run, but I can't be

14   certain without looking through the case.  There was a SANE

15   exam run, I believe, and I don't know if they run tests or not.

16   Q    And a SANE is a sexual assault examination; correct?

17   A    Yes, sir.

18   Q    And typically in those cases they don't test for drug use,

19   do they?

20   A    That was the first one that I had ordered so I am not

21   familiar with everything they had tested.

22   Q    But you're not familiar if there was any hair follicle test

23   done or anything like that?

24   A    If there was, I don't distinctly remember it.  I remember

25   discussions of it, but I don't -- I can't say yes or no.

1          MS. LYONS:  Your Honor, can we briefly have a sidebar?

2          THE COURT:  Sure.

3      (A bench conference is held as follows.)

4          MS. LYONS:  I think I know why he is hesitating, Your

5  Honor.  In the DSS case I think DSS may have done a hair test

6  and so he didn't do it and he might be thinking about it

7  and --

8          MR. MERZLAK:  That's fine.

9          MS. LYONS:  -- we weren't given like the file --

10          MR. MERZLAK:  Sure.

11          MS. LYONS:  -- and legally we were not allowed to ---

12          MR. MERZLAK:  That's all I am going to ask him about.

13          MS. LYONS:  You see what I mean?  And so I think he is

14  probably afraid that he is going to say something ---

15          MR. MERZLAK:  Mix up his investigation with what he

16  knows.

17          MS. LYONS:  That's exactly it and so I just didn't

18  want to and I don't think he can legally say that.  We'll

19  probably take that off the record.

20          MR. MERZLAK:  No problem.

21          THE COURT:  Okay.

22      (Bench Conference Ends.)

23  Q    Now, moving on to the situation involving Grantham --

24  A    Yes, sir.

25  Q    -- in that particular case based on your investigation

1  Mr. Grantham never claimed that he spoke to Michael Gunn on the

2  telephone?

3  A    No, sir.

4  Q    Never claimed that he knew whether he was communicating

5  with a man or a woman?

6  A    Correct.

7  Q    The individual who was communicating with him initially

8  told him that the child was 15?

9  A    Yes, sir.

10  Q   Okay.  And then he met with this child and he claims he had

11  no idea that she was 15?

12  A   Yes, sir.

13  Q   And with the exception of Grace's statement that Mr. Gunn

14  was involved in that, there is absolutely no evidence that he

15  was involved in it, is there?

16  A   No, sir.

17  Q   Now the child was interviewed multiple times in this

18  particular case; correct?

19  A   Yes, sir.

20  Q   And those interviews were done by the CAFI -- the child

21  forensic interviewer -- some of those?

22  A   Yes, sir.

23  Q   And that's a person who has a particular specialized

24  knowledge and training to interview children who were involved

25  in these type of allegations; correct?

1   A    Yes, sir.

2   Q    And they are trained in this area because they have to

3   interview a child different than how an adult might be

4   interviewed?

5   A    Yes, sir.

6   Q    Correct?  And that's because children can be more open to

7   suggestive questioning?

8   A    That's one reason.  Yes, sir.

9   Q    So the interviewers are trained to ask open-ended

10  questions; correct?

11  A    Yes, sir.

12  Q    Non-leading questions?

13  A    Right.

14  Q    To allow the child to divulge what the child divulges?

15  A    Yes, sir.

16  Q    Okay.  Without pointing them in a particular direction?

17  A    Yes, sir.

18  Q    Without pointing them to a particular suspect?

19  A    Right.

20  Q    And then some of those interviews were later conducted by

21  yourself?

22  A    Of ---

23  Q    Of the minor?

24  A    Yes, sir.

25  Q    Ms. Lyons was involved in talking to the child?

1  A    Yes, sir.

2  Q    And in the initial interviews Amanda was actually taking

3  the child to those interviews, wasn't she?

4  A    Are you talking about with the CAFI?

5  Q    CAFI.

6  A    I can't remember who took her to those.  I know -- I seem

7  to remember her aunt bringing her to some, but I can't be

8  certain.  I just -- that's not memorialized in -- or if it is

9  memorialized, I would need to look back at the 302s, but I

10 can't remember exactly who brought her to every one.

11 Q    Do you remember Amanda bringing her to any of them?

12 A    Yes, sir.

13 Q    And to your knowledge the child was also involved in

14 counseling at this time?

15 A    I'm not sure when her counseling started.  I know she's

16 currently in counseling.

17 Q    But somewhere over the period of the first interview that

18 the minor ever gave to a CAFI and the last interview that she

19 gave in relation to this, she started counseling in that time

20 period?

21 A    From her first CAFI to -- she's still in counseling, yes,

22 sir.

23        MR. MERZLAK:  One moment, please, Judge.  No

24 additional questions at this time, Judge.

25        THE COURT:  Redirect?

1          MS. LYONS:  Thank you, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MS. LYONS:

4    Q    Good morning, Special Agent Godbee.

5    A    Hey.

6    Q    And just for the record you were on cross when we left last

7    night, weren't you?

8    A    Yes, ma'am.

9    Q    So we have not had any discussions about your testimony and

10   we have not prepared you for this morning, have you -- by "we"

11   I mean me -- correct?

12   A    Correct.  Yes, ma'am.

13   Q    Mr. Merzlak asked you a couple of questions that I would

14   just like to follow up on.  Mr. Merzlak referred to Ms. Long

15   and her computer and he asked you a couple of questions about

16   if he had sent an email from Ms. Long's computer wouldn't it

17   say that Ms. Long had sent the computer -- I mean, sent the

18   email; correct?  He was talking --

19   A    Yes, ma'am.

20   Q    -- to you about authorship of some Word documents.  Do you

21   remember that?

22   A    Yes, ma'am.

23   Q    I think he was specifically talking about the authorship of

24   some satanic documents that had been entered in this case?

25   A    Yes, ma'am.

(Harold D. Godbee III-Redirect by Ms. Lyons)

1  Q   And he asked you the question whether or not if he sent an

2  email from Ms. Long's computer whether or not it would indicate

3  Ms. Long sent the email or whether or not it would indicate

4  that he'd sent the email and I think you agreed with him that

5  it would say Ms. Long sent the email; is that correct?

6  A   Yes, ma'am.

7  Q   But if you had a witness who was sitting in the room and

8  told you who'd sent the email, would you trust the witness?

9  A   Depending on the witness.

10 Q   And in this particular case the witness is the child.

11 A   Yes, ma'am.

12 Q   You would trust the child?

13 A   I absolutely trust ---

14        MR. MERZLAK:  Objection, Judge.  Bolstering.  It is

15 for the jury to decide the credibility of the witness.

16        THE COURT:  I agree.  Sustained.

17        MS. LYONS:  May I rephrase the question, Your Honor?

18        THE COURT:  Yes.

19        Disregard That question, ladies and gentlemen.

20        MS. LYONS:  Thank you.  I'll rephrase.

21        Based on the information that the child provided you

22 during the course of the investigation were you able to

23 corroborate the things that the child was telling you?

24        THE WITNESS:  I've corroborated almost every single

25 thing that that child has told me.

1   Q   Mr. Merzlak also -- I believe he asked a question and he

2   said that in relation to Mr. Grantham and the sex trafficking

3   or -- yes, Mr. Grantham and the sex trafficking -- that other

4   than what the child had told you that there is no evidence

5   connected to the defendant.  Do you remember that question?

6   A   Yes, ma'am.

7   Q   Okay.  I want you to confirm something from me from your

8   forensic examinations, okay?  The Craigslist emails -- were

9   they going to the ggirl06 email account?

10  A   Yes, ma'am.

11  Q   And do you have emails between the ggirl06 email account

12  and the toxicdove email account?

13  A   Yes, ma'am.

14  Q   And entered into evidence is an email between realgunn and

15  toxicdove with the image of child pornography?

16  A   Yes, ma'am.

17  Q   So you do have a connection between the defendant and the

18  Craigslist postings, don't you?

19  A   Yes, ma'am.  Also, we have where the defendant and the

20  little girl are talking in one of those emails.

21          MR. MERZLAK:  Objection, Your Honor.  That's

22  speculation.

23          THE COURT:  I don't know if that's speculation or not.

24          MS. LYONS:  I don't think ---

25          THE COURT:  I'm not sure -- I'll overrule that.  I

1  don't think that's speculation.

2           MS. LYONS:  Thank you, Your Honor.

3           I want to go back to another question that Mr. Merzlak

4  asked you about.  I think he was referencing perhaps -- I am

5  trying to remember what the question was, but, Special Agent

6  Godbee, you in some way referenced the fact that the child was

7  asked to change her story and she said no.  Can you tell us a

8  little more about that?

9           THE WITNESS:  Yes, ma'am.  At some point after Peyton

10 is arrested the little girl is with her mom and the little girl

11 told me that her mom asked her if she could somehow change her

12 story and the little girl said, "No, that would look weird.  I

13 can't do that."

14 Q   Thank you.  Now we've talked a lot about the devices and

15 Mr. Merzlak has asked a lot about some of the searches that you

16 did.  In these forensic examinations of these devices and with

17 Magnet AXIOM did you search for connections to Amanda Gunn?

18 A   Yes, ma'am.

19 Q   Were you able to find any child pornography in the two

20 email accounts that you had for Amanda Gunn?

21 A   No, ma'am.

22 Q   Mr. Merzlak brought up the fact that you failed to seek any

23 DNA evidence or fingerprint evidence in this case.  Do you want

24 to talk to us about why you didn't do that, Special Agent

25 Godbee?

1  A   Well, there's a lot of reasons.  One, this isn't TV where

2  you can just get an automatic and exact match.  It takes time

3  and effort to send that to the lab and I did discuss with the

4  lab that -- those things -- but we felt like we were so certain

5  that the shoe was that shoe that we didn't need to waste

6  resources sending it to a lab; that we -- it was Peyton's shoe.

7  Everyone in the house said it was Peyton's shoe.  It matched --

8  any reasonable person looking at that picture that it was

9  Peyton's shoe and so we felt like that was -- that our

10 resources were better served somewhere else.

11 Q   Let -- I apologize.  You also worked guns and drugs and

12 gangs at one point; correct?  We talked about that on your

13 direct?

14 A   Yes, ma'am.

15 Q   I think in those types of cases it is normally asked why

16 you don't run DNA and fingerprints on guns a lot; right?

17 A   Yes, ma'am.

18 Q   Is it easy to get DNA and fingerprints off of guns?

19 A   No.  That goes back to what I was saying about this is real

20 world.  It's tough to get.  Depending on a shoe or a tiny thumb

21 device, it is tough to pull prints and DNA off of these things.

22 Q   All of these items that Mr. Merzlak referenced were in the

23 home with Amanda Gunn, Michael Gunn, and two minors; is that

24 correct?

25 A   Can you say that again?

1  Q   All of the devices and items that Mr. Merzlak referenced

2  when he talked about DNA and fingerprints were actually in the

3  home with Amanda Gunn, Michael Gunn, and their two children?

4  A   Yes, ma'am.

5  Q   So whose DNA and fingerprints would you expect might be on

6  any, all, or none of those items?

7  A   I would have expected that Amanda Gunn's DNA would have

8  been on it.  Peyton Gunn's DNA would have been on it.  The

9  little girl's DNA would have been on it and maybe even the

10 little boy's DNA would have been on --

11 Q   Since we're -- I apologize.

12 A   -- anything in the house.

13 Q   Since we're also talking about DNA and fingerprints, let's

14 talk about handwriting.  We've heard a lot about handwriting in

15 this case and we saw a number of people identify certain

16 documents as either being written by the defendant or written

17 by the child.  In this case Mr. Merzlak talked to you about

18 being familiar with the different resources that the FBI has.

19 Does the FBI have resources where you can conduct handwriting

20 analysis?

21      MR. MERZLAK:  Objection, Judge.  This wasn't covered

22 on cross-examination.  I would ask the Court to direct her to

23 only redirect on what was covered in cross.

24      MS. LYONS:  Your Honor, Mr. Merzlak cross-examined on

25 the issue of what this agent failed to do and he specifically

1  brought in the resources of the FBI and what the agent did or

2  didn't do with the evidence and this is something that the

3  agent actually did do and so I think it's a worthy response to

4  cross-examination.

5          THE COURT:  I'll let him answer.

6          MS. LYONS:  Thank you.

7          Special agent Godbee, did you apply for and receive

8  court process and authorization for a handwriting sample in

9  this case?

10          MR. MERZLAK:  Yes, ma'am.

11  Q    And did you talk to a special division of the FBI in order

12  to find out how you actually take a handwriting sample?

13  A    Yes, ma'am.

14  Q    And did you get some advice on how you actually do a

15  comparison?

16  A    Yes, ma'am.  I got -- I talked to them.  They explained

17  what I needed to get in order and how to get it in order to

18  send it to them for them to analyze.

19  Q    Did you go through all of the proper procedures you needed

20  to go through in order to obtain a handwriting sample from the

21  defendant?

22  A    Yes, ma'am.

23  Q    And did you go out to meet with the defendant in order to

24  obtain that handwriting sample?

25  A    Yes, ma'am.

1  Q   And were you ultimately able to get a handwriting sample

2  from the defendant?

3  A   No.  He refused to give it to me.

4          MS. LYONS:  I beg the Court's indulgence.

5          Mr. Merzlak talked to you about things that happened

6  on February 6th; is that correct?

7          THE WITNESS:  Yes, ma'am.

8  Q   And he went through the fact that you showed up at the

9  house while it was still being searched?

10 A   Yes, ma'am.

11 Q   And the defendant was still being interviewed during that

12 search?

13 A   Yes, ma'am.

14 Q   And do you recall that during his interview the defendant

15 indicated that he had been in the military?

16 A   I remember on the 5th and the 6th he indicated that to me.

17 Q   And do you recall that he indicated that he had been

18 discharged for medical reasons?

19 A   Yes, ma'am.

20 Q   During your investigation were you able to obtain his

21 military records?

22 A   Yes, ma'am.

23 Q   Was he discharged for medical reasons?

24 A   No, ma'am.

25 Q   I want to go back to Jonathan Grantham and the Craigslist

1   ads for a second.  Did the Craigslist messages that were being

2   sent back and forth sometimes include child pornography?

3   A    With Jonathan Grantham?

4   Q    No, with any or -- any user that was messaging back and

5   forth in order to schedule a date?

6   A    Yes, ma'am.

7   Q    And specifically I'm talking about the targets that you

8   have yet to arrest.

9   A    Yes.  There has -- there was child pornography sent to

10  targets that I have not yet arrested.

11          MS. LYONS:  And, Your Honor, I would like to approach

12  and hand Special Agent Godbee Government's Exhibit 38.  I am

13  not going to enter it because it does contain information

14  related to targets who have not yet been arrested, but I would

15  like to just ask him some questions about this document.

16          THE COURT:  Okay.  You're not going to admit it.

17          MS. LYONS:  I am not going to admit it for viewing.

18          THE COURT:  All right.  You may approach.

19          MS. LYONS:  Thank you.

20          Special Agent Godbee, I am handing you what's been

21  marked as Government's Exhibit 38, if you'll take that for me.

22  I just really want to ask you one or two questions.  If you can

23  flip through -- I don't want you to divulge anything about any

24  of the potential targets.  I just simply want you to tell me if

25  you see any subject lines meaning the posts, the names of any

1   ads that were posted for which these targets were responding.

2          THE WITNESS:  So you just want me to read some of the

3   subject lines?

4   Q   Yes.  So if it says "Re:" what the subject lines were.

5   A   I see subject "Re:  Saw your ad on Craigslist."

6   Q   Yes.  Can you keep going down that document and see if you

7   see any of the names of the ads that were actually posted to

8   Craigslist?

9   A   I see subject regarding calling "Looking for horses."

10  Q   You said it was "Looking for horses"?

11  A   "Looking for horses."

12  Q   Okay.

13  A   And then subject, "Looking for horses."

14  Q   Any other different ones?

15  A   One that says regarding:  "Why am I so different??  I like

16  need and crave things other girls don" -- D-O-N -- and then

17  some characters.

18  Q   Any other ones?

19  A   A lot of these are the same.

20  Q   Okay.

21  A   You don't want me to repeat that.

22  Q   No, sir.  If that's all you see then that's ---

23  A   No, ma'am.  I am only maybe half-way through.

24  Q   If you see any in the next couple of pages just read them

25  into the record for me.

1   A    The same ones for the most part.

2   Q    Okay.  Thank you, Special Agent Godbee.  I just have two

3   questions left, I believe.  Thank you.

4        And, Mrs. Widener, I will need the monitor for the last two

5   questions.

6        Ms. Long, can you show -- I beg the Court's indulgence.

7        Special Agent Godbee, 15 -- publish for the entire jury

8   15-004.

9        This is my last set of questions, Special Agent Godbee.

10  Thank you.  I think Mr. Merzlak -- 15-004.  It's already been

11  -- thank you.

12       Do you recognize this photo, Special Agent Godbee?

13  A    Yes, ma'am.

14  Q    And I think on cross-examination Mr. Merzlak was talking to

15  you about the dates.  He first started with February 5th, the

16  day you originally showed up at 209 Nicklaus Court, and how you

17  didn't come back until February 6th, and who was left at the

18  home on the night of February 5th?

19  A    On February 5th was the little girl, the little boy, and

20  the mom -- their mom.

21  Q    Was there anybody else there?  Was the defendant there on

22  February 5th after you arrived the first time?

23  A    I'm sorry.  I was getting my dates confused.  Yes, ma'am.

24  On the 5th, the initial day we made contact, all four of them

25  were in the house.  So Peyton Gunn, Amanda Gunn, the little boy

1   and the little girl.

2   Q    And is that the evening that the little girl indicated

3   after you left that night her father had sex with her and then

4   stayed up all night on computers?

5   A    Yes, ma'am.

6   Q    Okay.  So I'm showing you what's been marked as Government

7   Exhibit 15-004.  Can you tell us what that little square thing

8   is that's to the right and above the black satchel?

9   A    Yes, ma'am.  To me that looks like a bracket that holds a

10  mini SD card or an SD card that you would insert into another

11  device like maybe a phone.

12  Q    And it's missing whatever the SD card or maybe even a SIM

13  card that might go in there?

14  A    Right.  A SIM card or -- yes.  So there is nothing in it.

15  It is just the bracket that holds it.  So the other -- the

16  memory devices that we found which are in that satchel next to

17  it for the most part would fit into that bracket.

18  Q    Can we ---

19  A    Or presumably fit into that bracket.

20           MS. LYONS:  Can we pull back out and go to 15-102?

21           And Mr. Merzlak mentioned to you that when you come

22  back the next day the computers are still there?

23           THE WITNESS:  Yes, ma'am.

24  Q    Is that right?

25  A    Yes, ma'am.

1  Q   Now this is one of the computers?

2  A   I believe so.  I can't see serial numbers.

3  Q   What is stuck inside or into the computer?

4  A   That's a thumb drive.

5  Q   And so just because the computers were still there didn't

6  mean that the defendant didn't delete things, does it?

7  A   No, ma'am.  I believe he tried to delete things.

8          MS. LYONS:  And 1503.  I'm sorry, Ms. Long.  15103.  I

9  apologize.

10         And this was another thumb drive that you found near

11 the computers when you returned on the 7th to conduct your

12 search?

13         THE WITNESS:  Yes, ma'am.

14 Q   Okay.  So the defendant did have about 24 hours between the

15 5th and the 6th to destroy evidence?

16 A   At least 24 hours.

17 Q   Even if he didn't remove it from the house?

18 A   Right.

19         MS. LYONS:  That's all I have for this witness, Your

20 Honor.  Thank you.

21         THE COURT:  Any more, Mr. Merzlak?

22         MR. MERZLAK:  I have just maybe one or two questions,

23 Judge.

24         THE COURT:  Go ahead.  Go ahead.

25         MR. MERZLAK:  Thank you.

(Harold D. Godbee III-Recross by Mr. Merzlak)          580

1                          RECROSS EXAMINATION

2    BY MR. MERZLAK:

3    Q    Just, likewise, once Mr. Gunn was arrested Amanda Gunn had

4    full rein of the Gunn house; correct?

5    A    Yes, sir.

6    Q    Her and the kids were the only people there?

7    A    Yes, sir.

8    Q    So she could have gotten rid of any evidence that she

9    wanted to?

10   A    Yes, sir.

11   Q    She could have gotten rid of any handwritten notes that

12   implicated her?

13   A    Yes, sir.

14   Q    She could have gotten rid of any pictures, photos on media

15   devices that 54 her?

16   A    Yes, sir.

17   Q    And she could have left any evidence that she found during

18   her search that doesn't implicate her?

19   A    Yes, sir.  You said that doesn't?

20   Q    That doesn't.

21   A    Yes, sir, she could've.  Yes, sir.

22              MR. MERZLAK:  Thank you.  That's all, Judge.

23              THE COURT:  Are we finished with Special Agent Godbee?

24              MS. LYONS:  Yes, Your Honor.

25              THE COURT:  You may step down.

1        Any more witnesses from the government?

2        MS. LYONS:  No, Your Honor.  The government rests.

3        THE COURT:  Thank you.

4        Mr. Merzlak?

5        MR. MERZLAK:  Your Honor, we have one motion but we

6  don't have any witnesses.

7        THE COURT:  Okay.  Let me see the lawyers for a

8  minute, please.

9     (A bench conference is held as follows.)

10        THE COURT:  So it's over.  You have a motion.

11        MR. MERZLAK:  Yes, sir, five minutes.

12        THE COURT:  Then we need to go over the charges.

13        MS. LYONS:  Yes, sir.

14        THE COURT:  So we need to do that.  So can I send them

15  out for about an hour and a half and then bring them back?

16        MS. LYONS:  That would be great, Your Honor.

17        THE COURT:  That would give them time to eat, do the

18  motion and do the charge conference.

19        MR. MERZLAK:  Yes.

20        MS. LYONS:  That would be great, Your Honor.

21        THE COURT:  All right.  Y'all come back and be ready

22  to go at 12:30.

23     (Bench Conference Ends.)

24        THE COURT:  Ladies and gentlemen, both sides have now

25  rested.  So you have heard all the evidence and seen all the

1   evidence in this case that you will see.  There will be no more

2   evidence, no more testimony, nothing.  So I need to take some

3   legal matters up with the lawyers.  Part of those legal matters

4   will be me going over with the lawyers the charges or the

5   instructions on the law that I will give to you after all of

6   the arguments have been made.  That's going to take just a

7   little bit and which would put us into the lunch hour.

8           So what I am going to do is I am going to give you a

9   little longer lunch hour so that I can take care of those legal

10  matters with the lawyers.  You'll have a chance to eat.  When

11  you come back they're going to make their closing arguments.  I

12  will charge you on the law and then you will deliberate.

13          So we're going to recess until 12:30.  So that's a

14  little extra long for lunch.  Hopefully, you can get some

15  business done or just take a more relaxing lunch.  Please come

16  back at 12:30 sharp.  Come to the jury room.  When you come

17  back, we will -- again, you'll hear closing arguments.  You

18  will hear my instructions on the law and then we will allow you

19  to deliberate.  So we will finish the trial this afternoon once

20  you come back.  12:30.  We are in recess.

21          Please remember my instructions.  Do not discuss the

22  case with each other, with anyone else, no posting on social

23  media, no research online of any sort.  Take care of your

24  business.  Enjoy your lunch.  Come back at 12:30 and we'll

25  finish.  Thank you.

1      (The jury exits the courtroom at 11:08 a.m.)

2          THE COURT:  Have a seat.

3          Are any still in the hall or in the restroom?

4          THE COURT SECURITY OFFICER:  We have a couple.

5          THE COURT:  All right.  We'll wait until they leave

6  the hall and then I'll hear.

7          THE COURT SECURITY OFFICER:  Your Honor, the hall is

8  clear.

9          THE COURT:  All right.  They're clear.

10         Mr. Merzlak, I believe you have a motion you'd like to

11 submit to the Court?

12         MR. MERZLAK:  Yes, Your Honor.  Your Honor, at this

13 time the defense would pursuant to Federal Rule of Criminal

14 Procedure 29 move for an order for directed acquittal on all

15 counts in the indictment.  In this particular case the evidence

16 and testimony that's been presented to the jury does not rise

17 to the level of proof beyond a reasonable doubt for any

18 particular count in the indictment.  The judge is aware of the

19 evidence in the case and I'll submit it to the Court without

20 additional argument.

21         THE COURT:  All right.  Any response from the

22 government?

23         MS. LYONS:  Your Honor, I think we've provided

24 sufficient evidence to meet the burden at this time as to every

25 element charged in each count of the indictment between the

1   witness of the minor to the testimony of Special Agent Godbee.

2   I think we've met our burden at this point.

3            THE COURT:  All right.  Well, certainly, I've had the

4   benefit, as you have, to listening to all of the testimony and

5   seeing all the evidence that has been admitted in this case.

6   As you know the standard for me to apply on a motion under Rule

7   29 is whether the evidence viewed in the light most favorable

8   to the government is sufficient on each count that a rational

9   trier of fact could find guilt beyond a reasonable doubt.

10  Arriving at this standard it is not my role to assess witness

11  credibility or weigh the evidence or draw any inferences of

12  fact from the evidence.

13           So looking at count one and the elements required to

14  prove that -- this is the conspiracy to engage in sex

15  trafficking of a minor -- what I have heard is the testimony of

16  the mother of the child, Amanda Gunn -- the admission by her

17  that she was a co-conspirator in this case and her

18  identification of the defendant being part of the conspiracy.

19  Again, on the second count of whether or not Mr. Gunn knew the

20  unlawful purpose of the plan and willfully joined in it, I have

21  heard testimony by not only Mrs. Gunn but also by the minor

22  child that satisfies that element.

23           On the third element, the object of the unlawful plan

24  was to knowingly recruit, entice, harbor, transport, provide,

25  obtain or maintain the person whom the defendant knew or

1   recklessly disregarded the fact had not obtained the age of 18
2   years or whom he had a reasonable opportunity to observe whom
3   would be caused to engage in a commercial sex act, I believe
4   that the government has satisfied this element based upon the
5   testimony of Amanda Gunn, of Jonathan Grantham, and of the
6   minor child.  Certainly, the testimony of both Amanda Gunn and
7   the child as to the age the child was adopted by Mr. Gunn and
8   the ages during the conspiracy would establish his knowledge
9   that she had not attained the age of 18 years.

10           Furthermore, the testimony by particularly the minor
11  child as to essentially the efforts by the defendant to
12  advertise her on Craigslist for commercial sex acts would
13  establish this element, and then, fourth, finally, on this
14  count that the object of Mr. Gunn's plan was in or affected
15  interstate commerce, I heard testimony from Mr. Grantham that
16  the sex acts with the minor child for which he paid money and
17  provided gifts occurred in a motel in Clearwater, South
18  Carolina and that she was picked up by him in Georgia for the
19  purpose of transporting her across state lines for the
20  commercial sex act.  In addition, dates were set via email over
21  the internet with Craigslist which would further satisfy that
22  particular element.  As on count one, I deny the defense motion
23  under Rule 29.

24           Count two, sex trafficking of children or by force,
25  fraud or coercion.  The first element -- Mr. Gunn knowingly

1    recruited, enticed, harbored, transported, provided, obtained
2    or maintained by any means a minor person.  Similar to count
3    one, the testimony of the minor girl establishes this element.
4    Count two, Mr. Gunn did so knowingly or in reckless disregard
5    of the fact that the person had not attained the age of 18
6    years or whom he had a reasonable opportunity to observe and
7    would be caused to engage in a commercial sex act, again, as I
8    found in count one the testimony -- at a minimum the testimony
9    of the minor child establishes this element.

10           Finally, count three, again, as in count one the
11   testimony of the minor child; furthermore, the evidence that I
12   heard from Mr. Grantham and the child about the use of the
13   internet on Craigslist would, in fact, satisfy the interstate
14   commerce element.  Count two, the motion is denied.

15           Count three, coercion and enticement of a minor to
16   engage in sexual activity.  Count one, Mr. Gunn knowingly
17   persuaded, induced, enticed or coerced a minor person to engage
18   in sexual activity as charged.  Again, the testimony of the
19   minor child would establish this in addition to the testimony
20   that I heard from the FBI agents as a result as to the
21   determinations made during their investigation of the case.

22           Second, Mr. Gunn used facilities of interstate and
23   foreign commerce including the internet to do so.  Both the
24   testimony that I heard from the agents of the FBI as a result
25   of the investigation, location of computers and

1  computer-related devices, posting of pictures and other matters

2  on the internet through various websites would establish this

3  element.

4        Second, when he did these acts the minor person was

5  less than 18 years old.  I have already made findings as to the

6  evidence that clearly Mr. Gunn was -- well, using a minor

7  person less than 18 years old, in this case his adopted

8  daughter.  Certainly, her testimony establishes and other

9  evidence establishes that her age at the time of the matters

10  involved in this indictment was less than 18 years old.

11  Mr. Gunn could have been charged with a criminal offense, that

12  is child molestation under the law of Georgia.  I think the

13  testimony or I believe the testimony of the child would

14  certainly establish sufficient evidence for a case of child

15  molestation of a minor or child molestation under the laws of

16  Georgia.

17        Counts four, five, six and seven are production of

18  child pornography by a parent or guardian.  First, as to count

19  three, then the motion by the defense is denied finding, again,

20  that the standard has been met.

21        First element of counts four, five, six and seven, an

22  actual minor that is a real person who is less than 18 years

23  old who is depicted.  I have testimony from the child as to her

24  age, testimony from Mrs. Gunn and testimony from the FBI agents

25  as to the age of the child establishing that she was, in fact,

588

1    a minor under 18 years old.  Mr. Gunn was a parent or legal

2    guardian of the minor.  I heard evidence that he was, in fact,

3    a parent -- an adoptive parent, that testimony coming from the

4    daughter and from the mother.  Third, Mr. Gunn employed, used,

5    persuaded, induced, enticed or coerced the minor to engage in

6    sexually explicit conduct for the purpose of producing a video

7    of the conduct.  The evidence from the child would establish

8    this element.  In addition, the evidence regarding the shoe --

9    the tennis shoe, the Puma tennis shoe -- and the fact that the

10   photo was part of a series of child pornography would suggest

11   his participation in the production of the photos and videos.

12          Four, either the visual depiction was produced using

13   materials that had been mailed, shipped or transported in

14   interstate or foreign commerce by any means including by

15   computer -- significant amount of testimony regarding the

16   posting of these videos on the internet through various sites.

17   In addition, there was testimony as it relates to Mr. Grantham

18   about a child pornography image being sent to him through

19   Craigslist.  As to counts four, five, six and seven applying

20   the Rule 29 standard, I hereby deny the defendant's motion.

21          Count eight is possession of child pornography.  First

22   element, Mr. Gunn knowingly possessed an item or items of child

23   pornography.  The evidence establishes a number of images that

24   were found on devices that were certainly captured from the

25   home -- computers that testimony would suggest that Mr. Gunn

1  had access to use if not controlled.  That sufficiently
2  establishes that element.

3       Second, the items had been produced using materials
4  which had been transported, shipped or mailed in interstate or
5  foreign commerce including by computer.  The evidence was these
6  were produced on cellphones -- a Samsung, iPhone, others --
7  that were items of interstate or foreign commerce and,
8  certainly, the use of the computer would also help establish
9  this element and there was testimony as to that usage.

10      Third, when he possessed the items he believed the
11  items were child pornography.  I think based upon the testimony
12  of the child this element has been established; therefore,
13  count eight, the motion -- Rule 29 motion as to count eight is
14  denied.

15      Finally, count nine, obstruction of a sex trafficking
16  investigation.  The first element, he, the defendant, knowingly
17  obstructed or attempted to obstruct the enforcement of the
18  investigation.  I heard testimony from the child as to the
19  efforts made after the FBI initially contacted or made contact
20  with the family on February 5th of efforts to gather up, bag,
21  and destroy items that could be useful in the investigation of
22  this case; also, the testimony of the child regarding her
23  instructions as to the destruction and/or discarding of the
24  iPhone and the second element is established as a result of the
25  findings on count one.  So as to count nine, the Court finds

 1   the government has certainly met the Rule 29 standard and the

 2   motion is denied.

 3              Having now addressed that, what I would propose is

 4   that we will pass out the charges to the parties.  Let's come

 5   back -- let's come back about ten minutes after 12 and let's

 6   have the charge conference, okay?  Does that give everybody

 7   enough time?

 8              MR. MERZLAK:  Yes, sir.

 9              THE COURT:  That's 50 minutes.  So, 10 after 12, let's

10   gather back here and have a charge conference and then we'll be

11   ready to go at 12:30.  Thank you.

12              MS. LYONS:  Thank you.

13              THE COURT:  My clerks will hand those out.  They need

14   to make a change.  Don't leave until you get the proposed

15   charges from the court.

16       (A break is taken.)

17              THE COURT:  Has everybody gone over the charges?  Let

18   me just ask are there any specific objections or issues or

19   corrections that we need to make?  I'll start with the

20   government.

21              MS. LYONS:  No, Your Honor.

22              THE COURT:  Mr. Merzlak?

23              MR. MERZLAK:  No, Your Honor.

24              THE COURT:  No?  So everybody is okay with the

25   charges?

1          MS. LYONS:  Yes, sir.

2          MR. MERZLAK:  Yes, sir.

3          THE COURT:  All right.  So when the jury comes back in

4    at 12:30 we're ready for closings?

5          MS. LYONS:  Yes, Your Honor.

6          THE COURT:  All right.  Well, if there are no

7    objections, then I'll go back and leave you to get ready and

8    I'll leave everybody alone.

9       (A break is taken.)

10          THE COURT:  Okay.  Are we ready?

11          MS. LYONS:  Yes, Your Honor.

12          THE COURT:  Let's recall the jury.

13          MS. LYONS:  Your Honor, I have spoken with the minor

14    child in the case.  She does indicate that she is okay with us

15    using her name during closing arguments.  I know there have

16    been some slip-ups during the trial.  She is okay with that.

17          MR. MERZLAK:  Yes, sir.

18          THE COURT:  All right.  Let's bring them in.

19       (The jury enters the courtroom at 12:32 p.m.)

20          THE COURT:  Ladies and gentlemen, welcome back from

21    lunch.  It does appear that all of our jurors have returned

22    from the lunch break.  As I told you before lunch both sides

23    have rested.  All of the the evidence has been admitted so

24    there will be no other evidence in the case.  What you are now

25    going to hear will be the final arguments, the summations from

1    the lawyers.  Once they finish, then I will instruct you on the

2    law and then you will go into the jury room and begin your

3    deliberations.

4           Now the government will have the opening argument and

5    then Mr. Merzlak, counsel for the defendant, will follow, and

6    then in conclusion the government will have an opportunity to

7    reply and that is called for under our rules because the

8    government has the burden of proof.

9           Now remember that in making these arguments the

10   lawyers will be commenting upon the testimony that you've heard

11   and the evidence that's been presented.  Just remember they are

12   recalling the evidence.  You will recall the evidence.  If

13   their recollection in any way differs from yours, you should

14   follow your own recollection of the evidence.

15          Finally, as I told you earlier, this is not evidence

16   or instructions on the law.  So do not take anything that the

17   lawyers say to you as either one, but they are important, and I

18   would ask you to give your close attention to them as they

19   present their argument.

20          So, Ms. Lyons, you may proceed.

21      (Closing arguments are held.)

22      (Jury Charge is given.)

23          THE COURT:  That concludes my delivery of the

24   instructions.

25          Any objections, corrections from the government?

1          MS. LYONS:  No, Your Honor.

2          THE COURT:  From the defense?

3          MR. MERZLAK:  None on behalf of Mr. Gunn.

4          THE COURT:  Thank you.

5          Now, ladies and gentlemen, at the beginning of this

6    case two of you were selected as alternate jurors.  We select

7    alternate jurors in every case because we never know what might

8    happen during a case.  Whether it's a medical emergency or an

9    accident or a family emergency or whatever, we must be prepared

10   at any time to substitute an alternate juror in case we lose a

11   juror.  We do not identify the alternates at the beginning of

12   the trial simply because we must ensure that everyone,

13   including the alternates, pays close attention, participate in

14   every moment of the trial.  The reason for that is if we are

15   required to use an alternate, we need to make sure that that

16   person has listened to every testimony, has seen all the

17   evidence, has, in other words, participated in every moment of

18   the trial.

19         In this case we have not been required to use an

20   alternate.  So I am going to ask the Clerk if she will announce

21   the names of the alternates.  Once those names are announced,

22   then I am going to ask the remaining 12 of you to stand and to

23   exit to the jury room to begin and conduct your deliberations.

24         So, Mrs. Widener, would you now announce the names of

25   the two alternates?

1          THE CLERK:  Yes, sir.  The alternates are Juror No. 8,

2    Anthony Cancer, and Juror No. 80, Phyllis Zimmerman.

3          THE COURT:  Okay.  Other than those two alternate

4    jurors, would the remaining 12 jurors now please rise and begin

5    your jury deliberations?  Oh, I forgot to tell you.  When you

6    get into the jury room there are some screens.  That is our

7    electronic evidence system.  It's called JERS.  It is a huge TV

8    screen and then there is a smaller screen that you will use to

9    pull up whatever evidence you want to see.  We have a court

10   security officer -- I mean, not a court security officer, a DCS

11   person who will come into the jury room as you go in and will

12   show you how to use it, answer any questions and then when

13   they're finished -- is he here?

14         THE CLERK:  I'll get him up.

15         THE COURT:  Get him up.

16         So if you have any questions, once that's completed

17   then he will leave the room and then you can begin your

18   deliberations.  So I would ask you not to actually talk about

19   the case until the court computer person leaves the room and

20   you are now the 12 of you alone.  Okay.  The jury can now leave

21   for deliberations.

22       (The jury exits the courtroom at 2:52 p.m.)

23         THE COURT:  To our two alternates, it can be kind of a

24   disappointment, I know, to alternates.  You sat through a trial

25   and now the rest go off the deliberate and you don't

1    participate, but you've had an incredibly important role.  I've

2    had to use alternates and the law requires that a certain

3    number of people decide -- particularly, in a criminal case --

4    a criminal case, and so in order to ensure that we always have

5    the minimum we have to have alternates.

6         So I am going to now excuse both of you.  I will leave

7    you remaining under summons.  If something were to happen in

8    the jury room I might need to recall you.  So make sure our

9    CSOs have a number they can call you.  You'll be actually

10   formally released once the jury verdict is returned.  So while

11   you're out please do not discuss the case with anyone, post

12   anything about the case.  In the event that I have to call you

13   back I will need to make sure you can say you have not

14   discussed the case or conducted any research.

15        With that, I am going to excuse you with the sincerest

16   thanks of the Court and I wish you just a great day and

17   wonderful Thanksgiving.  Thank you.  You may leave.

18        Please remain standing for the alternates to leave.

19   (The alternate jurors exit the courtroom at 2:54 p.m.)

20        THE COURT:  You may be seated.

21        Let me know when they're clear.

22        THE COURT SECURITY OFFICER:  Your Honor, they are off

23   the floor.

24        THE COURT:  All right.  Ladies and gentlemen, stay

25   close by.  We will notify you of any message, questions or any

1    other action by the jury.

2        (A break is taken.)

3        THE COURT:  I received a question from the jury.  I am

4    going to have my law clerks pass you -- give you each the

5    question.  It is a question about the facts and a very short

6    response from me.  So I will let you see that to see if anyone

7    has any objections to my proposed short answer.  The question

8    from the jury was:  "Did minor child number one have one or two

9    iPhones?"  And you'll see my response.  While you've got that,

10   I'll read the proposed response into the record.  "Thank you

11   for your question.  I am not permitted to answer questions

12   about the facts.  Your own recollection of the evidence and

13   facts is what matters."  That's all I can say.  Any objection?

14       MR. MERZLAK:  No objection, Judge.

15       MS. LYONS:  No objection, Your Honor.

16       THE COURT:  Very well.  I'll ask that -- if you'll

17   hand that to the security officer.  Please deliver that to the

18   jury.  If we have any more information, we'll call you back.

19   Thank you.

20       MS. LYONS:  Thank you, Your Honor.

21       (A break is taken.)

22       THE COURT:  Okay.  It is my understanding that the

23   jury has reached a verdict; so I am going to ask that the jury

24   now be recalled to the courtroom.

25       (The jury enters the courtroom at 5:06 p.m.)

1       THE COURT:  Has the jury selected a foreperson?  Would

2  you please stand and identify yourself?

3       THE JUROR:  I am Tiffany Cail.

4       THE COURT:  And, Madam Foreperson, has the jury

5  reached a unanimous verdict?

6       THE FOREPERSON:  We have, Your Honor.

7       THE COURT:  Very well.  If you would pass that to the

8  security officer, please.

9       Madam Clerk, would you publish the verdict?

10      THE CLERK:  In the case of the United States of

11  America v Michael Peyton Gunn, case number CR120-14.  Count

12  one:  We, the jury, unanimously find the defendant, Michael

13  Peyton Gunn, guilty as charged in count one of the Superceding

14  Indictment.  Count two:  We, the jury, unanimously find the

15  defendant, Michael Peyton Gunn, guilty as charged in count two

16  of the Superceding Indictment.  Count three:  We, the jury,

17  unanimously find the defendant, Michael Peyton Gunn, guilty as

18  charged in count three of the Superceding Indictment.  Count

19  four:  We, the jury, unanimously find the defendant, Michael

20  Peyton Gunn, guilty as charged in count four of the Superceding

21  Indictment.  Count five:  We, the jury, unanimously find the

22  defendant, Michael Peyton Gunn, guilty as charged in count five

23  of the Superceding Indictment.  Count six:  We, the jury,

24  unanimously find the defendant, Michael Peyton Gunn, guilty as

25  charged in count six of the Superceding Indictment.  Count

1  seven:  We, the jury, unanimously find the defendant, Michael

2  Peyton Gunn, guilty as charged in count seven of the

3  Superceding Indictment.  Count eight:  We, the jury,

4  unanimously find the defendant, Michael Peyton Gunn, guilty as

5  charged in count eight of the Superceding Indictment.  Count

6  nine:  We, the jury, unanimously find the defendant, Michael

7  Peyton Gunn, guilty as charged in count nine of the Superceding

8  Indictment.  Signed Tiffany Cail, Foreperson, November 18,

9  2021.

10            THE COURT:  Thank you.  Does counsel wish to have the

11  jury polled?

12            MR. MERZLAK:  Yes, Your Honor, we would.

13            THE COURT:  Would you poll the jury, please?

14            THE CLERK:  Yes, sir.

15            Please stand when your when is called.

16            Juror No. 7, Ms. Cail.  Was the verdict as published

17  your verdict?

18            THE FOREPERSON:  Yes.

19            THE CLERK:  Is it now your verdict?

20            THE FOREPERSON:  Yes.

21            THE CLERK:  Was your verdict freely and voluntarily

22  entered by you?

23            THE FOREPERSON:  Yes.

24            THE CLERK:  Thank you.  You may be seated.

25            Juror No. 40, Ms. Johnson.  Was the verdict as

1    published your verdict?

2            THE JUROR:  Yes.

3            THE CLERK:  Is it now your verdict?

4            THE JUROR:  Yes.

5            THE CLERK:  Was this verdict freely and voluntarily

6    entered by you?

7            THE JUROR:  Yes.

8            THE CLERK:  Thank you.

9            Juror No. 71, Mr. Simpson.  Was the verdict as

10   published your verdict?

11           THE JUROR:  Yes.

12           THE CLERK:  Is it now your verdict?

13           THE JUROR:  Yes.

14           THE COURT:  Was this verdict freely and voluntarily

15   entered by you?

16           THE JUROR:  Yes.

17           THE CLERK:  Thank you.

18           Juror number 62, Mr. Price.  Was the verdict as

19   published your verdict?

20           THE JUROR:  Yes.

21           THE CLERK:  Is it now your verdict?

22           THE JUROR:  Yes.

23           THE CLERK:  Was the verdict freely and voluntarily

24   entered by you?

25           THE JUROR:  Yes.

1          THE CLERK:  Thank you.

2          Juror No. 58, Ms. Peterson.

3          THE JUROR:  Yes.

4          THE CLERK:  Was the verdict as published your verdict?

5          THE JUROR:  Yes.

6          THE CLERK:  Is it now your verdict?

7          THE JUROR:  Yes.

8          THE CLERK:  Was the verdict freely and voluntarily

9   entered by you?

10         THE JUROR:  Yes.

11         THE CLERK:  Thank you.

12         Juror No. 49, Mr. Milner.

13         THE JUROR:  Yes, ma'am.

14         THE CLERK:  Was the verdict as published your verdict?

15         THE JUROR:  Yes.

16         THE CLERK:  Is it now your verdict?

17         THE JUROR:  Yes.

18         THE CLERK:  Was the verdict freely and voluntarily

19  entered by you?

20         THE JUROR:  Yes.

21         THE CLERK:  Thank you.

22         Juror No. 77, Ms. Welter.  Was the verdict as

23  published your verdict?

24         THE JUROR:  Yes.

25         THE CLERK:  Is it now your verdict?

1            THE JUROR:  Yes.

2            THE CLERK:  Was this verdict freely and voluntarily

3   entered by you?

4            THE JUROR:  Yes.

5            THE CLERK:  Thank you.

6            Juror No. 31, Mr. Hart.  Was the verdict as published

7   your verdict?

8            THE JUROR:  Yes.

9            THE CLERK:  Is it now your verdict?

10            THE JUROR:  Yes.

11            THE CLERK:  Is this verdict freely and voluntarily

12   entered by you?

13            THE JUROR:  Yes.

14            THE CLERK:  Thank you.

15            Juror No. 52, Mr. Morris.  Was the verdict as

16   published your verdict?

17            THE JUROR:  Yes.

18            THE CLERK:  Is it now your verdict?

19            THE JUROR:  Yes.

20            THE CLERK:  Was this verdict freely and voluntarily

21   entered by you?

22            THE JUROR:  Yes.

23            THE CLERK:  Thank you.

24            Juror No. 16, Ms. Davenport.  Was the verdict as

25   published your verdict?

1           THE JUROR:  Yes.

2           THE CLERK:  Is it now your verdict?

3           THE JUROR:  Yes.

4           THE CLERK:  Was this verdict freely and voluntarily

5  entered by you?

6           THE JUROR:  Yes.

7           THE COURT:  Thank you.

8           Juror No. 57, Mr. Overstreet.  Was the verdict as

9  published your verdict?

10          THE JUROR:  Yes.

11          THE CLERK:  Is it now your verdict?

12          THE JUROR:  Yes.

13          THE CLERK:  Was this verdict freely and voluntarily

14  entered by you?

15          THE JUROR:  Yes.

16          THE CLERK:  And Juror No. 44, Mr. Lee.  Was the

17  verdict as published your verdict?

18          THE JUROR:  Yes.

19          THE CLERK:  Is it now your verdict?

20          THE JUROR:  Yes.

21          THE CLERK:  Was this verdict freely and voluntarily

22  entered by you?

23          THE JUROR:  Yes.

24          THE CLERK:  Thank you.

25          THE COURT:  Thank you.  Based upon the verdict of the

1   jury finding the defendant, Michael Peyton Gunn, guilty of

2   counts one through nine charged in the Indictment in case

3   number -- Superceding Indictment in case number CR120-14, I

4   hereby accept the verdict of the jury and I now adjudge

5   Mr. Gunn guilty of counts one through nine inclusive charged

6   therein.  Okay.

7           Ladies and gentlemen of the jury, your service has now

8   ended.  I want to thank each and every one of you for the task

9   that you have performed over the last several days.  You have

10  more than met your duty as citizens and we are very

11  appreciative.  Now I am going to ask you if you would go into

12  the jury room for just a few moments.  I am going to come into

13  the jury room.  I am going to speak to you briefly.  I am going

14  to leave everyone in the courtroom.  I won't keep you but just

15  a few minutes.  I know it's after five, but if you would go

16  into the jury room, ladies and gentlemen of the jury, I'll

17  follow you in there and I just want to address you on a couple

18  of matters.  Thank you.

19      (The jury exits the courtroom at 5:13 p.m.)

20          THE COURT:  If everyone would stay in the courtroom

21  until I return, please.

22      (A break is taken.)

23          THE COURT:  All right.  We'll finish while they're

24  leaving.

25          Mr. Gunn, Mr. Merzlak, would you rise, please?

1    Mr. Gunn, prior to me leaving the courtroom I adjudged

2 you guilty of the charges set forth in the Superceding

3 Indictment.  I now inform you that you have -- you will have 14

4 days within which to file a motion for a new trial and 14 days

5 from the date of sentencing in which to file a notice of

6 appeal.

7    Before you are sentenced for this conviction the

8 United States Probation Office will conduct what is called a

9 presentence investigation.  When that investigation is complete

10 they will file a written report.  You and your counsel and

11 counsel for the government will be provided a copy of that

12 report to review.  If there are any inaccuracies in the report

13 or any genuine issues that cannot be resolved between your

14 lawyer and you and the probation office, then I will resolve

15 those remaining objections or issues at the time of your

16 sentencing.

17    I advise you that you're entitled to the assistance of

18 counsel in taking any appeal and if you are unable to afford a

19 lawyer one will be provided for you.  In the event of an appeal

20 it will be the obligation and responsibility of your counsel to

21 continue representation on appeal unless and until an order to

22 the contrary is issued by the United States Court of Appeals

23 for the Eleventh Circuit.

24    In addition, if you are unable to pay the cost of an

25 appeal, you have a right to apply for leave to have counsel

1  appointed unless it shall be found that the appeal is not taken

2  in good faith or that you are otherwise not entitled to so

3  proceed.

4          Based upon the verdict of the jury finding you guilty

5  I hereby remand you to the custody of the United States Marshal

6  pending sentencing.  Once I receive the final report from the

7  court -- I mean from the probation office, we will conduct your

8  sentencing hearing and you will be brought back to court for

9  sentencing.

10         With those instructions, once they're clear -- are

11  they clear?

12         Have a seat.

13         THE COURT SECURITY OFFICER:  They're clear.

14         THE COURT:  All right.  The jury has cleared.  With

15  that, this concludes the trial in this case.  Thank you.

16      (The hearing is concluded.)

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF REPORTER

2

3

4

5        I, Lisa H. Davenport, Federal Official Reporter, in and

6    for the United States District Court for the Southern District

7    of Georgia, do hereby certify that pursuant to Section 753,

8    Title 28, United States Code that the foregoing is a true and

9    correct transcript of the stenographically-reported proceedings

10   held and that the transcript page format is in conformance with

11   the regulations of the Judicial Conference of the United

12   States.

13

14                         _____

15                         Lisa H Davenport, RPR, FCRR

16                         Federal Official Reporter

17

18

19

20

21

22

23

24

25